Michael D. Seplow, SBN 150183
mseplow@sshhlaw.com
Aidan C. McGlaze, SBN 277270
amcglaze@sshhlaw.com
Schonbrun Seplow Harris & Hoffman LLP
11543 W. Olympic Blvd.
Los Angeles, CA  90064
Tel: 310-396-0731
Fax: 310-399-7040

Gerard V. Mantese (MI Bar # P34424)
gmantese@manteselaw.com
David Honigman (MI Bar # P33146)
dhonigman@manteselaw.com
Kathryn Eisenstein (MI Bar #P66371)
keisenstein@manteselaw.com
(*Pro Hac Vice* applications to be filed)
Mantese Honigman, P.C.
1361 E. Big Beaver Road
Troy, MI 48083
(*Pro Hac Vice* admission pending)
Tel: 248-457-9200
Fax: (248)-457-9201

*Attorneys for Plaintiffs and Proposed Class Members.*
[*Additional counsel on following page*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| ROSEMARIE VARGAS, KISHA SKIPPER, JAZMINE SPENCER, DEILLO RICHARDS, on behalf of themselves individually, and on behalf of all others similarly situated, | Case No. 3:19-cv-5081 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| vs. | |
| FACEBOOK, INC. | |
| Defendant. | |

Wilmer Harris, SBN 150407
wharris@sshhlaw.com
Schonbrun Seplow Harris & Hoffman LLP
715 Fremont Ave., Suite A,
South Pasadena, CA 91030
Tel: 626-441-4129
Fax: 626-283-5770

Patricia A. Stamler (MI Bar #35905)
(*Pro Hac Vice* application to be filed)
pstamler@hertzschram.com
Hertz Schram PC
1760 South Telegraph Road, Ste 300
Bloomfield Hills, MI 48302
Tel: 248-335-5000
Fax: 248-335-3346

Elizabeth Thomson (MI Bar #53579)
(*Pro Hac Vice* application to be filed)
lthomson@hertzschram.com
Hertz Schram PC
1760 South Telegraph Road, Ste 300
Bloomfield Hills, MI 48302
Tel: 248-335-5000
Fax: 248-335-3346

Matthew Turchyn (MI Bar #76482)
(*Pro Hac Vice* application to be filed)
mturchyn@hertzschram.com
Hertz Schram PC
1760 South Telegraph Road, Ste 300
Bloomfield Hills, MI 48302
Tel: 248-335-5000
Fax: 248-335-3346

*Attorneys for Plaintiffs and Proposed Class Members.*

*"The American real-estate industry believed segregation to be a moral principle. As late as 1950, the National Association of Real Estate Boards' code of ethics warned that 'a Realtor should never be instrumental in introducing into a neighborhood … any race or nationality, or any individuals whose presence will clearly be detrimental to property values.' Redlining was not officially outlawed until 1968, by the Fair Housing Act."*

> —Ta-Nehisi Coates

*"Advertising works most effectively when it's in line with what people are already trying to do."*

> —Mark Zuckerberg

*"Facebook is discriminating against people based upon who they are and where they live. Using a computer to limit a person's housing choices can be just as discriminatory as slamming a door in someone's face."*

> —Ben Carson

Plaintiffs, by and through their attorneys, on behalf of themselves and all others similarly situated, hereby allege the following in support of their Complaint:

## OVERVIEW OF CASE

1.     This case arises out of Defendant Facebook's illegal discrimination in violation of the Fair Housing Act (FHA), a statute promulgated to prohibit discrimination in housing markets in the United States.   The FHA prohibits both publishers and advertisers from publishing tailored advertisements based on sex, familial status, disability, national origin, race and other protected classes.

2.     Facebook has created, implemented and/or maintained a pre-populated list of demographics, behaviors and interests that makes it possible for real estate brokers and landlords to exclude certain buyers or renters from ever seeing their ads.   This action is called "redlining" and Facebook's practice of redlining is illegal and prohibited under the FHA.

3.     Defendant Facebook, under the auspices of being a social-networking site, mines, collects, purchases, and assembles into individual profiles countless terabytes of data in multitudes of categories (hereafter "demographics data"), about Facebook's approximately two billion active monthly users worldwide.

4.     Facebook uses its demographics data to permit real estate brokers and landlords to create, publish and send ads to certain groups of Facebook users.  More importantly, Facebook also uses its demographics data to permit Facebook and its advertisers to avoid publishing, providing, or sending ads to Facebook users in certain protected classes. As alleged more fully below, Facebook created, developed, implemented, marketed, and used an advertising platform ("Ad Platform") that has created and developed advertisements for housing.  This Ad Platform allowed and/or facilitated omission of certain Facebook users based on their real or perceived personal characteristics, by purposefully and intentionally creating, developing, and/or using the "Exclude People" feature.  The Ad Platform also permits advertisers to include only certain users with perceived "favored" personal characteristics, thereby excluding users who lack the favored personal characteristics (the "Include People" feature).

5.     Facebook thus created and developed its Ad Platform with its anti-diversity Multicultural Affinity tool that Facebook and its advertisers have used to avoid publishing, providing or sending information or content to users in protected classes, while defendant published, provided, and/or sent the same information and content to other Facebook users who are not in protected classes.

6.     In 2016, ProPublica and other media outlets began reporting that Facebook's advertising platform violated fair housing laws.

7.     Throughout 2017 until about March 2018 four nonprofit organizations (NPOS) with the common mission of eliminating housing discrimination and promoting residential integration, investigated Facebook's conduct.  The NPOS created dozens of housing advertisements and completed Facebook's full ad submission and review process in New York, Washington D.C., Miami, and San Antonio. The NPOS's

investigation confirmed that Facebook provides the option for advertisers to exclude: (a) families with children; (b) women; (c) users with interests based on disability; and/or (d) users with interests based on national origin, from receiving advertisements. Once these selections are made, Facebook approves and permits advertisers to publish these ads in a discriminatory manner without Facebook users (i.e. consumers) ever knowing they have been excluded.

8.     Advertising in a discriminatory fashion is just as insidious and damaging as discrimination at the point of rental or sale. In the past, excluded groups might see a "for rent" sign or newspaper classified ad because the ads were and are located in a public forum. Now, however, the clandestine nature of Facebook's technology conceals housing ads from entire groups of protected classes of people.

9.     By way of example, by allowing an advertiser to preclude advertising to women with school-age children, Facebook excludes such families from the advertising audience, thereby denying access to that housing opportunity by making the ad invisible to this protected class of users. At the same time, Facebook's ad platform allows that same landlord's illegal efforts to maintain a segregated, adults-only rental complex.

10.     Facebook's algorithms for data collection and its Ad Platform allows exclusion and denies access to housing.

11.     By purposefully and intentionally creating, developing, and/or using both (1) the "Exclude People" feature, and (2) the "Include People" feature), Defendant knowingly and intentionally prevent ads and the information and content therein from being published, provided, or sent to users who do not match certain personal characteristics such as "African American (US)," "Asian American (US)," "Immigrant," "Hispanic US – English dominant," "Christian," "Moms," and "people ages 21 to 55 who live or were recently in the United States."

12.     Facebook, through its creation, development, implementation, promotion and marketing of its Multicultural Affinity, Exclude People, or Include People tools, permits its advertisers to select illegal preferences for its ads to Facebook users. By way

of example, as of August 16, 2019, Facebook's Ad Platform provided the following protected categories for the advertiser to exclude:

2:47 ⌐                                           ·ı||  LTE ▣

‹                    **All Parents**

🔍   Add demographics, interests or behaviors

New parents (0-12 months)                          ⊕
Parents

Parents (All)                                      ⊕
Parents

Parents with adult children (18-26 years)          ⊕
Parents

Parents with early school-age children (06-08      ⊕
years)
Parents

Parents with preschoolers (03-05 years)            ⊕
Parents

Parents with preteens (08-12 years)                ⊕
Parents

Parents with teenagers (13-18 years)               ⊕
Parents

Parents with toddlers (01-02 years)                ⊕
Parents

2:49

◀ LTE

**‹    Multicultural Affinity**

🔍  Add demographics, interests or behaviors

African American (US)
Behaviors                                    ⊕

Asian American (US)
Behaviors                                    ⊕

Hispanic (US - All)
Behaviors                                    ⊕

Hispanic (US - Bilingual)
Behaviors                                    ⊕

Hispanic (US - English dominant)
Behaviors                                    ⊕

Hispanic (US - Spanish dominant)
Behaviors                                    ⊕

2:52

LTE

**‹**        **More Categories**

🔍   transgender                          ⊗

| Disability | 191,000 | |
| Employers | people | ⊕ |

| Transgenderism | 44,800,000 | |
| Additional Interests | people | ⊕ |

| The Lesbian, Gay, Bisexual & Transgender Community Center | 3,840 | |
| Employers | people | ⊕ |

2:53

LTE

‹                    **More Categories**

🔍   sex                                          ⊗

| Disability
Employers | 191,000
people | ⊕ |

| Trader
Job Titles | 585,000
people | ⊕ |

| Human sexuality
Additional Interests | 502,000,000
people | ⊕ |

| Sex and the City
Additional Interests | 5,200,000
people | ⊕ |

| Love & Sex
Additional Interests | 1,920,000
people | ⊕ |

| Same-sex marriage
Additional Interests | 14,800,000
people | ⊕ |

| Same-sex relationship
Additional Interests | 876,000
people | ⊕ |

| Sexology
Additional Interests | 36,900,000
people | ⊕ |



13.     Facebook is responsible, in whole or in part, for the creation, development, and use of its advertising platform.

14.     Facebook's affirmative conduct in promoting its advertisers' use of its Multicultural Affinity, Exclude People, or Include People tools has resulted in the unlawful discrimination of many Facebook users in violation of the Fair Housing Act.

15.     Facebook's conduct, as further detailed herein, makes Facebook a creator or developer of the information or content in the ads that are not published, not provided, and not sent to Facebook users, based on the users' genuine or perceived protected personal characteristics.

16.     Facebook is an information content provider for the platforms, screening tools, and ads that are published, provided, and sent to Facebook users based on those users' protected personal characteristics, or the perception created by Facebook from data collected by Facebook or acquired by Facebook from other data collection firms of those users' protected personal characteristics.

17.     Despite Facebook's corporate mission statement "*to give people the power to build community and bring the world closer together*," Facebook has created and developed an Ad Platform with its anti-diversity Multicultural Affinity tool that permits Facebook and its advertisers to not publish, not provide, and not send information or content to many in Facebook's community while deciding to  publish, provide, and send the same information to other Facebook community members.

18.     Ms. Sandberg, as Facebook's COO, stated that "We believe advertisers and us   should   be   held   accountable   for   content   and   ads." https://www.nytimes.com/2018/06/28/technology/facebook-twitter-political-ads.html

19.     Facebook created a platform for its advertisers' targeting decisions as demonstrated by the excerpts from a recent Bloomberg Businessweek article titled "How Facebook   Helps   Shady   Advertisers   Pollute   the   Internet" (https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them).

20.     On March 28, 2019 The Secretary, United States Department of Housing and Urban Development, on behalf of Complainant Assistant Secretary for Fair Housing and Equal Opportunity filed a charge of discrimination against Facebook pursuant to 42 U.S.C § § 3601-19.  **Exhibit 1**, HUD Charge of Discrimination, HUD ALJ No., FHEJ No. 01-18-0323-8.

21.     As Facebook significantly increases its presence in housing advertising and the housing marketplace, it must end its discriminatory practices.[1]

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to: 28 U.S.C. § 1331, as Plaintiffs and the class they seek to represent, assert federal claims under the Fair Housing Act; 28 U.S.C. § 1343(a)(4), as Plaintiffs seek to recover damages and/or equitable relief under an Act of Congress providing for the protection of civil rights; and under 42 U.S.C. § 3613(a)(1)(A), and as Plaintiffs seek relief regarding a discriminatory housing practice prohibited by the Fair Housing Act.

23.     This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1); because Facebook's principal place of business is located in the Northern District of California and it transacts business within the state of California.

24.     Declaratory and injunctive relief is sought and authorized by 28 U.S.C. §§ 2201 and 2202.

25.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to Plaintiffs' claims occurred in the Northern District of California.

## THE PARTIES

26.     Plaintiff Rosemarie Vargas is, for all times relevant to this Complaint, a disabled female of Hispanic descent, and a single parent, with minor children residing in

---

[1]     https://www.housingwire.com/articles/46569-facebook-set-to-add-millions-of-new-real-estate-listings-as-push-into-real-estate-continues (last visited August 16, 2019).

New York City, New York.  She is a Facebook user who has used Facebook to seek housing.

27.    Plaintiff Kisha Skipper is, for all times relevant to this Complaint, a female of African American descent, and a single parent with minor children residing in Yonkers, New York.  She is a Facebook user who has used Facebook to seek housing.

28.    Plaintiff Jazmine Spencer is, for all times relevant to this Complaint, a female of both African American and Hispanic descent, and a single parent with minor children residing in New York, New York.  She is a Facebook user who has used Facebook to seek housing.

29.    Plaintiff Deillo Richards is, for all times relevant to this Complaint, a male of African American descent, who resides in Yonkers, New York.  He is a Facebook user who has used and continues to use Facebook to seek housing.

30.    Defendant Facebook, Inc. ("Facebook"), a Delaware corporation with its headquarters located in Menlo Park, California, operates a nationwide and international online social network website which allows its users to communicate with each other through written texts, photos, images and/or videos.  A component of Facebook's website is its Ad Platform Multicultural Affinity tool which has allowed advertisers to engage in illegal discriminatory preferences, based on the users' personal characteristics (e.g. race, sex, familial status, disability, etc.) or perceived personal characteristics.

## CLASS ALLEGATIONS

31.    Plaintiffs bring this class action on behalf of themselves and on behalf of all other similarly situated for the class as defined:

> All natural person Facebook users located within the United States, who are in the protected classes of race, color, sex, familial status, and/or disability/handicap or national origin, and who at any time from the earliest date actionable under the limitations period until the date of judgment in this action, and who:

///

a. used Facebook and/or Facebook's Marketplace to seek housing and due to Facebook's marketing, sourcing, advertising, branding and/or other services that facially discriminate or have a disparate impact, were excluded from receiving marketing, sourcing, advertising, branding or other information for housing, or

b. have not seen an housing-related advertisement on Facebook because the ad's buyer used the Ad Platform's "Exclude People" functionality to exclude the class member based on race, color, religion, sex, familial status, or national origin.

32. **Numerosity/Impracticability of Joinder:** The members of the Class are so numerous that joinder of all members would be impractical. The members of the class are so numerous that joinder of all members would be unfeasible and impractical. Named Plaintiffs are informed and believe, and on that basis allege that there are well over 50 persons within the Plaintiff Class. The identity of individuals qualifying for class membership is readily ascertainable via inspection of Facebook's records and other documents maintained by Defendant.

33. **Commonality and Predominance:** There are common questions of law and fact that predominate over any questions affecting only individual members of the class so that a class action is superior to other forms of action. The claims of the Named Plaintiffs are typical of those of every member of the Plaintiff Class. All the Class Members were treated in a similar fashion and suffered similar harm as a consequence of Defendant's conduct.

34. For Named Plaintiffs and the Plaintiff Class, the common legal and factual questions include, but are not limited to the following:

///

///

///

**A. Common Factual Questions:**

    1.    Whether Defendant engaged in a nationwide practice which violated the Fair Housing Act by denying protected groups access to advertising for available housing.

    2.    Whether Plaintiffs suffered injury or damage as a result of Defendant's common and nationwide practices.

**B. Common Legal Questions:**

    1.    Whether Defendant's creation of the Ad Platform violates the Fair Housing Act.

    2.    Whether Defendant's maintenance of the Ad Platform violates the Fair Housing Act.

34.    **Typicality:** The Named Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all the members of the class have been injured by the same wrongful practices of Facebook. Named Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the class and are based on the same legal theories. Named Plaintiffs will fairly and adequately represent the interests of the Plaintiff Class because Named Plaintiffs are members of the class and Named Plaintiffs do not have an interest that is contrary to or in conflict with those of the Plaintiff Class. There is a well-defined community of interest in the questions of law and fact affecting the class of persons that Named Plaintiffs represent as a whole. Each member of the Plaintiff Class was subjected to illegal practices of Defendant.

35.    **Superiority:** A class action is superior to any other form of action for the fair and efficient adjudication of this lawsuit. Individuals such as Plaintiffs have a difficult time prosecuting an individual action against Facebook, a large corporation with tremendous economic resources. Even if any class member could afford individual litigation against Defendant, it would be unduly burdensome to the court system. Individual litigation of such numerous claims magnifies the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management

difficulties and affords the benefits of unitary adjudication, economics of scale, and comprehensive supervision by a single court.  Concentrating this litigation in one forum will promote judicial economy and parity among the claims of individual class members and judicial consistency in rulings.  Notice of the pendency and any resolution of this action can be efficiently provided to class members by mail, print, broadcast, internet, and/or multimedia publication.  Requiring each class member to both establish individual liability and pursue an individual remedy would discourage the assertion of lawful claims Facebook users who would be disinclined to pursue an action against it for fear of retaliation as Facebook has the ability to bar user access.  Proof of a common business practice or factual pattern, of which the Named Plaintiffs were subjected to is representative of the alleged class and will establish the right of each of the members of the alleged class to recoveries on the claims alleged herein.

The prosecution of separate actions by individual class members, even if possible, would create: (a) a substantial risk of inconvenient or varying verdicts or adjudications with respect to the individual class members against the Defendant herein; and/or (b) legal determinations with respect to individual class members which would, as a practical matter, be dispositive of the other class members not parties to the adjudications or which would substantially impair or impede the ability of class members to protect their interests.  Further, the claims of the individual members of the class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.  Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

36.   **Adequacy:** The Named Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class and have retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Named Plaintiffs nor their attorneys have any interest contrary to or in conflict with the Class.

///

37.    The Named Plaintiffs do not anticipate any difficulty in the management of this litigation.

38.    Facebook has, or has access to, email or other contact information for the Class Members, which may be used for the purpose of providing notice of the pendency of this action.

39.    Named Plaintiffs request permission to amend the complaint to include other individuals as class representatives if any of the Named Plaintiffs are deemed not to be an adequate representative of the Plaintiff Class.   Named Plaintiffs further request permission to amend the complaint to revise the Plaintiff Class definition as appropriate after discovery.

## THE FAIR HOUSING ACT

40.    The Fair Housing Act of 1968 (the "Act") was enacted to provide "for fair housing throughout the United States." 42 U.S.C. § 3601.

41.  The Act renders it unlawful:

To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or any intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

42.    Further, the regulations applicable to the Fair Housing Act provide a definition for discriminatory notices, statements, and advertisements:

(3) selecting media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Refusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such

1    advertising because of race, color, religion, sex, handicap,

2    familial status, or national origin.

3    24 C.F.R. § 100.75(c)(3).

4    43.   Under the Act, it is unlawful to "represent to any person because of race,

5    color, religion, sex, handicap, familial status, or national origin that any dwelling is not

6    available for inspection, sale, or rental when such dwelling is in fact so available." 42

7    U.S.C. § 3604(d).

8    44.   The implementing regulations clarify that it is unlawful to "provide

9    inaccurate or untrue information about the availability of dwellings for sale or rental." 24

10   C.F.R. § 100.80(a). This includes "limiting information, by word or conduct, regarding

11   suitably priced dwellings available for inspection, sale or rental, because of race, color,

12   religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.80(b)(4).

13   45.   The Fair Housing Act renders it unlawful to:

14   [D]eny any person access to or membership or participation in

15   any multiple-listing service, real estate brokers' organization or

16   other service, organization, or facility relating to the business of

17   selling or renting dwellings, or to discriminate against him in the

18   terms or conditions of such access, membership, or participation,

19   on account of race, color, religion, sex, handicap, familial status,

20   or national origin.

21   42 U.S.C. § 3606.

22   ## RELEVANT BACKGROUND FACTS

23   **A.   Facebook, Inc.**

24   46.   Facebook, Inc. is a technology and social networking company. It owns and

25   operates the world's largest social media platform, including Facebook, Instagram,

26   Messenger, among others. Facebook also owns and develops software and technology.

27   ///

28   ///

16    CLASS ACTION COMPLAINT

47.     According to Facebook, "more than 2.7 billion people use at least one of our family of services each month." Company Info, Facebook Stats, https://newsroom.fb.com/company-info/ (last visited 8/14/19).

48.     Facebook's products and services "help people discover and learn about what is going on in the world around them, enable people to share their opinions, ideas, photos and videos, and other activities with audiences ranging from their closest friends to the public at large, and stay connected everywhere by accessing [Facebook's] products." *Facebook 2018 SEC Annual Report*, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2018-Annual-Report. pdf, p. 8 (last visited 8/14/19).

49.     Facebook collects vast amounts of data about its users, including: information and content that users provide by signing in, creating or sharing content, and messaging with others on Facebook platforms; information about people, pages, accounts, and groups that users connect with and how users interact with them; information about how users use Facebook's platform, including the types of content a user views and the duration of a user's activity on Facebook's platform; information about transactions made on the Facebook platform, including purchases; and information other users provide about a particular user through communications and interactions between users. *See* https:// www.facebook.com/policy.php (last visited 8/14/19).

50.     According to a report in Fortune magazine, "when you sign up for a Facebook account, you're required to share:  name, gender, date of birth, email or mobile number."  (Fortune.com/2018/03/21/Facebook-personaldata-cambridgeanalytics)  (last visited 8/14/19).  From there, Facebook gathers and stores additional personal data, which can be used to target ads to its users.  *Id.*  Facebook gathers and stores data about: every ad users' click on; any additional personal information added to the users' profile; every IP address used to log in to Facebook; every friend and deleted friend in users' network; and all of the users' activity (stored in Facebook's activity log).  *Id.*

///

51.     Facebook uses the data about its users to in a variety of ways. One such use is to personalize and target advertisements to its users based on users' characteristics garnered from the data Facebook collects.

### B.     Facebook's Advertising Platform

52.     In addition to its business as a technology and social networking company, Facebook is in the advertising business.

53.     In fact, Facebook generates "substantially all" of its revenue from selling advertisements. *Facebook 2018 SEC Annual Report*, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2018-Annual-Report.pdf, p. 12. In 2018, Facebook generated $55.01 billion in advertising revenue out of $55.84 billion in total revenue. *Facebook 2018 SEC Annual Report*, p. 38. In 2017, Facebook generated $39.94 billion in advertising revenue out of $40.65 billion total revenue. *Facebook 2017 SEC Annual Report*, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/FB_AR_2017_FINAL.pdf, p. 36 (last visited 8/14/19).

54.     Facebook does not merely publish advertisements for a fee on its websites and applications. Rather, Facebook is integrally involved in both the creation and publication of advertisements on its platforms.

55.     Facebook collects millions of data points about its users, draws inferences about each user based on this data, and then charges advertisers for the ability to micro target ads to users based on Facebook's inferences about them. These ads are then shown to users across the web and in mobile applications. Facebook promotes and distinguishes its advertising platform by proclaiming that "most online advertising tools have limited targeting options . . . like location, age, gender, interests and potentially a few others. . . . But Facebook is different. People on Facebook share their true identities, interests, life events and more."1[2] As Facebook explains, its advertising platform enables advertisers

---

[2]     Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).

to "[r]each people based on . . . zipcode . . . age and gender . . . specific languages . . . the interests they've shared, their activities, the Pages they've like[d] . . . [their] purchase behaviors or intents, device usage and more."[3] Thus, Facebook "use[s] location-related information-such as your current location, where you live, the places you like to go, and the businesses and people you're near to provide, personalize and improve our Products, including ads, for you and others."[4]

56.    Advertisers pay Facebook to show targeted ads to users on Facebook, among other platforms. Targeted ads are generally placed through a platform called Ads Manager.

57.    Facebook holds out its advertising platform as a powerful resource for advertisers in many industries, including housing and housing-related services. For example, Facebook promotes its advertising platform with "success stories," including stories from a housing developer, a real estate agency, a mortgage lender, a real-estate-focused marketing agency, and a search tool for rental housing.

### i.    **How Facebook's Advertising Platform Works**

#### a.    *Facebook Collects User Data*

58.    Facebook collects and extracts data about its users' demographics, interests, and behavior both on and off Facebook's platform, including the pages that a user and a user's friends like, information from a user's Facebook and Instagram profiles; a user's activities with businesses not affiliated with Facebook, including purchases and emails; a user's activity on other websites and apps; and a user's location. https://www.facebook.com/about/ads (last visited 8/14/19).

---

[3]    Facebook    Business,    *Your    Guide    to    Digital    Advertising,* www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).
[4]    Facebook    Business,    *Your    Guide    to    Digital    Advertising*, www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).

59.    Indeed, Facebook's website provides information to its users or prospective users as to how ads are targeted.

### Why you see a particular ad

Our ad system prioritizes what ad to show you based on what advertisers tell us their desired audience is, and we then match it to people who might be interested in that ad.  This means we can show you relevant and useful ads without advertisers learning who you are.  We don't sell any individual data that could identify you, like your name.

When an advertiser wants to reach…
## Bike enthusiasts

Between **18 – 35** years old
**Female**
Within **20 miles** of my store
Interested in **bicycling**
**Mobile** users

We show their ad to people like…
## Facebook user

**30** years old
**Female**
**Menlo Pak, CA**
Interested in **bicycling**, movies, cooking
**iPhone user**, car shopper, gamer

www.facebook.com/about/ads (last visited 8/14/19).

20                    CLASS ACTION COMPLAINT

60.    "We use the information we have (including your activity off our Products, such as the websites you visit and the ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services…" *Data Policy*, Facebook, https://www.facebook.com/policy.php. (last visited 8/15/19)

### b.    *Facebook Creates and Assigns Categories Using Data*

61.    Upon information and belief, Facebook evaluates, analyzes, and processes the user data to create thousands of different categories, which are based on information that users have provided to Facebook and on information that Facebook has inferred from the user's actions and behaviors. Louise Matsakis, *Facebook's Targeted Ads Are More Complex Than It Lets On*, Wired (April 25, 2018), https://www.wired.com/story/facebooks-targeted-ads-are-more-complex-than-it-lets-on/

62.    Then Facebook assigns applicable categories to each user. Julia Angwin, et al, *Facebook Doesn't Tell Users Everything It Really Knows About Them*, ProPublica, (Dec. 27, 2016),   https://www.propublica.org/article/facebook-doesnt-tell-users-everything-it-really-knows-about-them (Clarification January 24, 2017).

63.    These categories include age, ethnic affinity, sex, race, geographic location, marital status, personality type, and thousands of other interests.

### c.    *Advertisers Use Facebook's Tools to Target Their Audience*

64.    Facebook sells advertisers the ability to target advertisements to people who, according to Facebook's assessment of the data it collects, share certain personal attributes and/or are likely to respond to a particular ad. Users may disclose some data about themselves when they set up their profiles, such as name and gender. However, users disclose most of this data unwittingly through the actions they, and those associated with them, take, on and off of Facebook's platforms.

65.    Advertisers are directed to first choose their objective by answering, "what's the most important outcome I want from this ad?" *Here's How to Create a Facebook Ad*, Facebook, https://www.facebook.com/business/ads (last visited 8-15-19).

///

66.     Facebook then instructs advertisers to select their audience: "Using what you know about the people you want to reach – like age, location, and other details – choose the demographics, interests and behaviors that best represent your audience." *Here's How to Create a Facebook Ad*, Facebook, https://www.facebook.com/business/ads (last visited 8/15/19).

67.     In the ad targeting phase, Facebook provides the advertiser with a variety of tools for selecting an ad's "eligible audience." In other words, the advertiser can specify attributes that the users who will be shown the ad must have and attributes that users who will be shown the ad must not have. Second, in the ad delivery phase, Facebook selects the ad's "actual audience," meaning Facebook chooses which users will actually be shown the ad from among the pool of eligible users.

68.     During the ad targeting phase, Facebook provides an advertiser with tools to define which users, or which types of users, the advertiser would like to see an ad. Facebook has provided a toggle button that enables advertisers to exclude men or women from seeing an ad, a search-box to exclude people who do not speak a specific language from seeing an ad, and a map tool to exclude people who live in a specified area from seeing an ad by drawing a red line around that area. Facebook also provides drop-down menus and search boxes to exclude or include (i.e., limit the audience of an ad exclusively to) people who share specified attributes. Facebook has offered advertisers hundreds of thousands of attributes from which to choose, for example to exclude "women in the workforce," "moms of grade school kids," "foreigners," "Puerto Rico Islanders," or people interested in "parenting," "accessibility," "service animal," "Hijab Fashion," or "Hispanic Culture." Facebook also has offered advertisers the ability to limit the audience of an ad by selecting to include only those classified as, for example, "Christian" or "Childfree."

69.     Advertisers are offered three different Facebook tools to assist them in targeting their audience with greater degrees of specificity: Facebook Core Target

Audiences, Facebook Custom Audiences, and Lookalike Audiences. *See* https://www.facebook.com/business/ads/ad-targeting (last visited 8/15/19).

70.    These tools empower advertisers to target audiences by Facebook's pre-determined categories and enable advertisers to include or exclude certain categories from their audiences. *See* https://business.facebook.com/ads/audience-insights/people?act=1006195749575790&business_id=838507093214687&age=18-&country=US. (last visited 8/15/19)

71.    Facebook enables advertisers to exclude categories of people from viewing advertisements based on the categories Facebook has created by extracting user data and making inferences about those users.

72.    Advertisers are also permitted to draw a line around a geographic area that it wishes to include or exclude from its audience. Once an advertiser has selected its target audience, it submits its ad to Facebook for approval. Upon approval, Facebook publishes the advertisement pursuant to the advertiser's directives.

73.    During the ad delivery phase, Facebook selects from among the users eligible to see an ad which users will actually see it. Facebook bases this decision in large part on the inferences and predictions it draws about each user's likelihood to respond to an ad based on the data it has about that user, the data it has about other users whom it considers to resemble that user, and the data it has about "friends" and other associates of that user. To decide which users will see an ad, Facebook considers sex and close proxies for the other protected classes. Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.

74.    Upon information and belief, Facebook alone, not the advertiser, determines which users will constitute the "actual audience" for each ad.

75.    Facebook charges its advertisers different prices to show the same ad to different users. The price to show an ad to a given user is based, in large part, on how likely Facebook believes that user is to interact with the particular ad. To decide how an

ad will be priced for each user, Facebook considers sex and close proxies for the other protected classes. Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline. Facebook alone sets the price the advertiser will pay to have Facebook show each ad to each user. Furthermore, Facebook uses the pricing differentials it sets to determine which users will see which ads rather than allowing advertisers to make that decision. As Facebook explains, "If there are more and cheaper opportunities among men than women, then we'd automatically spend more of [an advertiser's] overall budget on the men."[5]

## C. Facebook's Discriminatory Housing Advertisements

76. Upon information and belief, Facebook has approved advertisements which exclude (or include) categories of protected classes, including sex, age, race or skin color, or geographic boundaries which effectively discriminate in a similar manner.

77. When an advertiser excludes a specific category from its audience and Facebook publishes its advertisement, Facebook ensures that the advertisement is not visible to anyone that it has characterized as belonging to that specific category.

78. Upon information and belief, as recently as 2019, Facebook mined user data to create categories of users defined by race or skin color *other than white* and permitted advertisers to exclude those categories from the audience of housing advertisements. *See* https://nationalfairhousing.org/facebook-settlement/ (last visited 8/15/19)

79. Upon information and belief, Facebook approved and published housing advertisements which excluded African Americans from the audience. *See*, *e.g.*, Julia Angwin, et al, *Facebook (Still) Letting Housing Advertisers Exclude Users By Race*, ProPublica, (November 21, 2017), https://www.propublica.org/article/facebook-advertising-discrimination-housing-race-sex-national-origin (last visited 8/15/19).

---

[5] *Facebook, Why did my cost per result go up when I increased my budget?* [https://web.archive.org/web/2016 0930124257/https://www.facebook.com/business/help pref=faq_content] (archived on Sep. 30, 2016 by The Internet Archive).

Specifically, on or about November 14, 2017, ProPublica purchased dozens of rental housing ads on Facebook and requested that these ads "not be shown to certain categories of users, such as African American, mothers of high school kids, people interested in wheelchair ramps, Jews, expats from Argentina and Spanish speakers." *Id.* "Every single ad was approved within minutes." *Id.* An additional ProPublica ad, which sought to exclude potential renters "interested in Islam, Sunni Islam and Shia Islam" took 22 minutes to approve. *Id.*

80. Upon information and belief, Facebook approved and published housing advertisements for sale and rental properties which excluded African Americans and single parents and/or that were based on sex, familial status and other protected classes from the ad's target audience.

81. Upon information and belief, Facebook continues to publish certain advertisements which exclude users based on protected classes under the Fair Housing Act. By way of example, Facebook continues to publish advertisements that exclude African Americans from a target audience for advertisements for the availability of housing.

82. Facebook's conduct results in certain audiences receiving ads about availability of housing for sale or rental, while users in certain protected classes do not receive such ads.

83. Facebook's conduct prevents Plaintiffs and the putative class from receiving advertisements for the sale or rental of available housing.

84. Facebook's conduct violates the Fair Housing Act of 1968, which prohibits the publication of advertisements which discriminate against a protected class.

85. As a direct and proximate result of Facebook's discriminatory practices described herein, Plaintiffs have suffered and will continue to suffer damages and ongoing violations of their civil rights under the Fair Housing Act.

///

///

## COUNT I – VIOLATION OF 42 U.S.C. § 3604(A)

86.   Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

87.   The housing advertised on the Facebook platforms for rent or sale are "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

88.   Facebook's extraction of user data and creation of discriminatory categories which it provides to advertisers for use in connection with advertisements published on Facebook's platforms has discriminated against and continues to discriminate against Plaintiffs and the class they seek to represent, by making unavailable or denying a dwelling to any person based on race or other protected classes 42 U.S.C. § 3604(a).

89.   Plaintiffs are "aggrieved person(s)" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

90.   As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## COUNT II – VIOLATION OF 42 U.S.C. § 3604(C)

91.   Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

92.   The housing advertised for rent or sale on Facebook's platforms constitute "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

93.   Facebook's extraction of user data and creation of discriminatory categories which it provides to advertisers for use in connection with advertisements published on Facebook's platforms has discriminated against and continues to discriminate against Plaintiffs by making, printing, publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination based on, among other things, race, or an intention to make any such preference, limitation, or discrimination. 42 U.S.C. § 3604(c).

94.    Plaintiffs and the class they seek to represent are "aggrieved person(s)" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

95.    As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## COUNT III – VIOLATION OF 42 U.S.C. § 3604(D)

96.    Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

97.    The housing advertised for rent or sale on Facebook's platforms constitute "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

98.    Facebook's extraction of user data and creation of discriminatory categories which it provides to advertisers for use in connection with advertisements published on Facebook's platforms has discriminated against and continues to discriminate against Plaintiffs and the class they seek to represent by representing to any person because of, among other things, race, that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available. 42 U.S.C. § 3604(d).

99.    Plaintiffs are "aggrieved person(s)" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and has sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

100.    As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## COUNT IV – VIOLATION OF 42 U.S.C. § 3606

101.    Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

102.    The housing advertised for rent or sale on Facebook's platforms constitute "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

103.    Facebook's extraction of user data and creation of discriminatory categories which it provides to advertisers for use in connection with advertisements published on

Facebook's platforms has discriminated against and continues to discriminate against Plaintiffs and the class they seek to represent by denying any person access to or participation in any service relating to the business of selling or renting dwellings and discriminating against Plaintiffs in the terms or conditions of such access or participation on the basis of race, among other things. 42 U.S.C. § 3606.

104.   Facebook provides a service relating to the business of selling or renting dwellings through its advertising platform and prevents Plaintiffs from participation in or access to these services.

105.   Plaintiffs are "aggrieved persons" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

106.   As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the class they seek to represent respectfully request that this Honorable Court enter judgment in their favor and grant them the following relief:

a.   Declaring that Defendant's discriminatory policies and practices violate the Fair Housing Act, 42 U.S.C. § 3601 *et seq*;

b.   Enjoining Defendant and its subsidiaries, agents, and employees from denying or withholding housing, or otherwise making housing unavailable on the basis of race, national origin or other prohibited classifications;

c.   Enjoining Defendant and its subsidiaries, agents, and employees from making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination on the basis of race, national origin or other prohibited classifications;

d.   Enjoining Defendant and its subsidiaries, agents, and employees from representing to any person because of race, national origin or other prohibited

classifications that any dwelling is not available for sale, rental, or inspection, when such dwelling is in fact so available;

e.    Enjoining Defendant and its subsidiaries, agents, and employees from denying any person access to Facebook's services relating to the business of selling or renting dwellings, and discriminating against such persons in the terms or conditions of such access or participation on the basis of race, national origin or other prohibited classifications;

f.    Actual, statutory, and punitive damages to which Plaintiffs are entitled;

g.    Reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

h.    Any other appropriate legal, equitable, and injunctive relief.


Respectfully Submitted,

Dated: August 16, 2019        **Schonbrun Seplow Harris & Hoffman LLP**

By:    */s/ Michael D. Seplow*
Michael D. Seplow
Wilmer Harris
Aidan C. McGlaze

**MANTESE HONIGMAN, P.C.**
Gerard V. Mantese
David Honigman
Kathryn Eisenstein

**HERTZ SCHRAM PC**
Patricia A. Stamler
Elizabeth Thomson
Matthew Turchyn

*Attorneys for Plaintiffs/Proposed Class Members.*

## JURY DEMAND

Plaintiffs request trial by jury on all claims.

Dated: August 16, 2019          **Schonbrun Seplow Harris & Hoffman LLP**

By:     */s/ Michael D. Seplow*
        Michael D. Seplow
        Wilmer Harris
        Aidan C. McGlaze

        **MANTESE HONIGMAN, P.C.**
        Gerard V. Mantese
        David Honigman
        Kathryn Eisenstein

        **HERTZ SCHRAM PC**
        Patricia A. Stamler
        Elizabeth Thomson
        Matthew Turchyn

        *Attorneys for Plaintiffs/Proposed Class Members.*