ROSEMARIE T. RING (State Bar No. 220769)
Rose.Ring@mto.com
MARIANNA MAO (State Bar No. 318070)
Marianna.Mao@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

Attorneys for Defendant Facebook Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| ROSEMARIE VARGAS, KISHA SKIPPER, JAZMINE SPENCER, DEILLO RICHARDS, on behalf of themselves individually, and on behalf of all others similarly situated,,<br><br>        Plaintiffs,<br><br>        vs.<br><br>FACEBOOK, INC.,<br><br>        Defendant. | Case No. 19-cv-05081<br><br>**DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>Judge:    Hon. William H. Orrick<br>Date:    July 22, 2020<br>Time:      2:00 p.m.<br>Courtroom: 2 – 17th Floor |

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................1

II.  BACKGROUND ................................................................................................4

III.  ARGUMENT ....................................................................................................6

    A.  Plaintiffs Lack Article III Standing ..........................................................6

    B.  Plaintiffs' Claims Are Barred By Section 230 of the CDA .....................8

        1.  Facebook Is an Interactive Computer Service.................................9

        2.  Plaintiffs' Claims Treat Facebook as a Publisher or Speaker ....................10

        3.  Plaintiffs' Claims Are Based on Allegedly Discriminatory Housing Ads Created by Third-Party Advertisers .......................................10

    C.  Plaintiffs Fail to State Any Claim Under the Fair Housing Act .............12

        1.  Plaintiffs Do Not Allege That Facebook Published Any Housing Ad "Indicating" An Unlawful Preference—Section 3604(c)............................13

        2.  Plaintiffs Do Not Allege Any Conduct By Facebook That Makes Housing Unavailable—Section 3604(a)........................................18

        3.  Plaintiffs Do Not Allege Any Conduct By Facebook Misrepresenting the Availability of Housing—Section 3604(d) ................21

        4.  Plaintiffs Do Not Allege Any Conduct By Facebook Denying Access to Any MLS Or Other Housing Service—Section 3606 ................22

        5.  Even Assuming Section 3604(a) and Section 3606 Apply To Facebook, Plaintiffs Do Not Allege Any Disparate Treatment Or Disparate Impact .......................................................................22

IV.  CONCLUSION .................................................................................................24

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Amazon.com, Inc. v. Comm'r of Internal Revenue*,
    934 F.3d 976 (9th Cir. 2019)................................................................16

*AT&T Corp. v. Iowa Utilities Bd.*,
    525 U.S. 366 (1999) .......................................................................17

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009)................................................................9

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003).................................................................8

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................8

*Bradley et al. v. T-Mobile, et al.*,
    No. 17-cv-07232-BLF, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ..................6, 7

*Caraccioli v. Facebook, Inc.*,
    167 F. Supp. 3d 1056 (N.D. Cal. 2016) .................................................9, 15

*Carafano v. Metrosplash.com Inc.*,
    339 F.3d 1119 (9th Cir. 2003).........................................................9, 11, 12

*Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
    519 F.3d 666 (7th Cir. 2008)..................................................................8

*Decker v. Nw. Envtl. Def. Ctr.*,
    568 U.S. 597 (2013) .......................................................................17

*Dunn v. Midwestern Indem.*, et al.,
    472 F. Supp. 1106 (S.D. Ohio 1979).........................................................20

*Dyroff v. Ultimate Software Grp., Inc.*,
    2017 WL 5665670 (N.D. Cal. Nov. 26, 2017) ..................................................9

*Edge v. City of Everett*,
    929 F.3d 657 (9th Cir. 2019)................................................................18

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008)..........................................................8, 9, 11

*Fields, et al. v. Twitter, Inc.*
    217 F. Supp. 3d 1116 (N.D. Cal. 2016) .......................................................9

**TABLE OF AUTHORITIES**
(Continued)

Page

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019) ................................................................9, 10, 11

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ......................................................8, 12

*Gonzales v. Google, Inc.*,
    282 F.Supp.3d 1150 (N.D. Cal. 2017) ................................................9, 10, 11, 12

*Guevara v. UMH Props., Inc.*,
    No. 2:11–cv–2339–SHL, 2014 WL 5488918 (W.D. Tenn. Oct. 29, 2014) ..............17

*Gwaltney of Smithfield, Inc. v. Chesapeake Bay Found., Ltd.*,
    484 U.S. 49 (1987) ..........................................................................13

*Hall Street Assocs., LLC v. Mattel, Inc.*,
    552 U.S. 576 (2008) ........................................................................22

*Hazen Paper Co. v. Biggins*,
    507 U.S. 604 (1993) ........................................................................23

*Hous. Rights Ctr. v. Donald Sterling Corp.*,
    274 F. Supp. 2d 1129 (C.D. Cal. 2003), aff'd sub nom. *Hous. Rights Ctr. v.*
    *Sterling*, 84 F. App'x 801 (9th Cir. 2003) ..................................................15

*Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*,
    943 F.2d 644 (6th Cir. 1991) ................................................................15

*Jancik v. Dep't of Hous. & Urban Dev.*,
    44 F.3d 553 (7th Cir. 1995) .................................................................15

*Jurin v. Google Inc.*,
    695 F. Supp. 2d 1117 (E.D. Cal. 2010) ......................................................12

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) .............................................................9, 11

*Klayman*,
    753 F.3d at 1357 ...........................................................................9

*La Park La Brea A LLC v. Airbnb, Inc.*,
    285 F. Supp. 3d 1097 (C.D. Cal. 2017) .....................................................11

*Laufman v. Oakley Bldg. & Loan Co.*,
    408 F. Supp. 489 (S.D. Ohio 1976) ........................................................20

**TABLE OF AUTHORITIES**
(Continued)

**Page**

*Levine v. Vilsack*,
  587 F.3d 986 (9th Cir. 2009)...................................................................................8

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ..........................................................................................6, 7

*Martinez v. Optimus Props., LLC*,
  No. 2:16-cv-08598-SVW, 2017 WL 1040743 (C.D. Cal. Mar. 14, 2017)...............17

*NAACP v. Am. Family Mut. Ins. Co.*,
  978 F.2d 287 (7th Cir.1992).................................................................................20

*Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co.*,
  208 F.Supp.2d 46 (D.D.C. 2002) .........................................................................20

*Nationwide Mut. Ins. Co. v. Cisneros*,
  52 F.3d 1351 (6th Cir. 1995)................................................................................20

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com Inc.*,
  591 F.3d 250 (4th Cir. 2009).................................................................................9

*Ojo v. Farmers Grp., Inc.*,
  600 F.3d 1205 (9th Cir. 2010), as amended (Apr. 30, 2010) .................................20

*Pennie v. Twitter, Inc., et al.*,
  281 F. Supp. 3d 874 (N.D. Cal. 2017) ........................................................9, 10, 11

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007)................................................................................8

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) .............................................................................................23

*Ragin v. New York Times Co.*,
  923 F.2d 995 (2d Cir. 1991)............................................................................15, 18

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) .......................................................................................6, 7

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Proj., Inc.*,
  135 S. Ct. 2507 (2015) .........................................................................................23

*Time, Inc. v. Hill*,
  385 U.S. 374 (1967) .............................................................................................18

*U.S. v. Beaudion*,
  416 F.3d 965 (9th Cir. 2005).................................................................................13

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*U.S. v. Hunter,*
    459 F.2d 205 (4th Cir. 1972).................................................................13

*United States v. Am. Inst. of Real Estate Appraisers of the Nat'l Ass'n of Relators,*
    442 F. Supp. 1072 (N.D. Ill. 1977) .........................................................20

*United States v. Speakman,*
    594 F.3d 1165 (10th Cir. 2010)...............................................................23

*Vill. of Bellwood v. Dwivedi,*
    895 F.2d 1521 (7th Cir. 1990).................................................................22

**FEDERAL STATUTES**

42 U.S.C. § 3604(a)............................................................................ 2, passim

42 U.S.C. § 3604(c)............................................................................ 2, passim

42 U.S.C. § 3604(d)............................................................................ 2, passim

42 U.S.C. § 3606 ...........................................................................2, 3, 12, 22

47 U.S.C. § 230(b)(1)-(2).............................................................................8

47 U.S.C. § 230(c)(1).......................................................................2, 8, 10

47 U.S.C. § 230(f)(2)....................................................................................9

Communications Decency Act.............................................................. 2, passim

Fair Housing Act ....................................................................................... 1, passim

**RULES - OTHER**

Federal Rules of Civil Procedure 12(b)(1)......................................................1

Federal Rules of Civil Procedure 12(b)(6)......................................................1

**FEDERAL REGULATIONS**

24 C.F.R. § 100.70(b)...................................................................................19

24 C.F.R. § 100.70(d)...................................................................................19

24 C.F.R. § 100.75(c)(4)...............................................................................16

24 C.F.R. § 100.80(b)(4)...............................................................................22

1

## TABLE OF AUTHORITIES
### (Continued)

2
                                                                                                    **Page**

3  Department of Housing and Urban Development, Advertising Guidelines for Fair
4      Housing, 37 Fed. Reg. 6700 (Apr. 1, 1972) .........................................................................14, 16

5  Department of Housing and Urban Development, Fair Housing Advertising
       Guidelines, 45 Fed. Reg. 57102 (Aug. 26, 1980) (codified at 24 C.F.R. pt. 109) ...............14, 16

6  Department of Housing and Urban Development, Implementation of the Fair
7      Housing Amendments Act of 1988, 54 Fed. Reg. 3232 (Jan. 23, 1989) ...........................15, 19

8  Memorandum from Roberta Achtenberg, Assistant Secretary for Fair Housing and
       Equal Opportunity, *Guidance Regarding Advertisements Under 804(c) of the*
9      *Fair Housing Act* .....................................................................................................................15

10 OTHER AUTHORITIES

11 Webster's New World College Dictionary (Agnes, et al. eds., 4th ed. 2004) ..........................14, 19

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on July 22, 2020 at 2:00 p.m., or as soon thereafter as may be heard, in Courtroom 2 on the 17th Floor of the above-entitled Court, Defendant Facebook, Inc. ("Facebook") will and hereby does move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiffs' Complaint in its entirety.

## I.    INTRODUCTION

Plaintiffs bring this action based on cases filed years ago by the National Fair Housing Alliance and the American Civil Liberties Union, among others, which were resolved through a settlement that addresses each and every alleged practice they challenge. All of Plaintiffs' claims are based on audience selection tools that third-party advertisers use to create ads for all types of products and services on Facebook's ad platform. According to Plaintiffs, because these tools permit *advertisers* to create and select eligible audiences for *housing ads* in ways they claim are discriminatory, *Facebook's* provision of these tools violates the Fair Housing Act.

But the tools are no longer available for use with housing ads. Inexplicably, Plaintiffs cite to the website of the National Fair Housing Alliance to allege and represent to this Court the tools they are challenging, but omit any reference to statements on the same website making clear that those tools would no longer exist a month later—and do not exist now—because of an "historic settlement involv[ing] sweeping changes to Facebook's paid advertising platform." In any event, Plaintiffs do not identify a single housing ad created by an advertiser using these now-defunct tools in ways they claim are discriminatory, or any basis for holding Facebook liable for any such use by advertisers under the Fair Housing Act. At bottom, Plaintiffs' claims are based on nonexistent tools and inapplicable laws, and fail on multiple independent grounds.

*First*, Plaintiffs fail to allege facts demonstrating Article III standing. Plaintiffs do not identify a single housing ad for which any advertiser excluded them from the eligible audience and that they would have been interested in and pursued, and therefore do not allege any injury in fact. Even if they could identify such an ad, Plaintiffs do not, and cannot, allege any injury that is traceable *to Facebook*, as opposed to the housing advertiser who, as Plaintiffs admit, decides whether and how to use the challenged audience selection tools.

*Second*, Plaintiffs' claims are barred by the Communications Decency Act ("CDA"). All of Plaintiffs' claims are premised on Facebook's publication of housing ads created and targeted by third-party advertisers, and therefore seek to hold Facebook liable "as the publisher or speaker" of third-party content in violation of the CDA. 47 U.S.C. § 230(c)(1). Binding Ninth Circuit authority makes clear that Facebook's provision of neutral audience selection tools does not make Facebook a creator or developer of that third-party content under the CDA.

*Third*, Plaintiffs fail to state any claim under the Fair Housing Act ("FHA"). Plaintiffs' core theory of liability is that, by publishing housing ads allegedly targeted by advertisers in discriminatory ways, Facebook violated *Section 3604(c)*, which makes it unlawful to publish a housing ad that "indicates" any preference, limitation, or discrimination based on protected characteristics. Plaintiffs further claim that, based on this alleged publishing activity, Facebook also violated other FHA provisions that prohibit, in relevant part, making housing unavailable, *Section 3604(a)*; misrepresenting the availability of housing, *Section 3604(d)*; and denying access to multiple-listing and similar housing services, *Section 3606*. No court has adopted this theory of liability, which is inconsistent with the plain text of the FHA and many decades of HUD guidance and regulations, and this Court should not be the first to do so.

*Section 3604(c)* applies to any housing ad that, on its face, indicates a discriminatory preference. The text of this provision and related HUD guidance and regulations distinguish between *advertisers* (persons placing housing ads) and *advertising media* (publishers), and make clear that only advertisers can "indicate" an unlawful preference in housing ads because only they are engaged in selling or renting housing. Advertising media can be liable for publishing such ads, but only if the unlawful preference is apparent on the face of the ads. Thus, even assuming Plaintiffs could identify housing ads that advertisers targeted in allegedly discriminatory ways, any such ads do not "indicate" any unlawful preference on their face and therefore do not support any claim against Facebook. In addition to being inconsistent with the text and applicable regulations, construing Section 3604(c) to impose liability on Facebook for publishing ads that do not indicate a discriminatory preference on their face would also create an entirely vague and unverifiable basis for liability that would violate due process and the First Amendment.

Plaintiffs' claims under *Section 3604(a)*, *Section 3604(d)*, and *Section 3606* also fail because they have no basis in the text of those provisions or related HUD regulations and analysis. *Section 3604(a)* prohibits refusing to sell, rent, or negotiate for the sale or rental of housing, and activities in connection with the provision of housing that "otherwise make unavailable or deny" housing because of protected characteristics.  Because Facebook does not rent, sell, or negotiate for the sale or rental of housing, Plaintiffs must show that Facebook's publication of housing ads that advertisers allegedly target in discriminatory ways makes housing *unavailable* to users who do not see those ads.  HUD has explained that, as applied to persons other than those engaged in the sale or rental of housing, the challenged activity must be a "prerequisite to obtaining" housing, such as the provision of mortgage loans and homeowner's insurance.  Receiving ads for housing, let alone receiving them on Facebook, is not a prerequisite to obtaining housing.  People learn about housing in countless other ways, including by contacting a broker or searching on housing websites like Zillow, Trulia, or Redfin.  And on Facebook, people can search all active housing ads in the "Housing" section of the Ad Library, regardless of whether they are Facebook users or were in the audience selected by the advertiser.[1]

Facebook prohibits discrimination on its platform, including through use of audience selection tools,[2] and has made "sweeping changes" to its platform to help prevent such misuse of those tools.  But as demonstrated below, Facebook cannot be held liable for publishing housing ads that Plaintiffs claim are discriminatory because of the way they are targeted by advertisers.  Plaintiffs' claims challenging these alleged publishing activities by Facebook are barred by the CDA and are not cognizable under the FHA because Facebook has not published any housing ad "indicating" an unlawful preference, made any housing unavailable, or misrepresented the availability of housing, and is not an MLS or similar housing service.

---

[1] *See* Declaration of Rosemarie T. Ring ("Ring Decl."), Exhibit C (Ad Library page).  Facebook's Motion to Dismiss Plaintiffs' Complaint should be granted regardless of whether the Court takes judicial notice of these materials.  But, as explained in Facebook's Request for Judicial Notice filed concurrently herewith, should the Court wish to consider these materials in resolving Facebook's Motion, such consideration is proper under Ninth Circuit law.

[2] Ring Decl., Exhibits A & B (advertising policies).

## II.    **BACKGROUND**

Plaintiffs allege that Facebook is a "technology and social networking company" that "owns and operates the world's largest social media platform."  Complaint ("Compl.") ¶ 46.  Facebook's "products and services 'help people discover and learn about what is going on in the world around them, enable people to share their opinions, ideas, photos and videos, and other activities with audiences ranging from their closest friends to the public at large,'" *id*. ¶ 48, and are used by "more than 2.7 billion people … each month," *id.* ¶ 47.  According to Plaintiffs, "[i]n addition to its business as a technology and social networking company, Facebook is in the advertising business," *id*. ¶ 52, and "generates 'substantially all' of its revenue from selling advertisements," *id*. ¶ 53.

Advertisers from "many industries" use Facebook's ad platform to create ads for all types of products and services.  *Id.* ¶ 57.  As Plaintiffs allege, these advertisers select an "eligible audience" for their ads using "a variety of tools" to "include" or "exclude" users.  *Id*. ¶ 67.  Plaintiffs allege that Facebook creates these tools using data it "collects [] about its users' demographics, interests, and behavior both on and off Facebook's platform."  *Id*. ¶ 58.  According to Plaintiffs, these tools "*enable[] advertisers*" to "exclude men or women" by "provid[ing] a toggle button" with options for All, Men, or Women; to "exclude people who do not speak a specific language" by providing "a search-box" that advertisers can use to search and select certain languages; and to "exclude people who live in a specified area" by providing a "map tool" that advertisers can use to "draw[] a red line around that area."  *Id*. ¶ 68 (emphasis added); ¶ 12.  Plaintiffs allege that Facebook also provides advertisers with "hundreds of thousands of attributes from which to choose," including "women in the workforce," "moms of grade school kids," "foreigners," "Puerto Rico Islanders," or people interested in "parenting," "accessibility," "service animals," "Hijab Fashion," or "Hispanic Culture."  *Id*. ¶ 68.  According to Plaintiffs, once advertisers select eligible audiences for their ads, "Facebook publishes the [ads] pursuant to the advertiser's directives."  *Id*. ¶ 72.

Plaintiffs do not, and cannot, allege that the challenged audience selection tools have no lawful purpose.  For example, a women's clothing designer may target ads to *include* women; a retailer having a "Back to School" sale may target ads to users who have expressed an interest in "parenting;" a Spanish-language publication may target ads to *include* users who have expressed

an interest in "Hispanic culture;" and an organization serving persons with disabilities may target ads to *include* users who have expressed an interest in "accessibility" or "service animals."  This is no different than a women's clothing designer choosing to advertise in *Vogue*; a retailer having a "Back to School" sale choosing to advertise during daytime talk shows; a Spanish-language publication choosing to advertise on Telemundo; or an organization serving persons with disabilities choosing to advertise on disability.gov.

Advertisers may also use these tools to *exclude* users in ways that are lawful and promote diversity and inclusion through "parallel advertising."  For example, an advertiser may run two ads on Facebook for the same product—one in Spanish and the other in English.  To avoid duplication, the advertiser may target the Spanish ad to users expressing an interest in the Hispanic (US-Spanish dominant) affinity and target the English ads to exclude those users because they were already targeted to see the Spanish ad.

Parallel advertising also occurs across advertising media, not just on Facebook.  For example, an advertiser may run a Spanish ad on Telemundo and an English ad on Facebook, targeting it to exclude users who have expressed an interest in Hispanic Culture, since that audience was already targeted to see the ads on Telemundo.  Similarly, a real estate agent marketing a house she believes is especially appealing to families may run ads with pictures of the backyard and playset on local parenting blogs and/or on Facebook targeting it to audiences who have expressed an interest in parenting, and run ads with pictures of the kitchen on Facebook excluding the same parenting-related options because those users have already been targeted through other ads on Facebook and other advertising media.

Plaintiffs also do not, and cannot, allege any discriminatory conduct *by Facebook*.  As Plaintiffs admit, audience selection tools are used by advertisers with ads for all types of products and services and have default settings of *all users* that only change if advertisers change them.  Indeed, the Complaint could not be clearer that any discriminatory targeting of housing ads—and Plaintiffs identify none—is done by advertisers, not Facebook.  *See e.g.*, *id.* ¶ 67 ("the *advertiser can specify* attributes that the users who will be shown the ad must have and attributes that users who will be shown the ad must not have") (emphasis added); ¶ 68 (describing how tools "*enable[]*

*advertisers*" to select audiences using a "toggle button," "search-box," "map tool," and "drop-down menus") (emphasis added); ¶ 77 ("an *advertiser* excludes a specific category from its audience") (emphasis added).  With respect to Facebook, Plaintiffs allege only that Facebook provides these neutral tools, and that, "[o]nce an advertiser has selected its target audience, [] Facebook publishes the advertisements pursuant to the advertiser's directives." *Id.* ¶ 72; *see also, e.g.*, *id.* ¶ 7 (Facebook "permits advertisers to publish these ads in a discriminatory manner"); *id.* ¶ 12 (Facebook "permits its advertisers to select illegal preferences for its ads to Facebook users"); *id.* ¶ 71 (Facebook "enables advertisers to exclude categories of people from viewing advertisements").

Plaintiffs do not identify a single housing ad targeted by advertisers in ways they claim are discriminatory.  Instead, they rely on *fake ads* created years ago by third parties, *id.* ¶¶ 6, 7, 78, 79, and "information and belief" allegations, with no factual support whatsoever, that Facebook has published and continues to publish such allegedly discriminatory housing ads.  *Id.* ¶¶ 80-81.

**III.    ARGUMENT**

    **A.    Plaintiffs Lack Article III Standing**

Plaintiffs' claims must be dismissed because they do not allege facts demonstrating Article III standing.  To establish Article III standing, Plaintiffs must "clearly … allege facts demonstrating each [of the following] element[s]": (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Plaintiffs do not allege that they suffered any harm as a result of not seeing certain housing ads on Facebook, let alone any harm that is traceable to Facebook.

*First*, Plaintiffs do not allege an injury in fact.  To show injury, a plaintiff must allege facts showing that she has "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 136 S. Ct. at 1548.  "A 'concrete' injury must be [] real'" rather than "'abstract.'"  *Id.*  For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id.*

Judge Freeman of this Court recently dismissed claims challenging audience selection tools on Facebook's ad platform because the plaintiffs failed to show any injury in fact based on allegations that are far more detailed than what Plaintiffs allege here. *See Bradley et al. v. T-Mobile, et al.*, No. 17-cv-07232-BLF, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020).  In *Bradley*, the plaintiffs alleged that the defendant advertisers used audience selection tools to "exclude older individuals from viewing the employment ads they post on Facebook." *Id.* at *1.  The *Bradley* plaintiffs generally alleged that they "were qualified to perform one or more jobs at each of the [advertisers] that was offered during the time period at issue, that they would have pursued those specific job opportunities . . . [and] that the Facebook ads for these jobs were subject to age restrictions and that, as a result, the [plaintiffs] did not receive the ads and did not learn about the jobs." *Id.* at *10 (internal quotations omitted).  They also identified a handful of real job ads that they allegedly "would have pursued" had they received the ads. *Id*.

Judge Freeman held that, to allege a basis for Article III standing, the plaintiffs had to identify specific job ads and allege that they were qualified for those jobs, that they would have pursued those jobs, that the job ads were subject to age restrictions and that, as a result of those age restrictions, the plaintiffs did not receive the ads and did not learn about the jobs. *Id.*  The "fatal failing" of the *Bradley* complaint, Judge Freeman held, was that it relied on general allegations and did "not identify—even by way of example—a single job for which these allegations are true." *Id.*

Plaintiffs do not come close to meeting this standard.  They allege only that "Facebook's conduct prevents Plaintiffs [] from receiving advertisements for the sale or rental of available housing," and that they "have suffered and will continue to suffer damages and ongoing violations of their civil rights under the Fair Housing Act."  Compl. ¶¶ 83, 85.  Plaintiffs do not identify a single *real housing ad* for which advertisers excluded from the eligible audience, or facts showing that they would have received any such ads if advertisers *had* included them—a remote possibility, given the millions of ads competing to be delivered to each of Facebook's 2.5 billion active monthly users at any given time.  Even if they could allege such facts, Plaintiffs do not allege that they would have been interested in, qualified for, and pursued any specific housing being advertised.  Plaintiffs' "bare" allegation of statutory violations does not suffice for standing. *Spokeo*, 136 S. Ct. at 1549.

1    *Second*, Plaintiffs have not alleged facts showing that any injury is traceable to Facebook.

2    To establish traceability, a plaintiff must allege facts showing that her injury results from "the

3    challenged action of the defendant," *Lujan*, 504 U.S. at 560, or, if based on third-party conduct,

4    facts showing that the defendant's actions had a "determinative or coercive effect" on the third

5    party's actions, *Bennett v. Spear*, 520 U.S. 154, 169 (1997); *Levine v. Vilsack*, 587 F.3d 986, 995

6    (9th Cir. 2009).  Plaintiffs do not do either here.

7    The Complaint could not be clearer that any harm to Plaintiffs caused by the use of

8    audience selection tools on Facebook's ad platform would be traceable only to *advertisers* who

9    used them in ways Plaintiffs claim are discriminatory, not to Facebook.  *See e.g.*, Compl. ¶ 12

10   (Facebook "permits [] *advertisers* to select illegal preferences for its ads to Facebook users")

11   (emphasis added); *id*. ¶ 2 (Facebook "makes it possible for *real estate brokers and landlords* to

12   exclude certain buyers or renters from ever seeing their ads") (emphasis added).  And, Plaintiffs

13   do not, and cannot, allege any facts showing that Facebook had a "coercive effect" on any

14   allegedly discriminatory use of the audience selection tools by advertisers.

15   **B.    Plaintiffs' Claims Are Barred By Section 230 of the CDA**

16   All of Plaintiffs' claims are based on Facebook's publication of housing ads they allege were

17   created and targeted in discriminatory ways *by advertisers*, and therefore seek to impose liability on

18   Facebook as the "publisher or speaker" of third-party content.   Under Section 230 of the

19   Communications Decency Act ("CDA"), "[n]o provider or user of an interactive computer service

20   shall be treated as the publisher or speaker of any information provided by another information

21   content provider."  47 U.S.C. § 230(c)(1).  The CDA "establish[es] broad 'federal immunity to any

22   cause of action that would make service providers liable for information originating with a third-

23   party user of the service,'" *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007),

24   including claims under the Fair Housing Act, *Fair Hous. Council of San Fernando Valley v.*

25   *Roommates.com, LLC*, 521 F.3d 1157, 1169 n.24 (9th Cir. 2008) (en banc); *Chi. Lawyers' Comm.*

26   *for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671-72 (7th Cir. 2008) (applying

27   CDA to dismiss FHA claims for publication of allegedly discriminatory housing ads).

28

Through the CDA, Congress sought to "encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *see* 47 U.S.C. § 230(b)(1)-(2). Accordingly, the "CDA has been interpreted to provide a 'robust' immunity" for "websites." *Goddard v. Google, Inc.,* 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) (quoting *Carafano v. Metrosplash.com Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)). Because the CDA is intended to protect websites "not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc)), courts routinely apply the CDA to dismiss cases on the pleadings. *See, e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, No 17-cv-05359-LB, 2017 WL 5665670 (N.D. Cal. Nov. 26, 2017) (granting motion to dismiss on CDA grounds), *aff'd*, 934 F.3d 1093 (9th Cir. 2019); *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (rejecting plaintiff's "effort to circumvent the CDA's protections through 'creative' pleading); *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150 (N.D. Cal. 2017) (same); *Fields, et al. v. Twitter, Inc.* 217 F. Supp. 3d 1116 (N.D. Cal. 2016).

CDA immunity applies when (1) the defendant is "a provider or user of an interactive computer service," (2) "whom a plaintiff seeks to treat … as a publisher or speaker," (3) "of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009). Applying this standard, courts repeatedly have held that the CDA protects Facebook from claims arising from its publication of third-party content. *See, e.g.*, *Pennie v. Twitter, Inc., et al.*, 281 F. Supp. 3d 874, 891-92 (N.D. Cal. 2017); *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065-66 (N.D. Cal. 2016); *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019). The same result is warranted here.

### 1.    Facebook Is an Interactive Computer Service

Facebook provides an interactive computer service. *See, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) ("Facebook qualifies as an interactive computer service because it is a service that provides information to 'multiple users' by giving them 'computer access … to a computer server,' 47 U.S.C. § 230(f)(2)"); *Caraccioli*, 167 F. Supp. 3d at 1065 (same).

2.    **Plaintiffs' Claims Treat Facebook as a Publisher or Speaker**

The gravamen of Plaintiffs' claims is Facebook's alleged violation of Section 3604(c), which makes it unlawful to *publish* any housing ad that indicates a discriminatory preference, and Plaintiffs' contention that such publishing activity also violates other provisions of the FHA.  In Plaintiffs' own words, "Once an advertiser has selected its target audience, [] Facebook *publishes* the advertisement pursuant to the *advertiser's directives*."  Compl. ¶ 72 (emphasis added); *see also, e.g.*, ¶ 79 (Facebook "*published* housing advertisements which excluded African Americans from the audience") (emphasis added); ¶ 81 (Facebook "continues to *publish* certain advertisements which exclude users based on protected classes) (emphasis added).  All of Plaintiffs' claims therefore seek to impose liability on Facebook for *publishing* housing ads that advertisers allegedly used audience selection tools to target in discriminatory ways.  But courts consistently have held that a website's provision of tools allowing advertisers to target ads for publication are publishing functions protected by the CDA, including with respect to Facebook.  *See, e.g.*, *Force*, 934 F.3d at 65-66 (holding that Facebook's "allow[ing] advertisers to target ads to its users who are likely most interested in those ads" is a protected publishing function under the CDA); *Pennie*, 281 F. Supp. 3d at 891 ("provision of neutral tools, including targeted advertising," is protected by the CDA); *Gonzalez*, 282 F. Supp. 3d at 1167 (same).

3.    **Plaintiffs' Claims Are Based on Allegedly Discriminatory Housing Ads Created by Third-Party Advertisers**

Plaintiffs' allegations also make clear that their claims are based on "information provided by another information content provider." 47 U.S.C. § 230(c)(1).  As Plaintiffs repeatedly allege, any discriminatory housing ads are created by advertisers, not Facebook, using audience selection tools that Plaintiffs claim "permit" or "enable" advertisers to target ads in discriminatory ways.  *See, e.g.*, Compl.  ¶ 7 (Facebook "permits *advertisers* to publish [housing ads] in a discriminatory manner") (emphasis added); ¶ 12 (Facebook "permits its *advertisers* to select illegal preferences for its ads") (emphasis added); ¶ 7 ("Facebook provides the option for *advertisers* to exclude" individuals from receiving housing ads) (emphasis added); ¶ 68 ("Facebook has provided a toggle button that enables *advertisers* to exclude men or women from seeing an ad") (emphasis added);

¶ 71 ("Facebook enables *advertisers* to exclude categories of people from viewing advertisements") (emphasis added).  To the extent Plaintiffs claim that Facebook's provision of these tools transforms it into an information content provider, that position has been flatly rejected by courts.

Plaintiffs admit, as they must, that the challenged audience selection tools were available for use by *all advertisers* creating ads for *all types of products and services*, not just housing ads, and that those tools would only have been used to create allegedly discriminatory housing if housing advertisers, not Facebook, had decided to use them in ways Plaintiffs claim are discriminatory.  *See e.g.*, *id.* ¶ 67 ("the *advertiser can specify* attributes that the users who will be shown the ad must have and attributes that users who will be shown the ad must not have") (emphasis added); ¶ 68 (describing how tools "*enable advertisers*" to select audiences using a "toggle button," "search-box," "map tool," and "drop-down menus") (emphasis added).    Accordingly, the challenged tools are exactly the type of "neutral tools" that courts have consistently held are functions protected by the CDA because they do not render a defendant who publishes third-party content a creator or developer of that content.  *See, e.g.*, *Pennie*, 281 F. Supp. 3d at 891 (Facebook's "provision of neutral tools, including targeted advertising, does not equate to content development under section 230"); *Gonzalez*, 282 F.Supp.3d at 1168–69 (same); *Force*, 934 F.3d at 65–66 (holding that Facebook's "allow[ing] advertisers to target ads to its users who are likely most interested in those ads" is a protected publisher function under CDA).   CDA immunity therefore applies "even if the users committed their misconduct using" such "tools."   *Roommates*, 521 F.3d at 1169 n.24; *see Kimzey*, 836 F.3d at 1270 (a "'neutral tool' operating on 'voluntary inputs' ... [does] not amount to content development or creation").  Indeed, such neutral tools are also protected even if they are alleged to "encourage[]," "facilitate[]" or "enable[]" third parties in engaging in unlawful conduct. *See La Park La Brea A LLC v. Airbnb, Inc.*, 285 F. Supp. 3d 1097, 1107 (C.D. Cal. 2017) (holding that website "must have done more than merely encourage[d] the creation of the challenged conduct" to lose CDA immunity).

For example, in *Carafano*, a dating website provided a "detailed questionnaire" to users that included multiple-choice questions where "members select[ed] answers ... from menus providing between four and nineteen options" in creating their profiles. 339 F.3d at 1121.  The plaintiff argued

that these menus included "sexually suggestive" phrases that facilitated the creation of a false and defamatory profile. *Id.* The Ninth Circuit held that "[d]oubtless, the questionnaire facilitated the expression of information by individual users," but the "selection of the content was left exclusively to the user." The court therefore concluded that the defendant "cannot be considered an 'information content provider'" because "no profile has any content until a user actively creates it." *Id.* at 1124.

Similarly, in *Goddard*, the plaintiff challenged Google's provision of a "Keyword Tool" that "suggest[ed] the phrase 'free ringtone'" to advertisers, claiming that "the suggestion of the word 'free,' when combined with Google's knowledge 'of the mobile content industry's unauthorized charge problems,' makes the Keyword Tool 'neither innocuous nor neutral.'" 640 F. Supp. 2d at 1197. The court rejected this argument, holding that "[l]ike the menus in *Carafano*, Google's Keyword Tool is a neutral tool. It does nothing more than provide options that advertisers may adopt or reject at their discretion." *Id.* at 1198; *see also*, *e.g.*, *Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010) (same); *Gonzalez*, 282 F. Supp. 3d at 1168 (holding that "Google's targeted ad algorithm" was protected by the CDA as a "neutral tool[]"). These same principles apply here. Facebook's provision of tools available for use with ads for *all types or products and services* does not render Facebook a "creator or developer" of housing ads based on the use of those tools by third parties to create and target such ads in ways Plaintiffs claim are discriminatory.

### C.    Plaintiffs Fail to State Any Claim Under the Fair Housing Act

Plaintiffs' core theory of liability under the Fair Housing Act is that, by publishing housing ads allegedly targeted by advertisers in discriminatory ways, Facebook violated Section 3604(c), which makes it unlawful to publish housing ads that "indicate" any preference, limitation, or discrimination based on protected characteristics. Based on this alleged publishing activity, Plaintiffs also claim that Facebook has violated other FHA provisions that prohibit, in relevant part, activities that make housing unavailable, Section 3604(a); misrepresent the availability of housing, Section 3604(d); and deny access to multiple-listing services and similar housing services, Section 3606. No court has accepted Plaintiffs' theory of liability that advertising media, like Facebook, that publish housing ads that do not "indicate" a discriminatory preference on their face are subject to liability under the FHA. This Court should not be the first to do so.

**1.**     **Plaintiffs Do Not Allege That Facebook Published Any Housing Ad "Indicating" An Unlawful Preference—Section 3604(c)**

Plaintiffs claim that Facebook's publication of housing ads that advertisers allegedly target in discriminatory ways violates Section 3604(c).  Plaintiffs also cite to two HUD regulations prohibiting "selecting media" and "refusing to publish" ads because of protected characteristics. Compl. ¶¶ 42, 44.  Plaintiffs fail to state any claim under Section 3604(c) because they have not, and cannot, allege facts showing that Facebook published any housing ad that "indicates" an unlawful preference, and neither of the regulations they cite have any applicability here.

Section 3604(c) makes it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on [protected characteristics], or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c). Plaintiffs also point to two HUD regulations identifying examples of "[d]iscriminatory… advertisements," including "[s]electing media" for advertising housing and "refusing to publish" housing ads because of [protected characteristics].  24 C.F.R. § 100.75(c)(3), (4); Compl. ¶¶ 42-43.

Advertising media, such as Facebook, are not liable under Section 3604(c) for publishing ads based on allegedly discriminatory "selections" made by advertisers because such ads do not, on their face, indicate any unlawful preference.  In other words, Plaintiffs' theory of liability, that Facebook is liable for publishing ads that housing advertisers target in discriminatory ways, is not cognizable under Section 3604(c).  This reading of Section 3604(c) is mandated by its plain text and confirmed by decades of agency action and court decisions implementing and applying this reading.

"It is well settled that 'the starting point for interpreting a statute is the language of the statute itself.'"  *U.S. v. Beaudion*, 416 F.3d 965, 968 (9th Cir. 2005) (quoting *Gwaltney of Smithfield, Inc. v. Chesapeake Bay Found., Ltd*., 484 U.S. 49, 56 (1987)) (internal citations and quotation marks omitted).  Starting with the plain text of Section 3604(c), the subject of that provision is *an ad that indicates* an unlawful preference or intention to make any such preference *with respect to the sale or rental of a dwelling*, and the *prohibited conduct* for advertising media, like Facebook, is *publishing* such ads.  *See U.S. v. Hunter*, 459 F.2d 205, 210 (4th Cir. 1972) ("landlords and brokers

'cause' advertisements to be printed or published and generally newspapers 'print' and 'publish' them"). "Indicate" means "to direct attention to; point to or point out; show." Webster's New World College Dictionary 726 (Agnes, et al. eds., 4th ed. 2004). Congress's choice of this term has important implications. *First*, one directs attention to, points to, or shows *something to someone*. *Second*, only a person who is engaged in selling or renting a dwelling can have an unlawful preference or an intention to make an unlawful preference "with respect to the sale of rental of a dwelling" so as to direct it to the attention of, point it out to, or show it to someone. *Third*, for an ad, the "someone" is the audience for that ad. The plain text of Section 3604(c) therefore makes clear that only advertisers can "indicate" an unlawful preference and that any such unlawful preference must be expressed on the face of the ad.

This reading has been confirmed, over many decades, through HUD guidance and implementing regulations. In 1972, HUD adopted "Advertising Guidelines for Fair Housing,"[3] and reissued them as regulations in 1980 as the "Fair Housing Advertising Guidelines."[4] In both sets of guidelines, HUD made clear that "advertising media" refers to media through which advertisers place ads, and that while *advertising media* are prohibited from publishing ads that "indicate" unlawful preferences, any such unlawful preferences are created through conduct by *advertisers*. Whereas HUD directed *advertisers* "to comply with the provisions of the rule" defining conduct that "indicates" unlawful preferences, *advertising media* were "provid[ed] criteria for use [] in determining whether to accept and publish" ads.[5] It also follows from this distinction that advertising media can only make the required determination where any unlawful preference is

---

[3] Department of Housing and Urban Development, Advertising Guidelines for Fair Housing, 37 Fed. Reg. 6700-04 (Apr. 1, 1972) ("1972 Guidelines").

[4] Department of Housing and Urban Development, Fair Housing Advertising Guidelines, 45 Fed. Reg. 57102 (Aug. 26, 1980) (codified at 24 C.F.R. pt. 109) ("1980 Guidelines").

[5] 1972 Guidelines, 37 Fed. Reg. at 6700-04 (stating "guidelines apply to advertisements in all *media*, including, *e.g.*, television and radio," and explaining that "selecting media" guidance applies to "selective use of advertising in various *media*) (emphasis added); 1980 Guidelines, 45 Fed. Reg. at 57106 (distinguishing "Advertising Media" from "Persons Placing Advertisements").

"indicated" on the face of an ad.  In 1988, HUD issued new regulations, including the two relied

upon by Plaintiffs here, that maintained this distinction between advertisers and advertising media,

explaining that the regulations "prohibit[] conduct related to advertisements [] *by persons engaged*

*in the sale or rental of housing* or in the [] *publishing* of *such advertisements* []."[6]  And, once again

in 1996, HUD confirmed that "a *publisher* is *not liable* under the Act for advertisements which, in

the context of the usage in a particular advertisement, might indicate a preference, limitation or

discrimination, but *where such a preference is not readily apparent to an ordinary reader*."[7]

Decades of case law applying Section 3604(c) reflect, as it must, this plain text reading of

Section 3604(c), and related HUD guidance and regulations, as prohibiting advertising media from

publishing housing ads that indicate an unlawful preference *on their face*.  "[E]very circuit that has

considered a claim under section 3604(c) has held that an objective 'ordinary reader' standard

should be applied in determining what is 'indicated' by an ad*." Jancik v. Dep't of Hous. & Urban*

*Dev.*, 44 F.3d 553, 556 (7th Cir. 1995).  As the Second Circuit explained, "[t]o be sure, the intent of

the creator of an ad may be relevant to a factual determination of the message conveyed, [] but the

touchstone is nevertheless the message."  *Ragin v. New York Times Co.*, 923 F.2d 995, 1000 (2d

Cir. 1991); *see also, e.g.*, *Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943

F.2d 644, 648 n.4 (6th Cir. 1991) (advertising media are "liable for publishing advertisements which

are discriminatory *on their face*") (emphasis added); *Hous. Rights Ctr. v. Donald Sterling Corp.*,

274 F. Supp. 2d 1129, 1138 (C.D. Cal. 2003)*, aff'd sub nom. Hous. Rights Ctr. v. Sterling*, 84 F.

App'x 801 (9th Cir. 2003).  Even if Plaintiffs could identify any housing ad that advertisers targeted

in ways they claim are discriminatory, their theory of liability that *Facebook* is liable for publishing

such ads is not cognizable under Section 3604(c).

---

[6]   Department of Housing and Urban Development, Implementation of the Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232, 3240 (Jan. 23, 1989).

[7]   Memorandum to Office Directors, Enforcement Directors, Staff, Office of Investigations, Field Assistant General Counsel, from Roberta Achtenberg, Assistant Secretary for Fair Housing and Equal Opportunity, *Guidance Regarding Advertisements Under §804(c) of the Fair Housing Act*, at 2 (Jan. 9, 1995) (emphases added), *available at* https://www.hud.gov/sites/documents/DOC_7784.PDF.

1     Plaintiffs' reliance on HUD's "refusing to publish" and "selecting media" regulations do not

2  save their claims.  "Regulations are interpreted according to the same rules as statutes, applying

3  traditional rules of construction. [] Our 'legal toolkit' includes careful examination of 'the text,

4  structure, history, and purpose of a regulation.'"  *Amazon.com, Inc. v. Comm'r of Internal Revenue*,

5  934 F.3d 976, 984 (9th Cir. 2019) (internal citations and quotation marks omitted).  The "refusing

6  to publish" regulation prohibits advertising media from "refusing to publish advertising for the sale

7  or rental of dwellings or requiring different charges or terms for such advertising because of

8  [protected characteristics]."  24 C.F.R. § 100.75(c)(4).  Plaintiffs do not allege facts showing that

9  Facebook has "refused to publish" any ad for "the sale or rental of dwellings," or requires different

10 charges or terms for advertisers placing such ads on Facebook, because of protected characteristics.

11 To the contrary, Plaintiffs allege that, "[o]nce an advertiser has selected its target audience, []

12 Facebook publishes the [ad] pursuant to the advertiser's directives."  Compl. ¶ 72.  And Plaintiffs'

13 own allegations show there is no basis for the conclusory allegation that Facebook requires

14 "different charges or terms" for housing ads because of protected characteristics, since they concede

15 that "[t]he price to show an ad to a given user is based, in large part, on how likely Facebook believes

16 that user is to interact with the particular ad."  *Id*. ¶ 75.

17     With respect to the "selecting media" regulation, the plain text shows that it applies to

18 *advertisers*, not advertising media.  Advertising media cannot "select" itself.  Advertisers select

19 advertising media.  And HUD has made clear over many decades that, to the extent "selecting

20 media" can "indicate" a preference under Section 3604(c), that is conduct engaged in by advertisers,

21 not advertising media.  HUD explained its view that an advertiser violates the FHA "whenever *the*

22 *advertiser* determines the manner for advertising because of [protected characteristics] of persons

23 who receive or do not receive a publication or where such determination has the effect of

24 discrimination because of [protected characteristics]."[8]

25     HUD also established a standard for evaluating conduct under the "selecting media"

26 regulation requiring consideration of specific housing markets and overall advertising campaigns

27

28
_____

[8] 1980 Guidelines, 45 Fed. Reg. at 57104 (emphasis added).

1   that can only be applied to advertisers: "The selective use of advertising media or content when

2   particular combinations thereof are used exclusively with respect to various housing developments

3   or sites *can lead to* discriminatory results and *may indicate* a violation of the [FHA].  For example,

4   the use of English language media *alone* or the *exclusive use of media* catering to the majority

5   population *in an area*, when, in such area, there are also available non-English language or other

6   minority media, may have discriminatory impact."[9]  Even assuming that Facebook, as advertising

7   media that is *selected* by advertisers, could be liable for *selecting* advertising media, which it cannot,

8   Facebook does not, and cannot, know what housing market is implicated by housing ads, let alone

9   whether those ads were placed exclusively on Facebook or on other advertising media as well.

10      Unsurprisingly, Facebook has only found two cases applying the "selecting media"

11   regulation and both involve advertisers.  *Martinez v. Optimus Props., LLC*, No. 2:16-cv-08598-

12   SVW, 2017 WL 1040743, at *5 (C.D. Cal. Mar. 14, 2017) (claim against advertiser); *Guevara v.*

13   *UMH Props., Inc.*, No. 2:11–cv–2339–SHL, 2014 WL 5488918, at *6 (W.D. Tenn. Oct. 29, 2014)

14   (same).  Even if the text of Section 3604(c) were broad enough to support a reading that housing

15   ads for which advertisers "select media" in discriminatory ways "indicate" an unlawful preference,

16   construing it to apply to advertising media would be inconsistent with the clear distinctions drawn

17   by Congress between advertisers and advertising media, and would therefore render the "selecting

18   media" regulation invalid.  "[R]egulations, in order to be valid, must be consistent with the statute

19   under which they are promulgated."  *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 608 (2013); *see*

20   *also AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366 (1999).

21      Such a construction would also raise serious constitutional questions under the Due Process

22   Clause and the First Amendment.  To comport with due process, a law must "give the person of

23   

_____

24   

25   [9] *Id*. at 57106 (emphasis added) (explaining that whether an advertiser's decision not to use
    advertising media for non-English speaking persons would be prohibited by the "selecting media"

26   regulation  was "a matter requiring use of judgment based on evaluation of demographic factors,
    predominant language in specific areas and interpretation of the regulation in specific

27   circumstances").

28

1    ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act

2    accordingly" and "provide explicit standards for those who apply [the law]." *Edge v. City of Everett*,

3    929 F.3d 657, 664–65 (9th Cir. 2019).  Holding Facebook liable because the audience for a housing

4    ad on Facebook does not reflect the demographic breakdown of the market in which that housing is

5    located, let alone based on decisions made by third-party advertisers regarding which advertising

6    media to use in their overall campaigns, does not satisfy this standard.  If the "selective media"

7    regulation were applied to Facebook, Facebook would have to undertake extensive investigation

8    into housing markets for all housing being advertised on its platform, as well as each advertiser's

9    overall advertising campaign, to determine whether any discriminatory impact exists.  It is an

10   understatement to say such a requirement would "chill" Facebook, and all other advertising media

11   who publish housing ads.  *Cf. Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) ("[w]e create a grave risk

12   of serious impairment of the indispensable service of a free press in a free society if we saddle the

13   press with the impossible burden of verifying to a certainty" before they publish); *Ragin*, 923 F.2d

14   at 1002, 1004 (rejecting due process and First Amendment challenges to Section 3604(c) by

15   publisher because publishers are able "to notice racial messages that are apparent to others").

### 2.    Plaintiffs Do Not Allege Any Conduct By Facebook That Makes Housing Unavailable—Section 3604(a)

18        Plaintiffs claim that, by publishing ads for housing that advertisers target in ways Plaintiffs

19   claims are discriminatory, Facebook has violated Section 3604(a) of the FHA, which makes it

20   unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate

21   for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because

22   of [protected characteristics]."  42 U.S.C. § 3604(a).  To state the obvious, Facebook does not sell,

23   rent, or negotiate the sale or rental of housing, and Plaintiffs do not, and cannot, allege otherwise.

24   Instead, Plaintiffs' theory of liability is that Facebook makes housing *unavailable* to persons who

25   do not receive ads for that housing on Facebook.  The plain text of Section 3604(a), HUD's

26   implementing regulations, and decades of case law make clear that *advertising media* is not

27   capable of making housing *unavailable* within the meaning of the FHA.

While the phrase "make unavailable or deny" has been interpreted broadly to cover practices other than purchasing or renting property, the touchstone in determining whether conduct is covered is, as it must be, whether the conduct falls within the meaning of those terms. Housing is "*unavailable*" if it cannot "be gotten, had, or reached," and it is "*denied*" by a "refus[al] to grant or give" the housing. Webster's New World College Dictionary 97, 387. Not receiving an ad for housing on Facebook, or through any other advertising media for that matter, does not mean that housing cannot "be gotten, had, or reached," or that there is any "refusal to grant" the housing.

HUD regulations and analysis also make clear that advertising media cannot make housing unavailable or deny housing within the meaning of Section 3604(a). Under the regulations, only "conduct relating to *the provision of housing* or of services and facilities *in connection therewith* … makes unavailable or denies dwellings to persons." 24 C.F.R. § 100.70(b) (emphasis added). In other words, housing is made unavailable or denied to a person through (1) *conduct* relating to *the provision of housing* or (2) the provision of *services and facilities* in connection with *the provision of housing*. With respect to (2), HUD explained that "discrimination in the provision of those services and facilities which are *prerequisites to obtaining dwellings* … render housing unavailable in violation of the Fair Housing Act."[10] HUD also provided examples of prohibited activities illustrating that, whereas (1) involves conduct by persons engaged in the sale or rental of housing so as to be in a position to affect whether and how those transactions occur, *e.g.*, refusing to show or take listings, refusing to deal with brokers or agents, denying or rejecting applications from buyers or renters because of protected characteristics, (2) involves services and facilities that are "prerequisites to obtaining" housing, *e.g.*, refusing to provide municipal services and property insurance, or providing those services in a discriminatory manner. 24 C.F.R. § 100.70(d).

---

[10] Department of Housing and Urban Development, Implementation of the Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232-01, 3240 (Jan. 23, 1989) (codified 24 C.F.R. pt. 14).

Because Plaintiffs do not, and cannot, allege that Facebook is engaged in the sale or rental of housing, their Section 3604(a) claim turns on whether Facebook provides a service that is a "prerequisite to obtaining" housing.  Applying this standard, courts have found that services like homeowner's insurance, mortgage lending, and home appraisal services are capable of making housing unavailable within the meaning of Section 3604(a).  *See e.g.*, *Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1207–08 (9th Cir. 2010), *as amended* (Apr. 30, 2010) ("Mortgage lenders require prospective borrowers to obtain homeowner's insurance, so without insurance, there may be no loan, and without a loan, there may be no home available."); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir.1992) (same because "discriminatory denials of insurance [] effectively preclude ownership of housing"); *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1359 (6th Cir. 1995) (same "in light of the direct connection of availability of property insurance and ability to purchase a house"); *Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co.*, 208 F.Supp.2d 46, 57 (D.D.C. 2002) (same because homeowner's insurance is "a prerequisite to home ownership for most people in the country"); *Dunn v. Midwestern Indem., et al.*, 472 F. Supp. 1106, 1109–10 (S.D. Ohio 1979) (same because "the availability of appropriate insurance is a necessary predicate to the availability of financing, and financial assistance is a precondition to securing the availability of adequate housing"); *Laufman v. Oakley Bldg. & Loan Co.*, 408 F. Supp. 489, 493 (S.D. Ohio 1976) (holding that mortgage lending is covered by Section 3604(a) because "[t]he cost of housing being what it is today, a denial of financial assistance in connection with a sale of a home would effectively 'make unavailable or deny' a 'dwelling'"); *United States v. Am. Inst. of Real Estate Appraisers of the Nat'l Ass'n of Relators*, 442 F. Supp. 1072, 1079 (N.D. Ill. 1977) (holding that home appraisal services are covered by Section 3604(a) because "treat[ing] race and national origin as a negative factor in determining the value of dwellings [] may effectively make unavailable or deny a dwelling") (internal quotation marks omitted).

In stark contrast to mortgage lending, homeowner's insurance, and appraisal services, being served an ad on Facebook is not a "prerequisite to obtaining" housing such that, if a person does not see a housing ad on Facebook, that housing is not available to that person to rent or buy. Indeed, a person can learn about housing without receiving *any ads at all*, let alone on Facebook, through friends, or an agent or broker, or on Zillow, Trulia, Realtor.com, Craigslist, Redfin, Apartments.com, Rent.com or countless other sources of housing information.  Moreover, receiving a housing ad is many steps removed from "obtaining" housing.  To obtain housing, a person must (1) learn about the housing, (2) be interested in the housing, (3) be qualified to buy or rent the housing, (4) apply for the housing, and (5) be accepted for the housing.  Housing ads, let alone housing ads on Facebook, are not required even for the first step in this multi-step process.

Not surprisingly, Facebook has not found a single case accepting Plaintiffs' theory of liability, which is breathtaking in its scope.  If not seeing a housing ad on Facebook means that Facebook has made housing "unavailable" or "denies" housing within the meaning of Section 3604(a), then *any* advertising media that housing advertisers do not use in their ad campaigns would be subject to FHA liability.  As explained above, Congress and HUD have been clear that advertising media are not subject to liability on this type of "selective advertising" theory, even under FHA's prohibition on discriminatory advertising.

### 3. Plaintiffs Do Not Allege Any Conduct By Facebook Misrepresenting the Availability of Housing—Section 3604(d)

Plaintiffs' claim under Section 3604(d) fails because Plaintiffs do not, and cannot, allege facts showing that Facebook misrepresented the availability of housing, let alone "suitably priced" housing, to any person for any reason.  Section 3604(d) makes it unlawful "[t]o represent to any person because of [protected characteristics] that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."  42 U.S.C. § 3604(d).  Plaintiffs also rely on a HUD regulation providing examples of "prohibited actions" under Section 3604(d), including "[l]imiting information, by word or conduct, regarding suitably priced dwellings available for

inspection, sale or rental, because of [protected characteristics]." 24 C.F.R. § 100.80(b)(4).  As advertising media, Facebook does not make any "representation" about the availability of housing that is advertised on its platform, let alone whether "suitably priced" housing is available. Facebook publishes the ads.  That is all.  As with all of the statutory provisions and regulations discussed above, Plaintiffs' attempt to apply them to advertising media, as opposed to advertisers, is not supported by their text, regulatory history, or any court decision accepting Plaintiffs' theory of liability.  Plaintiffs' § 3604(d) claim must be dismissed.

### 4. Plaintiffs Do Not Allege Any Conduct By Facebook Denying Access to Any MLS Or Other Housing Service—Section 3606

Equally far-fetched is Plaintiffs' claim under Section 3606, which makes it "unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings."  42 U.S.C. § 3606.  Facebook plainly is not a "multiple-listing service" or "real estate brokers' organization," and Plaintiffs do not, and cannot, allege otherwise. Nor does Facebook qualify as an "other service, organization, or facility."  *Id.*  Under the interpretive canon of *ejusdem generis*, "when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows."  *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008).  Plaintiffs allege that Facebook "operates the world's largest social media platform," Compl. ¶ 46, as well as an "advertising platform … for advertisers in many industries," not just housing.  *Id.* ¶ 57.  As such, Facebook is fundamentally different from a multiple-listing service or brokers' organization, which are run by brokers themselves for the sole and express purpose of selling or renting housing.  Section 3606 therefore does not apply to Facebook.

### 5. Even Assuming Section 3604(a) and Section 3606 Apply To Facebook, Plaintiffs Do Not Allege Any Disparate Treatment Or Disparate Impact

Even assuming Section 3604(a) and Section 3606 apply to Facebook, which they do not, Plaintiffs do not, and cannot, state any claim against Facebook based on either disparate treatment or disparate impact.  Disparate treatment requires "*consciousness* of [a protected characteristic], and a *purpose to use* [that protected characteristic] as a decision-making tool."  *Vill. of Bellwood v.*

1    *Dwivedi*, 895 F.2d 1521, 1529-30 (7th Cir. 1990) (emphasis added); *see also Hazen Paper Co. v.*

2    *Biggins*, 507 U.S. 604, 610 (1993) (disparate treatment requires that "the protected trait …

3    *actually motivated* the [challenged conduct]") (emphasis added); *Pers. Adm'r of Mass. v. Feeney*,

4    442 U.S. 256, 279 (1979) (FHA disparate treatment claim requires showing that defendants took

5    challenged action "because of," and not merely "in spite of," adverse housing effects).  Plaintiffs

6    allege no facts whatsoever showing that Facebook, by providing audience selection tools for use

7    by all advertisers placing ads for all types of products and services, intended those tools to be used

8    by housing advertisers in ways Plaintiffs claim are discriminatory.  Indeed, Facebook explicitly

9    prohibits advertisers from engaging in discrimination, and requires all advertisers to certify

10   compliance with Facebook's policies prohibiting discrimination, including through the use of

11   audience selection tools, and all applicable antidiscrimination laws.[11]  As Plaintiffs repeatedly

12   allege, advertisers, not Facebook, decide whether and how the tools are used.  These allegations do

13   not come close to showing any discriminatory intent by Facebook because there is none.

14          Nor do Plaintiffs state any claim based on a disparate impact theory, which requires them

15   to allege "facts at the pleading stage" consisting of "statistical evidence demonstrating a causal

16   connection" between conduct by Facebook and a disparity based on protected characteristics.  *Tex.*

17   *Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Proj., Inc.*, 135 S. Ct. 2507, 2523 (2015); *see*

18   *also id.* at 2524 (cautioning that courts must "examine with care … at the pleading stage" whether

19   a plaintiff has stated a disparate-impact claim, lest defendants face "abusive disparate-impact

20   claims" that "displace valid governmental and private priorities").  Plaintiffs do not allege any

21   statistical evidence showing disparities based on protected characteristics, let alone that result

22   from any conduct by Facebook.  *Id.* at 2523.  Even assuming advertisers used audience selection

23   tools in ways Plaintiffs claim are discriminatory, such use is a "superseding cause" of any

24   discriminatory impact that "break[s] the causal chain" between any such harm and Facebook's

25   provision of the tools.  *United States v. Speakman*, 594 F.3d 1165, 1174 (10th Cir. 2010).

26

27   _____

28   [11] Ring Decl., Exhibits A & B (advertising policies).

## IV.    <u>CONCLUSION</u>

For these reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.

DATED:  May 22, 2020                    MUNGER, TOLLES & OLSON LLP


                                        By:  _____/s/ *Rosemarie T. Ring*_____
                                              ROSEMARIE T. RING

                                        Attorneys for Defendant Facebook Inc.