Gerard V. Mantese (MI Bar # P34424)
*gmantese@manteselaw.com*
David Honigman (MI Bar # P33146)
*dhonigman@manteselaw.com*
Kathryn Eisenstein (MI Bar #P66371)
*keisenstein@manteselaw.com*
(Admitted Pro Hac Vice)
MANTESE HONIGMAN, P.C.
1361 E. Big Beaver Road
Troy, MI 48083
Tel: 248-457-9200
Fax: (248)-457-9201

*Attorneys for Plaintiffs and Proposed Class Members.*
*[Additional counsel on following page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| ROSEMARIE VARGAS, KISHA SKIPPER, JAZMINE SPENCER, DEILLO RICHARDS, JENNY LIN and JESSICA TSAI, on behalf of themselves individually, and on behalf of all others similarly situated, | Case No. 3:19-cv-05081-WHO **SECOND AMENDED CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| vs. | Judge: Hon. William H. Orrick Courtroom: 2, 17th Floor Action Filed: August 16, 2019 |
| FACEBOOK, INC. | |
| Defendant. | |

Patricia A. Stamler (MI Bar #35905)
*pstamler@hertzschram.com*
Elizabeth Thomson (MI Bar #53579)
*lthomson@hertzschram.com*
Matthew Turchyn (MI Bar #76482)
*mturchyn@hertzschram.com*
Admitted Pro Hac Vice
HERTZ SCHRAM PC
1760 South Telegraph Road, Ste 300
Bloomfield Hills, MI 48302
Tel: 248-335-5000
Fax: 248-335-3346

Michael D. Seplow, SBN 150183
*mseplow@sshhzlaw.com*
Wilmer Harris, SBN 150407
*wharris@sshhzlaw.com*
Aidan C. McGlaze, SBN 277270
*amcglaze@sshhzlaw.com*
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
11543 W. Olympic Blvd.
Los Angeles, CA  90064
Tel: 310-396-0731
Fax: 310-399-7040

*Attorneys for Plaintiffs and Proposed Class Members.*

*"**The American real-estate industry believed segregation to be a moral principle. As late as 1950, the National Association of Real Estate Boards' code of ethics warned that 'a Realtor should never be instrumental in introducing into a neighborhood … any race or nationality, or any individuals whose presence will clearly be detrimental to property values.' Redlining was not officially outlawed until 1968, by the Fair Housing Act.*"*

—Ta-Nehisi Coates

**"Advertising works most effectively when it's in line with what people are already trying to do."**

—Mark Zuckerberg

**"Facebook is discriminating against people based upon who they are and where they live. Using a computer to limit a person's housing choices can be just as discriminatory as slamming a door in someone's face."**

—Ben Carson

Plaintiffs, by and through their attorneys, on behalf of themselves and all others similarly situated, and pursuant to Fed. R. Civ. P. 15, hereby allege, on information and belief, the following in support of their Second Amended Complaint:

## OVERVIEW OF CASE

1.      This case arises out of Defendant Facebook's illegal discrimination in violation of the Fair Housing Act ("FHA"), as well as its violations of analogous state statutes in New York and California.  The FHA and the analogous state statutes were promulgated to prohibit discrimination in housing markets in the United States, and it forbids both publishers and advertisers from targeting housing advertisements based on sex, familial status, disability, national origin, race and other protected classes.

2.      At all relevant times through December 31, 2019, Facebook created, implemented and/or maintained a pre-populated list of demographics, behaviors and interests that allowed real estate brokers, real estate agents and landlords to exclude certain

buyers or renters from ever seeing their ads for housing. This exclusionary advertising is called "redlining." By enabling redlining, Facebook violated both the FHA and New York and California state statutes prohibiting such discrimination.[1] Facebook created and used its advertising platform to create and maintain a segregated marketplace for housing.

3. Facebook's illegal advertising practices were successfully challenged in a lawsuit by the National Fair Housing Alliance and others, which resulted in a settlement in which Facebook purportedly vowed to revise its advertising practices regarding housing by the end of 2019. Unfortunately, while Facebook has claimed that it is committed to changing its illegal advertising practices, Facebook has yet to offer or pay any compensation to tens of thousands of users who were subjected to its discriminatory segregated housing marketplace over a period of several years. Moreover, although Facebook has agreed to change its practices, there is no guarantee it will continue to comply in the future, which therefore warrants that Facebook be enjoined from ever again operating a segregated housing marketplace through its advertising platforms.

4. Facebook, under the auspices of providing a social-networking site, mines, collects, purchases, and assembles into individual profiles countless terabytes of data in multitudes of categories (hereafter "demographics data"), about Facebook's approximately two billion active monthly users worldwide.

5. Facebook used its demographics data to permit real estate brokers, real estate agents and landlords to create, publish, circulate, utilize, target, and/or send ads to certain groups of Facebook users. More importantly, Facebook also used its demographics data to permit Facebook and its housing advertisers to avoid publishing, providing, or sending ads to Facebook users in certain protected classes. As alleged more fully below, Facebook created, developed, implemented, marketed, and utilized an advertising platform (the "Ad Platform") that created, utilized, published, disseminated, circulated and/or targeted

---

[1] Facebook contends that it has changed the ad portals to prevent discrimination in housing as of December 31, 2019.

advertisements for housing. This Ad Platform allowed and/or facilitated the omission of certain Facebook users based on their real or perceived personal characteristics (which included several protected classes), by purposefully and intentionally creating, developing, and/or offering the "Exclude People" feature. The Ad Platform also permitted advertisers to include only certain users with certain demographic characteristics (which included several protected classes), thereby excluding users who lacked those characteristics (the "Include People" feature).

6. Thus, by way of example, Facebook created, utilized, published, circulated and developed its Ad Platform to enable advertisers to exclude men or women from seeing an ad, a search box to exclude people who do not speak a specific language from seeing an ad, and a map tool to exclude people who live in a specified area from seeing an ad by drawing a red line around that ad, among other options.

7. Facebook also created, utilized, published, circulated and developed the Multicultural Affinity groups for use on its Ad Platform. The Multicultural Affinity groups were made up of people whose activities on Facebook suggest they may be interested in ads related to African American, Hispanic American, or Asian American communities, for example. Facebook allowed advertisers to promote or market a community or home for sale or rent to select 'ethic affinity' groups as part of their advertising campaigns.

8. Facebook created, utilized, published, circulated and developed its Ad Platform with its illegal discriminatory Multicultural Affinity tool that Facebook and its advertisers used to steer advertisements, information and content away from users in protected classes, while Facebook published, provided, disseminated and/or circulated the same advertisements, information and content to other Facebook users who were not in protected classes. Facebook's conduct resulted in a segregated marketplace for housing.

9. In 2016, *ProPublica* and other media outlets began reporting that Facebook's advertising platform violated fair housing laws.

10.     Throughout 2017 until about March 2018, four nonprofit organizations (NPOS) with the common mission of eliminating housing discrimination and promoting residential integration, investigated Facebook's conduct.  The NPOS created dozens of housing advertisements and completed Facebook's full ad submission and review process in New York, Washington D.C., Miami, and San Antonio.

11.     The NPOS's investigation confirmed that Facebook provided the option for housing advertisers to exclude the following categories of Facebook users from receiving advertisements:

(a) families with children; (b) women; (c) users with interests based on disability; and/or (d) users with interests based on national origin.

Once the broker, realtor or landlord used Facebook's advertising dropdown menu to select the target audience for the ad, Facebook approved, published, circulated, utilized, disseminated and/or targeted these housing ads in a discriminatory manner without Facebook users (i.e. consumers) ever knowing they were excluded from the marketplace.

12.     Advertising in a discriminatory fashion is just as insidious and damaging as discrimination at the point of rental or sale.  In the past, excluded groups might see a "for rent" sign or newspaper classified ad because the ads were and are located, in a public forum.  Contrarywise, the clandestine nature of Facebook's technology and targeting practices concealed housing ads from entire groups of protected classes of people thereby creating a segregated marketplace.

13.     By way of example, Facebook's Ad Platform, which allowed a housing advertiser to preclude advertising to women with school-age children, could and did result in the exclusion of such families from the advertising audience for certain properties, thereby denying them equal access to those housing opportunities.  At the same time, the Ad Platform facilitated certain discriminatory sellers and/or landlords' illegal efforts to maintain segregated, adults-only complexes and/or neighborhoods.

14.     Facebook's algorithms for data collection and its Ad Platform excluded protected classes of individuals and thereby denied them equal access to the housing marketplace.

15.     By purposefully and intentionally creating, developing, and/or using both (1) the "Exclude People" feature, and (2) the "Include People" feature, Facebook knowingly and intentionally prevented ads and the information and content therein from being published, provided, circulated or sent to users who did not match certain protected class characteristics such as "African American (US)," "Asian American (US)," "Immigrant," "Hispanic US – English dominant," "Christian," "Moms," and "people ages 21 to 55 who live or were recently in the United States."

16.     Facebook, through its creation, utilization, development, implementation, promotion, targeting and/or marketing of its Multicultural Affinity, Exclude People, or Include People tools, permitted its housing advertisers to select illegal preferences for its ads to Facebook users.  By way of example, as of August 16, 2019, Facebook's Ad Platform provided the following protected categories for the advertiser to exclude:

SECOND AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2:49 📶 LTE 🔋

‹ **Multicultural Affinity**

🔍 Add demographics, interests or behaviors

African American (US)
Behaviors ⊕

Asian American (US)
Behaviors ⊕

Hispanic (US - All)
Behaviors ⊕

Hispanic (US - Bilingual)
Behaviors ⊕

Hispanic (US - English dominant)
Behaviors ⊕

Hispanic (US - Spanish dominant)
Behaviors ⊕

2:52 📶 LTE 🔋

‹ **More Categories**

🔍 transgender ⊗

Disability
Employers                191,000 people ⊕

Transgenderism
Additional Interests     44,800,000 people ⊕

The Lesbian, Gay, Bisexual & Transgender
Community Center         3,840 people ⊕
Employers

17. Facebook is responsible, in whole or in part, for the creation, publication, dissemination, circulation, utilization and/or targeting of its advertising platform for housing.

18. Facebook's affirmative conduct in creating, maintaining and promoting its housing advertisers' use of its Multicultural Affinity, Exclude People, or Include People tools resulted in the unlawful discrimination of many Facebook users in violation of the Fair Housing Act, and analogous New York and California statutes.

19. Facebook's conduct, as further detailed above and below, made Facebook a creator or developer of the information or content in the ads that are not published, not provided, not circulated and not sent to Facebook users, based on the users' genuine or perceived protected class characteristics.

20.     Facebook is an information content provider for the advertising platforms, screening tools, and ads that were published, provided, circulated, targeted, utilized, disseminated and/or sent to Facebook users based on those users' actual or perceived protected class characteristics, created by Facebook from data collected by Facebook or acquired by Facebook from other data collection firms of those users' actual or perceived protected class characteristics.

21.     Despite Facebook's corporate mission statement "*to give people the power to build community and bring the world closer together,*" https://investor.fb.com/resources/default.aspx#:~:text=Founded%20in%202004%2C%20Facebook's%20mission,express%20what%20matters%20to%20them, Facebook created and developed an Ad Platform with its discriminatory Multicultural Affinity tool that permitted Facebook and its advertisers to not publish, not provide, not circulate and not send information or content to individuals in protected classes in Facebook's community while deciding to publish, provide, circulate, utilize, target and/or send the same information to other Facebook community members outside of the protected classes.

22.     Sheryl Sandberg, as Facebook's COO, admitted that "We believe advertisers and us [Facebook] should be held accountable for content and ads." https://www.nytimes.com/2018/06/28/technology/facebook-twitter-political-ads.html

23.     Facebook created a platform for its advertisers' targeting decisions as demonstrated by the excerpts from a *Bloomberg Businessweek* article titled "How Facebook Helps Shady Advertisers Pollute the Internet" (https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them).

24.     On March 28, 2019 The Secretary, United States Department of Housing and Urban Development, on behalf of the Complainant Assistant Secretary for Fair Housing and Equal Opportunity filed a charge of discrimination against Facebook pursuant to 42 U.S.C § § 3601-19 alleging, *inter alia*, Facebook's advertising platform violated the FHA. **Exhibit 1**, HUD Charge of Discrimination, HUD ALJ No., FHEJ No. 01-18-0323-8.

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiffs and the class they seek to represent assert federal claims under the Fair Housing Act; 28 U.S.C. § 1343(a)(4), as Plaintiffs seek to recover damages and/or equitable relief under an Act of Congress providing for the protection of civil rights; and under 42 U.S.C. § 3613(a)(1)(A), and as Plaintiffs seek damages and/or equitable relief regarding a discriminatory housing practice prohibited by the Fair Housing Act. This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367(a).

26. This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1), because Facebook's principal place of business is located in the Northern District of California and it transacts business within the state of California.

27. Declaratory and injunctive relief is sought under and authorized by 28 U.S.C. §§ 2201 and 2202.

28. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to Plaintiffs' claims occurred in the Northern District of California.

## THE PARTIES

29. Plaintiff Rosemarie Vargas is, for all times relevant to this Complaint, a disabled female of Hispanic descent, and a single parent with minor children, residing in New York City, New York. She is a Facebook user who used Facebook during the relevant time period to seek housing.

30. Plaintiff Vargas searched for housing periodically on Facebook during the relevant period. She would filter her search for housing on the Facebook marketplace by location and cost.

31. However, because Facebook created a platform which provided tools to exclude women of color, single parents and other protected attributes, Ms. Vargas and others similarly situated were prevented by Facebook from having the same opportunity to view ads for housing that other Facebook users who did not share the same characteristics were shown.

32.    Plaintiff Vargas filtered her search for housing on the Facebook marketplace using the same parameters that her white male friend used but she obtained fewer results than her white male friend.

33.    Moreover, when Plaintiff Vargas included her use of a Section 8 voucher and her status as a veteran in her search, she obtained no results.

34.    Plaintiff Kisha Skipper is, for all times relevant to this Complaint, a female of African American descent, and a single parent with minor children, residing in Yonkers, New York.  She is a Facebook user who used Facebook during the relevant time period to seek housing.

35.    Plaintiff Jazmine Spencer is, for all times relevant to this Complaint, a female of both African American and Hispanic descent, and a single parent with minor children, residing in New York, New York.  She is a Facebook user who used Facebook during the relevant time period to seek housing.

36.    Plaintiff Deillo Richards is, for all times relevant to this Complaint, a male of African American descent, who resides in Yonkers, New York.  He is a Facebook user who used and continues to use Facebook during the relevant time period to seek housing.

37.    Plaintiff Jenny Lin is, for all times relevant to this Complaint, a female of Asian American descent, residing in California. She is a Facebook user who used Facebook during the relevant time period to seek housing.

38.    Plaintiff Jessica Tsai is, for all times relevant to this Complaint, a female of Asian American descent, residing in California.  She is a Facebook user who used Facebook during the relevant time period to seek housing.

39.    Defendant Facebook, Inc. ("Facebook"), a Delaware corporation with its headquarters located in Menlo Park, California, operates a nationwide and international online advertising system and social network website which allows its users to communicate with each other through written texts, photos, images and/or videos.

///

///

# CLASS ALLEGATIONS

40.    Plaintiffs bring this class action on behalf of themselves and on behalf of others similarly situated, under Fed. R. Civ. P. 23(a) and (b)(2), seeking equitable and injunctive relief, and under Fed. R. Civ. P. 23(a) and (b)(3) seeking damages on behalf of the following class (the "Nationwide Class"):

> All natural persons located within the United States, who are in the protected classes of race, color, sex, familial status, disability/handicap and/or national origin who had a Facebook account during the relevant period and who were looking for housing using Facebook.

41.    Plaintiffs bring this class action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the California Unruh Act, Cal. Civil Code §§ 51, 52(a), on behalf of the following Subclass (the "California Damages Subclass"):

> All natural persons located within the California, who are in the protected classes of sex, race, color, religion, ancestry, national origin, age, disability, medical condition, genetic information, marital status, or sexual orientation, who had a Facebook account during the relevant period and who were looking for housing using Facebook.

42.    Plaintiffs bring this class action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the New York Rights Law, N.Y. Exec. L. § 290 *et seq.*, on behalf of the following Subclass (the "New York Damages Subclass"):

> All natural persons residing in New York, who are in the protected classes of age, race, creed, color, national origin, sexual orientation, military status, sex, marital status or disability, who had a Facebook account during the relevant period and who were looking for housing using Facebook.

43.    **Numerosity/Impracticability of Joinder:** The members of the Class and Subclasses are so numerous that joinder of all members would be unfeasible and

impractical. Named Plaintiffs are informed and believe, and on that basis allege, that there are many thousands of persons within the Plaintiff Class and within each Subclass. The identity of individuals qualifying for class membership is readily ascertainable via inspection of Facebook's records and other documents maintained by Facebook or by other methods, including by Facebook users' self-identification.

44. **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class and Subclasses. Defendant's discriminatory policies and practices were generally applicable to all members of the Class and Subclasses, thereby making a class action superior to other forms of action. Such common questions of law and fact include, but are not limited to:

**A.** **Common Factual Questions:**

1. Are the Plaintiffs and the Class they seek to represent "aggrieved person(s)" as defined by the FHA, 42 U.S. C. § 3602(i);

2. Are the Plaintiffs and the Class they seek to represent members of protected classes as defined by the FHA, 42 U.S.C. § 3604;

3. Are the New York Plaintiffs and the Subclass they seek to represent members of protected classes as defined by the New York Human Rights Law, N.Y. Exec. L. § 290 *et seq.*;

4. Are the California Plaintiffs and the Subclass they seek to represent members of protected classes as defined by the California Unruh Act, Cal. Civil Code §§ 51.5, 52(a); and

5. Whether Plaintiffs suffered injury or damage as a result of Defendant's common and nationwide housing advertising practices.

**B.** **Common Legal Questions:**

1. Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated the FHA as alleged in the First, Second, Third and Fourth Counts;

2. Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated the New York Human Rights Law, N.Y. Exec. L. § 290 *et seq.*, as alleged in the Fifth Count;

3. Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated the California Unruh Act, Cal. Civil Code §§ 51.5, 52(a), as alleged in the Sixth Count;

4. Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated Cal. Civil Code §§ 51.5, 52(a) by engaging in blacklisting and discrimination in as alleged in the Seventh Count;

5. Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated California's Unfair Competition Law, Business and Professions Code section 17200 et seq., by engaging in unfair, unlawful, and fraudulent activity as alleged in the Eighth Count;

6. The appropriate injunctive and related equitable relief for the Nationwide Class;

7. The appropriate class-wide measure of damages for the Nationwide Class;

8. The appropriate measure of damages for the New York Subclass.

9. The appropriate measure of damages for the California Subclass.

45. **Typicality:** The Named Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses. Plaintiffs and all the members of the Class and Subclasses have been injured by the same wrongful practices of Facebook. Named Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and Subclasses and are based on the same legal

theories. Named Plaintiffs will fairly and adequately represent the interests of the Class and Subclasses because Named Plaintiffs are members of the Class and Subclasses, and because Named Plaintiffs do not have any interest that is contrary to or in conflict with those of the Plaintiff Class and Subclasses. There is a well-defined community of interest in the questions of law and fact affecting the Class of persons that Named Plaintiffs represent as a whole. Each member of the Class and Subclasses was subjected to Facebook's illegal practices.

46. **Superiority:** A class action is superior to any other form of action for the fair and efficient adjudication of this lawsuit. Individuals such as Plaintiffs have a difficult time prosecuting an individual action against Facebook, a large corporation with tremendous economic resources. Even if any class member could afford individual litigation against Defendant, it would be unduly burdensome to the court system. Individual litigation of such numerous claims magnifies the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and affords the benefits of unitary adjudication, economics of scale, and comprehensive supervision by a single court. Concentrating this litigation in one forum will promote judicial economy and parity among the claims of individual class members and judicial consistency in rulings. Notice of the pendency and any resolution of this action can be efficiently provided to class members by mail, print, broadcast, internet, and/or multimedia publication. Requiring each class member to both establish individual liability and pursue an individual remedy would discourage the assertion of lawful claims Facebook users who would be disinclined to pursue an action against it for fear of retaliation as Facebook has the ability to bar user access. Proof of a common business practice or factual pattern, which the Named Plaintiffs were subjected to, is representative of the business practice or factual pattern to which the alleged Class was subjected to and will establish the right of each of the members of the alleged Class to recoveries on the claims alleged herein. The prosecution of separate actions by individual class members, even if possible, would create: (a) a substantial risk of inconvenient or varying verdicts or

adjudications with respect to the individual class members against the Defendant herein; and/or (b) legal determinations with respect to individual class members which would, as a practical matter, be dispositive of the other class members not parties to the adjudications or which would substantially impair or impede the ability of class members to protect their interests. Further, the claims of the individual members of the class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

47. **Adequacy:** The Named Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class and Subclasses and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Named Plaintiffs nor their attorneys have any interest contrary to or in conflict with the Class.

48. The Named Plaintiffs do not anticipate any difficulty in the management of this litigation.

49. Facebook has, or has access to, email or other contact information for the individual members of the Class, which may be used for the purpose of providing notice of the pendency of this action.

50. Named Plaintiffs request permission to amend the complaint to include other individuals as class representatives if any of the Named Plaintiffs are deemed not to be an adequate representative of the Plaintiff Class. Named Plaintiffs further request permission to amend the complaint to revise the Plaintiff Class definition as appropriate after discovery.

## THE FAIR HOUSING ACT

51. The Fair Housing Act of 1968 ("FHA") was enacted to provide "for fair housing throughout the United States." 42 U.S.C. § 3601.

52. The FHA renders it unlawful:

To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or any intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

53. Further, the regulations applicable to the FHA provide a definition for discriminatory notices, statements, and advertisements:

(3) selecting media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Refusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.75(c)(3).

54. Under the FHA, it is unlawful to "represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d).

55. The FHA's implementing regulations clarify that it is unlawful to "provide inaccurate or untrue information about the availability of dwellings for sale or rental." 24 C.F.R. § 100.80(a). This includes "limiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.80(b)(4).

56. The FHA renders it unlawful to:

[D]eny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other

SECOND AMENDED CLASS ACTION COMPLAINT

service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3606.

**RELEVANT BACKGROUND FACTS**

**A.   FACEBOOK, INC.**

57.    Facebook, Inc. is a technology and social networking company. It serves as an advertiser for numerous businesses including relators, real estate agents and landlords. It owns and operates the world's largest social media platform, including Facebook, Instagram, Messenger, among others. Facebook also owns and develops software and technology.

58.    According to Facebook, "more than 2.7 billion people use at least one of our family of services each month." Company Info, Facebook Stats, https://newsroom.fb.com/company-info/ (last visited 8/14/19).

59.    Facebook's products and services "help people discover and learn about what is going on in the world around them, enable people to share their opinions, ideas, photos and videos, and other activities with audiences ranging from their closest friends to the public at large, and stay connected everywhere by accessing [Facebook's] products." *Facebook 2018 SEC Annual Report*, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2018-Annual-Report. pdf, p. 8 (last visited 8/14/19).

60.    Facebook collects vast amounts of data about its users, including: information and content that users provide by creating a Facebook account, signing in, creating or sharing content, and messaging with others on Facebook platforms; information about people, pages, accounts, and groups that users connect with and how users interact with them; information about how users use Facebook's platform, including the types of content a user views and the duration of a user's activity on Facebook's

platform; information about transactions made on the Facebook platform, including purchases; and information other users provide about a particular user through communications and interactions between users. *See* https://www.facebook.com/policy.php (last visited 8/14/19).

61. According to a report in *Fortune* magazine, "*when you sign up for a Facebook account, you're required to share: name, gender, date of birth, email or mobile number.*" (Fortune.com/2018/03/21/Facebook-personaldata-cambridgeanalytics) (last visited 8/14/19) (emphasis added). From there, Facebook gathers and stores additional personal data, which can be used to target ads to its users. *Id.* Facebook gathers and stores data about: every ad users' click on; any additional personal information added to the users' profile; every IP address used to log in to Facebook; every friend and deleted friend in users' network; and all of the users' activity (stored in Facebook's activity log). *Id.*

62. Facebook uses the data about its users in a variety of ways. One such use is to personalize and target advertisements to its users based on users' characteristics, including protected classes, garnered from the data Facebook collects.

## B. FACEBOOK'S ADVERTISING PLATFORM

63. In addition to its business as a technology and social networking company, Facebook is in the advertising business. In fact, Facebook generates "substantially all" of its revenue from selling advertisements. *Facebook 2018 SEC Annual Report*, https://s21.q4cdn.com /399680738/files/doc_financials/annual_reports/2018-Annual-Report.pdf, p. 12. In 2018, Facebook generated $55.01 billion in advertising revenue out of $55.84 billion in total revenue. *Facebook 2018 SEC Annual Report*, p. 38. In 2017, Facebook generated $39.94 billion in advertising revenue out of $40.65 billion total revenue. *Facebook 2017 SEC Annual Report*, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/ FB_AR_2017_FINAL.pdf, p. 36 (last visited 8/14/19). In **2019**, **Facebook's revenue** amounted to 70.7 billion US dollars, up from 55.8 billion U.S. dollars in the previous fiscal year.

The social network's main source of income is digital advertising. https://www.statista.com/statistics/268604/annual-revenue-of-facebook/#:~:text=In%202019%2C%20Facebook's%20revenue%20amounted,of%20income%20is%20digital%20advertising. (last visited 6-29-2020)

64.     Facebook does not merely publish advertisements for a fee on its websites and applications. Rather, Facebook is integrally involved in both the creation, utilization, publication, dissemination, circulation and/or targeting of advertisements on its platforms.

65.     Facebook collects millions of data points about its users, draws inferences about each user based on this data, and then charges advertisers for the ability to micro target ads to users based on Facebook's inferences about them. Facebook then publishes, circulates, utilizes, and/or disseminates ads to users across the web and in mobile applications in a targeted fashion. Facebook promotes and distinguishes its advertising platform by proclaiming that "most online advertising tools have limited targeting options . . . like location, age, gender, interests and potentially a few others. . . But Facebook is different. People on Facebook share their true identities, interests, life events and more."[2] As Facebook explains, its advertising platform enables advertisers to "[r]each people based on . . . zip code . . . age and gender . . . specific languages . . . the interests they've

_____

[2]     Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).

SECOND AMENDED CLASS ACTION COMPLAINT

shared, their activities, the Pages they've like[d] . . . [their] purchase behaviors or intents, device usage and more."[3] Thus, Facebook "use[s] location-related information-such as your current location, where you live, the places you like to go, and the businesses and people you're near to provide, personalize and improve our Products, including ads, for you and others."[4]

66.   Advertisers pay Facebook to show targeted ads to users on Facebook, among other platforms. Targeted ads are generally placed through a platform called Ads Manager.

67.   Facebook holds out its advertising platform as a powerful resource for advertisers in many industries, including housing and housing-related services. For example, Facebook promotes its advertising platform with "success stories," including stories from a housing developer, a real estate agency, a mortgage lender, a real-estate-focused marketing agency, and a search tool for rental housing. https://www.facebook.com/business/success/categories/real-estate (last viewed 6-29-2020.

## C.   HOW FACEBOOK'S ADVERTISING PLATFORM WORKS

### i. Facebook Collects User Data

68.   Facebook collects and extracts data about its users' demographics, interests, and behavior both on and off Facebook's platform, including the pages that a user and a user's friends like, information from a user's Facebook and Instagram profiles; a user's activities with businesses not affiliated with Facebook, including purchases and emails; a user's activity on other websites and apps; and a user's location. https://www.facebook.com/about/ads (last visited 8/14/19).

---

[3]   Facebook Business, *Your Guide to Digital Advertising,* www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).
[4]   Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).

69.     Indeed, Facebook's website provides information to its users or prospective users as to how Facebook targets ads.

**Why you see a particular ad**

Our ad system prioritizes what ad to show you *based on what advertisers tell us their desired audience is,* and we then match it to people who might be interested in that ad. *This means we can show you relevant and useful ads without advertisers learning who you are.* We don't sell any individual data that could identify you, like your name.

(emphasis added)

When an advertiser wants to reach…
## Bike enthusiasts

Between **18 – 35 years old**
**Female**
Within **20 miles** of my store
Interested in **bicycling**
**Mobile** users

We show their ad to people like…
## Facebook user

**30 years old**
**Female**
**Menlo Pak, CA**
Interested in **bicycling**, movies, cooking
**iPhone user**, car shopper, gamer

www.facebook.com/about/ads (last visited 8/14/19). (emphasis supplied in part and added in part)

70.     "We use the information we have (including your activity off our Products, such as the websites you visit and the ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services…" *Data Policy*, Facebook, https://www.facebook.com/policy.php. (last visited 8/15/19)

### ii. Facebook Creates and Assigns Categories Using Data

71.     Upon information and belief, Facebook evaluates, analyzes, and processes the user data to create thousands of different categories, which are based on information that users have provided to Facebook and on information that Facebook has inferred from the user's actions and behaviors. Louise Matsakis, *Facebook's Targeted Ads Are More Complex Than It Lets On*, Wired (April 25, 2018), https://www.wired.com/story/facebooks-targeted-ads-are-more-complex-than-it-lets-on/

72.     Then Facebook assigns applicable categories to each user. Julia Angwin, et al, *Facebook Doesn't Tell Users Everything It Really Knows About Them*, ProPublica, (Dec. 27, 2016), https://www.propublica.org/article/facebook-doesnt-tell-users-everything-it-really-knows-about-them (Clarification January 24, 2017).

### iii. Facebook and Advertisers Use Facebook's Tools to Target Their Audiences

73.     Facebook sold its housing advertisers the ability to target advertisements to people who, according to Facebook's assessment of the data it collects, share certain personal attributes and/or are likely to respond to a particular ad. Users are required to disclose some data about themselves when they set up their profiles, such as date of birth, name and gender. However, users disclose much of their personal attributes unwittingly through the actions they, and those associated with them, take, on and off of Facebook's platforms.  https://www.facebook.com/business/ads/ad-targeting (last visited 6-29-2020).

74.     Advertisers were directed to first choose their objective by answering, "what's the most important outcome I want from this ad?" *Here's How to Create a Facebook Ad*, Facebook, https://www.facebook.com/business/ads (last visited 8-15-19).

75.     Facebook then instructed housing advertisers[5] to select their audience: "Using what you know about the people you want to reach – like age, location, and other details – choose the demographics, interests and behaviors that best represent your audience." *Here's How to Create a Facebook Ad*, Facebook, https://www.facebook.com/business/ads (last visited 8/15/19).

### iv. Ad Targeting Process

76.     In the ad targeting phase, Facebook provided the housing advertiser with a variety of tools for selecting an ad's "eligible audience." In other words, the housing advertiser was able to specify attributes that the users who were shown the ad must have and attributes that users who were shown the ad must not have. Second, in the ad delivery phase, Facebook selected the ad's "actual audience," meaning Facebook chose the members of the marketplace, eligible to see the ad from among the pool of Facebook users, thereby creating a segregated marketplace.

77.     During the ad targeting phase, Facebook provided a housing advertiser with tools that defined which users, or which types of users, he/she would like to see an ad. Facebook provided a toggle button that enabled housing advertisers to exclude men or women from seeing an ad, a search-box to exclude people who did not speak a specific language from seeing an ad, and a map tool to exclude people who live in a specified area

---

[5] Facebook's advertising platforms applied to all advertisers. The Second Amended Complaint is focused on housing advertisers. Based on settlement agreements Facebook has entered into with various fair housing organizations, Facebook has publicly claimed it no longer illegally targets housing ads and it no longer allows housing advertisers to use its Ad Platforms to target ads based on protected classes.

from seeing an ad by drawing a red line around the excluded geographic area.[6] Facebook also provided drop-down menus and search boxes to exclude or include (i.e., limit the audience of an ad exclusively to) people who share specified attributes. Facebook has offered housing advertisers hundreds of thousands of attributes from which to choose, for example to exclude "women in the workforce," "moms of grade school kids," "foreigners," "Puerto Rico Islanders," or people interested in "parenting," "accessibility," "service animal," "Hijab Fashion," or "Hispanic Culture." Facebook also has offered housing advertisers the ability to limit the audience of an ad by selecting to include only those classified as, for example, "Christian" or "Childfree."

78.     Housing advertisers were offered three different Facebook tools to assist them in targeting their audiences with greater degrees of specificity: Facebook Core Target Audiences, Facebook Custom Audiences, and Lookalike Audiences. *See* https://www.facebook.com/business/ads/ad-targeting (last visited 8/15/19).

79.     These tools empowered housing advertisers to target audiences by Facebook's pre-determined categories and enable them to include or exclude certain categories from their audiences. *See* https://business.facebook.com/ads/audience-insights/people?act=1006195749575790&business_id=838507093214687&age=18-&country=US. (last visited 8/15/19)

80.     Facebook enabled housing advertisers to exclude categories of people from viewing advertisements based on the categories Facebook created by extracting user data and making inferences about those users.

81.     Facebook's design, maintenance and implementation of its advertising platform, allowed ads for housing and housing-related services to be targeted to large segregated audiences based on characteristics protected by the FHA, California statutes, and New York statutes.

---

[6] The choice of red lines use for exclusion is more than ironic. The housing advertisers' and Facebook's prior ability to exclude users based on their geographic locations fostered the maintenance of segregated communities and a segregated marketplace.

82.     During the ad delivery phase, Facebook selected from among the users eligible to see a housing ad which users were in the marketplace where the targeted ad appeared. Facebook based this targeting decision in large part on the inferences and predictions it drew about each user's likelihood to respond to an ad based on the data it had about that user, the data it had about other users whom it considered to resemble that user, and the data it had about "friends" and other associates of that user. To decide which users were in the targeted housing ad audience, Facebook considered the user's sex and close proxies for the other protected classes. Such proxies may have included which pages a user visited, which apps a user had, where a user went during the day, and the purchases a user made on and offline. As a result of Facebook's conduct in the ad delivery phase, Facebook created a segregated housing marketplace resulting in the denial of access to plaintiffs and the putative class. Those Facebook users who were given access to this segregated marketplace were eligible to see thousands of housing ads which plaintiffs and the putative class were not eligible to see.

83.     Upon information and belief, Facebook alone, not the advertiser, determined which users constituted the "actual audience" for each housing ad.

### v. Facebook Set the Price for Advertising in Tandem with the Target Audience

84.     Facebook charged its housing advertisers different prices to show the same ad to different users. The price to show a housing ad to a given user was based, in large part, on how likely Facebook believed that user was to interact with the particular housing ad. In order to determine the pricing for a housing ad for each user, Facebook considered, by way of example, the sex and close proxies for the other protected classes. Such proxies may have included which pages a user visited, which apps a user had, where a user went during the day, and the purchases a user made on and offline. Facebook alone sets the price the housing advertiser paid to have Facebook to display the ad to the target audience. Furthermore, Facebook used the pricing differentials it set to determine which users will be in the target audience for housing ads rather than allowing advertisers to make that

decision. As Facebook explained "*If there are more and cheaper opportunities among men than women, then we'd automatically spend more of [an advertiser's] overall budget on the men.*"[7] (emphasis added)

85.  To group users by shared attributes, to create a Lookalike Audience, to determine an ad's "actual audience" during the ad delivery phase, and to price each ad for each user, Facebook combined the data it had about user attributes and behavior on its platforms with data it obtained about user behavior on other websites and in the non-digital world. Facebook then used machine learning and other prediction techniques to classify and group users to project each user's likely response to a given housing ad. In doing so, Facebook inevitably recreated groupings defined by their protected class or classes. For example, the top Facebook pages users "like" vary sharply by their protected class, according to Facebook's "Audience Insights" tool.

86.  Therefore, by grouping users who "like" similar pages (unrelated to housing) and presuming a shared interest or disinterest in housing-related advertisements, Facebook's tools functioned just like an advertiser who intentionally targets or excludes users based on their protected class.

### vi. Facebook's Discriminatory Housing Advertisements

87.  Upon information and belief, Facebook approved housing advertisements which exclude (or include) categories of protected classes, including sex, age, disability, sexual preference, age, marital status, race or skin color, or geographic boundaries which effectively discriminate in a similar manner.

88.  When Facebook or a housing advertiser excluded a specific category from its audience and Facebook published its advertisement, Facebook ensured that the

---

[7] *Facebook, Why did my cost per result go up when I increased my budget?* [https://web.archive.org/web/2016 0930124257/https://www.facebook.com/business/help pref=faq_content] (archived on Sep. 30, 2016 by The Internet Archive).

advertisement was visible to a target audience that created a barrier to marketplace access for those who excluded from the audience based on protected class status.

89.     Upon information and belief, as recently as 2019, Facebook mined user data to create categories of users defined by race or skin color *other than white* and permitted advertisers to exclude those categories from the audience of housing advertisements. *See* https://nationalfairhousing.org/facebook-settlement/ (last visited 8/15/19)

90.     Upon information and belief, Facebook approved and published housing advertisements which excluded African Americans from the audience. *See*, *e.g*., Julia Angwin, et al, *Facebook (Still) Letting Housing Advertisers Exclude Users By Race*, ProPublica, (November 21, 2017), https://www.propublica.org/article/facebook-advertising-discrimination-housing-race-sex-national-origin (last visited 8/15/19).

91.     In addition, on or about November 14, 2017, ProPublica purchased dozens of rental housing ads on Facebook and requested that these ads "not be shown to certain categories of users, such as African American, mothers of high school kids, people interested in wheelchair ramps, Jews, expats from Argentina and Spanish speakers." *Id.* "Every single ad was approved within minutes." *Id.* An additional ProPublica ad, which sought to exclude potential renters "interested in Islam, Sunni Islam and Shia Islam" took 22 minutes to approve. *Id.*

92.     Upon information and belief, Facebook approved and published housing advertisements for sale and rental properties which excluded African Americans and single parents and/or that were based on sex, familial status, religion, disability and other protected classes from the ad's target audience.

93.     Facebook's conduct resulted in certain audiences receiving ads about availability of housing for sale or rental, while users in certain protected classes were excluded from the target audience and thus deprived access to the housing marketplace. By denying users access to the full market of potential housing advertisements based on the users' protected characteristics, Facebook violated the FHA and analogous state laws

by its wholesale exclusion of certain users from the possibility of seeing housing advertisements.

94.     Facebook's conduct prevented Plaintiffs and the putative class from being in the target audience for ads for the sale or rental of available housing.

95.     Facebook's conduct violated the FHA as set forth in Counts I, II, III and IV below and the analogous New York and California state laws as set forth in Count V (New York), and Counts VI, VII and VIII (California).

96.     As a direct and proximate result of Facebook's discriminatory practices described herein, Plaintiffs have suffered and will continue to suffer damages due to the violations of their civil rights under the FHA, New York state laws, and California state laws.

## COUNT I – VIOLATION OF 42 U.S.C. § 3604(A)

97.     Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

98.     The housing advertised on the Facebook platforms for rent or sale are "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

99.     Facebook's extraction of user data and creation, utilization, publication, dissemination, circulation and/or targeting of discriminatory categories which it provided to housing advertisers for use in connection with advertisements published on Facebook's platforms discriminated against and Plaintiffs and the class they seek to represent, by making unavailable or denying a dwelling to any person based on race or other protected classes 42 U.S.C. § 3604(a).

100.    Plaintiffs are "aggrieved person(s)" as defined by the FHA, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

101.    As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## COUNT II – VIOLATION OF 42 U.S.C. § 3604(C)

102. Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

103. The housing advertised for rent or sale on Facebook's platforms constitute "dwellings" as defined by the FHA, 42 U.S.C. § 3602(b).

104. Facebook's extraction of user data and creation, utilization, publication, dissemination, circulation and/ or targeting of discriminatory categories which it provides to advertisers for use in connection with advertisements published on Facebook's platforms to create a segregated housing marketplace has discriminated against and Plaintiffs by making, printing, publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination based on, among other things, race, or an intention to make any such preference, limitation, or discrimination. 42 U.S.C. § 3604(c).

105. Plaintiffs and the class they seek to represent are "aggrieved person(s)" as defined by the FHA, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

106. As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## COUNT III – VIOLATION OF 42 U.S.C. § 3604(D)

107. Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

108. The housing advertised for rent or sale on Facebook's platforms constitute "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

109. Facebook's extraction of user data and creation, utilization, publication, dissemination, circulation and/ or targeting of discriminatory categories which it provided to advertisers for use in connection with advertisements published, on Facebook's platforms to create a segregated housing marketplace has discriminated against Plaintiffs

and the class they seek to represent by representing to Plaintiff and the class because of, among other things, race, that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available. 42 U.S.C. § 3604(d).

110.    Plaintiffs are "aggrieved person(s)" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

111.    As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## COUNT IV – VIOLATION OF 42 U.S.C. § 3606

112.    Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

113.    The housing advertised for rent or sale on Facebook's platforms constitute "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

114.    Facebook's extraction of user data and creation, utilization,  publication, dissemination, circulation and/or targeting of discriminatory categories which it provided to advertisers for use in connection with advertisements published on Facebook's platforms to create a segregated housing marketplace discriminated against Plaintiffs and the class they seek to represent by denying any person access to or participation in any service relating to the business of selling or renting dwellings and discriminating against Plaintiffs in the terms or conditions of such access or participation on the basis of race, among other things. 42 U.S.C. § 3606.

115.    Facebook provided a service relating to the business of selling or renting dwellings through its advertising platform creating target audiences which prevented Plaintiffs from participation in or access to these services.

116.    Plaintiffs are "aggrieved persons" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

117.   As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## COUNT V – VIOLATION OF N.Y. EXEC. L. § 290 ET. SEQ.

(New York Human Rights Law)

(On behalf of New York Plaintiffs and the proposed New York Subclass)

118.   Plaintiffs reallege and incorporate herein by reference, each and every allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

119.   The New York State Human Rights Law provides in part that "every individual within this state is afforded an equal opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance or inadequate education, training, housing or health care not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants."   N.Y. Exec. L. § 290.

120.   Plaintiffs are persons as defined by N.Y. Exec. L. § 292(1).

121.   Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of a segregated marketplace allowed housing advertisers to exclude certain protected classes of Facebook users from eligibility to receive such housing ads in violation of N.Y. Exec. L. § 290 *et seq*.

122.   Facebook's advertising platform, aggregation of demographic data and advertising targeting illegally denied Plaintiffs and the New York subclass access to "an equal opportunity to enjoy a full and productive life" in violation of the New York State Human Rights Law.  N.Y. Exec. L. § 290 *et seq*.

123.   Facebook's discriminatory practices were intentional, willful, or made in reckless disregard for the rights of others, including Plaintiffs and the New York Subclass.

124.   Facebook's conduct as set forth above constitutes an unlawful discriminatory practice resulting in the denial withholding of housing accommodations in violation of N.Y Exec. L. § 296(5).

125.    Facebook's conduct as set forth above constitutes aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by N.Y. Exec. L. § 296(5) in violation of the N.Y. Exec. L. § 296(6).

126.    As a direct and proximate result of Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads in a segregated marketplace, Plaintiffs and the New York Subclass have been damaged and continue to suffer damages.

127.    Accordingly, pursuant to Article 4 of the N.Y. Exec. L. § 297, Facebook is required to disgorge any profits obtained through the commission of the unlawful discriminatory acts described herein.

128.    Pursuant to Articles 9 and 10 of the N.Y. Exec. L. § 297, Plaintiffs and the New York Subclass are entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

129.    Pursuant to N.Y. CLS Civ. R. 41, Plaintiffs and the New York Subclass are entitled to statutory damages for each and every violation of not less than $100.00 and not more than $500.00 per violation.

## COUNT VI – VIOLATION OF THE CAL. CIVIL CODE §§ 51, 52(a)

(Unruh Civil Rights Act)

(On behalf of the California Plaintiff Jenny Lin, Plaintiff Jessica Tsai and the proposed California Subclass)

130.    Plaintiff Jenny Lin and Plaintiff Jessica Tsai reallege and incorporate herein by reference, each and every allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

131.    The Unruh Civil Rights Act provides in part that "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full

and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

132. Defendant Facebook is, and during the applicable time frames was, a business establishment under the Unruh Civil Rights Act doing business in the state of California.

133. Defendant Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of a segregated marketplace in which advertisers were able to exclude certain classes of Facebook users, who are within the definition of persons protected by the Unruh Civil Rights Act, from being part of the pool of Facebook users eligible to see certain housing advertisements, denied Plaintiff Jenny Lin, Plaintiff Jessica Tsai and the California Subclass the "full and equal accommodations, advantages, facilities, privileges, or services" provided by Facebook in violation of the Unruh Civil Rights Act.

134. As a direct and proximate result of the aforementioned acts by Defendant Facebook, Plaintiff Jenny Lin, Plaintiff Jessica Tsai and the California Subclass have incurred actual damages. Accordingly, they are entitled to statutory damages in an amount up to three times the amount of actual damages, with a minimum amount of $4,000, and entitled to injunctive and declaratory relief. Civil Code §§ 52(a), (e) and 52.1(h).

135. Plaintiff Jenny Lin, Plaintiff Jessica Tsai and the California Subclass are also entitled to injunctive and declaratory relief as well as attorneys' fees and costs pursuant to Civil Code §§ 52(a) and (e).

136. Defendant Facebook, with the knowledge of its officers and managers, committed the acts and omissions alleged herein with intent and/or in reckless disregard of the rights of Plaintiff and the members of the subclass and therefore, Defendant is liable for punitive damages.

## COUNT VII - Cal. Civil Code §§ 51.5, 52(a)

(Blacklisting and Discrimination in violation of Cal. Civil Code §§ 51.5, 52(a))

(On behalf of the California Plaintiff Jenny Lin, Plaintiff Jessica Tsai and the proposed California Subclass)

137. Plaintiffs reallege and incorporate herein by reference, each and every allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

138. Section 51.5 of the California Civil Code provides that "No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51 . . . because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics."

139. Defendant Facebook is, and during the applicable time frame was, a business establishment doing business in the state of California.

140. Defendant Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of segregated marketplace in which advertisers were able to exclude certain classes of Facebook users, who are within the definition of persons protected by the statute, from being part of the pool of Facebook users eligible to see certain housing advertisements constitutes discrimination and/or blacklisting against Plaintiffs Jenny Lin, Jessica Tsai and the California Subclass.

141. As a direct and proximate result of the aforementioned acts by Defendant Facebook, Plaintiffs and the California Subclass have incurred actual damages. Accordingly, they are entitled to statutory damages in an amount up to three times the amount of actual damages, with a minimum amount of $4,000, and entitled to injunctive and declaratory relief. Civil Code §§ 52(a), (e) and 52.1(h).

142. Plaintiffs and the California Subclass are also entitled to injunctive and declaratory relief as well as attorneys' fees and costs pursuant to Civil Code §§ 52(a) and (e).

143.   Defendant, with the knowledge of its officers and managers, committed the acts and omissions alleged herein with intent and/or in reckless disregard of the rights of Plaintiffs Jenny Lin, Jessica Tsai and the California Subclass, and therefore Defendant is liable for punitive damages.

## COUNT VIII – CAL. BUS. & PROF. CODE § 17200

(Unfair business practices in violation of Business and Professions Code § 17200 et seq.)

(On behalf of California Plaintiff Jenny Lin, Plaintiff Jessica Tsai and the proposed California Subclass)

144.   Plaintiff Jenny Lin and Plaintiff Jessica Tsai reallege and incorporate herein by reference, each and every allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

145.   Defendant has violated, California's Unfair Competition Law, Business and Professions Code section 17200 *et seq.*, by engaging in unfair, unlawful, and fraudulent activity as alleged herein.   In particular, Defendant Facebook's creation of segregated marketplace in which advertisers were able to exclude certain classes of Facebook users from being part of the pool of Facebook users eligible to see certain housing advertisements constitutes an unfair business practice.

146.   Defendant has generated, and continue to generate, income as a direct result of its unfair, fraudulent and unlawful business practices.   Plaintiff Jenny Lin, Plaintiff Jessica Tsai and the California Subclass are therefore entitled to injunctive relief, restitution and/or to restitutionary disgorgement of any and all monies received by Defendant while engaged in such practices, plus interest pursuant to Business and Professions Code section 17200 et seq.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class they seek to represent respectfully request that this Honorable Court enter judgment in their favor and grant them the following relief:

a.   Certify the case as a class action on behalf of the proposed Class and Subclasses;

b.     Designate Plaintiffs as representatives of the Class;

c.     Designate the New York Plaintiffs as representatives of the New York Subclass;

d.     Designate the California Plaintiffs as representatives of the California Subclass;

e.     Designate Plaintiffs' counsel of record as Class Counsel;

f.     Declare that Defendant's discriminatory policies and practices violate the Fair Housing Act, 42 U.S.C. § 3601 *et seq*;

g.     Declare that Defendant's discriminatory policies and practices violate the New York Human Rights Law, N.Y. Exec. L. § 290 et seq.;

h.     Declare that Defendant's discriminatory policies and practices violate the California Unruh Civil Rights Act, Cal. Civil Code §§ 51, 52(a);

i.     Declare that Defendant Facebook's discriminatory policies and practices constitute unfair business practices in violation of Business and Professions Cal. Code § 17200 et seq.;

j.     Declare that Defendant Facebook's discriminatory policies and practices constitute Blacklisting and Discrimination in violation of Cal. Civil Code §§ 51.5, 52(a);

k.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from denying or withholding housing, or otherwise making housing unavailable on the basis of race, national origin or other prohibited classifications;

l.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination on the basis of race, national origin or other prohibited classifications;

m. Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from representing to any person because of race, national origin or other prohibited classifications that any dwelling is not available for sale, rental, or inspection, when such dwelling is in fact so available;

n. Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from denying any person access to Facebook's services relating to the business of selling or renting dwellings, and discriminating against such persons in the terms or conditions of such access or participation on the basis of race, national origin or other prohibited classifications;

o. Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from engaging in acts that violate the New York Human Rights Law;

p. Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from engaging in acts that violate the California Unruh Act;

q. Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from engaging in Blacklisting and Discrimination in violation of Cal. Civil Code §§ 51.5, 52(a);

r. Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from engaging in unfair business practices in violation of California Business and Professions Code, Cal. Code § 17200 et seq.;

s. Order restitution and/or restitutionary disgorgement of any and all monies received by Defendant while engaged in such discriminatory practices and /or unfair business practices;

1    t.    Award Plaintiffs and the members of the Classes actual, statutory, and
2          punitive damages to which Plaintiffs are entitled;
3    u.    Award Plaintiffs and the members of the Classes their costs of suit, including
4          reasonable attorneys' fees, as provided by law;
5    v.    Award Plaintiffs and the members of the Classes pre- and post- judgment
6          interest as provided by law, from and after the date of service of this
7          Complaint; and
8    w.    Award Plaintiffs and members of the Classes such other and further relief as
9          the case may require and the Court may deem just and proper.

Respectfully Submitted,

Dated: August 10, 2020                    **MANTESE HONIGMAN, P.C.**

                                 By:    */s/ Gerard V. Mantese*
                                        Gerard V. Mantese
                                        David Honigman
                                        Kathryn Eisenstein

                                        **HERTZ SCHRAM PC**
                                        Patricia A. Stamler
                                        Elizabeth Thomson
                                        Matthew Turchyn

                                        **SCHONBRUN SEPLOW HARRIS
                                        HOFFMAN & ZELDES LLP**
                                        Michael D. Seplow
                                        Aidan C. McGlaze
                                        Wilmer Harris

                                        *Attorneys for Plaintiffs/Proposed Class Members.*

SECOND AMENDED CLASS ACTION COMPLAINT

# JURY DEMAND

Plaintiffs request trial by jury on all claims.

Respectfully Submitted,

Dated: August 10, 2020 **MANTESE HONIGMAN, P.C.**

By:    _/s/ Gerard V. Mantese_
Gerard V. Mantese
David Honigman
Kathryn Eisenstein

**HERTZ SCHRAM PC**
Patricia A. Stamler
Elizabeth Thomson
Matthew Turchyn

**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
Michael D. Seplow
Aidan C. McGlaze
Wilmer Harris

*Attorneys for Plaintiffs/Proposed Class Members.*

# EXHIBIT 1

_____

| | |
|---|---|
| The Secretary, United States | ) |
| Department of Housing and Urban | ) |
| Development, on behalf of Complainant | ) |
| Assistant Secretary for Fair Housing and Equal | ) |
| Opportunity, | ) |
| | ) |
| Charging Party, | ) |
| | ) |
| v. | ) |
| | ) |
| Facebook, Inc., | ) |
| | ) |
| Respondent | ) |

HUD ALJ No.
FHEO No. 01-18-0323-8

_____)

## CHARGE OF DISCRIMINATION

### I.    JURISDICTION

On August 13, 2018, the Assistant Secretary for Fair Housing and Equal Opportunity ("Assistant Secretary") filed a timely complaint with the Department of Housing and Urban Development ("HUD" or the "Department") alleging that Respondent violated subsections 804(a), 804(b), 804(c) and 804(f) of the Fair Housing Act, 42 U.S.C. §§ 3601-19 ("Act"), by discriminating because of race, color, religion, sex, familial status, national origin and disability.

The Act authorizes the Secretary of HUD to issue a Charge of Discrimination ("Charge") on behalf of aggrieved persons following an investigation and a determination that reasonable cause exists to believe that a discriminatory housing practice has occurred.  *See* 42 U.S.C. § 3610(g)(1), (2).  The Secretary has delegated that authority to the General Counsel, 24 C.F.R. §§ 103.400, 103.405, who has re-delegated that authority to the Associate General Counsel for Fair Housing and the Assistant General Counsel for Fair Housing Enforcement.  76 Fed. Reg. 42,463, 42,465 (July 18, 2011).

By a Determination of Reasonable Cause issued contemporaneously with this Charge of Discrimination, the Director of the Office of Systemic Investigations in the Office of Fair Housing and Equal Opportunity has determined that reasonable cause exists to believe that a discriminatory housing practice has occurred and has authorized and directed the issuance of this Charge.  42 U.S.C. § 3610(g)(2).

## II.      SUMMARY OF FINDINGS IN SUPPORT OF THIS CHARGE

Based on HUD's investigation of the allegations contained in the aforementioned complaint and the Determination of Reasonable Cause, Respondent is hereby charged with violating the Act as follows:

### A.      Legal Authority

1.      It is unlawful to make unavailable or deny a dwelling to any person because of race, color, religion, sex, familial status, national origin or disability.  42 U.S.C. § 3604(a), (f)(1); 24 C.F.R. § 100.50(b)(1), (3); 24 C.F.R. § 100.60(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(a).

2.      It is unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, national origin or disability. 42 U.S.C. § 3604(b), (f)(2); 24 C.F.R. § 100.50(b)(2); 24 C.F.R. § 100.65(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(b).

3.      It is unlawful to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, familial status, national origin or disability, or that indicates an intention to make such a distinction.  42 U.S.C. § 3604(c); 24 C.F.R. § 100.75(a), (b), (c)(1).  Such unlawful activity includes "[s]electing media or locations for advertising the sale or rental of dwellings which deny a particular segment of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin."  24 C.F.R. § 100.75(c)(3).  Such unlawful activity also includes "[r]efusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin."  24 C.F.R. § 100.75(c)(4).

### B.      Parties

4.      Complainant Assistant Secretary is authorized to file a complaint of discrimination under the Act on behalf of the Secretary of HUD.  42 U.S.C. § 3610(a); 24 C.F.R. § 103.204(a).

5.      Respondent Facebook, Inc., is incorporated in Delaware with headquarters in Menlo Park, California.  Respondent is the second largest online advertiser in the United States and is responsible for approximately twenty percent of all online advertising nationwide.

6.      Respondent operates Facebook and Instagram, two of the most widely used social media platforms in the United States.  Facebook has approximately 221 million active users in the United States and over two billion active users globally, while Instagram has approximately 114 million active users in the United States and over one billion active users globally, with active user defined as someone who uses the platform at least once per month.  Respondent also operates Messenger, a messaging tool and platform that can be accessed from within Facebook

or through a standalone website and mobile application. In addition, Respondent has created an "Audience Network," which is comprised of thousands of websites and mobile applications that are operated by third parties but on which Respondent displays targeted ads.

### C. Factual Allegations

7. Respondent collects millions of data points about its users, draws inferences about each user based on this data, and then charges advertisers for the ability to microtarget ads to users based on Respondent's inferences about them. These ads are then shown to users across the web and in mobile applications. Respondent promotes and distinguishes its advertising platform by proclaiming that "most online advertising tools have limited targeting options . . . like location, age, gender, interests and potentially a few others. . . . But Facebook is different. People on Facebook share their true identities, interests, life events and more."[1] As Respondent explains, its advertising platform enables advertisers to "[r]each people based on . . . zipcode . . . age and gender . . . specific languages . . . the interests they've shared, their activities, the Pages they've like[d] . . . [their] purchase behaviors or intents, device usage and more."[2] Thus, Respondent "use[s] location-related information-such as your current location, where you live, the places you like to go, and the businesses and people you're near to provide, personalize and improve our Products, including ads, for you and others."[3]

8. Advertisers pay Respondent to show targeted ads to users on Facebook, Instagram, and Messenger, and on Respondent's Audience Network. Targeted ads are generally placed through a single advertising platform called Ads Manager regardless of where the ads will be shown to users.

9. Respondent holds out its advertising platform as a powerful resource for advertisers in many industries, including housing and housing-related services. For example, Respondent promotes its advertising platform with "success stories," including stories from a housing developer, a real estate agency, a mortgage lender, a real-estate-focused marketing agency, and a search tool for rental housing.

10. Respondent's advertising platform is actively being used for housing-related ads. Such ads include ads for mortgages from large national lenders, ads for rental housing from large real estate listing services, and ads for specific houses for sale from real estate agents.

11. Because of the way Respondent designed its advertising platform, ads for housing and housing-related services are shown to large audiences that are severely biased based on characteristics protected by the Act, such as audiences of tens of thousands of users that are nearly all men or nearly all women.

---

[1] Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited Mar. 27, 2019).

[2] Facebook Business, *Your Guide to Digital Advertising*, www facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited Mar. 27, 2019).

[3] Facebook, *Data Policy* (Apr. 19, 2018), www.facebook.com/privacy/explanation/.

12.     Respondent sells advertisers the ability to target advertisements to people who, according to Respondent's assessment of the data it collects, share certain personal attributes and/or are likely to respond to a particular ad.  Users may disclose some data about themselves when they set up their profiles, such as name and gender.  However, users disclose most of this data unwittingly through the actions they, and those associated with them, take on and off of Respondent's platforms.

13.     Respondent determines which users will see an ad through a two-phase process.  First, in the ad targeting phase, Respondent provides the advertiser with a variety of tools for selecting an ad's "eligible audience."  In other words, the advertiser can specify attributes that the users who will be shown the ad must have and attributes that users who will be shown the ad must not have.  Second, in the ad delivery phase, Respondent selects the ad's "actual audience," meaning Respondent chooses which users will actually be shown the ad from among the pool of eligible users.

14.     During the ad targeting phase, Respondent provides an advertiser with tools to define which users, or which types of users, the advertiser would like to see an ad.  Respondent has provided a toggle button that enables advertisers to exclude men or women from seeing an ad, a search-box to exclude people who do not speak a specific language from seeing an ad, and a map tool to exclude people who live in a specified area from seeing an ad by drawing a red line around that area.  Respondent also provides drop-down menus and search boxes to exclude or include (i.e., limit the audience of an ad exclusively to) people who share specified attributes.  Respondent has offered advertisers hundreds of thousands of attributes from which to choose, for example to exclude "women in the workforce," "moms of grade school kids," "foreigners," "Puerto Rico Islanders," or people interested in "parenting," "accessibility," "service animal," "Hijab Fashion," or "Hispanic Culture."  Respondent also has offered advertisers the ability to limit the audience of an ad by selecting to include only those classified as, for example, "Christian" or "Childfree."

15.     During this first phase, Respondent also provides a tool called Custom Audiences, which enables an advertiser to use a list of specific people whom the advertiser wants included in or excluded from the eligible audience for an ad.  The advertiser can do this by uploading the personal information of its customers, or by having Respondent generate a list of people who have engaged with the advertiser's content on Facebook or Instagram, on other websites, in a mobile application, or offline.

16.     Facebook offers a variant of its Custom Audiences tool called Lookalike Audiences.  If an advertiser selects this option, the platform directs the advertiser to pick a Custom Audience that represents the advertiser's "best existing customers."  Respondent then identifies users who share "common qualities" with those customers, and these users become the ad's eligible audience.  To generate a Lookalike Audience, Respondent considers sex and close proxies for the other protected classes.  Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.  Respondent alone, not the advertiser, determines which users will be included in a Lookalike Audience.

4

17.     During the second phase, the ad delivery phase, Respondent selects from among the users eligible to see an ad which users will actually see it.  Respondent bases this decision in large part on the inferences and predictions it draws about each user's likelihood to respond to an ad based on the data it has about that user, the data it has about other users whom it considers to resemble that user, and the data it has about "friends" and other associates of that user.  To decide which users will see an ad, Respondent considers sex and close proxies for the other protected classes.  Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.  Respondent alone, not the advertiser, determines which users will constitute the "actual audience" for each ad.

18.     Respondent charges advertisers different prices to show the same ad to different users. The price to show an ad to a given user is based, in large part, on how likely Respondent believes that user is to interact with the particular ad.  To decide how an ad will be priced for each user, Respondent considers sex and close proxies for the other protected classes.  Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.  Respondent alone sets the price the advertiser will pay to have Respondent show each ad to each user.  Furthermore, Respondent uses the pricing differentials it sets to determine which users will see which ads rather than allowing advertisers to make that decision.  As Respondent explains, "If there are more and cheaper opportunities among men than women, then we'd automatically spend more of [an advertiser's] overall budget on the men."[4]

19.     Respondent's ad delivery system prevents advertisers who want to reach a broad audience of users from doing so.  Even if an advertiser tries to target an audience that broadly spans protected class groups, Respondent's ad delivery system will not show the ad to a diverse audience if the system considers users with particular characteristics most likely to engage with the ad.  If the advertiser tries to avoid this problem by specifically targeting an unrepresented group, the ad delivery system will still not deliver the ad to those users, and it may not deliver the ad at all.  This is so because Respondent structured its ad delivery system such that it generally will not deliver an ad to users whom the system determines are unlikely to engage with the ad, even if the advertiser explicitly wants to reach those users regardless.

20.     To group users by shared attributes, to create a Lookalike Audience, to determine an ad's "actual audience" during the ad delivery phase, and to price each ad for each user, Respondent combines the data it has about user attributes and behavior on its platforms with data it obtains about user behavior on other websites and in the non-digital world.  Respondent then uses machine learning and other prediction techniques to classify and group users so as to project each user's likely response to a given ad.  In doing so, Respondent inevitably recreates groupings defined by their protected class.  For example, the top Facebook pages users "like" vary sharply by their protected class, according to Respondent's "Audience Insights" tool.  Therefore, by grouping users who "like" similar pages (unrelated to housing) and presuming a shared interest

---

[4] Facebook, *Why did my cost per result go up when I increased my budget*, [https://web.archive.org/web/2016 0930124257/https://www.facebook.com/business/help/934288416682198?helpref=faq_content] (archived on Sep. 30, 2016 by The Internet Archive).

or disinterest in housing-related advertisements, Respondent's mechanisms function just like an advertiser who intentionally targets or excludes users based on their protected class.

### D. Legal Allegations

21.     As described above, Respondent discriminated by making dwellings unavailable because of race, color, religion, sex, familial status, national origin or disability.  42 U.S.C. § 3604(a), (f)(1); 24 C.F.R. § 100.50(b)(1), (3); 24 C.F.R. § 100.60(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(a).

22.     As described above, Respondent discriminated in the terms, conditions, or privileges of the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin or disability.  42 U.S.C. § 3604(b), (f)(2); 24 C.F.R. § 100.50(b)(2); 24 C.F.R. § 100.65(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(b).

23.     As described above, Respondent made, printed, or published – or caused to be made, printed, or published – notices, statements, or advertisements with respect to the sale or rental of dwellings that indicated preferences, limitations, or discrimination because of race, color, religion, sex, familial status, national origin or disability, or that indicated an intention to make such a distinction.  42 U.S.C. § 3604(c); 24 C.F.R. § 100.75(a), (b), (c)(1).

24.     As described above, Respondent selected media or locations for advertising the sale or rental of dwellings that denied persons information about housing opportunities because of race, color, religion, sex, familial status, national origin or disability.  24 C.F.R. § 100.75(c)(3).

25.     As described above, Respondent refused to publish advertising for the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin or disability.  24 C.F.R. § 100.75(c)(4).

26.     As described above, Respondent required different charges or terms for advertising the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin and disability.  24 C.F.R. § 100.75(c)(4).

## III. CONCLUSION

        WHEREFORE, the Secretary of the United States Department of Housing and Urban Development, through the Office of the General Counsel, and pursuant to 42 U.S.C. § 3610(g)(2)(A), hereby charges Respondent with engaging in discriminatory housing practices in violation of 42 U.S.C. § 3604(a), (b), (c) and (f), and prays that an order be issued that:

1.     Declares that the discriminatory housing practices of Respondent, as set forth above, violate the Fair Housing Act, 42 U.S.C. §§ 3601-19;

2.     Enjoins Respondent and its agents, employees, successors, and all other persons in active concert or participation with it, from discriminating because of race, color, religion, sex, familial status, national origin or disability in any aspect of the sale, rental, use, marketing, or advertising of dwellings and related services pursuant to 42 U.S.C. § 3612(g)(3);

3. Requires Respondent's agents and employees to attend, at Respondent's cost, training that addresses the Fair Housing Act's prohibitions against discrimination in advertising;

4. Awards such damages pursuant to 42 U.S.C. § 3612(g)(3) as will fully compensate any aggrieved persons for any harm caused by Respondent's discriminatory conduct;

5. Awards the maximum civil penalty against Respondent for each violation of the Act, pursuant to 42 U.S.C. § 3612(g)(3) and 24 C.F.R. § 180.671; and

6. Awards such additional relief as may be appropriate under 42 U.S.C. § 3612(g)(3).

Respectfully submitted on this 28th day of March, 2019.

_____
Jeanine Worden
Associate General Counsel for Fair Housing

_____
Kathleen M. Pennington
Assistant General Counsel for Fair Housing
   Enforcement

_____
Ayelet R. Weiss
Trial Attorney
U.S. Department of Housing
   and Urban Development
Office of General Counsel
451 7th St. SW, Room 10270
Washington, DC 20410
Office: (202) 402-2882
Email: ayelet.r.weiss@hud.gov