Gerard V. Mantese (MI Bar # P34424)[*]
gmantese@manteselaw.com
David Honigman (MI Bar # P33146)[*]
dhonigman@manteselaw.com
Kathryn Eisenstein (MI Bar #P66371)[*]
keisenstein@manteselaw.com
**MANTESE HONIGMAN, P.C.**
1361 E. Big Beaver Road
Troy, MI 48083
Tel: 248-457-9200
Fax: (248)-457-9201

*\* Pro Hac Vice*

*Attorneys for Plaintiffs and Proposed Class Members*
[*Additional counsel on following page*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| ROSEMARIE VARGAS, KISHA SKIPPER, JAZMINE SPENCER, DEILLO RICHARDS, JENNY LIN And JESSICA TSAI, on behalf of themselves individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC. <br><br> Defendant. | Case No. 3:19-cv-5081-WHO <br><br> **PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** <br><br> Judge:  Hon. William H. Orrick <br> Date:  November 11, 2020 <br> Time:  2:00 p.m. <br> Crtrm:  2, 17th Floor |

1   Patricia A. Stamler (MI Bar #35905)[*]
    pstamler@hertzschram.com
2   Elizabeth Thomson (MI Bar #53579)[*]
    lthomson@hertzschram.com
3   Matthew Turchyn (MI Bar #76482)[*]
    mturchyn@hertzschram.com
4   **HERTZ SCHRAM P.C.**
    1760 S. Telegraph Road, Suite 300
5   Bloomfield Hills, MI 48302
    Tel: 248-335-5000
6   Fax: 248-335-3346
7
    Michael D. Seplow, SBN 150183
8   mseplow@sshhzlaw.com
    Wilmer Harris, SBN 150407
9   wharris@sshhzlaw.com
    Aidan C. McGlaze, SBN 277270
10  amcglaze@sshhzlaw.com
11  **SCHONBRUN SEPLOW HARRIS**
    **HOFFMAN & ZELDES LLP**
12  11543 W. Olympic Blvd.
    Los Angeles, CA  90064
13  Tel: 310-396-0731
    Fax: 310-399-7040
14

15  *Attorneys for Plaintiffs and Proposed Class Members.*

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................. iv-x

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS .......................................................................................1

III.   LEGAL STANDARDS ...........................................................................................3

IV.   ARGUMENTS.........................................................................................................5

    A.  Plaintiffs' Have Article III and Statutory Standing ...............................5

        1.  Segregation from a Housing Marketplace Is an Injury in Fact ........................5

        2.  Facebook's Segregated Marketplace Was Clearly Created and Run by Facebook ...................................................................................8

    B.  The CDA Does Not Shield Facebook from Liability Because Facebook Is A Publisher or Speaker for the Purposes of Section 230 ...........................................9

    C.  Plaintiffs Have Stated Claims Under the FHA ..............................................16

        1.  Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(c).............................16

        2.  Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(a).............................18

        3.  Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(d) ...........................19

    D.  The California Plaintiffs Sufficiently Plead Unruh Act Claims ...........................20

    E.  The California Plaintiffs have Properly Alleged a Claim under California Business and Professions Sections 17200 et seq ..................................................22

    F.  The New York Plaintiffs State A Claim Under The NYSHRL ...........................23

        1.  The New York Plaintiffs Did Not Assent to the Choice of Law Clause .........23

    G.  Plaintiffs' New York Claims are well-pled ......................................................25

        1.  NYSHRL § 296(5) Includes Agent Liability...................................................25

        2.  Facebook Is Liable for Aiding and Abetting Under N.Y. Exec. Law § 296(6).......................................................................................27

        3.  In the Alternative, California Law Is Contrary to Fundamental New York Policy ........................................................................................28

    H.  In the Alternative, Plaintiffs Seek Leave to Amend Under Rule 15(a) .................29

V.    CONCLUSION.......................................................................................................29

**TABLE OF AUTHORITIES**

**CASES**

*Abogados v. AT & T, Inc.*,
   223 F.3d 932, 935 (9th Cir. 2000) ...................................................................28

*Angelov v. Wilshire Bancorp*,
   331 F. App'x 471, 472 (9th Cir. 2009) ............................................................29

*Angelucci v. Century Supper Club*,
   41 Cal. 4th 160, 165 (2007) ..............................................................................6

*Applebaum v. Lyft*, Inc.,
   263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) ...............................................25

*Arnal v. Aspen View Condominium Association, Inc.*,
   2017 WL 1231555, at * 4 (D. Colorado, March 28, 2017) ..............................26

*Arnal v. Aspen View Condominium Association, Inc.*,
   245 F.Supp.3d 1261, at * 4 (citing Restatement (Second) of Agency § 411 (1958)) ........26

*Ashcroft v. Iqbal*,
   556 U.S. 662, 678 (2009) ...................................................................................4

*Augustine v. United States*,
   704 F.2d 1074, 1079 (9th Cir. 1983) .................................................................4

*Bank of Am. Corp. v. City of Miami, Fla.*,
   137 S. Ct. 1296, 1302-03 (2017) .......................................................................6

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) .........................................................................11

*Be In, Inc. v. Google Inc.*,
   2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013) ..........................................24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 570 (2007) ...................................................................................4

*Bennett v. Spear*,
   520 U.S. 154, 168-69 (1997) .............................................................................8

*Bradley v. T-Mobile*,
   2020 WL 1233924, at *10 (N.D. Cal. Mar. 13, 2020) .......................................7

**<u>TABLE OF AUTHORITIES – CONT'D</u>**

**<u>CASES</u>**

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*,
    622 F.3d 996, 1004 (9th Cir. 2010) ...................................................................28

*Broam v. Boan*,
    320 F.3d 1023, 1028 (9th Cir. 2003) .................................................................29

*California. Keum v. Virgin Am. Inc.*,
    781 F. Supp. 2d 944, 955 (N.D. Cal. 2011) .......................................................28

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) ...........................................................................16

*Certain Approval Programs, L.L.C. v. Xcentric Ventures, L.L.C.*,
    2009 U.S. Dist. LEXIS 22318, at *3-7 (D. Ariz. Mar. 9, 2009)........................14

*Chapman v. Pier 1 Imports Inc.*,
    631 F.3d 939, 946 (9th Cir. 2011) .......................................................................5

*Colgate v. JULUL Labs, Inc.*,
    402 F. Supp. 3d 728, 758-59 (N.D. Cal. 2019)...........................................22, 24

*Cullinane v. Uber Techs., Inc.*,
    893 F.3d 53, 62-63 (1st Cir. 2018) ....................................................................25

*Desertrain v. City of Los Angeles*,
    754 F.3d 1147, 1154 (9th Cir. 2014) .................................................................29

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846, 849-54 (9th Cir. 2016) ................................................................11

*Elliott v. Versa CIC, L.P.*,
    2019 U.S. Dist. LEXIS 16744, at *18 (S.D. Cal. Feb. 1, 2019) ........................17

*Fair Hous. Counsel of San Fernando Valley v. Roommates.com LLC*,
    521 F.3d 1157, 1163 (9th Cir. 2008) .......................................................... *passim*

*Fair Hous. of Marin v. Combs*,
    285 F.3d 899, 902 (9th Cir. 2002) .......................................................................7

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019)..................................................................................15

1

**<u>TABLE OF AUTHORITIES – CONT'D</u>**

2

**<u>CASES</u>**

3

4

*Francis v. Kings Park Manor*,
    944 F3d 370 (2d Cir. 2019)..................................................................27

5

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
    528 U.S. 167, 180-81 (2000) ..............................................................5

6

7

*Gladstone Realtors v. Vill. of Bellwood*,
    441 U.S. 91, 110-14 (1979) ................................................................8

8

9

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ...........................................15

10

11

*Gonzalez v. Google, Inc.*,
    282 F. Supp. 3d 1150 (N.D. Cal. 2017) ...........................................15

12

13

*Griffin v. Sirva, Inc.*,
    76 N.E.3d 1063, 1070 (2017)...........................................................27

14

*Griffin v. Sirva, Inc.*,
    29 N.Y.3d 174, 188, 76 N.E.3d 1063, 1070 (2017)..........................27

15

16

*Guevara v. UMH Props.*,
    2014 U.S. Dist. LEXIS 154394, at * 15-16 (W.D. Tenn. Oct. 29, 2014).........................18

17

18

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363, 373 (1982).................................................................5, 6

19

20

*Heckler v. Mathews*,
    465 U.S. 728, 739-40 (1984) ..............................................................6

21

*Hernandez v. Burger*,
    102 Cal.App.3d 795, 802, (1980) ....................................................28

22

23

*Hoffman v. Parade Publs.*,
    15 N.Y.3d 285, 292,744 (2010) .......................................................27

24

25

*HomeAway.com v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2018) ...........................................................11

26

*Housing Opportunities Made Equal v. Cincinnati Enquirer*,
    731 F. Supp. 801, 804 (S.D. Ohio, 1990), aff'd 943 F.2d 644 (6th Cir. 1991) ..........17, 18

27

28

<u>**TABLE OF AUTHORITIES – CONT'D**</u>

<u>**CASES**</u>

*In re Facebook Biometric Info. Privacy Litig.,*
    185 F. Supp. 3d 1155, 1169 (N.D. Cal. 2016) ............................................28, 29

*In re Google Android Consumer Priv. Litig.,*
    2014 WL 988889, at *7 (N.D. Cal. Mar. 10, 2014)...............................22

*Iniestra v. Cliff Warren Invs., Inc.,*
    886 F. Supp. 2d 1161, 1169 (C.D. Cal. 2012) ...............................17

*Johnson v. Macy,*
    145 F. Supp. 3d 907, 916 (C.D. Cal. 2015) ...............................17

*Kerns v. United States,*
    585 F.3d 187, 193 (4th Cir. 2009) ...............................4

*Knutson v. Sirius XM Radio Inc.,*
    771 F.3d 559, 567 (9th Cir. 2014) ...............................23

*Koebke v. Bernardo Heights Country Club,*
    36 Cal. 4th 824 (2005) ...............................20

*Kwikset Corp. v. Superior Court,*
    51 Cal.4th 310, 337 (2011) ...............................22

*Lazy Y Ranch Ltd., v. Behrens,*
    546 F.3d 580, 588 (9th Cir. 2008) ...............................4

*Lierboe v. State Farm Mut. Auto. Ins. Co.,*
    350 F.3d 1018, 1022 (9th Cir. 2003) ...............................5

*Lopez v. Trendacosta,*
    2014 WL 6883945, *4 (C.D. Cal. Dec. 4, 2014) ...............................3

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871, 889 (1990) ...............................5

*Marin Storage & Trucking v. Benco Contracting & Eng.'g, Inc.,*
    89 Cal. App. 4th 1042,1049 (2001) ...............................23

*Mazza v. Am. Honda Motor Co.,*
    666 F.3d 581, 594 (9th Cir.2012) ...............................29

1

**TABLE OF AUTHORITIES – CONT'D**

2

**CASES**

3

*Meyer v. Holley,*

4
    537 U.S. 280, 285 (2003) ...............................................................................26

5

*Mobil Oil Corp. v. Syracuse Indus. Dev. Agency,*

6
    76 N.Y.2d 428, 433 (N.Y. 1990) ......................................................................6

7

*Moore v. Townsend,*

8
    525 F.2d 482, 485 (7th Cir. 1975) ..................................................................26

*Morsa v. Facebook, Inc.,*

9
    77 F. Supp. 3d 1007 (C.D. Cal. 2014), aff'd, 622 F. App'x 915 (Fed. Cir. 2015) ...........21

10

*Navarro v. Block,*

11
    250 F.3d 729, 732 (9th Cir. 2001) ....................................................................4

12

*Nguyen v. Barnes & Noble, Inc.,*

13
    763 F.3d 1171, 1175 (9th Cir. 2014) ...............................................................23

14

*Olsen v. Stark Homes, Inc.,*
    759 F.3d 140, 153 (2d Cir. 2014) ....................................................................26

15

*OpenTV, Inc. v. Netflix Inc.,*

16
    76 F. Supp. 3d 886, 893 (N.D. Cal. 2014) ......................................................22

17

*Palomino v. Facebook,*

18
    2017 WL 76901 (N.D. Cal. Jan. 9, 2017) ........................................................29

19

*Pennie v. Twitter, Inc.,*
    281 F. Supp. 3d 874 (N.D. Cal. 2017) .............................................................15

20

*Perfect 10, Inc. v. Google, Inc.,*

21
    2008 WL 4217837, *8 (C.D. Cal. July 16, 2008) ..............................................4

22

*Perks v. Town of Huntington,*

23
    251 F. Supp. 2d 1143, 1160 (E.D.N.Y. 2003) .................................................27

24

*Pride v. Correa,*

25
    719 F.3d 1130, 1133 (9th Cir. 2013) .................................................................4

26

*Rivera v. Peri & Sons Farms, Inc.,*
    735 F.3d 892, 902 (9th Cir. 2013) ....................................................................4

27

28

<u>**TABLE OF AUTHORITIES – CONT'D**</u>

<u>**CASES**</u>

*Rojas v. Bird*,
   2014 U.S. Dist. LEXIS 10809, at *1 (C.D. Cal. Jan. 10, 2014) .........................................17

*S.F. Baykeeper v. W. Bay Sanitary Dist.*,
   791 F. Supp. 2d 719, 749 (N.D. Cal. 2011) ........................................................................8

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035, 1039 (9th Cir. 2004) .................................................................................4

*Saunders v. Superior Court*,
   27 Cal. App. 4th 832, 838-39 (1994) ...............................................................................22

*Savetsky v. Pre-Paid Legal Servs.*,
   2015 WL 604767 (N.D. Cal. Feb. 12, 2015) .....................................................................23

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540, 1548 (2016)...........................................................................................5

*Stalker v. Stewart Tenants Corp.*,
   93 A.D.3d 550, 940 N.Y.S.2d 600, 602–03 (1st Dep't 2012)............................................26

*Swift v. Zynga Game Network, Inc.*,
   2010 WL 4569889, *6 (N.D. Cal. Nov. 3, 2010) ................................................................4

*Swift v. Zynga Game Network, Inc.*,
   2010 U.S. Dist. LEXIS 117355, at *11-17 (N.D. Cal. Nov. 3, 2010) ...............................14

*Trafficante v. Metro Life Ins. Co.*,
   409 U.S. 205, 208 (1972)...............................................................................................9

*Warren v. Fox Family Worldwide, Inc.*,
   328 F.3d 1136, 1140 (9th Cir. 2003) .................................................................................5

*White v. HUD*,
   475 F.3d 898, 904 (7th Cir. 2007) ..................................................................................17

*White v. Lee*,
   277 F.3d 1214, 1242 (9th Cir. 2000) .................................................................................3

*White v. Square, Inc.*,
   7 Cal. 5th 1019 (2019) ...................................................................................................21

1

<u>**TABLE OF AUTHORITIES – CONT'D**</u>

2

<u>**CASES**</u>

3

*Willborn v. Sabbia,*

4
     2011 WL 1900455, at *4 (N.D. Ill. May 19, 2011) ........................................26

5

*Wilson v. Redbox Automated Retail, LLC,*

6
     448 F. Supp. 3d 873, 884 (N.D. Ill. 2020) ...............................................24, 25

<u>**STATUTES**</u>
7
24 C.F.R. § 100.75 ..........................................................................................17

8
24 C.F.R. § 100.75(b) .....................................................................................16

24 C.F.R. § 100.75(c)(2) .................................................................................17

9
24 C.F.R. § 100.80(b)(4) ................................................................................19

42 U.S.C. § 3601 ...............................................................................................1

10
42 U.S.C. § 3604(a) ..................................................................................18, 19

42 U.S.C. § 3604(c) ..............................................................................16, 17, 18

11
42 U.S.C. § 3604(d) ........................................................................................19

42 U.S.C. § 3606 ........................................................................................19, 20

12
47 U.S.C. § 230 .........................................................................................*passim*

47 U.S.C. § 230(a) ..........................................................................................10

13
47 U.S.C. § 230(b) ..........................................................................................10

47 U.S.C. § 230(c) ...............................................................................11, 12, 14

14
47 U.S.C. § 230(f)(3) .................................................................................13, 14

15
Cal. Civil Code § 51.5 ...................................................................................... 1

Cal. Civil Code § 52(a) .....................................................................................1

16
California's Unfair Competition Law, Business and Professions Code § 17200 *et seq.*

17
("UCL") ........................................................................................................1, 22

N.Y. Exec. Law § 300 ......................................................................................28

18
N.Y. Exec. Law §296(5) ....................................................................25, 26, 27

N.Y. Exec. Law §296(6) ..................................................................................27

19
New York Human Rights Law, N.Y. Exec. L. § 290 *et seq.* ("NYSHRL") ....................................1

20
NYSHRL § 290 .................................................................................................26

NYSHRL § 296(5) .............................................................................25, 26, 27

21

<u>**RULES**</u>
22
Federal Rules of Civil Procedure 12(b)(1) ......................................................3

23
Federal Rules of Civil Procedure 12(b)(6) ...................................................3, 4

24
Rule 15(a) ........................................................................................................29

25
Rule 56 ..............................................................................................................4

26

27

28

1

## I.   INTRODUCTION

2

Facebook engaged in blatant housing discrimination and, in the process, garnered hundreds of

3

millions of dollars of revenue. Facebook claims that it no longer uses its illegal advertising platform as

4

of 2020. While that may be true, Facebook still needs to financially answer for its years of illegal housing

5

discrimination [1]

6

Facebook is liable under the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA"), because it

7

created a discriminatory website advertising platform that invited and permitted its advertisers to direct

8

traffic in a manner that excluded its users who are members of protected classes. The Plaintiffs in the

9

putative class have standing by virtue of the injuries in fact that they suffered in a segregated

10

marketplace. Furthermore, Facebook does not have immunity under the Communications Decency Act

11

of 1996, 47 U.S.C. § 230 ("CDA"), because Facebook was integrally involved in the creation of the

12

content used by its advertisers through its discriminatory software. Facebook further fostered

13

discrimination by using powerful algorithms to direct housing ads away from those in protected classes.

14

Finally, Plaintiffs have stated claims for relief under the California Unruh Act ("Unruh"), Cal. Civil

15

Code § 51.5, 52(a); California's Unfair Competition Law, Business and Professions Code § 17200 *et*

16

*seq.* ("UCL"); and, the New York Human Rights Law, N.Y. Exec. L. § 290 *et seq.* ("NYSHRL").

17

Plaintiffs have demonstrated a right to financial recovery and injunctive relief.

18

## II.   STATEMENT OF FACTS

19

Facebook's advertising portal empowers advertisers to select target audiences based on their

20

demographic and behavioral characters, and Facebook algorithms then direct the ads to the targeted

21

audience. (SAC ¶¶ 79, 80-82). Facebook evaluates, analyzes, and processes user data to create thousands

22

of different categories based on information that users provide to Facebook, as well as information that

23

Facebook infers from the users' actions and behaviors. These categories include age, ethnic affinity, sex,

24

25

26

27

[1] There is evidence to suggest that Facebook is still using algorithms to target housing ads in a discriminatory manner. Nadiyah Humber and James Matthews, *Fair Housing Enforcement in the Age of Digital Advertising: A Closer Look at Facebook's Marketing Algorithms*, BOSTON BAR JOURNAL (Feb. 19, 2020), https://bostonbarjournal.com/2020/02/19/fair-housing-enforcement-in-the-age-of-digital-advertising-a-closer-look-at-facebooks-marketing-algorithms-2/#_ednref5.

28

PL.'S OPP. TO MOTION TO DISMISS
CASE NO. 3:19-cv-5081-WHO

race, geographic location, marital status, personality type, and thousands of other characteristics. (SAC ¶ 77).

Facebook sells advertisers its tools to target advertisements to people who, according to Facebook's assessment of the data it collects, share certain personal attributes and/or are likely to respond to a particular ad. (SAC ¶¶ 64-65). Users may disclose some data about themselves when they set up their profiles, such as name and gender. (SAC ¶ 73). However, users disclose most of the data Facebook uses unwittingly through their actions and behaviors, and the actions and behaviors of people associated with them, on and off Facebook's platforms. *Id.*

Facebook approved advertisements that excluded categories that identify its users as members of protected classes, including sex, age, race, and geographic boundaries, and other discriminatory variables. (SAC ¶ 87). When an advertiser excluded a specific category from its audience and Facebook published its advertisement, Facebook ensured that the advertisement was not directed to anyone that Facebook placed in that category. (SAC ¶ 88). As recently as 2019, Facebook mined user data to create categories of users defined by race or skin color *other than White* and empowered advertisers to exclude those categories from the audience of housing advertisements. (SAC ¶ 89).

Facebook approved and published housing advertisements that excluded African Americans from its audiences. (SAC ¶ 90). Specifically, on or about November 14, 2017, ProPublica purchased dozens of rental housing ads on Facebook and requested that those ads "not be shown to certain categories of users, such as African Americans, mothers of high school kids, people interested in wheelchair ramps, Jews, expats from Argentina and Spanish speakers." (SAC ¶ 91). "Every single ad was approved within minutes." *Id.* An additional ProPublica ad that sought to exclude potential renters "interested in Islam, Sunni Islam and Shia Islam" took 22 minutes to approve. *Id.* Facebook approved and published housing advertisements for sale and rental properties that excluded African Americans and single parents and/or that were based on sex, familial status, and other protected classes from the ad's target audience. *Id.*

Facebook's conduct prevented Plaintiffs and the putative class from receiving advertisements for the sale or rental of available housing. (SAC. ¶ 93). Further, Facebook's affirmative conduct made

it a creator or developer of the information or content in the ads that are not published, not provided, not circulated, and not sent to Facebook users, based on the users' genuine or perceived protected class characteristics. (SAC ¶¶ 18-20). Facebook's conduct violates the FHA, and the analogous New York and California state laws, Unruh, the UCL, and NYSHRL, respectively, which prohibit the publication of advertisements that discriminate against protected classes. (SAC ¶ 95).

In response to past litigation, Facebook has represented that it changed its illegal advertising practices, but Facebook has yet to offer any compensation to the tens of thousands of users who were subjected to its discriminatory segregated housing marketplace. (SAC ¶ 3). Moreover, although Facebook has agreed to change its practices, there is no guarantee it will continue to comply in the future, which therefore warrants that Facebook be enjoined from ever again operating a segregated housing marketplace through its advertising platforms. *Id.*; *see also* Dkt. No. 64, p. 16.

### III.   LEGAL STANDARDS

Facebook seeks to dismiss Plaintiffs' SAC in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. 64, at ¶ 1). Specifically, Facebook moves to dismiss Plaintiffs SAC under Federal Rule of Civil Procedure Rule ("Rule") 12(b)(1) for lack of subject matter jurisdiction alleging that (1) Plaintiffs failed to "identify any housing ad" within the allegations of the SAC illustrating discriminatory outcomes under the FHA; and (2) that Plaintiffs failed to allege facts illustrating personal harm stemming from Facebooks' "discriminatory conduct" within the allegations of the SAC. (Dkt. 64, at ¶ 7.)

Facebook did not submit evidence in support of its Rule 12(b)(1) challenge. Importantly, a challenge to subject matter jurisdiction may be either facial or factual. That is, "[a] party who brings a Rule 12(b)(1) challenge may do so by referring to the face of the pleadings or by presenting extrinsic evidence." *Lopez v. Trendacosta*, No. 14-05406, 2014 WL 6883945, *4 (C.D. Cal. Dec. 4, 2014) (citing *White v. Lee*, 277 F.3d 1214, 1242 (9th Cir. 2000)). Where, as here, Facebook has made a facial attack on jurisdiction, the Court must resolve the challenge, "as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences

in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013).

Even more fundamentally, because Facebook disputes the facts underpinning subject matter jurisdiction and those facts are "inextricably intertwined" with the merits of Plaintiffs' claims, Facebook must proceed under Rules 12(b)(6) or 56 and "the court should resolve the relevant factual disputes only after appropriate discovery." *Kerns v. United States,* 585 F.3d 187, 193 (4th Cir. 2009); *see also Augustine v. United States*, 704 F.2d 1074, 1079 (9th Cir. 1983). Significantly, the court may not weigh and decide disputed facts on a facial attack as to jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

Facebook also seeks dismissal of Plaintiffs' SAC under Rule 12(b)(6). (Dkt. 64, at ¶ 1). A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court must accept all well-pled facts as true and construe facts "in the light most favorable to the plaintiff." *Lazy Y Ranch Ltd., v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

Moreover, an affirmative defense cannot serve as a basis for dismissal unless its applicability is obvious on the face of the complaint. *See Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013). The Communications Decency Act ("CDA") is an affirmative defense that turns on an interpretation of facts, and as such should not be resolved through a 12(b)(6) motion. *See, e.g.*, *Swift v. Zynga Game Network, Inc.*, No. 09-05443 SBA, 2010 WL 4569889, *6 (N.D. Cal. Nov. 3, 2010) ("It would be improper to resolve [CDA immunity] on the pleadings and the limited record presented.") (citing *Perfect 10, Inc. v. Google, Inc.*, No. 04-9484, 2008 WL 4217837, *8 (C.D. Cal. July 16, 2008) ("preemption under the CDA is an affirmative defense that is not proper to raise in a Rule 12(b)(6) motion")).

IV.   **ARGUMENTS**

   A.   **Plaintiffs' Have Article III and Statutory Standing**

   Plaintiffs' SAC alleges facts sufficient to confer Article III standing and statutory standing. Plaintiffs have standing because: (1) they suffered an "injury in fact" that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged action; and (3) a favorable decision will likely redress the injuries.   *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*., 528 U.S. 167, 180-81 (2000). In a class action case, only one named plaintiff must have suffered injury. *Lierboe v. State Farm Mut. Auto. Ins. Co*., 350 F.3d 1018, 1022 (9th Cir. 2003). At the pleading stage, Plaintiffs "need only show that the facts alleged, if proved, would confer standing." *Warren v. Fox Family Worldwide, Inc*., 328 F.3d 1136, 1140 (9th Cir. 2003) (emphasis added). At this stage, a court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Courts are "instructed . . . to take a broad view of constitutional standing in civil rights cases." *Chapman v. Pier 1 Imports Inc*., 631 F.3d 939, 946 (9th Cir. 2011).

   1.   **Segregation from a Housing Marketplace Is an Injury in Fact.**

   Plaintiffs have sufficiently alleged a concrete and particularized injury: They have been denied access to Facebook's online housing marketplace that is accessible to users in non-protected classes. To show injury in fact, a plaintiff must allege facts demonstrating that, due to the challenged conduct, they have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). A "particularized" injury "must affect the plaintiff in a personal and individual way." *Id.*

   Injury under the FHA encompasses all housing discrimination and has a very liberal standing requirement. The "actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982). In *Havens*, the Supreme Court held that black testers who had no intention of buying or renting a home nevertheless had standing to enforce their statutory rights "to truthful information concerning the availability of housing," because they had been injured by receiving false information.

455 U.S. 363, 374 (1982). The injury was the tester's "statutory right to truthful housing information." *Id.* at 375.

Under the UCL and the Unruh, Plaintiffs must establish standing by alleging facts showing that they "actually suffer[ed] the discriminatory conduct" being challenged and possess a "concrete and actual interest that is not merely hypothetical or conjectural." *Angelucci v. Century Supper Club*, 41 Cal. 4th 160, 165 (2007). Under the NYSHRL, Plaintiffs must establish that they have been "aggrieved by an unlawful discriminatory practice," N.Y. Exec. Law § 297, which "requires a threshold showing that a person has been adversely affected by the activities of defendants." *Mobil Oil Corp. v. Syracuse Indus. Dev. Agency*, 76 N.Y.2d 428, 433 (N.Y. 1990).

Plaintiffs have alleged that they are members of protected classes ("disabled female of Hispanic descent, and a single parent with minor children," SAC at ¶ 29, "a female of African American descent, and a single parent with minor children," *Id.* at ¶ 34, "female of both African American and Hispanic descent, and a single parent with minor children," *Id.* at ¶ 35, "a male of African American descent" *Id.* at ¶¶ 36, "a female of Asian American descent," *Id.* at ¶ 37, and second "a female of Asian American descent." *Id.* at ¶ 38.) who have "used Facebook during the relevant time period to seek housing," and that "because Facebook created a platform which provided tools to exclude women of color, single parents and other protected attributes," Plaintiffs were prevented from "having the same opportunity to view ads for housing that other Facebook users who did not share the same characteristics were shown." SAC at ¶ 29, 31, 34-39.

The Plaintiffs' allegations clearly identify concrete injuries that they have personally experienced, each of which independently has been recognized by the United States Supreme Court to confer standing, including: "discrimination" based on protected classes, SAC at ¶¶ 88-89; "perpetuat[ion] [of] segregation" and denial of "the benefits of living in a[n] . . . integrated society," SAC at ¶ 92; and finally, denial of information that laws require to be given on an equal basis. SAC at ¶ 87, 93; *See also Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302-03 (2017); *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984).

Facebook argues that in *Bradley v. T-Mobile*, the court found that the Plaintiffs complaint "[did] not identify—even by way of example—a single job for which these allegations are true." *Bradley*, No. 17-CV-07232-BLF, 2020 WL 1233924, at *10 (N.D. Cal. Mar. 13, 2020). Notably, *Bradley* is an employment discrimination case, brought under the Age Discrimination in Employment Act, which has a different standing analysis from the broad standing under the FHA. Standing under the FHA "extend[s] to the full limits of Article III." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 902 (9th Cir. 2002). In contrast, *Bradley* does not implicate this principle. Also, Facebook fails to realize that standing under the FHA has long been settled to include fact scenarios more relaxed than those in the instant action.

Furthermore, Plaintiffs here have sufficiently pled their standing allegations in the SAC. SAC ¶¶ 29-33. Plaintiffs allege that "Plaintiff Vargas searched for housing periodically during the relevant period. . . by location and cost." *Id.* at ¶ 30. Due to Facebook's "platform which provided tools to exclude women of color, single parents and other protected attributes, Ms. Vargas and others similarly situated were prevented by Facebook from having the same opportunity to view ads for housing that other Facebook users who did not share the same characteristics were shown." *Id.* at ¶ 31. She discovered she was being discriminated against when she "filtered her search for housing on the Facebook marketplace using the same parameters that her White male friend used but she obtained fewer results than her White male friend." *Id.* at ¶ 32. This is clearly an example of advertisements that did not reach Plaintiff Vargas due to her protected characteristics. Moreover, "when Plaintiff Vargas included her use of a Section 8 voucher and her status as a veteran in her search, she obtained no results." *Id.* at ¶ 33.

Further, Facebook's effort to distinguish between its housing marketplace and its housing advertisements is a red herring. This distinction is irrelevant because Facebook's housing marketplace contains all of Facebook's housing advertisements that the searcher is "eligible" to see.

Finally, Facebook asserts, based on *Bradley*, that Plaintiffs must identify specific housing advertisements that they were qualified to rent but were prevented from doing so because of Facebook's conduct. Facebook's reliance on *Bradley*, is misplaced, however, as that case involved employment discrimination, not housing discrimination. Standing under the FHA is sufficiently broader than standing in employment discrimination cases. The Supreme Court has found standing in cases where people of

color were subjected to racial steering but did not identify the specific opportunities they were denied (e.g., a specific apartment). *Havens*, 455 U.S. at 368, 373-74 (finding standing where African Americans were steered away from housing opportunities even though they did not identify a specific housing unit the landlord refused to show them); *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110-14 (1979).

The allegations in Plaintiffs' SAC demonstrate that the Plaintiffs have "suffered an invasion of a legally protected interest that is concrete and particularized." Plaintiff Vargas "filtered her search for housing on the Facebook marketplace using the same parameters that her White male friend used," yet obtained "fewer results than her White male friend." Plaintiff Vargas was personally harmed by being excluded from Facebook's housing marketplace, which the Supreme Court has held sufficiently constitutes harm as required for Article III standing.

### 2.   Facebook's Segregated Marketplace Was Clearly Created and Run by Facebook.

Facebook argues that Plaintiffs' injuries are the result of advertisers who use Facebook's purportedly "neutral tools" to exclude protected classes from viewing ads. MTD at ¶¶ 9-10. But as Facebook's own authority shows, traceability does not require a "defendant's actions [to be] the very last step in the chain of causation" or solely cause an injury. *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). Moreover, to establish Article III standing, an indirect causal relationship suffices. *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 749 (N.D. Cal. 2011). Facebook created the illegal advertising platform content, gave it to its advertisers, and collected data regarding protected classes and was the last step in the determination of targeting and delivering the housing ads.  SAC at ¶¶ 7-8, 14-16, 65-67, 69-96.

There is a close, direct relationship between Facebook's conduct and Plaintiffs' injuries. Plaintiffs allege that Facebook "collects and extracts data about its users' demographics, interests, and behavior both on and off Facebook's platform." *Id.* at ¶ 68. Facebook, using this data, "evaluates, analyzes, and processes the user data to create thousands of different categories, which are based on information that users have provided to Facebook and on information that Facebook has inferred from the user's actions and behaviors." *Id.* at ¶ 71. Facebook assigns applicable categories to each user. *Id.* at

¶ 72. Facebook organizes its ad platform with drop-down forms, containing protected class categories, so advertisers can use illicit data to target users based on protected classes. *Id.* at ¶¶ 73-75. Facebook, not the advertisers, then delivers the ads based on illegal and discriminatory classifications for and on behalf of advertisers to its users. *Id.* at ¶¶ 76-96.

The Supreme Court has held that plaintiffs had standing where there was a far less direct connection between a defendant's violation and a plaintiff's injury. *See Havens*, 455 U.S. at 379-80. *Trafficante v. Metro Life Ins. Co.*, 409 U.S. 205, 208 (1972). In this case, Facebook takes multiple affirmative steps that create a segregated online housing marketplace. Facebook collects the data. Facebook organizes the data. Facebook asks the advertisers what types of people they want to preclude from seeing the ads. Lastly, Facebook chooses who the ad goes to and then carries out the discrimination by excluding protected classes from seeing ads. Facebook takes affirmative steps that directly cause the injuries alleged by Plaintiffs. Plaintiffs injuries are therefore traceable to Facebook's conduct, satisfying the second element of Article III standing.

### B. The CDA Does Not Shield Facebook from Liability Because Facebook Is A Publisher or Speaker for the Purposes of Section 230.

Facebook's reliance on Section 230 of the CODA is misplaced. One reason Congress passed the CDA was to "prohibit obscene or indecent material from reaching children on the internet, also to safeguard internet ingenuity." *See* Humber & Matthews, *supra* note 1. Facebook seeks to weaponize the CDA as a tool for blanket immunity from suit. Facebook's distortion of the CDA and the alleged facts should be rejected.

Facebook deliberately ignores its role in the creation of the advertising platform tools used by housing advertisers. Facebook's ad platform tools of Exclude People and Include People, which contain dropdown boxes allowing the inclusion or exclusion of users in protected classes, constitute content creation. Further, Facebook is not simply a passive host for advertisements. Facebook plays an active and key role in targeting third party ads based upon its sophisticated marketing algorithms as alleged in the SAC (Dkt. 61, at *¶¶* 13-24.) Facebook is not shielded by the CDA because Plaintiffs' SAC alleges facts that Facebook "materially contributes" to the management of the advertising content on its

platform. *Fair Hous. Counsel of San Fernando Valley v. Roommates.com LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008).

Contrary to Facebook's arguments, Section 230 does not provide sanctuary from Plaintiffs' claims. Facebook argues that it is immune because the advertiser, and not Facebook, decides which categories of users to include or exclude from advertisements is specious: "The CDA does not grant immunity for inducing third parties to express illegal preferences." *Roommates.com LLC*, 521 F.3d at 1165. Facebook and the advertiser are co-developers of each targeted ad because "the fact that [advertisers] are information content providers does not preclude [Facebook] from also being an information content provider by helping 'develop' at least 'in part' the [unlawful content]." *Id.* To hold otherwise and consider Facebook responsible "only [for] content that originates entirely with the website . . . ignores the words 'development . . . in part' in the statutory passage." *Id.* at 1167.

In addition, the dropdown menus and other tools are themselves content (in that they are material existing on the internet); unlike the advertisements, which Facebook alone developed, and is, therefore, responsible for, the composition of these tools. Facebook's "own acts — posting the questionnaire and requiring answers to it — are entirely its doing and thus section 230 of the CDA does not apply to [those acts]." *Id.* at 1165.

Section 230 of the CDA was implemented to promote the continued development of the Internet by providing civil immunity to Internet users and content creators under certain circumstances. 47 U.S.C. § 230(a), (b). The operative provision of section 230 is subsection (c), which states, in its entirety:

(c) Protection for "Good Samaritan" blocking and screening of offensive material.

> (1) Treatment of publisher or speaker. No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider

> (2) Civil liability. No provider or user of an interactive computer service shall be held liable on account of—

>> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene,

lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1) [subparagraph (A)].

47 U.S.C. § 230(c). Thus, section 230 provides two categories of immunity: 1) immunity for a provider or user of an "interactive computer service" for information provided by another "information content provider" and 2) immunity for providers and users of interactive computer services who restrict access to content "that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." *Id.*

*Barnes v. Yahoo!, Inc.,* 570 F.3d 1096 (9th Cir. 2009) is the leading Ninth Circuit decision interpreting section 230 of the CDA. Several recent published Ninth Circuit opinions rely upon the analysis from *Barnes* with minimal additional interpretation. *See*, e.g., *HomeAway.com v. City of Santa Monica,* 918 F.3d 676 (9th Cir. 2018); *Doe v. Internet Brands, Inc.,* 824 F.3d 846, 849-54 (9th Cir. 2016).

In *Barnes*, the Ninth Circuit recognized that "subsection (c)(1) [of section 230] only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes*, 570 F.3d at 1100-01. The court has further recognized that the cause of action at issue in a given case does not determine whether section 230 applies to a defendant. *Id.* at 1101-02. Rather, "what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Id.* at 1102. "To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Id.* "If it does, section 230(c)(1) precludes liability." *Id.*

The text of the CDA is "clear that neither this subsection nor any other declares a general immunity from liability deriving from third-party content." *Id.* at 1100. To provide broad immunity

1   "every time a website uses data initially obtained from third parties would eviscerate [the CDA]." *Id.* at

2   1100. For the purposes of section 230, "publication involves reviewing, editing, and deciding whether

3   to publish or to withdraw from publication third-party content." *Id.* "Thus, a publisher reviews material

4   submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to

5   publish it." *Id.*

6          Critically, section 230 of the CDA provides key restrictions to its immunity provision to apply

7   only to certain internet-based actors from certain kinds of lawsuits. The CDA does not protect online

8   content that Facebook created, in whole or in part. *Roommates.com LLC*, 521 F.3d at 1162. Plaintiffs'

9   SAC alleges Facebook created in part the illegal advertising at issue in this case by "provid[ing] drop-

10   down menus and search boxes to exclude or include (i.e., limit the audience of an ad exclusively to)

11   people who share specified attributes." (Dkt. 61, at ¶ 77; *see also* Dkt. 61, at ¶¶ 11, 16.)

12          In *Roommates.com*, LLC, the Ninth Circuit addressed section 230's application to FHA claims

13   and the question of whether a pre-made form renders a defendant an author or publisher in

14   *Roommates.com*, LLC. The defendant in that case operated a website designed to match people renting

15   out spare rooms with people looking for a place to live. *Roommates.com*, LLC, 521 F.3d at 1161. Before

16   subscribers to the defendant's website could search for listings, they were required to create profiles,

17   which required each subscriber to disclose his sex, sexual orientation, and whether he would bring

18   children to a household. *Id.* Each subscriber was also required to describe his or her preference in

19   roommates concerning the same three criteria: sex, sexual orientation, and whether they will bring

20   children to the household. *Roommates.com*, *LLC* at 1161. The district court held that the defendant was

21   immune under section 230(c). *Id.* The Ninth Circuit reversed and found that section 230(c) did not grant

22   the defendant immunity. *Id.*

23          In finding that section 230 did not apply, the Ninth Circuit recognized that "[i]n passing section

24   230, Congress sought to spare interactive computer services this grim choice by allowing them to

25   perform some editing on user-generated content without thereby becoming liable for all defamatory or

26   otherwise unlawful messages that they [did not] edit or delete." *Id.* at 1163. "In other words, Congress

27   sought to immunize the removal of user-generated content, not the creation of content." *Id.*

28

The Ninth Circuit held that a company that develops a form to be filled out by a website's users can be liable under section 230 because it is, at least in part, creating discriminatory content. The court held that the defendant in *Roommates.com*, *LLC* was an "information content provider" under section 230 because "Roommate created the questions and choice of answers, and designed its website registration process around them." *Id.* at 1164. "The CDA does not grant immunity for inducing third parties to express illegal preferences." *Id.* at 1165. "Roommate's own acts--posting the questionnaire and requiring answers to it--are entirely its doing and thus section 230 of the CDA does not apply to them." *Id.*

The *Roommates.com*, *LLC* court further recognized that "the fact that users are information content providers does not preclude Roommate from also being an information content provider by helping 'develop' at least 'in part' the information in the profiles." *Id.* This is because the defendant developed the questions to which the users were required to respond:

> [T]he part of the profile that is alleged to offend the Fair Housing Act and state housing discrimination laws--the information about sex, family status, and sexual orientation--is provided by subscribers in response to Roommate's questions, which they cannot refuse to answer if they want to use defendant's services.

*Id.* at 1166. "By requiring subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information." *Id.* (emphasis added). "And section 230 provides immunity only if the interactive computer service does not 'creat[e] or develop[ ]' the information 'in whole or in part.'" *Id.* (quoting 47 U.S.C. § 230(f)(3)). The court further stated that "[w]hen a business enterprise extracts [discriminatory] information from potential customers as a condition of accepting them as clients, it is no stretch to say that the enterprise is responsible, at least in part, for developing that information." *Id.*

The court also recognized that "Roommate designed its search system so it would steer users based on the preferences and personal characteristics that Roommate itself forces subscribers to disclose." *Id.* Thus, "[i]f Roommate has no immunity for asking the discriminatory questions, as we

concluded above . . . it can certainly have no immunity for using the answers to the unlawful questions to limit who has access to housing." *Id.* The court recognized that to hold otherwise would be "no different from a real estate broker saying to a client: 'Sorry, sir, but I can't show you any listings on this block because you are [gay/female/black/a parent].'" *Id.* (emphasis added) Therefore, the court held that "[i]f such screening is prohibited when practiced in person or by telephone, we see no reason why Congress would have wanted to make it lawful to profit from it online." *Id.*

The court closed its opinion in *Roommates.com*, *LLC* with several big-picture takeaways. Critically, "[p]roviding immunity every time a website uses data initially obtained from third parties would eviscerate the exception to section 230 for 'develop[ing]' unlawful content 'in whole or in part.'" *Id.* at 1171 (quoting 47 U.S.C. § 230(f)(3)). The court further reiterated the legislative purpose of section 230:

> When Congress passed section 230 it [did not] intend to prevent the enforcement of all laws online; rather, it sought to encourage interactive computer services that provide users neutral tools to post content online to police that content without fear that through their "good Samaritan . . . screening of offensive material," 47 U.S.C. § 230(c), they would become liable for every single message posted by third parties on their website.

*Id.* at 1176. For these reasons, the court found that a website developer that provides its users with a form to fill out can be liable under section 230. Several courts within the Ninth Circuit have followed *Roommates.com*, *LLC* in finding that section 230 immunity does not apply to causes of action based on wrongdoing where a website creates prompts to which a user responds. *See*, e.g., *Swift v. Zynga Game Network, Inc*., No. C 09-05443 SBA, 2010 U.S. Dist. LEXIS 117355, at *11-17 (N.D. Cal. Nov. 3, 2010); *Certain Approval Programs, L.L.C. v. Xcentric Ventures, L.L.C.*, No. CV08-1608-PHX-NVW, 2009 U.S. Dist. LEXIS 22318, at *3-7 (D. Ariz. Mar. 9, 2009).

*Roommates.com LLC*, is dispositive here and eviscerates Facebook's arguments. As in *Roommates.com LLC*, Facebook's "work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanisms," in its advertising platform, as alleged in the Complaint, disqualifies it from CDA immunity. *Id.* at 1172. Facebook's creation of a premade form for its

advertisers to use to create advertisements is sufficient to remove it from the scope of section 230. (*See* Dkt. 61, at ¶ 77; *see also* Dkt. 61, at ¶¶ 11, 16). Facebook's conduct violates the FHA and Plaintiffs have suffered violations of their rights under the FHA.

Facebook created premade prompts for third-party advertisers to use in placing advertisements on its platforms. It is impossible for an advertiser to place an advertisement on Facebook without using content that was created by Facebook. Facebook gave advertisers tools that it created that enable and encourage advertisers to unlawfully discriminate, by allowing housing advertisers to include or exclude users based on their protected class status. Facebook's creation of these tools renders it a content creator that is exempt from section 230's protections because it created the discriminatory advertisements at least "in part." *See Roommates.com*, *LLC*, 521 F.3d at 1166-67. Thus, Facebook cannot use section 230 as a basis to escape liability.

In support of its request for immunity under section 230, Facebook relies upon *Force v. Facebook, Inc*., 934 F.3d 53 (2d Cir. 2019), *Pennie v. Twitter, Inc.,* 281 F. Supp. 3d 874 (N.D. Cal. 2017), and *Gonzalez v. Google, Inc.,* 282 F. Supp. 3d 1150 (N.D. Cal. 2017). These cases are distinguishable because they involve federal antiterrorism claims arising out of social media use associated with terrorist attacks by Hamas and ISIS. The Second Circuit's opinion in *Force* involved Facebook posts by Hamas that encouraged terrorist attacks in Israel that allegedly resulted in the deaths of the plaintiffs' decedents in that case when they were, in fact, attacked by terrorists and Hamas made celebratory posts on Facebook after the fact. *Force*, 934 F.3d at 58-59. Similarly, the plaintiffs in *Pennie* alleged that they were injured in a mass shooting by a domestic terrorist who was radicalized by Hamas through Hamas's Twitter, Facebook, and YouTube content, which was entirely produced by Hamas. *Pennie*, 281 F. Supp 3d at 876-79. The decision in *Gonzalez* dealt with allegations that Google "knowingly provided material support to ISIS" though its YouTube platform by hosting propaganda videos that allegedly lead to the death of the plaintiff's decedent. *Gonzalez*, 282 F. Supp. 3d at 1153-56. These cases have no application to this FHA case. Moreover, there is no discussion about Facebook's premade dropdown menus that are alleged to be at issue in this case. (*See* Dkt. 61, at ¶ 77; *see also* Dkt. 61, at ¶¶ 11, 16). The same is true of *Goddard v. Google, Inc*., 640 F. Supp. 2d 1193 (N.D. Cal. 2009),

which involves a Google keyword tool that is distinguishable from Facebook's drop-down menus at issue here. These advertising platform menus are critical because, as discussed, they render Facebook a creator, in part, of the discriminatory advertising that is at issue in this case, thereby removing Facebook from the scope of section 230.

Facebook also relies upon *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119 (9th Cir. 2003), an invasion of privacy case where the Ninth Circuit applied section 230 immunity. However, importantly, the *Carafano* court recognized that even though the defendant, in that case, used a prepopulated questionnaire to obtain some information from the plaintiff, it "did not play a significant role in creating, developing, or 'transforming' the relevant information." *Carafano*, 339 F.3d at 1125. This is in direct contrast with this case, where Facebook's prepopulated drop-down menus are central to the creation of the discriminatory advertisements that are at issue.

As discussed above, Facebook is not entitled to section 230 immunity because it is not simply a passive host for advertisements; rather, Facebook played an active and integral role in targeting third party ads based upon its sophisticated marketing algorithms, resulting in the creation of the discriminatory content and then effecting the discriminatory transmission.

**C.** **Plaintiffs Have Stated Claims Under the FHA.**

**1.** **Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(c).**

Facebook incorrectly takes the position that it cannot be liable for violating the FHA because it is a mere publisher of discriminatory advertisements provided to it by third parties. Facebook's position lacks legal merit. The FHA's broad reach renders Facebook's conduct unlawful and actionable. Section 3604(c) of the FHA provides that it is unlawful:

[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c). The U.S. Department of Housing and Urban Development's ("HUD") implementing regulations provide that these prohibitions "apply to all written or oral notices or statements by a person engaged in the sale or rental of a dwelling." 24 C.F.R. 100.75(b). It states that notices and statements subject to the requirements "include any applications, flyers, brochures, deeds, signs, banners, posters, billboards, or any documents used with respect to the sale or rental of a dwelling." *Id.* Prohibited statements include discriminatory statements "[e]xpress[ed] to agents, brokers, employees, prospective sellers or renters or any other persons." 24 C.F.R. 100.75(c)(2). To determine whether a statement violates section 3604(c), courts ask whether it "would suggest a preference to an ordinary reader or listener." *Johnson v. Macy*, 145 F. Supp. 3d 907, 916 (C.D. Cal. 2015) (citation and quotation marks omitted). "Intent is not a necessary element of a § 3604(c) violation." *Iniestra v. Cliff Warren Invs., Inc.*, 886 F. Supp. 2d 1161, 1169 (C.D. Cal. 2012); *Rojas v. Bird*, No. 13-04967, 2014 U.S. Dist. LEXIS 10809, at *1 (C.D. Cal. Jan. 10, 2014).

A plaintiff in a section 3604(c) case based on an alleged statement, must allege that (1) the defendant made the statement; (2) the statement was made with respect to the rental of a dwelling; and (3) the statement indicated a preference, limitation, or discrimination on a prohibited basis. *See Elliott v. Versa CIC, L.P.*, No. 16-cv-0288-BAS-AGS, 2019 U.S. Dist. LEXIS 16744, at *18 (S.D. Cal. Feb. 1, 2019) (citing *White v. HUD*, 475 F.3d 898, 904 (7th Cir. 2007)). In advertising, a cognizable claim under § 3604(c) may be established when (a) an ad communicates in an obvious and undeniable way a discriminatory preference; or (b) the ad is rendered discriminatory through the proof of extrinsic circumstances demonstrating discriminatory intent. *Housing Opportunities Made Equal v. Cincinnati Enquirer*, 731 F. Supp. 801, 804 (S.D. Ohio, 1990), aff'd 943 F.2d 644 (6th Cir. 1991). Violations of § 3604(c) in advertising can be proven by looking at the "totality of the evidence." *Id.* At least one court has recognized that "[o]f course, a publisher also remains liable for publishing advertisements which are discriminatory on their face or with the intent to discriminate." *Id.* at 648, n.4.

Facebook argues that the alleged advertisements at issue are not discriminatory because they do not violate section 3604(c) on their faces. However, both HUD and at least one court have recognized that the way an ad is "targeted" may run afoul of section 3604(c). HUD's regulations interpreting §

3604(c) state that "[s]electing media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin" is discriminatory advertising. 24 C.F.R. § 100.75. Based on this regulation, the Western District of Tennessee has recognized that an "allegation that Defendant only advertised in Spanish language media outlets is sufficient to state a claim" under section 3604(c) "because it meets the Department of Housing and Urban Development's definition of discriminatory advertisement in that it denies non-Spanish speaking segments of the housing market, who are overwhelmingly non-Hispanic, information about housing opportunities." *Guevara v. UMH Props.*, No. 2:11-cv-2339-SHL-tmp, 2014 U.S. Dist. LEXIS 154394, at * 15-16 (W.D. Tenn. Oct. 29, 2014).

Likewise, Facebook is liable in this case under section 3604(c) because it played a fundamental role in creating discriminatory advertisements that intentionally excluded protected minorities from receiving and viewing advertisements for housing. Because of its creation of an advertising platform that facilitates and encourages discriminatory advertisements by creating and making prepopulated forms available to its advertisers, Facebook has repeatedly violated section 3604(c) notwithstanding that the ads that it created on behalf of third parties may or may not have been facially neutral. *See id.*; *see also* Dkt. 61, at ¶ 77; *see also* Dkt. 61, at ¶¶ 11, 16. This is precisely what the government agency charged with enforcing the FHA, the United States Department of Housing and Urban Development ("HUD"), recognized when it brought a charge of discrimination against Facebook based on similar facts. (Dkt. 61, at ¶ 24 and its Ex. 1). By maintaining this platform, Facebook expressed a preference on prohibited bases; accordingly, Plaintiffs' complaint states a claim under section 3604(c) of the FHA. *See Elliott,* 2019 U.S. Dist. LEXIS 16744, at *18; *see also Housing Opportunities Made Equal*, 731 F. Supp. at 804. That Facebook recognized its liability and claims to have stopped its practice is fine. But that does not immunize itself from damages and injunctive relief in this case.

## 2. Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(a).

Facebook is also liable under section 3604(a) of the FHA because it hosted and provided advertising tools that made housing unavailable to members of protected classes. The FHA provides that

it is unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).  Plaintiffs have alleged a claim under the plain language of this statute. The dictionary definition of "unavailable" is "not obtainable                    or                    accessible."                    Unavailable,                    Merriam-Webster, https://www.dictionary.com/browse/unavailable (last visited September 22, 2020). By maintaining its discriminatory advertising platform that allows advertisers to remove members of protected classes from the audiences of advertisements, Facebook made housing unavailable in violation of section 3604(a) because that housing could not have been available to people who did not know that it was for sale or rent. (*See* Dkt. 61, at ¶¶ 97-101). Indeed, HUD alleged that Facebook violated section 3604(a) based on these facts when it brought its charge of discrimination against Facebook. (Dkt. 61, at ¶ 24 and its Ex. 1). Accordingly, Plaintiffs have stated a claim under the plain language of section 3604(a) based on Facebook's maintenance of an advertising platform that allowed advertisers to discriminate based on the race, color, religion, sex, familial status, or national origin of its users.

### 3.     Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(d).

Likewise, Facebook is liable under section 3604(d) of the FHA because it is representing to users who are members of protected classes that housing is not available to them even though it is. The FHA provides that it is unlawful "[t]o represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d).

As Facebook has recognized, HUD has issued regulations providing that it is a violation of this section to "[l]imit[] information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of [protected characteristics]." 24 C.F.R. § 100.80(b)(4). By maintaining an advertising platform that allows advertisers to filter out Facebook users who may view the ad based on each individual's race, color, religion, sex, handicap, familial status, or national origin, Facebook is representing to its users that housing is not available to them when it is, in fact, available. As with Plaintiffs' other claims under section 3604, HUD alleged that Facebook violated subsection (d)

when it brought its charge of discrimination against Facebook based on similar facts as those alleged in this case. (Dkt. 61, at ¶ 24 and its Ex. 1.) Because Facebook maintains a platform that is capable of preventing its users who are members of protected classes from receiving information about housing that is available to other users, Facebook's conduct violates section 3604(d) of the FHA. Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3606.

Plaintiffs have also stated claims under 42 U.S.C. § 3606 because of Facebook's denial of Plaintiffs access to advertisements based on race, color, religion, sex, handicap, familial status, or national origin. Under the FHA, it is unlawful:

> to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3606. Facebook violated this section by creating and providing an advertising platform that prevents Plaintiffs from viewing advertisements for housing based on race, color, religion, sex, handicap, familial status, or national origin. Facebook actions denied Plaintiffs' participation in a service relating to the business of selling or renting dwellings and discriminated against them in the terms and conditions of their access to housing. (*See* Dkt. 61, at ¶ 77; *see also* Dkt. 61, at ¶¶ 11, 16). Accordingly, Plaintiffs have stated a claim under 42 U.S.C. § 3606.

### D.   The California Plaintiffs Sufficiently Plead Unruh Act Claims.

As demonstrated above, Facebook intentionally designed and implemented a segregated marketplace by enabling targeted advertising, and intentionally enabled these discriminatory capabilities for housing advertisements, specifically. Facebook relies primarily on the interpretation of the Unruh Act from the California Supreme Court in *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824 (2005). However, *Koebke* concerned the application of a "spousal benefits" at a country club, and the analysis upon which Facebook relies merely rejected the premise that by restricting those benefits to lawfully married couples in a state where same-sex marriage was prohibited, the policy was facially and

intentionally discriminatory. *See id*. at 853-54. Significantly, *Koebke* concerned review of a ruling on summary judgment and ultimately concluded that, in light of evidence that the country club "did not apply its facially neutral policy in an impartial manner," the matter should be remanded for further proceedings. *See id*. *Koebke* does not control the outcome here. If anything, *Koebke* merely highlights the distinction between facially discriminatory policies (such as Facebook's implementation of a segregated marketplace) and "as-applied" challenges, which are also viable.

Notably absent from Facebook's motion, in contrast, is any serious (or superficial, for that matter) consideration of the California Supreme Court's decision in *White v. Square, Inc.*, 7 Cal. 5th 1019 (2019). Although Facebook superficially cites *White* in support of the proposition that to establish standing there must be a concrete injury (*see* MTD At p. 7:1-4), Facebook disregards the specific holding of the decision entirely. *White* involved "a plaintiff who neither paid a fee nor requested equal treatment before leaving the business establishment — in this case, a website, not a brick-and-mortar vendor." *Id.* at 1027. The plaintiff contended that his interaction was "analogous to a plaintiff who intends to patronize a brick-and-mortar shop but, upon his attempted entry, sees a sign indicating that the business does not offer services to individuals based on a protected category of which he is a member." The Supreme Court concluded "that a person who visits a business's website with intent to use its services and encounters terms or conditions that exclude the person from full and equal access to its services has standing under the Unruh Civil Rights Act, with no further requirement that the person enter into an agreement or transaction with the business." *Id.* at 1032-33.

Compounding the specious fiction that Facebook did not "intend" to build these discriminatory capabilities into its marketplace, Facebook next argues that there is nothing "malicious, hostile, or damaging" about unlawfully discriminating against members of protected classes in providing access to a marketplace for housing. Relying on an incoherent "slippery-slope" argument, Facebook suggests that if they can be held liable for intentional housing discrimination, then they can be held liable for targeted advertising generally. The argument is frivolous. There are no state or federal laws mandating equal access to advertisements for hair care products, or clothing, or most of the various commercial products available for purchase in this country. However, and for good reason, such laws do exist with regard to

1    housing. An examination of Facebook's frivolous authority confirms this proposition. *Morsa v.*

2    *Facebook, Inc.*, 77 F. Supp. 3d 1007 (C.D. Cal. 2014), aff'd, 622 F. App'x 915 (Fed. Cir. 2015)

3    (concerned a challenge regarding a patent for a form of targeted advertising); *see id.* at 1013-14

4    (concluding only, broadly, that the notions of "targeting advertisements to certain consumers" and

5    "using a bidding system to determine when and how advertisements will be displayed" are both

6    "fundamental, long-standing, well-known concepts"); *OpenTV, Inc. v. Netflix Inc.*, 76 F. Supp. 3d 886,

7    893 (N.D. Cal. 2014) (to the same effect). Neither case is relevant to the housing discrimination at issue

8    here.

9    **E.    The California Plaintiffs have Properly Alleged a Claim under California Business**

10         **and Professions Sections 17200 et seq.**

11         Facebook erroneously contends that Plaintiffs have failed to state a claim under the UCL.

12   Facebook is simply wrong that Plaintiffs have not alleged a claim under the "unlawful" prong. Indeed,

13   Facebook's violations of the FHA and the Unruh Act are predicate violations that render Plaintiffs' UCL

14   claims viable. *See Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994) ("The 'unlawful'

15   practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal,

16   state, or municipal, statutory, regulatory, or court-made."). Moreover, because Facebook's actions in

17   creating a segregated market for housing advertising contravene public policy and can be categorized as

18   immoral, oppressive, or unscrupulous, Plaintiffs have also alleged a claim under the "unfair" prong of

19   the UCL. *See Colgate v. JULUL Labs, Inc.*, 402 F. Supp. 3d 728, 758-59 (N.D. Cal. 2019).

20         Facebook also contends that the UCL claim fails because Plaintiffs are asserting an improper

21   unjust enrichment theory and Plaintiffs have not given any money directly to Facebook. (Opp. at 28).

22   However, as the California Supreme Court held *in Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 337

23   (2011), even if plaintiffs are not eligible for restitution under the UCL, they still have standing to sue for

24   injunctive relief and their UCL claim should not be dismissed. Moreover, even if Plaintiffs did not pay

25   Facebook directly, it remains to be seen whether they can establish that at least some of Facebook's

26   profits were attributable to their being victims of Facebook's unfair advertising practices and therefore

27   eligible for restitution. Accordingly, the California Plaintiffs have properly alleged a claim under the

28

UCL. *See In re Google Android Consumer Priv. Litig.*, No. 19-cv-04286-BLF, 2014 WL 988889, at *7 (N.D. Cal. Mar. 10, 2014) ("Although Plaintiffs do not allege facts that show they paid money directly to Google, the Court cannot conclude that Plaintiffs might not be able to show an ownership interest in at least some of Google's profits."); *see also,* Robert J. Shapiro, What Your Data Is Really Worth to Facebook and Why You Deserve a Cut; WASHINGTON MONTHLY (July/August 2019), https://washingtonmonthly.com/magazine/july-august-2019/what-your-data-is-really-worth-to-facebook/.

### F.     The New York Plaintiffs State A Claim Under The NYSHRL.

Facebook summarily states that the New York Plaintiffs fail to state a claim because their relationship with Facebook is governed by a California choice of law clause.[2] But Facebook ignores applicable law holding that no contract is formed "when the writing does not appear to be a contract and the terms are not called to the attention of the recipient. In such a case, no contract is formed with respect to the undisclosed term." *Knutson v. Sirius XM Radio Inc*., 771 F.3d 559, 567 (9th Cir. 2014) (quoting *Marin Storage & Trucking v. Benco Contracting & Eng.'g, Inc*., 89 Cal. App. 4th 1042,1049 (2001)). "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble, Inc*., 763 F.3d 1171, 1175 (9th Cir. 2014). Across an ever-evolving variety of online formats—including scrollwrap, clickwrap, browsewrap, and sign-in-wrap—the fundamental question remains: did the website provide the average internet user with adequate notice of the purported contract and its terms?  See *Savetsky v. Pre-Paid Legal Servs*., No. 14-03514, 2015 WL 604767 (N.D. Cal. Feb. 12, 2015).

Here, the New York Plaintiffs have not alleged that they reviewed (much less assented to) Facebook's terms when they registered their accounts. Accordingly, Plaintiffs are not bound by the California choice of law clause and Facebook's motion to dismiss Plaintiffs' New York claims should be denied.

---

[2] Facebook cannot have it both ways, either California law applies to- and provides a cause of action- to residents of all 50 states; or California law applies only to California residents, and New York law applies to New York Residents.

1

### 1.     <u>The New York Plaintiffs Did Not Assent to the Choice of Law Clause.</u>

2

3      There are two main types of contracts formed on the internet. "Clickwrap" (or "click-through")

4  agreements require website users to click on an "I agree" box after being presented with a list of terms

5  and conditions of use. *Nguyen*, 763 F.3d at 1175-76. "Browsewrap" agreements exist where a website's

6  terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the

7  screen. *Id.* at 1176 (internal citations omitted). Unlike a clickwrap agreement, a browsewrap agreement

8  does not require an express manifestation of assent to the terms and conditions. *Id.* Rather, a party gives

9  its assent by simply using the website. *Id.* (internal citations omitted). "The defining feature of

10 browsewrap agreements is that the user can continue to use the website or its services without visiting

11 the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Id.* (citing *Be*

12 *In, Inc. v. Google Inc*., No. 12-CV-03373-LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013)).

13     Some internet contracts are a blend of the two, and have been called a "hybrid design," "modified

14 clickwrap," or "sign-in wrap" agreement. "Sign-in-wrap" agreements are those in which a user signs up

15 to use an internet product or service, and the signup screen states that by registering for the service, the

16 user agrees to a separate agreement. *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 884

17 (N.D. Ill. 2020).

18     Facebook's effort to rely on documents beyond the SAC is improper and addressed in Plaintiffs'

19 response to Facebook's request for judicial notice. In the event this Court considers the Wong

20 Declaration Plaintiffs respond as follows: Facebook required, for example, that Vargas and Skipper

21 create an account by clicking "Sign Up."  The Sign-up/log-in page contains many graphics and various

22 boxes, but the terms of use and the privacy policy are in the smallest type on a very busy page:



PL.'S OPP. TO MOTION TO DISMISS
CASE NO. 3:19-cv-5081-WHO

Vargas and Skipper were not on actual notice of the terms and conditions because it was inconspicuous, the hyperlink was in small type, not underlined or italicized or in any way visually distinct from the surrounding text. Courts have found more conspicuous hyperlinks to be legally deficient. *See Colgate v. JUUL Labs, Inc*., 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019) ( JUUL's hyperlink was not highlighted, underlined, in all caps, or in a separate box, therefore failing to put a reasonable user on inquiry notice about the terms of service); *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 884–85 (N.D. Ill. 2020) (holding that terms of use not clearly and conspicuously displayed and thus, failed to provide constructive notice and that "Redbox's failure to add some additional distinguishing characteristic to the Terms of Use hyperlink is particularly glaring here, given that the Sign In page includes two other hyperlinks formatted differently from the Terms of Use hyperlink"); *Cullinane v. Uber Techs., Inc.,* 893 F.3d 53, 62-63 (1st Cir. 2018) (gray rectangular box with the language "Terms of Service & Privacy Policy" displayed in a larger font, in bold, contrasting in color, and highlighted by the box around it was not reasonably conspicuous); *Applebaum v. Lyft*, Inc., 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (hyperlink in smallest font on the screen but colored in light blue on a white background insufficient to provide notice).

Because conspicuous hyperlinks are an indispensable element of notice in online contracts under California law, *see Nguyen*, at ¶ 1177, Facebook's efforts to conceal the hyperlink foreclose enforcement of the Terms of Use. Accordingly, Facebooks' motion to dismiss Plaintiffs' New York claims should be denied.

### G.      Plaintiffs' New York Claims are well-pled.

#### 1.      <u>NYSHRL § 296(5) Includes Agent Liability.</u>

The NYSHRL includes agent  liability: "the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right to sell, rent or lease a housing accommodation, constructed or to be constructed, or any agent or employee thereof." N.Y. Exec. Law §296(5). Here, Plaintiffs pled that Facebook created, implemented, and/or maintained a pre-populated list of demographics, behaviors, and interests that allowed real estate brokers, real estate agents, and landlords to exclude certain buyers or renters from ever seeing their ads for housing. *See* SAC, Dkt. 61, at ¶¶ 1-16. By enabling and actively

participating in redlining, Facebook violated both the FHA and New York state statutes prohibiting such discrimination.[3] In fact, Facebook used its demographics data to target ads and to permit real estate brokers, real estate agents, and landlords to create, publish, circulate, utilize, target, and/or send ads to certain groups of Facebook users on a digital platform which is no different from the historical practice of banks and real estate agents steering minorities away from predominately White neighborhoods.

Further, the United States Supreme Court held that "an action brought for compensation by a victim of housing discrimination is, in effect, a tort action." *Meyer v. Holley*, 537 U.S. 280, 285 (2003) (applying the law of agency to determine whether owner was vicariously liable for discriminatory conduct of broker under FHA); *see also Arnal v. Aspen View Condominium Association, Inc.* 2017 WL 1231555, at * 4 (D. Colorado, March 28, 2017) ("An action [under the FHA] is essentially an action in tort" and therefore, the law of agency applies). Under well-established principles of agency law, "[a]n agent who did an act that was otherwise a tort [is] not relieved from liability by the fact that he acted at the command of the principal or on account of the principal." *Arnal v. Aspen View Condominium Association, Inc.*, 245 F.Supp.3d 1261, at * 4 (citing Restatement (Second) of Agency § 411 (1958)). Therefore, an agent who acts on the instructions of the principal may be held liable as a joint tortfeasor. *Id.*; *Willborn v. Sabbia,* No. 10 C 5382, 2011 WL 1900455, at *4 (N.D. Ill. May 19, 2011) (denying real estate agent's motion to dismiss an FHA claim on the basis that he merely conveyed to the plaintiffs the owner's decision not to sell to them because they were African American); *Moore v. Townsend,* 525 F.2d 482, 485 (7th Cir. 1975) (held a real estate agent could be liable for assisting the owner in racial discrimination where owner told real estate agent after learning race of plaintiffs that she no longer wished to sell her house and real estate agent passed that information on to the plaintiffs and suggested they look for a house in a different neighborhood).

Plaintiffs have properly pled a claim under the NYSHRL § 290 et seq.

---

[3] Claims of discrimination under § 296 of the NYHRL are analyzed under the same framework used in FHA cases. See *Stalker v. Stewart Tenants Corp*., 93 A.D.3d 550, 940 N.Y.S.2d 600, 602–03 (1st Dep't 2012)(noting the "substantial identity between the language and purposes of Executive Law § 296(5) and those of the federal Fair Housing Act"). Indeed, "[c]laims under the FHA and [§] 296 are evaluated under the same framework." *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 153 (2d Cir. 2014) (quotation marks omitted).

2.     **Facebook Is Liable for Aiding and Abetting Under N.Y. Exec. Law § 296(6).**

Section 296(6)[4] specifies that "It shall be an unlawful discriminatory practice for any person to aid [or] abet . . . the doing of any of the acts forbidden under this chapter, or to attempt to do so." *Id.* These provisions provide a "broad[ ] source of personal liability." *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1160 (E.D.N.Y. 2003).

Thus, contrary to Facebook's assertions, it is not shielded from aiding and abetting liability. Plaintiffs have adequately alleged primary violations of NYSHRL § 296(5) under agency law and claims under the FHA. The New York Court of Appeals has clearly held that § 296(6)'s use of the "any person" language should be "construed broadly." *Griffin v. Sirva, Inc.*, 76 N.E.3d 1063, 1070 (2017); *Francis v. Kings Park Manor*, 944 F3d 370 (2d Cir. 2019) (Francis III), en banc review granted, 949 F3d 67 (2d Cir. Feb. 3, 2020)(In reinstating FHA and NY claims under § 296(5) and § 296(6), the court stated: "we assume without deciding that intentional discrimination is an element of an FHA violation and conclude that Francis's complaint, viewed in the light most favorable to Francis, plausibly and adequately alleges that the KPM Defendants engaged in intentional racial discrimination.").

Here, Plaintiffs have alleged facts that show that Facebook knowingly and intentionally prevented ads and the information and content from being published, provided, circulated, or sent to users who did not match certain protected class characteristics such as "African American (US)," "Asian American (US)," "Immigrant," "Hispanic US – English dominant," "Christian," "Moms," and "people ages 21 to 55 who live or were recently in the United States."   SAC, Dkt. 61, at ¶ 15. These facts and others as outlined in Plaintiffs' SAC clearly allege discriminatory intent and bring Facebook within the ambit of N.Y Exec. Law § 296(6).

---

[4]     Section 296(6) also applies to out-of-state defendants. The Human Rights Law contains an extraterritoriality provision, which provides: "The provisions of this article shall apply as hereinafter provided to an act committed outside this state against a resident of this state ... if such act would constitute an unlawful discriminatory practice if committed within this state" (Executive Law § 298–a [1] ). In particular, the extraterritoriality provision "protects New York residents ... from discriminatory acts committed outside the state" (*Hoffman v. Parade Publs.*, 15 N.Y.3d 285, 292,744 (2010)). To prevail, the injured party "must plead and prove that the alleged discriminatory conduct had an impact in New York." *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 188, 76 N.E.3d 1063, 1070 (2017).

1

2

       3.       **In the Alternative, California Law Is Contrary to Fundamental New York Policy.**

3

      The NYSHRL reflects a fundamental policy of the state of New York. In fact, just days before this litigation was filed, Governor Cuomo signed into law significant expansions to protect every New Yorker from harassment and discrimination. These changes, which allow uncapped punitive damages, statutory damages, and attorney fees are now more expansive than federal laws and provide for the "liberal construction for the accomplishment of the remedial purposes. N.Y. Exec. Law § 300. A choice of law provision which purports to obligate the parties to a law that does not contain protections identical to the NYSHRL operates as an outright waiver, which would eviscerate the statute's strong language and prohibitions, as well as the New York Supreme Court's mandate that the NYSHRL is entitled to a broad interpretation. The NYSHRL would essentially be "written out of existence. That is the essence of a choice-of-law conflict." *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1169 (N.D. Cal. 2016).

      New York's greater interest in the outcome of the dispute over the choice of law is also readily apparent. The fundamental question on this point is "which state, in the circumstances presented, will suffer greater impairment of its policies if the other state's law is applied." *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010) (citing *Brack*, 164 Cal. App. 4th at 1329 (2008)). It is abundantly clear that New York's enhanced protections which include statutory damages and punitive damages for its citizens will be rendered nugatory if California law is applied so as to exclude New York law, at least as to New York residents. In contrast, California law and policy will suffer little, if anything at all, if NYSHRL is applied. California law, the Unruh Act, which prohibits a wide variety of discriminatory conduct, is expressly limited to violations taking place in *California. Keum v. Virgin Am. Inc.*, 781 F. Supp. 2d 944, 955 (N.D. Cal. 2011); *see also Bridge Fund Capital Corp.*, 622 F.3d at 1004.

      California recognizes that "with respect to regulating or affecting conduct within its borders, the place of the wrong has the predominant interest." *See Hernandez v. Burger*, 102 Cal.App.3d 795, 802, (1980), cited with approval by *Abogados v. AT & T, Inc.*, 223 F.3d 932, 935 (9th Cir. 2000). California

considers the "place of the wrong" to be the state where the last event necessary to make the actor liable occurred. *See McCann*, 48 Cal. 4th at 94 n.12 (pointing out that the geographic location of an omission is the place of the transaction where it should have been disclosed). "Here, the last events necessary for liability as to the foreign class members—communication of the advertisements to the claimants and their reliance thereon in []—took place in [New York], not in California." *Mazza v. Am. Honda Motor Co.,* 666 F.3d 581, 594 (9th Cir.2012). Thus, New York has a strong interest in the application of its laws to the transactions between its citizens and corporations like Facebook which does business in its state. Id at 594.

Facebook's reliance on *Palomino v. Facebook,* No. 16-cv-04230-HSG, 2017 WL 76901 (N.D. Cal. Jan. 9, 2017) is unavailing. Palomino alleged claims based on California's consumer protection laws which the court found comparable to the New Jersey statute. Here, it is clear that the California UCL does not offer a remedy to the New York plaintiffs. Thus, California law is contrary to fundamental New York policy, and the California choice of law clause is unenforceable as to New York residents. *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d at 1169 (rejecting Facebook's choice of law clause in favor of Illinois law).

### H.     In the Alternative, Plaintiffs Seek Leave to Amend Under Rule 15(a).

Plaintiffs have standing and stated claims for each of the causes of action in the SAC. However, in the event the Court dismisses any of these claims, Plaintiffs respectfully seek leave to amend. Under Rule 15(a), leave to amend should be "freely given when justice so requires." *Desertrain v. City of Los Angeles,* 754 F.3d 1147, 1154 (9th Cir. 2014) ("[T]his policy is to be applied with extreme liberality."); *Broam v. Boan*, 320 F.3d 1023, 1028 (9th Cir. 2003) ("Dismissal without leave to amend is proper only in 'extraordinary' cases."). *See* also *Angelov v. Wilshire Bancorp*, 331 F. App'x 471, 472 (9th Cir. 2009).

## V.   CONCLUSION

Plaintiffs request that this Court deny Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint.

Dated:  October 2, 2020                     Respectfully Submitted,

**MANTESE HONIGMAN, P.C.**
**HERTZ SCHRAM PC**
**SCHONBRUN SEPLOW HARRIS**
**HOFFMAN & ZELDES LLP**


By:     s/ Gerard V. Mantese
Gerard V. Mantese
David Honigman
Kathryn Eisenstein
*Attorneys for Plaintiffs/Proposed Class Members.*