ROSEMARIE T. RING (State Bar No. 220769)
rose.ring@mto.com
MARIANNA MAO (State Bar No. 318070)
marianna.mao@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

JORDAN D. SEGALL (State Bar No. 281102)
jordan.segall@mto.com
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:    (213) 683-9208
Facsimile:    (213) 687-3702

*Attorneys for Defendant, Facebook, Inc*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| ROSEMARIE VARGAS, KISHA SKIPPER, JAZMINE SPENCER, DEILLO RICHARDS, JENNY LIN, and JESSICA TSAI on behalf of themselves individually, and on behalf of all others similarly situated,, <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC., <br><br> Defendant. | Case No. 19-cv-05081-WHO <br><br> **DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** <br><br> Judge:    Hon. William H. Orrick <br> Date:     November 18, 2020 <br> Time:     2:00 p.m. <br> Crtrm:    2 – 17th Floor |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II. ARGUMENT .......................................................................................................3

 A. Plaintiffs Fail To Establish Article III and Statutory Standing ...................3

  1. Plaintiffs Do Not Allege Any Injury in Fact ...................................3

   (a) No Particularized Injury ........................................................3

   (b) No Concrete Injury .................................................................5

   (c) Plaintiff Vargas's "Marketplace Search" Is Irrelevant .........6

  2. Plaintiffs Do Not Allege Any Injury Traceable To Facebook .........7

 B. Plaintiffs' Claims Are Barred By Section 230 Of The CDA ......................8

  1. Plaintiffs' Claims Treat Facebook as a Publisher or Speaker ........8

  2. Facebook Is Not A Creator Or Developer of Allegedly Discriminatory Housing Ads Created By Third-Party Advertisers .............10

 C. Plaintiffs Fail to State a Fair Housing Act Claim ...................................12

  1. Plaintiffs Do Not Allege that Facebook Published Any Housing Ad "Indicating" An Unlawful Preference Under § 3604(c) ...................12

  2. Facebook Does Not Make Housing "Unavailable" Under § 3604(a) .........14

  3. Facebook Does Not Represent Housing is Unavailable Under § 3604(d) ........................................................................................15

  4. Facebook Is Not a Housing Service Subject to § 3606 .................15

 D. The California Plaintiffs Do Not State Any Claim Under California Law .............15

  1. Plaintiffs Fail To State A Claim Under The Unruh Act ...............15

  2. Plaintiffs Fail To State A Claim Under The UCL ........................16

 E. The New York Plaintiffs Fail To State Any Claim Under New York Law ...........16

  1. Plaintiffs Agreed That California Law Would Apply ....................16

  2. Plaintiffs Fail To State Any Claim Under the NYSHRL ..............17

III. CONCLUSION ...................................................................................................17

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Bank of Am. Corp. v. City of Miami, Fla.*,
  137 S. Ct. 1296 (2017) ........................................................................................6

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ...........................................................................9

*Bradley v. T-Mobile*,
  2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ............................................2, 3, 4

*Carafano v. Metrosplash.com, Inc.*,
  339 F.3d 1119 (9th Cir. 2003) .........................................................................10

*Carroll v. Nakatani*,
  342 F.3d 934 (9th Cir. 2003) .............................................................................5

*Doe One v. CVS Pharmacy, Inc.*,
  348 F. Supp. 3d 967 (N.D. Cal. 2018) .............................................................16

*Dryoff v. Ultimate Software Grp., Inc.*,
  2017 WL 5665670 (N.D. Cal. Nov. 26, 2017) ...................................................9

*Dryoff v. Ultimate Software Grp., Inc.*,
  934 F.3d 1093 (9th Cir. 2019) ......................................................................9, 10

*In re Facebook Biometric Info. Privacy Litig.*,
  185 F. Supp. 3d 1155 (N.D. Cal. 2016) ...........................................................17

*Fair Hous. of Marin v. Combs*,
  285 F.3d 899 (9th Cir. 2002) .............................................................................2

*Fields v. Twitter, Inc.*,
  217 F. Supp. 3d 1116 (N.D. Cal. 2016) .............................................................9

*Goddard v. Google, Inc.*,
  640 F. Supp. 2d 1193 (N.D. Cal. 2009) ...........................................................10

*Guevara v. UMH Properties, Inc.*,
  2014 WL 5488918 (W.D. Tenn. Oct. 29, 2014) ...............................................14

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ....................................................................................5, 6, 7

*Heckler v. Mathews*,
  465 U.S. 728 (1984) ...........................................................................................6

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*Housing Opportunities Made Equal v. Cincinnati Enquirer*,
    731 F. Supp. 801 (S.D. Ohio 1990) ..................................................................13

*Housing Opportunities Made Equal v. Cincinnati Enquirer*,
    943 F.2d 644 (6th Cir. 1991) ..........................................................................13

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...............................................................................3, 4, 5

*Miami Prod. & Chem. Co. v. Olin Corp.*,
    449 F. Supp. 3d 136 (W.D.N.Y. 2020) ............................................................18

*Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*,
    476 F. Supp. 2d 414 (S.D.N.Y. 2007) .............................................................17

*Opiotennione v. Facebook, Inc.*,
    2020 WL 5877667 (N.D. Cal. Oct. 2, 2020) ...........................................2, 4, 15

*S.F. Baykeeper v. W. Bay Sanitary Dist.*,
    791 F. Supp. 2d 719 (N.D. Cal. 2011) ...........................................................7, 8

*Saunders v. General Services Corp.*,
    659 F. Supp. 1042 (E.D. Va. 1987) .................................................................13

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) ..........................................................................4

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ......................................................................................3

*Trafficante v. Metro Life Ins. Co.*,
    409 U.S. 205 (1972) ..........................................................................................7

*Williams v. Twin Rivers Unified Sch. Dist.*,
    2018 WL 4735734 (E.D. Cal. Sept. 28, 2018) .................................................16

**FEDERAL STATUTES**

42 U.S.C.:

    § 3604(a) .................................................................................................2, 14, 15

    § 3604(c) ....................................................................................................2, passim

    § 3604(d) ......................................................................................................2, 15

    § 3606 ...........................................................................................................1, passim

DEFENDANT'S REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT

### TABLE OF AUTHORITIES
(Continued)

**Page**

47 U.S.C. § 230, Communications Decency Act .................................................................2, 8, 10

**FEDERAL COURT ORDERS**

*Mobley v. Facebook, Inc.*, No. 16-cv-06440 (N.D. Cal. Apr. 7, 2017)
Order Staying Discovery, ECF No. 35 ......................................................................................8

**STATE STATUTES**

Cal. Civ. Code § 51, California Unruh Act .........................................................................2, 15, 16

Cal. Civ. Code § 51.5 ..............................................................................................................15, 16

**FEDERAL REGULATIONS**

24 C.F.R. § 100.75 ........................................................................................................................14

54 Fed. Reg. 3232-01 ....................................................................................................................14

54 Fed. Reg. 3240 .........................................................................................................................14

## I.      **INTRODUCTION**

Plaintiffs' opposition only confirms that they do not, and cannot, state any claim against Facebook based on tools that Plaintiffs assert, without factual support, were used by third-party advertisers to target housing ads in allegedly discriminatory ways and Facebook's publication of those ads.  Despite being on their Second Amended Complaint ("SAC"), Plaintiffs *still* have not identified a single housing ad that any advertiser targeted in allegedly discriminatory ways using the tools, let alone one that Plaintiffs would have been interested in, qualified to rent or buy, and pursued but did not receive because of such targeting.  And Plaintiffs admit that discriminatory targeting has always been prohibited by Facebook's advertising policies and, for over a year, has not been possible because the tools they challenge no longer exist.  In other words, Plaintiffs' claims are based on non-existent tools that, except for conclusory assertions unsupported by facts, Plaintiffs do not allege were ever actually used to target housing ads in allegedly discriminatory ways, let alone in ways that affected Plaintiffs, which alone requires dismissal of their claims.

Plaintiffs' theory of liability also has no basis in law or fact.  According to Plaintiffs, because advertisers may have used the tools to select target audiences for housing ads on Facebook that include or exclude users in protected classes, by publishing those ads, Facebook indicated unlawful preferences and made housing unavailable to users who were not in those target audiences in violation of the federal Fair Housing Act ("FHA") and "analogous" California and New York law.  No court has accepted this theory of liability, and for good reason.  It assumes that any time advertising media publishes a housing ad that does not reach all persons in all protected classes, the publisher is indicating an unlawful preference and making the housing unavailable to people who do not receive it.  Even assuming that not receiving a housing ad could make housing unavailable, which it cannot, advertisers use many types of advertising media to reach people, including Zillow, Redfin, and Apartments.com, to name just a few, which means that only the *advertisers* know whether their media selections indicate an unlawful preference.  Imposing liability on Facebook for those selections would mean that, to avoid future liability, publishers would have to confirm with advertisers that their overall campaigns reach people in all protected classes before agreeing to publish housing ads.  Plaintiffs' claims should be dismissed on multiple, independent grounds.

DEFENDANT'S REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT

1    *First*, Plaintiffs fail to demonstrate Article III standing.  Plaintiffs allege, without factual

2    support, that advertisers used tools on Facebook's advertising platform to target housing ads in

3    allegedly discriminatory ways, and Facebook published those ads.  SAC ¶ 93.  But Plaintiffs have

4    not identified a single housing ad for which that allegation is true, let alone one that they would have

5    been interested in, qualified to rent or buy, and pursued but did not receive because of such targeting,

6    which courts in this District have repeatedly held is required to establish Article III injury in cases

7    challenging the same tools at issue here.  *See Opiotennione v. Facebook, Inc.*, 2020 WL 5877667

8    (N.D. Cal. Oct. 2, 2020); *Bradley v. T-Mobile*, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020).

9    Plaintiffs also do not, and cannot, allege any injury caused *by Facebook*, since they admit that any

10   allegedly discriminatory targeting is *by advertisers*.  Plaintiffs' only response is to argue that FHA

11   claims are different from other types of claims.  But that is wrong.  Standing to bring FHA claims

12   "extend[s] to the full limits of Article III," not beyond them.  *Fair Hous. of Marin v. Combs*, 285

13   F.3d 899, 902 (9th Cir. 2002).

14   *Second*, Plaintiffs' claims are barred by Section 230 of the Communications Decency Act

15   ("CDA") because they seek to impose liability on Facebook as the publisher of third-party content.

16   Plaintiffs challenge Facebook's provision of tools used by advertisers to target ads for all types of

17   products and services that, according to their conclusory allegations, some advertisers used to target

18   housing ads in allegedly discriminatory ways, and Facebook's publication of those ads.  Binding

19   Ninth Circuit authority makes clear that these are protected publisher functions under the CDA.

20   *Third*, on the FHA claims, Plaintiffs argue that Section 3604(c) applies to Facebook based on

21   a single case citing HUD's "selecting media" regulation, but that case involves an *advertiser*, not

22   *advertising media*, and therefore supports Facebook's position.  With respect to Sections 3604(a),

23   3604(d), and 3606, Plaintiffs just repeat the text of the statutes.  No court has ever applied these

24   FHA provisions to advertising media *selected by advertisers*, and this Court should not be the first.

25   *Finally*, on the California and New York claims, Plaintiffs do not allege facts supporting any

26   Unruh Act, Section 51.5, or UCL claim.  Plaintiffs also wrongly argue that they are not bound by

27   Facebook's California choice-of-law provision, and, in any event, also do not allege facts supporting

28   any claim under New York law.  Plaintiffs' SAC should be dismissed with prejudice.

DEFENDANT'S REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT

II.   **ARGUMENT**

    A.   **Plaintiffs Fail To Establish Article III and Statutory Standing**

To establish Article III standing, Plaintiffs must allege facts demonstrating (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs do not allege facts establishing any injury in fact that is traceable to conduct by Facebook.

          **1.   Plaintiffs Do Not Allege Any Injury in Fact**

Plaintiffs argue that they have suffered three types of injury: (1) "discrimination based on protected classes;" (2) "perpetuation of segregation and denial of the benefits of living in an integrated society;" and (3) "denial of information that laws require to be given on an equal basis." Opp. at 6. An injury in fact must be both "particularized" and "concrete." *Spokeo*, 136 S. Ct. at 1545 (quotation omitted). It must "affect the plaintiff in a personal and individual way," rather than in a generalized way, and it "must actually exist." *Id.* at 1548, 1556. Plaintiffs' alleged injuries are neither. Plaintiffs do not identify a single housing ad that any advertiser targeted in allegedly discriminatory ways, let alone one that they would have been interested in, qualified to rent or buy, and pursued if they had received it.

          **(a)   No Particularized Injury**

In two cases involving the same tools at issue here, courts in this District have dismissed claims for lack of Article III standing because the plaintiffs did not identify any ads that were targeted by advertisers in allegedly discriminatory ways and that the plaintiffs would have been interested in, qualified for, and pursued if they had received them. In *Bradley*, Judge Freeman dismissed claims challenging allegedly discriminatory use of the tools by advertisers placing employment ads on Facebook where, as here, the plaintiffs claimed both "denial of an opportunity to obtain a benefit" and "stigmatic injury." 2020 WL 1233924, at *8, *11. The Court held that the plaintiffs failed to allege a particularized injury because they did not identify any employment ad that the plaintiffs would have been interested in, qualified for, and pursued, but did not receive because of the allegedly discriminatory targeting by advertisers. *See id.* at *10 ("To establish

1   personalized injury, the Named Plaintiffs must show they were qualified for and interested in *the*

2   *particular jobs* subject to Defendants' allegedly discriminatory practices." (emphasis added)).

3   Instead, the plaintiffs alleged *generally* that the advertisers targeted ads "for a range of positions,"

4   but did not "provid[e] any description or examples of these positions to suggest that the [plaintiffs]

5   would have been able and ready to apply for them."  *Id.* at *10 (internal quotation marks omitted).

6        Earlier this month, in *Opiotennione*, Judge Corley likewise dismissed claims challenging

7   allegedly discriminatory use of the tools by advertisers placing financial services ads on Facebook

8   for failure to allege a particularized injury.  2020 WL 5877667, at *3.  The plaintiff identified

9   specific financial services ads allegedly targeted by advertisers to exclude older people and women,

10  and which therefore allegedly did not "appear in her News Feed because of her age and gender," but

11  the Court held that these allegations did not establish a particularized injury because she "[did] not

12  allege that she was qualified for and interested in actually applying for the product[s] offered."  *Id.* at

13  *3–4.  Absent such allegations, her claims asserted "merely a generalized claim of 'unequal

14  treatment'" that does not rise to the level of an injury in fact.  *Id.* at *3.  The plaintiff's "general

15  grievance about being denied 'full and equal access'" to advertising could not establish standing

16  absent "facts that support an inference that she was personally injured by that denial."  *Id.* at *5.

17       Here, Plaintiffs' allegations are even less specific that those deemed insufficient in *Bradley*

18  and *Opiotennione*.  Plaintiffs have not identified a single real (as opposed to test) housing ad that any

19  advertiser targeted in allegedly discriminatory ways, let alone one that they would have been

20  interested in, qualified to rent or buy, and pursued if they had received it.

21       Plaintiffs attempt to distinguish *Bradley* by arguing that *Bradley* was "an employment

22  discrimination case," and standing requirements for FHA claims are "more relaxed."  Opp. at 7.

23  Plaintiffs do not cite any authority supporting this position, nor can they, because the "irreducible

24  constitutional minimum" of Article III standing is the same for all cases.  *Lujan*, 504 U.S. at 560; *see*

25  *also Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (applying concrete and

26  particularized injury requirement in FHA case).

27       Plaintiffs also argue that they do not need to allege facts demonstrating a particularized injury

28  because it is sufficient to allege generally that they have suffered discrimination and been deprived

"of the benefits of living in an integrated society."  Opp. at 6.  As Facebook's Motion explained, the Ninth Circuit rejected this argument in *Carroll v. Nakatani*, 342 F.3d 934, 947 (9th Cir. 2003), holding that the mere *existence* of an alleged racial classification, without more, does not demonstrate Article III standing.  Mot. at 8–9.  Under *Carroll*, Plaintiffs cannot simply point to the existence of audience selection tools that advertisers may have used to target housing ads in allegedly discriminatory ways.  Rather, Plaintiffs must allege facts demonstrating that those tools were actually used by advertisers to deprive them of ads for housing that they would have been interested in, qualified to rent or buy, and pursued if they had received those ads—which they do not come close to doing.  *See id.* at 940 (when a defendant allegedly discriminates, "the resulting injury 'accords a basis for standing only to those persons who are personally denied equal treatment'").

**(b)      No Concrete Injury**

Plaintiffs also fail to identify any concrete injury.  As noted, Plaintiffs do not identify any housing ad for which any advertiser used audience selection tools in ways Plaintiffs claim are discriminatory.  Instead, Plaintiffs rely on test ads allegedly placed by journalists nearly three years ago and by plaintiffs in cases long since resolved.  *See* Opp. at 2.  Plaintiffs' asserted injuries therefore rest solely on speculation that unidentified advertisers *may* have used audience selection tools on Facebook to create and target unidentified housing ads in allegedly discriminatory ways.  This is precisely the type of "conjectural or hypothetical" injury the Supreme Court has repeatedly rejected.  *Lujan*, 504 U.S. at 560 (quotations omitted).

Plaintiffs' reliance on *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982), Opp. at 5–6, is misplaced.  In *Havens*, the plaintiffs, who acted as "testers" attempting to determine whether real estate brokers were violating the FHA, argued they had standing to bring FHA claims based on false statements by those brokers that housing they inquired about was unavailable, even though they had no intention of buying or renting that housing.  The Supreme Court held that "[a] tester *who has been the object of a misrepresentation* made unlawful under [Section 3604(d) of the FHA] has suffered injury," because Congress specifically "conferred on all 'persons' a legal right to truthful information about available housing."  *Id.* at 373–74 (emphasis added).  The testers in *Havens* were injured because they alleged that they were in fact repeatedly given false information

about the availability of specific housing.  *Id.* at 374.  Here, by contrast, Plaintiffs do not (and cannot) allege that they received false information about housing.  Indeed, they do not identify any housing at all.

Plaintiffs' reliance on *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302–03 (2017) and *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) is equally unavailing.  Opp. at 6.  In *Bank of America*, the City of Miami alleged concrete financial injuries based on specific allegedly unlawful predatory lending practices by the defendant bank.  137 S. Ct. at 1302.  In *Heckler*, the plaintiff alleged concrete financial injuries because, "as a nondependent man, he receive[d] fewer benefits [under the Social Security Act] than he would if he were a similarly situated woman."  465 U.S. at 738.  Both cases involved allegations of specific acts by the defendants that the plaintiffs alleged caused concrete harms.  No comparable allegations exist here.

### (c)   Plaintiff Vargas's "Marketplace Search" Is Irrelevant

Plaintiff Vargas alleges that she "filtered her search for housing on the Facebook marketplace using the same parameters that her white male friend used but she obtained fewer results[.]"  SAC ¶ 32.  In their Opposition, Plaintiffs argue that this allegation is sufficient to establish a concrete, particularized injury as to Plaintiff Vargas "because Facebook's housing marketplace contains all of Facebook's housing advertisements that the searcher is 'eligible' to see."  Opp. at 7.

As an initial matter, this assertion regarding the Facebook Marketplace, which is a totally different product from Facebook News Feed, appears nowhere in the SAC.  Moreover, it is untrue and irrelevant to Plaintiffs' theory of liability.  As Facebook's public website explains, the Marketplace product allows users to list items for sale free of charge and to search through listings,[1] but Marketplace listings are not the same as paid ads that appear in the News Feed product, which do not appear in Marketplace unless directed by advertisers.[2]  So, Plaintiffs' argument that the Facebook Marketplace contains all housing ads that users are eligible to see either misunderstands or misrepresents the product.  It is also irrelevant to Plaintiffs' theory of liability, because Marketplace

---

[1] *See* https://www.facebook.com/marketplace/learn-more/ ("What is Marketplace?").
[2] *See* https://www.facebook.com/business/help/1648521258544455.

search functionality has nothing to do with the "ad targeting" and "ad delivery" phases of publishing ads on Facebook upon which all of Plaintiffs' claims are based.  SAC ¶¶ 76–82.  Even if advertisers *targeted* housing ads in allegedly discriminatory ways and Facebook *delivered* those ads in the News Feed product, neither would have had any impact on search results for housing listings in the Facebook Marketplace product.

Even assuming a Marketplace search was relevant to *targeting* and *delivery* of housing ads, which it is not, Plaintiffs' own allegations show that neither could have impacted her Marketplace search results.  Plaintiffs' claims are limited to conduct occurring "[a]t all relevant times through December 31, 2019," because the challenged tools were not available after that date.  SAC ¶¶ 2–3.  But Plaintiff Vargas's allegation about her Marketplace search appeared for the first time in the FAC filed in July 2020, six months after the relevant time period.  *Compare* ECF No. 1 (Compl.), *with* FAC ¶ 32.  Plaintiffs' "search" for some basis to say they have standing by going beyond the pleadings fails because it is procedurally improper, factually wrong, and, as their own allegations show, by the time they got around to "searching," the challenged tools no longer existed.

### 2.     Plaintiffs Do Not Allege Any Injury Traceable To Facebook

Plaintiffs do not dispute that any discriminatory use of audience selection tools would have been by third-party advertisers, not Facebook, and therefore, to demonstrate standing as to Facebook, they must allege conduct by Facebook that had a "determinative or coercive effect" on any such conduct by third-party advertisers.  *See* Mot. at 9–10.  Plaintiffs have not come close to meeting this standard.  The principal authority Plaintiffs cite on causation, *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 749 (N.D. Cal. 2011), provides no support for their argument that Facebook caused Plaintiffs' alleged injury.[3]  The *Baykeeper* plaintiffs asserted a claim under the Clean Water Act that their use and enjoyment of the San Francisco Bay and tributaries had been impaired by a sanitary district's upstream pollution of waterways.  The court held that the existence of other contributing polluters did not undermine the plaintiffs' showing of an Article III injury

---

[3] Plaintiffs also cite *Havens*, 455 U.S. at 379–80, and *Trafficante v. Metro Life Ins. Co.*, 409 U.S. 205, 208 (1972).  Opp. at 9.  But both of those cases were lawsuits against the parties who actually caused the injury—*i.e.*, landlords engaged in racial steering and other discriminatory practices.

1   because there was "substantial evidence" that the sanitary district itself "discharge[d] a pollutant"

2   upstream of the areas that plaintiffs used.  *Id.* at 749.

3        Establishing injury causation in cases involving waterway pollution is inherently difficult,

4   where pollution necessarily intermingles and particular injuries cannot be traced to particular

5   discharges of pollution with empirical certainty.  Here, by contrast, even if Plaintiffs could

6   demonstrate an injury in fact, which they have not, there would be no question about who caused it:

7   third-party advertisers who choose to use audience selection tools in allegedly discriminatory ways

8   and in violation of Facebook's policies.

9       **B.**    **Plaintiffs' Claims Are Barred By Section 230 Of The CDA**

10       Plaintiffs do not identify any basis for distinguishing the Ninth Circuit and other authority

11  cited in Facebook's Motion requiring dismissal of their claims because a website's provision of

12  neutral tools and publication decisions regarding third-party content are protected publisher

13  functions subject to immunity under Section 230 of the CDA.[4]  Instead, Plaintiffs argue that this case

14  is controlled by *Roommates.com*.  As explained, in Facebook's Motion and below, Plaintiffs' claims

15  seek to impose liability on Facebook as the "publisher" of housing ads created by third-party

16  advertisers, and therefore are barred by Section 230 of the CDA.

17      **1.**    **Plaintiffs' Claims Treat Facebook as a Publisher or Speaker**

18       As Facebook's Motion demonstrates, Plaintiffs' claims treat Facebook as the "publisher or

19  speaker" of third-party content because they challenge neutral tools that they allege *may* have been

20  used by third-party advertisers to place housing ads on Facebook in allegedly discriminatory ways

21  and Facebook's *publication* of those third-party ads.  Mot. at 11–12.  Indeed, Plaintiffs' core theory

22  of liability is based on Section 3604(c), which prohibits the *publication* of housing ads that indicate

23  unlawful preferences, and Plaintiffs allege that such publishing activity also violates other provisions

24

25

---

26  [4] Facebook's CDA immunity defense can and should be resolved on the pleadings.  Plaintiffs argue
   that the CDA issue "turns on an interpretation of facts," but do not identify any unestablished facts

27  that would be relevant to whether Facebook materially contributes to the alleged illegality of those
   ads.  District courts in this Circuit regularly resolve such claims on the pleadings, including in cases

28  raising virtually identical issues.  *See, e.g.*, Order Staying Discovery, *Mobley v. Facebook, Inc.*, No.
   16-cv-06440 (N.D. Cal. Apr. 7, 2017) (Davila, J.), ECF No. 35.

of the FHA, as well as "analogous" state laws.  See SAC ¶¶ 93, 99–117.

Plaintiffs attempt to distinguish the unbroken line of cases cited in Facebook's Motion rejecting claims based on neutral tools and publication decisions regarding third-party content, including in the Ninth Circuit and this District, on grounds that are legally baseless.  Plaintiffs argue that *Force*, *Pennie*, and *Gonzalez* involve "federal antiterrorism" claims and therefore "have no application to this FHA case."  Opp. at 15.  The Ninth Circuit has squarely rejected the notion that the CDA applies to some types of claims and not others:  "A provider of information services might get sued for violating *anti-discrimination laws*, for fraud, negligent misrepresentation, and ordinary negligence, for false light; or even for negligent publication of advertisements that cause harm to third parties. What matters is not the name of the cause of action … [but] whether the cause of action inherently requires the court to treat the defendant as the "publisher or speaker" of content provided by another."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101–02 (9th Cir. 2009) (emphasis added).

Moreover, the reasoning of these cases did not turn on the *type* of third-party content at issue, but whether the plaintiffs were attempting to hold the defendant websites liable for publication decisions regarding that third party content.  Mot. at 12–13.  As this Court explained in dismissing another "federal antiterrorism" case on CDA grounds, where "choices about what [third-party] content can appear on [a platform] … form the basis of a plaintiff's claim, section 230(c)(1) applies."  *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (Orrick, J.).

In *Dryoff*, the Ninth Circuit reiterated that this reasoning applies to claims based on neutral tools and publication decisions *regardless* of the type of third-party content at issue.  *Dryoff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1095 (9th Cir. 2019).  The *Dyroff* plaintiff brought claims based on a website defendant's neutral tools and publication decisions regarding content relating to drug sales.  The Court explained that a website's "tools meant to facilitate the communication and content of others [] are not content in and of themselves."  *Id.* at 1098.  Relying on *Barnes*, the Court found the CDA applicable and affirmed the district court's holding "reject[ing] plaintiffs' attempts to plead around immunity by basing liability on a website's tools."  *Dryoff v. Ultimate Software Grp., Inc.*, 2017 WL 5665670, at *7 (N.D. Cal. Nov. 26, 2017) (citing *Fields*, 217 F. Supp. 3d at 1121–22 and *Gonzalez*, 2017 WL 4773366, at *10–11).

2.     **Facebook Is Not A Creator Or Developer of Allegedly Discriminatory Housing Ads Created By Third-Party Advertisers**

Plaintiffs acknowledge, as they must, that their claims challenge allegedly discriminatory housing ads created by third parties, but argue that Facebook is a "creator or developer" of those ads because of its "role in the creation of the advertising platform tools used by housing advertisers" to "include[e] or exclude[e] users in protected classes" and Facebook's publication of those ads using "sophisticated marketing algorithms." Opp. at 9.  As demonstrated in Facebook's Motion, under binding Ninth Circuit precedent, neither of these publishing functions renders Facebook a "creator or developer" of that third-party content.  Mot. at 12–15.  When websites provide tools that allow, but do not require, users to take certain actions, CDA immunity applies as long as the choice of action is "left exclusively to the user." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003); *see also Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198 (N.D. Cal. 2009) (holding that CDA immunity applies because, "[l]ike the menus in *Carafano*, Google's Keyword Tool is a neutral tool.  It does nothing more than provide options that advertisers may adopt or reject at their discretion").  CDA immunity also applies to publication of that third-party content using algorithms because algorithms are not "content in and of themselves." *Dyroff*, 934 F.3d at 1098.

According to Plaintiffs, *Roommates.com* is dispositive on "section 230's application to FHA claims and the question of whether a pre-made form renders a defendant an author or publisher." Opp. at 12.  Plaintiffs argue that, under *Roommates.com*, "Facebook's creation of a premade form for its advertisers to use to create advertisements is sufficient to remove it from the scope of section 230." *Id*. at 14–15.  As explained below, *Roommates.com* is inapposite because there is no analogy in this case to the service provided by the defendant website, the "premade form" used by the website, or the requirements imposed on users by the website, and therefore no basis to find that Facebook creates or develops content so as to remove CDA immunity.

In *Roommates.com*, the defendant was an online housing service "designed to match people renting out spare rooms with people looking for a place to live." *Roommates.com*, 521 F.3d at 1161. As a condition of using the service, Roommate *required* potential subscribers to answer questions identifying their own protected characteristics and protected characteristics they would accept in a

roommate using drop-down menus.  *Id*.  For example, "Roommate require[d] subscribers listing housing to disclose whether there are 'Children present' or 'Children not present' and require[d] housing seekers to say 'I will live with children' or 'I will not live with children.'"  *Id*. at 1165.  These mandatory answers were then used in display, matching, and search functions on the website.  The plaintiffs challenged the questions, answers, and related functionality as violating Section 3604(c) of the FHA, which makes it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that *indicates any preference*, limitation, or discrimination based on [protected characteristics], or *an intention to make any such preference*, limitation, or discrimination."  42 U.S.C. § 3604(c) (emphasis added).  Specifically, plaintiffs asserted FHA violations based on (1) questions they alleged were discriminatory because they "indicate[] an intent to discriminate" in housing, *Roommates.com*, 521 F.3d at 1164; (2) requiring users to answer those discriminatory questions because they forced users to express *unlawful preferences* in housing, *id*. at 1165, and (3) use of those *unlawful preferences* to display, match, and search housing ads, *id*. at 1162.

The Ninth Circuit held there was no CDA immunity for these alleged FHA violations.  Asking *discriminatory questions* and requiring subscribers to indicate *unlawful preferences* for housing in their profiles were Roommate's "own acts," and therefore not protected by the CDA.  *Id*. at 1165.  With respect to the display of the unlawful preferences in user profiles, the Court held that, "by *requiring* subscribers to provide the information as a condition of accessing its service[s] and by providing a limited set of pre-populated answers, Roommate becomes … the developer, at least in part, of *that information*."  *Id*. at 1166 (emphases added).  The Court made clear that its holding applied only where a website *requires* users to create unlawful content—it is not enough to "provide a framework that could be utilized for proper or improper purposes."  *Id*. at 1172.  The Court also denied CDA immunity for use of the compelled unlawful preferences to match housing ads because "[i]f Roommate has no immunity for asking the discriminatory questions, [] it can certainly have no immunity for using the answer to the unlawful questions to limit access to housing."  *Id*. 1167.

Thus, the "content" that was relevant to the CDA analysis in *Roommates.com* was "unlawful preferences" to which Roommate "materially contributed" by forcing users to answer questions for

which the *only answers* were unlawful preferences that violated the FHA.  Because Roommate was an online housing service where all users were offering or searching for housing, requiring them to answer questions about their protected characteristics and the protected characteristics they would accept in a roommate necessarily forced them to express preferences that violated the FHA.

Plaintiffs' position that *Roommates.com* is controlling is wrong because Facebook is nothing like Roommate.  Facebook is a general-use platform that third parties use to create ads for *all types of products and services*, not only, or even primarily, housing ads—a distinction that was "material[]" to the *Roommates.com* holding.  *See id*.  Accordingly, there is no basis for Plaintiffs' arguments analogizing the audience selection tools at issue here to the discriminatory questions and drop-down menus that Roommates required subscribers to use.  As Plaintiffs admit, in stark contrast to Roommate's, Facebook's tools are used with *all types of ads* and therefore have many lawful uses, and Facebook does not *require* advertisers to use the tools to select any particular audience for their ads, let alone an audience that Plaintiffs claim is discriminatory.  As the *Roommates.com* Court explained in distinguishing tools for which CDA immunity applies, while an "anonymous dastard" may choose to use the tools in allegedly discriminatory ways, any such decision is made "entirely by the malevolent user." *Roommates.com*, 521 F.3d at 1171.  That is precisely the case with respect to Facebook's audience targeting tools.

Finally, Plaintiffs' references to Facebook's "algorithm" do not alter the CDA analysis.  As Facebook explains in its Motion, "Plaintiffs admit [that] Facebook treats all users within an advertiser's target audience as 'eligible' to receive the ad, which show[s] that the 'ad delivery phase' did not contribute to Plaintiffs' alleged harm, *i.e.*, their 'wholesale exclusion … from the possibility of seeing housing advertisements.'"  Mot. at 15.  Plaintiffs do not, and cannot, dispute this.  The alleged illegality is that advertisers may have targeted housing ads in allegedly discriminatory ways *before* Facebook delivered those ads to users in advertisers' selected audiences.

**C.**      **Plaintiffs Fail to State a Fair Housing Act Claim**

**1.**      **Plaintiffs Do Not Allege that Facebook Published Any Housing Ad "Indicating" An Unlawful Preference Under § 3604(c)**

Plaintiffs' core theory of liability under the FHA—that advertisers may have targeted

housing ads in allegedly discriminatory ways and Facebook published those ads in violation of Section 3604(c)—fails because advertising media like Facebook are not subject to liability for publishing housing ads that do not indicate an unlawful preference on their face as determined by an objective "ordinary reader" test.  Mot. at 15–19.  Plaintiffs do not cite any authority to the contrary. Indeed, they rely on cases *confirming* the objective "ordinary reader" test, including *Housing Opportunities Made Equal v. Cincinnati Enquirer*, 731 F. Supp. 801, 804 (S.D. Ohio 1990), which Plaintiffs quote out of context to argue for a different standard.  Opp. at 17.

In *Housing Opportunities*, the court applied the objective "ordinary reader" standard and explained that, even if an illegal preference is not "communicate[d] in an obvious and undeniable way," an ad may still violate Section 3604(c).  731 F. Supp. at 804.  The court pointed to *Saunders v. Gen. Servs. Corp*., 659 F. Supp. 1042 (E.D. Va. 1987), as an example.  *Saunders* involved a housing brochure with 68 photographs of human models, virtually none of whom were black, and discussed evidence relevant to the "ordinary reader" test, including "academic and market research on the effect of the racial composition of advertising models" as well as the "[housing advertiser's] own belief that the race of models used would indicate [its] racial preferences."  *Id.* at 1058–59.

In affirming *Housing Opportunities*, the Sixth Circuit likewise applied an "ordinary reader" test, concluding that "the use of all-white models could be a factor in determining whether an advertisement conveys a discriminatory message, although its strength and clarity will depend upon an analysis of the entire advertisement."  *Housing Opportunities Made Equal v. Cincinnati Enquirer*, 943 F.2d 644, 647 (6th Cir. 1991).  It was in this context that the Sixth Circuit noted that a publisher's "intent to discriminate" could be relevant to the "ordinary reader" test—not because such intent alone would be sufficient, but because it might suggest that what was intended was actually conveyed on the face of the ad.  *Id.* at 648 n.4.

Plaintiffs do not respond to Facebook's arguments that the plain text of Section 3604(c), and decades of agency action and court decisions implementing it, show that Plaintiffs' theory of liability, that Facebook is liable for publishing ads that housing advertisers may have targeted in allegedly discriminatory ways, is not cognizable.  Instead, Plaintiffs rely on HUD's so-called "selecting media" regulation, which provides examples of conduct "indicating" a preference in

violation of the Section 3604(c), including "[s]electing media or locations for advertising the sale or rental of dwellings."  Opp. at 18 (quoting 24 C.F.R. § 100.75).  As Facebook explained in its Motion, the plain text of this regulation and related HUD guidance confirm that it applies only to advertisers, not to advertising media like Facebook.  Mot. at 19.  Because advertisers "select[] media or locations for advertising," and advertising media cannot "select" themselves, to the extent "selecting media" can indicate a preference under Section 3604(c), that is conduct engaged in by advertisers, not advertising media.  Plaintiffs' only response is to point to a case applying the "selecting media" regulation to *a housing advertiser*, which supports Facebook's position.  Opp. at 18 (citing *Guevara v. UMH Props., Inc.*, 2014 WL 5488918, at *6 (W.D. Tenn. Oct. 29, 2014)).

Finally, Plaintiffs argue that by "maintaining [a] platform" on which advertisers have the ability to target housing ads in allegedly discriminatory ways, Facebook "expressed a preference on prohibited bases."  Opp. at 18.  But Plaintiffs do not explain how advertisers choosing to use tools that are used with ads for *all types of products and services*, not just housing, suggests any kind of prohibited preference *by Facebook*—because it does not.

### 2.   Facebook Does Not Make Housing "Unavailable" Under § 3604(a)

Section 3604(a) makes it unlawful to "refuse to sell or rent [], or to refuse to negotiate for the sale or rental of, or otherwise *make unavailable or deny*," a dwelling to a person because of protected characteristics.  42 U.S.C. § 3604(a) (emphasis added).  As demonstrated in Facebook's Motion, the text, legislative history, and implementing HUD regulations for Section 3604(a) show that advertising media like Facebook is not capable of making housing "unavailable" or "denying" housing within the meaning of Section 3604(a) because it does not provide "services and facilities which are *prerequisites to obtaining dwelling*."  Mot. at 21 (quoting 54 Fed. Reg. 3232-01, 3240).

Plaintiffs again do not respond to these arguments or cite a single case to the contrary. Instead, they argue that "unavailable" means "not obtainable" or "not accessible," and that "housing could not have been available to people who did not know that it was for sale or rent."  Opp. at 19. But Plaintiff do not, and cannot, explain how not receiving a housing ad on Facebook makes housing "not obtainable" or "not accessible," which explains why Plaintiffs are unable to cite any case applying Section 3604(a) to advertising media.

### 3. Facebook Does Not Represent Housing is Unavailable Under § 3604(d)

Section 3604(d) makes it unlawful to represent that housing is not available when in fact it is. Plaintiffs argue that by "maintaining an advertising platform that allows advertisers to filter out Facebook users who may view the ad," Facebook makes unlawful representations about the availability of housing. Opp. at 19. But even Plaintiffs admit that Facebook has done nothing more than "maintain[] a *platform*." *Id.* at 20 (emphasis added). Plaintiffs do not cite any authority or offer any argument as to why providing an advertising platform on which *advertisers* make representations amounts to *Facebook* making representations about the availability of housing.

### 4. Facebook Is Not a Housing Service Subject to § 3606

Section 3606 applies to multiple-listing services, real estate brokers' organizations, and comparable housing services. As demonstrated in Facebook's Motion, Section 3606 does not apply to advertising media, like Facebook, under the interpretive canon of *ejusdem generis*. Mot. at 24. Plaintiffs do not explain how Facebook's operation of an advertising platform—even one that advertisers may have used to target housing ads in allegedly discriminatory way—can in any way be construed as a housing service under Section 3606. *See* Opp. at 19–20.

### D. The California Plaintiffs Do Not State Any Claim Under California Law

### 1. Plaintiffs Fail To State A Claim Under The Unruh Act

An Unruh Act or Section 51.5 claim requires pleading and proving discrimination that is (1) intentional and (2) unreasonable, arbitrary, or invidious. Mot. at 26–27. The California Plaintiffs do not, and cannot, allege intentional discrimination by Facebook. There is no dispute that the challenged audience selection tools were available for use with all types of ads, and could only have resulted in discrimination if advertisers chose to use those tools in ways that violated Facebook's anti-discrimination policies. *Id.* at 27. Plaintiffs' Opposition relies entirely on the conclusory assertion that Facebook "intentionally enabled these discriminatory capabilities for housing advertisements." Opp. at 20. But "[a] plaintiff bringing an Unruh Act violation claim cannot allege intentional discrimination in a conclusory fashion." *Williams v. Twin Rivers Unified Sch. Dist.*, 2018 WL 4735734, at *2 (E.D. Cal. Sept. 28, 2018) (collecting cases); *Doe One v. CVS Pharmacy, Inc.*, 348 F. Supp. 3d 967, 989 (N.D. Cal. 2018) (finding allegation that defendants

"specifically and intentionally targeted individuals on the basis of a particular disability" to be "conclusory").  Moreover, Facebook's advertising policies which have always prohibited discrimination and its decision over a year ago to take further steps to prevent possible misuse of the tools by *disabling* for use with housing ads flatly contradict Plaintiffs' conclusory allegation that Facebook intended the tools to be used by third-party advertisers in discriminatory ways.

There is also no basis in the SAC, or common sense, for Plaintiffs' conclusory assertion that Facebook's provision of an advertising platform used to place ads for all types of products and services (most of which are *not* housing ads) was unreasonable, arbitrary, or invidious, because some *advertisers* may have used that platform in allegedly discriminatory ways.  Opp. at 21.  Plaintiffs cite no authority holding or even suggesting that, even assuming such use occurred, it transforms general use online services, like Facebook, into "unreasonable, arbitrary, or invidious" services.

### 2.    Plaintiffs Fail To State A Claim Under The UCL

The California Plaintiffs' "unlawful" claim fails because they do not allege any predicate violation of the FHA, Unruh Act, or Section 51.5.  Plaintiffs' "unfair" claim fails because, for the same reasons they cannot allege unreasonable, arbitrary, or invidious conduct under the Unruh Act or Section 51.5, they also cannot allege "immoral, oppressive or unscrupulous" conduct under the UCL.  Plaintiffs do not argue that they have stated a claim under the UCL's fraud prong.  Plaintiffs also concede that they have never paid any money to Facebook, Opp. at 22, and do not allege any way in which, as users of Facebook's free service, they could "show an ownership interest" in Facebook's profits, which alone requires dismissal of Plaintiffs' UCL claim.  *See* Mot. at 28.

### E.    The New York Plaintiffs Fail To State Any Claim Under New York Law

### 1.    Plaintiffs Agreed That California Law Would Apply

Each New York Plaintiff alleges that he or she "*is* a Facebook user who used Facebook during the relevant time period," SAC ¶¶ 29, 34, 35, 36 (emphasis added), and each of them has continued to use Facebook as recently as spring and summer of 2020, *see* Wong Decl. ¶¶ 2–6, 13, 14, 20, 21.  Facebook's Terms have contained a California choice-of-law provision since 2009, and Facebook provides individualized notice to users via both email and on Facebook that continued use of Facebook constitutes agreement to all updated Terms.  *See* Wong Decl. ¶ 30.

1   According to the New York Plaintiffs, the link to Facebook's Terms during registration was

2   too "inconspicuous" to provide adequate notice.  Opp. at 25; *but see In re Facebook Biometric Info.*

3   *Privacy Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (concluding that users who registered in

4   2008 and 2009, using the same registration procedures at issue here, "assented to the user agreement

5   when they signed up for Facebook").  Even assuming *arguendo* that the New York Plaintiffs did not

6   receive adequate notice of Facebook's Terms upon registration, they do not allege that they did not

7   receive individualized notice of Facebook's Terms at some point in their decade-plus of continuous

8   use of the service and are therefore bound by those Terms, including the California choice-of-law

9   provision.  *See id.* (concluding that plaintiffs who registered in 2008 and 2009 agreed to the 2015

10   version of Facebook's Terms because emails and jewel notifications sent to all users constituted

11   "individualized notice" of the updated terms in combination with users' continued use).

### 2.   Plaintiffs Fail To State Any Claim Under the NYSHRL

13   The New York Plaintiffs argue that Facebook is an "agent" of  persons with the right to sell,

14   rent, or lease housing, Opp. at 25, but do not allege any facts demonstrating any principal-agent

15   relationship between Facebook and such persons.  Facebook's delivery of housing ads created and

16   targeted by advertisers does not transform Facebook into an *agent* of that advertiser for purposes of

17   the NYSHRL.  At the pleading stage, "[a] *full showing* of agency supported by an accepted theory of

18   agency or contract law is required, and generalized allegations of affiliation are insufficient."  *Miami*

19   *Prod. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 173 (W.D.N.Y. 2020) (quotation omitted)

20   (emphasis added).  The SAC is totally devoid of allegations that could support a plausible theory of

21   agency affiliation between Facebook and advertisers who placed housing ads on Facebook.  The

22   New York Plaintiffs also argue that Facebook is liable under an aiding and abetting theory.  Opp. at

23   27.  But to state a claim for aiding and abetting, Plaintiffs must show Facebook's "knowledgeable

24   and intentional participation" in unlawful third-party conduct.  Mot. at 29–30.  Plaintiffs do not plead

25   any predicate violation of law by advertisers, and do not, and cannot, plead any discriminatory intent

26   by Facebook.  *See supra* at 15.

### III.   <u>CONCLUSION</u>

28   The Court should dismiss Plaintiffs' Second Amended Complaint with prejudice.

1   DATED:  October 29, 2020                    MUNGER, TOLLES & OLSON LLP

2                                                         ROSEMARIE T. RING
                                                          JORDAN D. SEGALL
3                                                         MARIANNA MAO

4
                                                 By:        /s/ Rosemarie T. Ring
5                                                        ROSEMARIE T. RING
                                                 Attorneys for Defendant Facebook, Inc
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28