UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSEMARIE VARGAS, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>FACEBOOK, INC.,<br><br>        Defendant. | Case No. 19-cv-05081-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 64 |

Plaintiffs' Second Amended Complaint (SAC) asserts claims under the federal Fair Housing Act (FHA) and analogous California and New York laws challenging defendant Facebook, Inc.'s former practice of allowing advertisers to self-select target audiences for their housing advertisements (ads), theoretically excluding protected classes of consumers from seeing those advertisers' particular housing ads. Facebook moves to dismiss, arguing that (i) plaintiffs lack standing because they fail to identify any facts about their use of Facebook to search for housing ads sufficient to plausibly allege injury in fact, (ii) Facebook's publishing conduct is protected and immune under Section 230 of the Communications Decency Act (CDA), and (iii) plaintiffs fail to state their claims under the FHA, California, and New York law.

I conclude that plaintiffs' failure to allege any specific facts regarding their use of Facebook to search for housing means, given the context of this case, that they have not adequately alleged plausible injury in fact and lack Article III standing. Plaintiffs are given leave to amend to attempt to allege the facts that are within their exclusive knowledge.

## BACKGROUND

In the SAC, plaintiffs allege that when Facebook "created, implemented and/or maintained a pre-populated list of demographics, behaviors and interests that allowed real estate brokers, real estate agents and landlords to exclude certain buyers or renters from ever seeing their ads for

housing," its conduct resulted in discriminatory "redlining" in violation of the FHA[1] and New York[2] and California[3] state statutes. SAC ¶ 3. Facebook was sued for this exact conduct by non-profits and charged with discrimination by the United States Department of Housing and Urban Development, and plaintiffs admit that Facebook asserts that it stopped using the challenged tools by December 2019. *Id*. ¶¶ 3, 24. Plaintiffs sue, however, to recover damages for plaintiffs who were allegedly injured by the practice and to enjoin Facebook from restarting use of the challenged tools in the future. *Id*.

Plaintiffs assert that Facebook created an advertising platform (the "Ad Platform") that published and disseminated targeted advertisements for housing. This Ad Platform "allowed and/or facilitated the omission of certain Facebook users based on their real or perceived personal characteristics (which included several protected classes), by purposefully and intentionally creating, developing, and/or offering the 'Exclude People' feature. The Ad Platform also permitted advertisers to include only certain users with certain demographic characteristics (which included several protected classes), excluding users who lacked those characteristics (the 'Include People' feature)." *Id*. ¶ 5. Plaintiffs allege that Facebook also created "Multicultural Affinity groups for use on its Ad Platform," where Multicultural Affinity groups were "made up of people whose activities on Facebook suggest they may be interested in ads related to African American,

---

[1] 42 U.S.C. § 3601 *et seq*., in particular § 3604, making it unlawful:

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
> . . .
> (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.
> (d) To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

[2] New York Rights Law, N.Y. Exec. L. § 290 *et seq*.

[3] California Unruh Act, Cal. Civil Code §§ 51, 51.5, 52(a) and California Business and Professions Code § 17200 *et seq*.

Hispanic American, or Asian American communities." *Id*. ¶ 7. Facebook then "allowed advertisers to promote or market a community or home for sale or rent to select 'ethic affinity' groups as part of their advertising campaigns" and through the Multicultural Affinity tool used with the other feature of the Ad Platform allowed housing advertisers to "steer advertisements, information and content away from users in protected classes," resulting in a segregated marketplace for housing. *Id*. ¶¶ 8, 15.

Plaintiff Rosemarie Vargas is a resident of New York City, New York. She is a disabled female of Hispanic descent, and a single parent with minor children. *Id*. ¶ 29. She alleges that "during the relevant time" she "searched for housing periodically on Facebook" and "would filter her search for housing on the Facebook marketplace by location and cost," but because "Facebook created a platform which provided tools to exclude women of color, single parents and other protected attributes, Ms. Vargas and others similarly situated were prevented by Facebook from having the same opportunity to view ads for housing that other Facebook users who did not share the same characteristics were shown." *Id*. ¶¶ 30-31. She also claims that she "filtered her search for housing on the Facebook marketplace using the same parameters that her white male friend used but she obtained fewer results than her white male friend," and when she "included her use of a Section 8 voucher and her status as a veteran in her search, she obtained no results." *Id*. ¶¶ 32-33.[4]

The plaintiffs did not identify: (i) when and how often they used Facebook to search for housing ads; (ii) the parameters or selection criteria used for those searches; (iii) what specific ads they saw during those times as the result of their searches; or (iv) the numbers of ads that were returned by their searches, or any other details regarding their "use" of Facebook to "seek housing." They did not allege that they were denied access to housing ads that, had they had seen them, they were otherwise ready, able, and willing to accept during the specific time periods they were using Facebook to search for housing. As an example, neither Vargas nor any plaintiff

---

[4] The five other named plaintiffs identify only their ethnicities and gender and that they "used Facebook during the relevant time period to seek housing." *Id*. ¶¶ 34-38. None of these other plaintiffs alleges any further details about their use of Facebook to seek or review housing ads.

3

1  provides facts explaining: (i) why she was actively looking for housing, (ii) what specific markets
2  at specific price ranges she was looking for during any specific time, and (iii) if she had found
3  housing in her preferred market, within those ranges and during those times, she would have
4  applied for that housing.

## LEGAL STANDARD

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) tests whether the court has subject matter jurisdiction to hear the claims alleged in the complaint. A Rule 12(b)(1) motion may be either facial, where the inquiry is limited to the allegations in the complaint, or factual, where the court may look beyond the complaint to consider extrinsic evidence. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). Here, Facebook brings a facial attack on the sufficiency of the allegations in the SAC. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (in a facial attack under Rule 12(b)(1), "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."). A district court, "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). As with a Rule 12(b)(6) motion, however, a court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

Facebook argues, first, that plaintiffs lack Article III standing and statutory standing. For Article III standing, plaintiffs must allege facts supporting (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Under the Unruh Act and Section 51.5, plaintiffs must allege facts showing that they "actually suffer[ed] the discriminatory conduct" being challenged and possess a "concrete and actual interest that is not merely hypothetical or

United States District Court
Northern District of California

conjectural." *Angelucci v. Century Supper Club*, 41 Cal. 4th 160, 165 (2007); *White v. Square, Inc.*, 7 Cal. 5th 1019, 1032 (2019). Similarly, under the NYSHRL, they must allege plausible facts that they have been "aggrieved by an unlawful discriminatory practice," N.Y. Exec. Law § 297, which "requires a threshold showing that a person has been adversely affected by the activities of defendants …, or—put another way—that [he or she] has sustained special damage, different in kind and degree from the community generally." *Mobil Oil Corp. v. Syracuse Indus. Dev. Agency*, 76 N.Y.2d 428, 433 (N.Y. 1990). Under California's UCL, plaintiffs must allege facts to "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that economic injury was the result of, *i.e.*, caused by, the unfair business practice." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 321–22 (2011) (citing Cal. Bus. Prof. Code § 17204).

Facebook points out that none of the plaintiffs in this case has identified any specific advertisement or series of advertisements (*i.e.*, advertisements from a particular source) that she or he was deprived of receiving. Nor do any of the plaintiffs allege that if they had seen particular advertisements, they would have been ready, willing, and able to pursue the housing advertised. Instead, plaintiffs broadly allege that they believe they were discriminated against because some unidentified housing advertisers may have used the Facebook tools that were available to target housing advertisements away from them and, accordingly, plaintiffs may not have been shown the same housings ads as others of presumably different races, ethnicities, genders, and/or family-types were shown in violation of the housing laws they invoke.

Two judges in this District have dismissed materially similar cases for lack of Article III standing. In *Bradley v. T-Mobile US, Inc.*, 17-CV-07232-BLF, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020), plaintiffs alleged that defendants T-Mobile US, Inc. ("T-Mobile") and Amazon.com, Inc. ("Amazon") used the discriminatory tools provided by Facebook to routinely exclude older individuals from viewing the employment ads they post on Facebook in violation of the Age Discrimination in Employment Act ("ADEA," 29 U.S.C. § 623(e)) and similar state laws, including the California Unruh Act and UCL. The Hon. Beth Labson Freeman recognized that being "denied an opportunity to apply for certain jobs" due to the defendants' alleged use of

Facebook's tools to target-ads away from older Facebook users might establish Article III standing. But in order to plausibly plead injury in fact, Judge Freeman concluded that the plaintiffs must "show that they were deprived of the opportunity to apply for jobs" and to do so must "plausibly allege that they were 'able and ready' to apply for one or more of the jobs advertised using age-restricted ads" and where "'able' means qualified and to be 'ready' means seeking employment and genuinely interested in the position." *Id.*, at *10. Because plaintiffs had not alleged those types of facts – and instead simply asserted (similar to plaintiffs here) that they were "denied" access to job advertisements – the complaint was dismissed with leave to amend.

In *Opiotennione v. Facebook, Inc.*, 19-CV-07185-JSC, 2020 WL 5877667, at *1 (N.D. Cal. Oct. 2, 2020, Magistrate Judge Jacqueline Scott Corley dismissed a materially similar case that likewise included federal and California Unruh Act discrimination claims. There, plaintiff challenged Facebook's practice of allowing businesses to direct their advertising to consumers based on a potential customer's age or gender. Unlike here, the plaintiff identified examples of ads "where Facebook and financial services companies selected and executed upon age- or gender-restricted audience selections that denied older persons and/or women, including Plaintiff, the full and equal accommodations, advantages, facilities, and services of Facebook and those companies." *Id.* at 1. And, unlike here, the plaintiff further identified "three specific ads that allegedly were not displayed in her News Feed because of her age and/or gender" that including she alleged she would have been interested in receiving in order to consider pursuing the opportunity. *Id*.

Despite plaintiff's identification of advertisements that she claimed were discriminatorily denied to her, Judge Corley still determined that plaintiff "has not met her burden of alleging facts sufficient to support an inference of injury in fact. She contends that because she identified advertisements that could not appear in her News Feed because of her age or gender she has suffered an injury in fact, namely, being subject to discrimination. . . . These allegations, however, are merely a generalized claim of "unequal treatment" that does not rise to the level of an Article III injury in fact." *Id*. at *3. While plaintiff generally alleged that she "would have been interested in receiving in order to consider pursuing the opportunity," she still failed to allege

6

injury in fact because she failed to "allege that she was qualified for and interested in actually applying for the product offered." *Id*. at *4.  Judge Corley explained, "Plaintiff's general grievance about being denied 'full and equal access' without alleging facts that support an inference that she was personally injured by that denial fails to demonstrate an injury in fact sufficient to confer Article III standing." *Id*. at 5.  Considering plaintiff's separate allegation of injury (that she suffered "stigmatic harm" when "she was denied a primary benefit or service of Facebook—financial services advertising and information—based on age and gender"), Judge Corley determined that was also deficient because "it still requires a personal denial of equal treatment, which as discussed *supra*, Plaintiff has not alleged." *Id*.

Plaintiffs here attempt to distinguish these two decisions by arguing that standing under the FHA is broader than that under the ADEA at issue in *Bradley* and the discrimination laws at issue in *Opiotennione*.  They cite no support for that proposition.  Instead, plaintiffs cite Supreme Court decisions finding standing in situations markedly different from the allegations here.

In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982), the Court found standing under the FHA for a "tester" who received false information from an apartment complex.  There, the rental agents "told her on four different occasions that apartments were not available in the Henrico County complexes while informing white testers that apartments were available." *Id*. at 374.  The Court explained that Section 804(d) of the FHA "establishes an enforceable right to truthful information concerning the availability of housing, is such an enactment. A tester who has been the object of a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions. That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury within the meaning of § 804(d)." *Id*. at 373-74.  Having *received* false information, the tester had standing even though the tester did not have the actual intent to secure housing from the rental agents.  *See also Bradley*, 2020 WL 1233924 at *8 (distinguishing *Havens* and other "tester" cases as inapposite "because they involve litigants who *sought* and were then denied truthful information." (emphasis in

7

original)). *Havens* also addressed the standing of a non-profit that had *spent* money to combat housing discrimination. It found that those expenditures constituted concrete harms sufficient to confer standing. *Id*. at 379.

In both of those situations, the plaintiffs had alleged sufficient injuries in fact to confer standing under the FHA. *See also Bank of Am. Corp. v. City of Miami, Fla*., 137 S. Ct. 1296, 1304 (2017) (standing for city based on allegation that banks "intentionally targeted predatory practices at African–American and Latino neighborhoods and residents," which led to a "concentration" of "foreclosures and vacancies" in those neighborhoods, that caused "stagnation and decline in African–American and Latino neighborhoods," and "reduced property values, diminishing the City's property-tax revenue and increasing demand for municipal services."); *Trafficante v. Metro. Life Ins. Co*., 409 U.S. 205, 209-212 (1972) (FHA allowed suits by white tenants claiming that they were deprived benefits from interracial associations when discriminatory rental practices kept minorities out of their apartment complex); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110-111 (1979) (municipality had standing based on allegations of lost tax revenue and had the racial balance of its community undermined by racial-steering practices).

The allegations in those cases readily established the plaintiffs' injuries in fact stemming directly from the defendants' conduct: in *Havens*, the tester's receipt of false information and the association's expenditures; in *Bank of Am. Corp*., the City's reduced taxes and increased expenditures; in *Trafficante,* the denial of plaintiffs' ability to live in integrated housing; and in *Gladstone Realtors,* the loss of tax revenue and racially balanced neighborhoods. Here, however, we have only allegations that plaintiffs could *theoretically* have been injured *if* housing advertisers in fact used the targeted-ad tools to exclude users with *plaintiffs'* characteristics from ads that *might* have been within plaintiffs' spheres of interest and ability. For these facially speculative allegations of injury to be potentially plausible, plaintiffs must at a minimum allege more facts regarding their own use of Facebook to search for housing that they would have been ready to pursue.

Plaintiffs argue they have identified "concrete injuries that they have personally experienced," namely (1) "discrimination" based on protected classes, SAC at ¶¶ 88-89; (2)

8

"perpetuat[ion] [of] segregation" and denial of "the benefits of living in a[n] . . . integrated society," SAC at ¶ 92; and (3) denial of information that laws require to be given on an equal basis. SAC at ¶¶ 87, 93; Oppo. at 6.  Not so.  There are *no facts* regarding the nature of the searches performed by Vargas or the other plaintiffs, *no facts* regarding specific entities who allegedly used Facebook's ad-targeting tools to place discriminatory ads that possibly could have been seen by Vargas or any other plaintiff, and *no facts* establishing that Vargas or the other plaintiffs were actively looking for housing during a specific period and were ready, able, and otherwise qualified to secure such new housing had they been able to see the ads to which they were speculatively denied access.  There are, in short, no facts showing that any of the plaintiffs were plausibly injured personally by the ad-targeting tools that advertisers purportedly used to possibly target housing ads in areas that plaintiffs possibly searched that plausibly resulted in plaintiffs not receiving ads for housing based on the aspects of their protected classifications that they otherwise would have been in a position to pursue.

The most specific allegation made by Vargas is that at some unspecified time, using some unspecified search criteria, a search in Facebook's "marketplace" for housing resulted in "fewer" results than her white male friend received at some unspecified time, using some unspecified search criteria.  *Id*. ¶ 32.  That is insufficient to establish Article III standing and statutory standing under the FHA under plaintiffs' own authority.

I recognize plaintiffs' concern that because they were allegedly denied access to housing ads, they cannot (absent evidence from a comparable "tester") identify ads that they were not shown as evidence of their actual injury in fact.  I am not reaching the question of whether plaintiffs in this sort of case need to plead facts showing that a specific, comparable testor received different specifically identified ads.  What I am requiring plaintiffs to plead are the facts within their exclusive knowledge, explaining what they actually *did* with respect to their use of Facebook to look for housing, how they know their white compatriot saw different ads, and facts regarding their then-current intent and ability to secure housing had they been shown a full range of ads through Facebook.  Those facts – which are wholly absent from the SAC – are necessary to raise a *plausible inference* that Vargas or the other plaintiffs were injured in fact by the potential use of

9

the Facebook's discriminatory tools by housing advertisers.[5]

The result is no different for statutory standing under California's Unruh Act and Unfair Competition Law or New York law. There are no plausible facts alleged that *any* of the plaintiffs have *personally* suffered discrimination as a result of potential use of Facebook's ad-targeting tools at any particular time or in any particular manner, much less that they suffered any other non-conjectural injury or economic loss.

## CONCLUSION

The Motion to Dismiss the Second Amended Complaint is GRANTED with leave to amend.[6] If plaintiffs can amend to cure the deficiencies identified, they shall file their Third Amended Complaint within 20 days of the date of this Order.

**IT IS SO ORDERED.**

Dated: January 21, 2021



William H. Orrick
United States District Judge

---

[5] These facts are within the exclusive control of plaintiffs. Plaintiffs' request – made during the hearing on this motion – that they be provided "jurisdictional discovery" by Facebook puts the cart before the horse. Plaintiffs must make a plausible showing of *their* injury in fact based on facts within their exclusive control before Facebook may be subject to discovery.

[6] As such, I need not reach Facebook's other arguments in support of its motion to dismiss.