Gerard V. Mantese (MI Bar # P34424)
*gmantese@manteselaw.com*
David Honigman (MI Bar # P33146)
*dhonigman@manteselaw.com*
Kathryn Eisenstein (MI Bar #P66371)
*keisenstein@manteselaw.com*
(*Admitted Pro Hac Vice*)
**MANTESE HONIGMAN, P.C.**
1361 E. Big Beaver Road
Troy, MI 48083
Tel: 248-457-9200
Fax: (248)-457-9201

*Attorneys for Plaintiffs and Proposed Class Members.*

[*Additional counsel on following page*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| ROSEMARIE VARGAS, KISHA SKIPPER, JAZMINE SPENCER, DEILLO RICHARDS, and JENNY LIN, on behalf of themselves individually, and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.<br><br>        Defendant. | Case No. 3:19-cv-05081-WHO<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br><br>Judge: Hon. William H. Orrick<br>Courtroom: 2, 17th Floor<br>Action Filed: August 16, 2019 |

*Additional Counsel for Plaintiffs and Proposed Class Members.*

Patricia A. Stamler (MI Bar #35905)
*pstamler@hertzschram.com*
Elizabeth Thomson (MI Bar #53579)
*lthomson@hertzschram.com*
Matthew Turchyn (MI Bar #76482)
*mturchyn@hertzschram.com*
*Admitted Pro Hac Vice*
**HERTZ SCHRAM PC**
1760 South Telegraph Road, Ste 300
Bloomfield Hills, MI 48302
Tel: 248-335-5000
Fax: 248-335-3346

Michael D. Seplow, SBN 150183
*mseplow@sshhzlaw.com*
Wilmer Harris, SBN 150407
*wharris@sshhzlaw.com*
Aidan C. McGlaze, SBN 277270
*amcglaze@sshhzlaw.com*
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
11543 W. Olympic Blvd.
Los Angeles, CA  90064
Tel: 310-396-0731
Fax: 310-399-7040

*Attorneys for Plaintiffs and Proposed Class Members.*

THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs, by and through their attorneys, on behalf of themselves and all others similarly situated, and pursuant to Fed. R. Civ. P. 15 and this Court's Order dated February 5, 2021, Dkt. 88, hereby allege, on information and belief, the following in support of their Third Amended Complaint:

## OVERVIEW OF CASE

1.     This case arises out of Defendant Facebook's illegal discrimination in violation of the Fair Housing Act ("FHA"), as well as its violations of analogous state statutes in New York and California.  The FHA and the analogous state statutes were promulgated to redress this country's long history of redlining, to promote integration and to prohibit discrimination in housing based on sex, familial status, disability, national origin, race and other protected classes.

2.     At all relevant times through December 31, 2019, Facebook created, implemented and/or maintained a pre-populated list of demographics, behaviors and interests that allowed real estate brokers, real estate agents and landlords (hereafter "housing advertisers") to exclude certain buyers or renters from ever seeing their ads for housing.  This exclusionary advertising is called "redlining."  Facebook's Ad Platform violated both the FHA and New York and California state statutes prohibiting such discrimination.[1] Facebook created and used its Ad Platform to create and maintain a segregated market for housing.

3.     Facebook's illegal advertising practices were successfully challenged in a lawsuit by the National Fair Housing Alliance and others, which resulted in a settlement in which Facebook purportedly vowed to revise its housing advertising practices to comply with the FHA by the end of 2019. However, regardless of the extent to which Facebook has reformed its illegal advertising practices, from which it reaped substantial profits, Facebook has yet to offer or pay any compensation to tens of thousands of users

---

[1] Facebook contends that it has changed the ad portals to prevent discrimination in housing as of December 31, 2019.

THIRD AMENDED CLASS ACTION COMPLAINT

who were subjected to its discriminatory segregated housing market over a period of several years. Moreover, while Facebook has agreed to change its housing advertising practices for the time being, there is no guarantee it will continue to comply in the future, thus warranting injunctive relief.

4.     Facebook, under the auspices of providing a social-networking site, mines, collects, purchases, and assembles into individual profiles countless terabytes of data in multitudes of categories (hereafter "demographics data"), about its approximately two billion active monthly users worldwide.

5.     Facebook used its demographics data to permit housing advertisers to create, publish, circulate, utilize, target, and/or send ads to certain groups of Facebook users. Facebook also used its demographics data to permit Facebook and its housing advertisers to avoid publishing, providing, or sending ads to Facebook users in certain protected classes.

6.     As alleged more fully below, Facebook created, developed, implemented, marketed, and utilized an advertising platform called Ads Manager (the "Ad Platform") that created, utilized, published, disseminated, circulated and/or targeted advertisements for housing. The Ad Platform allowed and facilitated the exclusion of certain Facebook users based on their real or perceived personal characteristics (which included several protected classes), by creating, developing, and/or offering the "Exclude People" feature. The Ad Platform also permitted housing advertisers to include only certain users with certain demographic characteristics (which included several protected classes), thereby excluding users who lacked those characteristics (the "Include People" feature).

7.     By way of example, Facebook created, utilized, published, circulated and developed its Ad Platform to enable housing advertisers to exclude men or women from seeing an ad, a search box to exclude people who do not speak a specific language from seeing an ad, and a map tool to exclude people who live in a specified area from seeing an ad by drawing a red line around that ad.

8.     Facebook also created, utilized, published, circulated and developed the Multicultural Affinity groups for use on its Ad Platform. For example, Multicultural Affinity groups comprised people whose activities on Facebook suggested they may be interested in ads related to African American, Hispanic American, or Asian American communities.  Facebook allowed housing advertisers to promote or market a community or home for sale or rent to select "ethnic affinity" groups as part of their advertising campaigns.

9.     Facebook created, utilized, published, circulated and developed this Ad Platform, including the illegal discriminatory inclusion and exclusion tools and its Multicultural Affinity tool, to assist and enable housing advertisers to steer advertisements, information and content away from users in protected classes, while Facebook published, provided, disseminated, targeted and/or circulated the same advertisements, information and content to other Facebook users who were not in protected classes. Facebook's conduct resulted in a segregated housing market.

10.     In 2016, *ProPublica* and other media outlets began reporting that Facebook's Ad Platform violated fair housing laws.

11.     Throughout 2017 until about March 2018, four nonprofit organizations (NPOS), with the common mission of eliminating housing discrimination and promoting residential integration, investigated Facebook's conduct related to housing discrimination. The NPOS created dozens of housing advertisements and completed Facebook's full ad submission and review process in New York, Washington D.C., Miami, and San Antonio.

12.     The NPOS's investigation confirmed that Facebook provided housing advertisers options to exclude the following categories of Facebook users from receiving advertisements: (a) families with children; (b) women; (c) users with interests based on disability; and/or (d) users with interests based on national origin. Once the housing advertiser used Facebook's advertising drop-down menu to select the target audience for the ad, Facebook approved, published, circulated, utilized, disseminated

and/or targeted these housing ads in a discriminatory manner without Facebook users (i.e. consumers) ever knowing that they had been excluded from full, equal access to the market.

13. Discriminatory housing advertising is just as insidious and damaging as discrimination at the point of rental or sale. In the past, excluded groups might see a "for rent" sign or newspaper classified ad because the ads were and are located, in a public forum. Contrarywise, the clandestine nature of Facebook's technology and targeting practices concealed housing ads from entire groups of protected classes of people, thereby creating a segregated market.

14. Facebook's algorithms for data collection and its Ad Platform excluded protected classes of individuals and thereby denied them equal access to the housing market.

15. By intentionally creating, developing, and/or using both (1) the "Exclude People" feature, and (2) the "Include People" feature, Facebook knowingly and intentionally prevented housing ads and the information and content therein from being published, provided, circulated or sent to users who did not match certain protected class characteristics such as "African American (US)," "Asian American (US)," "Immigrant," "Hispanic US – English dominant," "Christian," "Moms," and "people ages 21 to 55 who live or were recently in the United States."

16. Facebook, through its creation, utilization, development, implementation, promotion, targeting and/or marketing of its Multicultural Affinity, Exclude People, or Include People tools, permitted its housing advertisers to select illegal preferences for its ads to Facebook users.

17. By way of example, as of August 16, 2019, Facebook's Ad Platform provided the following protected categories for the advertiser to exclude:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2:47

All Parents

🔍  Add demographics, interests or behaviors

New parents (0-12 months)
Parents                                                    ⊕

Parents (All)
Parents                                                    ⊕

Parents with adult children (18-26 years)
Parents                                                    ⊕

Parents with early school-age children (06-08
years)                                                     ⊕
Parents

Parents with preschoolers (03-05 years)
Parents                                                    ⊕

Parents with preteens (08-12 years)
Parents                                                    ⊕

Parents with teenagers (13-18 years)
Parents                                                    ⊕

Parents with toddlers (01-02 years)
Parents                                                    ⊕

2:49

Multicultural Affinity

🔍  Add demographics, interests or behaviors

African American (US)
Behaviors                                                  ⊕

Asian American (US)
Behaviors                                                  ⊕

Hispanic (US - All)
Behaviors                                                  ⊕

Hispanic (US - Bilingual)
Behaviors                                                  ⊕

Hispanic (US - English dominant)
Behaviors                                                  ⊕

Hispanic (US - Spanish dominant)
Behaviors                                                  ⊕

THIRD AMENDED CLASS ACTION COMPLAINT

18.    Facebook is responsible, in whole or in part, for the creation, publication, dissemination, circulation, utilization and/or targeting of its Ad Platform for housing.

19.    Facebook's affirmative conduct in creating, maintaining and promoting its housing advertisers' use of its Multicultural Affinity, Exclude People, or Include People tools resulted in unlawful discrimination against Facebook users who sought housing through Facebook in violation of the Fair Housing Act, and analogous New York and California statutes.

20.    Facebook's conduct, as further detailed above and below, made it a creator or developer of the information or content in the ads that were not published, not provided, not circulated and not sent to certain Facebook users, based on these users' genuine or perceived protected class characteristics.

21.    Facebook is an information content provider for its Ad Platform, screening tools, and ads that were published, provided, circulated, targeted, utilized, disseminated and/or sent to Facebook users based on those users' actual or perceived protected class characteristics, compiled by Facebook from data it collected or acquired from other data collection firms of those users' actual or perceived protected class characteristics.

22.    Despite Facebook's corporate mission statement "*to give people the power to build community and bring the world closer together*," https://investor.fb.com/resources/default.aspx, Facebook created and developed an Ad Platform with its discriminatory Exclude People, Include People and its Multicultural Affinity tools that permitted Facebook and its housing advertisers to not publish, not provide, not circulate and not send information or content to individuals in protected classes in Facebook's community while deciding to publish, provide, circulate, utilize, target and/or send the same information to other Facebook community members outside of the protected classes.

23.    Facebook's COO, Sheryl Sandberg, admitted that "We believe advertisers and us [Facebook] should be held accountable for content and ads." https://www.nytimes.com/2018/06/28/technology/facebook-twitter-political-ads.html

24.    Facebook created a platform for its housing advertisers' targeting decisions as demonstrated by the excerpts from a *Bloomberg Businessweek* article titled "How Facebook Helps Shady Advertisers Pollute the Internet" (https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them).

HUD's Charge of Discrimination Against Facebook

"***Facebook is discriminating against people based upon who they are and where they live. Using a computer to limit a person's housing choices can be just as discriminatory as slamming a door in someone's face***."

—Ben Carson-former Secretary of HUD

25.     On March 28, 2019, The Secretary, United States Department of Housing and Urban Development, on behalf of the Complainant Assistant Secretary for Fair Housing and Equal Opportunity filed a charge of discrimination against Facebook pursuant to 42 U.S.C § § 3601-19 alleging, *inter alia*, Facebook's Ad Platform violated the FHA. **Exhibit 1**, HUD Charge of Discrimination ("Charge"), HUD ALJ No., FHEJ No. 01/18/0323-8. The details of HUD's Charge are addressed more fully below.

26.     HUD's Charge alleges that Facebook is the "second largest online advertiser in the United States", "is responsible for approximately twenty percent of all online advertising nationwide," and operates "Facebook and Instagram, two of the most widely used social media platforms in the United States." Further, "Facebook has approximately 221 million active users in the United States and over two billion active users globally, while Instagram has approximately 114 million active users in the United States and over one billion active users globally, with active user defined as someone who uses the platform at least once per month." (Exhibit 1- ¶ 6).

27.     Advertisers pay Facebook "to show targeted ads to users on Facebook, Instagram, and Messenger," and on its "Audience Network." Further, the "[t]argeted ads are generally placed through *a single advertising platform called Ads Manager regardless of where the ads will be shown to users*." (Exhibit 1- ¶ 8) (emphasis added).

28.     Due to the way Facebook "designed its advertising platform, *ads for housing and housing-related services are shown to large audiences that are severely biased based on characteristics protected by the Act, such as audiences of tens of thousands of users that are nearly all men or nearly all women*. (Exhibit 1- ¶ 11) (emphasis added).

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiffs and the class they seek to represent assert federal claims under the Fair Housing Act; 28 U.S.C. § 1343(a)(4); as Plaintiffs seek to recover damages and/or equitable relief under an Act of Congress providing for the protection of civil rights, and under 42 U.S.C. § 3613(a)(1)(A), and as Plaintiffs seek damages and/or equitable relief regarding a

discriminatory housing practice prohibited by the Fair Housing Act. This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367(a).

30.    This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1), because Facebook's principal place of business is located in the Northern District of California and it transacts business within the state of California.

31.    Declaratory and injunctive relief is sought under and authorized by 28 U.S.C. §§ 2201 and 2202.

32.    Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to Plaintiffs' claims occurred in the Northern District of California.

## **RELEVANT BACKGROUND FACTS**

### A. **FACEBOOK, INC.**

33.    Facebook, Inc. is a technology and social-networking company. It serves as an advertiser for numerous businesses including relators, real estate agents and landlords. It owns and operates the world's largest social media platform, including Facebook, Instagram, and Messenger, among others. Facebook also owns and develops software and technology.

34.    According to Facebook, "more than 2.7 billion people use at least one of our family of services each month." Company Info, Facebook Stats, https://newsroom.fb.com/company-info/ (last visited Aug. 14, 2019).

35.    Facebook's products and services "help people discover and learn about what is going on in the world around them, enable people to share their opinions, ideas, photos and videos, and other activities with audiences ranging from their closest friends to the public at large, and stay connected everywhere by accessing [Facebook's] products." *Facebook 2018 SEC Annual Report*, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2018-Annual-Report.pdf, p. 8 (last visited Feb. 24, 2021).

36.    Facebook collects vast amounts of data about its users, including: information and content that users provide by creating a Facebook account, signing in,

creating or sharing content, and messaging with others on Facebook products; information about people, pages, accounts, and groups that users connect with and how users interact with them; information about how users use Facebook, including the types of content a user views and the duration of a user's activity on Facebook; information about transactions made on Facebook, including purchases; and information other users provide about a particular user through communications and interactions between users. *See* https://www.facebook.com/policy.php (last visited Aug. 14, 2019).

37. According to a report in *Fortune* magazine, "*when you sign up for a Facebook account, you're required to share: name, gender, date of birth, email or mobile number.*" (Fortune.com/2018/03/21/Facebook-personaldata-cambridgeanalytics) (last visited Aug. 14, 2019) (emphasis added). From there, Facebook gathers and stores additional personal data, which can be and is used to target ads to its users. *Id.* Facebook gathers and stores data about: every ad users' click on; any additional personal information added to the users' profiles; every IP address used to log in to Facebook; every friend and deleted friend in users' network; and all of the users' activity (stored in Facebook's activity log). *Id.*

38. Paragraph thirteen of Facebook's Ad Policy states that, "[y]our use of Facebook's advertising products and services is part of "Facebook" under Facebook's Statement of Rights and Responsibilities." See https://www.facebook.com/policies/ads/ (last visited March 2, 2021).

39. Facebook uses the data about its users in a variety of ways. One such use is to personalize and target advertisements to its users based on users' characteristics, including protected classes, garnered from the data Facebook collects.

**B. FACEBOOK'S AD PLATFORM**

40. In addition to its business as a technology and social networking company, Facebook is in the advertising business. In fact, Facebook generates "substantially all" of its revenue from selling advertisements. *Facebook 2018 SEC Annual Report*, https://s21.q4cdn.com       /399680738/files/doc_financials/annual_reports/2018-Annual-

Report.pdf, p. 12. In 2018, Facebook generated $55.01 billion in advertising revenue out of $55.84 billion in total revenue. *Facebook 2018 SEC Annual Report*, p. 38. In 2017, Facebook generated $39.94 billion in advertising revenue out of $40.65 billion total revenue. *Facebook 2017 SEC Annual Report*, https: //s21.q4cdn.com/3996807 38/files/doc_financials/annual_reports/FB_AR_2017_FINAL.pdf, p. 36 (last visited Aug. 14, 2019). In 2020, Facebook reported nearly **86 billion (USD) in revenue**, up from $70.7 billion in 2019, and $55.8 billion in 2018. https://www.statista.com/statistics/268604/annual-revenue-of-facebook/ (last visited Feb. 26, 2021).



41.   Facebook does not merely publish advertisements for a fee on its websites and applications. Rather, Facebook is integrally involved in the creation, utilization, publication, dissemination, circulation and/or targeting of advertisements on its products.

THIRD AMENDED CLASS ACTION COMPLAINT

42.     Facebook collects millions of data points about its users, draws inferences about each user based on this data, and then charges advertisers for the ability to use its Ad Platform to micro target ads to users based on Facebook's inferences about them. Facebook then uses the Ad Platform to publish, circulate, utilize, and/or disseminate ads to users across the web and in mobile applications in a targeted fashion. Facebook promotes and distinguishes its Ad Platform by proclaiming that "most online advertising tools have limited targeting options . . . like location, age, gender, interests and potentially a few others. . . *But Facebook is different. People on Facebook share their true identities, interests, life events and more.*"[2] *As Facebook explains, its Ad Platform enables advertisers to "[r]each people based on . . . zip code . . . age and gender . . . specific languages . . . the interests they've shared, their activities, the Pages they've like[d] . . . [their] purchase behaviors or intents, device usage and more.*"[3] (emphasis added). Thus, Facebook "use[s] location-related information-such as your current location, where you live, the places you like to go, and the businesses and people you're near to provide, personalize and improve our Products, including ads, for you and others."[4]

43.     Advertisers pay Facebook to show targeted ads to users on Facebook, among other places. Targeted ads are placed through the Ad Platform.

44.     Facebook holds out its Ad Platform as a powerful resource for advertisers in many industries, including housing and housing-related services. For example, Facebook promotes its Ad Platform with "success stories," including stories from a housing developer, a real estate agency, a mortgage lender, a real estate-focused marketing

---

[2] Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).

[3] Facebook Business, *Your Guide to Digital Advertising,* www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).

[4] Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).

agency, and a search tool for rental housing. https://www.facebook.com/business/success
/categories/real-estate (last viewed Feb. 26, 2021).

## C. **HOW FACEBOOK'S AD PLATFORM WORKS**

### *i. Facebook Collects User Data*

45.   Facebook collects and extracts data about its users' demographics, interests,
and behavior both on and off Facebook's products, including the pages that a user and a
user's friends like, information from a user's Facebook and Instagram profiles; a user's
activities with businesses not affiliated with Facebook, including purchases and emails;
a user's activity on other websites and apps; and a user's location.
https://www.facebook.com/about/ads (last visited Feb. 26, 2021).

46.   Indeed, Facebook's website provides information to its users or prospective
users as to how Facebook targets ads.

**Why you see a particular ad**

Our ad system prioritizes what ad to show you *based on what
advertisers tell us their desired audience is,* and we then match it
to people who might be interested in that ad.  *This means we can
show you relevant and useful ads without advertisers learning
who you are.*  We don't sell any individual data that could identify
you, like your name.

When an advertiser wants to reach…
# Bike enthusiasts

Between **18 – 35 years old**
**Female**
Within **20 miles** of my store
Interested in **bicycling**
**Mobile** users

THIRD AMENDED CLASS ACTION COMPLAINT

<div style="border:1px solid">

We show their ad to people like…

## Facebook user

**30 years old**

**Female**

**Menlo Park, CA**

Interested in **bicycling**, movies, cooking

**iPhone user**, car shopper, gamer

</div>

www.facebook.com/about/ads (last visited Aug. 14, 2019) (emphases added in part).

47.     Facebook uses "…the information we have (including your activity off our Products, such as the websites you visit and the ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services." *Data Policy*, Facebook, https://www.facebook.com/policy.php. (last visited Aug. 15, 2019)

### ii. Facebook Creates and Assigns Categories Using Data

48.     Upon information and belief, Facebook evaluates, analyzes, and processes the user data to create thousands of different categories, which are based on information that users have provided to Facebook and on information that Facebook has inferred from the user's actions and behaviors. Louise Matsakis, *Facebook's Targeted Ads Are More Complex Than It Lets On*, Wired (April 25, 2018), https://www.wired.com/story/facebooks-targeted-ads-are-more-complex-than-it-lets-on/ (last visited Feb. 24, 2021).

49.     Then Facebook assigns applicable categories to each user. Julia Angwin, et al, *Facebook Doesn't Tell Users Everything It Really Knows About Them*, ProPublica, (Dec. 27, 2016), https://www.propublica.org/article/facebook-doesnt-tell-users-everything-it-really-knows-about-them (Clarification January 24, 2017).

### iii. Facebook and Advertisers Use Facebook's Tools to Target Their Audiences

50.     Facebook sold to its housing advertisers the ability to target advertisements to people who, according to Facebook's assessment of the data it collected, shared certain personal attributes and/or are likely to respond to a particular ad. Users are required to disclose some data about themselves when they set up their profiles, such as date of birth, name and gender. However, users disclose much of their personal attributes unwittingly through the actions they, and those associated with them, take on and off of Facebook's products.  https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 26, 2021).

51.     Facebook directed its housing advertisers to first choose their objective by answering, "what's the most important outcome I want from this ad?" *Here's How to Create a Facebook Ad*, Facebook, https://www.facebook.com/business/ads (last visited Feb. 26, 2021).

52.     Facebook then instructed housing advertisers[5] to select their audience: "Using what you know about the people you want to reach – like age, location, and other details – choose the demographics, interests and behaviors that best represent your audience." *Here's   How   to   Create   a   Facebook   Ad*,   Facebook, https://www.facebook.com/business/ads (last visited Feb. 26, 2021).

### iv. Ad Targeting Process

53.     In the ad targeting phase, Facebook provided the housing advertiser with a variety of tools for selecting an ad's "eligible audience." In other words, the housing advertiser was able to specify attributes that the users who were shown the ad must have

---

[5] Facebook's Ad Platform applied to all advertisers.  The Third Amended Complaint is focused on housing advertisers.  Based on settlement agreements Facebook has entered into with various fair housing organizations, Facebook has publicly claimed it no longer illegally targets housing ads and it no longer allows housing advertisers to use its Ad Platform to target ads based on protected classes.

and attributes that users who were shown the ad must not have. Second, in the ad delivery phase, Facebook selected the ad's "actual audience," meaning Facebook chose the potential customers who were eligible to and/or did see the ad from among the pool of Facebook users, thereby creating a segregated market.

54.   During the ad targeting phase, Facebook provided housing advertisers with tools to define which users, or which types of users, the advertisers wanted to target with their ads. Facebook provided a toggle button that enabled housing advertisers to exclude men or women from seeing an ad, a search box to exclude people who did not speak a specific language from seeing an ad, and a map tool to exclude people who lived in a specified area from seeing an ad by drawing a red line around the excluded geographic area.[6] Facebook also provided drop-down menus and search boxes to exclude or include (i.e., limit the audience of an ad exclusively to) people who share specified attributes. Facebook has offered housing advertisers hundreds of thousands of attributes from which to choose, for example to exclude "women in the workforce," "moms of grade school kids," "foreigners," "Puerto Rico Islanders," or people interested in "parenting," "accessibility," "service animal," "Hijab Fashion," or "Hispanic Culture." Facebook also has offered housing advertisers the ability to limit the audience of an ad by selecting to include only those classified as, for example, "Christian" or "Childfree."

55.   Housing advertisers were offered three different Facebook tools to assist them in targeting their audiences with greater degrees of specificity: Facebook Core Target Audiences, Facebook Custom Audiences, and Lookalike Audiences. *See* https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 26, 2021).

56.   These tools empowered housing advertisers to target audiences by Facebook's pre-determined categories and enabled them to include or exclude certain categories of people from their audiences. *See* https://business.facebook.com/

---

[6] The choice of red lines for exclusion is more than ironic.  The housing advertisers' and Facebook's prior ability to exclude users based on their geographic locations fostered the maintenance of segregated communities and a segregated market for housing.

ads/audience-insights/people?act=1006195749575790&business_id=838507093214687&age=18-&country=US (last visited Feb. 26, 2021).

57.    Facebook enabled housing advertisers to exclude categories of people from viewing advertisements based on the categories Facebook created by extracting user data and making inferences about those users.

58.    Facebook's design, maintenance and implementation of its Ad Platform allowed ads for housing and housing-related services to be targeted to large, segregated audiences based on characteristics protected by the FHA, California statutes, and New York statutes.

59.    During the ad delivery phase, Facebook selected from among the users who had been defined as "eligible" to see a housing ad which users would actually see the ad. Facebook based this targeting decision in large part on the inferences and predictions it drew about each user's likelihood to respond to an ad based on the data it had about that user, the data it had about other users whom it considered to resemble that user, and the data it had about "friends" and other associates of that user. To decide which users were in the targeted housing ad audience, Facebook considered the user's sex and close proxies for the other protected classes. Such proxies may have included which pages a user visited, which apps a user had, where a user went during the day, and the purchases a user made on- and offline.  As a result of Facebook's conduct in the ad delivery phase, Facebook created a segregated housing market, unlawfully denying plaintiffs and the putative class equal access to housing advertisements. Those Facebook users who were given access to this segregated market were eligible to see thousands of housing ads which plaintiffs and the putative class were not eligible to see.

60.    Upon information and belief, Facebook alone, not the advertiser, determined which users constituted the "actual audience" for each housing ad.

1
2

***v.   Facebook Set the Price for Advertising in Tandem with the Target Audience***

3   61.   Facebook charged its housing advertisers different prices to show the same
4   ad to different users. The price to show a housing ad to a given user was based, in large
5   part, on how likely Facebook believed that user was to interact with the particular housing
6   ad. In order to determine the pricing for a housing ad for each user, Facebook considered,
7   by way of example, the sex and close proxies for the other protected classes. Such proxies
8   may have included which pages a user visited, which apps a user had, where a user went
9   during the day, and the purchases a user made on and offline. Facebook alone sets the
10  price the housing advertiser paid to have Facebook to display the ad to the target audience.
11  Furthermore, Facebook used the pricing differentials it set to determine which users will
12  be in the target audience for housing ads rather than allowing advertisers to make that
13  decision. As Facebook explained "*If there are more and cheaper opportunities among*
14  *men than women, then we'd automatically spend more of [an advertiser's] overall budget*
15  *on the men*."[7] (emphasis added).

16  62.   To group users by shared attributes, to create a Lookalike Audience, to
17  determine an ad's "actual audience" during the ad delivery phase, and to price each ad for
18  each user, Facebook combined the data it had about user attributes and behavior on its
19  platforms with data it obtained about user behavior on other websites and in the non-digital
20  world. Facebook then used machine learning and other prediction techniques to classify
21  and group users to project each user's likely response to a given housing ad. In doing so,
22  Facebook inevitably recreated groupings defined by their protected class or classes. For
23  example, the top Facebook pages users "like" varies sharply by their protected class,
24  according to Facebook's "Audience Insights" tool.

25

26  ───────────────────────

[7] *Facebook, Why did my cost per result go up when I increased my budget?*
27  [https://web.archive.org/web/2016
0930124257/https://www.facebook.com/business/help pref=faq_content] (archived on
28  Sep. 30, 2016 by The Internet Archive).

63.    Therefore, by grouping users who "like" similar pages (unrelated to housing) and presuming a shared interest or disinterest in housing-related advertisements, Facebook's tools functioned just like an advertiser who intentionally targets or excludes users based on their protected class.

### vi. Facebook's Discriminatory Housing Advertisements

64.    Upon information and belief, Facebook approved housing advertisements which exclude (or include) categories of protected classes, including sex, age, disability, sexual preference, age, marital status, race or skin color, or geographic boundaries which effectively discriminate in a similar manner.

65.    When Facebook or a housing advertiser excluded a specific category from its audience and Facebook published its advertisement, Facebook ensured that the advertisement was visible to a target audience that created a barrier to marketplace access for those who excluded from the audience based on protected class status.

66.    Upon information and belief, as recently as 2019, Facebook mined user data to create categories of users defined by race or skin color *other than white* and permitted advertisers to exclude those categories from the audience of housing advertisements. *See* https://nationalfairhousing.org/facebook-settlement/ (last visited Feb. 26, 2021).

67.    Upon information and belief, Facebook approved and published housing advertisements which excluded African Americans from the audience. *See*, *e.g*., Julia Angwin, et al., *Facebook (Still) Letting Housing Advertisers Exclude Users By Race* (ProPublica, Nov. 21, 2017), https://www.propublica.org/article/facebook-advertising-discrimination-housing-race-sex-national-origin.

68.    In addition, on or about November 14, 2017, ProPublica purchased dozens of rental housing ads on Facebook and requested that these ads "not be shown to certain categories of users, such as African American, mothers of high school kids, people interested in wheelchair ramps, Jews, expats from Argentina and Spanish speakers." *Id.* "Every single ad was approved within minutes." *Id.*  An additional ProPublica ad, which

sought to exclude potential renters "interested in Islam, Sunni Islam and Shia Islam" took 22 minutes to approve. *Id.*

69.   Upon information and belief, Facebook approved and published housing advertisements for sale and rental properties which excluded African Americans and single parents and/or that were based on sex, familial status, religion, disability and other protected classes from the ad's target audience.

70.   Facebook's conduct resulted in certain audiences receiving ads about availability of housing for sale or rental, while users in certain protected classes were excluded from the target audience and thus deprived access to the housing marketplace. By denying users access to the full market of potential housing advertisements based on the users' protected characteristics, Facebook violated the FHA and analogous state laws by its wholesale exclusion of certain users from the possibility of seeing housing advertisements.

71.   Facebook's conduct prevented Plaintiffs and the putative class from being in the target audience for ads for the sale or rental of available housing.

72.   Facebook's conduct violated the FHA as set forth in Counts I, II, III, and IV below and the analogous New York and California state laws as set forth in Count V (New York), and Counts VI, VII and VIII (California).

73.   As a direct and proximate result of Facebook's discriminatory practices described herein, Plaintiffs have suffered and will continue to suffer damages due to the violations of their civil rights under the FHA, New York state laws, and California state laws.

### vii. Facebook's "Marketplace" [8]

74.   In addition, beginning in or around 2016, Facebook integrated a "Marketplace" feature, enabling users to post items – including housing for sale (or, as

---

[8] This case only involves advertisements that were created using the targeting features available on Facebook's Ad Platform. It does not involve user-created Marketplace listings that do not use the Ad Platform's targeting features.

relevant to this case, for rent) and to search or browse the Marketplace. As explained in early 2019, "Facebook Marketplace was introduced in 2016 as a place for people to buy and sell within their communities. Think Craigslist, but with Messenger." Katie Sehl, *Facebook Marketplace: A Comprehensive Guide for Marketers* (Hootsuite, Jan. 9, 2019), *available at* https://blog.hootsuite.com/facebook-marketplace/ (last visited Feb. 24, 2021). In other words, like Craigslist, the Marketplace facilitated "C2C" (consumer-to-consumer) transactions by creating a platform for Facebook users to create, search, and browse various categories of listings, including listings for home sales and rentals. In essence, it operates as "an online shopping channel. It's a place for Facebook users to buy and sell from each other locally." *See id.*

75.    The Marketplace was widely adopted by users and quickly became a popular destination within the Facebook platform; as of May 2018, it was being used in "more than 70 different countries by more than 800 million people each month." *Id.*

76.    Unfortunately, the Marketplace also incorporated the same, unlawful, discriminatory features discussed above, particularly through ad placement and targeting. "In June 2018, Facebook announced the option for businesses to place ads in Marketplace." *Id.* These ads would appear "in-feed" (i.e., as someone was browsing or scrolling through the results of a search) and had "the advantage of reaching people where they are shopping." *Id.* In fact, it was reported that placing ads in Marketplace yielded "a marked increase in conversion rates compared with News Feed placements." *Id.*

77.    Facebook's maintenance of its Ad Manager Platform, which allowed advertisers to exclude or exclude individuals and protected classes in violation of the FHA's mandate, is a per se violation of the statute. See *Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("In this we think, lies the critical distinction between *Trafficante* and the situation here…Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute.")

78.   Facebook's discriminatory actions deprived Plaintiffs and those similarly situated of the social benefits and business and professional advantages of an integrated community giving rise to a legally cognizable injury.

## THE PLAINTIFFS

**A. Rosemarie Vargas**

79.   Plaintiff Rosemarie Vargas is, for all times relevant to this Complaint, a disabled female of Hispanic descent, and a single parent with minor children, residing in New York City, New York. She is a Facebook user who used Facebook from on or about August 2018 through April 2019 to look for housing.

80.   Prior to August 2018 and throughout the time she was looking for housing on Facebook, Plaintiff Vargas used Facebook for a variety of reasons, including posting of photos of herself and her children.

81.   From on or about August 2018 through April 2019, Plaintiff Vargas searched for housing on Facebook four to five times per week. She was ready, willing and able to move if she located suitable housing.

82.   Plaintiff Vargas's search for housing from August 2018 through April 2019 was pressing due to the need for increased space given the size of her family and the need for an additional bedroom.

83.   From on or about August 2018 through April 2019 Ms. Vargas logged into Facebook, then accessed the Marketplace (discussed above) from her Facebook home page.

84.   Once in the Marketplace, Plaintiff Vargas used the following search criteria in her efforts to locate housing:  number of bedrooms, geographic location, number of residents and price range.

85.   Specifically, Plaintiff Vargas's housing search included, but was not limited to, a three-bedroom apartment located in lower Manhattan in the rental price range of $1,7000.00 per month.

86. During the time-period Plaintiff Vargas was looking for housing on Facebook's Marketplace, she was sharing a bedroom with her minor daughter.  Her minor son had a separate bedroom.

87. During the time period Plaintiff Vargas was seeking housing on Facebook's Marketplace she was suffering from Post-Traumatic Stress Disorder ("PTSD") and an anxiety disorder from her military service in the Navy. Plaintiff Vargas's mental health diagnoses caused her to have very bad nightmares and caused her to scream and terrify her daughter.

88. Plaintiff Vargas's quest for new housing from August 2018 through April 2019 was undertaken in an effort to shield her daughter from some of her PTSD symptoms that manifested while she slept.

89. On or about August 2018, Plaintiff Vargas initially included in her search criteria the use of Section 8 housing voucher and her status as a veteran, and the search results yielded no ads.

90. After Plaintiff Vargas removed the use of the Section 8 housing voucher, she received different search results.

91. Even though Ms. Vargas searched for housing in lower Manhattan, her search results produced ads in predominately unsafe areas and/or Hispanic and Black residential neighborhoods outside of Manhattan, like the Bronx.

92. After receiving these search results, Plaintiff Vargas modified her search criteria to include housing in Brooklyn, but the results of her searches continued to provide ads for apartments located in unsafe areas in predominately Hispanic and/or Black residential locations.

93. Plaintiff Vargas received some of the same ads repeatedly for apartments that were no longer available or were in unsafe locations.

94. During her Facebook searches for housing, Plaintiff Vargas did not receive any ads for housing in Manhattan.

95.   On or about February or March 2019, Plaintiff Vargas was with a Caucasian friend, Chet Marcello.  Plaintiff Vargas and Ms. Marcello sat side-by-side and conducted a search for housing through Facebook's Marketplace, both using the same search criteria Plaintiff Vargas had been using. Ms. Marcello received more ads for housing in locations that were preferable to Plaintiff Vargas.  Plaintiff Vargas did not receive the ads that Ms. Marcello received.

96.   Despite months of diligent searching, Plaintiff Vargas was never able to locate suitable housing through Facebook's Marketplace.  Instead, she was able to work with her landlord to physically modify her existing apartment to provide a separate area for her daughter to sleep.

97.   From August 2018 through April 2019, Ms. Vargas did not receive any housing ads in her Facebook News Feed despite her regular, lengthy searches for housing in the Marketplace.

98.   Based upon information and belief, including Facebook's well-known amassing of detailed demographic data about each user, Plaintiff Vargas's status as a single parent, disabled female of Hispanic descent was known to Facebook.

99.   Facebook's Ad Platform and its targeting methods provide tools to exclude women of color, single parents, persons with disabilities and other protected attributes, and as a result of Facebook's actions, Plaintiff Vargas, and others similarly situated, were prevented from having the same opportunity to view ads for housing that other Facebook users, not in protected classes received.

100.  Facebook's Ad Platform and its targeting methods created a barrier to equal access to the housing market for Plaintiff Vargas and the putative class, based on her status as a member of several protected classes under the FHA and analogous state statutes.

101. Facebook's discriminatory Ad Platform and its discriminatory targeting of housing advertising caused and continue to cause Plaintiff Vargas injuries, including but not limited to compensatory damages for loss of housing opportunities which include but

are not limited to, their increased amount of time spent looking for housing, their loss of a more desirable housing space, a continuation of residing in a homeless shelter, loss of housing located in a safer area, loss of housing more proximate to their house of worship and other activities, loss of a more stable neighborhood, loss of an ideal housing environment, and/or loss of housing located in a more desirable location, punitive damages, and nominal damages.  Ligatti, Christopher C. (2019) "Max Weber Meets the Fair Housing Act: 'Life Chances' and the Need for Expanded Lost Housing Opportunity Damages," Belmont Law Review: Vol. 6, Article 3, *available at* https://repository.belmont.edu/lawreview/vol6/iss1/3 (hereafter, "Ligatti").

**B. <u>Kisha Skipper</u>**

102.  Plaintiff Kisha Skipper is, for all times relevant to this Complaint, a female of African American descent, and a single parent with minor children, residing in Yonkers, New York.  She used her Facebook account from on or about November 2016 through May 2017 to look for housing.

103.  Prior to November 2016 and throughout the time she was looking for housing on Facebook, Plaintiff Skipper used Facebook for a variety of reasons, including posting of photos of herself and her children.

104. From on or about November 2016 through May 2017, Plaintiff Skipper urgently needed new housing because the house she and her family were renting was in foreclosure.

105.  From on or about November 2016 through May 2017, Plaintiff Skipper was gainfully employed and prepared to move.

106. During on or about November 2016 through May 2017, once in the Marketplace, Plaintiff Skipper used the following search criteria in her efforts to locate housing:  number of bedrooms, geographic location, and price range.

107. Specifically, from on or about November 2016 through May 2017, on a nearly daily basis, Plaintiff Skipper used the following search criteria: a two-to-three

bedroom single family home or apartment unit in Yonkers or Westchester County in the monthly rental range of $1,000 to $2,000.

108.  Plaintiff Skipper routinely received ads in the Marketplace in other locations like Great Neck, NY, Mt. Vernon NY and Long Island, NY.

109.  Plaintiff Skipper did not receive ads for housing in Yonkers or Westchester County and did not locate alternate housing through Facebook.

110.  Ms. Skipper did not receive any housing ads on her Facebook News Feed despite her search for housing on Facebook.

111.  Based upon information and belief, including Facebook's well-known amassing detailed demographic data about each user, Plaintiff Skipper's status as a single parent, female of African American descent was known to Facebook.

112.  Facebook's Ad Platform and its targeting methods provide tools to exclude women of color, single parents, and other protected attributes, and Facebook prevented Plaintiff Skipper, and others similarly situated, from having the same opportunity to view ads for housing that other Facebook users, not in protected classes received.

113.  Facebook's Ad Platform and its targeting methods created a barrier to equal access to the housing market for Plaintiff Skipper and the putative class, based on her status as a member of several protected classes under the FHA and analogous state statutes.

114.  Facebook's discriminatory Ad Platform and its discriminatory targeting of housing advertising caused and continue to cause Plaintiff Skipper injuries, including but not limited to compensatory damages for loss of housing opportunities which include but are not limited to, their increased amount of time spent looking for housing, their loss of a more desirable housing space, a continuation of residing in a homeless shelter, loss of housing located in a safer area, loss of housing more proximate to their house of worship and other activities, loss of a more stable neighborhood, loss of an ideal housing environment, and/or loss of housing located in a more desirable location, and punitive and nominal damages. Ligatti, *supra*.

C. **Jazmine Spencer**

115.  Plaintiff Jazmine Spencer is, for all times relevant to this Complaint, a female of both African American and Hispanic descent, and a single parent with minor children, residing in New York, New York.  She used her Facebook account to look for housing from on or about 2016 through 2019.

116. Prior to 2016 and throughout the time she was looking for housing on Facebook, Plaintiff Spencer used Facebook for a variety of reasons, including the posting of photos of herself and her children.

117. From 2016 through 2019 Plaintiff Spencer was residing in either a family shelter or a homeless shelter, including the Urban Family Center and the Henry Street Settlement, with her two minor children.  Her need to locate stable and safe housing for herself and her children was urgent.  She was ready, willing, and able to move if she located suitable housing.

118. During from on or about 2016 through 2019, Plaintiff Spencer used Facebook's Marketplace on a bi-weekly basis to search for housing with the assistance of a housing specialist. She also accessed the Marketplace using her cell phone four to five times a week to perform additional searches.

119. Plaintiff Spencer's searches for housing on Marketplace utilized the following criteria: price range, number of bedrooms, type of dwelling and location.

120. Specifically, Plaintiff Spencer's search criteria for housing on the Marketplace included but were not limited to two-bedrooms, apartment or house, located in New York City or New Jersey in the price range of $750-$1,450 per month.

121.  Plaintiff Spencer received Marketplace ads for housing in Newark, New Jersey, which is an area with high crime rates. Plaintiff Spencer received approximately 20-30 ads each time she did a search, but the results she received did not match her search criteria.

122.  Despite years of diligent searching, Plaintiff Spencer was never able to locate suitable alternate housing on the Facebook Marketplace.

123.  Plaintiff Spencer did not receive any housing ads on her Facebook News Feed despite her search for housing on Facebook.

124. Based upon information and belief, including Facebook's well-known amassing detailed demographic data about each user, Plaintiff Spencer's status as a single parent, female of African American and Hispanic descent was known to Facebook.

125. Facebook's Ad Platform and its targeting methods provide tools to exclude women of color, single parents, and other protected attributes, and Facebook prevented Plaintiff Spencer, and others similarly situated, from having the same opportunity to view ads for housing that other Facebook users, not in protected classes received.

126. Facebook's Ad Platform and its targeting methods created a barrier to equal access to the housing market for Plaintiff Spencer and the putative class, based on her status as a member of several protected classes under the FHA and analogous state statutes.

127. Facebook's discriminatory Ad Platform and its discriminatory targeting of housing advertising caused and continue to cause Plaintiff Spencer injuries, including but not limited to compensatory damages for loss of housing opportunities which include but are not limited to, their increased amount of time spent looking for housing, their loss of a more desirable housing space, a continuation of residing in a homeless shelter, loss of housing located in a safer area, loss of housing more proximate to their house of worship and other activities, loss of a more stable neighborhood, loss of an ideal housing environment, and/or loss of housing located in a more desirable location, as well as punitive and nominal damages. Ligatti, *supra*.

**D. Deillo Richards**

128. Plaintiff Deillo Richards is, for all times relevant to this Complaint, a male of African American descent, and a single parent with minor children residing in Yonkers, New York. He used Facebook to look for housing from on or about March 2019 through August 2019.

129.  Prior to March 2019 and throughout the time he was looking for housing on Facebook, Plaintiff Richards used Facebook for a variety of reasons, including the posting of photos of himself and his children, and noting his marital status is single.

130.  From on or about March 2019 through August 2019, Plaintiff Richards was residing in a studio apartment with his two minor sons ages 6 and 11.  Plaintiff Richards needed a larger residence for himself and his family and he was prepared to move if he found suitable housing.

131.  From on or about March 2019 through August 2019, Plaintiff Richards was using Facebook by accessing its Marketplace two to three times per week to locate housing with the criteria of location, size, apartment, and rate of rent.

132.  Specifically, Plaintiff Richards used the following search criteria including but not limited to a two to three-bedroom apartment, located in Yonkers, NY or the Bronx in NY in a price range of $1,000 to $1,250 monthly rent.

133.  Plaintiff Richards' searches for housing on Facebook's Marketplace resulted in ads for studio apartments that did not meet his housing needs.

134.  Plaintiff Richards did not locate housing through Facebook's Marketplace.

135.  Plaintiff Richards did not receive any housing ads on his Facebook News Feed despite his search for housing.

136.  Based upon information and belief, including Facebook's well-known amassing of detailed demographic data about each user, Plaintiff Richards' status as a single parent, of African American descent was known to Facebook.

137.  Facebook's Ad Platform and its targeting methods provide tools to exclude people of color, single parents, and other protected attributes, and Facebook prevented Plaintiff Richards, and others similarly situated, from having the same opportunity to view ads for housing that other Facebook users, not in protected classes received.

138.  Facebook's Ad Platform and its targeting methods created a barrier to equal access to the housing market for Plaintiff Richards and the putative class, based on his

status as a member of several protected classes under the FHA and analogous state statutes.

139.  Facebook's discriminatory Ad Platform and its discriminatory targeting of housing advertising caused and continue to cause Plaintiff Richards' injuries, including but not limited to compensatory damages for loss of housing opportunities which include but are not limited to, their increased amount of time spent looking for housing, their loss of a more desirable housing space, a continuation of residing in a homeless shelter, loss of housing located in a safer area, loss of housing more proximate to their house of worship and other activities, loss of a more stable neighborhood, loss of an ideal housing environment, and/or loss of housing located in a more desirable location, as well as punitive and nominal damages.  Ligatti, *supra*.[9]

**E.  Jenny Lin**

140.  Plaintiff Jenny Lin is, for all times relevant to this Complaint, a female of Asian American descent, residing in California. She used Facebook to seek housing for approximately two months, from May to June 2017.

141.  Prior to May 2017 and throughout the time she was looking for housing on Facebook, Plaintiff Lin used Facebook for a variety of reasons, including the posting of photos of herself.

142.  Plaintiff Lin was seeking housing during May through June 2017, because the rental property where she lived was being sold and she had to vacate the premises with the change in ownership.

143.  Plaintiff Lin actively searched for housing through Facebook's housing group entitled "Inspired Women of L.A. Housing."  Plaintiff Lin estimates that she searched for housing in the Women of L.A. Housing group about 60 times.

_____

[9] Collectively, Vargas, Skipper, Spencer, and Richards are referred to as the "New York Plaintiffs."

THIRD AMENDED CLASS ACTION COMPLAINT

144. Plaintiff Lin joined this housing group on Facebook based on a friend's recommendation due to the type of housing and location of the housing she was seeking.

145. Specifically, Plaintiff Lin was looking for a sublet, a single room or a roommate situation.

146. Plaintiff Lin was searching for housing located in a better area. Specifically, she was looking for a single room in Mid-City or Culver City, California for a rent ranging from $800 to $1,100 per month.

147. If Plaintiff Lin had found an ad meeting her criteria, she was ready and able to move.

148. Ms. Lin did not receive any housing ads on her Facebook News Feed despite her search for housing.

149. Based upon information and belief, including Facebook's well-known amassing of detailed demographic data about each user, Plaintiff Lin's status as a female of Asian-American descent was known to Facebook.

150. Facebook's Ad Platform and its targeting methods provide tools to exclude women of color, and other protected attributes, and Facebook prevented Plaintiff Lin, and others similarly situated, from having the same opportunity to view ads for housing that other Facebook users, not in protected classes received.

151. Facebook's Ad Platform and its targeting methods created a barrier to equal access to the housing market for Plaintiff Lin and the putative class, based on her status as a member of several protected classes under the FHA and analogous state statutes.

152. Facebook's discriminatory Ad Platform and its discriminatory targeting of housing advertising caused and continue to cause Plaintiff Lin injuries, including but not limited to compensatory damages for loss of housing opportunities which include but are not limited to, their increased amount of time spent looking for housing, their loss of a more desirable housing space, a continuation of residing in a homeless shelter, loss of housing located in a safer area, loss of housing more proximate to their house of worship and other activities, loss of a more stable neighborhood, loss of an ideal housing

environment, and/or loss of housing located in a more desirable location, as well as punitive and nominal damages. Ligatti, *supra*.

## THE DEFENDANT

153. Defendant Facebook, Inc. ("Facebook"), a Delaware corporation with its headquarters located in Menlo Park, California, operates a nationwide and international online advertising system and social network website which allows its users to communicate with each other through written texts, photos, images and/or videos.

## CLASS ALLEGATIONS

154. Plaintiffs bring this class action on behalf of themselves and on behalf of others similarly situated, under Fed. R. Civ. P. 23(a) and (b)(2), seeking equitable and injunctive relief, and under Fed. R. Civ. P. 23(a) and (b)(3) seeking damages on behalf of the following class (the "Nationwide Class"):

> All natural persons located within the United States, who are in the protected classes of race, color, sex, familial status, disability/handicap and/or national origin who had a Facebook account during the relevant period, who used Facebook to look for housing.

155. Plaintiffs bring this class action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the California Unruh Act, Cal. Civil Code §§ 51, 52(a), on behalf of the following Subclass (the "California Damages Subclass"):

> All natural persons located within the California, who are in the protected classes of sex, race, color, religion, ancestry, national origin, age, disability, medical condition, genetic information, marital status, or sexual orientation, who had a Facebook account during the relevant period and who used Facebook for housing.

156. Plaintiffs bring this class action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages

pursuant to the New York Rights Law, N.Y. Exec. L. § 290 *et seq.*, on behalf of the following Subclass (the "New York Damages Subclass"):

> All natural persons residing in New York, who are in the protected classes of age, race, creed, color, national origin, sexual orientation, military status, sex, marital status or disability, who had a Facebook account during the relevant period and who used Facebook to look for housing.

157. **Numerosity/Impracticability of Joinder:** The members of the Class and Subclasses are so numerous that joinder of all members would be unfeasible and impractical.  Named Plaintiffs are informed and believe, and on that basis allege, that there are many thousands of persons within the Plaintiff Class and within each Subclass. The identity of individuals qualifying for class membership is readily ascertainable via inspection of Facebook's records and other documents maintained by Facebook or by other methods, including by Facebook users' self-identification.

158. **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class and Subclasses.  Defendant's discriminatory policies and practices were generally applicable to all members of the Class and Subclasses, thereby making a class action superior to other forms of action.  Such common questions of law and fact include, but are not limited to:

A. **Common Factual Questions:**

1. Are the Plaintiffs and the Class they seek to represent "aggrieved person(s)" as defined by the FHA, 42 U.S.C. § 3602(i);

2. Are the Plaintiffs and the Class they seek to represent members of protected classes as defined by the FHA, 42 U.S.C. § 3604;

3. Are the New York Plaintiffs and the Subclass they seek to represent members of protected classes as defined by the New York Human Rights Law, N.Y. Exec. L. § 290 *et seq.*;

4.  Are the California Plaintiffs and the Subclass they seek to represent members of protected classes as defined by the California Unruh Act, Cal. Civil Code §§ 51.5, 52(a); and

5.  Whether Plaintiffs suffered injury or damage as a result of Defendant's common and nationwide housing advertising practices.

**B.**  **<u>Common Legal Questions:</u>**

1.  Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated the FHA as alleged in the First, Second, Third and Fourth Counts;

2.  Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated the New York Human Rights Law, N.Y. Exec. L. § 290 *et seq.*, as alleged in the Fifth Count;

3.  Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated the California Unruh Act, Cal. Civil Code §§ 51.5, 52(a), as alleged in the Sixth Count;

4.  Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated Cal. Civil Code §§ 51.5, 52(a) by engaging in blacklisting and discrimination in as alleged in the Seventh Count;

5.  Whether Facebook's creation, utilization, publication, dissemination, circulation and/or  targeting of housing ads resulting in a segregated marketplace violated California's Unfair Competition Law, Business and Professions Code section 17200 *et seq.*, by engaging in unfair, unlawful, and fraudulent activity as alleged in the Eighth Count;

6.    The appropriate injunctive and related equitable relief for the Nationwide Class;

7.    The appropriate class-wide measure of damages for the Nationwide Class;

8.    The appropriate measure of damages for the New York Subclass.

9.    The appropriate measure of damages for the California Subclass.

159.    **Typicality:** The Named Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses. Plaintiffs and all the members of the Class and Subclasses have been injured by the same wrongful practices of Facebook. Named Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and Subclasses and are based on the same legal theories. Named Plaintiffs will fairly and adequately represent the interests of the Class and Subclasses because Named Plaintiffs are members of the Class and Subclasses, and because Named Plaintiffs do not have any interest that is contrary to or in conflict with those of the Plaintiff Class and Subclasses. There is a well-defined community of interest in the questions of law and fact affecting the Class of persons that Named Plaintiffs represent as a whole. Each member of the Class and Subclasses was subjected to Facebook's illegal practices.

160.    **Superiority:** A class action is superior to any other form of action for the fair and efficient adjudication of this lawsuit. Individuals such as Plaintiffs have a difficult time prosecuting an individual action against Facebook, a large corporation with tremendous economic resources. Even if any class member could afford individual litigation against Defendant, it would be unduly burdensome to the court system. Individual litigation of such numerous claims magnifies the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and affords the benefits of unitary adjudication, economics of scale, and comprehensive supervision by a single court. Concentrating this litigation in one forum will promote judicial economy and parity among the claims of individual class members

and judicial consistency in rulings.  Notice of the pendency and any resolution of this action can be efficiently provided to class members by mail, print, broadcast, internet, and/or multimedia publication.  Requiring each class member to both establish individual liability and pursue an individual remedy would discourage the assertion of lawful claims Facebook users who would be disinclined to pursue an action against it for fear of retaliation as Facebook has the ability to bar user access.  Proof of a common business practice or factual pattern, which the Named Plaintiffs were subjected to, is representative of the business practice or factual pattern to which the alleged Class was subjected to and will establish the right of each of the members of the alleged Class to recoveries on the claims alleged herein.  The prosecution of separate actions by individual class members, even if possible, would create: (a) a substantial risk of inconvenient or varying verdicts or adjudications with respect to the individual class members against the Defendant herein; and/or (b) legal determinations with respect to individual class members which would, as a practical matter, be dispositive of the other class members not parties to the adjudications or which would substantially impair or impede the ability of class members to protect their interests.  Further, the claims of the individual members of the class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.  Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

161. **Adequacy:** The Named Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class and Subclasses and have retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Named Plaintiffs nor their attorneys have any interest contrary to or in conflict with the Class.

162. The Named Plaintiffs do not anticipate any difficulty in the management of this litigation.

163.  Facebook has, or has access to, email or other contact information for the individual members of the Class, which may be used for the purpose of providing notice of the pendency of this action.

164.  Named Plaintiffs request permission to amend the complaint to include other individuals as class representatives if any of the Named Plaintiffs are deemed not to be an adequate representative of the Plaintiff Class.  Named Plaintiffs further request permission to amend the complaint to revise the Plaintiff Class definition as appropriate after discovery.

## THE FAIR HOUSING ACT

### A.   THE FAIR HOUSING ACT OF 1986

165.  The Fair Housing Act of 1968 ("FHA") was enacted to provide "for fair housing throughout the United States." 42 U.S.C. § 3601.

166.  The FHA renders it unlawful:

> To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or any intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

167.  Further, the regulations applicable to the FHA provide a definition for discriminatory notices, statements, and advertisements:

> (3) selecting media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Refusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.75(c)(3).

168.  Under the FHA, it is unlawful to "represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d).

169.  The FHA's implementing regulations clarify that it is unlawful to "provide inaccurate or untrue information about the availability of dwellings for sale or rental." 24 C.F.R. § 100.80(a). This includes "limiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.80(b)(4).

170.  The FHA renders it unlawful to:

[D]eny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3606.

## B.  PLAINTIFFS READILY SATISFY THE FHA'S "VERY LIBERAL" ARTICLE III STANDING REQUIREMENTS

171.  This case is brought, in part, under Section 3612 of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, which invokes uniquely broad principles of standing under Article III of the United States Constitution.

172.  The United States Supreme Court has recognized that standing under the FHA extends "'to the full limits of Art. III' and that the courts accordingly lack the

authority to create prudential barriers to standing in suits brought under that section." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n.9 (1979) ("*Gladstone*")).

173. This view of FHA standing emerged in *Trafficante v. Metropolitan Life Insurance Company*, 409 U.S. 205 (1972). In that case, the Supreme Court interpreted standing under the FHA to be "as broad [] as is permitted by Article III." *Id.* at 209.

174. In *Trafficante*, the Supreme Court determined that white and black tenant plaintiffs had standing under Section 3610(a) to file a complaint against their apartment complex owner for allegedly discriminating against non-whites. *Id.* at 208, 211. The Supreme Court found sufficient their allegations that the defendant's discriminatory housing practices deprived them of the social benefits and business and professional advantages of an integrated community and caused embarrassment and economic damages from the stigma of being residents of a discriminatory apartment complex. *Id.* at 208.

175. Subsequently, in *Gladstone*, the Supreme Court specifically affirmed that standing under Section 3612 is "as broad as is permitted by Article III." *Id.* at 109 (quoting *Trafficante*, 409 U.S. at 209). *Gladstone* further established that standing under Section 3612 is not limited to "direct victims" of alleged discriminatory housing practices. *Id.* at 108–09. "As long as the plaintiff suffers actual injury as a result of the defendant's conduct, [s]he is permitted to prove that the rights of another were infringed." *Id.* at 103 n.9.

176. In *Havens*, the Supreme Court reaffirmed that "the sole requirement for standing to sue under [the FHA] is the Art[icle] III *minima* of injury in fact: that the plaintiff allege that as a result of the defendants' discriminatory housing practices he has suffered a 'distinct and palpable injury.'" 455 U.S. at 372 (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)) (emphasis added).

177.  *Havens* further recognized that the "actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Id.* at 373 (quoting *Warth*, 422 U.S. at 501).

178.  Under binding Ninth Circuit precedent construing these decisions from the Supreme Court, plaintiffs suing under the FHA are "judged under a very liberal standing requirement." *See Harris v. Itzhaki*, 183 F.3d 1043, 1049 (9th Cir. 1999).  Accordingly, "*any person* harmed by discrimination, *whether or not the target of the discrimination*, can sue to recover for his or her own injury." *San Pedro Hotel v. City of Los Angeles*, 159 F.3d 470, 475 (9th Cir. 1998) (citing *Trafficante*, 409 U.S. at 212) (emphases added).

179.  The FHA provides that any "aggrieved person" can bring a complaint under its terms. 42 U.S.C. § 3613.

180.  The FHA provides a broad definition for "aggrieved person," which includes "any person who [:] (1) claims to have been injured by a discriminatory housing practice; or (2) *believes* that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i) (emphasis added).

181.  Based on these provisions, the Ninth Circuit has further recognized that although the FHA does not provide a concrete definition for "injury," Article III injuries typically arise under the FHA where a plaintiff has been denied a housing opportunity as a result of a defendant's discrimination. *See, e.g.*, *Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988).

182.  In *Keith*, the Ninth Circuit held that the plaintiffs, in that case, had suffered an Article III injury in fact solely because they had been denied access to housing based on their race. *Id.* at 477.

183.  Based on the foregoing, the Plaintiffs, in this case, have suffered injuries under Article III that support standing under well-established Supreme Court and Ninth Circuit precedent.

184.  If the Court has doubts whether the requirements for Article III standing are met, Plaintiffs request discovery. In *Bradley v. T-Mobile US, Inc.*, "the [c]ourt

recognize[d] the difficulty of identifying advertisements that the entire Plaintiff Class was allegedly prevented from seeing; such information is not within Plaintiffs' possession and is difficult to obtain." No. 17-CV-07232-BLF, 2020 WL 1233924, at *16 (N.D. Cal. Mar. 13, 2020). In granting plaintiff's request, the court stated that such discovery "will be helpful—if not necessary—to establish the jurisdictional facts." *Id.*

## C.   <u>The Purpose of the Fair Housing Act</u>

185.   A primary purpose for enacting the FHA was "to increase residential mobility so as to improve access to opportunities such as transportation, education, and employment." Ligatti, *supra*.

186.  The FHA sets forth "legal prohibitions on private discrimination," and requires HUD, "its grantees, and all federal departments and agencies to 'affirmatively further fair housing.'" *Id.* (additional citations omitted).

187.  The FHA "intended to address documented societal imbalances caused by both public and private discrimination in housing;" and its goal was to "create an integrated society." *Id.* (additional citations omitted).

188.  Segregation, per the "Kerner Report of 1968 . . . could be traced back to a lack of geographic mobility." *Id.* (additional citations omitted). The Kerner Report recognized "the importance of the 'spatial mismatch' between where African Americans were forced to live and areas where jobs and other opportunities existed," which "led to the final recommendation of the Kerner Report: programs intended to increase the ability of African Americans to escape the '"ghetto."'" *Id.* (additional citations omitted). Although the Kerner Report recommended "greater investments in public and subsidized housing, the report emphasized the siting of such housing in areas of opportunity and the need for a federal law addressing housing discrimination." Further, the "Kerner Report explicitly acknowledged the need for housing mobility to increase the mobility opportunities available to minorities, choosing to focus primarily on integration through mobility, rather than focusing on investing in segregated communities." This "background and the Kerner Report's recommendations" led to the creation of the FHA's

THIRD AMENDED CLASS ACTION COMPLAINT

goals of "eliminating impediments to mobility and integration…" *Id.* (additional citations omitted).

189. Further, "[h]ousing is the primary conduit to accessing opportunity and building wealth and economic stability" in this country. *Id. citing* THE OHIO STATE UNIVERSITY KIRWAN INSTITUTE FOR THE STUDY OF RACE AND ETHNICITY, THE GEOGRAPHY OF OPPORTUNITY: REVIEW OF OPPORTUNITY MAPPING RESEARCH INITIATIVES 5 (July 2008), https://perma.cc/ZD4Z-VHMQ.

190. In the United States, "[h]ousing location is the critical leverage point to determining access to education, employment, childcare and health care or in determining the likelihood of developing assets/wealth through home equity. Housing can be either an impediment or a conduit to opportunity depending on its location." https://www. npr.org/sections/thetwo-way/2016/10/19/498536077/interactive redlining-map-zooms-in-on-americas-history-of-discrimination. (last visited February 18, 2021).

**D.   A BRIEF HISTORY OF REDLINING**

  **"*The American real-estate industry believed segregation to be a moral principle. As late as 1950, the National Association of Real Estate Boards' code of ethics warned that 'a Realtor should never be instrumental in introducing into a neighborhood … any race or nationality, or any individuals whose presence will clearly be detrimental to property values.' Redlining was not officially outlawed until 1968, by the Fair Housing Act*."**

          —Ta-Nehisi Coates

191. Following the Great Depression, the United States government "set out to evaluate the riskiness of mortgages—and left behind a stunning portrait of the racism and discrimination that has shaped American housing policy." https://www.npr.org/sections /thetwo-way/2016/10/19/498536077/interactive-redlining-map-zooms-in-on-americas-history-of-discrimination. (last visited February 18, 2021).

192.  Redlining followed the "'one-house rule'—like the 'one-drop rule' for racial identity. Under the 'one-drop rule' in the 19th and early 20th century, a single drop of African-American 'blood' made a person black, even if their heritage was overwhelmingly white. Similarly, on redlining maps, a single black household in a middle-class area could make the whole neighborhood 'risky' for mortgage loans in the eyes of the federal government." *Id.*

193.  Redlining resulted in families of color who "'couldn't avail themselves of what is arguably the most significant route to family and personal wealth-building in the 20th century, which is homeownership.'" *Id.*

194.  A team of scholars at four universities created an interactive tool ("the Project") which shows redlining on maps in more than 150 cities and replaces an earlier version of the map to now include the reason(s) why neighborhoods had a specific classification. *Id.*

195.  The Project "features the infamous redlining maps from the Homeowners' Loan Corporation["HOLC"]. In the late 1930s, the HOLC 'graded' neighborhoods into four categories, based in large part on their racial makeup. Neighborhoods with minority occupants were marked in red—hence 'redlining'—and considered high-risk for mortgage lenders." *Id.*

196.  The "newly revamped interactive site from 'Mapping Inequality' takes scores of HOLC maps … and embeds them on a single map of the USA." *Id.*

197.  The practice of redlining was done in large and small cities, "with the help of local realtors and appraisers." *Id.*

198.  By way of example, on the interactive map which shows a "neighborhood was redlined, ranked as 'desirable' or fell somewhere in the middle," the viewer can "just click and you can find out why. 'Infiltration of: Negroes' is a common fill-in-the-blank item explaining why a region was deemed hazardous." *Id.*

199.  The image below shows overlapping maps of the five boroughs of New York which were combined in 'Mapping Inequality,' to show redlining across the entire city.

*Id.;* and *Mapping Inequality/Screenshot by NPR.*

200.  The following map shows "the redlining districts as an overlay on a modern map" of a "part of Asheville, N.C."

*Id.* and *Mapping Inequality/Screenshot by NPR.*



201.  Scholars, including Ta-Nehisi Coates, often cite redlining as a root cause of inequality in the United States. *Id.* citing, Ta-Nehisi Coates' "<u>Case for Reparations</u>" in *The Atlantic.* Coates noted, "'Neighborhoods where black people lived



were rated "D" and were usually considered ineligible for FHA backing.'" Further,

"'[b]lack people were viewed as a contagion. Redlining went beyond FHA-backed loans and spread to the entire mortgage industry, which was already rife with racism, excluding black people from most legitimate means of obtaining a mortgage.'" Black families who were seeking to own homes were relegated to lenders who were predatory and abusive. *Id.* quoting, Ta-Nehisi Coates' "Case for Reparations" in *The Atlantic.*

202.   Defendant's actions in this case essentially continue these redlining activities against classes protected under federal and state law.

## COUNT I – VIOLATION OF 42 U.S.C. § 3604(A)

203.   Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

204.   The housing advertised on Facebook products for rent or sale are "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

205.   Facebook's extraction of user data and creation, utilization, publication, dissemination, circulation and/or targeting of discriminatory categories which it provided to housing advertisers for use in connection with advertisements published on Facebook's products discriminated against and Plaintiffs and the class they seek to represent, by making unavailable or denying a dwelling to any person based on race or other protected classes 42 U.S.C. § 3604(a).

206.   Plaintiffs are "aggrieved person(s)" as defined by the FHA, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

207.   As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## COUNT II – VIOLATION OF 42 U.S.C. § 3604(C)

208.   Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

209.   The housing advertised for rent or sale on Facebook's products constitute "dwellings" as defined by the FHA, 42 U.S.C. § 3602(b).

210.   Facebook's extraction of user data and creation, utilization, publication, dissemination, circulation and/ or targeting of discriminatory categories which it provides to advertisers for use in connection with advertisements published on Facebook's products to create a segregated housing marketplace has discriminated against and Plaintiffs by making, printing, publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination based on, among other things, race, or an intention to make any such preference, limitation, or discrimination. 42 U.S.C. § 3604(c).

211.   Plaintiffs and the class they seek to represent are "aggrieved person(s)" as defined by the FHA, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

212.   As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## **COUNT III – VIOLATION OF 42 U.S.C. § 3604(D)**

213.   Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

214.   The housing advertised for rent or sale on Facebook's products constitute "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

215.   Facebook's extraction of user data and creation, utilization, publication, dissemination, circulation and/or targeting of discriminatory categories which it provided to advertisers for use in connection with advertisements published, on Facebook's products to create a segregated housing marketplace has discriminated against Plaintiffs and the class they seek to represent by representing to Plaintiff and the class because of,

among other things, race, that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available. 42 U.S.C. § 3604(d).

216.   Plaintiffs are "aggrieved person(s)" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

217.   As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## **COUNT IV – VIOLATION OF 42 U.S.C. § 3606**

218.   Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

219.   The housing advertised for rent or sale on Facebook's products constitute "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

220.   Facebook's extraction of user data and creation, utilization,  publication, dissemination, circulation and/or targeting of discriminatory categories which it provided to advertisers for use in connection with advertisements published on Facebook's products to create a segregated housing marketplace discriminated against Plaintiffs and the class they seek to represent by denying any person access to or participation in any service relating to the business of selling or renting dwellings and discriminating against Plaintiffs in the terms or conditions of such access or participation on the basis of race, among other things. 42 U.S.C. § 3606.

221.   Facebook provided a service relating to the business of selling or renting dwellings through its Ad Platform creating target audiences which prevented Plaintiffs from participation in or access to these services.

222.   Plaintiffs are "aggrieved persons" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

223.   As such, Plaintiffs are entitled to actual, statutory, and punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## COUNT V – VIOLATION OF N.Y. EXEC. L. § 290 ET. SEQ.

(New York Human Rights Law)

(On behalf of New York Plaintiffs and the proposed New York Subclass)

224.   Plaintiffs reallege and incorporate herein by reference, each and every allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

225.   The New York State Human Rights Law provides in part that "every individual within this state is afforded an equal opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance or inadequate education, training, housing or health care not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants."   N.Y. Exec. L. § 290.

226.   Plaintiffs are persons as defined by N.Y. Exec. L. § 292(1).

227.   Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of a segregated marketplace allowed housing advertisers to exclude certain protected classes of Facebook users from eligibility to receive such housing ads in violation of N.Y. Exec. L. § 290 *et seq*.

228.   Facebook's Ad Platform, aggregation of demographic data and advertising targeting illegally denied Plaintiffs and the New York subclass access to "an equal opportunity to enjoy a full and productive life" in violation of the New York State Human Rights Law.  N.Y. Exec. L. § 290 *et seq*.

229.   Facebook's discriminatory practices were intentional, willful, or made in reckless disregard for the rights of others, including Plaintiffs and the New York Subclass.

230. Facebook's conduct as set forth above constitutes an unlawful discriminatory practice resulting in the denial withholding of housing accommodations in violation of N.Y Exec. L. § 296(5).

231. Facebook's conduct as set forth above constitutes aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by N.Y. Exec. L. § 296(5) in violation of the N.Y.  Exec. L. § 296(6).

232. As a direct and proximate result of Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads in a segregated marketplace, Plaintiffs and the New York Subclass have been damaged and continue to suffer damages.

233. Accordingly, pursuant to Article 4 of the N.Y. Exec. L. § 297, Facebook is required to disgorge any profits obtained through the commission of the unlawful discriminatory acts described herein.

234. Pursuant to Articles 9 and 10 of the N.Y. Exec. L. § 297, Plaintiffs and the New York Subclass are entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

235. Pursuant to N.Y. CLS Civ. R. 41, Plaintiffs and the New York Subclass are entitled to statutory damages for each and every violation of not less than $100.00 and not more than $500.00 per violation.

## COUNT VI – VIOLATION OF THE CAL. CIVIL CODE §§ 51, 52(a)

(Unruh Civil Rights Act)

(On behalf of the California Plaintiffs and the proposed California Subclass)

236. Plaintiff Jenny Lin reallege and incorporate herein by reference, each and every allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

237. The Unruh Civil Rights Act provides in part that "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information,

marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."   Cal. Civ. Code § 51(b).

238.   Defendant Facebook is, and during the applicable time frames was, a business establishment under the Unruh Civil Rights Act doing business in the state of California.

239.   Defendant Facebook's creation,  utilization, publication, dissemination, circulation and/or targeting of a segregated marketplace in which advertisers were able to exclude certain classes of Facebook users, who are within the definition of persons protected by the Unruh Civil Rights Act, from being part of the pool of Facebook users eligible to see certain housing advertisements, denied Plaintiff Jenny Lin and the California Subclass the "full and equal accommodations, advantages, facilities, privileges, or services" provided by Facebook in violation of the Unruh Civil Rights Act.

240.   As a direct and proximate result of the aforementioned acts by Defendant Facebook, Plaintiff Jenny Lin and the California Subclass have incurred actual damages. Accordingly, they are entitled to statutory damages in an amount up to three times the amount of actual damages, with a minimum amount of $4,000, and entitled to injunctive and declaratory relief.  Civil Code §§ 52(a), (e) and 52.1(h).

241.   Plaintiff Jenny Lin and the California Subclass are also entitled to injunctive and declaratory relief as well as attorneys' fees and costs pursuant to Civil Code §§ 52(a) and (e).

242.   Defendant Facebook, with the knowledge of its officers and managers, committed the acts and omissions alleged herein with intent and/or in reckless disregard of the rights of Plaintiff and the members of the subclass and therefore, Defendant is liable for punitive damages.

1

**COUNT VII - Cal. Civil Code §§ 51.5, 52(a)**

2

(Blacklisting and Discrimination in violation of Cal. Civil Code §§ 51.5, 52(a))

3

(On behalf of the California Plaintiffs and the proposed California Subclass)

4

243.   Plaintiffs reallege and incorporate herein by reference, each and every

5

allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

6

244.   Section 51.5 of the California Civil Code provides that "No business

7

establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or

8

refuse to buy from, contract with, sell to, or trade with any person in this state on account

9

of any characteristic listed or defined in subdivision (b) or (e) of Section 51 . . . because

10

the person is perceived to have one or more of those characteristics, or because the person

11

is associated with a person who has, or is perceived to have, any of those characteristics."

12

245.   Defendant Facebook is, and during the applicable time frame was, a business

13

establishment doing business in the state of California.

14

246.   Defendant Facebook's creation, utilization, publication, dissemination,

15

circulation and/or targeting of segregated marketplace in which advertisers were able to

16

exclude certain classes of Facebook users, who are within the definition of persons

17

protected by the statute, from being part of the pool of Facebook users eligible to see

18

certain housing advertisements constitutes discrimination and/or blacklisting against

19

Plaintiffs Jenny Lin and the California Subclass.

20

247.   As a direct and proximate result of the aforementioned acts by Defendant

21

Facebook, Plaintiffs and the California Subclass have incurred actual damages.

22

Accordingly, they are entitled to statutory damages in an amount up to three times the

23

amount of actual damages, with a minimum amount of $4,000, and entitled to injunctive

24

and declaratory relief.  Civil Code §§ 52(a), (e) and 52.1(h).

25

248.   Plaintiffs and the California Subclass are also entitled to injunctive and

26

declaratory relief as well as attorneys' fees and costs pursuant to Civil Code §§ 52(a) and

27

(e).

28

249.   Defendant, with the knowledge of its officers and managers, committed the acts and omissions alleged herein with intent and/or in reckless disregard of the rights of Plaintiffs Jenny Lin and the California Subclass, and therefore Defendant is liable for punitive damages.

## COUNT VIII – CAL. BUS. & PROF. CODE § 17200

(Unfair business practices in violation of Business and Professions Code § 17200 *et seq.*)

(On behalf of the California Plaintiffs and the proposed California Subclass)

250.   Plaintiff Jenny Lin and reallege and incorporate herein by reference, each and every allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

251.   Defendant has violated, California's Unfair Competition Law, Business and Professions Code section 17200 *et seq.*, by engaging in unfair, unlawful, and fraudulent activity as alleged herein.  In particular, Defendant Facebook's creation of segregated marketplace in which advertisers were able to exclude certain classes of Facebook users from being part of the pool of Facebook users eligible to see certain housing advertisements constitutes an unfair business practice.

252.   Defendant has generated, and continue to generate, income as a direct result of its unfair, fraudulent, and unlawful business practices. Plaintiff Jenny Lin and the California Subclass are therefore entitled to injunctive relief, restitution and/or to restitutionary disgorgement of any and all monies received by Defendant while engaged in such practices, plus interest pursuant to Business and Professions Code section 17200 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class they seek to represent respectfully request that this Honorable Court enter judgment in their favor and grant them the following relief:

a.     Certify the case as a class action on behalf of the proposed Class and Subclasses;

b.     Designate Plaintiffs as representatives of the Class;

c.     Designate the New York Plaintiffs as representatives of the New York Subclass;

d.     Designate the California Plaintiffs as representatives of the California Subclass;

e.     Designate Plaintiffs' counsel of record as Class Counsel;

f.     Declare that Defendant's discriminatory policies and practices violate the Fair Housing Act, 42 U.S.C. § 3601 *et seq*;

g.     Declare that Defendant's discriminatory policies and practices violate the New York Human Rights Law, N.Y. Exec. L. § 290 *et seq.*;

h.     Declare that Defendant's discriminatory policies and practices violate the California Unruh Civil Rights Act, Cal. Civil Code §§ 51, 52(a);

i.     Declare that Defendant Facebook's discriminatory policies and practices constitute unfair business practices in violation of Business and Professions Cal. Code § 17200 *et seq.*;

j.     Declare that Defendant Facebook's discriminatory policies and practices constitute Blacklisting and Discrimination in violation of Cal. Civil Code §§ 51.5, 52(a);

k.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from denying or withholding housing, or otherwise making housing unavailable on the basis of race, national origin or other prohibited classifications;

l.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination on the basis of race, national origin or other prohibited classifications;

m.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from representing

to any person because of race, national origin or other prohibited classifications that any dwelling is not available for sale, rental, or inspection, when such dwelling is in fact so available;

n.   Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from denying any person access to Facebook's services relating to the business of selling or renting dwellings, and discriminating against such persons in the terms or conditions of such access or participation on the basis of race, national origin or other prohibited classifications;

o.   Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from engaging in acts that violate the New York Human Rights Law;

p.   Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from engaging in acts that violate the California Unruh Act;

q.   Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from engaging in Blacklisting and Discrimination in violation of Cal. Civil Code §§ 51.5, 52(a);

r.   Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from engaging in unfair business practices in violation of California Business and Professions Code, Cal. Code § 17200 *et seq.*;

s.   Order restitution and/or restitutionary disgorgement of any and all monies received by Defendant while engaged in such discriminatory practices and /or unfair business practices;

t.   Award Plaintiffs and the members of the Classes actual, compensatory, statutory, and punitive damages to which Plaintiffs are entitled;

u.    Award Plaintiffs and the members of the Classes their costs of suit, including reasonable attorneys' fees, as provided by law;

v.    Award Plaintiffs and the members of the Classes pre- and post- judgment interest as provided by law, from and after the date of service of this Complaint; and

w.    Award Plaintiffs and members of the Classes such other and further relief as the case may require and the Court may deem just and proper.


Respectfully Submitted,

Dated: March 3, 2021                    **MANTESE HONIGMAN, P.C.**

By:    */s/ Gerard V. Mantese*
Gerard V. Mantese
David Honigman
Kathryn Eisenstein

**HERTZ SCHRAM PC**
Patricia A. Stamler
Elizabeth Thomson
Matthew Turchyn

**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
Michael D. Seplow
Aidan C. McGlaze
Wilmer Harris

*Attorneys for Plaintiffs/Proposed Class Members.*

1

## JURY DEMAND

2

Plaintiffs request trial by jury on all claims.

3

4

Respectfully Submitted,

5

Dated: March 3, 2021

**MANTESE HONIGMAN, P.C.**

6

7

By:  /s/ Gerard V. Mantese

Gerard V. Mantese

8

David Honigman

Kathryn Eisenstein

9

10

**HERTZ SCHRAM PC**

Patricia A. Stamler

11

Elizabeth Thomson

12

Matthew Turchyn

13

**SCHONBRUN SEPLOW HARRIS**

14

**HOFFMAN & ZELDES LLP**

Michael D. Seplow

15

Aidan C. McGlaze

16

Wilmer Harris

17

*Attorneys for Plaintiffs/Proposed Class Members.*

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF ADMINISTRATIVE LAW JUDGES

_____

| | |
|---|---|
| The Secretary, United States Department of Housing and Urban Development, on behalf of Complainant Assistant Secretary for Fair Housing and Equal Opportunity, )<br><br>Charging Party, )<br><br>v. )<br><br>Facebook, Inc., )<br><br>Respondent ) | HUD ALJ No.<br>FHEO No.  01-18-0323-8 |

_____

**CHARGE OF DISCRIMINATION**

**I.    JURISDICTION**

On August 13, 2018, the Assistant Secretary for Fair Housing and Equal Opportunity ("Assistant Secretary") filed a timely complaint with the Department of Housing and Urban Development ("HUD" or the "Department") alleging that Respondent violated subsections 804(a), 804(b), 804(c) and 804(f) of the Fair Housing Act, 42 U.S.C. §§ 3601-19 ("Act"), by discriminating because of race, color, religion, sex, familial status, national origin and disability.

The Act authorizes the Secretary of HUD to issue a Charge of Discrimination ("Charge") on behalf of aggrieved persons following an investigation and a determination that reasonable cause exists to believe that a discriminatory housing practice has occurred.  *See* 42 U.S.C. § 3610(g)(1), (2).  The Secretary has delegated that authority to the General Counsel, 24 C.F.R. §§ 103.400, 103.405, who has re-delegated that authority to the Associate General Counsel for Fair Housing and the Assistant General Counsel for Fair Housing Enforcement.  76 Fed. Reg. 42,463, 42,465 (July 18, 2011).

By a Determination of Reasonable Cause issued contemporaneously with this Charge of Discrimination, the Director of the Office of Systemic Investigations in the Office of Fair Housing and Equal Opportunity has determined that reasonable cause exists to believe that a discriminatory housing practice has occurred and has authorized and directed the issuance of this Charge.  42 U.S.C. § 3610(g)(2).

1

## II.   SUMMARY OF FINDINGS IN SUPPORT OF THIS CHARGE

Based on HUD's investigation of the allegations contained in the aforementioned complaint and the Determination of Reasonable Cause, Respondent is hereby charged with violating the Act as follows:

### A.   Legal Authority

1.      It is unlawful to make unavailable or deny a dwelling to any person because of race, color, religion, sex, familial status, national origin or disability.  42 U.S.C. § 3604(a), (f)(1); 24 C.F.R. § 100.50(b)(1), (3); 24 C.F.R. § 100.60(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(a).

2.      It is unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, national origin or disability. 42 U.S.C. § 3604(b), (f)(2); 24 C.F.R. § 100.50(b)(2); 24 C.F.R. § 100.65(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(b).

3.      It is unlawful to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, familial status, national origin or disability, or that indicates an intention to make such a distinction.  42 U.S.C. § 3604(c); 24 C.F.R. § 100.75(a), (b), (c)(1).  Such unlawful activity includes "[s]electing media or locations for advertising the sale or rental of dwellings which deny a particular segment of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin."  24 C.F.R. § 100.75(c)(3).  Such unlawful activity also includes "[r]efusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin."  24 C.F.R. § 100.75(c)(4).

### B.   Parties

4.      Complainant Assistant Secretary is authorized to file a complaint of discrimination under the Act on behalf of the Secretary of HUD.  42 U.S.C. § 3610(a); 24 C.F.R. § 103.204(a).

5.      Respondent Facebook, Inc., is incorporated in Delaware with headquarters in Menlo Park, California.  Respondent is the second largest online advertiser in the United States and is responsible for approximately twenty percent of all online advertising nationwide.

6.      Respondent operates Facebook and Instagram, two of the most widely used social media platforms in the United States.  Facebook has approximately 221 million active users in the United States and over two billion active users globally, while Instagram has approximately 114 million active users in the United States and over one billion active users globally, with active user defined as someone who uses the platform at least once per month.  Respondent also operates Messenger, a messaging tool and platform that can be accessed from within Facebook

or through a standalone website and mobile application. In addition, Respondent has created an "Audience Network," which is comprised of thousands of websites and mobile applications that are operated by third parties but on which Respondent displays targeted ads.

### C. Factual Allegations

7.     Respondent collects millions of data points about its users, draws inferences about each user based on this data, and then charges advertisers for the ability to microtarget ads to users based on Respondent's inferences about them. These ads are then shown to users across the web and in mobile applications. Respondent promotes and distinguishes its advertising platform by proclaiming that "most online advertising tools have limited targeting options . . . like location, age, gender, interests and potentially a few others. . . . But Facebook is different. People on Facebook share their true identities, interests, life events and more."[1] As Respondent explains, its advertising platform enables advertisers to "[r]each people based on . . . zipcode . . . age and gender . . . specific languages . . . the interests they've shared, their activities, the Pages they've like[d] . . . [their] purchase behaviors or intents, device usage and more."[2] Thus, Respondent "use[s] location-related information-such as your current location, where you live, the places you like to go, and the businesses and people you're near to provide, personalize and improve our Products, including ads, for you and others."[3]

8.     Advertisers pay Respondent to show targeted ads to users on Facebook, Instagram, and Messenger, and on Respondent's Audience Network. Targeted ads are generally placed through a single advertising platform called Ads Manager regardless of where the ads will be shown to users.

9.     Respondent holds out its advertising platform as a powerful resource for advertisers in many industries, including housing and housing-related services. For example, Respondent promotes its advertising platform with "success stories," including stories from a housing developer, a real estate agency, a mortgage lender, a real-estate-focused marketing agency, and a search tool for rental housing.

10.     Respondent's advertising platform is actively being used for housing-related ads. Such ads include ads for mortgages from large national lenders, ads for rental housing from large real estate listing services, and ads for specific houses for sale from real estate agents.

11.     Because of the way Respondent designed its advertising platform, ads for housing and housing-related services are shown to large audiences that are severely biased based on characteristics protected by the Act, such as audiences of tens of thousands of users that are nearly all men or nearly all women.

---

[1] Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320? helpref=uf_permalink (visited Mar. 27, 2019).

[2] Facebook Business, *Your Guide to Digital Advertising*, www facebook.com/business/help/1029863103720320? helpref=uf_permalink (visited Mar. 27, 2019).

[3] Facebook, *Data Policy* (Apr. 19, 2018), www.facebook.com/privacy/explanation/.

12.     Respondent sells advertisers the ability to target advertisements to people who, according to Respondent's assessment of the data it collects, share certain personal attributes and/or are likely to respond to a particular ad.  Users may disclose some data about themselves when they set up their profiles, such as name and gender.  However, users disclose most of this data unwittingly through the actions they, and those associated with them, take on and off of Respondent's platforms.

13.     Respondent determines which users will see an ad through a two-phase process.  First, in the ad targeting phase, Respondent provides the advertiser with a variety of tools for selecting an ad's "eligible audience."  In other words, the advertiser can specify attributes that the users who will be shown the ad must have and attributes that users who will be shown the ad must not have.  Second, in the ad delivery phase, Respondent selects the ad's "actual audience," meaning Respondent chooses which users will actually be shown the ad from among the pool of eligible users.

14.     During the ad targeting phase, Respondent provides an advertiser with tools to define which users, or which types of users, the advertiser would like to see an ad.  Respondent has provided a toggle button that enables advertisers to exclude men or women from seeing an ad, a search-box to exclude people who do not speak a specific language from seeing an ad, and a map tool to exclude people who live in a specified area from seeing an ad by drawing a red line around that area.  Respondent also provides drop-down menus and search boxes to exclude or include (i.e., limit the audience of an ad exclusively to) people who share specified attributes.  Respondent has offered advertisers hundreds of thousands of attributes from which to choose, for example to exclude "women in the workforce," "moms of grade school kids," "foreigners," "Puerto Rico Islanders," or people interested in "parenting," "accessibility," "service animal," "Hijab Fashion," or "Hispanic Culture."  Respondent also has offered advertisers the ability to limit the audience of an ad by selecting to include only those classified as, for example, "Christian" or "Childfree."

15.     During this first phase, Respondent also provides a tool called Custom Audiences, which enables an advertiser to use a list of specific people whom the advertiser wants included in or excluded from the eligible audience for an ad.  The advertiser can do this by uploading the personal information of its customers, or by having Respondent generate a list of people who have engaged with the advertiser's content on Facebook or Instagram, on other websites, in a mobile application, or offline.

16.     Facebook offers a variant of its Custom Audiences tool called Lookalike Audiences.  If an advertiser selects this option, the platform directs the advertiser to pick a Custom Audience that represents the advertiser's "best existing customers."  Respondent then identifies users who share "common qualities" with those customers, and these users become the ad's eligible audience.  To generate a Lookalike Audience, Respondent considers sex and close proxies for the other protected classes.  Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.  Respondent alone, not the advertiser, determines which users will be included in a Lookalike Audience.

17.     During the second phase, the ad delivery phase, Respondent selects from among the users eligible to see an ad which users will actually see it.  Respondent bases this decision in large part on the inferences and predictions it draws about each user's likelihood to respond to an ad based on the data it has about that user, the data it has about other users whom it considers to resemble that user, and the data it has about "friends" and other associates of that user.  To decide which users will see an ad, Respondent considers sex and close proxies for the other protected classes.  Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.  Respondent alone, not the advertiser, determines which users will constitute the "actual audience" for each ad.

18.     Respondent charges advertisers different prices to show the same ad to different users. The price to show an ad to a given user is based, in large part, on how likely Respondent believes that user is to interact with the particular ad.  To decide how an ad will be priced for each user, Respondent considers sex and close proxies for the other protected classes.  Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.  Respondent alone sets the price the advertiser will pay to have Respondent show each ad to each user.  Furthermore, Respondent uses the pricing differentials it sets to determine which users will see which ads rather than allowing advertisers to make that decision.  As Respondent explains, "If there are more and cheaper opportunities among men than women, then we'd automatically spend more of [an advertiser's] overall budget on the men."[4]

19.     Respondent's ad delivery system prevents advertisers who want to reach a broad audience of users from doing so.  Even if an advertiser tries to target an audience that broadly spans protected class groups, Respondent's ad delivery system will not show the ad to a diverse audience if the system considers users with particular characteristics most likely to engage with the ad.  If the advertiser tries to avoid this problem by specifically targeting an unrepresented group, the ad delivery system will still not deliver the ad to those users, and it may not deliver the ad at all.  This is so because Respondent structured its ad delivery system such that it generally will not deliver an ad to users whom the system determines are unlikely to engage with the ad, even if the advertiser explicitly wants to reach those users regardless.

20.     To group users by shared attributes, to create a Lookalike Audience, to determine an ad's "actual audience" during the ad delivery phase, and to price each ad for each user, Respondent combines the data it has about user attributes and behavior on its platforms with data it obtains about user behavior on other websites and in the non-digital world.  Respondent then uses machine learning and other prediction techniques to classify and group users so as to project each user's likely response to a given ad.  In doing so, Respondent inevitably recreates groupings defined by their protected class.  For example, the top Facebook pages users "like" vary sharply by their protected class, according to Respondent's "Audience Insights" tool.  Therefore, by grouping users who "like" similar pages (unrelated to housing) and presuming a shared interest

---

[4] Facebook, *Why did my cost per result go up when I increased my budget*, [https://web.archive.org/web/2016 0930124257/https://www.facebook.com/business/help/934288416682198?helpref=faq_content] (archived on Sep. 30, 2016 by The Internet Archive).

or disinterest in housing-related advertisements, Respondent's mechanisms function just like an advertiser who intentionally targets or excludes users based on their protected class.

### D.   Legal Allegations

21.   As described above, Respondent discriminated by making dwellings unavailable because of race, color, religion, sex, familial status, national origin or disability.  42 U.S.C. § 3604(a), (f)(1); 24 C.F.R. § 100.50(b)(1), (3); 24 C.F.R. § 100.60(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(a).

22.   As described above, Respondent discriminated in the terms, conditions, or privileges of the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin or disability.  42 U.S.C. § 3604(b), (f)(2); 24 C.F.R. § 100.50(b)(2); 24 C.F.R. § 100.65(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(b).

23.   As described above, Respondent made, printed, or published – or caused to be made, printed, or published – notices, statements, or advertisements with respect to the sale or rental of dwellings that indicated preferences, limitations, or discrimination because of race, color, religion, sex, familial status, national origin or disability, or that indicated an intention to make such a distinction.  42 U.S.C. § 3604(c); 24 C.F.R. § 100.75(a), (b), (c)(1).

24.   As described above, Respondent selected media or locations for advertising the sale or rental of dwellings that denied persons information about housing opportunities because of race, color, religion, sex, familial status, national origin or disability.  24 C.F.R. § 100.75(c)(3).

25.   As described above, Respondent refused to publish advertising for the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin or disability. 24 C.F.R. § 100.75(c)(4).

26.   As described above, Respondent required different charges or terms for advertising the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin and disability.  24 C.F.R. § 100.75(c)(4).

## III.   CONCLUSION

WHEREFORE, the Secretary of the United States Department of Housing and Urban Development, through the Office of the General Counsel, and pursuant to 42 U.S.C. § 3610(g)(2)(A), hereby charges Respondent with engaging in discriminatory housing practices in violation of 42 U.S.C. § 3604(a), (b), (c) and (f), and prays that an order be issued that:

1.   Declares that the discriminatory housing practices of Respondent, as set forth above, violate the Fair Housing Act, 42 U.S.C. §§ 3601-19;

2.   Enjoins Respondent and its agents, employees, successors, and all other persons in active concert or participation with it, from discriminating because of race, color, religion, sex, familial status, national origin or disability in any aspect of the sale, rental, use, marketing, or advertising of dwellings and related services pursuant to 42 U.S.C. § 3612(g)(3);

3.      Requires Respondent's agents and employees to attend, at Respondent's cost, training that addresses the Fair Housing Act's prohibitions against discrimination in advertising;

4.      Awards such damages pursuant to 42 U.S.C. § 3612(g)(3) as will fully compensate any aggrieved persons for any harm caused by Respondent's discriminatory conduct;

5.      Awards the maximum civil penalty against Respondent for each violation of the Act, pursuant to 42 U.S.C. § 3612(g)(3) and 24 C.F.R. § 180.671; and

6.      Awards such additional relief as may be appropriate under 42 U.S.C. § 3612(g)(3).

Respectfully submitted on this 28th day of March, 2019.


_____
Jeanine Worden
Associate General Counsel for Fair Housing


_____
Kathleen M. Pennington
Assistant General Counsel for Fair Housing
  Enforcement


_____
Ayelet R. Weiss
Trial Attorney
U.S. Department of Housing
  and Urban Development
Office of General Counsel
451 7th St. SW, Room 10270
Washington, DC 20410
Office: (202) 402-2882
Email: ayelet.r.weiss@hud.gov