Gerard V. Mantese (MI Bar # P34424)
*gmantese@manteselaw.com*
David Honigman (MI Bar # P33146)
*dhonigman@manteselaw.com*
Kathryn Eisenstein (MI Bar #P66371)
*keisenstein@manteselaw.com*
(*Admitted Pro Hac Vice*)
**MANTESE HONIGMAN, P.C.**
1361 E. Big Beaver Road
Troy, MI 48083
Tel: 248-457-9200
Fax: (248)-457-9201


*Attorneys for Plaintiffs and Proposed Class Members.*

[*Additional counsel on following page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**

ROSEMARIE VARGAS, KISHA SKIPPER, JAZMINE SPENCER, DEILLO RICHARDS, and JENNY LIN, on behalf of themselves individually, and on behalf of all others similarly situated,

        Plaintiffs,

vs.

FACEBOOK, INC.

        Defendant.

Case No. 3:19-cv-05081-WHO

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**

Judge: Hon. William H. Orrick
Courtroom: 2, 17th Floor
Action Filed: August 16, 2019
Hearing Date: June 9, 2021
Time: 2:00 p.m.

1

*Additional Counsel for Plaintiffs and Proposed Class Members.*

2

Patricia A. Stamler (MI Bar #35905)
*pstamler@hertzschram.com*
3
Elizabeth Thomson (MI Bar #53579)
*lthomson@hertzschram.com*
4
Matthew Turchyn (MI Bar #76482)
*mturchyn@hertzschram.com*
5
*Admitted Pro Hac Vice*
6
**HERTZ SCHRAM PC**
7
1760 South Telegraph Road, Ste 300
Bloomfield Hills, MI 48302
8
Tel: 248-335-5000
Fax: 248-335-3346
9

10
Michael D. Seplow, SBN 150183
*mseplow@sshhzlaw.com*
11
Wilmer Harris, SBN 150407
*wharris@sshhzlaw.com*
12
Aidan C. McGlaze, SBN 277270
*amcglaze@sshhzlaw.com*
13
**SCHONBRUN SEPLOW HARRIS**
14
**HOFFMAN & ZELDES LLP**
9415 Culver Blvd., #115
15
Culver City, CA  90232
Tel: 310-396-0731
16
Fax: 310-399-7040

17

*Attorneys for Plaintiffs and Proposed Class Members.*

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.   LEGAL STANDARDS ................................................................................................ 2

II.  STATEMENT OF FACTS ........................................................................................ 3

III. LEGAL ARGUMENTS ........................................................................................... 9

   A.  Plaintiffs Have Article III and Statutory Standing. ........................................... 9

      1.  A Segregated Housing Market Is an Injury in Fact. ................................... 10

      2.  Facebook Created and Ran a Segregated Market .................................... 13

   B.  The CDA Does Not Shield Facebook from Liability ....................................... 13

   C.  Plaintiffs Have Stated Claims Under the FHA. ............................................... 19

      1.  Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(c). ..................... 19

      2.  Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(a). ..................... 21

      3.  Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(d). ..................... 22

   D.  The California Plaintiffs Sufficiently Pled Unruh Act Claims. ....................... 23

   E.  The California Plaintiffs Properly Allege a Claim under UCL Sections 17200 *et seq.* ................ 24

   F.  The New York Plaintiffs Are Not Bound By The Facebook Terms of Service .......................... 25

   G.  Plaintiffs' New York Claims Are Well Pled...................................................... 27

      1.  N.Y. Exec. Law § 296(5) includes Agent Liability. ................................. 27

      2.  Facebook Is Liable for Aiding and Abetting Under N.Y. Exec. Law § 296(6). ..................... 28

   H.  In the Alternative, California Law Is Contrary to Fundamental New York Policy ................... 29

   I.   In the Alternative, to the Extent the Court Requires Further Factual Detail to Evaluate Standing, the Court Should Permit Jurisdictional Discovery. ................................. 29

IV. CONCLUSION ..................................................................................................... 30

Case No. 3:19-cv-05081-WHO

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## <u>TABLE OF AUTHORITIES</u>

*Page(s)*

*Federal Cases*

*Abogados v. AT & T, Inc.*,
   223 F.3d 932 (9th Cir. 2000) .................................................................................. 29

*Applebaum v. Lyft, Inc.*,
   263 F. Supp. 3d 454 (S.D.N.Y. 2017) ...................................................................... 26

*Arnal v. Aspen View Condo. Ass'n., Inc.*,
   245 F. Supp. 3d 1261 (D. Colo. 2017) ..................................................................... 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................. 3

*Augustine v. United States*,
   704 F.2d 1074 (9th Cir. 1983) ................................................................................... 2

*Backus v. Conagra Foods, Inc.*,
   2016 WL 3844331 (N.D. Cal. July 15, 2016) ........................................................... 30

*Bank of Am. Corp. v. City of Miami, Fla.*,
   137 S. Ct. 1296 (2017).............................................................................................. 12

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................. 13

*Bradley v. T-Mobile*,
   2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ................................................... 10, 11

*Braunstein v. Arizona Dep't of Transp.*,
   683 F.3d 1177 (9th Cir. 2012) ................................................................................. 29

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) ................................................................................. 19

*Certain Approval Programs, LLC v. Xcentric Ventures, LLC*, No. CV08-1608-PHX-NVW,
   2009 U.S. Dist. LEXIS 22318, at *3-7 (D. Ariz. Mar. 9, 2009)............................... 18

*Chapman v. Pier 1 Imports Inc.*,
   631 F.3d 939 (9th Cir. 2011) ................................................................................... 10

*Colgate v. JUUL Labs, Inc.*,
   402 F. Supp. 3d 728 (N.D. Cal. 2019)................................................................ 24, 26

# TABLE OF AUTHORITIES – CONT'D

*Page(s)*

*Federal Cases (Continued*

*Cullinane v. Uber Techs., Inc.*,
 893 F.3d 53 (1st Cir. 2018)..........................................................................................26

*Doe v. Internet Brands, Inc.*,
 824 F.3d 846 (9th Cir. 2016) .......................................................................................15

*Elliott v. Versa CIC, L.P.*, No. 16-cv-0288-BAS-AGS,
 2019 U.S. Dist. LEXIS 16744, at *18 (S.D. Cal. Feb. 1, 2019)..............................20, 21

*Fair Hous. Counsel of San Fernando Valley v. Roommates.com LLC*,
 521 F.3d 1157 (9th Cir. 2008) ...................................................................14, 16, 17, 18

*Fair Hous. of Marin v. Combs*,
 285 F.3d 899 (9th Cir. 2002) .......................................................................................10

*Force v. Facebook, Inc.*,
 934 F.3d 53 (2d Cir. 2019) ..........................................................................................18

*Francis v. Kings Park Manor*,
 944 F.3d 370 (2d Cir. 2019) ........................................................................................29

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
 528 U.S. 167 (2000) .......................................................................................................9

*Friery v. Los Angeles Unified Sch. Dist.*,
 448 F.3d 1146 (9th Cir. 2006) .....................................................................................30

*Gladstone Realtors v. Village of Bellwood*,
 441 U.S. 91 (1979) .......................................................................................................11

*Goddard v. Google, Inc.*,
 640 F. Supp. 2d 1193 (N.D. Cal. 2009) .......................................................................19

*Gonzalez v. Google, Inc.*,
 282 F. Supp. 3d 1150 (N.D. Cal. 2017) ..................................................................18, 19

*Guevara v. UMH Props.*, No. 2:11-cv-2339-SHL-tmp,
 2014 U.S. Dist. LEXIS 154394, at * 15-16 (W.D. Tenn. Oct. 29, 2014)......................21

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982) ...............................................................................................11, 13

<u>**TABLE OF AUTHORITIES** – **CONT'D**</u>

*Page(s)*

*Federal Cases (Continued*

*Heckler v. Mathews*,
   465 U.S. 728 (1984) ................................................................................... 12

*HomeAway.com v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2018) ..................................................................... 15

*Housing Opportunities Made Equal v. Cincinnati Enquirer*,
   731 F. Supp. 801 (S.D. Ohio, 1990) ..................................................... 20, 21

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ............................................................. 15, 16

*In re First Am. Corp. ERISA Litig.*,
   258 F.R.D. 610 (C.D. Cal. 2009) ............................................................... 29

*In re Google Android Consumer Priv. Litig.*,
   2014 WL 988889 (N.D. Cal. Mar. 10, 2014) ......................................... 24-25

*Iniestra v. Cliff Warren Invs., Inc.*,
   886 F. Supp. 2d 1161 (C.D. Cal. 2012) ..................................................... 20

*Johnson v. Macy*,
   145 F. Supp. 3d 907 (C.D. Cal. 2015) ....................................................... 20

*Kerns v. United States*,
   585 F.3d 187 (4th Cir. 2009) ....................................................................... 2

*Knutson v. Sirius XM Radio Inc.*,
   771 F.3d 559 (9th Cir. 2014) ..................................................................... 25

*Lazy Y Ranch Ltd., v. Behrens*,
   546 F.3d 580 (9th Cir. 2008) ....................................................................... 3

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
   350 F.3d 1018 (9th Cir. 2003) ..................................................................... 9

*Lopez v. Trendacosta*,
   2014 WL 6883945 (C.D. Cal. Dec. 4, 2014) ............................................... 2

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ................................................................................... 10

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## <u>TABLE OF AUTHORITIES</u> – CONT'D

*Page(s)*

*Federal Cases (Continued*

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................................................. 29

*Meyer v. Holley*,
   537 U.S. 280 (2003) ........................................................................................................... 28

*Morsa v. Facebook, Inc.*,
   77 F. Supp. 3d 1007 (C.D. Cal. 2014) ............................................................................... 24

*Moss v. Infinity Ins. Co.*,
   2016 WL 7178559 (N.D. Cal. Dec. 9, 2016) ...................................................................... 30

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001) ............................................................................................... 3

*Nguyen v. Barnes & Noble, Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ..................................................................................... 25, 27

*Pennie v. Twitter, Inc.*,
   281 F. Supp. 3d 874 (N.D. Cal. 2017) ............................................................................... 18

*Perks v. Town of Huntington*,
   251 F. Supp. 2d 1143 (E.D.N.Y. 2003) ............................................................................. 28

*Pride v. Correa*,
   719 F.3d 1130 (9th Cir. 2013) ............................................................................................. 2

*Rivera v. Peri & Sons Farms, Inc.*,
   735 F.3d 892 (9th Cir. 2013) ............................................................................................... 3

*S.F. Baykeeper v. W. Bay Sanitary Dist.*,
   791 F. Supp. 2d 719 (N.D. Cal. 2011) ............................................................................... 13

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004) ............................................................................................. 2

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ....................................................................................................... 10

*St. Clair v. City of Chico*,
   880 F.2d 199 (9th Cir. 1989) ............................................................................................. 30

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1

## TABLE OF AUTHORITIES – CONT'D

2

*Page(s)*

*Federal Cases (Continued*

3

4
*Swift v. Zynga Game Network, Inc*.,
  2010 WL 4569889 (N.D. Cal. Nov. 3, 2010) ............................................................. 3, 18

5

6
*Trafficante v. Metropolitan Life Insurance*,
  409 U.S. 205 (1972) ........................................................................................... 11, 13

7

8
*Warren v. Fox Family Worldwide, Inc*.,
  328 F.3d 1136 (9th Cir. 2003) ........................................................................................ 9

9
*Wells Fargo & Co. v. Wells Fargo Exp. Co.*,
  556 F.2d 406 (9th Cir. 1977) ........................................................................................ 30

10

11
*White v. HUD*,
  475 F.3d 898 (7th Cir. 2007) ........................................................................................ 20

12

13
*Willborn v. Sabbia*, No. 10 C,
  2011 WL 1900455 (N.D. Ill. May 19, 2011) ................................................................ 28

14

15
*Wilson v. Huuuge, Inc.*,
  944 F.3d 1212 (9th Cir. 2019) ...................................................................................... 27

16
*Wilson v. Redbox Automated Retail, LLC*,
  448 F. Supp. 3d 873 (N.D. Ill. 2020) ............................................................................ 26

17

18
*State Cases*

19
*Angelucci v. Century Supper Club*,
  41 Cal. 4th 160 (2007) .................................................................................................. 11

20

21
*Griffin v. Sirva, Inc.*,
  76 N.E.3d 1063 (2017) .................................................................................................. 29

22

23
*Hernandez v. Burger*,
  102 Cal.App.3d 795 (1980) ........................................................................................... 29

24
*Hoffman v. Parade*,
  15 N.Y.3d 285 (2010) ................................................................................................... 28

25

26
*Koebke v. Bernardo Heights Country Club*,
  36 Cal. 4th 824 (2005) .................................................................................................. 23

27

28
*Kwikset Corp. v. Superior Court*,
  51 Cal.4th 310 (2011) ................................................................................................... 24

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF AUTHORITIES – CONT'D

*Page(s)*

*State Cases (Continued*

*McCann v. Foster Wheeler LLC,*
   48 Cal. 4th 68, 225 P.3d 516 (2010)..................................................................29

*Mobil Oil Corp. v. Syracuse Indus. Dev. Agency,*
   76 N.Y.2d 428 (N.Y. 1990) ............................................................................12

*Saunders v. Superior Court,*
   27 Cal. App. 4th 832 (1994) ..........................................................................24

*Stalker v. Stewart Tenants Corp.,*
   940 N.Y.S.2d 600 (1st Dep't. 2012) ..............................................................28

*White v. Square, Inc.,*
   7 Cal. 5th 1019 (2019) ..................................................................................23

*Federal Statutes*

42 U.S.C. § 3601 .....................................................................................................1

42 U.S.C. § 3604 ..................................................................................19, 20, 21, 22

42 U.S.C. § 3606 ...................................................................................................22

42 U.S.C. § 3613 .....................................................................................................9

47 U.S.C. § 230......................................................................................Passim

*State Statutes*

Cal. Business and Professions Code § 17200 .................................................2, 24

Cal. Civil Code § 51.5, 52(a) ...............................................................................2

N.Y. Exec. L. § 290 ...........................................................................................2, 28

N.Y. Exec. Law § 296(5) ..................................................................................27, 29

N.Y. Exec. Law § 296(6) ..................................................................................28, 29

N.Y. Exec. Law § 297..........................................................................................11

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## <u>TABLE OF AUTHORITIES – CONT'D</u>

*Page(s)*

*Federal Rules*

Fed. R. Civ. P. 12 ....................................................................................................... 2, 3

*Federal Regulations*

24 C.F.R. § 100.75 ........................................................................................................ 20

24 C.F.R. § 100.80(b)(4) ............................................................................................... 22

*Other Authorities*

Bank of America v. City of Miami: Standing and Causation Under the Fair Housing Act,
   51 Loy. L.A. L. Rev. 413 (2018) ............................................................................. 11

Restatement (Second) of Agency § 411 (1958) ........................................................... 28

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1    This case seeks to hold Facebook accountable for its blatant housing discrimination which

2    garnered billions of dollars of advertising revenue. It earned $55.8 billion worldwide in 2018, mostly

3    from targeted advertising,[1] by mining demographic and other data from its unsuspecting users. Facebook

4    uses its algorithms to surgically target and retarget ads based on that data. Its digital platform delivers

5    exponentially more housing ads than any newspaper ever could with the added benefit of the opacity of

6    the digital world.[2] Digital housing discrimination may look different from the early days of redlining, but

7    it is no less illegal. The monumental effect of Facebook's discriminatory actions requires insight into the

8    Fourth Industrial Revolution.[3] Currently, traditional methodologies of our culture have been obliterated

9    by the Digital Age. COVID-19 further propelled the transition from our brick-and-mortar society to

10   eCommerce, but this transition was well in the works before the pandemic. Growing up digital,

11   Millennials and Generation Z, making up 42% of today's US population,[4] "changed the world of business

12   . . . for generations to come."[5] In the Digital Age, social media platforms like Facebook transformed from

13   a place for occasional social interactions to the Mecca for everything from news to purchasing anything

14   you can imagine. Facebook is the 'newspaper' of the Digital Age, with less than five percent of

15   Millennials using traditional print newspapers as their news source:[6] *Technology has forever changed*

16   *how Americans shop for homes …it's no secret that buyers are doing most of the home search process*

17   *themselves . . . without ever calling in an agent . . . using apps, websites and digital platforms*.[7]  That

18   makes Facebook's digital redlining housing practices all the more impactful and pernicious.

19   Facebook is liable under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), because it

20   created a discriminatory website Ad Platform that invited and empowered housing advertisers to direct

21   ads in a manner that excluded users who were members of protected classes. Plaintiffs and the putative

---

[1] Facebook 2018 SEC Filings.

[2] Facebook's data warehouse has 300 petabytes of data in 800,000 tables and generates 4 new petabytes [one million gigabytes] of data and runs 600,000 queries and 1 million map-reduce jobs per day." https://research .fb.com/blog/2014/10/facebook-s-top-open-data-problems/

[3] The "Digital Age" is a term referring to the Fourth Industrial Revolution. https://www.linkedin.com/pulse/what-digital-age-internet-things-cheryl-smith

[4] https://www.statista.com/statistics/296974/us-population-share-by-generation/#:~:text=The% 20statistic%20depicts%20the%20distribution,population%20in%20the%20United%20States.

[5] https://www.entrepreneur.com/article/289574.

[6] https://www.digitalnewsreport.org/survey/2019/how-younger-generations-consume-news-differently

[7] https://www.forbes.com/sites/alyyale/2018/08/01/are-real-estate-agents-still-relevant-in-the-age-of-tech/?sh=2bf6445e65ec (emphasis added).

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1    class have standing by virtue of the injuries in fact that they suffered in a segregated market. Further,

2    Facebook does not have immunity under the Communications Decency Act of 1996, 47 U.S.C. § 230

3    ("CDA"), because it was integrally involved in the creation of the content used by its advertisers through

4    its discriminatory software and illegal ad targeting through its powerful algorithms to direct housing ads

5    away from those in protected classes. Plaintiffs have stated claims for relief under the California Unruh

6    Act ("Unruh"), Cal. Civil Code § 51.5, 52(a); California's Unfair Competition Law, Business and

7    Professions Code § 17200 *et seq.* ("UCL"); and, the New York Human Rights Law, N.Y. Exec. L. § 290

8    *et seq.* ("NYSHRL"). Plaintiffs have demonstrated a right to financial recovery and injunctive relief.

## I.    LEGAL STANDARDS

10       Facebook seeks to dismiss Plaintiffs' Third Amended Complaint ("TAC") under Fed. R. Civ. P.

11   12(b)(1) and 12(b)(6). (Dkt. 92, at ¶ 10). Facebook moves to dismiss Plaintiffs' TAC under Rule 12(b)(1)

12   for lack of subject matter jurisdiction alleging (1) that Plaintiffs failed to "identify a single housing ad"

13   within the allegations of the TAC illustrating discriminatory outcomes under the FHA; and (2) that

14   Plaintiffs failed to allege facts illustrating personal harm stemming from Facebook's "discriminatory

15   conduct." (*Id.*)

16       A challenge to subject matter jurisdiction may be either facial or factual: "A party who brings a

17   Rule 12(b)(1) challenge may do so by referring to the face of the pleadings or by presenting extrinsic

18   evidence." *Lopez v. Trendacosta*, No. 14-05406, 2014 WL 6883945, *4 (C.D. Cal. Dec. 4, 2014) (citation

19   omitted). Facebook makes a facial attack on jurisdiction, requiring the Court to resolve the challenge, "as

20   it would a motion to dismiss under Rule 12(b)(6): [a]ccepting the plaintiff's allegations as true and

21   drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are

22   sufficient as a legal matter to invoke the court's jurisdiction." *Pride v. Correa*, 719 F.3d 1130, 1133 (9th

23   Cir. 2013). Because it disputes the facts underpinning subject matter jurisdiction and those facts are

24   "inextricably intertwined" with the merits of Plaintiffs' claims, Facebook must proceed under Rules

25   12(b)(6) or 56 and "the court should resolve the relevant factual disputes only after appropriate

26   discovery." *Kerns v. United States,* 585 F.3d 187, 193 (4th Cir. 2009); *Augustine v. United States*, 704

27   F.2d 1074, 1079 (9th Cir. 1983). The court may not weigh and decide disputed facts on a facial attack as

28   to jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

1    Facebook also seeks dismissal of Plaintiffs' TAC under Rule 12(b)(6), a challenge which "tests

2    the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a

3    motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

4    to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). A

5    court must accept all well-pled facts as true and construe facts "in the light most favorable to the plaintiff."

6    *Lazy Y Ranch Ltd., v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). An affirmative defense cannot serve

7    as a basis for dismissal unless its applicability is obvious on the face of the complaint. *Rivera v. Peri &*

8    *Sons Farms, Inc*., 735 F.3d 892, 902 (9th Cir. 2013). The CDA is an affirmative defense that turns on an

9    interpretation of facts, and thus should not be resolved on a 12(b)(6) motion. *Swift v. Zynga Game*

10   *Network, Inc*., No. 09-05443 SBA, 2010 WL 4569889, *6 (N.D. Cal. Nov. 3, 2010) ("It would be

11   improper to resolve [CDA immunity] on the pleadings and the limited record presented and preemption

12   under the CDA is an affirmative defense that is not proper to raise in a Rule 12(b)(6) motion.")

13   ## II.   STATEMENT OF FACTS

14    Facebook evaluates, analyzes, and processes user data to create thousands of different subject

15   matter categories based on information that users provide to it, and information it infers from the users'

16   actions and behaviors including age, ethnic affinity, sex, race, geographic location, and marital status.

17   (TAC ¶ 17). When users "sign up for a Facebook account, you're required to share: name, gender, date

18   of birth, email or mobile number." https://fortune.com/2018/03/21/facebook-personal-data-cambridge-

19   analytica (last visited 8-14-19). Facebook gathers and stores additional personal data, which is used to

20   target ads to its users. *Id.* (TAC ¶ 37). It uses the data about its users in a variety of ways including

21   personalized and targeted ads to its users based on their characteristics, including protected classes. (TAC

22   ¶ 39). Facebook's advertising portal called Ads Manager (the "Ad Platform") empowered housing

23   advertisers to select target audiences based on their demographic and behavioral characteristics, and then

24   Facebook directs the ads to the targeted audience. (TAC ¶¶ 14, 16-18). It approved ads that excluded

25   users categorized as members of protected classes, including sex, age, race, geographic boundaries, and

26   other discriminatory variables. (TAC ¶¶ 64-67). When a housing advertiser excluded a specific category

27   from its audience and Facebook published its ads, Facebook ensured that the ad was not directed to the

28   excluded category. (TAC ¶ 65).

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

As recently as 2019, Facebook mined user data to create categories of users defined by race or skin color *other than White* and empowered housing advertisers to exclude those categories from the audience receiving ads. (TAC ¶ 66). It also approved and published housing ads that excluded Blacks from its audiences. (TAC ¶ 67).

Around 2016, Facebook integrated a "Marketplace" feature, enabling users to post and search for items–including housing for sale or rent. (TAC ¶ 74). The Marketplace facilitated consumer-to-consumer transactions by creating a platform for its users to create, search, and browse various categories of listings, including home sales and rentals. The Marketplace operates as "an online shopping channel. It's a place for Facebook users to buy and sell from each other locally."[8] (TAC ¶ 74). In addition to these free, user-created ads, the Marketplace also incorporated the same discriminatory features discussed above by allowing advertisers to place targeted ads in the Marketplace using its paid Ad Platform. "In June 2018, Facebook announced the option for businesses to place ads in Marketplace." *Id.* These ads would appear "in-feed" (i.e., as someone was browsing or scrolling through the results of a search) and had "the advantage of reaching people where they are shopping." *Id.* In fact, it was reported that placing ads in Marketplace using the Ad Platform yielded "a marked increase in conversion rates compared with News Feed placements." *Id.* (TAC ¶ 76).

Around November 14, 2017, ProPublica purchased dozens of rental housing ads on Facebook and requested that those ads "not be shown to certain categories of users, such as African Americans, mothers of high school kids, people interested in wheelchair ramps, Jews, expats from Argentina and Spanish speakers." (TAC ¶ 68). "Every single ad was approved within minutes." *Id.* An additional ProPublica ad that sought to exclude potential renters "interested in Islam, Sunni Islam and Shia Islam" took 22 minutes to approve. *Id.* Facebook approved and published housing ads for sale and rental properties that excluded African Americans and single parents and/or that were based on sex, familial status, and other protected classes from the ad's target audience. *Id.*

Facebook's conduct prevented Plaintiffs and the putative class from receiving ads for the sale or rental of available housing. (TAC ¶ 71). Its affirmative conduct made it a creator or developer of the

---

[8] https://blog.hootsuite.com/facebook-marketplace/ (last visited Apr. 26, 2021).

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1   information or content in the ads that are not published, not provided, not circulated, and not sent to

2   Facebook users based on the users' genuine or perceived protected class characteristics. (TAC ¶¶ 18-20).

3   **Plaintiffs**

4   Plaintiff Rosemarie Vargas, a resident of New York City, New York, is a disabled female of

5   Hispanic descent, and a single parent with minor children. (TAC ¶ 79). She is a Facebook user who used

6   Facebook from on or about August 2018 through April 2019 to look for housing, and prior to those dates

7   used Facebook for, *inter alia*, posting photos of herself and her children. (TAC ¶ 80). From around

8   August 2018 through April 2019, she searched for housing on Facebook four to five times per week and

9   she was ready, willing, and able to move if she located suitable housing. (TAC ¶ 81). Her search for

10  housing was pressing due to the need for increased space given the size of her family and the need for an

11  additional bedroom. (TAC ¶ 82, 84). She logged into Facebook, then accessed the Marketplace from her

12  Facebook home page and used the following search criteria: a three-bedroom apartment located in lower

13  Manhattan in the rental price range of $1,7000.00 per month. (TAC ¶¶ 83, 84, 85). Around August 2018,

14  Vargas accessed the Marketplace and included in her search criteria Section 8 housing voucher and her

15  status as a veteran, yielding no housing ads. (TAC ¶ 89). She removed the Section 8 housing voucher

16  from her search terms, and she received different search results. (TAC ¶ 90). She received some of the

17  same ads repeatedly for apartments that were unavailable or were in unsafe locations. (TAC ¶ 91). During

18  her Facebook searches for housing, she did not receive any ads for housing in Manhattan. (TAC ¶ 94).

19  Around February or March 2019, Vargas was with a Caucasian friend, Chet Marcello. She and

20  Ms. Marcello sat side-by-side and searched for housing through the Marketplace, both using the same

21  search criteria Vargas had been using. Ms. Marcello received more ads for housing in locations that were

22  preferable to Vargas, who did not receive the ads that Ms. Marcello received. (TAC ¶ 95).

23  Despite months of diligent searching, Vargas was never able to locate suitable housing through

24  the Marketplace. (TAC ¶ 96). She did not receive any housing ads in her Facebook News Feed despite

25  her regular, lengthy searches for housing in the Marketplace. (TAC ¶ 97). On information and belief,

26  including Facebook's well-known amassing of detailed demographic data about each user, Vargas's

27  status as a single parent, disabled female of Hispanic descent was known to Facebook. (TAC ¶ 98).

28

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1    Plaintiff Kisha Skipper, a resident of Yonkers, New York, is a female of African American

2 descent, and a single parent with minor children, who used her Facebook account from on or about

3 November 2016 through May 2017 to look for housing, because the house that she and her family were

4 renting was in foreclosure. (TAC ¶ ¶ 102, 104). Skipper was gainfully employed and prepared to move.

5 (TAC ¶ 105). Prior to November 2016 and throughout the time she was looking for housing on

6 Facebook, Skipper used Facebook for a variety of reasons, including the posting of photos of herself and

7 her children. (TAC ¶ 103). Once in the Marketplace Skipper, on a near daily basis, used the following

8 search criteria in her efforts to locate housing: a two-to-three-bedroom single-family home or apartment

9 unit in Yonkers or Westchester County in the monthly rental range of $1,000 to $2,000. (TAC

10 ¶ ¶ 106,107). She routinely received ads in the Marketplace for other New York locations like Great

11 Neck, Mt. Vernon, and Long Island, but she did not receive ads for housing in Yonkers or Westchester

12 County and did not locate alternate housing through Facebook. (TAC ¶ ¶ 108,109). She did not receive

13 any housing ads on her News Feed despite her search for housing on Facebook. (TAC ¶ 110). Based upon

14 information and belief, including Facebook's well-known amassing detailed demographic data about

15 each user, Skipper's status as a single parent, female of African American descent was known to

16 Facebook. (TAC ¶ 111).

17    From 2016 through 2019, Plaintiff Jazmine Spencer was residing in either a family shelter or a

18 homeless shelter, including the Urban Family Center and the Henry Street Settlement, with her two minor

19 children in New York, New York. Prior to 2016 and throughout the time she was looking for housing on

20 Facebook, Spencer used Facebook for a variety of reasons, including the posting of photos of herself and

21 her children. (TAC ¶ 116). She had an urgent need to locate stable and safe housing for herself and her

22 children and she was ready, willing, and able to move if she located suitable housing. (TAC ¶ 117).

23 During 2016 through 2019, Spencer used Facebook's Marketplace on a bi-weekly basis to search for

24 housing with the assistance of a housing specialist and she also accessed the Marketplace using her cell

25 phone four to five times a week to perform additional searches for housing. (TAC ¶ 118). Spencer's

26 searches for housing on the Marketplace utilized the following criteria:  two-bedrooms, apartment, or

27 house, located in New York City or New Jersey in the price range of $750-$1,450 per month. (TAC

28 ¶ ¶ 119,120). She received Marketplace ads for housing in Newark, New Jersey, which is an area with

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1   high crime rates and although she received approximately 20-30 ads each time that she did a search, the

2   results she received did not match her search criteria. (TAC ¶ 121). Despite years of diligent searching,

3   Spencer was never able to locate suitable alternate housing in the Marketplace. (TAC ¶ 122). She did not

4   receive any housing ads on her News Feed despite her search for housing on Facebook. (TAC ¶ 122).

5   Based upon information and belief, including Facebook's well-known amassing of detailed demographic

6   data about each user, Spencer's status as a single parent, female of African American and Hispanic

7   descent was known to Facebook. (TAC ¶ 124).

8       Plaintiff Deillo Richards is an African American male, and a single parent with minor children

9   residing in Yonkers, New York. He used Facebook to look for housing from on or about March 2019

10  through August 2019. (TAC ¶ 128). Prior to March 2019 and throughout the time he was looking for

11  housing on Facebook, he used Facebook for a variety of reasons, including the posting of photos of

12  himself and his children, and noting his marital status is single. (TAC ¶ 129). From on or about March

13  2019 through August 2019, Richards was residing in a studio apartment with his two minor sons ages 6

14  and 11, he needed a larger residence for himself and his family, and he was prepared to move if he found

15  suitable housing. (TAC ¶ 130). During this time, he used Facebook by accessing its Marketplace two to

16  three times per week to locate housing with the criteria of a two to a three-bedroom apartment, located

17  in Yonkers, N.Y., or the Bronx in N.Y. in a price range of $1,000 to $1,250 monthly rent. (TAC

18  ¶¶ 131,132). His searches resulted in ads for studio apartments that did not meet his housing needs and

19  he did not locate housing through the Marketplace. (TAC¶ ¶ 133, 134). Richards did not receive any

20  housing ads on his Facebook News Feed despite his search for housing. (TAC ¶ 135). Based upon

21  information and belief, including Facebook's well-known amassing of detailed demographic data about

22  each user, Richards' status as a single parent, of African American descent was known to Facebook.

23  (TAC ¶ 136).

24      Plaintiff Jenny Lin, a resident of San Francisco, California, is an Asian American female who

25  used Facebook to seek housing for approximately two months, from May to June 2017 because the rental

26  property where she lived was being sold requiring her to vacate. (TAC ¶ ¶ 140,142). Prior to May 2017

27  and throughout the time she was looking for housing on Facebook, Lin used Facebook for a variety of

28  reasons, including the posting of photos of herself. (TAC ¶ 141). Lin actively searched for housing

through Facebook's housing group entitled "Inspired Women of L.A. Housing" and estimates that she searched for housing in the Women of L.A. Housing group about 60 times. (TAC ¶ 143). She joined this housing group on Facebook based on a friend's recommendation due to the type of housing and location of the housing she was seeking. (TAC ¶ 144). Lin was searching for housing located in a better area; she was looking for a single room in Mid-City or Culver City, CA at a monthly rental rate from $800 to $1,100. (TAC ¶ 146). If she had found an ad meeting her criteria, she was ready and able to move. (TAC ¶ 147). Lin did not receive any housing ads on her News Feed despite her search for housing on Facebook. (TAC. ¶ 148). Based upon information and belief, including Facebook's well-known amassing of detailed demographic data about each user, Lin's status as a female of Asian American descent was known to Facebook. (TAC. ¶ 149).

Plaintiffs' TAC alleges that Facebook's Ad Platform and its targeting methods provide tools to exclude persons of color, single parents, persons with disabilities, and other protected attributes, and due its actions, Plaintiffs, and putative class, were prevented from having the same opportunity to view ads for housing that other Facebook users, not in protected classes received. (TAC ¶ 99). Facebook's Ad Platform and its targeting methods created an unlawful barrier to equal access to the housing market for Plaintiffs and the putative class, who were all members of protected classes statuses under the FHA and analogous state statutes. (TAC ¶ 100).

Facebook's Ad Platform and its discriminatory targeting of housing advertising injured Plaintiffs, such that they are entitled to compensatory damages for loss of housing opportunities which encompass, among other injuries, their increased amount of time spent looking for housing, their loss of a more desirable housing space, a continuation of residing in a homeless shelter, loss of housing located in a safer or more stable area, loss of housing more proximate to their house of worship and other activities, loss of an ideal housing environment, and/or loss of housing located in a more desirable location; as well as punitive damages, and nominal damages. (TAC ¶¶ 101, 114, 127, 139, 152).[9]Plaintiffs are members of protected classes under the FHA and the analogous New York and California state laws, Unruh, the UCL, and NYSHRL, respectively. (TAC ¶ 58).

---

[9] Ligatti, Christopher C. (2019) "Max Weber Meets the Fair Housing Act: 'Life Chances' and the Need for Expanded Lost Housing Opportunity Damages," Belmont Law Review: Vol. 6, Article 3, available at https://repository.belmont.edu/lawreview/vol6/iss1/3 (hereafter, "Ligatti").

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1   Facebook seeks to blame housing advertisers for any wrongful action. However, Facebook's

2   algorithms make the decisions about which users will see particular ads. (TAC ¶ 59). Its Ad Platform

3   makes money when users click on ads; it is designed to maximize clicks and profits for Facebook. It

4   considered the user's sex and close proxies for the other protected classes to determine the targeted

5   audience receiving the housing ad. The close proxies may have included which pages a user visited,

6   which apps a user had, where a user went during the day, and the purchases a user made on and offline.

7   As a result of its conduct, Facebook created and exacerbated a segregated housing market, unlawfully

8   denying Plaintiffs and the putative class equal access to housing ads. *Id.*

9   Plaintiffs and the putative class are "aggrieved person[s]" under the FHA 42 U.S.C. § 3613 which

10   is defined broadly as including "any person who [:] (1) claims to have been injured by a discriminatory

11   housing practice; or (2) believes that such person will be injured by a discriminatory housing practice

12   that is about to occur." (TAC ¶¶ 179, 180). Facebook's conduct violates the FHA, and the analogous

13   New York and California state laws, Unruh, the UCL, and NYSHRL, respectively, which prohibit the

14   publication of ads that discriminate against protected classes. (TAC ¶ 58). Facebook has represented that

15   it stopped its illegal advertising practices, but it has not compensated tens of thousands of users who were

16   victims of these practices. (TAC ¶ 3). Moreover, there is no guarantee Facebook will continue to comply

17   with its reformed practices in the future. An injunction is therefore warranted, preventing Facebook from

18   ever again operating a segregated housing market through its advertising platforms. *Id.*

19                                   **III.   LEGAL ARGUMENTS**

20         **A.  Plaintiffs Have Article III and Statutory Standing.**

21   Plaintiffs' TAC alleges facts sufficient to confer Article III standing and statutory standing

22   because: (1) they suffered an "injury in fact" that is concrete, particularized, and actual; (2) the injury is

23   fairly traceable to the challenged action; and (3) a favorable decision will likely redress the injuries.

24   *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*., 528 U.S. 167, 180-81 (2000). In a class action

25   case, only one named plaintiff must have suffered injury. *Lierboe v. State Farm Mut. Auto. Ins. Co*., 350

26   F.3d 1018, 1022 (9th Cir. 2003). At the pleading stage, Plaintiffs "need only show that the facts alleged,

27   *if proved*, would confer standing." *Warren v. Fox Family Worldwide, Inc*., 328 F.3d 1136, 1140 (9th Cir.

28   2003) (emphasis added). At this stage, a court "presumes that general allegations embrace those specific

1   facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

2   Courts are "instructed . . . to take a broad view of constitutional standing in civil rights cases." *Chapman*

3   *v. Pier 1 Imports Inc.*, 631 F.3d 939, 946 (9th Cir. 2011).

4        Plaintiffs have standing because they incurred the loss of housing opportunities as a result of

5   Facebook's actions in creating a segregated housing market.  Moreover, Plaintiffs and the class were

6   injured by being excluded from the targeted ads and thus have standing under the FHA.  It is as if a real

7   estate company maintained a listing of available housing at its office but then chose to send mailers with

8   these housing ads only to white residents, thereby excluding non-white residents from receipt of these

9   ads.  Plaintiffs submit that this discriminatory act alone, which is analogous to Facebook's targeted

10  housing ads, violates the FHA, thereby conferring standing upon anyone excluded from the targeted ads,

11  regardless of whether they can demonstrate that they missed a specific, desired housing opportunity.

12              ### 1.   A Segregated Housing Market Is an Injury in Fact.

13       Plaintiffs have sufficiently alleged a concrete and particularized injury: They have been denied

14  access to Facebook's online housing market that is accessible to users in non-protected classes. A plaintiff

15  must allege facts demonstrating that, due to the challenged conduct, they have "suffered 'an invasion of

16  a legally protected interest' that is 'concrete and particularized.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,

17  1548 (2016). A "particularized" injury "must affect the plaintiff in a personal and individual way." *Id.*

18       Relying on a single, 2020 district court case, Facebook wrongly argues that Plaintiffs must

19  identify specific housing ads that they were qualified to rent and would have rented, but they were

20  prevented from doing so because of Facebook's conduct. (Dkt. 92 at pp. 9-10 (citing *Bradley v. T-Mobile*,

21  No. 17-CV-07232-BLF, 2020 WL 1233924, at *10 (N.D. Cal. Mar. 13, 2020)).  However, *Bradley* is an

22  employment age discrimination case, while standing under the FHA "extend[s] to the full limits of Article

23  III." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 902 (9th Cir. 2002). *Bradley* does not implicate this

24  principle, and its holding rests on the fact that plaintiffs in that case failed to identify "single job for which

25  these allegations [of age discrimination] are true." 2020 WL 1233924, at *10. Facebook fails to realize

26  that standing under the FHA includes fact scenarios more relaxed than those in the instant action. *Injury*

27  under the FHA encompasses all housing discrimination and has a very liberal standing requirement. The

28  "actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights,

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

the invasion of which creates standing." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982)

("*Havens*"). The Supreme Court has consistently applied this liberal standing requirement starting with

*Trafficante v. Metropolitan Life Insurance*, 409 U.S. 205 (1972), where a black tenant and a white tenant

within the same apartment complex sued their landlord for racial discrimination in renting practice,

alleging damage from loss of "the social benefits of living in an integrated community." *Id.* at 208. The

Court found this *injury* sufficient because "[FHA standing is] as broad[] as is permitted by Article III of

the Constitution." *Id.* at 209. In 1979, the Supreme Court recognized *injury* as not only the social harm

racial segregation caused residents, as in *Trafficante*, but also the economic loss in property values and

property tax revenues that flow from segregation. *Gladstone Realtors v. Village of Bellwood*, 441 U.S.

91 (1979). In *Gladstone*, plaintiffs acted as testers in uncovering racial steering by the defendant realtors.

The Court found that the adverse consequences of racial steering amply qualified plaintiffs to assert FHA

claims. *Id*. In *Havens*, the Court expanded FHA injury to include an "informational injury . . . in addition

to the type of neighborhood or community injury recognized in" *Gladstone* and *Trafficante*. Alan M.

White, Bank of America v. City of Miami: Standing and Causation Under the Fair Housing Act, 51 Loy.

L.A. L. Rev. 413, 416 (2018). In *Havens*, the Supreme Court again held that black testers who had ***no

intention of buying or renting*** a home nevertheless ***had standing*** to enforce their statutory rights "to

***truthful information*** concerning the availability of housing," because they had been injured by receiving

false information. 455 U.S. at 374 (emphases added). The injury was to the tester's "statutory right to

truthful housing information." *Id*. at 375.

Thus, *Gladstone Realtors*, *Trafficante*, and *Havens*, finding standing where protected classes were

subjected to racial steering but did not identify the specific opportunities they were denied (e.g., a specific

apartment), resoundingly confirm that *Bradley* is inapposite, and Facebook's reliance on it is misguided.

Facebook's actions created and exacerbated segregated housing for Plaintiffs, which by itself is sufficient

injury under these binding Supreme Court cases.

Similarly, under the UCL and the Unruh, Plaintiffs must establish standing by alleging facts

showing that they "actually suffer[ed] the discriminatory conduct" being challenged and possess a

"concrete and actual interest that is not merely hypothetical or conjectural." *Angelucci v. Century Supper

Club*, 41 Cal. 4th 160, 165 (2007). Under the NYSHRL, Plaintiffs must establish that they have been

1  "aggrieved by an unlawful discriminatory practice," N.Y. Exec. Law § 297, which "requires a threshold

2  showing that a person has been adversely affected by the activities of defendants." *Mobil Oil Corp. v.*

3  *Syracuse Indus. Dev. Agency*, 76 N.Y.2d 428, 433 (N.Y. 1990).

4      Plaintiffs alleged they are members of protected classes ("disabled female of Hispanic descent,

5  and a single parent with minor children," "a female of African American descent, and a single parent

6  with minor children," "female of both African American and Hispanic descent, and a single parent with

7  minor children" "a male of African American descent," and "a female of Asian American descent") (TAC

8  ¶¶79, 102, 115, 124, 140) who used Facebook during the relevant time period to seek housing, and that

9  "because Facebook created a platform which provided tools to exclude women of color, single parents

10 and other protected attributes," they were prevented from "having the same opportunity to view ads for

11 housing that other Facebook users, not in protected classes received." (TAC ¶¶ 79-152, 31, 34-39).

12     Plaintiffs allege concrete injuries that they personally suffered, each of which the Supreme Court

13 recognized as conferring  standing, including: "discrimination" based on protected classes (TAC ¶¶ 65-

14 66); "perpetuat[ion] [of] segregation" and denial of "the benefits of living in a[n] . . . integrated society,"

15 (TAC ¶ 69); and denial of information that laws require to be given on an equal basis, *(*TAC ¶ 64, 70);

16 *Bank of Am. Corp. v. City of Miami, Fla*., 137 S. Ct. 1296, 1302-03 (2017); *Heckler v. Mathews*, 465

17 U.S. 728, 739-40 (1984).

18     Plaintiffs' TAC sufficiently pleads standing allegations and includes their use of Facebook to

19 search for housing, that Facebook's Ad Platform and its targeting methods provided tools to exclude

20 women of color, single parents, and other protected attributes, which prevented all Plaintiffs from "having

21 the same opportunity to view ads for housing that other Facebook users, not in protected classes

22 received." (TAC ¶¶ 79, 99, 112, 125, 137,152). They allege they have "suffered an invasion of a legally

23 protected interest that is concrete and particularized." Vargas "filtered her search for housing on

24 Facebook's Marketplace using the same parameters that her White female friend used," yet obtained

25 "fewer results than her White male friend." She was personally harmed by being excluded from

26 Facebook's housing market, which sufficiently constitutes harm as required for Article III standing.

27

28

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1

### 2.   Facebook Created and Ran a Segregated Market

2

Facebook argues that Plaintiffs' injuries are due to advertisers who use its purportedly "neutral

3

tools" to exclude protected classes from viewing ads. (Dkt. 92 at p. 12). Its own authority shows

4

traceability does not require a "defendant's actions [to be] the very last step in the chain of causation" or

5

solely cause an injury. *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). An indirect causal relationship

6

suffices to establish standing. *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 749 (N.D.

7

Cal. 2011). Facebook created the illegal Ad Platform content, gave it to its advertisers, collected data

8

regarding protected classes and was the last step in its targeting and delivering housing ads. (TAC ¶¶ 8-

9

9, 14-16, 42-44, 45-73).

10

There is a close, direct relationship between Facebook's conduct and Plaintiffs' injuries. Plaintiffs

11

allege that Facebook "collects and extracts data about its users' demographics, interests, and behavior

12

both on and off its platform." (*Id.* at ¶ 45). Facebook, using this data, "evaluates, analyzes, and processes

13

the user data to create thousands of different categories, which are based on information that users have

14

provided to" it and "on information that [it] has inferred from the user's actions and behaviors." (*Id.* at ¶

15

48). It assigns applicable categories to each user and it organizes its Ad Platform with drop-down forms,

16

containing protected class categories, so advertisers can use illicit data to target users based on protected

17

classes. (*Id.* at ¶¶ 49-52). Facebook, not the advertisers, delivers the ads based on illegal and

18

discriminatory classifications for and on behalf of advertisers to its users. (*Id.* at ¶¶ 53-78).

19

The Supreme Court has held that plaintiffs had standing where there was a far less direct

20

connection between a defendant's violation and a plaintiff's injury. *Havens*, 455 U.S. at 379-80;

21

*Trafficante*, 409 U.S. at 208. Here, Facebook created a segregated online housing market, collecting and

22

organizing the data, asking the advertisers what types of people they want to preclude from seeing the

23

ads, and then implementing the preferences and excluding protected classes from seeing ads. Facebook

24

took *multiple* affirmative steps that directly cause the injuries alleged by Plaintiffs. Plaintiffs' injuries are

25

therefore traceable to Facebook's conduct, satisfying the second element of Article III standing.

26

### B.  The CDA Does Not Shield Facebook from Liability

27

Facebook's reliance on Section 230 (Sec. 230) of the CDA is misplaced. One reason Congress

28

passed the CDA was to "prohibit obscene or indecent material from reaching children on the internet,

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1   also to safeguard internet ingenuity." *See* Nadiyah Humber and James Matthews, *Fair Housing*

2   *Enforcement in the Age of Digital Advertising: A Closer Look at Facebook's Marketing Algorithms*,

3   BOSTON BAR JOURNAL (Feb. 19, 2020), https://bostonbarjournal.com/2020/02/19/fair-housing-

4   enforcement-in-the-age-of-digital-advertising-a-closer-look-at-facebooks-marketing-algorithms-

5   2/#_ednref5. Facebook seeks to weaponize the CDA as a tool for blanket immunity from suit; its

6   distortion of both the CDA and Plaintiffs' allegations should be rejected. It deliberately ignores its role

7   in the creation of its Ad Platform used by housing advertisers. Its Ad Platform tools of Exclude People

8   and Include People, which contain dropdown boxes allowing the inclusion or exclusion of users in

9   protected classes, constitute content creation. It is not simply a passive host for ads. It plays an active and

10  key role in targeting third party ads based upon its sophisticated marketing algorithms. (TAC ¶¶ 14-24).

11       Facebook is not shielded by the CDA because Plaintiffs' TAC alleges that Facebook "materially

12  contributes" to the management of the advertising content on its platform. *Fair Hous. Counsel of San*

13  *Fernando Valley v. Roommates.com LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008). Contrary to Facebook's

14  arguments, Sec. 230 does not provide sanctuary from Plaintiffs' claims. Its argument that it is immune

15  because the housing advertiser, and not Facebook, decides which categories of users to include or exclude

16  from ads is specious: "The CDA does not grant immunity for inducing third parties to express illegal

17  preferences." *Roommates.com LLC*, 521 F.3d at 1165. Facebook and the advertiser are co-developers of

18  each targeted ad because "the fact that [advertisers] are information content providers does not preclude

19  [Facebook] from also being an information content provider by helping 'develop' at least 'in part' the

20  [unlawful content]." *Id.* To hold otherwise and consider Facebook responsible "only [for] content that

21  originates entirely with the website...ignores the words 'development . . . in part' in the statutory

22  passage." *Id.* at 1167. The dropdown menus and other tools in Facebook's Ad Platform are themselves

23  content (in that they are material existing on the internet); Facebook *alone* developed, and is therefore

24  responsible for, the composition of these tools. Facebook's "own acts—posting the questionnaire and

25  requiring answers to it—are entirely its doing and thus section 230 of the CDA does not apply to [those

26  acts]." *Id.* at 1165.

27

28

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The CDA was implemented to promote the continued development of the internet by providing civil immunity to internet users and content creators under certain circumstances. 47 U.S.C. § 230(a), (b). The operative provision of Sec. 230 is subsection (c), which states, in its entirety:

(c) Protection for "Good Samaritan" blocking and screening of offensive material.

    (1) Treatment of publisher or speaker. No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

    (2) Civil liability. No provider or user of an interactive computer service shall be held liable on account of—

        (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

        (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1) [subparagraph (A)].

47 U.S.C. § 230(c). Sec. 230 provides two categories of immunity: 1) immunity for a provider or user of an "interactive computer service" for information provided by another "information content provider" and 2) immunity for providers and users of interactive computer services who restrict access to content "that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." *Id. Barnes v. Yahoo!, Inc.,* 570 F.3d 1096 (9th Cir. 2009) is the leading Ninth Circuit decision interpreting Sec. 230. Several recent published Ninth Circuit opinions rely upon the analysis from *Barnes* with minimal additional interpretation. *See*, *e.g., HomeAway.com v. City of Santa Monica,* 918 F.3d 676 (9th Cir. 2018); *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 849-54 (9th Cir. 2016). *Barnes* recognized that "subsection (c)(1) [of section 230] only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes*, 570 F.3d at 1100-01. Further, the cause of action at issue in a case does not determine whether

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

section 230 applies to a defendant. *Id.* at 1101-02. Rather, "what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Id.* at 1102. "To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Id.* "If it does, section 230(c)(1) precludes liability." *Id.*

Sec. 230 is "clear that neither this subsection nor any other declares a general immunity from liability deriving from third-party content." *Id.* at 1100. To provide broad immunity "every time a website uses data initially obtained from third parties would eviscerate [the CDA]." *Id.* at 1100. For the purposes of Sec. 230, "publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.* "Thus, a publisher reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it." *Id.* Section 230 provides key restrictions to its immunity provision to apply only to certain internet-based actors from certain kinds of lawsuits. The CDA does not protect online content that Facebook created, in whole or in part. *Roommates.com LLC*, 521 F.3d at 1162. Plaintiffs allege Facebook created in part the illegal advertising at issue in this case by "provid[ing] drop-down menus and search boxes to exclude or include (i.e., limit the audience of an ad exclusively to) people who share specified attributes." (TAC ¶ ¶ 54, 12, 16)

In *Roommates.com, LLC*, the Ninth Circuit addressed Sec. 230's application to FHA claims and whether a pre-made form renders a defendant an author or publisher. Defendant in *Roommates*, operated a website designed to match people renting spare rooms with people looking for a place to live. *Roommates.com, LLC*, 521 F.3d at 1161. Before subscribers to the defendant's website could search for listings, they were required to create profiles, requiring them to disclose their sex, sexual orientation, and whether they would bring children to a household. *Id.* They were also required to describe their preference in roommates based on sex, sexual orientation, and whether kids would be living there. *Id.* at 1161. The district court held defendant was immune under Sec. 230(c). *Id.* The Ninth Circuit reversed and found that Sec. 230(c) did not grant the defendant immunity. *Id.* In finding that Sec. 230 did not apply, *Roommates* noted that Congress "sought to spare interactive computer services this grim choice by allowing them to perform some editing on user-generated content without thereby becoming liable for

all defamatory or otherwise unlawful messages that they [did not] edit or delete. In other words, Congress sought to immunize the removal of user-generated content, *not the creation of content*." *Id.* at 1163. (emphasis added). The court also held that a company that develops a form to be filled out by a website's users can be liable under Sec. 230 because it is, at least in part, creating discriminatory content; that is the defendant was an "information content provider" under Sec. 230 because "Roommate created the questions and choice of answers, and designed its website registration process around them." *Id.* at 1164. "*The CDA does not grant immunity for inducing third parties to express illegal preferences.*" *Id.* at 1165. (emphasis added). "Roommate's own acts--posting the questionnaire and requiring answers to it--are entirely its doing and thus section 230 of the CDA does not apply to them." *Id.* Further, "the fact that users are information content providers does not preclude Roommate from also being an information content provider by helping 'develop' at least 'in part' the information in the profiles." *Id.* "[T]he part of the profile that is alleged to offend the [FHA] and state housing discrimination laws--the information about sex, family status, and sexual orientation--is provided by subscribers in response to Roommate's questions, which they cannot refuse to answer if they want to use defendant's services." *Id.* at 1166. Defendant required "subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information." *Id.* The court further stated that "[w]hen a business enterprise extracts [discriminatory] information from potential customers as a condition of accepting them as clients, it is no stretch to say that the enterprise is responsible, at least in part, for developing that information." *Id.* The court noted that "Roommate designed its search system so it would steer users based on the preferences and personal characteristics that Roommate itself forces subscribers to disclose." *Id.* Thus, "[i]f Roommate has no immunity for asking the discriminatory questions, as we concluded above…. it can certainly have no immunity for using the answers to the unlawful questions to limit who has access to housing." *Id.* To hold otherwise would be "no different from a real estate broker saying to a client: 'Sorry, sir, but I can't show you any listings on this block because you are [gay/female/black/a parent].'" *Id.* Thus, "[i]f such screening is prohibited when practiced in person or by telephone, we see no reason why Congress would have wanted to make it lawful to profit from it online." *Id.*

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Several courts within the Ninth Circuit have followed *Roommates.com*, *LLC* in finding that Sec. 230 immunity does not apply to causes of action based on wrongdoing where a website creates prompts to which a user responds. *Swift v. Zynga Game Network, Inc*., No. C 09-05443 SBA, 2010 U.S. Dist. LEXIS 117355, at *11-17 (N.D. Cal. Nov. 3, 2010); *Certain Approval Programs, LLC v. Xcentric Ventures, LLC*, No. CV08-1608-PHX-NVW, 2009 U.S. Dist. LEXIS 22318, at *3-7 (D. Ariz. Mar. 9, 2009).

*Roommates.com LLC* is dispositive here and eviscerates Facebook's arguments. Facebook's "work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanisms," in its advertising platform, as alleged in the TAC, disqualifies it from CDA immunity. *Id*. at 1172. Facebook's creation of a pre-made form for its advertisers to use to create ads is sufficient to remove it from the scope of Sec. 230. (TAC¶¶ 12, 16, 54). It created pre-made prompts for third party advertisers to use in placing ads on its platforms. It is impossible for a Facebook advertiser to place an ad on Facebook without using content that Facebook created. It gave housing advertisers tools that it created that enable and encourage them to unlawfully discriminate, by allowing them to include or exclude users based on their protected class status. It then used this pre-populated content to target ads using its Ad Platform's algorithms. Facebook's creation of these tools renders it a content creator exempting it from Sec. 230's protections because it created the discriminatory ads at least "in part." *See Roommates.com*, *LLC*, 521 F.3d at 1166-67. Facebook is not entitled to immunity under the CDA.

Facebook's reliance on *Force v. Facebook, Inc*., 934 F.3d 53 (2d Cir. 2019), *Pennie v. Twitter, Inc.,* 281 F. Supp. 3d 874 (N.D. Cal. 2017), and *Gonzalez v. Google, Inc.,* 282 F. Supp. 3d 1150 (N.D. Cal. 2017), is misplaced. In those cases, Facebook, Twitter, and Google, respectively, did not provide a menu of illegal content options, or steer the ads to designated customers. Both of those elements are present in the instant case and destroy Sec. 230 immunity. These decisions involve federal antiterrorism claims arising out of social media use associated with terrorist attacks by Hamas and ISIS. *Force* involved Facebook posts by Hamas that encouraged terrorist attacks in Israel that allegedly resulted in the deaths of the plaintiffs' decedents in that case when they were, in fact, attacked by terrorists and Hamas made celebratory posts on Facebook after the fact. *Force*, 934 F.3d at 58-59. Plaintiffs in *Pennie* alleged that they were injured in a mass shooting by a domestic terrorist who was radicalized by Hamas through

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1    Hamas's Twitter, Facebook, and YouTube content, which was entirely produced by Hamas. *Pennie*, 281

2    F. Supp 3d at 876-79. The decision in *Gonzalez* dealt with allegations that Google "knowingly provided

3    material support to ISIS" through its YouTube platform by hosting propaganda videos that allegedly lead

4    to the death of the plaintiff's decedent. *Gonzalez*, 282 F. Supp. 3d at 1153-56. These terrorism-related

5    cases are irrelevant to this FHA case because they do not involve allegations of discrimination that

6    implicate Facebook's unlawful advertising tools at issue in this case. These cases do not discuss

7    Facebook's pre-made dropdown menus at issue in this case. (TAC ¶¶ 54, 12, 16). The same is true of

8    *Goddard v. Google, Inc*., 640 F. Supp. 2d 1193 (N.D. Cal. 2009), which involves a Google keyword tool

9    that is distinguishable from Facebook's drop-down menus at issue here. Facebook's Ad Platform menus

10   are critical because, as discussed, they render it a creator, in part, of the discriminatory advertising,

11   thereby removing Facebook from the scope of section 230.

12       Facebook also relies upon *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119 (9th Cir. 2003), an

13   invasion of privacy case where the Ninth Circuit applied Sec. 230 immunity, recognizing that even

14   though defendant used a pre-populated questionnaire to obtain some information from plaintiff, it "did

15   not play a significant role in creating, developing, or 'transforming' the relevant information" *Carafano*,

16   339 F.3d at 1125, which contrasts with this case, where Facebook's pre-populated drop-down menus are

17   central to the creation of the discriminatory ads at issue.

18       Facebook is not entitled to Sec. 230 immunity as it is not a passive host for ads; rather, it played

19   an active and integral role in targeting third party ads based upon the content that it created for use in pre-

20   populated drop-down menus, which was then fed into its sophisticated marketing algorithms, resulting

21   in the creation of the discriminatory content and then targeting the housing ads in a discriminatory way.

22       **C. Plaintiffs Have Stated Claims Under the FHA.**

23           *1.  Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(c).*

24       Section 3604(c) of the FHA provides that it is unlawful "[t]o make, print, or publish, or cause to

25   be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental

26   of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion,

27   sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation,

28   or discrimination." 42 U.S.C. § 3604(c). The U.S. Department of Housing and Urban Development's

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1   ("HUD") regulations provide that these prohibitions "apply to all written or oral notices or statements by

2   a person engaged in the sale or rental of a dwelling." 24 C.F.R. 100.75(b). It states that notices and

3   statements subject to the requirements "include any applications, flyers, brochures, deeds, signs, banners,

4   posters, billboards, or any documents used with respect to the sale or rental of a dwelling." *Id. Prohibited*

5   *statements include discriminatory statements "[e]xpress[ed] to agents, brokers, employees, prospective*

6   *sellers or renters or any other persons*." 24 C.F.R. 100.75(c)(2). (emphasis added). To determine whether

7   a statement violates section 3604(c), courts ask whether it "would suggest a preference to an ordinary

8   reader or listener." *Johnson v. Macy*, 145 F. Supp. 3d 907, 916 (C.D. Cal. 2015) (citation and quotation

9   marks omitted). "Intent is not a necessary element of a § 3604(c) violation." *Iniestra v. Cliff Warren*

10  *Invs., Inc.*, 886 F. Supp. 2d 1161, 1169 (C.D. Cal. 2012). A plaintiff in a section 3604(c) case based on

11  an alleged illegal statement, must allege that (1) the defendant made the statement; (2) the statement was

12  made with respect to the rental of a dwelling; and (3) the statement indicated a preference, limitation, or

13  discrimination on a prohibited basis. *See Elliott v. Versa CIC, L.P.*, No. 16-cv-0288-BAS-AGS, 2019

14  U.S. Dist. LEXIS 16744, at *18 (S.D. Cal. Feb. 1, 2019) (citing *White v. HUD*, 475 F.3d 898, 904 (7th

15  Cir. 2007)). A claim under § 3604(c) may be established when (a) an ad communicates in an obvious and

16  undeniable way a discriminatory preference; or (b) the ad is rendered discriminatory through the proof

17  of extrinsic circumstances demonstrating discriminatory intent. *Housing Opportunities Made Equal v.*

18  *Cincinnati Enquirer*, 731 F. Supp. 801, 804 (S.D. Ohio, 1990), aff'd 943 F.2d 644 (6th Cir. 1991).

19  Violations of § 3604(c) in advertising can be proven by looking at the "totality of the evidence." *Id.* At

20  least one court has recognized that "[o]f course, a publisher also remains liable for publishing

21  advertisements which are discriminatory on their face or with the intent to discriminate." *Id.* at 648, n.4.

22         Facebook argues that the alleged ads at issue are not discriminatory because they do not violate

23  section 3604(c) on their faces. HUD and at least one court have recognized that the way an ad is

24  "targeted" may run afoul of section 3604(c). HUD's regulations interpreting § 3604(c) state that

25  "[s]electing media or locations for advertising the sale or rental of dwellings which deny particular

26  segments of the housing market information about housing opportunities because of race, color, religion,

27  sex, handicap, familial status, or national origin" is discriminatory advertising. 24 C.F.R. § 100.75. Based

28  on this regulation, the Western District of Tennessee held that an "allegation that Defendant only

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

advertised in Spanish language media outlets is sufficient to state a claim" under section 3604(c) because it meets HUD's "definition of discriminatory advertisement in that it denies non-Spanish speaking segments of the housing market, who are overwhelmingly non-Hispanic, information about housing opportunities." *Guevara v. UMH Props.*, No. 2:11-cv-2339-SHL-tmp, 2014 U.S. Dist. LEXIS 154394, at * 15-16 (W.D. Tenn. Oct. 29, 2014). Facebook is also liable under section 3604(c) because it played a fundamental role in creating discriminatory ads that excluded protected classes from receiving housing ads. Because of its creation of its Ad Platform that facilitates and encourages discriminatory ads by creating and making pre-populated forms available to its advertisers, Facebook repeatedly violated section 3604(c) notwithstanding that the ads that it created on behalf of third parties may or may not have been facially neutral. *See id.*; *see also* (TAC ¶¶ 12, 16, 54). Facebook's conduct is *precisely* what HUD challenged when it brought a charge of discrimination against Facebook based on its Ad Platform. (TAC ¶ 25 & Ex. 1). Because the Ad Platform expressed a preference based on prohibited classes, Plaintiffs' TAC states a claim under section 3604(c). *See Elliott,* 2019 U.S. Dist. LEXIS 16744, at *18; *see also Housing Opportunities Made Equal*, 731 F. Supp. at 804. Facebook's recognition of its FHA liability and its claimed cessation of misconduct does not immunize it from damages and injunctive relief.

### *2. Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(a).*

Facebook is also liable under FHA's section 3604(a) because it hosted and provided advertising tools that made housing unavailable to members of protected classes. It is illegal "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Plaintiffs alleged a claim under the FHA's plain language. "Unavailable" is defined as "not obtainable or accessible." Unavailable, Merriam-Webster, https://www.dictionary.com/browse/unavailable (last visited Apr. 26, 2021). Facebook's maintenance of its discriminatory Ad Platform allowing advertisers to exclude members of protected classes from the audiences of ads, it made housing unavailable in violation of section 3604(a) because that housing could not have been available to people who did not know that it was for sale or rent. (TAC ¶¶ 203-207). HUD alleged that Facebook violated section 3604(a) based on these facts. (TAC ¶ 25 & Ex. 1). Plaintiffs have

1    stated a claim under the plain language of section 3604(a) based on Facebook's maintenance of its Ad

2    Platform that allowed advertisers to unlawfully discriminate against users in protected classes.

3                    **3.   Plaintiffs Have Stated a Claim Under 42 U.S.C. § 3604(d).**

4         Facebook is liable under FHA section 3604(d) because it represented to users who are members

5    of protected classes that housing is not available to them even though it is. It is unlawful "[t]o represent

6    to any person because of race, color, religion, sex, handicap, familial status, or national origin that any

7    dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 42

8    U.S.C. § 3604(d). HUD's regulations provide that it is a violation of this section to "[l]imit[] information,

9    by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because

10   of [protected characteristics]." 24 C.F.R. § 100.80(b)(4). By maintaining its Ad Platform, Facebook is

11   representing to its users that housing is not available to them when it is, in fact, available. HUD alleged

12   that Facebook violated subsection (d) when it brought its charge of discrimination against it based on

13   similar facts as those alleged in this case. (TAC ¶ 25 & Ex. 1.) Because Facebook maintained a platform

14   that is capable of preventing its users, who are members of protected classes from receiving information

15   about housing that is available to other users, its conduct violated FHA section 3604(d). Plaintiffs have

16   stated a claim under 42 U.S.C. § 3606.

17        Plaintiffs have also stated claims under 42 U.S.C. § 3606 because its denial of access to Plaintiffs

18   to ads based on race, color, religion, sex, handicap, familial status, or national origin is prohibited. It is

19   illegal "to deny any person access to or membership or participation in any multiple-listing service, real

20   estate brokers' organization or other service, organization, or facility relating to the business of selling

21   or renting dwellings, or to discriminate against him in the terms or conditions of such access,

22   membership, or participation, on account of race, color, religion, sex, handicap, familial status, or national

23   origin." 42 U.S.C. § 3606. Facebook violated this section by creating and providing its Ad Platform that

24   prevents Plaintiffs from viewing housing ads based on race, color, religion, sex, handicap, familial status,

25   or national origin. Its actions denied Plaintiffs' participation in a service relating to the business of selling

26   or renting dwellings and discriminated against them in the terms and conditions of their access to housing.

27   (TAC ¶¶ 12, 16, 54). Accordingly, Plaintiffs have stated a claim under 42 U.S.C. § 3606.

28

1

**D.  The California Plaintiffs Sufficiently Pled Unruh Act Claims.**

2

Facebook *intentionally* designed and implemented a segregated market by enabling targeted

3

advertising, and *intentionally* enabled these discriminatory capabilities for *housing* ads, specifically.

4

Facebook rests its argument primarily on the interpretation of the Unruh Act from the California Supreme

5

Court in *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824 (2005). However, *Koebke* concerned

6

the application of "spousal benefits" at a country club, and the analysis upon which Facebook relies

7

merely rejected the premise that by restricting those benefits to lawfully married couples in a state where

8

same-sex marriage was prohibited, the policy was facially and intentionally discriminatory. *Id.* at 853-

9

54. *Koebke* reviewed a *summary judgment* ruling and ultimately concluded that, in light of evidence that

10

the country club "did not apply its facially neutral policy in an impartial manner," the matter should be

11

remanded for further proceedings. *Id. Koebke* does not control the outcome here and if anything, it

12

highlights the distinction between facially discriminatory policies (such as Facebook's implementation

13

of a segregated market) and viable "as-applied" challenges.

14

Facebook's motion lacks any serious consideration of the California Supreme Court's decision in

15

*White v. Square, Inc.*, 7 Cal. 5th 1019 (2019). Although Facebook cites *White* in support of the proposition

16

that to establish standing there must be a concrete injury (*see* Mot. at 7:1-4), it disregards the holding of

17

the decision entirely. *White* involved "a plaintiff who neither paid a fee nor requested equal treatment

18

before leaving the business establishment—in this case, a website, not a brick-and-mortar vendor." *Id.*

19

at 1027. Plaintiff contended that his interaction was "analogous to a plaintiff who intends to patronize a

20

brick-and-mortar shop but, upon his attempted entry, sees a sign indicating that the business does not

21

offer services to individuals based on a protected category of which he is a member." *White* held "that a

22

person who visits a business's website with intent to use its services and encounters terms or conditions

23

that exclude the person from *full and equal access to its services* has standing under the Unruh Civil

24

Rights Act, with no further requirement that the person enter into an agreement or transaction with the

25

business." *Id.* at 1032-33. Compounding Facebook's specious fiction that it did not "intend" to build

26

these discriminatory capabilities into its market, it argues that there is nothing "malicious, hostile, or

27

damaging" about unlawfully discriminating against members of protected classes in providing access to

28

a housing market. Relying on an incoherent "slippery-slope" argument, Facebook suggests that if it can

be held liable for intentional *housing* discrimination, then it can be held liable for targeted advertising *generally*. The argument is frivolous. There are no state or federal laws mandating equal access to ads for hair care products, clothing, or most of the various commercial products available for purchase in this country. But for good reason, such laws *do* exist regarding housing ads. Facebook's facetious authority confirms the proposition: *Morsa v. Facebook, Inc.*, 77 F. Supp. 3d 1007 (C.D. Cal. 2014), *aff'd*, 622 F. App'x 915 (Fed. Cir. 2015), concerned a challenge regarding a *patent* for a form of targeted advertising, *see id.* at 1013-14 (concluding only, broadly, that the notions of "targeting advertisements to certain consumers" and "using a bidding system to determine when and how advertisements will be displayed" are both "'fundamental, long-standing, well-known concepts'").

### E. The California Plaintiffs Properly Allege a Claim under UCL Sections 17200 *et seq.*

Plaintiffs properly pled claims under California's Unfair Competition Law ("UCL"), Business & Professions Code Section 17200, which prohibits any "unlawful, unfair or fraudulent business act or practice." Facebook's violations of the FHA and the Unruh Act are predicate "unlawful" acts or practices that render Plaintiffs' UCL claims viable. *See Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994) ("The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made."). Moreover, because its actions in creating a segregated market for housing ads contravene public policy and can be categorized as immoral, oppressive, or unscrupulous, Plaintiffs have also alleged a claim under the 'unfair' prong of the UCL. *See Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 758-59 (N.D. Cal. 2019). Facebook's contention that it is simply a passive actor and that it is advertisers who are the ones who engaged in wrongful conduct cannot be resolved at the pleadings stage. It also contends that the UCL claim fails because Plaintiffs assert an improper unjust enrichment theory in that it does not charge a fee to become a user. (Opp. at 29). But, as the California Supreme Court held *in Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 337 (2011), even if Plaintiffs are not eligible for restitution under the UCL, they still have standing to sue for injunctive relief. Further, if Plaintiffs did not pay Facebook directly to use it, Facebook clearly makes money by harvesting the data from its users. Plaintiffs should be given the opportunity to establish that at least some of its profits were attributable to their being victims of discriminatory advertising practices and therefore eligible for restitution. *In re Google Android*

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*Consumer Priv. Litig.*, No. 19-cv-04286-BLF, 2014 WL 988889, at *7 (N.D. Cal. Mar. 10, 2014) ("Although Plaintiffs do not allege facts that show they paid money directly to Google, the Court cannot conclude that Plaintiffs might not be able to show an ownership interest in at least some of Google's profits."); Robert J. Shapiro, What Your Data Is Really Worth to Facebook and Why You Deserve a Cut; WASHINGTON MONTHLY (July/August 2019), https://washingtonmonthly.com/magazine/july-august-2019/what-your-data-is-really-worth-to-facebook/. Accordingly, the California Plaintiffs have properly alleged a claim under the UCL.

### F.  The New York Plaintiffs Are Not Bound By The Facebook Terms of Service

Facebook summarily states that the New York Plaintiffs fail to state a claim because their relationship with it is governed by a California choice of law clause. But it ignores applicable law holding that no contract is formed "when the writing does not appear to be a contract and the terms are not called to the attention of the recipient. In such a case, no contract is formed with respect to the undisclosed term." *Knutson v. Sirius XM Radio Inc.,* 771 F.3d 559, 567 (9th Cir. 2014) (additional citations omitted). "'While new commerce on the internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.'" *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). Because conspicuous hyperlinks are an indispensable element of notice in online contracts under California law, *see id.* at 1177, Facebook's efforts to conceal the hyperlink foreclose enforcement of the California choice of law clause buried in its Terms of Service.  Here, the New York Plaintiffs have not alleged that they reviewed (much less assented to) Facebook's terms when they registered their accounts. Plaintiffs are not bound by the California choice of law clause, and Facebook's motion to dismiss Plaintiffs' New York claims should be denied.

//

//

1    Facebook required, for example, that Vargas and Skipper create an account by clicking "Sign

2   Up." The Sign-up/log-in page contains many graphics and various boxes, but the terms of use and the

3   privacy policy are in the smallest font at the bottom of a very busy page:



12   Declaration of Nicholas Wong. (Dkt. 94, p. 2). Vargas and Skipper were not on reasonable notice of the

13   terms and conditions because it was inconspicuous, the hyperlink was in small type, not underlined or

14   italicized, or in any way visually distinct from the surrounding text. Courts have found more conspicuous

15   hyperlinks to be legally deficient. *Colgate,* 402 F. Supp. 3d at 765 (JUUL's hyperlink was not highlighted,

16   underlined, in all caps, or in a separate box and therefore failed to put a reasonable user on notice); *Wilson*

17   *v. Redbox Automated Retail, LLC,* 448 F. Supp. 3d 873, 885 (N.D. Ill. 2020) ("Redbox's failure to add

18   some additional distinguishing characteristic to the Terms of Use hyperlink is particularly glaring here,

19   given that the Sign In page includes two other hyperlinks formatted differently from the Terms of Use

20   hyperlink."); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62-63 (1st Cir. 2018) (gray rectangular box

21   with the language "Terms of Service & Privacy Policy" displayed in a larger font, in bold, contrasting in

22   color, and highlighted by the box around it was not reasonably conspicuous); *Applebaum v. Lyft, Inc.*,

23   263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (hyperlink in the smallest font on the screen but colored in

24   light blue on a white background insufficient to provide notice); *Wilson v. Redbox Automated Retail,*

25   *LLC*, 448 F. Supp. 3d 873, 884 (N.D. Ill. 2020) (Terms of Use not clearly and conspicuously displayed

26   and thus, failed to provide constructive notice).

27

28

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiffs Richards and Spencer were presented with the following screen when they signed up for Facebook:

English (US)   Esp

Facebook © 2009

Declaration of Nicholas Wong. (Dkt. 94, p. 3, p. 5). This version of the Facebook sign-up screen does not even use the phrase "Terms of Service." The phrase "Terms" is buried at the bottom of the screen, in the smallest font on the screen between "Careers" and "Blogs." "Terms" is not near the sign-up button nor is it bold, underlined, or otherwise distinguished from the other dozen small buttons nearby. Richards and Spencer were not put on reasonable notice of the Terms of Service. *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019) ("[T]he onus must be on website owners to put users on notice of the terms by which they wish to bind consumers.") (citing *Nguyen*, 763 F.3d at 1179).

Here, the inconspicuousness of Facebook's Terms hyperlink, both on its own and within the context of the Facebook Sign-in general design, thus forecloses the enforcement of the Terms of Service. Facebooks' motion to dismiss Plaintiffs' New York claims should be denied.

## G. <u>Plaintiffs' New York Claims Are Well Pled.</u>

### 1. *N.Y. Exec. Law § 296(5) includes Agent Liability.*

N.Y. Exec. Law § 296(5) includes agent liability: "the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right to sell, rent or lease a housing accommodation, constructed or to be constructed, or any agent or employee thereof." Plaintiffs pled that Facebook created, implemented, and/or maintained a pre-populated list of demographics, behaviors, and interests that allowed real estate brokers, real estate agents, and landlords to exclude certain buyers or renters from ever seeing their ads for housing. (TAC ¶¶ 1-19). By enabling and actively participating in digital

redlining, Facebook violated the FHA and New York statutes prohibiting such discrimination.[10] It used its demographics data to target ads and to permit housing advertisers to create, publish, circulate, utilize, target, and/or send ads to certain groups of Facebook users on a digital platform which is no different from the historical practice of banks and real estate agents steering minorities away from predominately white neighborhoods.

The Supreme Court held that "an action brought for compensation by a victim of housing discrimination is, in effect, a tort action." *Meyer v. Holley*, 537 U.S. 280, 285 (2003) (applying the law of agency to determine whether owner was vicariously liable for discriminatory conduct of broker under FHA); *see also, e.g.*, *Arnal v. Aspen View Condo. Ass'n., Inc.*, 245 F. Supp. 3d 1261, 1267 (D. Colo. 2017) (confirming that the law of agency applies to FHA actions). Further, "[a]n agent who did an act that was otherwise a tort [is] not relieved from liability by the fact that he acted at the command of the principal or on account of the principal." *Arnal,* 245 F. Supp. 3d at 1267 (citing Restatement (Second) of Agency § 411 (1958)). An agent who acts on the instructions of the principal may be held liable as a joint tortfeasor. *Id.*; *Willborn v. Sabbia*, No. 10 C 5382, 2011 WL 1900455, at *4 (N.D. Ill. May 19, 2011) (denying real estate agent's motion to dismiss an FHA claim on the basis that he merely conveyed to the plaintiffs the owner's decision not to sell to them because they were African American).  Plaintiffs have properly pled a claim under the N.Y. Exec. Law § 290 *et seq.* and Defendant's motion should be denied.

### 2.   Facebook Is Liable for Aiding and Abetting Under N.Y. Exec. Law § 296(6).

Section 296(6)[11] specifies that "It shall be an unlawful discriminatory practice for *any person* to aid [or] abet . . . the doing of any of the acts forbidden under this chapter, or to attempt to do so." This provision provides a "broad[ ] source of personal liability." *Perks v. Town of Huntington,* 251 F. Supp. 2d 1143, 1160 (E.D.N.Y. 2003). Contrary to Facebook's assertions, it is not shielded from aiding and abetting liability. Plaintiffs have adequately alleged primary violations of N.Y. Exec. Law § 296(6) under

---

[10] Claims of discrimination under § 296 of the New York Human Rights Law are analyzed under the same framework used in FHA cases. *Stalker v. Stewart Tenants Corp.*, 940 N.Y.S.2d 600, 602-03 (1st Dep't. 2012).

[11] Section 296(6) also applies to out-of-state defendants and states, "The provisions of this article shall apply as hereinafter provided to an act committed outside this state against a resident of this state . . . if such act would constitute an unlawful discriminatory practice if committed within this state" (Executive Law § 298–a [1]). The extraterritoriality provision "protects New York residents . . . from discriminatory acts committed outside the state" (*Hoffman v. Parade Publs.,*15 N.Y.3d 285, 292,744 (2010).

1  agency law and under the FHA. The New York Court of Appeals held that § 296(6)'s use of the "any

2  person" language should be "construed broadly." *Griffin v. Sirva, Inc*., 76 N.E.3d 1063, 1070 (2017); *see*

3  *also Francis v. Kings Park Manor*, 944 F.3d 370 (2d Cir. 2019), *en banc review granted*, 949 F.3d 67

4  (2d Cir. Feb. 3, 2020) (reinstating FHA and N.Y. claims under § 296(5) and § 296(6)).

5     Here, Facebook's statements against discrimination are illusory. Plaintiffs have alleged facts that

6  show that Facebook knowingly and intentionally prevented ads from reaching users in protected classes,

7  like Plaintiffs, and steered ad content away from users who did not match certain protected class

8  characteristics such as "African American (U.S.)," "Asian American (U.S.)," "Immigrant," "Hispanic

9  U.S.–English dominant." (TAC ¶ 17). Plaintiffs' TAC clearly alleges discriminatory intent and brings

10  Facebook within the ambit of N.Y Exec. Law § 296(6). Defendant's motion should be denied.

11     **H.  In the Alternative, California Law Is Contrary to Fundamental New York Policy**

12     California recognizes that "with respect to regulating or affecting conduct within its borders, the

13  place of the wrong has the predominant interest." *See Hernandez v. Burger,* 102 Cal.App.3d 795,

14  802, (1980), *cited with approval by Abogados v. AT & T, Inc.*, 223 F.3d 932, 935 (9th Cir. 2000).

15  California considers the "place of the wrong" to be the state where the last event necessary to make the

16  actor liable occurred. *See McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 94, 225 P.3d 516, 531 (2010)

17  "Here, the last events necessary for liability as to the foreign class members—communication of the

18  advertisements to the claimants and their reliance thereon in []—took place in [New York], not in

19  California." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012). Thus, New York has a

20  strong interest in the application of its laws to the transactions between its citizens and corporations like

21  Facebook. *Id.* at 594.

22     **I.  In the Alternative, to the Extent the Court Requires Further Factual Detail to Evaluate**

23         **Standing, the Court Should Permit Jurisdictional Discovery.**

24     Plaintiffs' position is that the TAC's allegations readily establish Article III standing. Under well-

25  established Ninth Circuit jurisprudence, "*general* allegations of injury can suffice at the pleading stage,"

26  and the requirement of setting forth "specific facts" only applies at the summary judgment stage.

27  *Braunstein v. Arizona Dep't of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012) (emphasis added; citation

28  omitted); *see also, e.g.*, *In re First Am. Corp. ERISA Litig.*, 258 F.R.D. 610, 617 (C.D. Cal. 2009)

1   ("[B]ecause substantial merits-based discovery has yet to begin, the Plan Participants may show standing

2   through the allegations in their consolidated complaint.") (footnote omitted).

3        Nonetheless, Plaintiffs respectfully request that—to the extent the Court requires greater detail in

4   allegations regarding advertisements and similar matters, all of which are *only* accessible to Facebook's

5   massive servers—the Court permit limited discovery on the pertinent issues.  *See Moss v. Infinity Ins.*

6   *Co.*, No. 15-CV-03456-JSC, 2016 WL 7178559, at *4 (N.D. Cal. Dec. 9, 2016) ("Discovery is *necessary*

7   in connection with a factual attack on subject matter jurisdiction 'if it is possible that the plaintiff can

8   demonstrate the requisite jurisdictional facts if afforded that opportunity.'") (quoting *St. Clair v. City of*

9   *Chico*, 880 F.2d 199, 201 (9th Cir. 1989)) (emphasis added).

10       Indeed, it is well established that the issue of Article III standing is "best resolved on a sworn

11  evidentiary record rather than on the pleadings." *Backus v. Conagra Foods, Inc.*, No. C 16-00454 WHA,

12  2016 WL 3844331, at *7 (N.D. Cal. July 15, 2016); *cf. Friery v. Los Angeles Unified Sch. Dist.*, 448 F.3d

13  1146, 1147 (9th Cir. 2006) ("Because we conclude that the record is insufficiently developed to determine

14  whether there is Article III standing, we remand to the district court for the limited purpose of finding

15  facts and making a determination of the plaintiff's standing."); *see also Wells Fargo & Co. v. Wells Fargo*

16  *Exp. Co.*, 556 F.2d 406, 430 (9th Cir. 1977) ("[I]t is clear that a court may allow discovery to aid in

17  determining whether it has in personam or subject matter jurisdiction.").

18                    **IV.   <u>CONCLUSION</u>**

19       For the foregoing reasons, Plaintiffs request that this Court deny Defendant's Motion to Dismiss

20  Plaintiffs' Third Amended Complaint.

21                              Respectfully Submitted,

22  Dated: April 30, 2021       **MANTESE HONIGMAN, P.C.**

23                              **HERTZ SCHRAM PC**

                                **SCHONBRUN SEPLOW HARRIS**
24                              **HOFFMAN & ZELDES LLP**

25

26                          By: */s/ Gerard V. Mantese*
                                Gerard V. Mantese
27                              *Attorney for Plaintiffs/Proposed Class Members.*

28