ROSEMARIE T. RING (State Bar No. 220769)
rose.ring@mto.com
MARIANNA MAO (State Bar No. 318070)
marianna.mao@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

JORDAN D. SEGALL (State Bar No. 281102)
jordan.segall@mto.com
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:     (213) 683-9208
Facsimile:     (213) 687-3702

*Attorneys for Defendant, Facebook, Inc*

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| ROSEMARIE VARGAS, KISHA SKIPPER, JAZMINE SPENCER, DEILLO RICHARDS, JENNY LIN, and JESSICA TSAI on behalf of themselves individually, and on behalf of all others similarly situated,, <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC., <br><br> Defendant. | Case No. 19-cv-05081-WHO <br><br> **DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT** <br><br> Judge:   Hon. William H. Orrick <br> Date:    June 9, 2021 <br> Time:    2:00 p.m. <br> Crtrm:   2 – 17th Floor |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................1

II.   ARGUMENT ......................................................................................................3

A.    Plaintiffs Fail To Establish Article III and Statutory Standing ..................3

1.    Plaintiffs Do Not Allege Any Injury in Fact ...................................3

(a)    Plaintiffs Do Not Allege Any Particularized Injury ..........4

(b)    Plaintiffs Do Not Allege Any Concrete Injury..................6

2.    Plaintiffs Do Not Allege Any Injury Traceable To Facebook .......7

B.    Plaintiffs' Claims Are Barred By Section 230 of the CDA ........................7

1.    Plaintiffs' Claims Treat Facebook as a Publisher or Speaker .......8

2.    Facebook Is Not A Creator Or Developer of Allegedly Discriminatory Housing Ads Created By Third-Party Advertisers...............9

C.    Plaintiffs Fail to State a Fair Housing Act Claim......................................12

1.    Plaintiffs Do Not Allege that Facebook Published Any Housing Ad "Indicating" An Unlawful Preference Under § 3604(c)...............12

2.    Facebook Does Not Make Housing "Unavailable" Under § 3604(a) .........14

3.    Facebook Does Not Represent Housing is Unavailable Under § 3604(d) ..................14

4.    Facebook Is Not a Housing Service Subject to § 3606 ................14

D.    The California Plaintiffs Do Not State Any Claim Under California Law ..............15

1.    Plaintiffs Fail To State A Claim Under The Unruh Act...............15

2.    Plaintiffs Fail To State A Claim Under The UCL........................15

E.    The New York Plaintiffs Fail To State Any Claim Under New York Law ............16

1.    Plaintiffs Agreed That California Law Would Apply ..................16

2.    Plaintiffs Fail To State Any Claim Under the NYSHRL ............16

F.    Jurisdictional Discovery Is Neither Necessary Nor Appropriate .............17

III.  CONCLUSION ................................................................................................17

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page**

**FEDERAL CASES**

3

4
*Bank of Am. Corp. v. City of Miami, Fla.*,
    137 S. Ct. 1296 (2017) ...............................................................................................6

5
*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ................................................................................8, 9

6

7
*Bradley v. T-Mobile*,
    2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ....................................................2, 4, 6

8

9
*Braunstein v. Ariz. Dep't of Transp.*,
    683 F.3d 1177 (9th Cir. 2012) .................................................................................17

10

11
*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) ..............................................................................9, 10

12
*Carroll v. Nakatani*,
    342 F.3d 934 (9th Cir. 2003) .................................................................................5, 6

13

14
*Doe One v. CVS Pharmacy, Inc.*,
    348 F. Supp. 3d 967 (N.D. Cal. 2018) .....................................................................15

15

16
*Dyroff v. Ultimate Software Grp., Inc.*,
    2017 WL 5665670 (N.D. Cal. Nov. 26, 2017) ...........................................................9

17
*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ..............................................................................9, 10

18

19
*In re Facebook Biometric Info. Privacy Litig.*,
    185 F. Supp. 3d 1155 (N.D. Cal. 2016) ...................................................................16

20

21
*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008)...................................................................8, 10, 11, 12

22
*Fair Hous. of Marin v. Combs*,
    285 F.3d 899 (9th Cir. 2002)......................................................................................2

23

24
*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal. 2016) .....................................................................9

25
*Gladstone Realtors v. Village of Bellwood*,
    441 U.S. 91 (1979) .....................................................................................................6

26

27
*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) .....................................................................9

28

## <u>TABLE OF AUTHORITIES</u>
### (Continued)

**Page**

*Gonzalez v. Google, Inc.*,
  2017 WL 4773366 (N.D. Cal. October 23, 2017) ....................................................8, 9

*Guevara v. UMH Props., Inc.*,
  2014 WL 5488918 (W.D. Tenn. Oct. 29, 2014) .........................................................13

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .................................................................................................6, 7

*Housing Opportunities Made Equal v. Cincinnati Enquirer*,
  731 F. Supp. 801 (S.D. Ohio 1990) .....................................................................12, 13

*Housing Opportunities Made Equal v. Cincinnati Enquirer*,
  943 F.2d 644 (6th Cir. 1991) ....................................................................................13

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .................................................................................................3, 6

*Miami Prod. & Chem. Co. v. Olin Corp.*,
  449 F. Supp. 3d 136 (W.D.N.Y. 2020) ......................................................................17

*Mobley v. Facebook, Inc.*,
  No. 16-cv-06440 (N.D. Cal. Apr. 7, 2017) ..................................................................8

*Opiotennione v. Facebook, Inc.*,
  2020 WL 5877667 (N.D. Cal. Oct. 2, 2020) ................................................2, 4, 6, 14

*S.F. Baykeeper v. W. Bay Sanitary Dist.*,
  791 F. Supp. 2d 719 (N.D. Cal. 2011) .........................................................................7

*Saunders v. Gen. Servs. Corp.*,
  659 F. Supp. 1042 (E.D. Va. 1987) ......................................................................12, 13

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ................................................................................................3

*Trafficante v. Metro. Life Ins. Co.*,
  409 U.S. 205 (1972) .................................................................................................6, 7

*Williams v. Twin Rivers Unified Sch. Dist.*,
  2018 WL 4735734 (E.D. Cal. Sept. 28, 2018) ..........................................................15

**STATE CASES**

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ............................................................................................16

# TABLE OF AUTHORITIES
### (Continued)

**Page**

**FEDERAL STATUTES**

42 U.S.C. § 3601 ...............................................................................................1, 2, 3

42 U.S.C. § 3604(a) ..................................................................................................3, 14

42 U.S.C. § 3604(c) ........................................................................................... 3, *passim*

42 U.S.C. § 3604(d) ....................................................................................................3, 14

42 U.S.C. § 3606 .......................................................................................................3, 14, 15

47 U.S.C. § 230 ................................................................................................... 2, *passim*

**STATE STATUTES**

Cal. Civ. Code § 51.5 .................................................................................................3, 15, 16

**FEDERAL REGULATIONS**

24 C.F.R. § 100.75 ......................................................................................................13

54 Fed. Reg. 3232-01 .................................................................................................14

DEFENDANT'S REPLY ISO MOTION TO DISMISS THIRD AMENDED COMPLAINT

1   I.      **INTRODUCTION**

2          Plaintiffs' opposition confirms that they do not, and cannot, state any claim against Facebook

3   based on tools that Plaintiffs assert, without factual support, were used by third-party advertisers to

4   target housing ads in allegedly discriminatory ways.  Despite being on their Third Amended

5   Complaint ("TAC"), Plaintiffs still have not identified a single housing ad that any advertiser

6   targeted in an allegedly discriminatory way, let alone one that Plaintiffs would have been interested

7   in, qualified to rent or buy, and pursued but did not receive because of such targeting—in direct

8   contravention of this Court's order dismissing Plaintiffs' prior complaint.  And Plaintiffs admit that

9   Facebook has always prohibited discriminatory targeting and that any such targeting by advertisers

10  has not been possible for nearly two years because the tools were removed.  In other words,

11  Plaintiffs' claims are based on tools that no longer exist and that Plaintiffs do not allege any facts

12  showing they were ever used to target housing ads in allegedly discriminatory ways, let alone in

13  ways that affected Plaintiffs, which alone requires dismissal of their claims.

14         Plaintiffs' theory of liability also fails as a matter of law.  According to Plaintiffs, because

15  advertisers may have used the tools to select target audiences for housing ads on Facebook that

16  include or exclude users in protected classes, by publishing those ads, Facebook indicated unlawful

17  preferences and made housing unavailable to users who were not in those target audiences in

18  violation of the federal Fair Housing Act ("FHA") and "analogous" California and New York law.

19  No court has accepted this theory of liability, and for good reason.  It assumes that any time

20  advertising media publishes a housing ad that does not reach *every* person in *all* protected classes,

21  the publisher is indicating an unlawful preference and making the housing "unavailable" to people

22  who do not receive it.  Even assuming that not receiving a housing ad can make housing unavailable,

23  which it cannot, advertisers use many types of advertising media to reach people, including Zillow,

24  Redfin, and Apartments.com, to name just a few, which means that only the *advertisers* know

25  whether their media selections indicate an unlawful preference.  Imposing liability on Facebook for

26  those selections would mean that, to avoid future liability, publishers would have to confirm with

27  advertisers that their overall campaigns reach people in all protected classes before agreeing to

28  publish housing ads.  Plaintiffs' claims should be dismissed on multiple, independent grounds.

*First*, Plaintiffs fail to demonstrate Article III standing.  Plaintiffs continue to allege, without factual support, that advertisers used tools on Facebook's ad platform to target housing ads in allegedly discriminatory ways, and Facebook published those ads.  TAC ¶¶ 6, 7.  But Plaintiffs have not identified a single housing ad for which that allegation is true, let alone one that they would have been interested in, qualified to rent or buy, and pursued but did not receive because of such targeting, which this Court and two other courts in this District agree is required to establish Article III injury in cases challenging the audience selection tools at issue here.  *See* ECF No. 86 ("Order") at 3; *Opiotennione v. Facebook, Inc.*, 2020 WL 5877667 (N.D. Cal. Oct. 2, 2020); *Bradley v. T-Mobile*, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020).  Here, as in the SAC, there are *still* "only allegations that plaintiffs could *theoretically* have been injured *if* housing advertisers in fact used the targeted-ad tools to exclude users with *plaintiffs'* characteristics from ads that *might* have been within plaintiffs' spheres of interest and ability."  Order at 8 (emphasis added).  Such "facially speculative allegations of injury," *id.*, are not rendered plausible by Plaintiffs' allegations that they could not locate suitable housing on Marketplace when searching, for example, for a three-bedroom apartment in lower Manhattan renting for less than $1,700 a month.  Plaintiffs also do not, and cannot, allege any injury caused *by Facebook*, as they admit that any allegedly discriminatory targeting is *by advertisers*.

Plaintiffs' only response is to recycle an argument that this Court has already rejected: that is, that Article III standing for FHA claims is somehow different from other types of claims.  The Court has already held that there is "no support for that proposition."  Order at 7.  As this Court correctly recognized, standing to bring FHA claims extends to the "limits of Article III"—not beyond them. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 902 (9th Cir. 2002).

*Second*, Plaintiffs' claims are barred by Section 230 of the Communications Decency Act ("CDA") because they seek to impose liability on Facebook as the publisher of third-party content. Plaintiffs challenge Facebook's provision of tools used by advertisers to target ads for all types of products and services that, according to their conclusory allegations, some advertisers used to target housing ads in allegedly discriminatory ways, and Facebook's publication of those ads.  Binding Ninth Circuit authority makes clear that these are protected publisher functions under the CDA.

DEFENDANT'S REPLY ISO MOTION TO DISMISS THIRD AMENDED COMPLAINT

*Third*, on the FHA claims, Plaintiffs argue that Section 3604(c) applies to Facebook based on a single case citing HUD's "selecting media" regulation, but that case involves an *advertiser*, not *advertising media*, and therefore supports Facebook's position.  With respect to Sections 3604(a), 3604(d), and 3606, Plaintiffs just repeat the text of the statutes.  No court has ever applied these FHA provisions to advertising media *selected by advertisers*, and this Court should not be the first.

*Finally*, on the state claims, Plaintiffs do not allege facts supporting any Unruh Act, Section 51.5, or UCL claim.  Plaintiffs fail to show that they are not bound by Facebook's California choice-of-law provision, and, in any event, do not allege facts supporting any claim under New York law.

Plaintiffs' TAC should be dismissed with prejudice.

## II.   ARGUMENT

### A.   Plaintiffs Fail To Establish Article III and Statutory Standing

To establish Article III standing, Plaintiffs must allege facts demonstrating "(1) []an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Plaintiffs do not allege facts establishing any injury in fact that is traceable to conduct by Facebook.

#### 1.   Plaintiffs Do Not Allege Any Injury in Fact

Plaintiffs continue to argue that they have suffered three types of injury: (1) "discrimination based on protected classes;" (2) "perpetuation of segregation and denial of the benefits of living in an integrated society;" and (3) "denial of information that laws require to be given on an equal basis."  Opp. at 12.  An injury in fact must be both "particularized" and "concrete."  *Spokeo*, 136 S. Ct. at 1545 (quotation omitted).  It must "affect the plaintiff in a personal and individual way," rather than in a generalized way, and it "must actually exist."  *Id.* at 1548–49.  Plaintiffs' alleged injuries are neither, as the Court previously ruled.  Plaintiffs still do not identify a single housing ad that any advertiser targeted in allegedly discriminatory ways, let alone one that they would have been interested in, qualified to rent or buy, and pursued if they had received it.  This defect is not cured by the TAC's new allegations, since nothing Plaintiffs allege suggests that housing satisfying their search criteria (*e.g.*, a three-bedroom apartment in lower Manhattan for under $1,700 a month (TAC

¶ 85), or a three-bedroom single-family home in Westchester County for $1,000–$2,000 (*id.* ¶ 107)),

was ever available *at all*, let alone advertised on Facebook in an allegedly discriminatory manner.

### (a)   Plaintiffs Do Not Allege Any Particularized Injury

This Court and two others in this District have dismissed "materially similar" claims for lack

of Article III standing because the plaintiffs did not identify any ads that were targeted by advertisers

in allegedly discriminatory ways and that the plaintiffs would have been interested in, qualified for,

and pursued if they had received them.  Order at 5–6 (citing *Bradley*, 2020 WL 1233924, at \*10, and

*Opiotennione*, 2020 WL 5877667, at \*1).

Here, Plaintiffs' allegations in the TAC continue to fall far short of the standard articulated

by this Court and the *Bradley* and *Opiotennione* Courts.  Plaintiffs have not identified a single real

(as opposed to test) housing ad that any advertiser targeted in allegedly discriminatory ways, let

alone one that they would have been interested in, qualified to rent or buy, and pursued if they had

received it.  The allegations about Plaintiffs' criteria for suitable housing still fail to show any

particularized injury because—as Plaintiffs do not dispute—nothing in the TAC suggests that the

particular housing the named plaintiffs allege they were looking for was ever available in the

markets in which they were looking for it, let alone advertised on Facebook *and* targeted in an

allegedly discriminatory way.  For these reasons, this Court's characterization of the standing defects

in the SAC remains equally true of the TAC: there still are

> *no facts* regarding specific entities who allegedly used Facebook's ad-targeting tools
> to place discriminatory ads that possibly could have been seen by Vargas or any other
> plaintiff, and *no facts* establishing that Vargas or the other plaintiffs were actively
> looking for housing during a specific period and were ready, able, and otherwise
> qualified to secure such new housing had they been able to see the ads to which they
> were speculatively denied access.

Order at 9.

Nor does Vargas manage to establish a particularized injury based on her alleged comparison

of her own Marketplace search results to those of her friend, Chet Marcello.  TAC ¶ 95.  There is no

dispute that Marketplace primarily "facilitate[s] *consumer-to-consumer* transactions" by providing

"a place for *Facebook users* to buy and sell *from each other* locally."  Opp. at 4 (quoting TAC ¶ 74)

(emphases added).  Nor is there dispute that a user who searches for housing on Marketplace is

1   shown search results for user-posted listings, and may additionally be shown paid ads for housing

2   *outside of* the user's search or paid ads for other products and services entirely.  *See* Mot. at 4; Ring

3   Decl. Exs. C & D (screenshots of Marketplace search results).  Thus, accepting as true the TAC's

4   allegation that "Plaintiff Vargas did not receive the ads that Ms. Marcello received," it remains

5   unclear whether Marcello in fact even received a *paid* ad for housing at all[1]—much less one that

6   satisfied Vargas's suitability criteria (a three-bedroom in Manhattan for $1,700 a month) and was

7   targeted by an advertiser to exclude Vargas as a recipient based on her demographic characteristics.

8   Indeed, the TAC still contains *no specifics whatsoever* about what ads Marcello received that Vargas

9   did not that could even raise the remote, speculative *possibility* of discrimination—to say nothing of

10  the "*plausible inference*" that this Court has held is required.  Order at 9; *compare id.* (noting that the

11  SAC contained unacceptably vague allegations that Vargas obtained "'fewer' results than her white

12  male friend received"), *with* TAC ¶ 95 (alleging that "Ms. Marcello received more ads for housing in

13  locations that were preferable to Plaintiff Vargas," with no additional detail).

14          Plaintiffs also argue that they do not need to allege facts demonstrating a particularized injury

15  because it is sufficient to allege generally that they have been deprived "of the benefits of living in

16  an integrated society."  Opp. at 12.  As Facebook's Motion explained, the Ninth Circuit rejected this

17  argument in *Carroll v. Nakatani*, 342 F.3d 934, 947 (9th Cir. 2003), holding that the mere *existence*

18  of an alleged racial classification, without more, does not demonstrate Article III standing.  Mot. at

19  9.  Under *Carroll*, Plaintiffs cannot simply point to the existence of audience selection tools that

20  advertisers may have used to target housing ads in allegedly discriminatory ways.  Rather, Plaintiffs

21  must allege facts demonstrating that those tools were actually used by advertisers to deprive them of

22  ads for housing that they would have been interested in, qualified to rent or buy, and pursued if they

23  had received those ads.  *See Carroll*, 342 F.3d at 940 (when a defendant allegedly discriminates, "the

24

25

---

26  [1] Not only are such details well within Vargas's ability to plead, Plaintiffs have long been on notice that vague Marketplace allegations are inadequate to establish injury with respect to the advertiser
27  tools at issue here, because Marketplace contains mostly organic content that is not targeted, with only a handful of paid ads that may be targeted.  *See, e.g.*, ECF No. 76 at 6–7 (explaining that user-posted housing listings on Marketplace are different than paid ads for housing).  Yet Plaintiffs have
28  continued to willfully conflate these two very different types of content.

1  resulting injury 'accords a basis for standing only to those persons who are personally denied equal

2  treatment'").  Plaintiffs do not address or distinguish *Carroll*, which is fatal to their incorrect

3  argument that an allegedly "segregated housing market" constitutes an "injury in fact" regardless of

4  whether the named plaintiffs actually experienced the consequences of the alleged segregation.

5  **(b)    Plaintiffs Do Not Allege Any Concrete Injury**

6      Plaintiffs also fail to identify any concrete injury.  As noted, Plaintiffs do not identify any

7  *real* housing ad targeted in an allegedly discriminatory way.  Instead, Plaintiffs rely on test ads

8  allegedly placed by journalists nearly three years ago and by plaintiffs in cases long since resolved.

9  *See* Opp. at 4.  Plaintiffs' asserted injuries rest solely on speculation that unidentified advertisers

10  *may* have used audience selection tools on Facebook to create and target unidentified housing ads in

11  allegedly discriminatory ways.  This is precisely the type of "conjectural or hypothetical" injury the

12  Supreme Court has repeatedly rejected.  *Lujan*, 504 U.S. at 560 (quotations omitted).

13      Plaintiffs repeat their rejected argument that standing under the FHA is "more relaxed" than

14  standing under the ADEA and anti-discrimination laws at issue in *Bradley* and *Opiotennione*.  Opp.

15  at 10.  As the Court has already held, there is "no support for that proposition," and the cases cited

16  by Plaintiffs found "standing in situations markedly different from the allegations here."  Order at 7.

17  For example, in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982), "[h]aving *received*

18  false information, the tester had standing even though the tester did not have the actual intent to

19  secure housing from the rental agents."  Order at 7–8.  But Plaintiffs do not and could not allege that

20  they ever received false information about the availability of housing.

21      The Court has similarly distinguished the other cases recycled in Plaintiffs' opposition as

22  involving "markedly different" injuries "stemming directly from the defendant's conduct."  Order at

23  7–8.  In *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1304 (2017), the plaintiff alleged

24  experiencing "reduced taxes and increased expenditures"; in *Trafficante v. Metro. Life Ins. Co.*, 409

25  U.S. 205, 209–12 (1972), the plaintiffs challenged "the denial of plaintiffs' ability to live in

26  integrated housing"; and in *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110–11 (1979),

27  the plaintiff experienced "the loss of tax revenue and racially balanced neighborhoods."  *Id.*  No

28  comparable allegations are offered here, where Plaintiffs allege only that they did not see ads

1  targeted by third parties on Facebook for housing with precisely the characteristics they preferred.

2  **2.      Plaintiffs Do Not Allege Any Injury Traceable To Facebook**

3  Plaintiffs do not dispute that any discriminatory use of audience selection tools would have

4  been by third-party advertisers, not Facebook, and therefore, to demonstrate standing as to

5  Facebook, they must allege that Facebook's conduct had a "determinative or coercive effect" on

6  unlawful conduct by third-party advertisers.  *See* Mot. at 11.  Plaintiffs fail to do so.  The principal

7  authority Plaintiffs cite on causation, *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719,

8  749 (N.D. Cal. 2011), provides no support for their argument that Facebook caused Plaintiffs'

9  alleged injury.[2]  The *Baykeeper* plaintiffs asserted a claim under the Clean Water Act that their use

10 and enjoyment of the San Francisco Bay and tributaries had been impaired by a sanitary district's

11 upstream pollution of waterways.  The court held that the existence of other contributing polluters

12 did not undermine the plaintiffs' showing of an Article III injury because there was "substantial

13 evidence" that the sanitary district itself "discharge[d] a pollutant" upstream of the areas that

14 plaintiffs used.  *Id.* at 749.  Establishing injury causation in cases involving waterway pollution is

15 inherently difficult, where pollution necessarily intermingles and particular injuries cannot be traced

16 to particular discharges of pollution with empirical certainty.  Here, by contrast, even if Plaintiffs

17 could demonstrate an injury in fact, which they have not, there would be no question about who

18 caused it: third-party advertisers who choose to use audience selection tools in allegedly

19 discriminatory ways and in violation of Facebook's policies.

20 **B.      Plaintiffs' Claims Are Barred By Section 230 of the CDA**

21 Plaintiffs do not identify any basis for distinguishing the Ninth Circuit and other authority

22 cited in Facebook's Motion requiring dismissal of their claims because a website's provision of

23 neutral tools and publication decisions regarding third-party content are protected publisher

24 functions subject to immunity under Section 230 of the CDA.  Instead, Plaintiffs argue that this case

---

26 [2] Plaintiffs also cite *Havens*, 455 U.S. at 379–80, and *Trafficante*, 409 U.S. at 208.  Opp. at 13.  But
27 both of those cases were lawsuits against the parties who actually caused the injury—*i.e.*, landlords
   engaged in racial steering and other discriminatory practices.

is controlled by *Roommates.com*. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157 (9th Cir. 2008) ("*Roommates.com*"). As explained, in Facebook's Motion and below, Plaintiffs' claims seek to impose liability on Facebook as the "publisher" of housing ads created by third-party advertisers, and therefore are barred by Section 230 of the CDA.[3]

### 1.   Plaintiffs' Claims Treat Facebook as a Publisher or Speaker

As Facebook's Motion demonstrates, Plaintiffs' claims treat Facebook as the "publisher or speaker" of third-party content because they challenge neutral tools that they allege *may* have been used by third-party advertisers to place housing ads on Facebook in allegedly discriminatory ways and Facebook's *publication* of those third-party ads. Mot. at 12. Indeed, Plaintiffs' core theory of liability is based on Section 3604(c), which prohibits the *publication* of housing ads that indicate unlawful preferences, and Plaintiffs allege that such publishing activity also violates other provisions of the FHA, as well as "analogous" state laws. See TAC ¶¶ 1, 208–212.

Plaintiffs attempt to distinguish the unbroken line of cases cited in Facebook's Motion rejecting claims based on neutral tools and publication decisions regarding third-party content, including in the Ninth Circuit and this District, on grounds that are legally baseless. Plaintiffs argue that *Force*, *Pennie*, and *Gonzalez* involve "federal antiterrorism" claims and therefore "are irrelevant to this FHA case." Opp. at 19. The Ninth Circuit has squarely rejected the notion that the CDA applies to some types of claims and not others: "A provider of information services might get sued for violating *anti-discrimination laws*, for fraud, negligent misrepresentation, and ordinary negligence, for false light; or even for negligent publication of advertisements that cause harm to third parties. What matters is not the name of the cause of action … [but] whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101–02 (9th Cir. 2009) (emphasis added).

---

[3] Facebook's CDA immunity defense can and should be resolved on the pleadings. Plaintiffs argue that the CDA issue "turns on an interpretation of facts," Opp. at 3, but do not identify any disputed facts that would be relevant to whether Facebook materially contributes to the alleged illegality of these ads. District courts in this Circuit regularly resolve such CDA issues on the pleadings, including in cases raising virtually identical issues. *See, e.g.*, Order Staying Discovery, *Mobley v. Facebook, Inc.*, No. 16-cv-06440 (N.D. Cal. Apr. 7, 2017) (Davila, J.), ECF No. 35.

Moreover, the reasoning of these cases did not turn on the *type* of third-party content at issue, but whether the plaintiffs were attempting to hold the defendant websites liable for publication decisions regarding that third party content.  Mot. at 13–14.  As this Court explained in dismissing another "federal antiterrorism" case on CDA grounds, where "choices about what [third-party] content can appear on [a platform] … form the basis of a plaintiff's claim, section 230(c)(1) applies."  *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (Orrick, J.).

In *Dyroff*, the Ninth Circuit reiterated that this reasoning applies to claims based on neutral tools and publication decisions *regardless* of the type of third-party content at issue.  *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1095 (9th Cir. 2019).  That plaintiff brought claims based on a website defendant's neutral tools and publication decisions regarding content relating to drug sales.  The Court explained that a website's "tools meant to facilitate the communication and content of others [] are not content in and of themselves."  *Id.* at 1098.  Relying on *Barnes*, the Court found the CDA applicable and affirmed the district court's holding "reject[ing] plaintiffs' attempts to plead around immunity by basing liability on a website's tools."  *Dyroff v. Ultimate Software Grp., Inc.*, 2017 WL 5665670, at *7 (N.D. Cal. Nov. 26, 2017) (citing *Fields*, 217 F. Supp. 3d at 1121–22 and *Gonzalez v. Google, Inc.*, 2017 WL 4773366, at *10–11 (N.D. Cal. October 23, 2017)).

### 2. Facebook Is Not A Creator Or Developer of Allegedly Discriminatory Housing Ads Created By Third-Party Advertisers

Plaintiffs acknowledge, as they must, that their claims challenge allegedly discriminatory housing ads created by third parties, but argue that Facebook is a "creator or developer" of those ads because of its "role in the creation of its advertising platform [tools] used by housing advertisers" to "include[e] or exclude[e] users in protected classes" and Facebook's publication of those ads using "sophisticated marketing algorithms."  Opp. at 14.  As demonstrated in Facebook's Motion, under binding Ninth Circuit precedent, neither of these publishing functions renders Facebook a "creator or developer" of that third-party content.  Mot. at 14–17.  When websites provide tools that allow, but do not require, users to take certain actions, CDA immunity applies as long as the choice of action is "left exclusively to the user."  *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003); *see also Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198 (N.D. Cal. 2009) (holding that

1   CDA immunity applies because, "[l]ike the menus in *Carafano*, Google's Keyword Tool is a neutral

2   tool.  It does nothing more than provide options that advertisers may adopt or reject at their

3   discretion").  CDA immunity also applies to publication of that third-party content using algorithms

4   because algorithms are not "content in and of themselves."  *Dyroff*, 934 F.3d at 1098.

5       According to Plaintiffs, *Roommates.com* is dispositive on "section 230's application to FHA

6   claims and [the question of] whether a pre-made form renders a defendant an author or publisher."

7   Opp. at 16.  Plaintiffs argue that, under *Roommates.com*, "Facebook's creation of a pre-made form

8   for its advertisers to use to create advertisements is sufficient to remove it from the scope of section

9   230." *Id*. at 18.  As explained below, *Roommates.com* is inapposite because there is no analogy in

10  this case to the service provided by that defendant's website, the "premade form" used by the

11  website, or the requirements imposed on users by the website, and therefore no basis to find that

12  Facebook creates or develops content so as to remove CDA immunity.

13      In *Roommates.com*, the defendant was an online housing service "designed to match people

14  renting out spare rooms with people looking for a place to live."  *Roommates.com*, 521 F.3d at 1161.

15  As a condition of using the service, Roommate *required* potential subscribers to answer questions

16  identifying their own protected characteristics and protected characteristics they would accept in a

17  roommate using drop-down menus.  *Id*.  For example, "Roommate require[d] subscribers listing

18  housing to disclose whether there are 'Children present' or 'Children not present' and require[d]

19  housing seekers to say 'I will live with children' or 'I will not live with children.'"  *Id*. at 1165.

20  These *mandatory* answers were then used in display, matching, and search functions on the website.

21  The plaintiffs challenged the questions, answers, and related functionality as violating Section

22  3604(c) of the FHA, which makes it unlawful to "make, print, or publish, or cause to be made,

23  printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a

24  dwelling that *indicates any preference*, limitation, or discrimination based on [protected

25  characteristics], or *an intention to make any such preference*, limitation, or discrimination."  42

26  U.S.C. § 3604(c) (emphasis added).  Specifically, plaintiffs asserted FHA violations based on

27  (1) questions they alleged were discriminatory because they "indicate[] an intent to discriminate" in

28  housing, *Roommates.com*, 521 F.3d at 1164; (2) requiring users to answer those discriminatory

questions because they forced users to express *unlawful preferences* in housing, *id*. at 1165, and (3) use of those *unlawful preferences* to display, match, and search housing ads, *id*. at 1162.

The Ninth Circuit held there was no CDA immunity for these alleged FHA violations.  By asking *discriminatory questions* and *requiring* subscribers to indicate *unlawful preferences* for housing, Roommate "contribute[d] materially to the alleged illegality." *Id*. at 1168.  With respect to the display of the unlawful preferences in user profiles, the Court held that, "by *requiring* subscribers to provide the information as a condition of accessing its service[s] and by providing a limited set of pre-populated answers, Roommate becomes … the developer, at least in part, of *that information*." *Id*. at 1166 (emphases added).  The Court made clear that its holding applied only where a website *requires* users to create unlawful content—it is not enough to "provide a framework that could be utilized for proper or improper purposes." *Id*. at 1172.  The Court also denied CDA immunity for use of the compelled unlawful preferences to match housing ads because "[i]f Roommate has no immunity for asking the discriminatory questions, [] it can certainly have no immunity for using the answer to the unlawful questions to limit access to housing." *Id*. at 1167.

Thus, the "content" that was relevant to the CDA analysis in *Roommates.com* was "unlawful preferences" to which Roommate "materially contributed" by forcing users to answer questions for which the *only answers* were unlawful preferences that violated the FHA.  Because Roommate was an online housing service where all users were offering or searching for housing, requiring them to answer questions about their protected characteristics and the protected characteristics they would accept in a roommate necessarily forced them to express preferences that violated the FHA.

Plaintiffs are wrong that *Roommates.com* is controlling.  Facebook is nothing like Roommate.  Facebook is a general-use platform that third parties use to create ads for *all types of products and services*, not only, or even primarily, housing ads—a distinction that was "material[]" to the *Roommates.com* holding.  *See id*.  Accordingly, the neutral audience selection tools at issue here are not remotely analogous to the discriminatory questions and drop-down menus that Roommates *required* subscribers to use.  As Plaintiffs admit, in stark contrast to Roommate's site, Facebook's tools are used with *all types of ads* and therefore have many lawful uses, and Facebook does not *require* advertisers to use the tools to select any particular audience for their ads, let alone

DEFENDANT'S REPLY ISO MOTION TO DISMISS THIRD AMENDED COMPLAINT

an audience that Plaintiffs claim is discriminatory.  As the *Roommates.com* Court explained, CDA immunity obtains whenever the decision to use a digital tool in an allegedly unlawful way is made "entirely by the malevolent user." 521 F.3d at 1171.  That is precisely the case with respect to Facebook's targeting tools.

Finally, Plaintiffs' references to Facebook's "algorithm," Opp. at 18–19, do not alter the CDA analysis.  As Facebook explains in its Motion, "Plaintiffs admit [that] Facebook treats all users within an advertiser's target audience as 'eligible' to receive the ad, which show[s] that the 'ad delivery phase' did not contribute to Plaintiffs' alleged harm, *i.e.*, their 'wholesale exclusion … from the possibility of seeing housing advertisements.'" Mot. at 16–17.  Plaintiffs do not, and cannot, dispute this.  The alleged illegality is that advertisers may have targeted housing ads in allegedly discriminatory ways *before* Facebook delivered those ads to users in advertisers' selected audiences.

**C.**      **Plaintiffs Fail to State a Fair Housing Act Claim**

**1.**      **Plaintiffs Do Not Allege that Facebook Published Any Housing Ad "Indicating" An Unlawful Preference Under § 3604(c)**

Plaintiffs' core theory of liability under the FHA—that advertisers may have targeted housing ads in allegedly discriminatory ways and Facebook published those ads in violation of Section 3604(c)—fails because advertising media like Facebook are not subject to liability for publishing housing ads that do not indicate an unlawful preference on their face as determined by an objective "ordinary reader" test.  Mot. at 15–19.  Plaintiffs do not cite any authority to the contrary.  Indeed, they rely on cases *confirming* the objective "ordinary reader" test, including *Housing Opportunities Made Equal v. Cincinnati Enquirer*, 731 F. Supp. 801, 804 (S.D. Ohio 1990), which Plaintiffs quote out of context to argue for a different standard.  Opp. at 20.

In *Housing Opportunities*, the court applied the objective "ordinary reader" standard and explained that, even if an illegal preference is not "communicate[d] in an obvious and undeniable way," an ad may still violate Section 3604(c).  731 F. Supp. at 804.  The court pointed to *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042 (E.D. Va. 1987), as an example.  *Saunders* involved a housing brochure with 68 photographs of human models, virtually none of whom were black, and discussed evidence relevant to the "ordinary reader" test, including "academic and market research on the

1 effect of the racial composition of advertising models" as well as the "[housing advertiser's] own

2 belief that the race of models used would indicate [its] racial preferences." *Id.* at 1058–59.

3     In affirming *Housing Opportunities*, the Sixth Circuit likewise applied an "ordinary reader"

4 test, concluding that "the use of all-white models could be a factor in determining whether an

5 advertisement conveys a discriminatory message, although its strength and clarity will depend upon

6 an analysis of the entire advertisement." *Housing Opportunities Made Equal v. Cincinnati Enquirer*,

7 943 F.2d 644, 647 (6th Cir. 1991).  It was in this context that the Sixth Circuit noted that a

8 publisher's "intent to discriminate" could be relevant to the "ordinary reader" test—not because such

9 intent alone would be sufficient, but because it might suggest that what was intended was actually

10 conveyed on the face of the ad.  *Id.* at 648 n.3–4.

11     Plaintiffs do not respond to Facebook's arguments that the plain text of Section 3604(c), and

12 decades of agency action and court decisions implementing it, foreclose Plaintiffs' theory that

13 Facebook is liable for publishing ads that housing advertisers may have targeted in allegedly

14 discriminatory ways.  Instead, Plaintiffs rely on HUD's so-called "selecting media" regulation,

15 which provides examples of conduct "indicating" a preference in violation of Section 3604(c),

16 including "[s]electing media or locations for advertising the sale or rental of dwellings."  Opp. at 20

17 (quoting 24 C.F.R. § 100.75).  As Facebook explained in its Motion, the plain text of this regulation

18 and related HUD guidance confirm that it applies only to advertisers, not to the advertising media

19 selected by advertisers.  Mot. at 21.  Because advertisers "select[] media or locations for

20 advertising," and advertising media cannot "select" themselves, to the extent "selecting media" can

21 indicate a preference under Section 3604(c), that is conduct engaged in by advertisers, not

22 advertising media.  Plaintiffs' only response is to point to a case applying the "selecting media"

23 regulation to *a housing advertiser*, which supports Facebook's position.  Opp. at 21 (citing *Guevara*

24 *v. UMH Props., Inc.*, 2014 WL 5488918, at *6 (W.D. Tenn. Oct. 29, 2014)).

25     Finally, Plaintiffs argue that by "maintaining [a] platform" on which advertisers have the

26 ability to target housing ads in allegedly discriminatory ways, Facebook "expressed a preference

27 based on prohibited classes."  Opp. at 21.  But Plaintiffs do not explain how advertisers choosing to

28 use tools that are used with ads for *all types of products and services*, not just housing, suggests any

1   kind of prohibited preference *by Facebook*—because it does not.

2   **2.      Facebook Does Not Make Housing "Unavailable" Under § 3604(a)**

3      Section 3604(a) makes it unlawful to "refuse to sell or rent [], or to refuse to negotiate for the

4   sale or rental of, or otherwise *make unavailable or deny*," a dwelling to a person because of

5   protected characteristics. 42 U.S.C. § 3604(a) (emphasis added).  As demonstrated in Facebook's

6   Motion, the text, legislative history, and implementing HUD regulations for Section 3604(a) show

7   that advertising media like Facebook are not capable of making housing "unavailable" or "denying"

8   housing within the meaning of Section 3604(a) because they do not provide "services and facilities

9   which are *prerequisites to obtaining dwelling*."  Mot. at 23 (quoting 54 Fed. Reg. 3232-01, 3240).

10      Plaintiffs again do not respond to these arguments or cite a single case to the contrary.

11   Instead, they argue that "unavailable" means "not obtainable" or "not accessible," and that "housing

12   could not have been available to people who did not know that it was for sale or rent."  Opp. at 21.

13   But Plaintiff do not, and cannot, explain how not receiving a housing ad on Facebook makes housing

14   "not obtainable" or "not accessible," which explains why Plaintiffs are unable to cite any case

15   applying Section 3604(a) to advertising media.

16   **3.      Facebook Does Not Represent Housing is Unavailable Under § 3604(d)**

17      Section 3604(d) makes it unlawful to represent that housing is not available when in fact it is.

18   Plaintiffs argue that by "maintain[ing] a platform that is capable of preventing its users …  from

19   receiving information about housing that is available to other users," Facebook makes unlawful

20   representations about the availability of housing.  Opp. at 22.  But Plaintiffs admit that Facebook has

21   done nothing more than "maintain[] its *Ad Platform*."  *Id.* at 22 (emphasis added).  Plaintiffs do not

22   cite any authority or offer any argument as to why providing an ad platform on which *advertisers*

23   make representations amounts to *Facebook* making representations about the availability of housing.

24   **4.      Facebook Is Not a Housing Service Subject to § 3606**

25      Section 3606 applies to multiple-listing services, real estate brokers' organizations, and

26   comparable housing services.  As demonstrated in Facebook's Motion, Section 3606 does not apply

27   to advertising media, like Facebook, under the interpretive canon of *ejusdem generis*.  Mot. at 24.

28   Plaintiffs do not explain how Facebook's operation of an advertising platform—even one that

-14-

1  advertisers may have used to target housing ads in allegedly discriminatory way—can in any way be

2  construed as a housing service under Section 3606.  *See* Opp. at 22.

3       **D.**      **The California Plaintiffs Do Not State Any Claim Under California Law**

4            **1.      Plaintiffs Fail To State A Claim Under The Unruh Act**

5       An Unruh Act or Section 51.5 claim requires pleading and proving discrimination that is

6  (1) intentional and (2) unreasonable, arbitrary, or invidious.  Mot. at 27–28.  The California

7  Plaintiffs do not, and cannot, allege intentional discrimination by Facebook.  There is no dispute

8  that the challenged audience selection tools were available for use with all types of ads, and could

9  only have resulted in discrimination if advertisers chose to use those tools in ways that violated

10  Facebook's anti-discrimination policies.  *Id.* at 28.  Plaintiffs' Opposition relies entirely on the

11  conclusory assertion that Facebook "intentionally enabled these discriminatory capabilities for

12  housing advertisements."  Opp. at 23.  But "[a] plaintiff bringing an Unruh Act violation claim

13  cannot allege intentional discrimination in a conclusory fashion."  *Williams v. Twin Rivers Unified*

14  *Sch. Dist.*, 2018 WL 4735734, at *2 (E.D. Cal. Sept. 28, 2018) (collecting cases); *Doe One v. CVS*

15  *Pharmacy, Inc.*, 348 F. Supp. 3d 967, 989 (N.D. Cal. 2018) (finding allegation that defendants

16  "specifically and intentionally targeted individuals on the basis of a particular disability" to be

17  "conclusory").  Moreover, Facebook's advertising policies which have always prohibited

18  discrimination and its decision over a year ago to take further steps to prevent possible misuse of

19  the tools by *disabling* for use with housing ads flatly contradict Plaintiffs' conclusory allegation

20  that Facebook intended the tools to be used by third-party advertisers in discriminatory ways.

21       There is also no basis in the TAC for Plaintiffs' conclusory assertion that Facebook's

22  provision of an advertising platform used to place ads for all types of products and services (the vast

23  majority of which are *not* housing ads) was unreasonable, arbitrary, or invidious, because some

24  *advertisers* may have used that platform in allegedly discriminatory ways.  Opp. at 23.  Plaintiffs cite

25  no authority holding or even suggesting that, even assuming such use occurred, it transforms

26  general-use online services, like Facebook, into "unreasonable, arbitrary, or invidious" services.

27            **2.      Plaintiffs Fail To State A Claim Under The UCL**

28       The California Plaintiffs' "unlawful" claim fails because they do not allege any predicate

1  violation of the FHA, Unruh Act, or Section 51.5.  Plaintiffs' "unfair" claim fails because, for the

2  same reasons they cannot allege unreasonable, arbitrary, or invidious conduct under the Unruh Act

3  or Section 51.5, they also cannot allege "immoral, oppressive or unscrupulous" conduct under the

4  UCL.  Plaintiffs do not argue that they have stated a claim under the UCL's fraud prong.  Plaintiffs

5  also concede that they have never paid any money to Facebook, Opp. at 25, and do not allege any

6  way in which, as users of Facebook's free service, they could "show an ownership interest" in

7  Facebook's profits, which alone requires dismissal of Plaintiffs' UCL claim.  *See* Mot. at 29; *Korea*

8  *Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144–45 (2003).

9      **E.**      **The New York Plaintiffs Fail To State Any Claim Under New York Law**

10          **1.**      **Plaintiffs Agreed That California Law Would Apply**

11          There is no dispute that each New York Plaintiff actively used Facebook during the relevant

12  time period, Opp. at 5-7, and each has continued to use Facebook as recently as spring of 2021, *see*

13  Wong Decl. ¶¶ 4, 6, 14, 21.  Facebook's Terms have contained a California choice-of-law provision

14  since 2009, and Facebook provides individualized notice to users both via email and on Facebook

15  that continued use of Facebook constitutes agreement to all updated Terms.  *See* Wong Decl. ¶ 30;

16  *see also* Mot. at 29 (collecting cases enforcing the choice of law in Facebook's terms of service).

17          According to the New York Plaintiffs, the link to Facebook's Terms during registration was

18  too "inconspicuous" to provide adequate notice.  Opp. at 26; *but see In re Facebook Biometric Info.*

19  *Privacy Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (concluding that the registration

20  procedures at issue here provide "reasonable notice").  But the New York Plaintiffs do not allege

21  that they did not receive individualized notice of Facebook's Terms at some point in their decade-

22  plus of continuous use of the service and are therefore bound by those Terms, including the

23  California choice-of-law provision.  *See id.* (concluding that those users received "individualized

24  notice" of and consented to updated terms through emails and jewel notifications).

25          **2.**      **Plaintiffs Fail To State Any Claim Under the NYSHRL**

26          The New York Plaintiffs argue that Facebook is an "agent" of persons with the right to sell,

27  rent, or lease housing, Opp. at 27–28, but the TAC is totally devoid of allegations that could support

28  a plausible theory of agency affiliation between Facebook and advertisers who placed housing ads

1  on Facebook.  Facebook's delivery of housing ads created and targeted by advertisers does not

2  transform Facebook into an *agent* of that advertiser for purposes of the NYSHRL.  At the pleading

3  stage, "[a] *full showing* of agency supported by an accepted theory of agency or contract law is

4  required, and generalized allegations of affiliation are insufficient."  *Miami Prod. & Chem. Co. v.*

5  *Olin Corp.*, 449 F. Supp. 3d 136, 173 (W.D.N.Y. 2020) (quotation omitted) (emphasis added).  The

6  New York Plaintiffs also argue that Facebook is liable under an aiding and abetting theory.  Opp. at

7  28–29.  But to state a claim for aiding and abetting, Plaintiffs must show Facebook's

8  "knowledgeable and intentional participation" in unlawful third-party conduct.  Mot. at 30.

9  Plaintiffs do not plead any predicate violation of law by advertisers, and do not, and cannot, plead

10  any discriminatory intent by Facebook.  *See supra* at 15–16.

### F.      Jurisdictional Discovery Is Neither Necessary Nor Appropriate

12          Plaintiffs' vague and ambiguous request for jurisdictional discovery regarding Article III

13  standing, Opp. at 30, should be denied.  First, there is simply nothing that discovery could reveal that

14  would cure Plaintiffs' defective allegations.  In dismissing the SAC, this Court held that Plaintiffs

15  had pleaded "no facts showing that any of the plaintiffs were plausibly injured personally by the ad-

16  targeting tools that advertisers purportedly used to possibly target housing ads that plaintiffs possibly

17  searched that plausibly resulted in plaintiffs not receiving ads for housing" based on their protected

18  characteristics.  Order at 9.  That remains true of the TAC.  Plaintiffs cannot even articulate what

19  discovery they would seek or what it would show; instead, they vaguely assert they would seek

20  information on "advertisements and similar matters."  Opp. at 30.  Nothing Plaintiffs might find in

21  discovery can make up for the fact that their "general allegations of injury" simply are not plausible.

22  *Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012).

23          *Second*, even assuming *arguendo* that Plaintiffs could establish Article III standing after

24  jurisdictional discovery, their claims would still be barred on their face by Section 230 of the CDA,

25  and the TAC would still fail to state any claim under the FHA or California or New York law.

26  Jurisdictional discovery would therefore be both futile and unduly burdensome.

### III.     CONCLUSION

28          The Court should dismiss Plaintiffs' Third Amended Complaint with prejudice.

1 DATED:  May 21, 2021                    MUNGER, TOLLES & OLSON LLP

2                                              ROSEMARIE T. RING
                                             JORDAN D. SEGALL
3                                            MARIANNA MAO

4
                                         By:    _____/s/ Rosemarie T. Ring_____
5                                            ROSEMARIE T. RING
                                         Attorneys for Defendant Facebook, Inc
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28