1   Gerard V. Mantese (MI Bar # P34424)
    *gmantese@manteselaw.com*
2   David Honigman (MI Bar # P33146)
    *dhonigman@manteselaw.com*
3   Kathryn Eisenstein (MI Bar #P66371)
    *keisenstein@manteselaw.com*
4   (*Admitted Pro Hac Vice*)
5   **MANTESE HONIGMAN, P.C.**
    1361 E. Big Beaver Road
6   Troy, MI 48083
7   Tel: 248-457-9200
    Fax: (248)-457-9201
8
9
    *Attorneys for Plaintiffs and Proposed Class Members.*
10
11  [*Additional counsel on following page*]
12
13              **UNITED STATES DISTRICT COURT**
        **NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**
14

| | |
|---|---|
| 15  ROSEMARIE VARGAS,<br>KISHA SKIPPER, JAZMINE<br>16  SPENCER, DEILLO RICHARDS, and<br>JENNY LIN, on behalf of themselves<br>17  individually, and on behalf of all others<br>18  similarly situated,<br><br>19              Plaintiffs,<br><br>20  vs.<br><br>21  FACEBOOK, INC.<br>22              Defendant. | Case No. 3:19-cv-05081-WHO<br><br>**FOURTH AMENDED CLASS ACTION<br>COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br><br>Judge: Hon. William H. Orrick<br>Courtroom: 2, 17th Floor<br>Action Filed: August 16, 2019 |

23
24
25
26
27
28

*Additional Counsel for Plaintiffs and Proposed Class Members.*

Patricia A. Stamler (MI Bar #35905)
*pstamler@hertzschram.com*
Elizabeth Thomson (MI Bar #53579)
*lthomson@hertzschram.com*
Matthew Turchyn (MI Bar #76482)
*mturchyn@hertzschram.com*
*Admitted Pro Hac Vice*
**HERTZ SCHRAM PC**
1760 South Telegraph Road, Ste 300
Bloomfield Hills, MI 48302
Tel: 248-335-5000
Fax: 248-335-3346

Michael D. Seplow, SBN 150183
*mseplow@sshhzlaw.com*
Wilmer Harris, SBN 150407
*wharris@sshhzlaw.com*
Aidan C. McGlaze, SBN 277270
*amcglaze@sshhzlaw.com*
**SCHONBRUN SEPLOW HARRIS**
**HOFFMAN & ZELDES LLP**
11543 W. Olympic Blvd.
Los Angeles, CA  90064
Tel: 310-396-0731
Fax: 310-399-7040

*Attorneys for Plaintiffs and Proposed Class Members.*

"***Facebook is discriminating against people based upon who they are and where they live. Using a computer to limit a person's housing choices can be just as discriminatory as slamming a door in someone's face***."

—Ben Carson, former Secretary of HUD

Plaintiffs, by and through their attorneys, on behalf of themselves and all others similarly situated, and pursuant to Fed. R. Civ. P. 15 and this Court's Opinion and Order dated January 21, 2021, Dkt. 86, hereby allege, on information and belief, the following in support of their Fourth Amended Complaint:

## OVERVIEW OF CASE

1. This case arises out of Defendant Facebook's illegal discrimination in violation of the Fair Housing Act ("FHA"), as well as its violations of comparable state statutes in New York and California. The FHA and the comparable state statutes were promulgated to redress this country's long history of redlining, to promote integration and to prohibit discrimination in housing based on sex, familial status, disability, national origin, race and other protected classes.

2. At all relevant times through December 31, 2019, Facebook created, implemented and/or maintained a pre-populated list of demographics, behaviors and interests that allowed real estate brokers, real estate agents and landlords (hereinafter "housing advertisers") to exclude certain buyers or renters from ever seeing their ads for housing. This exclusionary advertising is called "redlining." Facebook's Ad Platform violated both the FHA and New York and California state statutes prohibiting such discrimination.[1] Facebook created and used its Ad Platform to create and maintain a segregated market for housing.

3. Facebook's illegal advertising practices were successfully challenged in a lawsuit by the National Fair Housing Alliance and others, which resulted in a settlement wherein Facebook purportedly vowed to revise its housing advertising practices to

---

[1] Facebook contends that it has changed the ad portals to prevent discrimination in housing as of December 31, 2019.

comply with the FHA by the end of 2019. However, regardless of the extent to which Facebook has reformed its illegal advertising practices, from which it reaped substantial profits, Facebook has yet to offer or pay any compensation to numerous users who were subjected to its discriminatory segregated housing market over a period of several years. Moreover, while Facebook has agreed to change its housing advertising practices for the time being, there is no guarantee that it will continue to comply in the future, thus warranting injunctive relief.

4.      Facebook, under the auspices of providing a social-networking site, mines, collects, purchases, and assembles into individual profiles countless terabytes of data in multitudes of categories (hereafter "demographics data"), about its approximately two billion active monthly users worldwide.

5.      Facebook used its demographics data to permit housing advertisers to create, publish, circulate, utilize, target, and/or send ads to certain groups of Facebook users. Facebook also used its demographics data to permit Facebook and its housing advertisers to avoid publishing, providing, or sending ads to Facebook users in certain protected classes.

6.      As alleged more fully below, Facebook created, developed, implemented, marketed, and utilized an advertising platform called Ads Manager (the "Ad Platform") that created, utilized, published, disseminated, circulated and/or targeted advertisements for housing.  The Ad Platform allowed and facilitated the exclusion of certain Facebook users based on their real or perceived personal characteristics (which included several protected classes), by creating, developing, and/or offering the "Exclude People" feature. The Ad Platform also permitted housing advertisers to include only certain users with certain demographic characteristics (which included several protected classes), thereby excluding users who lacked those characteristics (the "Include People" feature).

7.      By way of example, Facebook created, utilized, published, circulated and developed its Ad Platform to enable housing advertisers to exclude men or women from seeing an ad, a search box to exclude people who do not speak a specific language from

FOURTH AMENDED CLASS ACTION COMPLAINT

1  seeing an ad, and a map tool to exclude people who live in a specified area from seeing
2  an ad by drawing a red line around that ad.

3      8.      Facebook also created, utilized, published, circulated and developed the
4  Multicultural Affinity groups for use on its Ad Platform. For example, Multicultural
5  Affinity groups comprised people whose activities on Facebook suggested they may be
6  interested in ads related to African American, Hispanic American, or Asian American
7  communities.  Facebook allowed housing advertisers to promote or market a community
8  or home for sale or rent to select "ethnic affinity" groups as part of their advertising
9  campaigns.

10     9.      Facebook created, utilized, published, circulated and developed this Ad
11 Platform, including the illegal discriminatory inclusion and exclusion tools and its
12 Multicultural Affinity tool, to assist and enable housing advertisers to steer
13 advertisements, information and content away from users in protected classes, while
14 Facebook published, provided, disseminated, targeted and/or circulated the same
15 advertisements, information and content to other Facebook users who were not in
16 protected classes. Facebook's conduct resulted in a segregated housing market.

17     10.     In 2016, *ProPublica* and other media outlets began reporting that
18 Facebook's Ad Platform violated fair housing laws.

19     11.     Throughout 2017 until about March 2018, four nonprofit organizations
20 (NPOs), with the common mission of eliminating housing discrimination and
21 promoting residential integration, investigated Facebook's conduct related to housing
22 discrimination. The NPOs created dozens of housing advertisements and completed
23 Facebook's full ad submission and review process in New York, Washington D.C.,
24 Miami, and San Antonio.

25     12.     The NPOs' investigation confirmed that Facebook provided housing
26 advertisers options to exclude the following categories of Facebook users from
27 receiving advertisements: (a) families with children; (b) women; (c) users with interests
28 based on disability; and/or (d) users with interests based on national origin. Once the

housing advertiser used Facebook's advertising drop-down menu to select the target audience for the ad, Facebook approved, published, circulated, utilized, disseminated and/or targeted these housing ads in a discriminatory manner without Facebook users (i.e., consumers) ever knowing that they had been excluded from full, equal access to the market.

13.    Discriminatory housing advertising is just as insidious and damaging as discrimination at the point of rental or sale.  In the past, excluded groups might see a "for rent" sign or newspaper classified ad because the ads were and are located, in a public forum. Contrarywise, the clandestine nature of Facebook's technology and targeting practices concealed housing ads from entire groups of protected classes of people, thereby creating a segregated market.

14.    Facebook's algorithms for data collection and its Ad Platform excluded protected classes of individuals and thereby denied them equal access to the housing market.

15.    By intentionally creating, developing, and/or using both  (1) the "Exclude People" feature, and (2) the "Include People" feature, Facebook knowingly and intentionally prevented housing ads and the information and content therein from being published, provided, circulated or sent to users who did not match certain protected class characteristics such as "African American (US)," "Asian American (US)," "Immigrant," "Hispanic US – English dominant," "Christian," "Moms," and "people ages 21 to 55 who live or were recently in the United States."

16.    Facebook, through its creation, utilization, development, implementation, promotion, targeting and/or marketing of its Multicultural Affinity, Exclude People, or Include People tools, permitted its housing advertisers to select illegal preferences for its ads to Facebook users.

17.    By way of example, as of August 16, 2019, Facebook's Ad Platform provided the following protected categories for the advertiser to exclude:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2:47

**All Parents**

🔍 Add demographics, interests or behaviors

New parents (0-12 months)
Parents                                        ⊕

Parents (All)
Parents                                        ⊕

Parents with adult children (18-26 years)
Parents                                        ⊕

Parents with early school-age children (06-08
years)                                         ⊕
Parents

Parents with preschoolers (03-05 years)
Parents                                        ⊕

Parents with preteens (08-12 years)
Parents                                        ⊕

Parents with teenagers (13-18 years)
Parents                                        ⊕

Parents with toddlers (01-02 years)
Parents                                        ⊕

2:49

**Multicultural Affinity**

🔍 Add demographics, interests or behaviors

African American (US)
Behaviors                                      ⊕

Asian American (US)
Behaviors                                      ⊕

Hispanic (US - All)
Behaviors                                      ⊕

Hispanic (US - Bilingual)
Behaviors                                      ⊕

Hispanic (US - English dominant)
Behaviors                                      ⊕

Hispanic (US - Spanish dominant)
Behaviors                                      ⊕

FOURTH AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18    18.    Facebook is responsible, in whole or in part, for the creation, publication,

19  dissemination, circulation, utilization and/or targeting of its Ad Platform for housing.

20    19.    Facebook's affirmative conduct in creating, maintaining and promoting its

21  housing advertisers' use of its Multicultural Affinity, Exclude People, or Include People

22  tools resulted in unlawful discrimination against Facebook users who sought housing

23  through Facebook in violation of the Fair Housing Act, and comparable New York and

24  California statutes.

25    20.    Facebook's conduct, as further detailed above and below, made it a creator

26  or developer of the information or content in the ads that were not published, not

27  provided, not circulated and not sent to certain Facebook users, based on these users'

28  genuine or perceived protected class characteristics.

21.     Facebook is an information content provider for its Ad Platform, screening tools, and ads that were published, provided, circulated, targeted, utilized, disseminated and/or sent to Facebook users based on those users' actual or perceived protected class characteristics, compiled by Facebook from data it collected or acquired from other data collection firms of those users' actual or perceived protected class characteristics.

22.     Despite Facebook's corporate mission statement "*to give people the power to build community and bring the world closer together*," https://web.archive.org/web/20240117151431/https://investor.fb.com/resources/default. aspx, Facebook created and developed an Ad Platform with its discriminatory Exclude People, Include People and its Multicultural Affinity tools that permitted Facebook and its housing advertisers to not publish, not provide, not circulate and not send information or content to individuals in protected classes in Facebook's community while deciding to publish, provide, circulate, utilize, target and/or send the same information to other Facebook community members outside of the protected classes.

23.     Facebook's COO, Sheryl Sandberg, admitted that "We believe advertisers and us [Facebook] should be held accountable for content and ads." https://web.archive.org/web/20240117151453/https://www.nytimes.com/2018/06/28/tec hnology/facebook-twitter-political-ads.html.

24.     Facebook created a platform for its housing advertisers' targeting decisions as demonstrated by the excerpts from a *Bloomberg Businessweek* article titled "How Facebook Helps Shady Advertisers Pollute the Internet" (https://web.archive.org/web/20240117151629/https://www.bloomberg.com/news/featu res/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them).

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiffs and the class they seek to represent assert federal claims under the Fair Housing Act; 28 U.S.C. § 1343(a)(4); as Plaintiffs seek to recover damages and/or equitable relief under an Act of Congress providing for the protection of civil rights, and under 42 U.S.C.

§ 3613(a)(1)(A), and as Plaintiffs seek damages and/or equitable relief regarding a discriminatory housing practice prohibited by the Fair Housing Act. This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367(a).

26. This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1), because Facebook's principal place of business is located in the Northern District of California and it transacts business within the state of California.

27. Declaratory and injunctive relief is sought under and authorized by 28 U.S.C. §§ 2201 and 2202.

28. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to Plaintiffs' claims occurred in the Northern District of California.

## RELEVANT BACKGROUND FACTS

### A. FACEBOOK, INC.

#### i. Facebook "Basics"

29. Facebook, Inc.[2] is a technology and social-networking company. It serves as an advertiser for numerous businesses including relators, real estate agents and landlords. It owns and operates the world's largest social media platform, including Facebook, Instagram, and Messenger, among others. Facebook also owns and develops software and technology.

30. According to Facebook, "more than 3 billion people around the world" use its products "to share ideas and offer support." Company Info, Facebook Stats, https://web.archive.org/web/20240117151657/https://about.meta.com/company-info/?utm_source=about.facebook.com&utm_medium=redirect (last visited Jan. 17, 2024).

---

[2] Facebook, Inc. is now known as Meta Platforms, Inc. Defendant is referred to as "Facebook" herein.

31.     It is estimated that in 2023, there were 243.58 million monthly users on Facebook in the United States.[3]

32.     Facebook's products and services "help people discover and learn about what is going on in the world around them, enable people to share their opinions, ideas, photos and videos, and other activities with audiences ranging from their closest friends to the public at large, and stay connected everywhere by accessing [Facebook's] products."   *Facebook      2018      SEC      Annual      Report*, https://web.archive.org/web/20240117153736/https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2018-Annual-Report.pdf, p. 8 (last visited Jan. 17, 2024).

33.     Facebook collects vast amounts of data about its users, including: information and content that users provide by creating a Facebook account, signing in, creating or sharing content, and messaging with others on Facebook products; information about people, pages, accounts, and groups that users connect with and how users interact with them; information about how users use Facebook, including the types of content a user views and the duration of a user's activity on Facebook; information about transactions made on Facebook, including purchases; and information other users provide about a particular user through communications and interactions between users. *See* https://www.facebook.com/policy.php, [https://perma.cc/LZ9N-7ACU] (last visited Jan. 17, 2024).

34.     To create a Facebook profile, prospective users are **required to provide** their name, gender, birthdate, and phone number or email address. *See Sign Up*, https://www.facebook.com/, [https://perma.cc/E59L-HK88] (last visited Jan. 17, 2024); *see also*  Fortune.com/2018/03/21/Facebook-personaldata-cambridgeanalytics ("*when*

_____

[3] https://web.archive.org/web/20240117152512/https://www.statista.com/statistics/408971/number-of-us-facebook-users/.

*you sign up for a Facebook account, you're required to share: name, gender, date of birth, email or mobile number.*") (last visited Aug. 14, 2019) (emphasis added).

35.   Once an individual has created a user profile, he or she can connect with other Facebook users by using the "friend" feature. Once Facebook friends, the users typically have increased access to information posted on their friends' Facebook feeds.

36.   Facebook users may also join "Facebook Groups" that allow users to "[c]onnect with people who share [their] interests." https://www.facebook.com/groups/discover/ (last visited Jan. 17, 2024). According to Facebook, these groups are spaces for users to "[m]eet new people, share knowledge or get support." *Id*. Facebook Group members have access to the information other members share within that group.

37.   Paragraph thirteen of Facebook's Ad Policy stated that, "[y]our use of Facebook's advertising products and services is part of 'Facebook' under Facebook's Statement of Rights and Responsibilities." *See* https://www.facebook.com/policies/ads/, [https://perma.cc/EY2J-JGWL] (last visited Jan. 17, 2024).

### *ii. Ad Placement on Facebook*

38.   One way in which Facebook delivers ads to users is via the "News Feed," the page that each user sees when he or she logs into Facebook. Each user's News Feed is personalized to that user and displays posts posted by that user and/or the user's Facebook friends.

39.   Facebook places advertisers' ads—including housing ads—among the various posts displayed on users' News Feeds such that users are occasionally presented with ads when they scroll through the posts on their News Feeds.

40.   Facebook also delivers ads to its users via Facebook Marketplace.

41.   Beginning in or around 2016, Facebook integrated its "Marketplace" feature, enabling users to post items – including housing for sale (or, as relevant to this case, for rent) and to search or browse the Marketplace. As explained in early 2019, "Facebook Marketplace was introduced in 2016 as a place for people to buy and sell within their

communities. Think Craigslist, but with Messenger." Katie Sehl, *Facebook Marketplace: A Comprehensive Guide for Marketers* (Hootsuite, Jan. 9, 2019), *available at* https://web.archive.org/web/20240117153338/https://blog.hootsuite.com/facebook-marketplace/ (last visited Jan. 17, 2024).

42.   In other words, like Craigslist, the Marketplace facilitated "C2C" (consumer-to-consumer) transactions by creating a platform for Facebook users to create, search, and browse various categories of listings, including listings for home sales and rentals. In essence, it operates as "an online shopping channel. It's a place for Facebook users to buy and sell from each other locally." *See id.*

43.   The Marketplace was widely adopted by users and quickly became a popular destination within the Facebook platform; as of May 2018, it was being used in "more than 70 different countries by more than 800 million people each month." *Id.*

44.   "In June 2018, Facebook announced the option for businesses to place ads in Marketplace." [4] *Id.* These ads would appear "in-feed" (i.e., as someone was browsing or scrolling through the results of a search) and had "the advantage of reaching people where they are shopping." *Id.* In fact, it was reported that placing ads in Marketplace yielded "a marked increase in conversion rates compared with News Feed placements." *Id.*

45.   Unfortunately, Facebook Marketplace also incorporated the same, unlawful, discriminatory features discussed herein, particularly through ad placement and targeting.

46.   Facebook uses the data about its users in a variety of ways. One such use is to personalize and target advertisements to its users based on users' characteristics, including protected classes, garnered from the data Facebook collects.

### iii. Facebook's Advertising Revenue

---

[4] This case involves advertisements that were created using the targeting features available on Facebook's Ad Platform. It does not involve user-created Marketplace listings that do not use the Ad Platform's targeting features.

1  47.  In addition to its business as a technology and social networking company,

2  Facebook is in the advertising business. In fact, Facebook generates "substantially all" of

3  its revenue from selling advertisements. *Facebook 2018 SEC Annual Report*,

4  https://web.archive.org/web/20240117153736/https://s21.q4cdn.com/399680738/files/d

5  oc_financials/annual_reports/2018-Annual-Report.pdf, p. 12.

6  48.  In 2017, Facebook generated $39.94 billion in advertising revenue out of

7  $40.65 billion total revenue. *Facebook 2017 SEC Annual Report*,

8  https://web.archive.org/web/20240117160530/https://s21.q4cdn.com/399680738/files/d

9  oc_financials/annual_reports/FB_AR_2017_FINAL.pdf, p. 36 (last visited Jan. 17,

10  2024).

11  49.  In 2018, Facebook generated $55.01 billion in advertising revenue out of

12  $55.84 billion in total revenue. *Facebook 2018 SEC Annual Report*, p. 38.

13  50.  In 2019, Facebook generated $69.66 billion in advertising revenue out of

14  $70.70 billion in total revenue. *Facebook 2019 SEC Annual Report*, p. 44,

15  https://web.archive.org/web/20240117160830/https://www.sec.gov/Archives/edgar/data

16  /1326801/000132680120000013/fb-

17  12312019x10k.htm#sE9BC7753C2D85D4AA9A33E6089940CDB.

18  51.  In 2020, Facebook reported nearly $86 billion (USD) in revenue, up from

19  $70.7 billion in 2019, and $55.8 billion in 2018.

20  https://web.archive.org/web/20240117161023/https://www.statista.com/statistics/26860

21  4/annual-revenue-of-facebook/ (last visited Jan. 17, 2024).

22  52.  In 2021, Facebook generated $114.934 billion in advertising revenue out of

23  $117.929 billion in total revenue. *Facebook 2021 SEC Annual Report*, p. 65,

24  https://web.archive.org/web/20240117161041/https://www.sec.gov/Archives/edgar/data

25  /1326801/000132680122000018/fb-20211231.htm.

26  53.  In 2022, Facebook generated $113.642 billion in advertising revenue out of

27  $116.609 billion in total revenue. *Facebook 2022 SEC Annual Report*, p. 70,

28

https://web.archive.org/web/20240117161924/https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm.



## B. FACEBOOK'S PRACTICES OF DISCRIMINATORY AD TARGETING, APPROVAL, LOOKALIKE-AUDIENCE CREATION, AND DELIVERY

54.   Facebook does not merely publish advertisements for a fee on its websites and applications. Rather, Facebook is integrally involved in the creation, utilization, publication, dissemination, circulation, delivery, and/or targeting of advertisements on its products.

55.   Indeed, as the Ninth Circuit panel majority found on appeal from this Court's dismissal of Plaintiffs' Third Amended Complaint, Plaintiffs' claims "challenge Facebook's conduct as a co-developer of content and not merely as a publisher of information provided by another information content provider." (**Exhibit 1**, Order and Amended Memo, pg. 5).

56. During the period relevant to this Complaint, Facebook violated federal and state housing laws by, *inter alia*, engaging in the following practices as part of its process for delivering housing ads to users:

(1) creating, implementing, maintaining, and proffering to housing advertisers Ad Platform functionality that allowed housing ads to be targeted to users based on protected characteristics that Facebook assigned to users via its invasive data collection processes;

(2) approving housing ads that used protected characteristics as a basis for determining the "Eligible Audience" for the housing ads;

(3) creating, implementing, maintaining, and proffering to housing advertisers the "Lookalike Audience" tool that expanded housing advertisers' initial audience selections into larger Eligible Audiences by including additional users who "looked like" the users in the advertisers' initial audience selection, based (at least in part) on the users' protected characteristics; and

(4) creating, implementing, and maintaining an algorithm that determined which users from the Eligible Audiences would actually receive the ads, basing this delivery determination (at least in part) on the users' protected characteristics.

57. The above violations are explained in further detail below.

***i. Facebook Mines Vast Troves of User Data—Including Data Regarding Users' Protected Characteristics—Used Such Data to Target Housing Ads, and Touted the Efficacy of its Ad Targeting to Prospective Housing Advertisers***

58. Facebook sold to its housing advertisers the ability to target advertisements to people who, according to Facebook's assessment of the data it collected, shared certain personal attributes and/or are likely to respond to a particular ad.

59. Users are required to disclose some data about themselves when they set up their profiles, such as date of birth, name and gender. However, users disclose much of

their personal attributes unwittingly through the actions they, and those associated with them, take on and off of Facebook's products.[5]

60.   Indeed, Facebook collects millions of data points about its users, draws inferences about each user based on this data, and then charges advertisers for the ability to use its Ad Platform to micro target ads to users based on Facebook's inferences about them. Facebook then uses the Ad Platform to publish, circulate, utilize, and/or disseminate ads to users across the web and in mobile applications in a targeted fashion.

61.   Beyond the information that users are required to provide Facebook as a condition of creating a profile (i.e., name, gender, birthdate, and phone number or email address), Facebook gathers and stores additional personal data, which can be and is used to target ads to its users. Fortune.com/2018/03/21/Facebook-personaldata-cambridgeanalytics

62.   Facebook collects and stores data about: every ad users click on; any additional personal information added to the users' profiles; every IP address used to log in to Facebook; every friend and deleted friend in users' network; and all of the users' activity (stored in Facebook's activity log). *Id.*

63.   The data Facebook collects and extracts include data about its users' demographics, interests, and behavior both on and off Facebook's products, including the pages that a user and a user's friends like, information from a user's Facebook and Instagram profiles; a user's activities with businesses not affiliated with Facebook, including purchases and emails; a user's activity on other websites and apps; and a user's location. https://www.facebook.com/about/ads, [https://perma.cc/9X8N-8G42] (last visited Jan. 17, 2024).

64.   Upon information and belief, the information Facebook mines and maintains includes data about users' protected characteristics.

---

[5] https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 26, 2021).

65.     Upon information and belief, Facebook evaluates, analyzes, and processes the vast trove of user data it mines in order to create a list containing thousands of different categories, each category corresponding to one or more interests, demographics, and other characteristics.

66.     Facebook then assigns applicable categories to each user. Julia Angwin, et al, *Facebook Doesn't Tell Users Everything It Really Knows About Them*, ProPublica, (Dec. 27, 2016), https://web.archive.org/web/20240117163231/https://www.propublica.org/article/facebook-doesnt-tell-users-everything-it-really-knows-about-them (Clarification January 24, 2017).

67.     The categories are based on information that users have provided to Facebook and on information that Facebook has inferred from the user's actions and behaviors. Louise Matsakis, *Facebook's Targeted Ads Are More Complex Than It Lets On*, Wired (April 25, 2018), https://www.wired.com/story/facebooks-targeted-ads-are-more-complex-than-it-lets-on/ (last visited Jan. 17, 2024).

68.     Facebook makes this list of user-assigned categories available to advertisers through Ad Platform, an interactive tool that enables advertisers to upload proposed ads and use Facebook's curated list of categories to determine which users will be eligible to view the ads (the "Eligible Audience"). In this way, advertisers on Facebook are able to target their ads to particular subsets of users.

69.     Facebook creates and controls the categories that it provides to advertisers as available targeting options.

70.     During the period relevant to this Complaint, Facebook provided housing advertisers with a variety of tools in Ad Platform that enabled the advertisers to filter the Eligible Audiences for housing ads based on users' protected characteristics (or proxies for such characteristics).

71.     In other words, by selecting from Facebook's curated list of categories (created using user data Facebook mined)—which included categories defined by

protected characteristics or proxies for such characteristics—housing advertisers were able to specify attributes that the users who were shown the ad must have (via the "Include People" function) and attributes that users who were shown the ad must not have (via the "Exclude People" function).

72.    During this interactive ad targeting phase, Facebook directed its housing advertisers to first choose their objective by answering, "what's the most important outcome I want from this ad?" *Here's How to Create a Facebook Ad*, Facebook, https://www.facebook.com/business/ads (last visited Feb. 26, 2021).

73.    Facebook then instructed housing advertisers[6] to select their audience: "Using what you know about the people you want to reach – like age, location, and other details – choose the demographics, interests and behaviors that best represent your audience." *Here's How to Create a Facebook Ad*, Facebook, https://www.facebook.com/business/ads (last visited Feb. 26, 2021).

74.    Facebook then supplied housing advertisers with the discriminatory tools, allowing the advertisers to define which users, or which types of users, they wanted to target with their ads.

75.    Facebook provided a toggle button that enabled housing advertisers to exclude men or women from seeing an ad, a search box to exclude people who did not speak a specific language from seeing an ad, and a map tool to exclude people who lived in a specified area from seeing an ad by drawing a red line around the excluded geographic area.[7]

---

[6] Facebook's Ad Platform applied to all advertisers.  The Fourth Amended Complaint is focused on housing advertisers.  Based on settlement agreements Facebook has entered into with various fair housing organizations, Facebook has publicly claimed it no longer illegally targets housing ads and it no longer allows housing advertisers to use its Ad Platform to target ads based on protected classes.

[7] The choice of red lines for exclusion is more than ironic.  The housing advertisers' and Facebook's prior ability to exclude users based on their geographic locations fostered the maintenance of segregated communities and a segregated market for housing.

76. Facebook also provided drop-down menus and search boxes to exclude or include (i.e., limit the audience of an ad exclusively to) users who share specified attributes.

77. Facebook offered housing advertisers hundreds of thousands of attributes from which to choose for exclusion, for example, "women in the workforce," "moms of grade school kids," "foreigners," "Puerto Rico Islanders," or people interested in "parenting," "accessibility," "service animal," "Hijab Fashion," or "Hispanic Culture." Facebook also has offered housing advertisers the ability to limit the audience of an ad by selecting to include only those classified as, for example, "Christian" or "Childfree."

78. Housing advertisers were offered three different Facebook tools to assist them in targeting their audiences with greater degrees of specificity: Facebook Core Target Audiences, Facebook Custom Audiences, and Lookalike Audiences. *See* https://www.facebook.com/business/ads/ad-targeting (last visited Jan. 17, 2024).

79. These tools empowered housing advertisers to target audiences by Facebook's pre-determined categories and enabled them to include or exclude certain categories of people from their audiences. *See* https://business.facebook.com/ads/audience-insights/people?act=1006195749575790&business_id=838507093214687&age=18-&country=US (last visited Feb. 26, 2021).

80. Advertisers pay Facebook to show targeted ads to users on Facebook, among other places. Targeted ads are placed through the Ad Platform.

81. Facebook not only provided its discriminatory ad-targeting tools to housing advertisers; Facebook has touted and promoted the effectiveness of its targeting capabilities.

82. For example, Facebook has promoted and distinguished its Ad Platform by proclaiming that "most online advertising tools have limited targeting options . . . like location, age, gender, interests and potentially a few others. . . *But Facebook is different.*

*People on Facebook share their true identities, interests, life events and more.*"[8] As Facebook explains, its Ad Platform enables advertisers to "*[r]each people based on . . . zip code . . . age and gender . . . specific languages . . . the interests they've shared, their activities, the Pages they've like[d] . . . [their] purchase behaviors or intents, device usage and more.*"[9] (emphasis added). Thus, Facebook "use[s] location-related information-such as your current location, where you live, the places you like to go, and the businesses and people you're near to provide, personalize and improve our Products, including ads, for you and others."[10]

83.   Moreover, Facebook holds out its Ad Platform as a powerful resource for advertisers in many industries, including housing and housing-related services.

84.   For instance, Facebook promotes its Ad Platform with "success stories," including stories from a housing developer, a real estate agency, a mortgage lender, a real estate-focused marketing agency, and a search tool for rental housing. https://www.facebook.com/business/success/categories/real-estate (last viewed Feb. 26, 2021).

85.   Facebook also provides information to its users or prospective users as to how Facebook targets ads.

**Why you see a particular ad**

Our ad system prioritizes what ad to show you *based on what advertisers tell us their desired audience is,* and we then match it to people who might be interested in that ad. *This means we can show you relevant and useful ads without advertisers learning*

---

[8] Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).

[9] Facebook Business, *Your Guide to Digital Advertising,* www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).

[10] Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited August 16, 2019).

*who you are.*  We don't sell any individual data that could identify you, like your name.

When an advertiser wants to reach…
## Bike enthusiasts

Between **18 – 35 years old**

**Female**

Within **20 miles** of my store

Interested in **bicycling**

**Mobile** users

We show their ad to people like…
## Facebook user

**30 years old**

**Female**

**Menlo Park, CA**

Interested in **bicycling**, movies, cooking

**iPhone user**, car shopper, gamer

https://www.facebook.com/about/ads, [https://perma.cc/9X8N-8G42] (last visited Jan. 17, 2024) (emphases added in part).

86.    Facebook uses "…the information we have (including your activity off our Products, such as the websites you visit and the ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services." *Data Policy*, Facebook, https://www.facebook.com/policy.php (last visited Aug. 15, 2019).

87.   As stated above, Facebook designed, created, implemented, promoted, and provided to housing advertisers Ad Platform functionality that allowed the advertisers to select from Facebook's curated list of user-assigned categories—which Facebook created based on the data it mined from its users—and thereby target housing ads to an Eligible Audience that included only certain types of users.

88.   Included in the Facebook-created list of categories presented to the housing advertisers were categories defined by protected characteristics (or proxies for such characteristics).

89.   Facebook's independently discriminatory actions thereby enabled housing advertisers to exclude categories of people from viewing advertisements based on the categories Facebook created by extracting user data and making inferences about those users.

90.   Facebook's design, maintenance and implementation of its Ad Platform allowed ads for housing and housing-related services to be targeted to large, segregated audiences based on characteristics protected by the FHA, California statutes, and New York statutes.

91.   Facebook engaged in intentional discrimination by creating user-assigned categories based on protected characteristics (which Facebook ascertained from data it mined from its users) and proffering such categories to housing advertisers as available filtering options in its ad-targeting tool, the efficacy of which Facebook promoted and touted.

92.   Facebook's policy or practice of creating categories based on protected characteristics and proffering such categories to housing advertisers in Ad Platform constituted unlawful disparate impact discrimination against users with protected characteristics, resulting in a significant disproportionate impact on such persons (i.e., their exclusion from the opportunity to see housing ads). Facebook's creation, implementation, and provision of these categories to housing advertisers in connection with targeting housing ads did not serve any legitimate business interest. Even if such

policy or practice did serve any legitimate business interests, Facebook could achieve its interests through alternative, less discriminatory means.

### ii. Facebook Approved Discriminatory Housing Ads

93.    Upon information and belief, Facebook approved housing advertisements which excluded (or included) categories of protected classes, including sex, age, disability, sexual preference, age, marital status, race or skin color, or geographic boundaries which effectively discriminate in a similar manner.

94.    When Facebook or a housing advertiser excluded a specific category from its audience and Facebook published its advertisement, Facebook ensured that the advertisement was visible to a target audience that created a barrier to marketplace access for those who were excluded from the audience based on protected class status.

95.    On February 8, 2017, Facebook issued a press release, asserting that "[d]iscriminatory advertising has no place on Facebook" and noting that "[o]ver the past several months . . . [w]e heard concerns that discriminatory advertising can wrongfully deprive people of opportunities and experiences, particularly in the areas of housing, employment and credit[.]"[11]

96.    In other words, Facebook was aware that its ad-targeting functionality allowed housing advertisers to exclude users with protected characteristics from receiving housing ads.

97.    In the same press release, Facebook made the following representation: "When an advertiser attempts to show an ad that we identify as offering a housing, employment or credit opportunity and either includes or excludes our multicultural advertising segments — which consist of people interested in seeing content related to

---

[11]
https://web.archive.org/web/20240111201004/https://about.fb.com/news/2017/02/improving-enforcement-and-promoting-diversity-updates-to-ads-policies-and-tools/.

1  the African American, Asian American and US Hispanic communities — **we will**

2  **disapprove the ad**."[12]

3      98.   Upon information and belief, this statement was untrue because Facebook

4  actually approved housing ads excluding the "multicultural advertising segments" after

5  February 8, 2017.

6      99.   Upon information and belief, as recently as 2019, Facebook mined user data

7  to create categories of users defined by race or skin color *other than white* and permitted

8  advertisers to exclude those categories from the audience of housing advertisements. *See*

9  https://web.archive.org/web/20240117165259/https://nationalfairhousing.org/facebook-

10  settlement/ (last visited Jan. 17, 2024).

11      100.  Upon information and belief, Facebook approved and published housing

12  advertisements which excluded African Americans from the audience. *See*, *e.g*., Julia

13  Angwin, et al., *Facebook (Still) Letting Housing Advertisers Exclude Users By Race*

14  (ProPublica,          Nov.          21,          2017),

15  https://web.archive.org/web/20240117165310/https://www.propublica.org/article/faceb

16  ook-advertising-discrimination-housing-race-sex-national-origin.

17      101.  In addition, on or about November 14, 2017, ProPublica purchased dozens

18  of rental housing ads on Facebook and requested that these ads "not be shown to certain

19  categories of users, such as African American, mothers of high school kids, people

20  interested in wheelchair ramps, Jews, expats from Argentina and Spanish speakers." *Id.*

21  "Every single ad was approved within minutes." *Id.*  An additional ProPublica ad, which

22  sought to exclude potential renters "interested in Islam, Sunni Islam and Shia Islam" took

23  22 minutes to approve. *Id.*

24      102.  According to the U.S. Department of Justice in its 2022 complaint against

25  Facebook (discussed below), on numerous occasions, Facebook approved various

26

27

28  ───────────────
[12] *Id*. (emphasis added).

housing ads that discriminatorily excluded users with protected characteristics from the ads' Eligible Audiences, including the following:

a. Housing ads requesting that only users of one sex (i.e., only male or female) be included in the Eligible Audiences — approved by Facebook in January and February 2018;

b. Housing ads requesting that Facebook exclude from the ads' Eligible Audiences any users that Facebook had assigned to the following categories: "Parents (All)," "Moms of high school kids," "Moms of grade school kids," "Moms of preschool kids," "New Moms," and "Moms." — approved by Facebook in November 2017;

c. Housing ads requesting that Facebook exclude from the ads' Eligible Audiences any users that Facebook had assigned to the following categories: "parents with teenagers (13-18)," "parents with preteens (08-12)," "parents with early school-age children (06-08 years)," "parents with preschoolers (03-05 years)," and "parents with toddlers (01-02 years)" — approved by Facebook in January and February 2018;

d. Housing ads requesting that Facebook exclude from the ads' Eligible Audiences any users that Facebook had assigned to the following categories: "Hispanic (US—Spanish dominant)," "African American (US)," or "Asian American (US)" — approved by Facebook at least as early as October 2016;

e. Housing ads requesting that Facebook exclude from the ads' Eligible Audiences any users that Facebook had assigned to the following categories: "Hispanic (US—Spanish dominant)," "Hispanic (US—Bilingual)," "African American (US)," or "Asian American (US)" — approved by Facebook in November 2017, *after* Facebook had stated in its February 8, 2017 press release that it would disapprove such ads;

f. Housing ads requesting that Facebook exclude from the ads' Eligible Audiences any users that Facebook categorized as having an interest in the following: "Catholicism," "Protestantism," "Shia Islam," "Sunni Islam," "Judaism," "Orthodox Judaism," "Hasidic Judaism," "Reform Judaism," "Conservative Judaism," "The Jewish Home," "Bible," "Christian," "Christianity," "Lutheranism," or "Jesus" — approved by Facebook in November 2017;

g. Housing ads requesting that Facebook exclude from the ads' Eligible Audiences any users that Facebook categorized as having an interest in "American Sign Language," "Wheelchair ramp," "Wheelchair accessible van," "Braille," "Guide Dogs for the Blind," or "Guide Dogs for the Blind Association" — approved by Facebook in November 2017.

**Exhibit 2**, *United States v. Meta*, Complaint, 1:22-cv-05187 ("DOJ Complaint") ¶¶ 51, 52, 54-56.

103.  The above instances of Facebook's approvals were reported by news sources and/or asserted in lawsuits brought against Facebook.

104. Upon information and belief, Facebook was aware of these reported approvals.

105. Upon information and belief, Facebook approved and published housing advertisements for sale and rental properties which excluded African Americans and single parents and/or that were based on sex, familial status, religion, disability, and other protected classes from the ad's target audience.

106. By approving housing ads that excluded certain users from the Eligible Audience based on the users' protected characteristics, Facebook engaged in intentional discrimination.

*iii. Facebook Created Segregated Housing Ad Audiences with the Lookalike Audience Tool*

107. In addition to Facebook's discriminatory ad-targeting practices described above, upon information and belief, Facebook contributed to housing discrimination by creating Lookalike Audiences based (at least in part) on protected characteristics.

108. Facebook's Lookalike Audience tool allows an advertiser to select a custom audience of users (the "source audience") that Facebook then expands into a larger audience (i.e., the Lookalike Audience) by finding additional users who "look like" the users in the advertiser's source audience.

109. Facebook then delivers the ad to this Facebook-created Lookalike Audience.

110. Facebook explains its Lookalike Audience functionality as follows:

> A lookalike audience uses an existing Custom Audience you select for its source audience. To create a lookalike audience, our system leverages information such as demographics, interests and behaviors from your source audience to find new people who share similar qualities. ***When you use a lookalike audience, your ad is delivered to that audience of people who are similar to (or '<u>look like</u>') your existing customers***.
>
> When you create your lookalike audience, you can use a percent range to choose how closely you want your new audience to match your source audience. The size you choose depends on your goals.[13]

111. According to United States in the DOJ Complaint, "Facebook acknowledged in 2018 and 2019 that the Lookalike Audience tool used the demographics of its users—***including race, sex, religions, age, zip codes***, and Facebook Group membership, among other categories—in selecting the Lookalike Audiences to whom to deliver ads." (**Exhibit 2**, ¶ 67) (emphasis added).

---

[13] https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Jan. 17, 2024) (emphasis added).

112.  Facebook designed, created, and implemented the algorithm used to formulate Lookalike Audiences and, upon information and belief, chose the data that would be fed into the algorithm, which included data about users' protected characteristics.

113.  In March 2019, Facebook entered into a settlement with several civil rights organizations (discussed in further detail below) wherein Facebook agreed, *inter alia*, to modify its Lookalike Audience functionality. (**Exhibit 3**, *Algorithms that "Don't See Color": Measuring Biases in Lookalike and Special Ad Audiences*, pg. 1).

114.  According to Facebook, the new version of its tool—called Special Ad Audiences—would function similarly to Lookalike Audiences; however, the new tool would not "consider users' age, gender, relationship status, religious views, school, political views, interests, or zip code when detecting common qualities." *Id*.

115.  Despite this claim, researchers found that the Special Ad Audience tool, like the Lookalike Audience tool before it, created audiences at least partly based on protected characteristics.

116.  In an academic paper published in December 2019, *after* Facebook purportedly modified its discriminatory Audience Lookalike tool, the authors revealed that they had tested Facebook's Special Ad Audience tool and found that audiences they created with that tool were "skewed to almost the same degree as Lookalike audiences, with many of the results being statistically indistinguishable." *Id*.

117.  The researchers also found evidence "indicating that both Lookalike and Special Ad audiences carry—to a certain extent—the biases of the source audience[.]" *Id*. at 1-2.

118.  For instance, where the source audience for an ad was 100% male, the ad was delivered to a group of users that was over 99% male when the Lookalike Audience tool was used, and the ad was delivered to a group of users that was over 95% male when the Special Ad Audience tool was used. *Id*. at 5.

119.  The researchers also found that an ad with a 50%-male source audience was delivered to a group of users that was about 70% male, reflecting a "male bias." *Id*.

120.  According to the United States in the DOJ Complaint, Facebook knew that its 2019 modification of the Lookalike Audience tool would likely not resolve Facebook's discriminatory delivery of ads that utilized this functionality, as Facebook's employees admitted in 2018 that the Lookalike Audience/Special Ad Audience algorithm would still result in skewed ad delivery based on protected characteristics even if protected characteristics were no longer inputted into the algorithm. (**Exhibit 2**, ¶ 70).

121.  In designing, creating, implementing, and maintaining the Lookalike Audience tool and in proffering this functionality to housing advertisers, Facebook engaged in intentional discrimination on the basis of users' protected characteristics. During the relevant period of this Complaint (i.e., until at least 2019), Facebook mined data about users' protected characteristics, including sex, and fed such data into its Lookalike Audience algorithm. Even after Facebook purportedly modified the algorithm to no longer explicitly consider users' protected characteristics, the functionality nevertheless continued to deliver ads discriminatorily based on such characteristics— upon information and belief, Facebook knew that such discrimination would continue or would be likely to continue even after the Lookalike Audience tool was modified.

122.  Facebook's design, creation, and implementation of the Lookalike Audience tool constituted unlawful disparate impact discrimination against users with protected characteristics (at least sex), resulting in a significant disproportionate impact on such persons (i.e., their exclusion from the opportunity to see housing ads). Facebook's implementation and provision of this tool to housing advertisers in connection with targeting housing ads did not serve any legitimate business interest. Even if such practice/policy did serve any legitimate business interests, Facebook could achieve its interests through alternative, less discriminatory means.

*iv.  Facebook Effectuated Discrimination by Determining, Based on Protected Characteristics, Which Users in the Eligible Audience for Housing Ads Would Actually See Those Ads*

123.  During the ad delivery phase, Facebook selected from among the users who had been defined as "eligible" to see a housing ad (i.e., included in the housing ad's Eligible Audience) to determine which of those users would actually see the ad. Facebook based this delivery decision in large part on the inferences and predictions it drew about each user's likelihood to respond to an ad based on the data it had about that user, the data it had about other users whom it considered to resemble that user, and the data it had about "friends" and other associates of that user. To decide which users were in the targeted housing ad audience, Facebook considered the user's sex and close proxies for the other protected classes. Such proxies may have included which pages a user visited, which apps a user had, where a user went during the day, and the purchases a user made on- and offline.  As a result of Facebook's conduct in the ad delivery phase, Facebook created a segregated housing market, unlawfully denying Plaintiffs and the putative class equal access to housing advertisements. Those Facebook users who were given access to this segregated market were eligible to see thousands of housing ads which Plaintiffs and the putative class were not eligible to see.

124.  Upon information and belief, Facebook alone, not the advertiser, determined which users constituted the "actual audience" for each housing ad.

125.  In order to determine which users will actually see advertisers' ads, Facebook uses ad auctions: "We use an ad auction to determine the best ad to show to a person at a given point in time. . . . Each time there's an opportunity to show an ad to someone, an auction takes place to determine which ad to show to that person. Billions of auctions take place everyday across the Facebook family of apps."[14]

---

[14] https://www.facebook.com/business/help/430291176997542?id=561906377587030

126.  Essentially, once advertisers tell Facebook which users should be in the target audience (i.e., Eligible Audience) for an ad, Facebook determines whether there is an opportunity to show that ad to a user in the Eligible Audience and if so, allows that ad to compete in an auction.

127.  To determine which ad wins an auction (and thus gets delivered to a targeted user), Facebook assigns a value to each ad participating in the auction, based on the following factors: (1) "bid"—the price the advertiser will pay; (2) "estimated action rates"—an estimate of the probability that a particular user will engage with that ad; and (3) "ad quality"—a measure of the ad's quality, determine from various sources such as feedback from people who have viewed the ad.[15]

128.  The ad to which Facebook assigns the highest value wins the auction and will be delivered to users, via Facebook's delivery algorithms. Until the advertiser's budget for that ad has been spent, Facebook will continue to deliver the ad to users.

129.  Facebook charged its housing advertisers different prices to show the same ad to different users. The price to show a housing ad to a given user was based, in large part, on how likely Facebook believed that user was to interact with the particular housing ad. In order to determine the pricing for a housing ad for each user, Facebook considered, by way of example, the sex and close proxies for the other protected classes. Such proxies may have included which pages a user visited, which apps a user had, where a user went during the day, and the purchases a user made on and offline. Facebook alone sets the price the housing advertiser paid to have Facebook to display the ad to the target audience. Furthermore, Facebook used the pricing differentials it set to determine which users will be in the target audience for housing ads rather than allowing advertisers to make that decision. As Facebook explained, "*If there are more and cheaper opportunities among*

---

[15] *Id.*

*men than women, then we'd automatically spend more of [an advertiser's] overall budget on the men*."[16] (emphasis added).

130. Facebook has explained that factors (2) and (3)—estimated action rates and ad quality—together measure an ad's relevance. According to Facebook, an ad that Facebook deems "more relevant to a person" is more likely to be shown to that person and can win an auction even other ads that have higher bids (i.e., ads for which the advertisers are willing to pay more to place on Facebook).[17]

131. In other words, if Facebook's delivery algorithms determine that certain users in an Eligible Audience are unlikely to find a particular ad "relevant," Facebook will exclude those users from seeing that ad and instead deliver that ad to different users for whom Facebook considers the ad "relevant."

132. To determine ads' relevancy (and thus which users in Eligible Audiences would actually receive the ads), Facebook gave its delivery algorithms access to the exceedingly vast trove of data that Facebook mined and collected from its users.

133. Facebook acquired this user data from, *inter alia*: the information users provide Facebook as a condition of creating a profile (e.g., gender and birthdate), users' activity on and off Facebook; users' membership and activity in Facebook Groups; and users' Facebook friends.

134. Such data encompassed the same data Facebook provided to advertisers for ad-targeting in Ad Platform and thus included information about users' protected characteristics, including sex, race, national origin, disability, religion, and familial status.

---

[16] *Facebook, Why did my cost per result go up when I increased my budget?* [https://web.archive.org/web/2016 0930124257/https://www.facebook.com/business/help pref=faq_content] (archived on Sep. 30, 2016 by The Internet Archive).

[17] *Id.*

135. Further, to group users by shared attributes, to create a Lookalike Audience, to determine an ad's "actual audience" during the ad delivery phase, and to price each ad for each user, Facebook combined the data it had about user attributes and behavior on its platforms with data it obtained about user behavior on other websites and in the non-digital world. Facebook then used machine learning and other prediction techniques to classify and group users to project each user's likely response to a given housing ad. In doing so, Facebook inevitably recreated groupings defined by their protected class or classes. For example, the top Facebook pages users "like" varies sharply by their protected class, according to Facebook's "Audience Insights" tool.

136. Therefore, by grouping users who "like" similar pages (unrelated to housing) and presuming a shared interest or disinterest in housing-related advertisements, Facebook's tools functioned just like an advertiser who intentionally targets or excludes users based on their protected class.

137. According to the United States in the DOJ Complaint, Facebook admitted in 2018 that its delivery algorithms considered race and sex when making ad delivery determinations. (**Exhibit 2**, ¶ 79).

138. Additionally, Facebook's ad delivery algorithms exacerbated the discriminatory exclusions resulting from advertisers' use of Ad Platform to target housing ads based on protected characteristics. This is because users in protected classes who were excluded from seeing housing ads would be unable to engage with such ads (i.e., they had no chance to click on the ads), which would likely result in Facebook's delivery algorithms determining that future housing ads would be less "relevant" to those users. As such, even if certain housing advertisers did not exclude users with protected characteristics from the Eligible Audiences for their housing ads, such ads were likely nevertheless steered away from such users at the delivery phase due to the skewed "relevancy" component in Facebook's delivery algorithms.

139. Indeed, testing conducted by academic researchers and the United States Government revealed that Facebook's ad delivery algorithms disproportionally targeted

particular housing ads towards certain users based on race, ***even though the testers did not try to target the ads based on race***.

140.   According to the United States in the DOJ Complaint, the Government "conducted extensive testing" of Facebook's ad delivery algorithms in various housing markets and found that Facebook's ad delivery algorithms disproportionately targeted housing ads towards White users and away from similarly situated Black users. (**Exhibit 2,** ¶ 87).

141.   Specifically, in one test, the Government targeted over 150 housing ads to an Eligible Audience of Facebook users living near two adjacent towns located in the Southern District of New York. In one of the towns, over 60% of the residents were African American; in the other town, more than 90% of the residents were White. *Id*., ¶¶ 88, 89.

142.   In the ads' Eligible Audiences, the Government selected an equal number of White and Black residents, and these residents were similarly situated with respect to age, sex, and income. Facebook delivered the Government's housing ads over 80,000 times, determining which users would receive the ads based on its delivery algorithms. *Id*., ¶¶ 89, 90.

143.   Even though the Government had controlled for location, income, age, and sex, Facebook nevertheless delivered the housing ads discriminatorily: in the majority-Black town, Facebook delivered the housing ads disproportionately towards Black users; in the predominantly White town, Facebook delivered the housing ads disproportionately towards White users. *Id*., ¶ 90.

144.   The Government found that the "steering was substantial and highly statistically significant" and also found, via additional testing, that Facebook's racially disparate ad delivery was not caused by the users' expressed interests in living in either of the towns. *Id*.

145.   Additionally, the Government conducted similar testing—again controlling for age, sex, and income—in neighborhoods located outside New York's Southern

District. The results of this testing again demonstrated "statistically significant racial disparities in Facebook's ad delivery." *Id*., ¶ 92.

146.  Academic researchers similarly found racial disparities in the way Facebook delivered ads. For instance, in one set of tests, researchers targeted housing ads to the same audiences in the same geographical locations in North Carolina. The results demonstrated a "significant ad delivery skew along racial lines." (**Exhibit 4**, *Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead to Skewed Outcomes*, pg. 13).

147.  Upon information and belief, researchers also found that where housing ads contained a picture of a Black family, it was less likely that the ads would be delivered to White users as compared to identical housing ads that featured a picture of a White family. The researchers did not attempt to target these ads by race or other characteristics. (**Exhibit 2**, ¶ 86).

148.  Upon information and belief, Facebook agreed in 2019 (in a settlement with civil rights organizations) to stop allowing advertisers to target housing ads based on users' protected characteristics; yet, Facebook knew that this would not resolve the discriminatory exclusions due to the biases embedded into Facebook's ad delivery algorithms. *See id*., ¶ 84.

149. Facebook's design, creation, and implementation of its ad delivery algorithms in connection with delivering housing ads and Facebook's mining and inputting of users' protected characteristics into its ad delivery algorithms to determine which eligible users would actually receive housing ads constitute intentional discrimination in violation of the FHA and comparable state laws. Upon information and belief, Facebook was aware of its violations yet failed to take appropriate steps to remedy them.

150. Facebook's design, creation, and implementation of its ad delivery algorithms in connection with housing ads constitutes unlawful disparate impact discrimination against users with protected characteristics (at least race), resulting in a

FOURTH AMENDED CLASS ACTION COMPLAINT

significant disproportionate impact on such persons (i.e., their exclusion from the opportunity to see housing ads). The manner in which Facebook designed, created, and implemented these algorithms to deliver housing ads (such as by inputting massive amounts of user data that reflected users' protected characteristics without safeguards, and by failing to remediate or correct the discriminatory delivery) did not serve any legitimate business interest. Even if such practice/policy did serve any legitimate business interests, Facebook could achieve its interests through alternative, less discriminatory means.

## C. FACEBOOK'S DISCRIMINATORY PRACTICES REVEALED AND SUBSEQUENT LEGAL PROCEEDINGS AGAINST FACEBOOK

151.  As noted above, ProPublica and other news outlets first issued reports about Facebook's practice of discriminatory housing-ad exclusions in 2016. *See* https://web.archive.org/web/20240117170752/https://www.propublica.org/article/facebook-lets-advertisers-exclude-users-by-race ("Facebook's system allows advertisers to exclude black, Hispanic, and other 'ethnic affinities' from seeing ads.").

152. Soon after the news broke, the National Fair Housing Alliance (NFHA) conducted an investigation using Ad Platform and thereafter notified Facebook that its ad-targeting tools seemingly violated the FHA and comparable state laws.

153. Upon information and belief, a Facebook representative emailed the following message to the NFHA in response: "We think ethnic affinity marketing is really valuable in promoting diversity of the voices and images on our platform, but we also understand the concerns we're hearing about wrongful discrimination. At this point, we're listening to stakeholders like you and considering the way forward." (**Exhibit 5**, *National Fair Housing Alliance, et al. v. Facebook*, First Amended Complaint, 1:18-cv-02689-JGK ("NFHA Complaint"), ¶ 75).

154.  According to the NFHA, the organization presented Facebook with relevant legal authority as to Facebook's liability for its discriminatory ad-targeting practices.

155. Facebook then issued a press release on November 11, 2016, wherein Facebook stated that it would remove race as an available targeting option for housing ads: "We will disable the use of ethnic affinity marketing for ads that we identify as offering housing, employment, or credit . . . and require advertisers to affirm that they will not engage in discriminatory advertising on Facebook[.]"[18]

156. Facebook published a similar statement on February 8, 2017 in which Facebook stated that it would "[d]isapprov[e] ads offering housing, employment or credit opportunities that use our multicultural affinity [formerly, "ethnic affinity"] segments[.]"[19] With respect to housing, employment, or credit ads that targeted users based on other, non-racial categories, Facebook stated that it would "require the advertiser to certify that it is complying with that policy and with applicable anti-discrimination laws."

157. Despite Facebook's representations, a subsequent ProPublica report published on November 21, 2017—over a year after the news outlet's first report was issued—demonstrated that Facebook had not actually ceased its discriminatory advertising practices.

158. Instead, Facebook provided ProPublica with the option to exclude users from receiving housing ads based on race, sex, familial status, disability, religion, and national origin. Further, Facebook approved housing ads that excluded users based on these protected characteristics. ProPublica stated that it was never presented with a self-certification screen.

---

[18]
https://web.archive.org/web/20240117170844/https://about.fb.com/news/2016/11/updates-to-ethnic-affinity-marketing/
[19]
https://web.archive.org/web/20240117171120/https://about.fb.com/news/2017/02/improving-enforcement-and-promoting-diversity-updates-to-ads-policies-and-tools/

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

159.  In response to the ProPublica report, the NFHA and three other fair housing non-profit organizations investigated Facebook's advertising practices, and in March 2018, they commenced an action against Facebook in the Southern District of New York.

160.  In the organizations' complaint, they alleged that Facebook's ad-targeting practices (including creating categories based on protected characteristics and providing the categories to housing advertisers in Ad Platform) violated the Fair Housing Act and the New York City Human Rights Law. (**Exhibit 5**).

161.  Ultimately, in March 2019, the parties executed a settlement agreement to resolve the case. (**Exhibit 6**, NFHA Settlement Agreement).

162.  Among other things, Facebook agreed to remove certain ad-targeting options for housing advertisers, administer civil rights training programs for certain of its employee groups, and pay $1,950,000 to the non-profit organizations.

163.  As stated above, Facebook generated $55.01 billion in advertising revenue in 2018 and $69.66 billion in advertising revenue in 2019.

164.  Even after this settlement, upon information and belief, advertisers on Facebook could still target housing ads based on users' protected characteristics. Additionally, the settlement did not require Facebook to modify its ad delivery algorithms.

165.  Facebook "denie[d] any and all wrongdoing or liability" with regard to its discriminatory housing ad practices. (**Exhibit 6**, Section XI.A.).

166.  Thereafter, on March 28, 2019, the Secretary of the United States Department of Housing and Urban Development, on behalf of the Complainant Assistant Secretary for Fair Housing and Equal Opportunity filed a charge of discrimination against Facebook pursuant to 42 U.S.C § § 3601-19 alleging, *inter alia*, that Facebook's Ad Platform violated the FHA.  (**Exhibit 7**, HUD Charge of Discrimination, HUD ALJ No., FHEJ No. 01/18/0323-8 ("Charge")).

167.  HUD's Charge alleged that Facebook is the "second largest online advertiser in the United States," "is responsible for approximately twenty percent of all online

advertising nationwide," and operates "Facebook and Instagram, two of the most widely used social media platforms in the United States."  Further, it alleged that "Facebook has approximately 221 million active users in the United States and over two billion active users globally, while Instagram has approximately 114 million active users in the United States and over one billion active users globally, with active user defined as someone who uses the platform at least once per month." (**Exhibit 7**, ¶ 6).

168.   The Charge also stated that advertisers pay Facebook "to show targeted ads to users on Facebook, Instagram, and Messenger," and on its "Audience Network." Further, the "[t]argeted ads are generally placed through *a single advertising platform called Ads Manager regardless of where the ads will be shown to users*." (**Exhibit 7**, ¶ 8) (emphasis added).

169.   The Charge further alleged that due to the way Facebook "designed its advertising platform, *ads for housing and housing-related services are shown to large audiences that are severely biased based on characteristics protected by the Act, such as audiences of tens of thousands of users that are nearly all men or nearly all women*. (**Exhibit 7**, ¶ 11) (emphasis added).

170.  Facebook elected for the Charge to be decided in federal district court (pursuant to 42 U.S.C. § 3612(a)), and on June 21, 2022, the United States filed a complaint against Facebook in the Southern District of New York (i.e., the DOJ Complaint). (**Exhibit 2**).

171.  The DOJ Complaint asserted claims against Facebook for violation of the FHA, under both disparate treatment and disparate impact theories.

172.  The complaint alleged, *inter alia*, that:

   a.  At least until 2019, Facebook "enabled and encouraged" housing advertisers to use Facebook-created categories—some of which were based on protected characteristics or were proxies for such characteristics—to filter the users in the ads' Eligible Audiences and thereby target the ads towards or away from users;

b. Before and after 2019, Facebook "invite[d]" housing advertisers to utilize Lookalike Audiences to expand the advertisers' source audience for an ad into a larger audience, which was generated, at least in part based on users' protected characteristics;

c. Before and after 2019, Facebook's "Personalization Algorithms" considered users' protected characteristics in predicting which users would find housing ads most relevant and using these predictions to determine which users in housing ads' Eligible Audiences would actually see the ads;

d. Testing conducted by HUD and academic researchers demonstrated that even after 2019, Facebook's system of delivering housing ads had a disparate, adverse impact on persons with protected characteristics;

e. Facebook was aware that it had approved discriminatory housing ads in November 2017 yet continued to approve discriminatory housing ads, including in 2018;

f. Facebook was aware, prior to its settlement with the NFHA, that its delivery algorithms and Lookalike Audience functionality could disparately impact users with protected characteristics and knew that removing users' protected characteristics as ad-targeting categories in Ad Platform and from consideration in its Lookalike Audience tool would not remedy Facebook's discriminatory delivery of housing ads;

g. Facebook, by virtue of its housing ad targeting and delivery practices, violated the following FHA provisions and their implementing regulations: 42 U.S.C. §§ 3604(a), (c), (d), and (f); and

1
2
3
4
5
6

      h. Facebook's discriminatory conduct with regard to its housing ad practices constituted a "pattern or practice of resistance to the full enjoyment of rights secured by" the FHA (42 U.S.C. § 3614(a)), and/or unlawful "discrimination and a denial of rights granted by the Fair Housing Act to a group of persons that raises an issue of general public importance" (42 U.S.C. § 3614(a)).

7

**Exhibit 2**, pgs. 3, 4, 17, 30, 34, 35, 37.

8
9
10

    173.  Facebook and the United States entered into a settlement agreement on June 27, 2022 to resolve the lawsuit. (**Exhibit 8**, DOJ Settlement Agreement and Final Judgment).

11
12
13

    174.  In the settlement agreement, Facebook "denie[d] liability and any and all wrongdoing relating to its provision of targeting options and delivery processes for housing advertisements[.]" (**Exhibit 8**, pg. 2).

14
15

    175.  Nevertheless, pursuant to the agreement, Facebook agreed to, among other things:

16
17

      a. Not provide housing advertisers with ad-targeting options based on users' protected characteristics or proxies for such characteristics;

18
19
20

      b. Cease using Lookalike Audience functionality to deliver housing ads to users who "look like" the users in an advertiser's source audience;

21
22
23
24
25
26
27

      c. Adopt a "Variance Reduction System" (machine learning technology) whereby, with respect to only sex and race/ethnicity, the variances between the Eligible Audiences and actual audiences for housing ads would be reduced and satisfy certain compliance metrics—for instance, by December 31, 2023, as to sex, Facebook was required to reduce the variances to no more than 10% for 91.7% of housing ads, and as to race/ethnicity, Facebook was

28

required to reduce the variances to no more than 10% for 81% of housing ads;

    d. Permit an independent, third-party reviewer to conduct ongoing investigation and verification to ensure that the Variance Reduction System satisfies the compliance metrics; and

    e. Provide relevant legal education resources to housing advertisers and certain Facebook employee groups.

**Exhibit 8**;

https://web.archive.org/web/20240117171417/https://www.justice.gov/opa/pr/justice-department-and-meta-platforms-inc-reach-key-agreement-they-implement-groundbreaking.

176. The parties agreed to extend the settlement agreement's term through June 27, 2026. There is no guarantee that Facebook will continue to place safeguards on its system of housing-ad targeting and delivery past this date.

177. Facebook also agreed to pay a civil penalty of $115,054.

178. As stated above, in 2021 and 2022, Facebook reported advertising revenues of $114.934 billion and $113.642 billion, respectively.

179. Facebook's settlements with the NFHA and Department of Justice have been insufficient to right the unlawful housing discrimination that Facebook has committed against its users with protected characteristics, such as Plaintiffs herein. As noted, Facebook has denied wrongdoing in connection with its discriminatory ad targeting and delivery practices, has received little more than proverbial slaps on the wrists in the form of monetary payments that are miniscule fractions of the advertising revenue Facebook has generated (including via its discriminatory practices), and there is no certainty that Facebook will continue to monitor and reduce the discriminatory features of its housing advertising platform.

180. Further, Facebook's algorithms continue to result in illegal housing discrimination on Facebook's platform—including on Marketplace—in violation of the statutes cited herein.

181. The ongoing housing discrimination on Facebook is evidenced by a recent test conducted on January 29, 2024 in St. Louis, Missouri.

182. This test involved a White male tester and a Black female tester who are similarly situated in all material respects besides their race, sex, and age.

183. Both testers live in St. Louis County in the same residence.

184. These testers simultaneously searched for housing on Facebook Marketplace using the same filtering criteria—housing located within 40 miles around St. Louis, Missouri. They set no other filters on their searches.

185. Despite the identical searches and the testers' similarities apart from race, sex, and age, these individuals received very different results.

186. Specifically, the White male tester received paid/sponsored (i.e., not user-generated) ads for housing rental opportunities that were, on average, about $200 to $300 per month more expensive than the housing rental opportunities in the ads received by the Black female tester.

187. In a specific instance, the Black female tester received an ad for housing that was in a less desirable, less safe area than the areas in the housing ads that the White male tester received.

188. All of the housing ads that the White male tester received were in desirable, safe areas.

189. As this test demonstrates, Facebook's discriminatory housing-ad practices continue to steer certain housing opportunities away from or towards certain users based on their protected characteristics, such as race, sex, and/or age.

190. Facebook's Marketplace thus has a discriminatory impact on members of protected classes.

191.  Other testing likewise confirms the illegal bias and discrimination in Facebook's algorithms.

192.  The "changes" Facebook has purportedly implemented in connection with its housing-ad platform have been woefully inadequate and fail to solve the problem of discriminatory housing-ad targeting and delivery on Facebook.

## D. FACEBOOK'S VIOLATIONS OF FEDERAL AND STATE LAW, RESULTING IN INJURIES TO PLAINTIFFS

193.  Facebook's conduct resulted in certain audiences receiving ads about availability of housing for sale or rental, while users in certain protected classes were excluded from the target audience and thus deprived access to the housing marketplace. By denying users access to the full market of potential housing advertisements based on the users' protected characteristics, Facebook violated the FHA and comparable state laws by its wholesale exclusion of certain users from the possibility of seeing housing advertisements.

194.  Facebook's conduct prevented Plaintiffs and the putative class from being in the target audience for ads for the sale or rental of available housing.

195.  Facebook's maintenance of its Ad Platform, which allowed advertisers to include or exclude individuals and protected classes in violation of the FHA's mandate, is a per se violation of the statute. See *Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("In this we think, lies the critical distinction between *Trafficante* and the situation here…Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute.")

196.  Facebook's discriminatory actions deprived Plaintiffs and those similarly situated of the social benefits and business and professional advantages of an integrated community giving rise to a legally cognizable injury.

197.  Facebook's conduct violated the FHA as set forth in Counts I, II, III, and IV below and the comparable New York and California state laws as set forth in Count V (New York), and Counts VI, VII, VIII, and IX (California).

198.  As a direct and proximate result of Facebook's discriminatory practices described herein, Plaintiffs have suffered and will continue to suffer damages due to the violations of their civil rights under the FHA, New York state laws, and California state laws.

## THE PLAINTIFFS

### A. Rosemarie Vargas

199.  Plaintiff Rosemarie Vargas is, for all times relevant to this Complaint, a disabled female of Hispanic descent, and a single parent with minor children. She is a Facebook user who used Facebook from on or about August 2018 through April 2019 to look for housing.

200.  At all times relevant to this Complaint, Plaintiff Vargas resided at 228 East 3rd Street, Apt.  2D, New York, NY 10009.

201.  Prior to August 2018 and throughout the time she was looking for housing on Facebook, Plaintiff Vargas used Facebook for a variety of reasons, including posting of photos of herself and her children.

202.  From on or about August 2018 through April 2019, Plaintiff Vargas searched for housing on Facebook four to five times per week. She was ready, willing and able to move if she located suitable housing.

203.  Plaintiff Vargas's search for housing from August 2018 through April 2019 was pressing due to the need for increased space given the size of her family and the need for an additional bedroom.

204.  From on or about August 2018 through April 2019, Ms. Vargas logged into Facebook, then accessed the Marketplace (discussed above) from her Facebook home page.

205.  Once in the Marketplace, Plaintiff Vargas used the following search criteria in her efforts to locate housing: number of bedrooms, geographic location, number of residents and price range.

206.  Specifically, Plaintiff Vargas's housing search included, but was not limited to, a three-bedroom apartment located in lower Manhattan in the rental price range of $1,7000.00 per month.

207.  During the time-period Plaintiff Vargas was looking for housing on Facebook's Marketplace, she was sharing a bedroom with her minor daughter.  Her minor son had a separate bedroom.

208.  During the time period Plaintiff Vargas was seeking housing on Facebook's Marketplace she was suffering from Post-Traumatic Stress Disorder ("PTSD") and an anxiety disorder from her military service in the Navy. Plaintiff Vargas's mental health diagnoses caused her to have very bad nightmares and caused her to scream and terrify her daughter.

209.  Plaintiff Vargas's quest for new housing from August 2018 through April 2019 was undertaken in an effort to shield her daughter from some of her PTSD symptoms that manifested while she slept.

210.  On or about August 2018, Plaintiff Vargas initially included in her search criteria the use of Section 8 housing voucher and her status as a veteran, and the search results yielded no ads.

211.  After Plaintiff Vargas removed the use of the Section 8 housing voucher, she received different search results.

212.  Even though Ms. Vargas searched for housing in lower Manhattan, her search results produced ads in predominately unsafe areas and/or Hispanic and Black residential neighborhoods outside of Manhattan, like the Bronx.

213.  After receiving these search results, Plaintiff Vargas modified her search criteria to include housing in Brooklyn, but the results of her searches continued to

provide ads for apartments located in unsafe areas in predominately Hispanic and/or Black residential locations.

214. Plaintiff Vargas received some of the same ads repeatedly for apartments that were no longer available or were in unsafe locations.

215. During her Facebook searches for housing, Plaintiff Vargas did not receive any ads for housing in Manhattan.

216. On or about February or March 2019, Plaintiff Vargas was with a Caucasian friend, Chet Marcello. Plaintiff Vargas and Ms. Marcello sat side-by-side and conducted a search for housing through Facebook's Marketplace, both using the same search criteria Plaintiff Vargas had been using. Ms. Marcello received more paid (i.e., not user-generated) ads for housing in locations that were preferable to Plaintiff Vargas. Plaintiff Vargas did not receive the ads that Ms. Marcello received.

217. Despite months of diligent searching, Plaintiff Vargas was never able to locate suitable housing through Facebook's Marketplace. Instead, she was able to work with her landlord to physically modify her existing apartment to provide a separate area for her daughter to sleep.

218. From August 2018 through April 2019, Ms. Vargas did not receive any housing ads in her Facebook News Feed despite her regular, lengthy searches for housing in the Marketplace.

219. Based upon information and belief, including Facebook's well-known amassing of detailed demographic data about each user, Plaintiff Vargas's status as a single parent, disabled female of Hispanic descent was known to Facebook.

220. Facebook's discriminatory housing-ads, targeting, approval, and delivery practices excluded women of color, single parents, persons with disabilities and other protected attributes, and as a result of Facebook's actions, Plaintiff Vargas, and others similarly situated, were prevented from having the same opportunity to view ads for housing that other Facebook users, not in protected classes received.

221. Facebook's discriminatory housing-ads, targeting, approval, and delivery practices created a barrier to equal access to the housing market for Plaintiff Vargas and the putative class, based on her status as a member of several protected classes under the FHA and comparable state statutes.

222. Facebook's discriminatory housing-ads, targeting, approval, and delivery practices caused and continue to cause Plaintiff Vargas injuries, including but not limited to compensatory damages for loss of housing opportunities which include but are not limited to, increased amount of time spent looking for housing, loss of a more desirable housing space, a continuation of residing in a homeless shelter, loss of housing located in a safer area, loss of housing more proximate to her house of worship and other activities, loss of a more stable neighborhood, loss of an ideal housing environment, and/or loss of housing located in a more desirable location, punitive damages, and nominal damages. Ligatti, Christopher C. (2019) "Max Weber Meets the Fair Housing Act: 'Life Chances' and the Need for Expanded Lost Housing Opportunity Damages," Belmont Law Review: Vol. 6, Article 3, *available at* https://web.archive.org/web/20240117171708/https://repository.belmont.edu/lawreview/vol6/iss1/3/ (hereafter, "Ligatti").

**B. <u>Kisha Skipper</u>**

223. Plaintiff Kisha Skipper is, for all times relevant to this Complaint, a female of African American descent, and a single parent with minor children. She used her Facebook account from on or about November 2016 through May 2017 to look for housing.

224. At all times relevant to this Complaint, Plaintiff Skipper resided at 366 Warburton Avenue, Yonkers, NY 10707.

225. Prior to November 2016 and throughout the time she was looking for housing on Facebook, Plaintiff Skipper used Facebook for a variety of reasons, including posting of photos of herself and her children.

226. From on or about November 2016 through May 2017, Plaintiff Skipper urgently needed new housing because the house she and her family were renting was in foreclosure.

227. From on or about November 2016 through May 2017, Plaintiff Skipper was gainfully employed and prepared to move.

228. During on or about November 2016 through May 2017, once in the Marketplace, Plaintiff Skipper used the following search criteria in her efforts to locate housing: number of bedrooms, geographic location, and price range.

229. Specifically, from on or about November 2016 through May 2017, on a nearly daily basis, Plaintiff Skipper used the following search criteria: a two-to-three bedroom single family home or apartment unit in Yonkers or Westchester County in the monthly rental range of $1,000 to $2,000.

230. Plaintiff Skipper routinely received ads in the Marketplace in other locations like Great Neck, NY, Mt. Vernon NY and Long Island, NY.

231. Plaintiff Skipper did not receive ads for housing in Yonkers or Westchester County and did not locate alternate housing through Facebook.

232. Ms. Skipper did not receive any housing ads on her Facebook News Feed despite her search for housing on Facebook.

233. Based upon information and belief, including Facebook's well-known amassing detailed demographic data about each user, Plaintiff Skipper's status as a single parent, female of African American descent was known to Facebook.

234. Facebook's discriminatory housing-ad, targeting, approval, and delivery practices excluded women of color, single parents, and other protected attributes, and Facebook prevented Plaintiff Skipper, and others similarly situated, from having the same opportunity to view ads for housing that other Facebook users, not in protected classes, received.

235. Facebook's discriminatory housing-ad, targeting, approval, and delivery practices created a barrier to equal access to the housing market for Plaintiff Skipper and

the putative class, based on her status as a member of several protected classes under the FHA and comparable state statutes.

236. Facebook's discriminatory housing-ad, targeting, approval, and delivery practices caused and continue to cause Plaintiff Skipper injuries, including but not limited to compensatory damages for loss of housing opportunities which include but are not limited to, increased amount of time spent looking for housing, loss of a more desirable housing space, a continuation of residing in a homeless shelter, loss of housing located in a safer area, loss of housing more proximate to her house of worship and other activities, loss of a more stable neighborhood, loss of an ideal housing environment, and/or loss of housing located in a more desirable location, and punitive and nominal damages. Ligatti, *supra*.

**C. <u>Jazmine Spencer</u>**

237. Plaintiff Jazmine Spencer is, for all times relevant to this Complaint, a female of both African American and Hispanic descent, and a single parent with minor children. She used her Facebook account to look for housing from on or about 2016 through 2019.

238. At all times relevant to this Complaint, Plaintiff Spencer resided at 142 Baruch Place, Apt. A51, New York, NY 10002.

239. Prior to 2016 and throughout the time she was looking for housing on Facebook, Plaintiff Spencer used Facebook for a variety of reasons, including the posting of photos of herself and her children.

240. From 2016 through 2019 Plaintiff Spencer was residing in either a family shelter or a homeless shelter, including the Urban Family Center and the Henry Street Settlement, with her two minor children. Her need to locate stable and safe housing for herself and her children was urgent. She was ready, willing, and able to move if she located suitable housing.

241. During from on or about 2016 through 2019, Plaintiff Spencer used Facebook's Marketplace on a bi-weekly basis to search for housing with the assistance

FOURTH AMENDED CLASS ACTION COMPLAINT

of a housing specialist. She also accessed the Marketplace using her cell phone four to five times a week to perform additional searches.

242. Plaintiff Spencer's searches for housing on Marketplace utilized the following criteria: price range, number of bedrooms, type of dwelling and location.

243. Specifically, Plaintiff Spencer's search criteria for housing on the Marketplace included but were not limited to two-bedrooms, apartment or house, located in New York City or New Jersey in the price range of $750-$1,450 per month.

244. Plaintiff Spencer received Marketplace ads for housing in Newark, New Jersey, which is an area with high crime rates. Plaintiff Spencer received approximately 20-30 ads each time she did a search, but the results she received did not match her search criteria.

245. Despite years of diligent searching, Plaintiff Spencer was never able to locate suitable alternate housing on the Facebook Marketplace.

246. Plaintiff Spencer did not receive any housing ads on her Facebook News Feed despite her search for housing on Facebook.

247. Based upon information and belief, including Facebook's well-known amassing detailed demographic data about each user, Plaintiff Spencer's status as a single parent, female of African American and Hispanic descent was known to Facebook.

248. Facebook's discriminatory housing-ad targeting, approval, and delivery practices excluded women of color, single parents, and other protected attributes, and Facebook prevented Plaintiff Spencer, and others similarly situated, from having the same opportunity to view ads for housing that other Facebook users, not in protected classes received.

249. Facebook's discriminatory housing-ad targeting, approval, and delivery practices created a barrier to equal access to the housing market for Plaintiff Spencer and the putative class, based on her status as a member of several protected classes under the FHA and comparable state statutes.

250. Facebook's discriminatory housing-ad targeting, approval, and delivery practices caused and continue to cause Plaintiff Spencer injuries, including but not limited to compensatory damages for loss of housing opportunities which include but are not limited to, increased amount of time spent looking for housing, loss of a more desirable housing space, a continuation of residing in a homeless shelter, loss of housing located in a safer area, loss of housing more proximate to her house of worship and other activities, loss of a more stable neighborhood, loss of an ideal housing environment, and/or loss of housing located in a more desirable location, as well as punitive and nominal damages. Ligatti, *supra*.

**D. Deillo Richards**

251. Plaintiff Deillo Richards is, for all times relevant to this Complaint, a male of African American descent, and a single parent with minor children. He used Facebook to look for housing from on or about March 2019 through August 2019.

252. At all times relevant to this Complaint, Plaintiff Richards resided at 28 Gaffney Place, Apt. B, Yonkers, NY 10704.

253. Prior to March 2019 and throughout the time he was looking for housing on Facebook, Plaintiff Richards used Facebook for a variety of reasons, including the posting of photos of himself and his children, and noting his marital status is single.

254. From on or about March 2019 through August 2019, Plaintiff Richards was residing in a studio apartment with his two minor sons ages 6 and 11. Plaintiff Richards needed a larger residence for himself and his family and he was prepared to move if he found suitable housing.

255. From on or about March 2019 through August 2019, Plaintiff Richards was using Facebook by accessing its Marketplace two to three times per week to locate housing with the criteria of location, size, apartment, and rate of rent.

256. Specifically, Plaintiff Richards used the following search criteria including but not limited to a two to three-bedroom apartment, located in Yonkers, NY or the Bronx in NY in a price range of $1,000 to $1,250 monthly rent.

257. Plaintiff Richards' searches for housing on Facebook's Marketplace resulted in ads for studio apartments that did not meet his housing needs.

258. Plaintiff Richards did not locate housing through Facebook's Marketplace.

259. Plaintiff Richards did not receive any housing ads on his Facebook News Feed despite his search for housing.

260. Based upon information and belief, including Facebook's well-known amassing of detailed demographic data about each user, Plaintiff Richards' status as a single parent, of African American descent was known to Facebook.

261. Facebook's discriminatory housing-ad targeting, approval, and delivery practices excluded people of color, single parents, and other protected attributes, and Facebook prevented Plaintiff Richards, and others similarly situated, from having the same opportunity to view ads for housing that other Facebook users, not in protected classes received.

262. Facebook's discriminatory housing-ad targeting, approval, and delivery practices created a barrier to equal access to the housing market for Plaintiff Richards and the putative class, based on his status as a member of several protected classes under the FHA and comparable state statutes.

263. Facebook's discriminatory housing-ad targeting, approval, and delivery practices caused and continue to cause Plaintiff Richards' injuries, including but not limited to compensatory damages for loss of housing opportunities which include but are not limited to, increased amount of time spent looking for housing, loss of a more desirable housing space, a continuation of residing in a homeless shelter, loss of housing located in a safer area, loss of housing more proximate to his house of worship and other activities, loss of a more stable neighborhood, loss of an ideal housing environment, and/or loss of housing located in a more desirable location, as well as punitive and nominal damages.  Ligatti, *supra*.[20]

[20] Collectively, Vargas, Skipper, Spencer, and Richards are referred to as the "New York Plaintiffs."

**E. Jenny Lin**

264.  Plaintiff Jenny Lin is, for all times relevant to this Complaint, a female of Asian American descent, residing in California. She used Facebook to seek housing for approximately two months, from May to June 2017.

265.  Prior to May 2017 and throughout the time she was looking for housing on Facebook, Plaintiff Lin used Facebook for a variety of reasons, including the posting of photos of herself.

266.  Plaintiff Lin was seeking housing during May through June 2017, because the rental property where she lived was being sold and she had to vacate the premises with the change in ownership.

267.  Plaintiff Lin actively searched for housing through Facebook's housing group entitled "Inspired Women of L.A. Housing."  Plaintiff Lin estimates that she searched for housing in the Women of L.A. Housing group about 60 times.

268.  Plaintiff Lin joined this housing group on Facebook based on a friend's recommendation due to the type of housing and location of the housing she was seeking.

269.  Specifically, Plaintiff Lin was looking for a sublet, a single room or a roommate situation.

270.  Plaintiff Lin was searching for housing located in a better area.  Specifically, she was looking for a single room in Mid-City or Culver City, California for a rent ranging from $800 to $1,100 per month.

271.  If Plaintiff Lin had found an ad meeting her criteria, she was ready and able to move.

272.  Ms. Lin did not receive any housing ads on her Facebook News Feed despite her search for housing.

273. Based upon information and belief, including Facebook's well-known amassing of detailed demographic data about each user, Plaintiff Lin's status as a female of Asian-American descent was known to Facebook.

274. Facebook's discriminatory housing-ad targeting, approval, and delivery practices excluded women of color, and other protected attributes, and Facebook prevented Plaintiff Lin, and others similarly situated, from having the same opportunity to view ads for housing that other Facebook users, not in protected classes received.

275. Facebook's discriminatory housing-ad targeting, approval, and delivery practices created a barrier to equal access to the housing market for Plaintiff Lin and the putative class, based on her status as a member of several protected classes under the FHA and comparable state statutes.

276. Facebook's discriminatory housing-ad targeting, approval, and delivery practices caused and continue to cause Plaintiff Lin injuries, including but not limited to compensatory damages for loss of housing opportunities which include but are not limited to, increased amount of time spent looking for housing, loss of a more desirable housing space, a continuation of residing in a homeless shelter, loss of housing located in a safer area, loss of housing more proximate to her house of worship and other activities, loss of a more stable neighborhood, loss of an ideal housing environment, and/or loss of housing located in a more desirable location, as well as punitive and nominal damages. Ligatti, *supra*.

## **THE DEFENDANT**

277. Defendant Facebook, Inc. ("Facebook"), a Delaware corporation with its headquarters located in Menlo Park, California, operates a nationwide and international online advertising system and social network website which allows its users to communicate with each other through written texts, photos, images and/or videos.

## **CLASS ALLEGATIONS**

278. Plaintiffs bring this class action on behalf of themselves and on behalf of others similarly situated, under Fed. R. Civ. P. 23(a) and (b)(2), seeking equitable and injunctive relief, and under Fed. R. Civ. P. 23(a) and (b)(3) seeking damages on behalf of the following class (the "Nationwide Class"):

1

2

3

4

5

> All natural persons located within the United States, who are in the protected classes of race, color, sex, familial status, disability/handicap and/or national origin who had a Facebook account during the relevant period, who used Facebook to look for housing, including those who used Facebook Marketplace for housing.

6

7

8

9

279.  Plaintiffs bring this class action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the California Unruh Act, Cal. Civil Code §§ 51, 52(a), on behalf of the following Subclass (the "California Damages Subclass"):

10

11

12

13

14

> All natural persons located within the California, who are in the protected classes of sex, race, color, religion, ancestry, national origin, age, disability, medical condition, genetic information, marital status, or sexual orientation, who had a Facebook account during the relevant period and who used Facebook for housing, including Facebook Marketplace.

15

16

17

18

280.  Plaintiffs bring this class action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the New York Rights Law, N.Y. Exec. L. § 290 *et seq.*, on behalf of the following Subclass (the "New York Damages Subclass"):

19

20

21

22

23

> All natural persons residing in New York, who are in the protected classes of age, race, creed, color, national origin, sexual orientation, military status, sex, marital status or disability, who had a Facebook account during the relevant period and who used Facebook to look for housing, including Facebook Marketplace.

24

25

26

27

28

281.  **Numerosity/Impracticability of Joinder:** The members of the Class and Subclasses are so numerous that joinder of all members would be unfeasible and impractical.  Named Plaintiffs are informed and believe, and on that basis allege, that there are many thousands of persons within the Plaintiff Class and within each Subclass. The identity of individuals qualifying for class membership is readily ascertainable via

inspection of Facebook's records and other documents maintained by Facebook or by other methods, including by Facebook users' self-identification.

282. **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class and Subclasses. Defendant's discriminatory policies and practices were generally applicable to all members of the Class and Subclasses, thereby making a class action superior to other forms of action. Such common questions of law and fact include, but are not limited to:

A. **Common Factual Questions:**

1. Are the Plaintiffs and the Class they seek to represent "aggrieved person(s)" as defined by the FHA, 42 U.S.C. § 3602(i);

2. Are the Plaintiffs and the Class they seek to represent members of protected classes as defined by the FHA, 42 U.S.C. § 3604;

3. Are the New York Plaintiffs and the Subclass they seek to represent members of protected classes as defined by the New York Human Rights Law, N.Y. Exec. L. § 290 *et seq.*;

4. Are the California Plaintiffs and the Subclass they seek to represent members of protected classes as defined by the California Unruh Act, Cal. Civil Code §§ 51.5, 52(a); and

5. Whether Plaintiffs suffered injury or damage as a result of Defendant's common and nationwide housing advertising practices.

B. **Common Legal Questions:**

1. Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated the FHA as alleged in the First, Second, Third and Fourth Counts;

2. Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated

FOURTH AMENDED CLASS ACTION COMPLAINT

marketplace violated the New York Human Rights Law, N.Y. Exec. L. § 290 *et seq.*, as alleged in the Fifth Count;

3.  Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated the California Unruh Act, Cal. Civil Code §§ 51, 52(a), as alleged in the Sixth Count;

4.  Whether Facebook aided and abetted discrimination in violation of the California Unruh Act, Cal. Civil Code §§ 51, 52(a), as alleged in the Seventh Count;

5.  Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated Cal. Civil Code §§ 51.5, 52(a) by engaging in blacklisting and discrimination as alleged in the Eighth Count;

6.  Whether Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads resulting in a segregated marketplace violated California's Unfair Competition Law, Business and Professions Code section 17200 *et seq.*, by engaging in unfair, unlawful, and fraudulent activity as alleged in the Ninth Count;

7.  Whether Facebook provided false and misleading information to the Class, specifically, whether Facebook misrepresented that it did not allow discrimination, when, as explained above, it facilitated and engaged in illegal housing discrimination.

8.  The appropriate injunctive and related equitable relief for the Nationwide Class;

9.  The appropriate class-wide measure of damages for the Nationwide Class;

10. The appropriate measure of damages for the New York Subclass.

11. The appropriate measure of damages for the California Subclass.

FOURTH AMENDED CLASS ACTION COMPLAINT

283.  **Typicality:** The Named Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses.  Plaintiffs and all the members of the Class and Subclasses have been injured by the same wrongful practices of Facebook.  Named Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and Subclasses and are based on the same legal theories.  Named Plaintiffs will fairly and adequately represent the interests of the Class and Subclasses because Named Plaintiffs are members of the Class and Subclasses, and because Named Plaintiffs do not have any interest that is contrary to or in conflict with those of the Plaintiff Class and Subclasses.  There is a well-defined community of interest in the questions of law and fact affecting the Class of persons that Named Plaintiffs represent as a whole.  Each member of the Class and Subclasses was subjected to Facebook's illegal practices.

284.  **Superiority:** A class action is superior to any other form of action for the fair and efficient adjudication of this lawsuit.  Individuals such as Plaintiffs have a difficult time prosecuting an individual action against Facebook, a large corporation with tremendous economic resources.  Even if any class member could afford individual litigation against Defendant, it would be unduly burdensome to the court system.  Individual litigation of such numerous claims magnifies the delay and expense to all parties and the court system.  By contrast, a class action presents far fewer management difficulties and affords the benefits of unitary adjudication, economics of scale, and comprehensive supervision by a single court.  Concentrating this litigation in one forum will promote judicial economy and parity among the claims of individual class members and judicial consistency in rulings.  Notice of the pendency and any resolution of this action can be efficiently provided to class members by mail, print, broadcast, internet, and/or multimedia publication.  Requiring each class member to both establish individual liability and pursue an individual remedy would discourage the assertion of lawful claims Facebook users who would be disinclined to pursue an action against it for fear of retaliation as Facebook has the ability to bar user access.  Proof of a common business

practice or factual pattern, which the Named Plaintiffs were subjected to, is representative of the business practice or factual pattern to which the alleged Class was subjected to and will establish the right of each of the members of the alleged Class to recoveries on the claims alleged herein.  The prosecution of separate actions by individual class members, even if possible, would create: (a) a substantial risk of inconvenient or varying verdicts or adjudications with respect to the individual class members against the Defendant herein; and/or (b) legal determinations with respect to individual class members which would, as a practical matter, be dispositive of the other class members not parties to the adjudications or which would substantially impair or impede the ability of class members to protect their interests.  Further, the claims of the individual members of the class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.  Named Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

285.  **Adequacy:** The Named Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class and Subclasses and have retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Named Plaintiffs nor their attorneys have any interest contrary to or in conflict with the Class.

286.  The Named Plaintiffs do not anticipate any difficulty in the management of this litigation.

287.  Facebook has, or has access to, email or other contact information for the individual members of the Class, which may be used for the purpose of providing notice of the pendency of this action.

288.  Named Plaintiffs request permission to amend the complaint to include other individuals as class representatives if any of the Named Plaintiffs are deemed not to be an adequate representative of the Plaintiff Class.  Named Plaintiffs further request

permission to amend the complaint to revise the Plaintiff Class definition as appropriate after discovery.

## THE FAIR HOUSING ACT

### A.   THE FAIR HOUSING ACT OF 1986

289. The Fair Housing Act of 1968 ("FHA") was enacted to provide "for fair housing throughout the United States." 42 U.S.C. § 3601.

290.  The FHA renders it unlawful:

> To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or any intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

291. Further, the regulations applicable to the FHA provide a definition for discriminatory notices, statements, and advertisements:

> (3) selecting media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin.
>
> (4) Refusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.75(c)(3).

292. Federal courts have found viable § 3604(c) claims where plaintiffs alleged that defendants engaged in discriminatory selective housing advertising. *See, e.g.*, *Martinez v. Optimus Properties, LLC*, No. 216CV08598SVWMRW, 2017 WL 1040743, at *5 (C.D. Cal. Mar. 14, 2017) ("Plaintiffs allege that Defendants selectively advertised

to particular segments of the housing market while denying information to people with disabilities, Latinos, and families with children. Their discriminatory advertising theory is viable."); *Guevara v. UMH Properties, Inc.*, No. 2:11-CV-2339-SHL-TMP, 2014 WL 5488918, at *6 (W.D. Tenn. Oct. 29, 2014) ("Plaintiffs' allegation that Defendant only advertised in Spanish language media outlets is sufficient to state a claim because it meets the Department of Housing and Urban Development's definition of discriminatory advertisement in that it denies non-Spanish speaking segments of the housing market, who are overwhelmingly non-Hispanic, information about housing opportunities.").

293.  Under the FHA, it is unlawful to "represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d).

294.  The FHA's implementing regulations clarify that it is unlawful to "provide inaccurate or untrue information about the availability of dwellings for sale or rental." 24 C.F.R. § 100.80(a). This includes "***limiting information***, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.80(b)(4) (emphasis added).

295.  The FHA renders it unlawful to:

> [D]eny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3606.

## B.   PLAINTIFFS READILY SATISFY THE FHA'S "VERY LIBERAL" ARTICLE III STANDING REQUIREMENTS

*i. Relevant Standing Law*

296.  This case is brought, in part, under Section 3612 of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, which invokes uniquely broad principles of standing under Article III of the United States Constitution.

297.  The United States Supreme Court has recognized that standing under the FHA extends "'to the full limits of Art. III' and that the courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n.9 (1979) ("*Gladstone*")).

298.  This view of FHA standing emerged in *Trafficante v. Metropolitan Life Insurance Company*, 409 U.S. 205 (1972). In that case, the Supreme Court interpreted standing under the FHA to be "as broad [] as is permitted by Article III." *Id.* at 209.

299.  In *Trafficante*, the Supreme Court determined that white and black tenant plaintiffs had standing under Section 3610(a) to file a complaint against their apartment complex owner for allegedly discriminating against non-whites. *Id.* at 208, 211. The Supreme Court found sufficient their allegations that the defendant's discriminatory housing practices deprived them of the social benefits and business and professional advantages of an integrated community and caused embarrassment and economic damages from the stigma of being residents of a discriminatory apartment complex. *Id.* at 208.

300.  Subsequently, in *Gladstone*, the Supreme Court specifically affirmed that standing under Section 3612 is "as broad as is permitted by Article III." *Id.* at 109 (quoting *Trafficante*, 409 U.S. at 209). *Gladstone* further established that standing under Section 3612 is not limited to "direct victims" of alleged discriminatory housing practices. *Id.* at 108–09. "As long as the plaintiff suffers actual injury as a result of the defendant's conduct, [s]he is permitted to prove that the rights of another were infringed." *Id.* at 103 n.9.

1    301.  In *Havens*, the Supreme Court reaffirmed that "the sole requirement for

2    standing to sue under [the FHA] is the Art[icle] III *minima* of injury in fact: that the

3    plaintiff allege that as a result of the defendants' discriminatory housing practices he has

4    suffered a 'distinct and palpable injury.'" 455 U.S. at 372 (quoting *Warth v. Seldin*, 422

5    U.S. 490, 501 (1975)) (emphasis added).

6    302.  *Havens* further recognized that the "actual or threatened injury required by

7    Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which

8    creates standing. Section 804(d), which, in terms, establishes an enforceable right to

9    truthful information concerning the availability of housing, is such an enactment." *Id*. at

10   373 (cleaned up).

11   303.  Accordingly, a black "tester" had standing to sue an apartment owner for the

12   latter's discriminatory denial of truthful information about an apartment's availability,

13   even though the plaintiff had no intent to rent the apartment.[21] *Id*. at 374.

14   304.   Following *Havens*, the Ninth Circuit has recognized that the FHA creates a

15   statutory right to information, "the ***deprivation of which can give rise to concrete injury***

16   sufficient for the purposes of Article III standing[.]" *Wilderness Soc., Inc. v. Rey*, 622

17   F.3d 1251, 1257 (9th Cir. 2010) (emphasis added).

18   305.  Under binding Ninth Circuit precedent construing the aforementioned

19   decisions from the Supreme Court, plaintiffs suing under the FHA are "judged under a

20   very liberal standing requirement." *See Harris v. Itzhaki*, 183 F.3d 1043, 1049 (9th Cir.

21   1999).  Accordingly, "*any person* harmed by discrimination, *whether or not the target of*

22   *the discrimination*, can sue to recover for his or her own injury." *San Pedro Hotel v. City*

23   *of Los Angeles*, 159 F.3d 470, 475 (9th Cir. 1998) (citing *Trafficante*, 409 U.S. at 212)

24   (emphases added).

25

26

---

27   [21] Unlike the tester in *Havens*, Plaintiffs were bona fide housing seekers on Facebook

28   who were denied truthful information concerning the availability of housing due to
     Facebook's discriminatory practices and actions.

306.  The FHA provides that any "aggrieved person" can bring a complaint under its terms. 42 U.S.C. § 3613.

307.  The FHA provides a broad definition for "aggrieved person," which includes "any person who [:] (1) claims to have been injured by a discriminatory housing practice; or (2) *believes* that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i) (emphasis added).

308.  Based on these provisions, the Ninth Circuit has further recognized that although the FHA does not provide a concrete definition for "injury," Article III injuries typically arise under the FHA where a plaintiff has been denied a housing opportunity as a result of a defendant's discrimination. *See, e.g.*, *Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988).

309.  In *Keith*, the Ninth Circuit held that the plaintiffs, in that case, had suffered an Article III injury in fact solely because they had been denied access to housing based on their race. *Id.* at 477.

### ii. Plaintiffs' Satisfaction of Standing Requirements

310.  Based on the foregoing, the Plaintiffs, in this case, have suffered injuries under Article III that support standing under well-established Supreme Court and Ninth Circuit precedent.

311.  The Ninth Circuit's panel majority confirmed this in its June 23, 2023 memorandum disposition issued in connection with this case, finding that Plaintiffs sufficiently established Article III standing in their Third Amended Complaint. (**Exhibit 1**, pg. 2).

312.  Specifically, the majority found that, as alleged in Plaintiffs' Third Amended Complaint, the "deprivation of truthful information and housing opportunities" resulting from Facebook's discriminatory conduct constituted "a concrete and particularized injury" sufficient to confer standing on Plaintiffs. *Id.* at 4.

313.  The panel majority also noted that Plaintiffs should not be faulted for any inability to identify specific ads that Plaintiffs were unable to see given that their "very

claim is that Facebook's practices <u>concealed</u> information from housing-seekers in protected classes. And nothing in the case law requires that a plaintiff identify specific ads that she could not see when she alleges that an ad-delivery algorithm restricted her access to housing ads in the first place." *Id*. at 3-4.

314.  If the Court has doubts whether the requirements for Article III standing are met, Plaintiffs request discovery. In *Bradley v. T-Mobile US, Inc*., "the [c]ourt recognize[d] the difficulty of identifying advertisements that the entire Plaintiff Class was allegedly prevented from seeing; such information is not within Plaintiffs' possession and is difficult to obtain." No. 17-CV-07232-BLF, 2020 WL 1233924, at *16 (N.D. Cal. Mar. 13, 2020). In granting plaintiff's request, the court stated that such discovery "will be helpful—if not necessary—to establish the jurisdictional facts." *Id.*

315.  Plaintiffs also satisfy standing under Article III because Facebook provided untruthful housing information about Facebook ads and its entire platform to members of the protected class, as described below.

## C.   <u>THE PURPOSE OF THE FAIR HOUSING ACT</u>

316.  A primary purpose for enacting the FHA was "to increase residential mobility so as to improve access to opportunities such as transportation, education, and employment." Ligatti, *supra*.

317. The FHA sets forth "legal prohibitions on private discrimination," and requires HUD, "its grantees, and all federal departments and agencies to 'affirmatively further fair housing.'" *Id.* (additional citations omitted).

318. The FHA "intended to address documented societal imbalances caused by both public and private discrimination in housing;" and its goal was to "create an integrated society." *Id.* (additional citations omitted).

319. Segregation, per the "Kerner Report of 1968 . . . could be traced back to a lack of geographic mobility." *Id.* (additional citations omitted). The Kerner Report recognized "the importance of the 'spatial mismatch' between where African Americans were forced to live and areas where jobs and other opportunities existed," which "led to

the final recommendation of the Kerner Report: programs intended to increase the ability of African Americans to escape the "'ghetto.'" *Id.* (additional citations omitted). Although the Kerner Report recommended "greater investments in public and subsidized housing, the report emphasized the siting of such housing in areas of opportunity and the need for a federal law addressing housing discrimination." Further, the "Kerner Report explicitly acknowledged the need for housing mobility to increase the mobility opportunities available to minorities, choosing to focus primarily on integration through mobility, rather than focusing on investing in segregated communities." This "background and the Kerner Report's recommendations" led to the creation of the FHA's goals of "eliminating impediments to mobility and integration…" *Id.* (additional citations omitted).

320. Further, "[h]ousing is the primary conduit to accessing opportunity and building wealth and economic stability" in this country. *Id. citing* THE OHIO STATE UNIVERSITY KIRWAN INSTITUTE FOR THE STUDY OF RACE AND ETHNICITY, THE GEOGRAPHY OF OPPORTUNITY: REVIEW OF OPPORTUNITY MAPPING RESEARCH INITIATIVES 5 (July 2008), https://perma.cc/ZD4Z-VHMQ.

321. In the United States, "[h]ousing location is the critical leverage point to determining access to education, employment, childcare and health care or in determining the likelihood of developing assets/wealth through home equity. Housing can be either an impediment or a conduit to opportunity depending on its location." https://www.npr.org/sections/thetwo-way/2016/10/19/498536077/interactive redlining-map-zooms-in-on-americas-history-of-discrimination. (last visited February 18, 2021).

D. **NOMINAL AND PUNITIVE DAMAGES UNDER THE FAIR HOUSING ACT**

322. If a plaintiff can demonstrate that a defendant has violated the Fair Housing Act, he or she is entitled to nominal damages even if he or she cannot prove actual damages. *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 431 (2d Cir. 1995) ("A plaintiff

who has proven a civil rights violation but has not proven actual compensable injury, is entitled to an award of nominal damages.").

323. Additionally, punitive damages are appropriate under the Fair Housing Act in cases where "a defendant's conduct is shown to be motivated by evil motive or intent, or if it involves reckless or callous indifference to the federally protected rights of others." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002); *see also Martinez*, 2017 WL 1040743, at *10 ("Plaintiffs allege that Defendants engaged in 'abusive and discriminatory practices,' and that this conduct was 'intentional, willful, and made in reckless disregard of the known rights of others.' If these allegations are proven, Plaintiffs will be entitled to punitive and exemplary damages.") (citation omitted).

324. As set forth herein, Facebook committed various clear-cut violations of the Fair Housing Act (e.g., by incorporating protected characteristics as filtering categories in an ad-targeting tool and offering and promoting this tool to housing advertisers; by using protected characteristics as variables in its ad delivery algorithms, etc.). Accordingly, Plaintiffs and the class they seek to represent are at least entitled to nominal damages in this case.

325. Plaintiffs are also entitled to punitive and exemplary damages given that Facebook committed various intentionally and willfully discriminatory actions (e.g., intentionally and willfully creating ad-targeting categories based on users' protected characteristics and helping housing advertisers target users based on these categories; intentionally and willfully feeding protected-characteristics data into its ad delivery algorithms and using these algorithms to deliver housing ads, etc.) *and* because Facebook demonstrated reckless disregard and/or callous indifference to the federally protected rights of its users (e.g., by continuing to offer protected-characteristic categories to housing advertisers *after* Facebook acknowledged that it was notified about its discriminatory practices; by refusing to modify or place safeguards on its ad-delivery algorithms despite knowing that these algorithms would continue to skew housing-ad

delivery even after Facebook removed protected-characteristic categories from Ad Platform for housing ads, etc.).

**E.**   **A BRIEF HISTORY OF REDLINING**

"*The American real-estate industry believed segregation to be a moral principle. As late as 1950, the National Association of Real Estate Boards' code of ethics warned that 'a Realtor should never be instrumental in introducing into a neighborhood ... any race or nationality, or any individuals whose presence will clearly be detrimental to property values.' Redlining was not officially outlawed until 1968, by the Fair Housing Act.*"

—Ta-Nehisi Coates

326.   Following the Great Depression, the United States Government "set out to evaluate the riskiness of mortgages—and left behind a stunning portrait of the racism and discrimination that has shaped American housing policy." https://web.archive.org/web/20240117172016/https://www.npr.org/sections/thetwo-way/2016/10/19/498536077/interactive-redlining-map-zooms-in-on-americas-history-of-discrimination (last visited Jan. 17, 2024).

327.   Redlining followed the "'one-house rule'—like the 'one-drop rule' for racial identity. Under the 'one-drop rule' in the 19th and early 20th century, a single drop of African-American 'blood' made a person black, even if their heritage was overwhelmingly white. Similarly, on redlining maps, a single black household in a middle-class area could make the whole neighborhood 'risky' for mortgage loans in the eyes of the federal government." *Id.*

328.   Redlining resulted in families of color who "'couldn't avail themselves of what is arguably the most significant route to family and personal wealth-building in the 20th century, which is homeownership.'" *Id.*

329. A team of scholars at four universities created an interactive tool ("the Project") which shows redlining on maps in more than 150 cities and replaces an earlier

version of the map to now include the reason(s) why neighborhoods had a specific classification. *Id.*

330.  The Project "features the infamous redlining maps from the Homeowners' Loan Corporation["HOLC"]. In the late 1930s, the HOLC 'graded' neighborhoods into four categories, based in large part on their racial makeup. Neighborhoods with minority occupants were marked in red—hence 'redlining'—and considered high-risk for mortgage lenders." *Id.*

331.  The "<u>newly revamped interactive site</u> from 'Mapping Inequality' takes



scores of HOLC maps … and embeds them on a single map of the USA." *Id.*

332.  The practice of redlining was done in large and small cities, "with the help of local realtors and appraisers." *Id.*

333.  By way of example, on the interactive map which shows a "neighborhood was redlined, ranked as 'desirable' or fell somewhere in the middle," the viewer can "just click and you can find out why. 'Infiltration of: Negroes' is a common fill-in-the-blank item explaining why a region was deemed hazardous." *Id.*

334.  The image below shows overlapping maps of the five boroughs of New York which were combined in 'Mapping Inequality,' to show redlining across the entire city. *Id.;* and *Mapping Inequality/Screenshot by NPR.*

335.  The following map shows "the redlining districts as an overlay on a modern map" of a "part of Asheville, N.C."

*Id.* and *Mapping Inequality/Screenshot by NPR.*

336.   Scholars, including Ta-Nehisi Coates, often cite redlining as a root cause of inequality in the United States. *Id.* citing, Ta-Nehisi Coates' "Case for Reparations" in *The Atlantic.* Coates noted, "'Neighborhoods where black people lived were rated "D" and were usually considered ineligible for FHA backing.'" Further, "'[b]lack people were viewed as a contagion. Redlining went beyond FHA-backed loans and spread to the entire mortgage industry, which was already rife with racism, excluding black people from most legitimate means of obtaining a mortgage.'" Black families who were seeking to own homes were relegated to lenders who were predatory and abusive. *Id.* quoting, Ta-Nehisi Coates' "Case for Reparations" in *The Atlantic.*

337. Defendant's actions in this case essentially continue these redlining activities against classes protected under federal and state law.

## THE UNRUH CIVIL RIGHTS ACT

338.   California's Unruh Civil Rights Act provides in pertinent part that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

339.   "The primary purpose of the Unruh Act is to compel recognition of the equality of all persons in the right to the particular service offered by an organization or entity covered by the act." *Curran v. Mount Diablo Council of the Boy Scouts*, 147 Cal. App. 3d 712, 733, 195 Cal. Rptr. 325 (Ct. App. 1983).

340.   As the California Supreme Court has emphasized, the Unruh Civil Rights Act is California's ***bulwark against arbitrary discrimination*** in places of public accommodation. Absent the principle it codifies, thousands of facilities in private ownership, but otherwise open to the public, would be free under state law to exclude

people for invidious reasons like sex, religion, age, and even race. The Legislature's desire to banish such practices from California's community life has led this court to ***interpret the Act's coverage in the broadest sense reasonably possible***." *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal. 3d 72, 75, 707 P.2d 212, 214 (1985), *as modified on denial of reh'g* (Dec. 19, 1985) (quotations omitted) (emphasis added).

341. When it enacted the Unruh Act, California's legislature "established that arbitrary [] discrimination by businesses is *per se* injurious." *Koire v. Metro Car Wash*, 40 Cal. 3d 24, 33, 707 P.2d 195, 200 (1985).

342. Accordingly, to root out invidious, arbitrary discrimination like the kind Facebook has perpetrated (as detailed herein), the Unruh Act includes an enforcement provision, Cal. Civ. Code § 52, that authorizes private parties to recover, *inter alia*, "minimum statutory damages of [\$4,000] for *every* violation of [the Act], *regardless* of the plaintiff's actual damages." *Id.*; Cal. Civ. Code § 52(a).

343. California's Supreme Court has explained the Unruh Act's statutory damage provision as follows:

> This sum is unquestionably a penalty which the law imposes, and which it directs shall be paid to the complaining party.... [But], while the law has seen fit to declare that it shall be paid to the complaining party, it might as well have directed that it be paid into the common-school fund. The imposition is in its nature penal, ***having regard only to the fact that the law has been violated and its majesty outraged***.

*Koire*, 40 Cal. 3d at 33–34 (quotations omitted) (bold emphasis added).

## THE NEW YORK STATE HUMAN RIGHTS LAW

344. The New York State Human Rights Law (NYSHRL) provides in relevant part that "every individual within this state is afforded an equal opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance or inadequate education, training, housing or health care not only threatens the rights and proper privileges of its inhabitants

but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants." N.Y. Exec. L. § 290.

345.   The NYSHRL's purpose "is broad and appears to be threefold: to prevent discrimination against individuals within this state; to protect the inhabitants of this state from discrimination; and to protect the general welfare of this state by curbing unlawful discriminatory practices within the state." *Hoffman v. Parade Publications*, 15 N.Y.3d 285, 293, 933 N.E.2d 744, 749 (2010) (Jones, J., dissenting).

346.   Under the NYSHRL, it is unlawful to "refuse to sell, rent, lease or otherwise to deny to or withhold from any person or group of persons such housing accommodation because of the [protected characteristics] of such person or persons, or to represent that any housing accommodations or land is not available . . . when in fact it is so available." N.Y. Exec. L. § 296(5)(a)(1).

347.   This provision proscribes two distinct types of discriminatory conduct: First, refusing to sell or rent housing to a person because of that person's protected characteristics; and second, representing that housing is unavailable when it is available. *See Est. of Dill v. Werba Realty*, 49 Misc. 3d 1202(A), 28 N.Y.S.3d 647 (N.Y. Sup. Ct.), *vacated in part sub nom. Est. of Scott v. Werba Realty* (N.Y. Sup. Ct. 2015).

348.   The NYSHRL's enforcement provision, N.Y. Exec. L. § 297 authorizes any "person claiming to be aggrieved by an unlawful discriminatory practice" to bring a cause of action for damages (including punitive damages in housing discrimination cases) and "other remedies as may be appropriate[.]" N.Y. Exec. L. § 297(9).

349.   Where a defendant has violated the NYSHRL, New York City's Human Rights Commission has awarded $1,000 for such violations "where [the] complainant[] did not establish any particular damage other than what a decent and reasonable individual would suffer when faced with such ignorant behavior. Following the New York City Human Rights Commission's recommendation, [courts] find an award of $1,000 to be appropriate in similar cases." *Hennessy by & through Hennessy v. 194*

*Bedford Ave Rest Corp.*, No. 21 CV 5434 (FB)(RML), 2022 WL 4134502, at *5 (E.D.N.Y. Aug. 8, 2022) (quotations and citations omitted).

350.   Further, courts construe the NYSHRL to encompass both "the New York Executive Law §§ 292 *et seq.* (which provides the substance of the law) and the New York Civil Rights Law §§ 40 *et seq.* (which provides for penalties)." *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 398 (E.D.N.Y. 2017).

351.   Accordingly, pursuant to N.Y. Civil Rights Law § 41, a person or entity that violates the NYSHRL is "liable to a penalty of not less than one hundred dollars nor more than five hundred dollars, to be recovered by the person aggrieved thereby or by any resident of this state, to whom such person shall assign his cause of action[.]"

352.   Plaintiffs have given notice of this action to the Attorney General of the State of New York. (**Exhibit 9**, Notice to New York Attorney General).

<u>**PLAINTIFFS' INJURIES RESULTING FROM DEFENDANT FACEBOOK'S DISCRIMINATORY CONDUCT**</u>

A. <u>**Deprivation of Truthful Information and Misrepresentation About the Availability of Housing**</u>

353.   As noted above, the FHA proscribes "represent[ing] to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d).

354.   In *Havens Realty Corp. v. Coleman*, the Supreme Court held that Section 804(d) of the FHA (42 U.S.C. § 3604(d)) "establishes an ***enforceable right to truthful information concerning the availability of housing***[.]" *Id*. at 373 (emphasis added). The "invasion of [this right] creates standing." *Id*. (quotations omitted).

355.   It is well-recognized that the deprivation of such information can result in concrete injury. *Wilderness Soc.*, 622 F.3d at 1257. The Ninth Circuit majority panel found that Plaintiffs' allegations that Facebook's actions deprived them of truthful

FOURTH AMENDED CLASS ACTION COMPLAINT

information about housing were sufficient to establish concrete and particularized injury for the purposes of standing.  **Exhibit 1**, pg. 4.

356.  Additionally, Section 804(d)'s implementing regulation states that it is unlawful to "provide inaccurate or untrue information about the availability of dwellings for sale or rental." 24 C.F.R. § 100.80(a). This includes "***limiting information***, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.80(b)(4) (emphasis added).

357.  Plaintiffs and the class they seek to represent have an enforceable right to truthful information about available housing opportunities.

358.  Facebook's discriminatory advertising practices, alleged herein, caused injury to Plaintiffs and the class they seek to represent by depriving them of this information.

359.  Specifically, Facebook mined user data to create categories based on protected characteristics; incorporated filtering based on such categories into its Ad Platform and then promoted and gave this functionality to housing advertisers; approved housing ads that excluded users with certain protected characteristics from their Eligible Audiences; and made its own determinations as to which users in the Eligible Audiences would actually receive ads based on, in part, users' protected characteristics.

360.  In other words, Facebook's actions directly resulted in certain users being unable to see housing ads because they possessed protected characteristics.

361.  Searching for housing opportunities yet being unable to see those that actually exist due to the defendant's discriminatory concealment practices is a textbook violation of 42 U.S.C. § 3604(d) that causes injury to the victims of such concealment.

362.  Moreover, Facebook also violated 42 U.S.C. § 3604(d)—and thereby injured Plaintiffs—by making misrepresentations related to the availability of housing opportunities.

363.   On November 11, 2016, Facebook made the following representations that were related to the availability of housing:

      a.  Facebook would "disable the use of ethnic affinity marketing" for targeting housing ads;

      b.  Facebook would "require advertisers to affirm that they will not engage in discriminatory advertising on Facebook[.]"

364.   These representations were related to the availability of housing opportunities on Facebook—with these statements, Facebook indicated that there would not be any further discriminatory housing-ad targeting on its platform and that similarly situated Facebook users would see the same housing ads, regardless of whether they possessed protected characteristics.

365.   These representations were untrue.  After Facebook made these representations, advertisers could still target housing ads based on users' protected characteristics, and Facebook did not present a self-certification screen to a would-be housing advertiser.

366.   On February 8, 2017, Facebook made the following representations that were related to the availability of housing:

      a.  Facebook would disapprove housing ads that used race as a targeting option to create the Eligible Audiences;

      b.  Facebook would require housing advertisers to certify that their housing ads complied with "applicable anti-discrimination laws."

367.   Facebook made other representations that it did not allow discrimination by advertisers, but, as explained fully herein, this was untrue.

368.   These representations were related to the availability of housing opportunities on Facebook—with these statements, Facebook indicated that there would not be any further discriminatory housing-ad targeting on its platform, that Facebook would not approve discriminatory housing ads, and that similarly situated Facebook users

would see the same housing ads, regardless of whether they possessed protected characteristics.

369. These representations were untrue. After Facebook made these representations, advertisers could still target housing ads based on users' protected characteristics, Facebook still approved housing ads that discriminatorily excluded users with protected characteristics from their Eligible Audiences, and Facebook did not present a self-certification screen to a would-be housing advertiser.

370. Facebook's violations of 42 U.S.C. § 3604(d) injured Plaintiffs by depriving them of truthful information about housing and by making misrepresentations concerning the availability of housing opportunities. Accordingly, Plaintiffs are entitled to relief under the FHA.

## B. <u>Denial of Housing Opportunities</u>

371. The wrongful denial of an opportunity to obtain a benefit, such as housing, is a well-recognized form of injury. *See, e.g. O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1069 (9th Cir. 2015) quoting 13 A Wright & Miller, *Federal Practice and Procedure* § 3541.4 (3d ed 1998) ("Loss of an opportunity may constitute injury, even though it is not certain that any benefit would have been realized if the opportunity had been accorded."); *West Virginia Ass'n of Community Health Centers, Inc. v. Heckler*, 734 F.2d 1570, 1575 (D.C. Cir. 1984) ("plaintiff's injury was the denial of an opportunity to obtain housing for which he would otherwise be qualified. Certainty of success in seeking to exploit that opportunity was not required.").

372. Additionally, the Ninth Circuit majority panel found that Plaintiffs' allegations that Facebook's actions denied them housing opportunities were sufficient to establish concrete and particularized injury for the purposes of standing. **Exhibit 1**, pg. 4.

373. Indeed, Facebook's discriminatory conduct as alleged herein concealed housing opportunities from Plaintiffs based on their protected characteristics.

374.   Facebook mined data about users' protected characteristics; used the data to create applicable categories that Facebook incorporated into an ad-targeting tool which it promoted and gave to housing advertisers; and determined, based in part on protected characteristics, which users in the Eligible Audiences for housing ads would actually receive the ads.

375.   Facebook's actions directly deprived Plaintiffs of housing opportunities based on their protected characteristics.

376.   Facebook wrongful, discriminatory conduct has thus injured Plaintiffs, entitling them to relief.

**C. Increased Search Costs**

377.   Facebook's discriminatory housing-ad practices also injured Plaintiffs and the class they seek to represent by forcing them to incur increased housing search costs.

378.   Since Plaintiffs were unable to see—on their News Feeds or on Marketplace—the housing ads that Facebook discriminatorily concealed from them, they were required to expend additional resources (such as time and/or money) to find and pursue suitable housing opportunities.

379.   Plaintiffs are entitled to relief for this injury.

## INJUNCTIVE RELIEF IS NECESSARY

380.   As the United States alleged in the DOJ Complaint, Facebook's ad delivery algorithms have been "tainted" by the vast amount of user data—including information related to users' protected characteristics—that Facebook has fed and embedded into the algorithms; such data includes user data collected before Facebook purportedly ceased offering discriminatory ad-targeting options to housing advertisers. **Exhibit 2**, ¶¶ 82, 93. As a result, Facebook's ad delivery algorithms will skew delivery of housing ads based on users' protected characteristics, regardless of advertisers' targeting selections. *Id*. ¶¶ 85, 86.

381.   In its 2022 settlement with the Department of Justice, Facebook agreed to implement machine learning functionality—i.e., the "Variance Reduction System"—

which attempts to "correct" the discriminatory skew in the delivery of housing ads on Facebook by reducing the variances between the Eligible Audiences and actual audiences for such ads. **Exhibit 8**, pgs. 6-8.

382.   Notably, this system only seeks to correct delivery skew as it pertains to sex and race/ethnicity. *Id.*, pg. 6 ("Meta will develop a system to reduce variances in Ad Impressions between Eligible Audiences and Actual audiences . . . for sex and estimated race/ethnicity.").

383.   Additionally, by its own terms, the settlement agreement imposes requirements on Facebook (including the Variance Reduction System, cessation of discriminatory ad-targeting, compliance metrics, etc.) for only four years from the settlement agreement's effective date. *Id.*, pg. 3. The settlement agreement will be "null and void and of no force or effect" after June 27, 2026. *Id.*, pg. 4; https://www.justice.gov/opa/pr/justice-department-and-meta-platforms-inc-reach-key-agreement-they-implement-groundbreaking.

384.   The measures imposed on Facebook pursuant to the Department of Justice Settlement Agreement are insufficient; injunctive relief is necessary in this case.

385.   Facebook's Variance Reduction System is a "band-aid" rather than a comprehensive fix. The system merely attempts to "correct" the existing discriminatory skew in Facebook's delivery algorithms rather than entirely rooting it out of the algorithms. In other words, Facebook's ad delivery algorithms are still tainted due to the massive amount of user data (including protected-characteristics data) they consider. The Variance Reduction System is merely a surface-level fix and thus wholly inadequate to ensure an end to Facebook's housing discrimination practices.

386.   Additionally, the Variance Reduction System only seeks to "correct" the discriminatory skew in Facebook's ad delivery algorithms as to sex and race/ethnicity— it does not address discriminatory housing-ad delivery skew with respect to other protected characteristics.

387.   Further, since the Department of Justice Settlement Agreement will expire on or after June 27, 2026, there is no guarantee that Facebook will continue to address the discrimination in its housing-ad delivery platform after that date.

388.   In addition, as the results of the January 29, 2024 test (detailed above) demonstrate, Facebook's algorithms still effectuate discrimination in housing ad delivery to the detriment of the Class.

389.   Plaintiffs are thus entitled to injunctive relief to enjoin Facebook's ongoing discriminatory housing-ad practices and to obtain more comprehensive safeguards than those purportedly instituted as a result of the 2022 Department of Justice Settlement Agreement.

## COUNT I – VIOLATION OF 42 U.S.C. § 3604(A)

390.   Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

391.   The housing advertised on Facebook products for rent or sale are "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

392.   Facebook discriminated against Plaintiffs and the class they seek to represent, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and its implementing regulations by making unavailable or denying a dwelling to any person based on race, color, religion, sex, familial status, or national origin.

393.   Facebook committed such violation by, *inter alia*, engaging in the following actions and practices:

  a.   Intentionally discriminating against users with characteristics protected under the FHA by encouraging, facilitating, and knowingly effectuating housing advertisers' discriminatory exclusion of users from housing ads' Eligible Audiences through the advertisers' use of Facebook-created categories to target or exclude users based on their protected characteristics;

  b.   Intentionally approving housing ads that excluded users with protected characteristics from their Eligible Audiences;

FOURTH AMENDED CLASS ACTION COMPLAINT

c.  Expanding housing advertisers' source audiences for housing ads into distinct Lookalike Audiences by finding users who "looked like" users in the source audiences, based in part on the users' protected characteristics;

d.  Intentionally inputting data it had mined about users' protected characteristics or proxies for such characteristics into the ad delivery algorithms used to deliver housing ads and implementing such delivery algorithms to deliver housing ads to users;

e.  Implementing and maintaining its system of ad delivery in a way that disproportionately excluded Facebook users with protected characteristics from receiving housing ads; and

f.  Implementing and maintaining its system of ad delivery in a way that created, increased, reinforced, or perpetuated segregated housing patterns because of characteristics protected under the FHA.

394. Plaintiffs are "aggrieved person(s)" as defined by the FHA, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

395. Facebook's discriminatory practices were intentional, willful, or made in reckless or callous disregard for the rights of others, including Plaintiffs.

396. As such, Plaintiffs are entitled to actual, compensatory, statutory, and punitive and exemplary damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

397. Defendant's violations of the FHA also entitle Plaintiffs to nominal damages.

## COUNT II – VIOLATION OF 42 U.S.C. § 3604(C)

398. Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

399. The housing advertised for rent or sale on Facebook's products constitute "dwellings" as defined by the FHA, 42 U.S.C. § 3602(b).

400. Facebook discriminated against Plaintiffs and the class they seek to represent, in violation of the Fair Housing Act, 42 U.S.C. § 3604(c), and its implementing regulations by making, printing, publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on, race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

401. Facebook committed such violation by, *inter alia*, engaging in the following actions and practices:

    a. Intentionally discriminating against users with characteristics protected under the FHA by encouraging, facilitating, and knowingly effectuating housing advertisers' discriminatory exclusion of users from housing ads' Eligible Audiences through the advertisers' use of Facebook-created categories to target or exclude users based on their protected characteristics;

    b. Intentionally approving housing ads that excluded users with protected characteristics from their Eligible Audiences;

    c. Expanding housing advertisers' source audiences for housing ads into distinct Lookalike Audiences by finding users who "looked like" users in the source audiences, based in part on the users' protected characteristics;

    d. Intentionally inputting data it had mined about users' protected characteristics or proxies for such characteristics into the ad delivery algorithms used to deliver housing ads and implementing such delivery algorithms to deliver housing ads to users;

    e. Implementing and maintaining its system of ad delivery in a way that disproportionately excluded Facebook users with protected characteristics from receiving housing ads; and

FOURTH AMENDED CLASS ACTION COMPLAINT

f.   Implementing and maintaining its system of ad delivery in a way that created, increased, reinforced, or perpetuated segregated housing patterns because of characteristics protected under the FHA.

402.   Plaintiffs and the class they seek to represent are "aggrieved person(s)" as defined by the FHA, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

403.   Facebook's discriminatory practices were intentional, willful, or made in reckless or callous disregard for the rights of others, including Plaintiffs.

404.   As such, Plaintiffs are entitled to actual, compensatory, statutory, and punitive and exemplary damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

405.   Defendant's violations of the FHA also entitle Plaintiffs to nominal damages.

## COUNT III – VIOLATION OF 42 U.S.C. § 3604(D)

406.   Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

407.   The housing advertised for rent or sale on Facebook's products constitute "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

408.   Facebook discriminated against Plaintiffs and the class they seek to represent, in violation of the Fair Housing Act, 42 U.S.C. § 3604(d), and its implementing regulations by representing to Plaintiffs and the class because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

409.   Facebook committed such violation by, *inter alia*, engaging in the following actions and practices:

a.   Intentionally discriminating against users with characteristics protected under the FHA by encouraging, facilitating, and knowingly effectuating housing advertisers' discriminatory exclusion of users from housing ads'

Eligible Audiences through the advertisers' use of Facebook-created categories to target or exclude users based on their protected characteristics;

b. Intentionally approving housing ads that excluded users with protected characteristics from their Eligible Audiences;

c. Expanding housing advertisers' source audiences for housing ads into distinct Lookalike Audiences by finding users who "looked like" users in the source audiences, based in part on the users' protected characteristics;

d. Intentionally inputting data it had mined about users' protected characteristics or proxies for such characteristics into the ad delivery algorithms used to deliver housing ads and implementing such delivery algorithms to deliver housing ads to users;

e. Implementing and maintaining its system of ad delivery in a way that disproportionately excluded Facebook users with protected characteristics from receiving housing ads; and

f. Implementing and maintaining its system of ad delivery in a way that created, increased, reinforced, or perpetuated segregated housing patterns because of characteristics protected under the FHA.

410. Plaintiffs are "aggrieved person(s)" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

411. Facebook's discriminatory practices were intentional, willful, or made in reckless or callous disregard for the rights of others, including Plaintiffs.

412. As such, Plaintiffs are entitled to actual, compensatory, statutory, and punitive and exemplary damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

413. Defendant's violations of the FHA also entitle Plaintiffs to nominal damages.

## COUNT IV – VIOLATION OF 42 U.S.C. § 3606

414.   Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

415.   The housing advertised for rent or sale on Facebook's products constitute "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

416.   Facebook discriminated against Plaintiffs and the class they seek to represent, in violation of the Fair Housing Act, 42 U.S.C. § 3606, by denying any person access to or participation in any service relating to the business of selling or renting dwellings and discriminating against Plaintiffs in the terms or conditions of such access or participation on the basis of race, color, religion, sex, handicap, familial status, or national origin.

417.   Facebook committed such violation by, *inter alia*, engaging in the following actions and practices:

    a.   Intentionally discriminating against users with characteristics protected under the FHA by encouraging, facilitating, and knowingly effectuating housing advertisers' discriminatory exclusion of users from housing ads' Eligible Audiences through the advertisers' use of Facebook-created categories to target or exclude users based on their protected characteristics;

    b.   Intentionally approving housing ads that excluded users with protected characteristics from their Eligible Audiences;

    c.   Expanding housing advertisers' source audiences for housing ads into distinct Lookalike Audiences by finding users who "looked like" users in the source audiences, based in part on the users' protected characteristics;

    d.   Intentionally inputting data it had mined about users' protected characteristics or proxies for such characteristics into the ad delivery algorithms used to deliver housing ads and implementing such delivery algorithms to deliver housing ads to users;

1
2
3

     e. Implementing and maintaining its system of ad delivery in a way that disproportionately excluded Facebook users with protected characteristics from receiving housing ads; and

4
5
6

     f. Implementing and maintaining its system of ad delivery in a way that created, increased, reinforced, or perpetuated segregated housing patterns because of characteristics protected under the FHA.

7
8
9
10

418.   Facebook provided a service relating to the business of selling or renting dwellings through its Ad Platform creating target audiences and its delivery algorithms delivering ads to such audiences, which prevented Plaintiffs from participation in or access to these services.

11
12
13

419.   Plaintiffs are "aggrieved persons" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

14
15

420.   Facebook's discriminatory practices were intentional, willful, or made in reckless or callous disregard for the rights of others, including Plaintiffs.

16
17
18

421.   As such, Plaintiffs are entitled to actual, compensatory, statutory, and punitive and exemplary damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

19
20

422.   Defendant's violations of the FHA also entitle Plaintiffs to nominal damages.

21

### COUNT V – VIOLATION OF N.Y. EXEC. L. § 290 ET. SEQ.

22

(New York State Human Rights Law)

23

(On behalf of New York Plaintiffs and the proposed New York Subclass)

24
25

423.   Plaintiffs reallege and incorporate herein by reference, each and every allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

26
27
28

424.   The New York State Human Rights Law provides in part that "every individual within this state is afforded an equal opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity, whether because of

discrimination, prejudice, intolerance or inadequate education, training, housing or health care not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants." N.Y. Exec. L. § 290.

425.   Plaintiffs are persons as defined by N.Y. Exec. L. § 292(1).

426.   Plaintiffs have given notice of this action to the New York Attorney General.

427.   Facebook unlawfully denied Plaintiffs and the New York subclass access to "an equal opportunity to enjoy a full and productive life" in violation of the New York State Human Rights Law. N.Y. Exec. L. § 290 *et seq*.

428.   Facebook committed such violation by, *inter alia*, engaging in the following actions and practices:

    a.   Intentionally discriminating against users with characteristics protected under the NYSHRL by encouraging, facilitating, and knowingly effectuating housing advertisers' discriminatory exclusion of users from housing ads' Eligible Audiences through the advertisers' use of Facebook-created categories to target or exclude users based on their protected characteristics;

    b.   Intentionally approving housing ads that excluded users with protected characteristics from their Eligible Audiences;

    c.   Expanding housing advertisers' source audiences for housing ads into distinct Lookalike Audiences by finding users who "looked like" users in the source audiences, based in part on the users' protected characteristics; and

    d.   Intentionally inputting data it had mined about users' protected characteristics or proxies for such characteristics into the ad delivery algorithms used to deliver housing ads and implementing such delivery algorithms to deliver housing ads to users.

429.   Facebook's discriminatory practices were intentional, willful, or made in reckless disregard for the rights of others, including Plaintiffs and the New York Subclass.

430.   Facebook's conduct as set forth above constitutes an unlawful discriminatory practice resulting in the denial withholding of housing accommodations in violation of N.Y Exec. L. § 296(5).

431.   Facebook's conduct as set forth above constitutes aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by N.Y. Exec. L. § 296(5) in violation of the N.Y. Exec. L. § 296(6).

432.   As a direct and proximate result of Facebook's creation, utilization, publication, dissemination, circulation and/or targeting of housing ads in a segregated marketplace, Plaintiffs and the New York Subclass have been damaged and continue to suffer damages.

433.   Accordingly, pursuant to Article 4 of the N.Y. Exec. L. § 297, Facebook is required to disgorge any profits obtained through the commission of the unlawful discriminatory acts described herein.

434.   Pursuant to Articles 9 and 10 of the N.Y. Exec. L. § 297, Plaintiffs and the New York Subclass are entitled to actual damages, punitive and exemplary damages, injunctive relief, and attorneys' fees and costs.

435.   Due to Facebook's discriminatory conduct, Plaintiffs and the New York Subclass suffered damage that a decent and reasonable individual would suffer when subjected to such discrimination, entitling Plaintiffs and the New York Subclass to at least $1,000 for each of Facebook's violations.

436.   Pursuant to N.Y. Civil Rights Law § 41, Plaintiffs and the New York Subclass are entitled to statutory damages for each and every violation of not less than $100.00 and not more than $500.00 per violation.

## COUNT VI – VIOLATION OF CAL. CIVIL CODE §§ 51, 52(a)

(Unruh Civil Rights Act)

1    (On behalf of the California Plaintiffs and the proposed California Subclass)

2    437.   Plaintiffs reallege and incorporate herein by reference, each and every

3    allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

4    438.   The Unruh Civil Rights Act provides in part that "All persons within the

5    jurisdiction of this state are free and equal, and no matter what their sex, race, color,

6    religion, ancestry, national origin, disability, medical condition, genetic information,

7    marital status, sexual orientation, citizenship, primary language, or immigration status are

8    entitled to the full and equal accommodations, advantages, facilities, privileges, or

9    services in all business establishments of every kind whatsoever."   Cal. Civ. Code

10   § 51(b).

11   439.   Defendant Facebook is, and during the applicable timeframes was, a

12   business establishment under the Unruh Civil Rights Act doing business in the state of

13   California.

14   440.   Facebook unlawfully denied Plaintiff Jenny Lin and the California Subclass

15   the "full and equal accommodations, advantages, facilities, privileges, or services"

16   provided by Facebook in violation of the Unruh Civil Rights Act.

17   441.   Facebook committed such violation by, *inter alia*, engaging in the following

18   actions and practices:

19   a.   Intentionally discriminating against users with characteristics protected

20        under the Unruh Civil Rights Act by encouraging, facilitating, and

21        knowingly effectuating housing advertisers' discriminatory exclusion of

22        users from housing ads' Eligible Audiences through the advertisers' use of

23        Facebook-created categories to target or exclude users based on their

24        protected characteristics;

25   b.   Intentionally approving housing ads that excluded users with protected

26        characteristics from their Eligible Audiences;

27   c.   Expanding housing advertisers' source audiences for housing ads into

28        distinct Lookalike Audiences by finding users who "looked like" users in

the source audiences, based in part on the users' protected characteristics; and

d. Intentionally inputting data it had mined about users' protected characteristics or proxies for such characteristics into the ad delivery algorithms used to deliver housing ads and implementing such delivery algorithms to deliver housing ads to users.

442. A substantial motivating reason for Defendant Facebook's conduct was Plaintiff Jenny Lin's and the California Subclass's characteristics that are protected by the Unruh Civil Rights Act.

443. Plaintiff Jenny Lin and the California Subclass were harmed by Defendant Facebook's conduct, which was a substantial factor in causing such harm.

444. As a direct and proximate result of the aforementioned acts by Defendant Facebook, Plaintiff Jenny Lin and the California Subclass have incurred actual damages. Accordingly, they are entitled to statutory damages in an amount up to three times the amount of actual damages, with a minimum amount of $4,000 per violation, and entitled to injunctive and declaratory relief. Civil Code §§ 52(a), (e) and 52.1(h).

445. Plaintiff Jenny Lin and the California Subclass are also entitled to injunctive and declaratory relief as well as attorneys' fees and costs pursuant to Civil Code §§ 52(a) and (e).

446. Defendant Facebook, with the knowledge of its officers and managers, committed the acts and omissions alleged herein with intent and/or in reckless disregard of the rights of Plaintiff and the members of the subclass and therefore, Defendant is liable for punitive and exemplary damages.

## **COUNT VII – AIDING AND ABETTING DISCRIMINATION IN VIOLATION OF CAL. CIVIL CODE §§ 51, 52(a)**

(Aiding and Abetting Discrimination in Violation of the Unruh Civil Rights Act)

(On behalf of the California Plaintiffs and the proposed California Subclass)

447.   Plaintiffs reallege and incorporate herein by reference, each and every allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

448.   Defendant Facebook is, and during the applicable timeframes was, a business establishment under the Unruh Civil Rights Act doing business in the state of California.

449.   In addition to its direct violations of the Unruh Civil Rights Act, Facebook also unlawfully aided, abetted, and/or incited discrimination contrary to Cal. Civ. Code § 51(b), thereby denying Plaintiff Jenny Lin and the California Subclass the "full and equal accommodations, advantages, facilities, privileges, or services" provided by Facebook in violation of the Unruh Civil Rights Act. Cal. Civ. Code § 52(a).

450.   Facebook knew that housing advertisers used Ad Platform to intentionally and discriminatorily target housing ads based on users' protected characteristics; such targeting violated the Unruh Civil Rights Act.

451.   Facebook was aware of housing advertisers' discriminatory housing-ad targeting because, *inter alia*, Facebook:

   a. Knew of reports which demonstrated that housing ads could be targeted based on users' protected characteristics and that such ads had been approved;

   b. Approved and delivered housing ads that excluded users from their Eligible Audiences based on protected characteristics; and

   c. Acknowledged concerns of discrimination in housing-ad targeting on Facebook and claimed to (but did not) take appropriate remedial action.

452.   Facebook gave substantial assistance and/or encouragement to housing advertisers to engage in discriminatory conduct that violated the Unruh Civil Rights Act by, *inter alia*:

   a. Providing housing advertisers with categories based on protected characteristics that could be used to target housing ads;

b. Following the selected Eligible Audience parameters when housing advertisers chose to discriminatorily target housing ads based on users' protected characteristics;

c. Maintaining its discriminatory ad-targeting functionality for housing ads after Facebook was aware that discriminatory housing-ad targeting was occurring via Facebook's advertising tools; and

d. Promoting the efficacy of its ad-targeting functionality to housing advertisers.

453. Plaintiff Jenny Lin and the California Subclass were harmed by Defendant Facebook's conduct, which was a substantial factor in causing such harm.

454. As a direct and proximate result of the aforementioned acts by Defendant Facebook, Plaintiff Jenny Lin and the California Subclass have incurred actual damages. Accordingly, they are entitled to statutory damages in an amount up to three times the amount of actual damages, with a minimum amount of $4,000 per violation, and entitled to injunctive and declaratory relief. Civil Code §§ 52(a), (e) and 52.1(h).

455. Plaintiff Jenny Lin and the California Subclass are also entitled to injunctive and declaratory relief as well as attorneys' fees and costs pursuant to Civil Code §§ 52(a) and (e).

456. Defendant Facebook, with the knowledge of its officers and managers, committed the acts and omissions alleged herein with intent and/or in reckless disregard of the rights of Plaintiff and the members of the subclass and therefore, Defendant is liable for punitive and exemplary damages.

## COUNT VIII - CAL. CIVIL CODE §§ 51.5, 52(a)

(Blacklisting and Discrimination in violation of Cal. Civil Code §§ 51.5, 52(a))

(On behalf of the California Plaintiffs and the proposed California Subclass)

457. Plaintiffs reallege and incorporate herein by reference, each and every allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

458.   Section 51.5 of the California Civil Code provides that "No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51 . . . because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics."

459.   Defendant Facebook is, and during the applicable timeframe was, a business establishment doing business in the state of California.

460.   Facebook engaged in unlawful discrimination and/or blacklisting against Plaintiffs Jenny Lin and the California Subclass in violation of Section 51.5 of the California Civil Code.

461.   Facebook committed such violation by, *inter alia*, engaging in the following actions and practices:

   a. Intentionally discriminating against users with characteristics protected under the statute by encouraging, facilitating, and knowingly effectuating housing advertisers' discriminatory exclusion of users from housing ads' Eligible Audiences through the advertisers' use of Facebook-created categories to target or exclude users based on their protected characteristics;

   b. Intentionally approving housing ads that excluded users with protected characteristics from their Eligible Audiences;

   c. Expanding housing advertisers' source audiences for housing ads into distinct Lookalike Audiences by finding users who "looked like" users in the source audiences, based in part on the users' protected characteristics; and

   d. Intentionally inputting data it had mined about users' protected characteristics or proxies for such characteristics into the ad delivery algorithms used to deliver housing ads and implementing such delivery algorithms to deliver housing ads to users.

1    462.   As a direct and proximate result of the aforementioned acts by Defendant
2    Facebook, Plaintiffs and the California Subclass have incurred actual damages.
3    Accordingly, they are entitled to statutory damages in an amount up to three times the
4    amount of actual damages, with a minimum amount of $4,000 per violation, and entitled
5    to injunctive and declaratory relief.  Civil Code §§ 52(a), (e) and 52.1(h).

6    463.   Plaintiffs and the California Subclass are also entitled to injunctive and
7    declaratory relief as well as attorneys' fees and costs pursuant to Civil Code §§ 52(a) and
8    (e).

9    464.   Defendant, with the knowledge of its officers and managers, committed the
10   acts and omissions alleged herein with intent and/or in reckless disregard of the rights of
11   Plaintiffs Jenny Lin and the California Subclass, and therefore Defendant is liable for
12   punitive and exemplary damages.

13   ## COUNT IX – CAL. BUS. & PROF. CODE § 17200
14   (Unfair business practices in violation of Business and Professions Code § 17200 *et seq.*)
15   (On behalf of the California Plaintiffs and the proposed California Subclass)

16   465.   Plaintiffs reallege and incorporate herein by reference, each and every
17   allegation contained in the precedent and subsequent paragraphs as fully set forth herein.

18   466.   Defendant has violated, California's Unfair Competition Law, Business and
19   Professions Code section 17200 *et seq.*, by engaging in unfair, unlawful, and fraudulent
20   activity as alleged herein.  In particular, Defendant Facebook's creation of segregated
21   marketplace in which advertisers were able to exclude certain classes of Facebook users
22   from being part of the pool of Facebook users eligible to see certain housing
23   advertisements constitutes an unfair business practice.

24   467.   Defendant has generated, and continue to generate, income as a direct result
25   of its unfair, fraudulent, and unlawful business practices. Plaintiff Jenny Lin and the
26   California Subclass are therefore entitled to injunctive relief, restitution and/or to
27   restitutionary disgorgement of any and all monies received by Defendant while engaged

28

in such practices, plus interest pursuant to Business and Professions Code section 17200 *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the class they seek to represent respectfully request that this Honorable Court enter judgment in their favor and grant them the following relief:

a.     Certify the case as a class action on behalf of the proposed Class and Subclasses;

b.     Designate Plaintiffs as representatives of the Class;

c.     Designate the New York Plaintiffs as representatives of the New York Subclass;

d.     Designate the California Plaintiffs as representatives of the California Subclass;

e.     Designate Plaintiffs' counsel of record as Class Counsel;

f.     Declare that Defendant's discriminatory policies and practices violate the Fair Housing Act, 42 U.S.C. § 3601 *et seq*;

g.     Declare that Defendant's discriminatory policies and practices violate the New York Human Rights Law, N.Y. Exec. L. § 290 *et seq.*;

h.     Declare that Defendant's discriminatory policies and practices violate the California Unruh Civil Rights Act, Cal. Civil Code §§ 51, 52(a);

i.     Declare that Defendant Facebook's discriminatory policies and practices constitute unfair business practices in violation of Business and Professions Cal. Code § 17200 *et seq.*;

j.     Declare that Defendant Facebook's discriminatory policies and practices constitute Blacklisting and Discrimination in violation of Cal. Civil Code §§ 51.5, 52(a);

k.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees, representatives, and any and all persons acting in concert with them, from denying or withholding housing, or otherwise making housing unavailable on the basis of race, national origin or other prohibited classifications;

1    l.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees,
2 representatives, and any and all persons acting in concert with them, from making,
3 printing, or publishing, or causing to be made, printed, or published any notice, statement,
4 or advertisement, with respect to the sale or rental of a dwelling that indicates any
5 preference, limitation, or discrimination on the basis of race, national origin or other
6 prohibited classifications;

7    m.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees,
8 representatives, and any and all persons acting in concert with them, from representing
9 to any person because of race, national origin or other prohibited classifications that any
10 dwelling is not available for sale, rental, or inspection, when such dwelling is in fact so
11 available;

12    n.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees,
13 representatives, and any and all persons acting in concert with them, from denying any
14 person access to Facebook's services relating to the business of selling or renting
15 dwellings, and discriminating against such persons in the terms or conditions of such
16 access or participation on the basis of race, national origin or other prohibited
17 classifications;

18    o.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees,
19 representatives, and any and all persons acting in concert with them, from engaging in
20 acts that violate the New York Human Rights Law;

21    p.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees,
22 representatives, and any and all persons acting in concert with them, from engaging in
23 acts that violate the California Unruh Act;

24    q.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees,
25 representatives, and any and all persons acting in concert with them, from engaging in
26 Blacklisting and Discrimination in violation of Cal. Civil Code §§ 51.5, 52(a);

27    r.     Enjoin Defendant Facebook and its subsidiaries, agents, and employees,
28 representatives, and any and all persons acting in concert with them, from engaging in

1   unfair business practices in violation of California Business and Professions Code, Cal.

2   Code § 17200 *et seq.*;

3        s.    Order restitution and/or restitutionary disgorgement of any and all monies

4   received by Defendant while engaged in such discriminatory practices and/or unfair

5   business practices;

6        t.    Award Plaintiffs and the members of the Classes actual, compensatory,

7   statutory, nominal, exemplary, and punitive damages to which Plaintiffs are entitled;

8        u.    Award Plaintiffs and the members of the Classes their costs of suit, including

9   reasonable attorneys' fees, as provided by law;

10        v.    Award Plaintiffs and the members of the Classes pre- and post- judgment

11   interest as provided by law, from and after the date of service of this Complaint; and

12        w.    Award Plaintiffs and members of the Classes such other and further relief as

13   the case may require and the Court may deem just and proper.

14

15                             Respectfully Submitted,

16   Dated: January 29, 2024        **MANTESE HONIGMAN, P.C.**

17                            By:   /s/ Gerard V. Mantese

18                                  Gerard V. Mantese

19                                  David Honigman

20                                  Kathryn Eisenstein

21                                **HERTZ SCHRAM PC**

22                                Patricia A. Stamler

23                                Elizabeth Thomson
                             Matthew Turchyn

24                              **SCHONBRUN SEPLOW HARRIS**

25                            **HOFFMAN & ZELDES LLP**

26                              Michael D. Seplow

27                              Aidan C. McGlaze
                           Wilmer Harris

28                            *Attorneys for Plaintiffs/Proposed Class Members.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY DEMAND

Plaintiffs request trial by jury on all claims.

Respectfully Submitted,

Dated: January 29, 2024

**MANTESE HONIGMAN, P.C.**

By:  /s/ Gerard V. Mantese
        _____
        Gerard V. Mantese
        David Honigman
        Kathryn Eisenstein

**HERTZ SCHRAM PC**
Patricia A. Stamler
Elizabeth Thomson
Matthew Turchyn

**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
Michael D. Seplow
Aidan C. McGlaze
Wilmer Harris

*Attorneys for Plaintiffs/Proposed Class Members.*

# EXHIBIT 1

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



FILED

OCT 13 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ROSEMARIE VARGAS; et al., | No.   21-16499 |
| Plaintiffs-Appellants, | D.C. No. 3:19-cv-05081-WHO |
| and | Northern District of California, San Francisco |
| NEUHTAH OPIOTENNIONE; JESSICA TSAI, | ORDER |
| Plaintiffs, | |
| v. | |
| FACEBOOK, INC., | |
| Defendant-Appellee. | |

Before:  M. MURPHY,[*] GRABER, and OWENS, Circuit Judges.

The memorandum disposition filed on June 23, 2023, is hereby amended.

The amended disposition and Judge Owens' dissent will be filed concurrently with

this order.

With the memorandum disposition so amended, Judge Murphy and Judge

Graber have voted to deny the petition for panel rehearing.  Judge Owens has voted

to grant the petition for panel rehearing.  Judge Murphy and Judge Graber have

---

[*]   The Honorable Michael R. Murphy, United States Circuit Judge for the
U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

recommended denial of the petition for rehearing en banc. Judge Owens has voted to grant the petition for rehearing en banc.

The full court has been advised of Appellee's petition for rehearing en banc, and no judge of the court has requested a vote on it.

The petition for panel rehearing and rehearing en banc, Docket No. 80, is DENIED. No further petitions for rehearing or rehearing en banc will be entertained.

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 13 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ROSEMARIE VARGAS; et al., | No. 21-16499 |
| Plaintiffs-Appellants, | D.C. No. 3:19-cv-05081-WHO |
| and | |
| NEUHTAH OPIOTENNIONE; JESSICA TSAI, | AMENDED MEMORANDUM* |
| Plaintiffs, | |
| v. | |
| FACEBOOK, INC., | |
| Defendant-Appellee. | |

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted July 28, 2022
Withdrawn January 9, 2023
Resubmitted June 20, 2023
San Francisco, California

Before: M. MURPHY,** GRABER, and OWENS, Circuit Judges.

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable Michael R. Murphy, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

Plaintiffs Rosemarie Vargas, Jazmine Spencer, Kisha Skipper, Deillo Richards, and Jenny Lin appeal from the dismissal of their Third Amended Class Action complaint against Defendant Facebook, Inc. We review the dismissal de novo, Meland v. Weber, 2 F.4th 838, 843 (9th Cir. 2021), and reverse and remand for further proceedings.

1. The district court erred by dismissing the operative complaint for failure to allege a concrete injury sufficient to confer Article III standing. "[A]t the pleading stage, the plaintiff must allege sufficient facts that, taken as true, 'demonstrate each element' of Article III standing." Jones v. L.A. Cent. Plaza LLC, 74 F.4th 1053, 1057 (9th Cir. 2023) (alteration adopted) (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016)). Plaintiffs have done so here.

The operative complaint alleges that Facebook's "targeting methods provide tools to exclude women of color, single parents, persons with disabilities and other protected attributes," so that Plaintiffs were "prevented from having the same opportunity to view ads for housing" that Facebook users who are not in a protected class received.

Plaintiff Vargas provides an example. She alleges that she is a disabled female of Hispanic descent and a single parent living in New York City with her two minor children and that she is a frequent Facebook user who has posted photos of herself and her children. Because of her use of Facebook, the platform knew

that she was "a single parent, disabled female of Hispanic descent." She sought

housing from August 2018 through April 2019 and was ready, willing, and able to

move. In an effort to find housing, she accessed the Facebook Marketplace.

Although she sought housing in Manhattan, her Facebook searches yielded no ads

for housing in Manhattan. After receiving unsatisfactory search results, in early

2019, Plaintiff Vargas sat side by side with a Caucasian friend "and conducted a

search for housing through Facebook's Marketplace, both using the same search

criteria . . . . [The Caucasian friend] received more ads for housing in locations

that were preferable to Plaintiff Vargas. Plaintiff Vargas did not receive the ads

that [the friend] received." Third Am. Compl. at 24 (emphases added). In other

words, her Caucasian friend saw more, and more responsive, ads than Plaintiff

Vargas received even though they used identical search criteria. See Havens

Realty Corp. v. Coleman, 455 U.S. 363, 373–74 (1982) (holding that racially

diverse "testers" attempting to obtain truthful information about available housing

had standing to sue under the Fair Housing Act of 1968).

The district court faulted the complaint for not identifying specific ads that

Plaintiff Vargas did not see. But Plaintiffs' very claim is that Facebook's practices

concealed information from housing-seekers in protected classes. And nothing in

the case law requires that a plaintiff identify specific ads that she could not see

when she alleges that an ad-delivery algorithm restricted her access to housing ads

3

in the first place.

The district court also relied on the fact that only paid ads used Facebook's targeting methods, and Plaintiffs do not specify whether the ads that Plaintiff Vargas's Caucasian friend saw (and that Plaintiff Vargas did not) were paid ads. The operative complaint alleges that Facebook hosts a vast amount of paid advertising but does not allege that all ads on the Marketplace are paid ads. Nonetheless, given the allegations concerning the magnitude of paid advertising, it is plausible to infer that one or more of the ads that Plaintiff Vargas could not access because of Facebook's methods was paid. If Plaintiff Vargas cannot prove that she was denied access to one or more paid ads, then her claims will fail on the merits—but they do not fail for lack of standing. See Cath. League for Religious & Civil Rts. v. City & County of San Francisco, 624 F.3d 1043, 1049 (9th Cir. 2010) (en banc) ("Nor can standing analysis, which prevents a claim from being adjudicated for lack of jurisdiction, be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true."). Plaintiff Vargas alleges a concrete and particularized injury—deprivation of truthful information and housing opportunities—whether or not she can establish all the elements of her claims later in the litigation.

2. The district court also erred by holding that Facebook is immune from liability pursuant to 47 U.S.C. § 230(c)(1). "Immunity from liability exists for '(1)

a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a [federal or] state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.'" Dyroff v. Ultimate Software Grp., 934 F.3d 1093, 1097 (9th Cir. 2019) (quoting Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1100 (9th Cir. 2009)). We agree with Plaintiffs that, taking the allegations in the complaint as true, Plaintiffs' claims challenge Facebook's conduct as a co-developer of content and not merely as a publisher of information provided by another information content provider.

Facebook created an Ad Platform that advertisers could use to target advertisements to categories of users. Facebook selected the categories, such as sex, number of children, and location. Facebook then determined which categories applied to each user. For example, Facebook knew that Plaintiff Vargas fell within the categories of single parent, disabled, female, and of Hispanic descent. For some attributes, such as age and gender, Facebook requires users to supply the information. For other attributes, Facebook applies its own algorithms to its vast store of data to determine which categories apply to a particular user.

The Ad Platform allowed advertisers to target specific audiences, both by including categories of persons and by excluding categories of persons, through the use of drop-down menus and toggle buttons. For example, an advertiser could choose to exclude women or persons with children, and an advertiser could draw a

boundary around a geographic location and exclude persons falling within that location.  Facebook permitted all paid advertisers, including housing advertisers, to use those tools.  Housing advertisers allegedly used the tools to exclude protected categories of persons from seeing some advertisements.

As the website's actions did in Fair Housing Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157 (9th Cir. 2008) (en banc), Facebook's own actions "contribute[d] materially to the alleged illegality of the conduct."  Id. at 1168.  Facebook created the categories, used its own methodologies to assign users to the categories, and provided simple drop-down menus and toggle buttons to allow housing advertisers to exclude protected categories of persons.  Facebook points to three primary aspects of this case that arguably differ from the facts in Roommates.com, but none affects our conclusion that Plaintiffs' claims challenge Facebook's own actions.

First, in Roommates.com, the website required users who created profiles to self-identify in several protected categories, such as sex and sexual orientation.  Id. at 1161.  The facts here are identical with respect to two protected categories because Facebook requires users to specify their gender and age.  With respect to other categories, it is true that Facebook does not require users to select directly from a list of options, such as whether they have children.  But Facebook uses its own algorithms to categorize the user.  Whether by the user's direct selection or by

6

sophisticated inference, Facebook determines the user's membership in a wide range of categories, and Facebook permits housing advertisers to exclude persons in those categories.  We see little meaningful difference between this case and Roommates.com in this regard.  Facebook was "much more than a passive transmitter of information provided by others; it [was] the developer, at least in part, of that information."  Id. at 1166.  Indeed, Facebook is more of a developer than the website in Roommates.com in one respect because, even if a user did not intend to reveal a particular characteristic, Facebook's algorithms nevertheless ascertained that information from the user's online activities and allowed advertisers to target ads depending on the characteristic.

Second, Facebook emphasizes that its tools do not require an advertiser to discriminate with respect to a protected ground.  An advertiser may opt to exclude only unprotected categories of persons or may opt not to exclude any categories of persons.  This distinction is, at most, a weak one.  The website in Roommates.com likewise did not require advertisers to discriminate, because users could select the option that corresponded to all persons of a particular category, such as "straight or gay."  See, e.g., id. at 1165 ("Subscribers who are seeking housing must make a selection from a drop-down menu, again provided by Roommate[s.com], to indicate whether they are willing to live with 'Straight or gay' males, only with 'Straight' males, only with 'Gay' males or with 'No males.'").  The manner of

7

discrimination offered by Facebook may be less direct in some respects, but as in Roommates.com, Facebook identified persons in protected categories and offered tools that directly and easily allowed advertisers to exclude all persons of a protected category (or several protected categories).

Finally, Facebook urges us to conclude that the tools at issue here are "neutral" because they are offered to all advertisers, not just housing advertisers, and the use of the tools in some contexts is legal. We agree that the broad availability of the tools distinguishes this case to some extent from the website in Roommates.com, which pertained solely to housing. But we are unpersuaded that the distinction leads to a different ultimate result here. According to the complaint, Facebook promotes the effectiveness of its advertising tools specifically to housing advertisers. "For example, Facebook promotes its Ad Platform with 'success stories,' including stories from a housing developer, a real estate agency, a mortgage lender, a real estate-focused marketing agency, and a search tool for rental housing." A patently discriminatory tool offered specifically and knowingly to housing advertisers does not become "neutral" within the meaning of this doctrine simply because the tool is also offered to others.

**REVERSED and REMANDED.**

FILED

*Vargas v. Facebook, Inc.*, No. 21-16499
OWENS, Circuit Judge, dissenting:

OCT 13 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

I respectfully dissent. Each of Plaintiffs' theories of injury—denial of truthful information, denial of the opportunity to obtain a benefit, denial of the social benefit of living in an integrated community, and stigmatic injury—depends on Plaintiffs having been personally discriminated against by at least one housing advertiser that used Facebook's Ad Platform. Thus, to survive a motion to dismiss, Plaintiffs would need to plausibly allege that a housing ad that would otherwise have appeared in their News Feeds or in their search results on Facebook Marketplace did not appear because the advertiser used Facebook's Ad Platform to exclude their protected class. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

As to each named plaintiff, the Third Amended Complaint ("TAC") does not identify any such ad or advertiser. Nor does it allege facts supporting an inference that housing discrimination (even if the identities of the ads and advertisers are unknown) is plausibly the reason Plaintiffs failed to find housing ads meeting their respective search criteria. Plaintiffs have alleged nothing to exclude the possibility that suitable housing was not available or not advertised on Facebook. *See Iqbal*, 556 U.S. at 682 (finding that an allegation of discrimination was not plausible in view of one "obvious alternative explanation").

1

Although Vargas alleges in Paragraph 95 of the TAC that her Caucasian friend, while using the same search criteria, received ads on Facebook Marketplace that she did not, she does not specify whether the ads her Caucasian friend saw were user-generated or paid (i.e., created using the Ad Platform and its audience selection tools). Users can distinguish paid ads from user-generated ads by the label "Sponsored." *See* Andrew Hutchinson, *Facebook Provides New Option to Boost Marketplace Posts, and Marketplace Ads for Businesses*, SocialMediaToday (June 7, 2018), https://www.socialmediatoday.com/news/facebook-provides-new-option-to-boost-marketplace-posts-and-marketplace-ad/525158/. Only paid ads are relevant to Vargas's housing discrimination claims.

Accordingly, I would affirm the district court's dismissal for failure to allege a concrete injury sufficient to confer standing.

# EXHIBIT 2

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America
By:     ELLEN BLAIN
        DAVID J. KENNEDY
        JACOB LILLYWHITE
        CHRISTINE S. POSCABLO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone (212) 637-2733
Facsimile (212) 637-0033
david.kennedy2@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
SAMEENA SHINA MAJEED
Chief, Housing and Civil Enforcement Section
R. TAMAR HAGLER
Deputy Chief
JUNIS L. BALDON
HARIN C. SONG
KINARA A. FLAGG
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel.: (202) 353-1339
Fax: (202) 514-1116

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | COMPLAINT |
| Plaintiff, | |
| v. | 22 Civ. _____ (____) |
| META PLATFORMS, INC., f/k/a FACEBOOK, INC., | |
| Defendant. | Jury Trial Demanded |

**INTRODUCTION**

1.      The United States of America brings this action against Meta Platforms, Inc., f/k/a Facebook, Inc. ("Facebook") to enforce the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619, which prohibits discrimination in housing, including housing-related advertising, on the basis of race, color, religion, sex, disability, familial status, and national origin (collectively, "FHA-protected characteristics").  For years, Facebook has discriminated against its users on the basis of these FHA-protected characteristics in its delivery of housing advertisements ("ads").

2.      As alleged more fully below, Facebook has discriminated in violation of the FHA in at least three aspects of the ad delivery system Facebook designed and provides to advertisers: (1) **Trait-Based Targeting**—encouraging advertisers to target ads by including or excluding Facebook users based on FHA-protected characteristics that Facebook, through its data collection and analysis, attributes to those users; (2) **"Lookalike" Targeting**—designing, maintaining, applying, and making available to advertisers a machine-learning algorithm to find users who "look like" an advertiser's "source audience" based in part upon FHA-protected characteristics, through a Facebook tool previously called "Lookalike Audience" and now known as "Special Ad Audience"; and (3) **Delivery Determinations**—designing, maintaining, and applying machine-learning algorithms ("Personalization Algorithms") to help determine which subset of the advertiser's targeted audience (the "Eligible Audience") will actually receive the ad (the "Actual Audience"), based in part upon FHA-protected characteristics.  By creating targeting tools to define the "Eligible Audience" in part by FHA-protected characteristics, Facebook enabled advertisers to categorically exclude protected groups from even being considered eligible to receive certain housing ads.  By designing, maintaining, applying, and

making available to advertisers an algorithm that finds users who "look like" an advertiser's source audience based in part on FHA-protected characteristics, Facebook continues to exclude users from receiving certain housing ads based on users' FHA-protected characteristics. And by designing, maintaining, and applying algorithms that use FHA-protected characteristics to help determine who from the Eligible Audience actually receives housing ads, Facebook continues to exclude even "eligible" users from receiving information about housing opportunities.

3.      First, until at least 2019, Facebook enabled and encouraged advertisers— including advertisers proposing housing-related ads covered by the FHA—to use Facebook-created categories of characteristics to target to or to exclude Facebook users from the Eligible Audience for an ad. Some of those Facebook-created categories were based on users' FHA-protected characteristics or on characteristics that are proxies for, or closely related to, FHA-protected categories. Facebook made some changes to this aspect of its ad delivery system in September 2019 as part of settling FHA claims brought by civil rights groups in this Court. *See National Fair Housing Alliance, et al. v. Facebook, Inc.*, 18 Civ. 02689 (JGK) (S.D.N.Y.) ("NFHA Lawsuit").

4.      Second, Facebook invites advertisers to use its proprietary tool called "Lookalike Audiences." Facebook employs a machine-learning algorithm to analyze an advertiser's own identified audience, the "source audience," and create a "Lookalike Audience" of additional Facebook users who Facebook determines have demographics, interests, or other characteristics in common with an advertiser's source audience. Using the algorithm, Facebook identifies users who it determines most "look like" the source audience as potential targets to receive the ad and excludes users who it determines are not similar enough to the advertiser's "source audience," which is explained more fully below. Until at least 2019 for housing advertisements, Facebook

identified "lookalike" users by considering FHA-protected characteristics like users' self-reported sex and religion in its Lookalike Audience tool to help determine whether a user "looked like" the advertiser's source audience. In 2019, Facebook modified this tool for housing ads by limiting the data that the machine-learning algorithm can use, but even the modified tool continues to construct Lookalike Audiences for housing ads based in part upon FHA-protected characteristics, including but not limited to sex.

5.      Third, Facebook discriminates against users on the basis of FHA-protected characteristics through the design, maintenance, and application of its Personalization Algorithms. Facebook uses the Personalization Algorithms as part of deciding which subset of an advertiser's Eligible Audience will actually receive an ad. Specifically, Facebook designed and implemented its Personalization Algorithms to predict which Facebook users will be most likely to click on, or otherwise interact with, an ad. That prediction significantly affects whether a user will see an ad. To make that prediction, Facebook provides the Personalization Algorithms with Facebook's massive trove of user data containing, encoding, or reflecting users' protected characteristics (or information closely related to, or proxies for, those characteristics). When an FHA-protected characteristic is predictive of user engagement with certain ads, Facebook's Personalization Algorithms are designed to determine relevance based, in part, on that characteristic. Facebook's use of these algorithms also has an unlawful disparate impact on users by disproportionately steering certain housing ads away from users because of FHA-protected characteristics such as race.

6.      It has been widely known—including at Facebook—that machine-learning processes like the Personalization Algorithms are susceptible to taking actions or producing effects that are unlawful when deployed in areas covered by the FHA or other civil rights laws.

4

Despite that awareness, Facebook designed and has maintained its ad delivery system in a way that produces discriminatory outcomes, and Facebook has failed to adequately identify, avoid, mitigate, or cure the discriminatory outcomes of its system.

7.      The United States files this action pursuant to 42 U.S.C. § 3612(o) following an investigation and charge of discrimination by the U.S. Department of Housing and Urban Development ("HUD"), and an election by Facebook to proceed in federal district court.

8.      The United States also brings this action under 42 U.S.C. § 3614(a) because Facebook, through its ad delivery system, has engaged in a pattern or practice of prohibited discrimination.  Facebook's ad delivery system also has denied rights to a group of persons and such denial raises an issue of general public importance under 42 U.S.C. § 3614(a).

## DEFENDANT

9.      Facebook is a social media company incorporated in Delaware that has its corporate headquarters in Menlo Park, California, and an office in New York City.

10.     Facebook operates a number of web- and mobile-device-based platforms through which users can share information about themselves and on which users can view content (including advertisements) arranged or chosen for the user by Facebook.

11.     Facebook, through its advertising system, enables advertisers to create audiences for their ads, and then Facebook delivers ads to users on its platforms and on Facebook-owned mobile applications ("apps"), such as Facebook, Instagram, and Messenger, as well as third-party apps enrolled in Facebook's Audience Network.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1345 because it arises under the laws of the United States and the United States brings this case as a plaintiff.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(a)-(b) because Facebook conducts business and delivers ads for housing and related services to millions of Facebook users within this judicial district.

## FACTUAL ALLEGATIONS

I.     **Facebook's Ad Delivery System**

    A.     **Background**

14.     Facebook has over 223 million monthly active users in the United States.

15.     Facebook's website and apps allow anyone willing to provide their full name, sex (or preferred gender pronoun), cellphone number or email address, and birthday to create a user profile.

16.     Facebook users can find other users—*e.g.*, individuals, businesses, or other entities—and designate them as "friends," which allows users to more easily see each other's information, including news stories and videos.

17.     Facebook users also can join "Facebook Groups," which encourages users to share content related to a particular subject with other users who have joined that group.

18.     Facebook delivers ads to its users in a variety of ways, one of which is a user's "News Feed."  Upon logging into Facebook, a user first sees a personalized "News Feed" page, which shows material that the user or the user's friends have posted to Facebook.

19.      Ads from different vendors, including housing-related ads, are interspersed within the News Feed.  As a user scrolls up or down the News Feed, Facebook chooses and periodically places ads among or alongside content posted by the user's friends.

20.      Advertising to users is the core of Facebook's business model.  In 2021 Facebook received approximately $114.9 billion in revenue from advertising.

21.      Facebook generates revenue by designing and using various tools to target ads to Facebook users and then delivering ads to users that Facebook's Personalization Algorithms predict will find the ads relevant.

22.      Facebook claims that it excels at matching ads to particular users through ad-targeting criteria and by predicting which users will find an ad most relevant.  Facebook is able to tout its skill to target ads to users because of two things: (1) the vast amount of information Facebook collects and infers about users' characteristics, up-to-date interests, and similarities or connections with other users; and (2) Facebook's Personalization Algorithms, which allow Facebook to steer ads toward users it predicts, based on its vast amount of data, are most likely to engage with the ad.

**B.      Facebook's Collection of User Data**

23.      Facebook uses data it has collected and inferred about its users to attribute particular behaviors, interests, and demographics to those users.  Facebook collects this data from several sources, including (1) information users must provide when signing up to use Facebook, (2) user profiles, (3) users' memberships in Facebook Groups, (4) users' creation of an "avatar" of themselves, (5) users' activity on Facebook, (6) users' activity elsewhere, including offline activity, and (7) similar information about users' "friends" on Facebook or Facebook-owned platforms.  Each of these sources of user data is explained in greater detail in

7

Paragraphs 24 through 33 of this Complaint. As explained below, Facebook uses its vast amount

of user data to classify the entire universe of its users into various categories—including by

demographics, interests, and other characteristics—and then uses those classifications as a key

element of its ad delivery system.

24.    When individuals sign up for a Facebook account they must reveal their sex (or

preferred gender pronouns) as a condition of accessing the site. Thus, from the first interaction

with its users, Facebook has data about users' sex (or preferred gender pronoun), and Facebook

uses that information as part of its ad delivery system.

25.    Facebook also invites and encourages users to provide additional information in

their Facebook profile, including, for example, a profile photo, religious views or affiliation,

family members, and relationship status. Facebook uses this profile information in its ad

delivery system.

26.    Facebook also collects information about users' membership in user-created

Facebook Groups. The names of some of these groups refer directly to characteristics protected

under the FHA, including race and gender (*e.g.*, "Single Black Mothers" or "Asian Single

Women"), national origin (*e.g.*, "United Latino Professionals"), religion (*e.g.*, "Jewish

Americans" or "United Muslims"), familial status (*e.g.*, "Mothers of Young Children" or

"Parents with Toddlers Support Group"), and disability (*e.g.*, "Parents in Wheelchairs" or

"Person with Disability (PWD)"). Facebook uses information about users' membership in

Facebook Groups as part of its ad delivery system.

27.    Facebook also invites and encourages Facebook users to create their "avatar,"

selecting their skin color, eye shape, nose and lip shapes, and hair type or style. The following

images from Facebook's website show how the avatar creation works.

8







28.     When the user is selecting the shape of the user's eyes, nose, and lips through the Facebook app, Facebook invites the user to open a "mirror" to display a feed from the user's device's front camera next to the avatar to help the user pick the best-matching facial features. For example:



29.     This information concerning the user's physical appearance becomes part of Facebook's enormous set of user data.

30.     Facebook collects information about users' activity on Facebook and other Facebook-owned platforms, including Instagram, Messenger, and WhatsApp, including which accounts users follow or visit, and what content each user "likes" or shares with other users. Facebook uses information about users' activity on its platforms as part of its ad delivery system.

31.     Facebook collects information about users' online activity on websites or apps that are not owned by Facebook, including the content the user visited or "liked." Facebook uses information about users' activity on other websites or apps as part of its ad delivery system.

32.     Facebook also collects information about users' offline activity, such as geo-location data and purchases at or visits to brick-and-mortar stores, restaurants, or events. Facebook uses information about this offline activity as part of its ad delivery system.

33.     Facebook's design as a social network means that Facebook's collection of data about each particular user includes information about the user's connected "friends," those individuals' sex (or preferred gender pronouns), user profiles, memberships in Facebook Groups,

"avatar" of themselves, activity on Facebook and other Facebook-owned platforms, activity elsewhere online, and data about offline activity. Facebook uses information about users' "friends" and connections as part of its ad delivery system.

     **C.**    **Facebook's Analysis of User Data to Create and Deploy Its Advertising Tools**

    34.    Using the vast amounts of data it has about its users, Facebook uses machine learning to create, maintain, and provide a curated list of demographics, interests, and other characteristics for advertisers to choose from in targeting an ad. Facebook encourages advertisers to use its categories, asserting that they allow advertisers to identify the users most likely to find a given ad relevant. The available options, which Facebook changes as it sees fit, include categories that constitute FHA-protected characteristics or are proxies for or closely related to such characteristics.

    35.    For example, Facebook makes users' sex—an FHA-protected characteristic— available to advertisers for ad targeting. And, until 2019, advertisers with housing-related ads were allowed to use that targeting feature, including to exclude users from an ad's Eligible Audience based on sex.

    36.    Facebook's classifications of users for the purpose of targeting and delivering ads also include categories that explicitly refer to users' familial status,[1] another FHA-protected

---

[1] The FHA defines "familial status" as:

> one or more individuals (who have not attained the age of 18 years) being domiciled with — (1) a parent or another person having legal custody of such individual or individuals; or (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person. The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process

characteristic.  Among the Facebook-created classifications that reveal users' familial status are: "parents with toddlers (01-02 years)," "New Moms," "parents with preschoolers (03-05 years)," "Moms of preschool kids," "parents with early school-age children (06-08 years)," "Moms of grade school kids," "parents with preteens (08-12)," "parents with teenagers (13-18)," "Moms of high school kids," and "Moms of high school students."

37.     Facebook's classifications of users for the purpose of targeting and delivering ads include, or have included in the recent past, categories that are either proxies for, or closely related to, additional FHA-protected characteristics, including race, national origin, religion, and disability.

38.     For example, Facebook has classified some of its users by what it characterizes as their "multicultural affinity," which Facebook previously called "ethnic affinity."  Facebook has created and deployed six "multicultural affinity" classifications:  "African American (US)," "Asian American (US)," "Hispanic (US—All)," "Hispanic (US—Bilingual: English and Spanish)," "Hispanic (US—English Dominant)," and "Hispanic (US—Spanish dominant)." Facebook has touted the use of its "multicultural affinity" feature as an effective way to target ads to people of specific races or ethnicities.

39.     Facebook also categorizes some of its users as having an "interest" in particular religions or religious topics, including "Judaism," "Orthodox Judaism," "Jewish culture," "Jewish holidays, "Islam," "Shia Islam," "Sunni Islam," "Islamic theology,"  "Christian," "Catholicism," or "Hinduism."

of securing legal custody of any individual who has not attained the age of 18 years.

42 U.S.C. § 3602(k).

12

40.     Moreover, Facebook classifies some of its users as having an "interest" in various disability-related topics or groups, including "Guide Dogs for the Blind," "service animal," "special education," "Wheelchair ramp," "American Sign Language," "Autistic Self Advocacy Network," "Disabled American Veteran," "Disabled Parking Permit," or "Disability.gov."

## II.     Three Aspects of Facebook's Ad Delivery System That Violate the FHA

41.     As previously noted, this Complaint alleges unlawful discrimination in three aspects of Facebook's ad delivery system: (1) Trait-Based Targeting—encouraging advertisers to target ads by including or excluding Facebook users based on demographics, interests, or other FHA-protected characteristics that Facebook, through its data collection and analysis, attributes to those users; (2) "Lookalike" Targeting—designing, maintaining, applying, and making available to advertisers a machine-learning algorithm to find users who "look like" an advertiser's source audience, based in part upon FHA-protected characteristics, through a Facebook tool called "Lookalike Audience"; and (3) Delivery Determinations—designing, maintaining, and applying machine-learning algorithms ("Personalization Algorithms") to help determine which subset of the advertiser's targeted audience (the "Eligible Audience") will actually receive the ad (the "Actual Audience"), based in part upon FHA-protected characteristics.

### A.     Facebook's Trait-Based Targeting to Create an Eligible Audience for an Ad

42.     Facebook offers advertisers an interactive tool called "Ads Manager," which allows an advertiser to upload a proposed ad and use various Facebook-created features and tools to ask Facebook to create an Eligible Audience for the ad.

43.     Facebook controls the ad targeting options available to advertisers.  Despite the fact that Facebook removed some targeting options for housing ads in 2019, Facebook can still

remove, change, or limit the ad targeting options available to advertisers, and it has done so at times relevant to this action. It can limit or modify the ad targeting options specifically available to advertisers seeking to deliver housing-related ads.

44.    Using Ads Manager, the advertiser defines the ad's Eligible Audience by using drop-down menus generated by Facebook, which allow an advertiser to select users for the Eligible Audience by their demographics, interests, and other characteristics, including FHA-protected characteristics or proxies for such characteristics.

45.    Facebook's Ads Manager includes a "Detailed Targeting" feature. As part of Detailed Targeting, Ads Manager prompts advertisers to search for "demographics, interests[,] or behaviors" that will match up with users identified by Facebook. At least until 2019, Facebook allowed housing advertisers to target ads through Ads Manager using Facebook's "multicultural affinity" classification of users, which was available to advertisers under the "demographics" targeting option in Facebook's "Detailed Targeting" feature of Ads Manager.

46.    As a potential advertiser uses Facebook's Ads Manager tool, Facebook provides real-time recommendations and feedback about the Eligible Audience that will result.

47.    Using Facebook's curated categories, advertisers can craft the ad's Eligible Audience to *include* users that, according to Facebook, match particular "demographics, interests[,] or behaviors."

48.    Facebook's "Detailed Targeting" options also allow advertisers to *exclude* users from the Eligible Audience based on "demographics, interests[,] or behaviors" that Facebook provides to the advertisers. At least until 2019, Facebook allowed advertisers to use its Detailed Targeting feature to exclude users from Eligible Audiences for housing-related ads based on certain characteristics protected by the FHA.

14

49.    These Detailed Targeting options included targeting based on Facebook's "multicultural affinity" classification of users.  When confronted with allegations that its "multicultural affinity" targeting allowed housing advertisers to exclude users from housing opportunities based on their race or ethnicity, Facebook has claimed that "multicultural affinity" is not meant to track users' race or ethnicity, but rather their "interest" in a particular race or ethnicity.

50.    But Facebook itself has repeatedly described its "multicultural affinity" ad targeting as race- or ethnicity-based.  For instance, during a panel discussion in March 2016, a Facebook executive explained that the company's ad delivery system "ha[s] a multicultural cluster that knows who is in the African American demographic or US Hispanic or the general population," and that Facebook has used this tool to help advertisers deliver targeted, separate ads to African American, Hispanic, and White audiences.[2]  Similarly, in an October 28, 2016 post entitled, "Driving Relevance and Inclusion with Multicultural Marketing," Facebook gave an example of how Ads Manager could help advertisers specifically target ads to Black women users on Facebook.[3]  More generally, in a 2015 earnings call, a Facebook executive stated that by "[u]sing Facebook and Instagram ads you can target by congressional district, you can target by interest, you can target by demographics or any combination of those." (*See* Harry Davies & Danny Yadron, *How Facebook tracks and profits from voters in a $10bn US election*, The Guardian, Jan. 28, 2016.)

---

[2] The audio of the discussion is available at https://soundcloud.com/officialsxsw/big-box-office-marketing-films-in-a-mobile-world-sxsw-interactivefilm-2016, at 28:00–29:30.

[3] https://www.facebook.com/business/news/driving-relevance-and-inclusion-with-multicultural-marketing.

51. _Targeting Based on Sex_: Prior to 2019, Facebook provided housing-related advertisers a toggle button that allowed them to exclude all female users or all male users from the Eligible Audiences for ads. That feature is still available for ads that are not identified by the advertiser or by Facebook as related to housing, credit, or employment.

    a. In January and February 2018, for example, Facebook approved requests from would-be housing advertisers to include only men or only women in the Eligible Audiences, thereby excluding all Facebook users of a particular sex from seeing the housing ads.

    b. HUD's investigation confirmed that Facebook allowed advertisers to exclude all men or all women from the Eligible Audience for a housing ad. As part of its investigation, HUD tested the "Ads Manager" tool and was able to exclude women from a proposed ad audience by simply selecting "men" on the gender toggle button in Ads Manager. At no point during the ad creation process did Facebook alert HUD that the test ads, if posted, would violate the FHA or Facebook's anti-discrimination policies.

52. _Targeting Based on Familial Status_: Facebook approved ads in which the would-be advertisers excluded users based on their familial status.

    a. In November 2017, for example, Facebook approved ads for rental housing for which the advertisers asked Facebook to exclude users from the Eligible Audience if they were classified as "Moms," "New Moms," "Moms of preschool kids," "Moms of grade school kids," "Moms of high school kids," and "Parents (All)."

b.  Facebook's approval of these ads was widely publicized, and Facebook was aware of it no later than November 29, 2017, when it claimed it had addressed the issue.

c.  Nonetheless, in January and February 2018, Facebook approved housing ads in which would-be housing advertisers asked Facebook to exclude from the Eligible Audience those Facebook users in the following demographic groups: "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with preteens (08-12)," and "parents with teenagers (13-18)."

d.  HUD's investigation also showed that Facebook allowed advertisers to exclude users based on their familial status.  As part of its investigation, HUD tested the "Ads Manager" tool and was able to exclude users whom Facebook had classified as a member of the "Mommy" demographic.  At no point during the ad creation process did Facebook alert HUD that the test ads, if posted, would violate the FHA or Facebook's anti-discrimination policies.

53.  At least prior to 2019, Facebook also allowed advertisers to exclude users from seeing housing-related ads based on classifications that are proxies for, or closely related to, FHA-protected characteristics.

54.  *Targeting Related to Race and National Origin*:  Facebook has approved ads in which the would-be advertisers excluded users based on classifications that are proxies for, or at least closely related to, race and national origin.

a.  As early as October 2016, Facebook approved housing-related ads for which advertisers had excluded from the Eligible Audience those users whom

17

Facebook characterized as having an "African American (US)," "Asian American (US)," or "Hispanic (US—Spanish dominant)" "ethnic affinity."

b. Facebook acknowledged in November 2016 that its ad delivery system allowed housing advertisers to use "ethnic affinity marketing," but claimed that it would disable that feature for housing-related ads.

c. In February 2017, Facebook claimed that it "would build an automated system to spot ads that discriminate illegally." As part of that automated system, Facebook stated that it would require housing advertisers "to 'self-certify' that their ads were compliant with anti-discrimination laws."

d. Sometime between November 2016 and November 2017, Facebook changed the "ethnic affinity" label to "multicultural affinity" in its Detailed Targeting function, but these classifications otherwise remained the same.

e. Despite Facebook's pledges to stop the discrimination, Facebook approved rental housing ads in November 2017 in which the advertisers asked Facebook to exclude from the Eligible Audience the users whom Facebook classified as having one of the following "multicultural affinities": "African American (US)," "Asian American (US)," "Hispanic (US—Spanish dominant)," or "Hispanic (US—Bilingual)."

f. HUD's investigation found similar results. As part of its investigation, HUD tested the "Ads Manager" tool and was able to exclude from the Eligible Audience for a housing ad those users whom Facebook classified as having an "African American (US)" "multicultural affinity." At no point during the ad

18

creation process did Facebook alert HUD that the test ads, if posted, would

violate the FHA or Facebook's anti-discrimination policies.

55.    *Targeting Related to Religion*:  Facebook has approved ads in which the would-be
advertisers excluded users based on classifications that are proxies for, or closely related to,
religion.

      a.   In November 2017, for example, Facebook approved rental housing ads in

which the advertisers asked Facebook to exclude from the Eligible Audience

those users whom Facebook had classified as having an "interest" in certain

religions or religious topics, including "Judaism," "Hasidic Judaism,"

"Orthodox Judaism," "Conservative Judaism," "Reform Judaism," "The

Jewish Home," "Shia Islam," "Sunni Islam," "Catholicism," "Protestantism,"

"Bible," "Christianity," "Christian," "Lutheranism," or "Jesus."

      b.   HUD's investigation found similar results.  As part of its investigation, HUD

tested the "Ads Manager" tool and was able to exclude from the Eligible

Audience for housing ads those users whom Facebook had classified as

having an interest in Islam, Hinduism, and Judaism.  At no point during the ad

creation process did Facebook alert HUD that the test ads, if posted, would

violate the FHA or Facebook's anti-discrimination policies.

56.    *Targeting Related to Disability*:  Facebook has approved ads in which the would-
be advertisers excluded users based on classifications that are proxies for, or closely related to,
disability.

      a.   In November 2017, Facebook approved rental housing ads in which the

advertisers asked Facebook to exclude from the Eligible Audience those users

whom Facebook had classified as having an "interest" in "Braille," "The Guide Dogs for the Blind Association," "Guide Dogs for the Blind," "Wheelchair accessible van," "Wheelchair ramp," or "American Sign Language."

b.  In January and February 2018, Facebook approved housing ads in which would-be housing advertisers asked Facebook to exclude from the Eligible Audience those Facebook users whom Facebook classified as having an "Interest in Disabled American Veteran," "Interest in Disabled Parking Permit," or "Interest in Disability.gov."

c.  HUD found that it was able to exclude from the Eligible Audience those Facebook users whom Facebook classified as having an interest in topics such as "service animal," "special education," or the "Autistic Self Advocacy Network."  At no point during the ad creation process did Facebook alert HUD that the test ads, if posted, would violate the FHA or Facebook's anti-discrimination policies.

57.  Facebook's approvals of these discriminatory ads were published in news reports, were alleged in the NFHA Lawsuit, and were summarized by HUD in determining that Facebook violated the FHA.  Facebook was aware of these reports that it approved these discriminatory ads.

58.  In the NFHA Lawsuit, which was filed in March 2018, several civil rights organizations alleged that Facebook's ad delivery system violated the FHA as well as other civil rights laws, including by creating and providing ad targeting options (such as those described above) in connection with ads relating to housing.  The parties resolved the NFHA Lawsuit with

20

a settlement agreement filed with and entered by this Court in March 2019. As part of the settlement, Facebook agreed to remove certain discriminatory targeting options for housing, employment, and credit advertisers.

59. Although Facebook has made some changes to the targeting options available for housing, credit, and employment ads, these changes have been insufficient to stop discriminatory ad targeting. As alleged above, *after* Facebook had claimed that it changed its system to address discriminatory ad targeting, would-be advertisers still were able to select targeting options Facebook claimed it had removed. In April 2021, advertisers were able to target credit ads using targeting options that Facebook had previously claimed were prohibited. Facebook still has no effective mechanism to ensure that it properly identifies housing advertisements and that targeting options based on FHA-protected characteristics are not available for such ads. Thus, Facebook's purported changes to date have been insufficient to stop discriminatory ad targeting, and those changes could be easily reversed.

60. Facebook, through its design and its use of ad targeting categories based on user demographics or other characteristics, has intentionally discriminated on the basis of race, color, religion, sex, disability, familial status, and national origin. Until recently, Facebook intentionally relied on information about, or closely related to, users' FHA-protected characteristics to create its ad targeting categories and also to identify users to include in or exclude from ad audiences. Facebook encourages, facilitates, and implements discriminatory decisions by advertisers to exclude users from Eligible Audiences. Facebook intentionally created user categories based upon protected characteristics and acquiesced in, and was deliberately indifferent to, discriminatory decisions by advertisers to exclude users from Eligible Audiences using Facebook's tools.

21

61. Facebook's design and its use of ad targeting categories based on user demographics or other characteristics have a disparate impact on the basis of FHA-protected categories on users' opportunities to see housing-related ads. The way Facebook designed and uses ad targeting categories based on, or closely related to, FHA-protected characteristics in connection with housing-related ads is neither justified by business necessity nor necessary to achieve any substantial, legitimate, nondiscriminatory interests. Even if it were, Facebook could achieve its interests in maximizing its revenue and providing relevant ads to users through less discriminatory means.

### B. Discrimination in Creating the "Lookalike Audience"

62. With the Lookalike Audience tool, Facebook must first create a "source audience" through its Custom Audience option. Facebook can create a Custom Audience in one of four ways. Specifically, the advertiser selects one among the following options:

    a. Website Custom Audience: if the advertiser has embedded a Facebook "pixel" in the advertiser's website, Facebook tracks activity on that site and can create a Custom Audience of users who have, among other things, recently visited the site;

    b. App Custom Audience: if the advertiser uses Facebook's software development kit to share data from the advertiser's app with Facebook, Facebook can create a Custom Audience of users who have installed the advertiser's app or engaged with it in a particular way;

    c. Personal Identifier Custom Audience: the advertiser can send to Facebook personally identifiable information, such as email addresses, phone numbers,

or home addresses, of those it would like to target ads to, to the extent they are
users of Facebook platforms;

      d.   Engagement Custom Audience: Facebook can create a Custom Audience of
users who have engaged with the advertiser's content on Facebook or Instagram.

Facebook's creation of a Custom Audience using the first three methods requires an additional
step.  Facebook must match the information used to identify the Custom Audience—the data
Facebook collects from its pixel (for a Website Custom Audience), from the data individuals
provide to the advertiser's app (for an App Custom Audience), or from the personally identifiable
information provided by the advertiser (for a Personal Identifier Custom Audience)—against the
data Facebook has collected about the users of Facebook platforms to identify the users who
match the criteria for the Custom Audience. Once the advertiser selects one of these four options,
that pool of Facebook users forms the source audience.

      63.    Next, the advertiser can then direct Facebook to either deliver the housing ad
exclusively to the users in the source audience, or deliver the housing ad to users who "look like"
the source audience.

      64.    To identify users who most "look like" the source audience, Facebook employs a
machine-learning algorithm.  As Facebook explains: "A lookalike audience uses an existing
Custom Audience you select for its source audience. To create a lookalike audience, our system
leverages information such as demographics, interests and behaviors from your source audience
to find new people who share similar qualities. When you use a lookalike audience, your ad is
delivered to that audience of people who are similar to (or 'look like') your existing customers."[4]

---

[4] https://www.facebook.com/business/help/164749007013531.

65.     Typically, the "Lookalike Audience" is significantly larger than the source audience provided by the advertiser.  For example, an advertiser might provide to Facebook the personally identifiable information of its 100 best customers to serve as the source audience, and Facebook would use its machine-learning algorithm to analyze the source audience with the objective of creating a Lookalike Audience of many more Facebook users who would be potential targets to receive the ad.

66.     Facebook designed the machine-learning algorithm that it uses to create Lookalike Audiences.  Facebook can choose what data it gives the algorithm in order to analyze the advertiser's source audience and to seek out the additional Facebook users who "look like" the source audience.  In a 2014 earnings call, a Facebook executive explained that the purpose of the Lookalike Audience tool was to identify "customers who share characteristics, age, demo[graphic]s, likes, interests with current customers."

67.     Facebook acknowledged in 2018 and 2019 that the Lookalike Audience tool used the demographics of its users—including race, sex, religions, age, zip codes, and Facebook Group membership, among other categories—in selecting the Lookalike Audiences to whom to deliver ads.

68.     As part of the NFHA settlement, Facebook agreed that by September 2019 it would no longer consider users' sex, religious views, Facebook Group membership, age, and zip code as part of its Lookalike Audience tool for housing, credit, and employment ads.  For these types of ads, Facebook agreed to design a new version of the "Lookalike Audience" tool, now called "Special Ad Audience."  Facebook claimed that its Special Ad Audience tool would "not consider age, gender, relationship status, religious views, school, political views, interested in [*sic*], or zip code."

24

69.     Despite Facebook's pledge, testing has revealed that the "Special Ad Audience" tool generated audiences based, at least in part, on sex for housing, credit, and employment ads. The testing showed, for example, that where an advertiser included only men in its source audience, the group of users to whom the old version of the Lookalike Audience tool delivered the ad was 99% male.  The results were almost as stark when the advertiser used the new Special Ad Audience tool for its all-male source audience.  Applying that new tool, Facebook still delivered the ad to an audience that was more than 95% male.  This result occurred despite Facebook's representation that its Special Ad Audience tool does not use age, gender, and other demographics, behaviors, or interests.  Facebook is aware of these results, which were published in an academic paper in December 2019.

70.     Facebook was aware that removing certain variables from its algorithms likely would not correct the discriminatory ad delivery resulting from Facebook's Lookalike Audience tool.  Specifically, Facebook employees acknowledged in 2018 that removing protected characteristics as inputs to Facebook's algorithm was insufficient, because its algorithm would nevertheless skew delivery along the lines of protected characteristics.

71.     Facebook, through its design and its use of the Lookalike Audience and Special Ad Audience tools, intentionally discriminates based upon FHA-protected characteristics such as sex.  Before 2019, Facebook elicited among other things the sex of its users and input that information into the Lookalike Audience tool.  After 2019, while Facebook no longer directly inputs this information into its Special Ad Audience and Lookalike Audience tools, Facebook continues to rely upon its vast trove of user data to create the audiences for housing ads.  FHA-protected characteristics are related to and encoded within this user data.

72.     Facebook's design and use of the Lookalike Audience and Special Ad Audience tools have an unlawful disparate impact on users' opportunity to see housing-related ads, at least based on sex. The way Facebook designed and uses these tools in connection with housing-related ads is neither justified by business necessity nor necessary to achieve any substantial, legitimate, nondiscriminatory interests. Even if it were, Facebook could achieve its interests in maximizing its revenue and providing relevant ads to users through less discriminatory means.

**C.      Discriminating Through the Design and Use of the Personalization Algorithms**

73.     After helping the advertiser create the Eligible Audience for an ad, Facebook uses the Personalization Algorithms, i.e., machine-learning algorithms, to help determine which subset of users in the advertiser's Eligible Audience will receive the ad.

74.     To determine which ad to deliver to a user at a given time, Facebook holds an automated auction by combining, for each ad for which a user is in the Eligible Audience, (a) the likelihood the user will engage with that ad as calculated by the Personalization Algorithms (what Facebook calls the user's "estimated action rate")[5]; (b) that advertiser's bid; and (c) what Facebook calls "ad quality," which includes a personalization component from some of the Personalization Algorithms. The ad with the highest total wins the auction and is delivered to the user.

75.     Facebook has explained that the Personalization Algorithms "use[] an ad auction and machine learning to determine where, when and to whom we show your ads. These processes work together to maximize value for both people and businesses."[6]  Facebook also

---

[5] https://www.facebook.com/business/help/430291176997542.

[6] https://www.facebook.com/business/help/1636814289727946.

explains that the Personalization Algorithms and its ad delivery system overall become more efficient at delivering ads the more an ad is shown to users. *Id.* In this way, Facebook "determine[s] the best ad to show a [Facebook user] at a given point in time."[7]

76.      Facebook uses the Personalization Algorithms to help determine whether a particular group of users will see an ad. Facebook then steers ads away from certain users that the Personalization Algorithms predict are unlikely to find an ad "relevant," and conversely steers an ad toward other users who are more likely to find the ad "relevant."

77.      Facebook has designed the Personalization Algorithms to match ads to users based on the algorithms' predictions about which users will find the ad relevant and whether those users are likely to interact with the ad in the manner desired by the advertiser—for example, by clicking a link in the ad, purchasing the advertised product, or sharing the ad with friends. Based upon these predictions, Facebook's ad delivery system steers ads that Facebook predicts to be most relevant to a user toward that user; and steers ads that Facebook predicts to be less relevant to a user away from that user. In this way, Facebook excludes certain users—all of whom are within the advertiser-defined Eligible Audience for the ad—from seeing that ad. Facebook has explained that "[t]argeting broadly essentially means that [an advertiser is] mostly relying on [Facebook's] delivery system to find the best people to show [an] ad to."[8] Using these predictions, Facebook delivers an ad to users until the advertiser's budget is exhausted.

78.      Facebook intentionally makes available to its Personalization Algorithms all of the data that Facebook has gathered about its users. The user data that Facebook makes available

---

[7] https://www.facebook.com/business/help/430291176997542.

[8] https://www.facebook.com/business/help/308474373366888.

to its algorithms includes information not only about the user, but also the user's Facebook friends and those friends' user data.

79.    This user data includes characteristics that are protected by the Fair Housing Act, including race, color, religion, sex, disability, familial status, and national origin.  In 2018, for example, Facebook acknowledged that race and sex were among the variables that the company used in its Personalization Algorithms.  Facebook knows its users' sex because users are required to disclose their sex (or preferred gender pronouns) as a condition of using the website. Facebook knows the religion and familial status of those users who voluntarily provide that information in their Facebook profiles.  Facebook also knows the race or color of users based on its massive trove of user data, and encourages users to create an avatar showing skin color, hair type, and shape of the eyes, nose, and lips.  The user data that Facebook makes available to the algorithms includes users' membership in Facebook Groups, some of which have names indicating their members' race, color, religion, sex, disability, familial status, or national origin. *See* Paragraph 26, *supra* (citing examples of such groups, including "Single Black Mothers," "United Latino Professionals," "Jewish Americans," "Mothers of Young Children," and "Parents in Wheelchairs").

80.    By making available to the Personalization Algorithms the type of information listed in Paragraph 79, Facebook intentionally designed an ad delivery process that allows its algorithms to take FHA-protected characteristics into account to predict which users will be most likely to click on, tap, or otherwise engage with a housing ad, and in determining which users will receive ads.

81.    As part of using the Personalization Algorithms to make ad delivery decisions, Facebook makes available to the algorithms the same data that underlies Facebook's

classification of users for ad targeting.  For example, Facebook provides the Personalization

Algorithms with data underlying Facebook's classification of users' multicultural affinity

(closely related to race and national origin); "interest" in particular religions (closely related to a

user's religion); and "interest" in various disability-related topics such as disability

organizations, physical accessibility issues, and devices or mechanisms commonly used by

people with disabilities (closely related to a user's disability).  Thus, Facebook's design of and

reliance on its Personalization Algorithms allow consideration of data reflecting characteristics

that are proxies for, closely related to, or direct descriptors of FHA-protected characteristics.

82.     The user data that Facebook makes available to its Personalization Algorithms

contains pre-2019 information about users' engagement with housing ads.   In other words, the

Personalization Algorithms have access to user data from the time period before the NFHA

settlement, a time period when Facebook created and offered tools and targeting categories that

expressly reflected FHA-protected characteristics or their proxies.  Discriminatorily excluding

someone from seeing housing ads diminishes that person's opportunity to demonstrate interest in

such ads, for the simple reason that users cannot click on ads they never receive.  As a result,

Facebook's Personalization Algorithms likely will underestimate previously excluded users'

interest in housing ads based on those users' lack of pre-2019 clicks, reducing the likelihood that

those users would receive housing ads even after the changes that Facebook claims to have made

in 2019.  At the same time, other users who were *not* excluded were able to demonstrate an

interest by clicking on the ads they received, thus increasing the likelihood that the

Personalization Algorithms would identify those users as interested in housing ads after 2019.

The information that Facebook feeds into its Personalization Algorithms is thus tainted by the

pre-2019 discrimination.

83.     The settlement of the NFHA Lawsuit did not require Facebook to alter its ad delivery system.

84.     In 2018, Facebook recognized that the company's use of the Personalization Algorithms involved disparate treatment and that both the Personalization Algorithms and Lookalike Audience tool raised disparate impact concerns.  Facebook was aware that even if it removed protected characteristics from advertiser targeting options and the Lookalike Audience tool, Facebook's Personalization Algorithms would simply reintroduce this bias in delivering the ads.

85.     Testing has demonstrated that, even when advertisers do not employ discriminatory targeting options, Facebook's Personalization Algorithms nonetheless steer certain housing ads disproportionately to White users and away from Black users, and vice versa.

86.      For example, researchers who conducted testing of Facebook's Personalization Algorithms found, in the course of their testing, that, as a general matter, housing ads featuring an image of a Black family were less likely to be delivered to White users than were identical ads featuring an image of a White family.  That disparity occurred even though the researchers did not try to target the ads by race or any other characteristics.

87.     The United States has conducted extensive testing of Facebook's Personalization Algorithms in a number of housing markets.  That testing showed that Facebook's Personalization Algorithms steer certain housing ads disproportionately away from Black users and toward similarly situated White users.

88.     In one set of tests, the United States compared Facebook's delivery of real, randomly selected ads for single-family homes located in two adjacent towns in the Southern

30

District of New York that have different racial makeups and housing prices. More than 60% of residents in one town were African-American, while the other town was more than 90% White.

89.     The United States placed more than 150 ads directed to an audience of users in the Southern District who lived near (but not in) these towns. In constructing the Eligible Audience, the United States included equal numbers of Black and White residents who were similarly situated as to income, sex, and age. Facebook, using its Personalization Algorithms to predict which users would be interested in the ads, delivered these ads more than 80,000 times.

90.     Though the users in the Eligible Audience were similarly situated with respect to income, sex, age, and location, Facebook steered the ads for housing opportunities in the majority-White town disproportionately toward White users and away from Black users; conversely, Facebook steered the ads for housing opportunities in the majority-Black town disproportionately toward Black users and away from White users. The steering was substantial and highly statistically significant. The United States conducted additional testing that further demonstrated that the racial disparities in the ad delivery were not driven by users' specific, expressed interest in living in one of the two towns.

91.     By steering ads for housing in majority-White neighborhoods disproportionately to White users and steering ads for housing in majority-Black neighborhoods disproportionately to Black users, Facebook's Personalization Algorithms actually and predictably reinforce or perpetuate segregated housing patterns because of race.

92.     The United States also conducted similar and complementary testing in neighborhoods outside the Southern District of New York. This testing, which controlled for sex, age, and income, showed statistically significant racial disparities in Facebook's ad delivery.

93.     Facebook's use of the Personalization Algorithms to help determine which users

31

receive housing-related ads intentionally discriminates based on FHA-protected characteristics. Facebook accomplishes this discrimination by:

a. inputting into its Personalization Algorithms a massive amount of user data that relates to users' FHA-protected characteristics;

b. failing to implement technical measures to prevent its Personalization Algorithms from making determinations based, in part, on FHA-protected characteristics;

c. failing to correct the output of its Personalization Algorithms for decision-making on the basis of FHA-protected characteristics;

d. training its Personalization Algorithms on user data tainted by expressly discriminatory targeting options previously offered by Facebook to housing advertisers; and

e. failing to remove or cure historical user data tainted by discriminatory ad delivery.

94.     Facebook's design and implementation of its Personalization Algorithms have an unlawful disparate impact on users' opportunity to see housing-related ads, at least based on race.  The way Facebook designed and uses its Personalization Algorithms in connection with housing-related ads—including insufficient limits on the types of data the Personalization Algorithms can or should consider, and the insufficient supervision or corrections of the algorithms' actions—is neither justified by business necessity nor necessary to achieve any substantial, legitimate, nondiscriminatory interests.  Even if it were, Facebook could achieve its interests in maximizing its revenue and providing relevant ads to users through less discriminatory means.

### III.   HUD's Investigation and Charge of Discrimination

95.    HUD's Office of Fair Housing and Equal Opportunity opened an investigation into Facebook's ad delivery system.

96.    On August 13, 2018, the Assistant Secretary for Fair Housing and Equal Opportunity filed a timely administrative complaint with HUD alleging that Facebook's ad delivery system violated the FHA.

97.    HUD investigated the administrative complaint in accordance with 42 U.S.C. § 3610(a)-(b).

98.    Based on HUD's investigation of the administrative complaint, the Secretary determined that there was reasonable cause to believe that Facebook's ad delivery system discriminates on the basis of protected characteristics in violation of the FHA.

99.     On March 28, 2019, the Secretary issued a Charge of Discrimination under 42 U.S.C. § 3610(g)(2), charging Facebook with engaging in a discriminatory housing practice in violation of the FHA.

100.    On April 16, 2019, Facebook timely elected to have the charge decided in federal district court in accordance with 42 U.S.C. § 3612(a).

101.    Facebook agreed to toll the statute of limitations in which to file a Complaint, to June 21, 2022.

### COUNT I – DISCRIMINATION ON THE BASIS OF PROTECTED CHARACTERISTICS

102.    The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

103.    Facebook's actions, policies, and practices, as alleged herein, constitute:

33

a. Making dwellings unavailable to persons because of race, color, religion, sex, disability, familial status, or national origin in violation of the Fair Housing Act, 42 U.S.C. § 3604(a) and (f), and its implementing regulations, 24 C.F.R. §§ 100.50(b)(3)-(5) and 100.70(a).

b. Making, printing, or publishing, or causing to be made, printed, or published, advertisements with respect to the sale or rental of dwellings that indicate a preference, limitation, or discrimination based on race, color, religion, sex, disability, familial status, and national origin, in violation of the Fair Housing Act, 42 U.S.C. § 3604(c), and its implementing regulations, 24 C.F.R. §§ 100.50(b)(4), 100.70(a), and 100.75(a)-(c).  Facebook, through each of the three challenged aspects of its ad targeting and delivery system, targets and delivers housing-related ads to some users while depriving other users based on FHA-protected characteristics or their proxies.  Those acts and practices constitute "[s]electing media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin," as well as "[r]efusing to publish advertising for the sale or rental of dwellings . . . because of race, color, religion, sex, handicap, familial status, or national origin."  24 C.F.R. § 100.75 (HUD regulation implementing FHA).

c. Representing to a person because of race, color, religion, sex, disability, familial status, or national origin that a dwelling "is not available for inspection, sale, or rental when such dwelling is in fact so available," in

violation of the Fair Housing Act, 42 U.S.C. § 3604(d), and its implementing regulations, 24 C.F.R. §§ 100.50(b)(5), 100.70(a), and 100.80(a)-(b).  Such unlawful conduct by Facebook, through its ad delivery system, includes "[l]imiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race, color, religion, sex, handicap, familial status, or national origin."  24 C.F.R. § 100.80(b)(4) (HUD regulation implementing FHA).

104.    In committing the violations alleged in paragraph 103, Facebook:

a.    Intentionally discriminated on the basis of race, color, religion, sex, disability, familial status, and national origin by encouraging, facilitating, and knowingly implementing the intentionally discriminatory decisions of advertisers to exclude users from the Eligible Audience on the basis of FHA-protected characteristics;

b.    Acted with deliberate indifference to the intentionally discriminatory decisions of advertisers to exclude users from the Eligible Audience based on their race, color, religion, sex, disability, familial status, and/or national origin;

c.    Intentionally made the following data available to its Personalization Algorithms for use in determining ad delivery: (1) information about Facebook users' race, color, religion, sex, disability, familial status, and/or national origin, and (2) data about Facebook users that served as a proxy for, or was closely related to, those FHA-protected categories;

35

d.  Implemented its ad delivery system in a manner that has disproportionately excluded certain Facebook users from receiving housing ads based on FHA-protected characteristics;

e.  Implemented its ad delivery system in a manner that actually or predictably creates, increases, reinforces, or perpetuates segregated housing patterns because of FHA-protected characteristics; and

f.  Acted with deliberate indifference to the racially disparate impact and segregative effect caused by its Personalization Algorithms, despite knowing that machine-learning tools, including its algorithms, at least are susceptible to unlawful actions or outcomes and despite knowing that the data Facebook made available to the algorithms contained FHA-protected characteristics or their proxies and was tainted by intentional discrimination that occurred prior to September 2019.

## COUNT II – PATTERN OR PRACTICE OF DISCRIMINATION
## AND A DENIAL OF RIGHTS TO A GROUP OF PERSONS

105.     The United States incorporates all prior paragraphs of the Complaint as if fully set

forth herein.

106.     Persons who have been victims of Facebook's discriminatory policies and

practices are aggrieved as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a

result of Facebook's conduct in violation of the Fair Housing Act, as described above.

107.     The conduct of Facebook as described above constitutes:

A.     A pattern or practice of resistance to the full enjoyment of rights secured

by the Fair Housing Act, 42 U.S.C. § 3614(a); and/or

B.     Unlawful discrimination and a denial of rights granted by the Fair Housing

Act to a group of persons that raises an issue of general public importance within

the meaning of 42 U.S.C. § 3614(a).


## REQUEST FOR RELIEF

WHEREFORE, the United States requests that the Court enter an order that:

1.     Declares that the conduct of Facebook violates the Fair Housing Act;

2.     Enjoins Facebook, its agents, employees, successors, and all other persons

in active concert or participation with it from:

a.     Discriminating on the basis of FHA-protected characteristics in

connection with the delivery of housing advertisements;

b.     Failing or refusing to take such affirmative steps as may be

necessary to restore, as nearly as practicable, the victims of Facebook's unlawful

37

practices to the position they would be in but for Facebook's discriminatory conduct;

       c.     Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct regarding the delivery of housing ads in the future and to eliminate, to the extent practicable, the effects of Facebook's unlawful practices; and

       d.     Discriminating through the adoption of policies and procedures that do not ensure all segments of Facebook's users are served housing ads without regard to FHA-prohibited characteristics;

3.     Awards monetary damages against Facebook in accordance with 42 U.S.C. § 3614(d)(1)(B);

4.     Assesses a civil penalty against Facebook in an amount authorized by 42 U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest; and

5.     Awards the United States any additional relief as the interests of justice may require.

The United States demands trial by jury.

Dated:      New York, New York
              June 21, 2022


MERRICK B. GARLAND
Attorney General

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

SAMEENA SHINA MAJEED
Chief, Housing and Civil Enforcement Section



R. TAMAR HAGLER
Deputy Chief
JUNIS L. BALDON
HARIN C. SONG
KINARA A. FLAGG
Trial Attorneys
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel.: (202) 353-1339
Fax: (202) 514-1116

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By:

ELLEN BLAIN
DAVID J. KENNEDY
JACOB LILLYWHITE
CHRISTINE S. POSCABLO
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2733
david.kennedy2@usdoj.gov

39

# EXHIBIT 3

# Algorithms that "Don't See Color": Measuring Biases in Lookalike and Special Ad Audiences

Piotr Sapiezynski
Northeastern University
Boston, MA, USA
p.sapiezynski@northeastern.edu

Avijit Ghosh
Northeastern University
Boston, MA, USA
ghosh.a@northeastern.edu

Levi Kaplan
Northeastern University
Boston, MA, USA
kaplan.l@northeastern.edu

Aaron Rieke
Upturn
Washington, DC, USA
aaron@upturn.org

Alan Mislove
Northeastern University
Boston, MA, USA
amislove@ccs.neu.edu

## ABSTRACT

Researchers and journalists have repeatedly shown that algorithms commonly used in domains such as credit, employment, healthcare, or criminal justice can have discriminatory effects. Some organizations have tried to mitigate these effects by simply removing sensitive features from an algorithm's inputs. In this paper, we explore the limits of this approach using a unique opportunity. In 2019, Facebook agreed to settle a lawsuit by removing certain sensitive features from inputs of an algorithm that identifies users similar to those provided by an advertiser for ad targeting, making both the modified and unmodified versions of the algorithm available to advertisers. We develop methodologies to measure biases along the lines of gender, age, and race in the audiences created by this modified algorithm, relative to the unmodified one. Our results provide experimental proof that merely removing demographic features from a real-world algorithmic system's inputs can fail to prevent biased outputs. As a result, organizations using algorithms to help mediate access to important life opportunities should consider other approaches to mitigating discriminatory effects.

## KEYWORDS

online advertising, fairness, process fairness

## 1 INTRODUCTION

Organizations use algorithmic models[1] ("algorithms") in a variety of important domains, including healthcare [27], credit [19], employment [9, 23], and content distribution [3]. Unfortunately, these algorithms have been shown to sometimes have discriminatory effects that can often be challenging to detect, measure, and articulate. Some have proposed mitigating discriminatory effects by removing demographic features from an algorithm's inputs. For example, in 2019 the U.S. Department of Housing and Urban Development (HUD) proposed a rule that considered applying this approach to housing discrimination [12]. Because algorithms can effectively use omitted demographic features by combining other inputs that are each *correlated* with those features [5], such a rule could nullify any protection from discriminatory effects. This is particularly true

in large-scale machine learning (ML) systems, which can take as input thousands or even millions of features [6].

In this paper, we leverage a unique opportunity created by a recent lawsuit settlement involving Facebook's advertising platform to explore the limits of this approach. Specifically, we examine Facebook's *Lookalike Audiences* targeting tool, which takes a list of Facebook users provided by an advertiser (called the *source audience*) and creates a new audience of users who share "common qualities" with those in the source audience. In March 2018, the National Fair Housing Alliance (NFHA) and others sued [13] Facebook over violations of the Fair Housing Act (FHA). When the case was settled in March 2019, Facebook agreed to modify the functionality of Lookalike Audiences when used to target housing, credit, and employment ads. In brief, Facebook created the *Special Ad Audiences* tool, which works like Lookalike Audiences, except its algorithm does *not* consider users' age, gender, relationship status, religious views, school, political views, interests, or zip code when detecting common qualities.

We seek to learn whether the Special Ad Audience algorithm (which is not provided with certain demographic features) actually produces significantly less *skewed* audiences than the Lookalike Audience algorithm (which is). In other words, when provided with a source audience that skews heavily toward one demographic group over another, to what extent do each of these tools reproduce that skew? We focus on skews along demographic features named in the settlement, enabling us to examine whether simply removing the protected features as input to an algorithm is sufficient eliminate skew along those features. To do so, we develop a methodology to examine the delivery of the same ads when using the two types of audiences, measuring the skew along the lines of gender, age, and race.

We show that our Special Ad audiences[2] are skewed to almost the same degree as Lookalike audiences, with many of the results being statistically indistinguishable. For example, when using a source audience that is all women, our Lookalike audience-targeted ad delivered to 96.1% women, while Special Ad audience-targeted ad delivered to 91.2% women. We also provide evidence indicating that both Lookalike and Special Ad audiences carry—to a certain

---

[1]Throughout this paper, we refer to a large class of algorithmic models using the now-common term "algorithms", especially those created through statistical modeling and machine learning.

[2]Throughout the paper, we use "Lookalike Audience" or "Special Ad Audience" to refer to the general tools provided by Facebook, and "Lookalike audience" or "Special Ad audience" to refer to a particular audience.

extent—the biases of the source audience in terms of race and political affiliation.

To underscore the real-world impact of these results, we place ads as an employer who is seeking to find candidates "similar to" to their current workforce. Using a source audience consisting of Facebook employees we find that the resulting Special Ad audience skews heavily towards 25–34-year-old men. We also confirm that previous findings on how Facebook's delivery mechanisms can cause *further* skews in who is shown ads hold for Special Ad Audiences.

Taken together, our results show that simply removing demographic features from the inputs of a large-scale, real-world algorithm will not always suffice to meaningfully change its outputs. At the same time, this work presents a methodology by which other algorithms could be studied.

To be clear, we are not claiming—and do not believe—that Facebook has *incorrectly* implemented Special Ad Audiences, or is in violation of its settlement agreement. Rather, the findings in this paper are a natural result of how complex algorithmic systems work in practice.

**Ethics**   The research has been reviewed by our Institutional Review Board and marked as exempt. Further, we minimized harm to Facebook users by only running "real" ads, i.e., if a user clicked on one of our ads, they were presented with a real-world site relevant to content the ad. We did not have any direct interaction with the users who were shown our ad, and did not collect any of their information. Finally, we minimized harm to Facebook by running and paying for our ads just like any other advertiser, as well as flagging them as employment ads whenever applicable.

## 2   BACKGROUND

In this section, we provide background on Facebook's ad targeting tools and overview related work.

### 2.1   Facebook's ad targeting tools

Facebook provides a range of *targeting* tools to help advertisers select an *audience* of users who will be eligible to see their ads. For example, advertisers can select users through combinations of *targeting attributes*, including over 1,000 demographic, behavioral, and interest-based features.

More germane to this paper and its methods, Facebook also offers a number of other, more advanced targeting tools. One such tool is *Custom Audiences*, which allows advertisers indicate individual users that they wish to include in an audience. To use Custom Audiences, an advertiser uploads a list of personally identifiable information (PII), potentially including names, email addresses, phone numbers, dates of birth, and mobile identifiers. Facebook then compares those identifiers against its database of active users, and lets the advertiser include matched users in their target audience.

Another tool is *Lookalike Audiences*, which creates an audience of users who share "common qualities" with users in a Custom audience provided by the advertiser (called the *source audience*). The exact input qualities used by the algorithm in creating these audiences are not known and the documentation lists only two examples: demographic information and interests. Prior work has demonstrated that Lookalike Audiences can reproduce demographic skews present in source audiences [34].

### 2.2   Special Ad Audiences

In March 2018, the NFHA and others sued Facebook for allowing landlords and real estate brokers to exclude members of protected groups from receiving housing ads [13]. The lawsuit was settled in March 2019, and Facebook agreed to make a number of changes to its ad targeting tools. Facebook now refers to this modified Lookalike Audiences tool as *Special Ad Audiences*.

From an advertiser's perspective, Special Ad Audiences are created in the same manner as Lookalike Audiences (i.e., based on a source Custom audience). The minimum size for both types of these algorithmically generated audiences is 1% of the population of the target location, regardless of the size of the source audience. In case of the US that means that the algorithm outputs audiences of 2.3 million users.

### 2.3   Related work

Greenberg distinguishes two kinds of fairness concerns, *distributive* and *procedural* [22]. The former aims to assure balanced outcomes, whereas the latter focuses on the process itself. Elimination of sensitive features, for example sex or race, from an algorithm's input (as with Special Ad Audiences) falls into the *procedural* category. Such approach in the legal context is also referred to as *anti-classification* and it is encoded in the current standards [11]. However, scholars and researchers have for decades critiqued this so-called "colorblind" approach to addressing historical inequality and discrimination [7]. Legal scholar Destiny Perry argues that "(1) colorblindness is, under most circumstances, undesirable given its recently discovered negative outcomes, particularly for the very groups or individuals it is meant to protect; (2) true colorblindness is unrealistic given the psychological salience of race; and (3) race consciousness in the law is necessary to ensure equal treatment of racial groups in regulated domains such as housing, education, and employment [30]." In the context of sentencing and mass incarceration Traci Schlesinger concludes that "in the post-civil rights era, racial disparities are primarily produced and maintained by colorblind policies and practices [32]." Similar arguments have been made in the context of housing discrimination and a range of other domains [4].

Previous work in statistics and machine learning indicated that, in general, removing sensitive features does not reliably achieve fairness for a number of reasons. First, certain features might serve as close proxies for the sensitive information. For example, due to housing segregation a person's zip-code can be predictive of their race. Second, the removed information might be *redundantly encoded* by non-sensitive features or their combinations. It will then be reconstructed by the model if it is pertinent to the prediction task [10, 14, 36]. One such example is the fiasco of Amazon's hiring algorithm [21]. Third, there are cases in which only certain intersections of values of otherwise non-sensitive features are to be protected [29]. Finally, even if none of the features or their combinations are unfair, their predictive performance might differ across sub-populations. In an effort to minimize the total error, the classifier will fit the majority group better than the minority [8, 31]. Taken together, these prior works paint a clear picture of process fairness, or fairness through unawareness, as insufficient to ensure fair outcomes. Unfortunately, despite this consensus among scholars and a few high-profile failures in practice, the 2019 settlement is

Algorithms that "Don't See Color": Measuring Biases in Lookalike and Special Ad Audiences

still based on fairness through unawareness. In this article we investigate whether this particular implementation is closer to achieving the goal of fairness.

Regardless of the particular approach to ML fairness, focusing on particular algorithms can be too narrow of a problem definition. Real-world algorithmic systems are often composed of multiple subsystems and can be discriminatory as a whole, even if built from a series of fair algorithms [15]. They need to be modeled along with the other components of the *socio-technical* systems they are embedded in [33]. The burden of these investigations lies on independent researchers and auditors since the companies who operate these algorithms might not be incentivized to measure and address the externalities they cause [28].

## 3  METHODOLOGY

In this work we propose to measure the audience skews in terms of gender, age, race, and political views. Facebook Ad Manager reports the gender and age distribution of the audiences that received each ad, but it does not report the information about the race or political views of these audiences. We therefore apply two different approaches to creating the audiences and measuring the effects.

### 3.1  Timing

The 2019 settlement [16] stipulated that the updated ad creation flow for special categories be implemented by September 30, 2019. All of our ads were created and run between October 20, 2019 and December 15, 2019, leaving Facebook ample time after the implementation deadline.

### 3.2  Measuring skews by gender and age

To measure the makeup of a target audience by gender and age, we create and run actual ads and then we use the Facebook Ad Manager API to record how they are delivered. For these experiments, we need to provide an *ad creative* (consisting of the ad text, headline, image, and destination URL). Since the ad content influences the delivery [3], we chose to use the same creative for all ads, unless otherwise noted: a generic ad for Google Web Search, which has basic text ("Search the web for information") and a link to Google. We found that Facebook does not verify that an ad that is self-reported by an advertiser as a housing, credit, or employment ad is, in fact, such an ad. On the other hand, Facebook does automatically classify housing, credit, or employment ads as such even if the advertisers chooses not to disclose that information. Thus, the only way for us to run the same ad creative using both Lookalike and Special Ad audiences was to run a neutral ad that would not trigger the automatic classification.

**Creating audiences**   Recall that our goal is to measure whether Special Ad Audiences produce significantly less biased audiences than Lookalike Audiences. We therefore need to generate source audiences with controlled and known bias, from which we can create a Lookalike and a Special Ad audience. We replicate the approach from prior work [3], relying on publicly available voter records from New York and North Carolina. These records include registered voters' gender, age, location (address), and (only in North Carolina) race.

Thus, for each demographic feature we wish to study, we first create a Custom audience based on the voter records (which we treat as ground truth). For example, when studying gender, we select a subset of the voters who are listed as female and use that list to create a Custom audience. We use each biased Custom audience to create both a Lookalike audience and a Special Ad audience, selecting users in the U.S. and choosing the smallest size option (1% of the population).

**Data collection**   Once the ads are running we use Facebook's Ad Manager tool to collect information about demographics of the audiences that Facebook shows our ads to, broken down by age group, gender, and the intersections of these two characteristics.

**Calculating and comparing gender skew**   The Ad Manager tool reports gender of each user as either female, male, or unknown. The unknown gender might refer to users who choose to self-report their gender as falling outside of the binary, or those who did not provide their gender. We note that in all experiments there is no more than 1% of such users, and report the observed gender bias as the fraction of men $\hat{p}$ in the reached audience. We also calculate the upper and lower 99% confidence intervals ($U.L$ and $L.L$, respectively) around this fraction $\hat{p}$ using the method presented by Agresti and Coull [2]:

$$
\begin{aligned}
L.L. &= \frac{\hat{p} + \frac{z_{\alpha/2}^2}{2n} - z_{\alpha/2}\sqrt{\frac{\hat{p}(1-\hat{p})}{n} + \frac{z_{\alpha/2}^2}{4n^2}}}{1 + z_{\alpha/2}^2/n}, \\[2mm]
U.L. &= \frac{\hat{p} + \frac{z_{\alpha/2}^2}{2n} + z_{\alpha/2}\sqrt{\frac{\hat{p}(1-\hat{p})}{n} + \frac{z_{\alpha/2}^2}{4n^2}}}{1 + z_{\alpha/2}^2/n},
\end{aligned}
\tag{1}
$$

We set $z_{\alpha/2} = 2.576$, corresponding to the 99% interval.

Finally, we verify whether the difference between fractions observed for Lookalike and Special Audiences is statistically significant using the difference of proportion test:

$$
\Delta_{pLS} = (\hat{p_L} - \hat{p_S}) \pm z_{\alpha/2}\sqrt{\frac{\hat{p_L}(1-\hat{p_L})}{n_L} + \frac{\hat{p_S}(1-\hat{p_S})}{n_S}},
\tag{2}
$$

where $\hat{p_L}$ and $\hat{p_S}$ are the fractions of men who saw the ad in the Lookalike and Special audiences, $n_L$ and $n_S$ are number of people reached in each of these audiences. Because we are testing the significance in seven experiments (one for each input proportion), we apply the Bonferroni correction for multiple hypotheses testing. We do so by setting $z_{\alpha/2}$ to 3.189, corresponding to Bonferroni corrected $p_{val} = 0.01/7 \approx 0.00143$. If the confidence interval includes 0, we cannot reject the hypothesis that the fraction of men is the same in the two audiences and thus the result is not statistically significant.

**Calculating and comparing the age skew**   Age of the users who were shown each ad is reported in groups: <18, 18-24, 35-44, 45-54, 55-64, and 65+. We calculate the mean age and the confidence intervals around it using formulas specific to grouped data. First, we compute the mid-point $M_i$ for each age range $i$,

$$
M_i = \frac{x_{min_i} + x_{max_i}}{2}
\tag{3}
$$

3

Piotr Sapiezynski, Avijit Ghosh, Levi Kaplan, Aaron Rieke, and Alan Mislove

Next, we find the mean age $\mu$

$$\mu = \frac{\sum_i (M_i \times F_i)}{\sum_i F_i}, \qquad (4)$$

where $F_i$ is the number of audience members in the age group $i$. We then compute the standard deviation around that mean

$$\sigma = \sqrt{\frac{\sum_i (F_i \times M_i^2) - (n \times \mu^2)}{n - 1}} \qquad (5)$$

and the corresponding standard error

$$SE = \frac{\sigma}{\sqrt{n}} \qquad (6)$$

Presented upper and lower confidence intervals correspond to

$$U.L. = \mu + k \times SE,$$
$$L.L. = \mu - k \times SE \qquad (7)$$

respectively, and $k$ is set to 2.576.

Finally, we verify whether the difference in mean ages between the Lookalike and Special audiences is statistically significant. To achieve that, we compute the standard error of the difference

$$SE_{LS} = \sqrt{\frac{\sigma_L^2}{n_L} + \frac{\sigma_S^2}{n_S}} \qquad (8)$$

and the 99% confidence interval around the difference between mean ages:

$$\Delta_{\mu_{LS}} = \mu_L - \mu_s \pm z_{\alpha/2} \times \sqrt{\frac{\sigma_L^2}{n_L} + \frac{\sigma_S^2}{n_S}} \qquad (9)$$

We apply the Bonferroni correction for six tests and use the $z_{\alpha/2}$ set to 3.143. If the confidence interval includes 0, we cannot reject the hypothesis that the mean age is the same in the two audiences and thus the difference is not statistically significant.

### 3.3   Measuring racial skews

When measuring racial skew in the audiences we are unable to re-use the same methodology for age and gender, which relied on Facebook's *ad delivery* statistics. Instead, we develop an alternative methodology that relies on *estimated daily results*– Facebook's estimate of the number of users matching the advertiser's targeting criteria that can be reached daily within the specified budget. We set the daily budget to the maximum allowed value ($1M) to best approximate the total number of users that match the targeting criteria. Facebook returns these values as a range (e.g., "12,100 – 20,400 users"); throughout this procedure, we always use the lower value.[3] The procedure has only two steps: audience creation and targeting. It does not involve running any ads and observing the skew in delivery, and it is entirely based on the estimates on audience sizes provided by Facebook at the ad targeting step.

We note that ours is not the first use of these estimates to infer the number of users that match different criteria. For example, Garcia et al. used them to estimate the gender inequality across the globe [20], while Fatehkia et al. found they are highly predictive of a range of other social indicators [18].

**Audience Creation**   We start with the publicly available voter records from North Carolina, in which the voters self-report their race and ethnicity. We focus on two groups: Non-Hispanic Black and Non-Hispanic white. For each group, we create two independent Custom audiences: one list of 10,000 randomly selected users with that race, and one list of 900,000 randomly selected users with that race. The latter audience does not contain any individuals already selected for the first list, and will be refered to as the *reference* audience.

We refer to these as w_10k and w_900k (white audiences) and b_10k and b_900k (Black audiences). We then have Facebook algorithmically generate Lookalike and Special Ad audiences using the smaller Custom audiences as input. We refer to the resulting audiences as $L_{\text{w\_10k}}$ (for the Lookalike audience based on w_10k), $S_{\text{w\_10k}}$ (for the Special Ad audience), $L_{\text{b\_10k}}$, and $S_{\text{b\_10k}}$.

**Targeting**   The goal of this step is to find the overlaps between the audiences with unknown race generated by the algorithms and the reference Custom audiences that we provided (with known race). Then we can say there is a race bias in the white Lookalike audience $L_{\text{w\_10k}}$ if the overlap between it and a white reference audience w_900k is higher than the overlap between it and a Black reference audience b_900k (and vice versa for an audience generated from a Black source audience). We also perform these overlap comparisons for Special Ad audiences to measure whether this effect persists despite removing sensitive features from the algorithm.

Our method relies on the fact that Facebook allows advertisers not only to specify which audiences to *include* in the targeting, but also which to *exclude*. Suppose we wish to obtain an estimate of the fraction of white users in $L_{\text{w\_10k}}$. To do so, we first target the reference white audience w_900k audience and record the potential daily reach (e.g., 81,000). We then target $L_{\text{w\_10k}}$ and record the potential daily reach (e.g., 397,000). Finally, we target $L_{\text{w\_10k}}$ and *exclude* the w_900k audience, and record the potential daily reach (e.g., 360,000). Now, we can observe that excluding w_900k from $L_{\text{w\_10k}}$ caused the potential daily reach to drop by 37,000, indicating that approximately 46% (37,000/81,000) of w_900k were present in $L_{\text{w\_10k}}$. We can then repeat the process with excluding b_900k, and measure the fraction of the reference Black audience that is present in $L_{\text{w\_10k}}$. By comparing the fraction of w_900k and b_900k that are present in $L_{\text{w\_10k}}$, we obtain an estimate of the racial bias of $L_{\text{w\_10k}}$.

**Measuring political skews**   To measure political skews we follow the exact same method as with measuring racial skews, but rather than constructing the audiences based on their reported race, we use their registered political affiliation as Democratic or Republican voters.

**Limitations**   Unlike in our experiments with gender and age, here we do not know the race of a vast majority of the audience. The Lookalike and Special Ad audiences that Facebook creates consist mostly of people who appear not to be in our voter records. There are multiple reasons for why this might be the case: (1) we only looked at single race, non-Hispanic white and Black voters, excluding all Hispanic voters, as well as those of other races, and multi-racial; (2) the users in the created audiences and could be located in other states - while creating lookalike and special

---

[3]We used the midpoint and the upper value and found similar results.

Algorithms that "Don't See Color": Measuring Biases in Lookalike and Special Ad Audiences



Figure 1: A. Gender breakdown of ad delivery to Lookalike and Special Ad audiences created from the source audiences with varying fraction of male users. The Special Ad audiences replicate the skew to a large extent. B. Age breakdown of ad delivery to Lookalike and Special Ad audiences created from source audiences with varying age brackets. Both Lookalike and Special Ad audiences follow the age distribution of the source audiences, but the latter shows a decrease of mean age by up to six years in the 65+ group.

audiences the advertiser can only select the country where those audiences would be located. Thus, the results we present in this section only refer to the fraction of voters with known race who are included in each Lookalike and Special Ad audience, not the racial composition of these audiences overall. Still, these estimates do give us a small window into the makeup of the Lookalike and Special Ad audiences.

## 4   RESULTS

We now present our experiments and analyze whether Lookalike and Special Ad Audiences show similar levels of skew.

### 4.1   Gender and age

We begin by focusing on gender, creating seven Custom audiences based on New York voter records. Each audience contains 10,000 voters, with varying fractions of men: 0%, 20%, 40%, 50%, 60%, 80%, 100%. We run ads to the resulting Lookalike and Special Ad audiences, and compare the results in ad delivery as reported by Facebook's advertiser interface.

Figure 1A presents a summary of the results of this experiment, and we make a number of observations. *First*, we can see that each Lookalike audience clearly mirrors its source audience along gender lines: the Lookalike audience derived from a male-only source audience delivers to over 99% men, and the the Lookalike audience derived from a female-only source audience delivers to over 97% women. *Second*, we observe a slight male bias in our delivery, relative to the source audience: for example, the Lookalike audience derived from a source audience of 50% men actually delivered to approximately 70% men. This male bias has been observed by prior work [3, 26] and may be due to market effects or ad delivery effects (which affect both Lookalike and Special Ad audiences equally).



Figure 2: Both Lookalike and Special Ad audiences created from source audiences of white users containing a higher fraction of white users than Black users. Conversely, audiences created from source audiences of Black users contain a higher fraction of Black users than white users.

*Third*, and most importantly, when we compare the delivery of each Special Ad audience to its corresponding Lookalike audience, we observe that a similar level of skew (that in some cases is statistically indistinguishable). For example, the Special Ad audience derived from a male-only source audiences delivers to over 95% men, despite being created without having access to users' genders. As emphasized the lower panel of Figure 1, the Special Ad audiences do show a bit less skew when compared to the Lookalike audiences for some of the input audiences, while still carrying over most of the skew from the source audience.

We follow an analogous procedure to create six Custom Audiences, each consisting of individuals only in a specified age range. We then create Custom and Special Ad audiences and measure whether the age skews are reproduced and present the results in Figure 1B.

### 4.2   Race

Next, we turn to examine the extent to which Special Ad Audiences can be biased along racial lines, in the same manner Lookalike Audiences were observed to be in past work [34]. We summarize the overlap between the Lookalike and Special Ad audiences and the large white and Black audiences in Table 1. Focusing on the table, we can immediately observe that both the Lookalike audiences show significantly more overlap with the race of the source audience, suggesting that the makeup of the Lookalike audiences are racially biased. For example, the Lookalike audience created from b_10k contains 61% of the active users from b_900k but only 16% of the active users from w_900k (see Methods for the explanation of the audience names). More importantly, the Special Ad audiences show a similar behavior (though as before, perhaps with slightly less of a bias). Again, it is important to keep in mind that we can only make estimates of the fraction of w_900k and b_900k that overlap with the Lookalike and Special Ad audiences, and cannot comment on the majority of these audiences (as they likely fall outside of North Carolina). Thus, our results are not conclusive—but only

Piotr Sapiezynski, Avijit Ghosh, Levi Kaplan, Aaron Rieke, and Alan Mislove

| Source | Type | Percent overlap | |
| --- | --- | --- | --- |
| | | Black (b_900k) | White (w_900k) |
| 100% Black | Lookalike ($L_{b\_10k}$) | 61.0 | 16.0 |
| | Special ($S_{b\_10k}$) | 62.3 | 12.3 |
| 100% white | Lookalike ($L_{w\_10k}$) | 16.9 | 42.0 |
| | Special ($S_{w\_10k}$) | 10.4 | 35.8 |

Table 1: Breakdown of overlap between audiences with known racial makeup and Lookalike and Special Ad audiences. While we do not know the race of the vast majority of the created audiences, we see large discrepancies in the race distribution among the known users.

| Source | Type | Percent overlap | |
| --- | --- | --- | --- |
| | | Democrat (d_900k) | Republican (r_900k) |
| Democrats | Lookalike $L_{d\_10k}$ | 51.6 | 31.8 |
| | Special $S_{d\_10k}$ | 42.2 | 25.8 |
| Republicans | Lookalike $L_{r\_10k}$ | 28.1 | 50.0 |
| | Special $S_{r\_10k}$ | 25.0 | 47.0 |

Table 2: Breakdown of overlap between source audiences with known political leaning and resulting Lookalike and Special Ad audiences. While we do not know the political leaning of the vast majority of the audiences, we see discrepancies in the distribution among the known users.

suggestive—that the overall audiences are similarly biased. Below, we provide further robustness analysis of these results.

### 4.3 Robustness

Here, we verify that the presented results regarding race biases are robust to the random selection of seed from which Lookalike and Special Ad audiences are created. Following the method described in Methodology, we use the two sample Kolmogorov–Smirnov test to compare the distributions of overlaps presented in Figure 2. The findings are confirmed to be robust to the particular source audience choice. *First*, the racial skew observable in Lookalike audiences persists in Special Ad audiences and is statistically significant at $p_{val} = 0.01$ even with the Bonferroni correction for multiple hypotheses testing, *Second*, the differences between overlaps produced by Special Ad audiences and Lookalike audiences generated from the w_10k custom audience *are not statistically significant* – Special Ad audiences generated from the w_10k are just as biased as the corresponding Lookalike audiences. *Third* the differences between overlaps produced by Special Ad audiences and Lookalike audiences generated from the b_10k custom audience *are small statistically significant* and this difference comes from Special Ad audiences being even more biased than Lookalike audiences.

### 4.4 Political views

We next turn to measure the extent to which Lookalike and Special Ad Audiences can be biased along the lines of political views. As with race, Facebook does not provide a breakdown of ad delivery by users' political views. Thus, we repeat the methodology we used for race, using voter records from North Carolina and focusing on the differences in delivery to users registered as Republicans and Democrats.

We report the results in Table 2. We can observe a skew along political views for Lookalike audiences (for example, the Lookalike audience created from users registered as Democrats contains 51% of d_900k but only 32% of r_900k). We can also observe that the Special Ad audiences show a skew as well, though to a somewhat lesser degree than the Lookalike audiences. As with the race experiments, we remind the reader that we can only observe the overlap between the created audiences and the large Democrat/Republican audiences; we are unable to measure the majority of the created audiences. However, the demonstrated skew suggests that there is a bias in the overall makeup of the created audiences.

### 4.5 Real-world use cases

Next, we test a "real-world" use case of Special Ad Audiences. We imagine an employer wants to use Facebook to advertise open positions to people who are similar to those already working for them. The employer might assume that since the Special Ad Audiences algorithm is not provided with protected features as inputs, it will allow them to reach users who are similar to their current employees but without gender, age, or racial biases. The employer would therefore upload a list of their current employees to create a Custom audience, ask Facebook to create a Special Ad audience from that, and then target ads to the resulting Special Ad audience.

We play the role of this hypothetical employer (Facebook itself in this example, which provides employees with an @fb.com email address). We then run the following experiment: We first create a baseline audience by using randomly generated U.S. phone numbers, 11,000 of which Facebook matched to existing users. We then create a Custom audience consisting of 12M generated email addresses: all 2–5 letter combinations + @fb.com, 11,000 of which Facebook matched to existing users; this is our audience of Facebook employees. We create Special Ad audiences based on each of these two Custom audiences. Finally, we run two generic job ads —each to one of these Special Ad audiences, at the same time, from the same account, with the same budget—and observe how they are delivered.

Figure 3 presents the results of the experiment. The Special Ad audience based on Facebook employees delivers to 88% men, compared to 54% in the baseline case. Further, the Special Ad audience based on Facebook employees delivers to 48% to men aged between 25-34, compared to 15% for the baseline audience. Note that Facebook themselves report that the actual skew among company employees is lower, with 63% of male employees [1]. Overall, our results show that our hypothetical employer's reliance on Special Ad audiences to avoid discrimination along protected classes was misplaced: their ad was ultimately delivered to an audience that was significantly biased along age and gender lines (and presumably reflective of Facebook's employee population). Based on this singular experiment we cannot claim that the extent of the problem would be similar for other employers. Still, we do recommend that potential advertisers use the tool cautiously.

Algorithms that "Don't See Color": Measuring Biases in Lookalike and Special Ad Audiences



Figure 3: Gender and age breakdown of a generic job ad delivery to a Special Ad audience based on random American users (in orange) and a Special Ad audience based on Facebook employees (in blue). The audience based on Facebook employees is predominantly male and 25-34.



Figure 4: Gender and age breakdown of delivery of job ads to a Special Ad audience based on random American users. Facebook's delivery optimization based on the ad content can lead to large skews despite the gender and age-balanced target audience.

## 4.6 Content-based skew in delivery

Previous work [3, 24] demonstrated that the skew in delivery can be driven by Facebook's estimated relevance of a particular ad copy to a particular group of people. Specifically, even when the target audience were held constant, Facebook would deliver our ads to different subpopulations: ads for supermarket jobs were shown primarily to women, while ads for jobs in lumber industry were presented mostly to men. Here, we show that these effects persist also when using Special Ad Audiences. We run generic job ad to a Special Ad Audience created from a random set of 11,000 users along with ads for supermarket and artificial intelligence pointing to search for either keyword on indeed.com. Figure 4 shows that the different ads skew towards middle-aged women (in the case of supermarket jobs) or towards younger men (in the case of artificial intelligence jobs).

The results underline a crucial point: when designing fairness/anti-discrimination controls, one cannot just focus on one part of the *algorithmic* system. Instead one must look at the whole *socio-technical* system, including how an algorithm is used by real people, how people adjust their behaviors in response to the algorithm, and how the algorithm adapts to people's behaviors.

## 5 LEGAL IMPLICATIONS

At a high level, U.S. federal law prohibits discrimination in the marketing of housing, employment and credit opportunities. Our findings might have near-term legal consequences for advertisers and even Facebook itself.

A creditor, employer, or housing provider who used biased Special Ad audiences in their marketing could run afoul of the US anti-discrimination laws. This could be exceptionally frustrating for an advertiser who believed that Special Ad Audiences was an appropriate, legally-compliant way to target their ads.

Facebook itself could also face legal scrutiny. In the U.S., Section 230 of the Communications Act of 1934 (as amended by the Communications Decency Act, specifically 47 USC § 230 *Protection for private blocking and screening of offensive material*) provides broad legal immunity to Internet platforms acting as publishers

of third-party content. This immunity was a central issue in the litigation resulting in the settlement analyzed above. Although Facebook argued in court that advertisers are "wholly responsible for deciding where, how, and when to publish their ads" [17], this paper makes clear that Facebook can play a significant, opaque role by creating biased Lookalike and Special Ad audiences. If a court found that the operation of these tools constituted a "material contribution" to illegal conduct, Facebook's ad platform could lose its immunity [35].

## 6 DISCUSSION

We demonstrated that both Lookalike and Special Ad Audiences can create similarly biased target audiences from the same source audiences. We are not claiming that Facebook incorrectly implemented Special Ad Audiences, nor are we suggesting they violated the settlement. Rather, our findings are a consequence of a complex algorithmic system at work.

Our findings have broad and narrow implications. Broadly, we demonstrate that simply removing demographic features from a complex algorithmic system can be insufficient to remove bias from its outputs, which is an important lesson for government and corporate policymakers. More specifically, we show that relative to Lookalike Audiences, Facebook's Special Ad Audiences do little to reduce demographic biases in target audiences. As a result, we believe Special Ad Audiences will do little to mitigate discriminatory outcomes.

Absent any readily available algorithm-centered solutions to the presented problem, removing the Lookalike/Special Ad audience functionality as well as disabling ad delivery optimization in the sensitive contexts of housing, employment, and credit ads might be the appropriate interim approach.

## ACKNOWLEDGEMENTS

The authors thank Ava Kofman and Ariana Tobin for suggesting the experiments presented in Section 4.5 as well as for going an extra mile (or two) for their ProPublica story around this work [25].

Piotr Sapiezynski, Avijit Ghosh, Levi Kaplan, Aaron Rieke, and Alan Mislove

We also thank NaLette Brodnax for her feedback on the experimental design and Aleksandra Korolova for her comments on the manuscript. This work was funded in part by a grant from the Data Transparency Lab, NSF grants CNS-1916020 and CNS-1616234, and Mozilla Research Grant 2019H1.

## REFERENCES

[1] Advancing Opportunity For All. https://diversity.fb.com/read-report/.
[2] Alan Agresti and Brent A Coull. Approximate Is Better Than "exact" For Interval Estimation Of Binomial Proportions. *The American Statistician*, 52(2):119–126, 1998.
[3] Muhammad Ali, Piotr Sapiezynski, Miranda Bogen, Aleksandra Korolova, Alan Mislove, and Aaron Rieke. Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead To Biased Outcomes. In *ACM Conference on Computer Supported Cooperative Work*, Austin, Texas, USA, November 2019.
[4] Michelle Wilde Anderson. Colorblind segregation: Equal protection as a bar to neighborhood integration. *Calif. L. Rev.*, 92:841, 2004.
[5] Solon Barocas, Moritz Hardt, and Arvind Narayanan. *Fairness And Machine Learning.* fairmlbook.org, 2019. http://www.fairmlbook.org.
[6] Joseph Blass. Algorithmic Advertising Discrimination. *Northwestern University Law Review*, 114(2):415–468, 2019.
[7] Eduardo Bonilla-Silva. *Racism without racists: Color-blind racism and the persistence of racial inequality in the United States.* Rowman & Littlefield Publishers, 2006.
[8] Irene Chen, Fredrik D Johansson, and David Sontag. Why Is My Classifier Discriminatory? In *Advances in Neural Information Processing Systems*, pages 3539–3550, 2018.
[9] Le Chen, Aniko Hannak, Ruijin Ma, and Christo Wilson. Investigating The Impact Of Gender On Rank In Resume Search Engines. In *Annual Conference of the ACM Special Interest Group on Computer Human Interaction*, Montreal, Canada, April 2018.
[10] Consumer Financial Protection Bureau. Using Publicly Available Information To Proxy For Unidentified Race And Ethnicity, 2014. https://files.consumerfinance.gov/f/201409_cfpb_report_proxy-methodology.pdf.
[11] Sam Corbett-Davies and Sharad Goel. The measure and mismeasure of fairness: A critical review of fair machine learning. *CoRR*, abs/1808.00023, 2018.
[12] Department of Housing and Urban Development. Hud's Implementation Of The Fair Housing Act's Disparate Impact Standard, 2019. https://www.federalregister.gov/documents/2019/08/19/2019-17542/huds-implementation-of-the-fair-housing-acts-disparate-impact-standard.
[13] Emily Dreyfuss. Facebook Changes Its Ad Tech To Stop Discrimination. *WIRED*, 2019. https://www.wired.com/story/facebook-advertising-discrimination-settlement/.
[14] Cynthia Dwork, Moritz Hardt, Toniann Pitassi, Omer Reingold, and Richard Zemel. Fairness Through Awareness. In *Proceedings of the 3rd Innovations in Theoretical Computer Science Conference*, pages 214–226. ACM, 2012.
[15] Cynthia Dwork and Christina Ilvento. Fairness Under Composition. In *10th Innovations in Theoretical Computer Science Conference (ITCS 2019)*, volume 124 of *Leibniz International Proceedings in Informatics (LIPIcs)*, pages 33:1–33:20, 2018.
[16] Exhibit A – Programmatic Relief. https://nationalfairhousing.org/wp-content/uploads/2019/03/FINAL-Exhibit-A-3-18.pdf.
[17] Facebook Motion To Dismiss In Onuoha V. Facebook. https://www.courtlistener.com/recap/gov.uscourts.cand.304918/gov.uscourts.cand.304918.34.0.pdf.
[18] Masoomali Fatehkia, Isabelle Tingzon, Ardie Orden, Stephanie Sy, Vedran Sekara, Manuel Garcia-Herranz, and Ingmar Weber. Mapping socioeconomic indicators using social media advertising data. *EPJ Data Science*, 9(1):22, 2020.
[19] Marion Fourcade and Kieran Healy. Classification Situations: Life-chances In The Neoliberal Era. *Accounting, Organizations and Society*, 38(8):559–572, 2013.
[20] David Garcia, Yonas Mitike Kassa, Angel Cuevas, Manuel Cebrian, Esteban Moro, Iyad Rahwan, and Ruben Cuevas. Analyzing gender inequality through large-scale facebook advertising data. *Proceedings of the National Academy of Sciences*, 115(27):6958–6963, 2018.
[21] Rachel Goodman. Why Amazon's Automated Hiring Tool Discriminated Against Women, 2018. https://www.aclu.org/blog/womens-rights/womens-rights-workplace/why-amazons-automated-hiring-tool-discriminated-against.
[22] Jerald Greenberg. A Taxonomy Of Organizational Justice Theories. *Academy of Management review*, 12(1):9–22, 1987.
[23] Aniko Hannak, Claudia Wagner, David Garcia, Alan Mislove, Markus Strohmaier, and Christo Wilson. Bias In Online Freelance Marketplaces: Evidence From Taskrabbit And Fiverr. In *ACM Conference on Computer Supported Cooperative Work*, Portland, Oregon, USA, February 2017.
[24] Basileal Imana, Aleksandra Korolova, and John Heidemann. Auditing For Discrimination In Algorithms Delivering Job Ads. In *Proceedings of the Web Conference 2021*, pages 3767–3778, 2021.
[25] Ava Kofman and Ariana Tobin. Facebook Ads Can Still Discriminate Against Women and Older Workers, Despite a Civil Rights Settlement. https://www.propublica.org/article/facebook-ads-can-still-discriminate-against-women-and-older%2Dworkers-despite-a-civil-rights-settlement.
[26] Anja Lambrecht and Catherine Tucker. Algorithmic bias? an empirical study of apparent gender-based discrimination in the display of stem career ads. *Management science*, 65(7):2966–2981, 2019.
[27] Ziad Obermeyer, Brian Powers, Christine Vogeli, and Sendhil Mullainathan. Dissecting Racial Bias In An Algorithm Used To Manage The Health Of Populations. *Science*, 366(6464):447–453, 2019.
[28] Rebekah Overdorf, Bogdan Kulynych, Ero Balsa, Carmela Troncoso, and Seda Gürses. Questioning The Assumptions Behind Fairness Solutions. *arXiv preprint arXiv:1811.11293*, 2018.
[29] Dino Pedreschi, Salvatore Ruggieri, and Franco Turini. Discrimination-aware Data Mining. In *ACM SIGKDD International Conference of Knowledge Discovery and Data Mining*, Las Vegas, North Dakota, USA, August 2008.
[30] Destiny Peery. The colorblind ideal in a race-conscious reality: The case for a new legal ideal for race relations. *Nw. JL & Soc. Pol'y*, 6:473, 2011.
[31] Piotr Sapiezyński, Valentin Kassarnig, Christo Wilson, Sune Lehmann, and Alan Mislove. Academic Performance Prediction In A Gender-imbalanced Environment. In *Workshop on Responsible Recommendation*, Como, Italy, August 2017.
[32] Traci Schlesinger. The failure of race neutral policies: How mandatory terms and sentencing enhancements contribute to mass racialized incarceration. *Crime & delinquency*, 57(1):56–81, 2011.
[33] Andrew D. Selbst, Danah Boyd, Sorelle A. Friedler, Suresh Venkatasubramanian, and Janet Vertesi. Fairness And Abstraction In Sociotechnical Systems. In *Conference on Fairness, Accountability, and Transparency*, Atlanta, Georgia, USA, January 2019.
[34] Till Speicher, Muhammad Ali, Giridhari Venkatadri, Filipe Nunes Ribeiro, George Arvanitakis, Fabrício Benevenuto, Krishna P. Gummadi, Patrick Loiseau, and Alan Mislove. On The Potential For Discrimination In Online Targeted Advertising. In *Conference on Fairness, Accountability, and Transparency*, New York, New York, USA, February 2018.
[35] Upturn Amicus Brief In Onuoha V. Facebook. https://www.courtlistener.com/recap/gov.uscourts.cand.304918/gov.uscourts.cand.304918.76.1.pdf.
[36] Samuel Yeom, Anupam Datta, and Matt Fredrikson. Hunting For Discriminatory Proxies In Linear Regression Models. In *Advances in Neural Information Processing Systems*, pages 4568–4578, 2018.

# EXHIBIT 4

# Discrimination through optimization:
# How Facebook's ad delivery can lead to skewed outcomes

Muhammad Ali*
Northeastern University
mali@ccs.neu.edu

Piotr Sapiezynski*
Northeastern University
sapiezynski@gmail.com

Miranda Bogen
Upturn
miranda@upturn.org

Aleksandra Korolova
University of Southern California
korolova@usc.edu

Alan Mislove
Northeastern University
amislove@ccs.neu.edu

Aaron Rieke
Upturn
aaron@upturn.org

arXiv:1904.02095v5 [cs.CY] 12 Sep 2019

## ABSTRACT

The enormous financial success of online advertising platforms is partially due to the precise targeting features they offer. Although researchers and journalists have found many ways that advertisers can target—or exclude—particular groups of users seeing their ads, comparatively little attention has been paid to the implications of the platform's *ad delivery* process, comprised of the platform's choices about which users see which ads.

It has been hypothesized that this process can "skew" ad delivery in ways that the advertisers do not intend, making some users less likely than others to see particular ads based on their demographic characteristics. In this paper, we demonstrate that such skewed delivery occurs on Facebook, due to market and financial optimization effects as well as the platform's own predictions about the "relevance" of ads to different groups of users. We find that both the advertiser's budget and the content of the ad each significantly contribute to the skew of Facebook's ad delivery. Critically, we observe significant skew in delivery along gender and racial lines for "real" ads for employment and housing opportunities despite neutral targeting parameters.

Our results demonstrate previously unknown mechanisms that can lead to potentially discriminatory ad delivery, even when advertisers set their targeting parameters to be highly inclusive. This underscores the need for policymakers and platforms to carefully consider the role of the ad delivery optimization run by ad platforms themselves—and not just the targeting choices of advertisers—in preventing discrimination in digital advertising.[1]

## 1 INTRODUCTION

Powerful digital advertising platforms fund most popular online services today, serving ads to billions of users daily. At a high level, the functionality of these advertising platforms can be divided into two phases: *ad creation*, where advertisers submit the text and images that comprise the content of their ad and choose targeting parameters, and *ad delivery*, where the platform delivers ads to specific users based on a number of factors, including advertisers' budgets, their ads' performance, and the predicted relevance of their ads to users.

One of the underlying reasons for the popularity of these services with advertisers is the rich suite of *targeting* features they offer

during ad creation, which allow advertisers to precisely specify which users (called the *audience*) are eligible to see the advertiser's ad. The particular features that advertisers can use for targeting vary across platforms, but often include demographic attributes, behavioral information, users' personally identifiable information (PII), mobile device IDs, and web tracking pixels [11, 72].

Due to the wide variety of targeting features—as well as the availability of sensitive targeting features such as user demographics and interests—researchers have raised concerns about discrimination in advertising, where groups of users may be excluded from receiving certain ads based on advertisers' targeting choices [68]. This concern is particularly acute in the areas of credit, housing, and employment, where there are legal protections in the U.S. that prohibit discrimination against certain protected classes in advertising [1–3]. As ProPublica demonstrated in 2016 [29], this risk is not merely theoretical: ProPublica investigators were able to run housing ads that explicitly excluded users with specific "ethnic affinities" from receiving them.[2] Recently, the U.S. Department of Housing and Urban Development (HUD) sued Facebook over these concerns and others, accusing Facebook's advertising platform of "encouraging, enabling, and causing" violations of the Fair Housing Act [28].

**The role of ad delivery in discrimination**    Although researchers and investigative journalists have devoted considerable effort to understanding the potential discriminatory outcomes of ad targeting, comparatively little has focused on ad delivery, due to the difficulty of studying its impacts without internal access to ad platforms' data and mechanisms. However, there are several potential reasons why the ad delivery algorithms used by a platform may open the door to discrimination.

*First*, consider that most platforms claim their aim is to show users "relevant" ads: for example, Facebook states "we try to show people the ads that are most pertinent to them" [67]. Intuitively, the goal is to show ads that particular users are likely to engage with, even in cases where the advertiser does not know a priori which users are most receptive to their message. To accomplish this, the platforms build extensive user interest profiles and track ad performance to understand how different users interact with different ads. This historical data is then used to steer future ads

---

[1] The delivery statistics of ad campaigns described in this work can be accessed at https://facebook-targeting.ccs.neu.edu/

\* These two authors contributed equally

---

[2] In response, Facebook banned the use of certain attributes for housing ads, but many other, un-banned, mechanisms exist for advertisers that achieve the same outcome [68]. Facebook agreed as part of a lawsuit settlement stemming from these issues to go further by banning age, gender, and certain kinds of location targeting—as well as some related attributes—for housing, employment, or credit ads [22].

towards those users who are most likely to be interested in them, and to users like them. However, in doing so, the platforms may inadvertently cause ads to deliver primarily to a skewed subgroup of the advertiser's selected audience, an outcome that the advertiser may not have intended or be aware of. As noted above, this is particularly concerning in the case of credit, housing, and employment, where such skewed delivery might violate antidiscrimination laws.

*Second*, market effects and financial optimization can play a role in ad delivery, where different desirability of user populations and unequal availability of users may lead to skewed ad delivery [25]. For example, it is well-known that certain users on advertising platforms are more valuable to advertisers than others [47, 54, 64]. Thus, advertisers who choose low budgets when placing their ads may be more likely to lose auctions for such "valuable" users than advertisers who choose higher budgets. However, if these "valuable" user demographics are strongly correlated with protected classes, it could lead to discriminatory ad delivery due to the advertiser's budget alone. Even though a low budget advertiser may not have intended to exclude such users, the ad delivery system may do just that because of the higher demand for that subgroup.

Prior to this work, although hypothesized [25, 51, 71], it was not known whether the above factors resulted in skewed ad delivery in real-world advertising platforms. In fact, in response to the HUD lawsuit [28] mentioned above, Facebook claimed that the agency had "no evidence" of their ad delivery systems' role in creating discrimination [41].

**Contributions**     In this paper, we aim to understand whether ads could end up being shown in a skewed manner—i.e., where some users are less likely than others to see ads based on their demographic characteristics—due to the ad delivery phase alone. In other words, we determine whether the ad delivery could cause skewed delivery *that an advertiser did not cause by their targeting choices and may not even be aware of.* We focus on Facebook—as it is the most mature platform offering advanced targeting features—and run dozens of ad campaigns, hundreds of ads with millions of impressions, spending over $8,500 as part of our study.

Answering this question—especially without internal access to the ad delivery algorithm, user data, and advertiser targeting data or delivery statistics—involves overcoming a number of challenges. These include separating market effects from optimization effects, distinguishing ad delivery adjustments based on the ad's performance measured through user feedback from initial ad classification, and developing techniques to determine the racial breakdown of the delivery audience (which Facebook does not provide). The difficulty of solving these without the ad platform's cooperation in a rigorous manner may at least partially explain the lack of knowledge about the potential discriminatory effects due to ad delivery to date. After addressing these challenges, we find the following:

*First*, we find that *skewed delivery can occur due to market effects alone.* Recall the hypothesis above concerning what may happen if advertisers in general value users differently across protected classes. Indeed, we find this is the case on Facebook: when we run identical ads targeting the same audience but with varying budgets, the resulting audience of users who end up seeing our ad can range from over 55% men (for ads with very low budgets) to under 45% men (for ads with high budgets).

*Second*, we find that *skewed delivery can occur due to the content of the ad itself* (i.e., the ad headline, text, and image, collectively called the *ad creative*). For example, ads targeting the same audience but that include a creative that would stereotypically be of the most interest to men (e.g., bodybuilding) can deliver to over 80% men, and those that include a creative that would stereotypically be of the most interest to women (e.g., cosmetics) can deliver to over 90% women. Similarly, ads referring to cultural content stereotypically of most interest to Black users (e.g., hip-hop) can deliver to over 85% Black users, and those referring to content stereotypically of interest to white users (e.g., country music) can deliver to over 80% white users, even when targeted identically by the advertiser. Thus, despite placing the same bid on the same audience, the advertiser's ad delivery can be heavily skewed based on the ad creative alone.

*Third*, we find that *the ad image itself has a significant impact on ad delivery.* By running experiments where we swap different ad headlines, text, and images, we demonstrate that the differences in ad delivery can be significantly affected by the image alone. For example, an ad whose headline and text would stereotypically be of the most interest to men with the image that would stereotypically be of the most interest to women delivers primarily to women at the same rate as when all three ad creative components are stereotypically of the most interest to women.

*Fourth*, we find that *the ad image is likely automatically classified by Facebook*, and that this classification can skew delivery from the beginning of the ad's run. We create a series of ads where we add an alpha channel to stereotypically male and female images with over 98% transparency; the result is an image with all of the image data present, but that looks like a blank white square to humans. We find that there are statistically significant differences in how these ads are delivered depending on the image used, despite the ads being visually indistinguishable to a human. This indicates that the image classification—and, therefore, relevance determination—is likely an automated process, and that the skew in ad delivery can be due in large part to skew in Facebook's automated estimate of relevance, rather than ad viewers' interactions with the ad.

*Fifth*, we show that *real-world employment and housing ads can experience significantly skewed delivery.* We create and run ads for employment and housing opportunities, and use our methodology to measure their delivery to users of different races and genders. When optimizing for clicks, we find that ads with the same targeting options can deliver to vastly different racial and gender audiences depending on the ad creative alone. In the most extreme cases, our ads for jobs in the lumber industry reach an audience that is 72% white and 90% male, our ads for cashier positions in supermarkets reach an 85% female audience, and our ads for positions in taxi companies reach a 75% Black audience, even though the targeted audience specified by us as an advertiser is identical for all three. We run a similar suite of ads for housing opportunities, and find skew there as well: despite the same targeting and budget, some of our ads deliver to an audience of over 72% Black users, while others delivery to over 51% Black users. While our results only speak to how our particular ads are delivered (i.e., we cannot say how housing or employment ads *in general* are delivered), the significant skew we observe even on a small set of ads suggests that real-world housing and employment ads are likely to experience the same fate.

Taken together, our results paint a distressing picture of heretofore unmeasured and unaddressed skew that can occur in online advertising systems, which have significant implications for discrimination in targeted advertising. Specifically, due to platforms' optimization in the ad delivery stage together with market effects, ads can unexpectedly be delivered to skewed subsets of the advertiser's specified audience. For certain types of ads, such skewed delivery might implicate legal protections against discriminatory advertising. For example, Section 230 of the U.S. Communications Decency Act (CDA) protects publishers (including online platforms) from being held responsible for third-party content. Our results show Facebook's integral role in shaping the delivery mechanism and might make it more difficult for online platforms to present themselves as neutral publishers in the future. We leave a full exploration of these implications to the legal community. However, our results indicate that regulators, lawmakers, and the platforms themselves need to think carefully when balancing the optimization of ad platforms against desired societal outcomes, and remember that ensuring that individual advertisers do not discriminate in their targeting is insufficient to achieve non-discrimination goals sought by regulators and the public.

**Ethics**   All of our experiments were conducted with careful consideration of ethics. We obtained Institutional Review Board review of our study at Northeastern University (application #18-11-13), with our protocol being marked as "Exempt". We minimized harm to Facebook users when we were running our ads by always running "real" ads (in the sense that if people clicked on our ads, they were brought to real-world sites relevant to the topic of the ad). While running our ads, we never intentionally chose to target ads in a discriminatory manner (e.g., we never used discriminatory targeting parameters). To further minimize the potential for discrimination, we ran most of our experimental ads in categories with no legal salience (such as entertainment and lifestyle); we only ran ad campaigns on jobs and housing to verify whether the effects we observed persist in these domains. We minimized harm to the Facebook advertising platform by paying for ads and using the ad reporting tools in the same manner as any other advertiser. The particular sites we advertised were unaffiliated with the study, and our ads were not defamatory, discriminatory, or suggestive of discrimination.

## 2   BACKGROUND

Before introducing our methodology and analyses, we provide background on online display advertising, describe Facebook's advertising platform's features, and detail related work.

### 2.1   Online display advertising

Online display advertising is now an ecosystem with aggregate yearly revenues close to $100 billion [21]. The web advertising ecosystem is a complex set of interactions between ad publishers, ad networks, and ad exchanges, with an ever-growing set of entities involved at each step allowing advertisers to reach much of the web. In contrast, online services such as Facebook and Twitter run advertising platforms that primarily serve a single site (namely, Facebook and Twitter themselves). In this paper, we focus on single-site advertising platforms, but our results may also be applicable to more general display advertising on the web; we leave a full investigation of the extent to which this is the case to future work.

The operation of platforms such as Facebook and Twitter can be divided into two phases: *ad creation* and *ad delivery*. We provide more details on each below.

**Ad creation**   Ad creation refers to the process by which the advertiser submits their ad to the advertising platform. At a high level, the advertiser has to select three things when doing so:

(1) *Ad contents*: Advertisers will typically provide the ad headline, text, and any images/videos. Together, these are called the *ad creative*. They will also provide the link where the platform should send users who click.

(2) *Audience Selection/Targeting*: Advertisers need to select which platform users they would like to see the ad (called the *audience*).

(3) *Bidding strategy*: Advertisers need to specify how much they are willing to pay to have their ads shown. This can come in the form of a per-impression or per-click bid, or the advertiser can simply place an overall *bid cap* and allow the platform to bid on their behalf.

Once the advertiser has entered all of the above information, they submit the ad for review;[3] once it is approved, the ad will move to the ad delivery phase.

**Ad delivery**   Ad delivery refers to the process by which the advertising platform shows ads to users. For every opportunity to show a user an ad (e.g., an *ad slot* is available as the user is browsing the service), the ad platform will run an *ad auction* to determine, from among all of the ads that include the current user in the audience, which ad should be shown.

In practice, however, the ad delivery process is somewhat more complicated. *First*, the platforms try to avoid showing ads from the same advertiser repeatedly in quick succession to the same user; thus, the platforms will sometimes disregard bids for recent winners of the same user. *Second*, the platforms often wish to show users relevant ads; thus, rather than relying solely on the bid to determine the winner of the auction, the platform may incorporate a relevance score into consideration, occasionally allowing ads with lower bids but more relevance to win over those with higher bids. *Third*, the platforms may wish to evenly spread the advertiser budget over their specified time period, rather than use it all at once, which introduces additional complexities as to which ads should be considered for particular auctions. The exact mechanisms by which these issues are addressed are not well-described or documented by the platforms.

Once ads enter the ad delivery phase, the advertising platforms give advertisers information on how their ads are performing. Such information may include detailed breakdowns (e.g., along demographic or geographic lines) of the characteristics of users to whom their ad is being shown and those who click on the ad.

---

[3]Most platforms have a review process to prevent abuse or violations of their platforms' advertising policies [7, 76].



**Figure 1: Each ad has five elements that the advertiser can control: (1) the ad text, entered manually by the advertiser, (2) the images and/or videos, (3) the domain, pulled automatically from the HTML `meta` property `og:site_name` of the destination URL, (4) the title, pulled automatically from the HTML `meta` property `og:title` of the destination URL, and (5) the description from `meta` property `og:description` of the destination URL. The title and description can be manually customized by the advertiser if they wish.**

## 2.2    Facebook's advertising platform

In this paper, we focus on Facebook's advertising platform as it is one of the most powerful and feature-rich advertising platforms in use today. As such, we provide a bit more background here about the specific features and options that Facebook provides to advertisers.

**Ad contents**    Each ad placed on Facebook must be linked to a *Page*; advertisers are allowed to have multiple Pages and run ads for any of them. Ads can come in multiple forms, such as promoting particular posts on the page. However, for typical ads, the advertiser must provide (a) the headline and text to accompany the ad, and (b) one or more images or videos to show to the user. Optionally, the advertiser can provide a *traffic destination* to send the user to if they click (e.g., a Facebook Page or an external URL); if the advertiser provides a traffic destination, the ad will include a brief description (auto-generated from the HTML `meta` data) about this destination. Examples showing all of these elements are presented in Figure 1.

**Audience selection**    Facebook provides a wide variety of audience selection (or *targeting*) options [10, 11, 37, 68]. In general, these options fall into a small number of classes:

- *Demographics and attributes*: Similar to other advertising platforms [38, 70], Facebook allows advertisers to select audiences based on demographic information (e.g., age, gender, and location), as well as profile information, activity on the site, and data from third-parties. Recent work has shown that Facebook offers over 1,000 well-defined attributes and hundreds of thousands of free-form attributes [68].

- *Personal information*: Alternatively, Facebook allows advertisers to specify *the exact users* who they wish to target by either (a) uploading the users' personally identifiable information including names, addresses, and dates of birth [30, 72, 73], or (b) deploying web tracking pixels on third-party sites [33]. On Facebook, audiences created using either mechanism are called *Custom Audiences*.[4]

- *Similar users*: Advertisers may wish to find "similar" users to those who they have previously selected. To do so, Facebook allows advertisers to create *Lookalike Audiences*[5] by starting with a source Custom Audience they had previously uploaded; Facebook then "identif[ies] the common qualities of the people in it" and creates a new audience with other people who share those qualities [34].

Advertisers can often combine many of these features together, for example, by uploading a list of users' personal information and then using attribute-based targeting to further narrow the audience.

**Objective and bidding**    Facebook provides advertisers with a number of *objectives* to choose from when placing an ad [8], where each tries to maximize a different *optimization event* the advertiser wishes to occur. These include "Awareness" (simply optimizing for the most *impressions*, a.k.a. views), "Consideration" (optimizing for clicks, engagement, etc.), and "Conversion" (optimizing for sales generated by clicking the ad). For each objective, the advertiser bids on the objective itself (e.g., for "Awareness", the advertiser would bid on ad impressions). The bid can take multiple forms, and includes the start and end time of the ad campaign and either a lifetime or a daily budget cap. With these budget caps, Facebook places bids in ad auctions on the advertisers' behalf. Advertisers can optionally specify a per-bid cap as well, which will limit the amount Facebook would bid on their behalf for a single optimization event.

**Facebook's ad auction**    When Facebook has ad slots available, it runs an ad auction among the active advertisements bidding for that user. However, the auction does not just use the bids placed by the advertisers; Facebook says [35]:

> The ad that wins an auction and gets shown is the one with the highest *total value* [emphasis added]. Total value isn't how much an advertiser is willing to pay us to show their ad. It's combination of 3 major factors: (1) Bid, (2) Estimated action rates, and (3) Ad quality and relevance.

Facebook defines "Estimated action rates" as "how well an ad performs", meaning whether or not *users in general* are engaging with the ad [5]. They define "Ad quality and relevance" as "how interesting or useful we think a given user is going to find a given ad", meaning how much *a particular user* is likely to be interested in the ad [5].

Thus, it is clear that Facebook attempts to identify the users within an advertiser's selected audience who they believe would find the ad most useful (i.e., those who are most likely to result in

---

[4]Google, Twitter, and Pinterest all provide similar features; these are called *Customer Match* [6], *Tailored Audiences*, and *Customer Lists* [60], respectively.
[5]Google and Pinterest offer similar features: on Google it is called *Similar Audiences* [39], and on Pinterest it is called *Actalike Audiences* [62].

an optimization event) and shows the ad preferentially to those users. Facebook says exactly as such in their documentation [4]:

> During ad set creation, you chose a target audience ... and an optimization event ... We show your ad to people in that target audience who are likely to get you that optimization event

Facebook provides advertisers with an overview of how well-matched it believes an ad is with the target audience using a metric called *relevance score*, which ranges between 1 and 10. Facebook says [67]:

> Relevance score is calculated based on the positive and negative feedback we expect an ad to receive from its target audience.

Facebook goes on to say [67]:

> Put simply, the higher an ad's relevance score, the less it will cost to be delivered. This is because our ad delivery system is designed to show the right content to the right people, and a high relevance score is seen by the system as a positive signal.

**Statistics and reporting**    Facebook provides advertisers with a feature-rich interface [26] as well as a dedicated API [55] for both launching ads and monitoring those ads as they are in ad delivery. Both the interface and the API give semi-live updates on delivery, showing the number of impressions and optimization events as the ad is running. Advertisers can also request this data be broken down along a number of different dimensions, including age, gender, and location (Designated Market Area [57], or DMA, region). Notably, the interface and API *do not* provide a breakdown of ad delivery along racial lines; thus, analyzing delivery along racial lines necessitates development of a separate methodology that we describe in the next section.

**Anti-discrimination rules**    In response to issues of potential discrimination in online advertising reported by researchers and journalists [29], Facebook currently has several policies in place to avoid discrimination for certain types of ads. Facebook also recently built tools to automatically detect ads offering housing, employment, and credit, and pledged to prevent the use of certain targeting categories with those ads. [45]. Additionally, Facebook relies on advertisers to self-certify [15] that they are not in violation of Facebook's advertising policy prohibitions against discriminatory practices [27]. More recently, in order to settle multiple lawsuits stemming from these reports, Facebook no longer allows age, gender, or ZIP code-based targeting for housing, employment or credit ads, and blocks other detailed targeting attributes that are "describing or appearing to relate to protected classes" [22, 44, 59].

## 2.3   Related work

Next, we detail related work on algorithm auditing, transparency, and discriminatory ad targeting.

**Auditing algorithms for fairness**    Following the growing ubiquity of algorithms in daily life, a community formed around investigating their societal impacts [65]. Typically, the algorithms under study are not available to outside auditors for direct examination; thus, most researchers treat them as "black boxes" and observe their reactions to different inputs. Among most notable results, researchers have shown price discrimination in online retail sites [42], gender discrimination in job sites [16, 43], stereotypical gender roles re-enforced by online translation services [12] and image search [46], disparate performance on gender classification for Black women [13], and political partisanships in search [20, 50, 63]. Although most of the work focused exclusively on the algorithms themselves, recently researchers began to point out that auditors should consider the entire socio-technical systems that include the users of those algorithms, an approach referred to as "algorithm-in-the-loop" [40, 66]. Furthermore, recent work has demonstrated that fairness is not necessarily composable, i.e., for several notions of fairness such as individual fairness [24], a collection of classifiers that are fair in isolation do not necessarily result in a fair outcome when they are used as part of a larger system [25].

**Advertising transparency**    In parallel to the developments in detecting and correcting unfairness, researchers have conducted studies and introduced tools with the aim of increasing transparency and explainability of algorithms and their outcomes. For example, much attention has been dedicated to shedding light on the factors that influence the targeting of a particular ad on the web [52, 53, 61, 78] and on specific services [19, 77].

Focusing on Facebook, Andreou et al. investigated the transparency initiative from Facebook that purportedly tells users why they see particular targeted ads [11]. They found that the provided explanations are incomplete and, at times, misleading. Venkatadri et al. introduced the tool called "TREADS" that attempts to close this gap by providing Facebook users with detailed descriptions of their inferred attributes using the ads themselves as a vehicle [74]. Further, they investigated how data from third-party data brokers is used in Facebook's targeting features and—for the first time—revealed those third-party attributes to the users themselves using TREADS [75]. Similar to other recent work [58], Venkatadri et al. found that the data from third-party data brokers had varying accuracy [75].

**Discrimination in advertising**    As described above, Facebook has some policies and tools in place to prevent discriminatory ad targeting. However, advertisers can still exclude users based on a variety of interests that are highly correlated with race by using custom audiences [68], or by using location [36, 49]. Separately, Sweeney [69] and Datta et al. [19] have studied discrimination in Google's advertising system.

The work just described deals with identifying possibilities for the advertisers to run discriminatory ads using the platform's features. In contrast, other researchers, as well as and HUD's recent complaint, have suggested that discrimination may be introduced by the ad platform itself, rather than by a malicious advertiser [19, 41, 51, 71]. For example, Lambrecht et al. ran a series of ads for STEM education and found they were consistently delivered more to men than to women, even though there are more female users on Facebook, and they are known to be more likely to click on ads and generate conversions [51]. Datta et al. explored ways that discrimination could arise in the targeting and delivery of

job-related ads, and analyzed how different parties might be liable under existing law [18]. Our work explores these findings in depth, separating market effects from optimization effects and exploring the mechanisms by which ads are delivered in a skewed manner.

## 3   METHODOLOGY

We now describe our methodology for measuring the delivery of Facebook ads. At a high level, our goal is to run groups of ads where we vary a particular feature, with the goal of then measuring how changing that feature skews the set of users the Facebook platform delivers the ad to. To do so, we need to carefully control which users are in our target audience. We also need to develop a methodology to measure the ad delivery skew along racial lines, which, unlike gender, is not provided by Facebook's existing reporting tools. We detail how we achieve that in the following sections.

### 3.1   Audience selection

When running ads, we often wish to control exactly which ad auctions we are participating in. For example, if we are running multiple instances of the same ad (e.g., to establish statistical confidence), we do not want the instances to be competing against each other. To this end, we use random PII-based custom audiences, where we randomly select U.S. Facebook users to be included in mutually-exclusive audiences. By doing so, we can ensure that our ads are only competing against each other in the cases where we wish them to. We also replicate some of the experiments while targeting all U.S. users to ensure that the effects do not only exist when custom audiences are targeted. As we show later in Section 4, we observe equivalent skews in these scenarios, which leads us to believe that preventing internal competition between our own ads is not crucial to measure the resulting skews.

**Generating custom audiences**   We create each custom audience by randomly generating 20 lists of 1,000,000 distinct, valid North American phone numbers (+1 XXX XXX XXXX, using known-valid area codes). Facebook reported that they were able to match approximately 220,000 users on each of the 20 lists we uploaded.

Initially, we used these custom audiences directly to run ads, but while conducting the experiments we noticed that—even though we specifically target only North American phone numbers—many ads were delivered to users outside of North America. This could be caused by users traveling abroad, users registering with fake phone numbers or with online phone number services, or for other reasons, whose investigation is outside the scope of this paper. Therefore, for all the experiments where we target custom audiences, we additionally limit them to people located in the U.S.

### 3.2   Data collection

Once one of our ad campaigns is run, we use the Facebook Marketing API to obtain the delivery performance statistics of the ad every two minutes. When we make this request, we ask Facebook to break down the ad delivery performance according to the attribute of study (age, gender, or location). Facebook's response to each query features the following fields, among others, for each of the demographic attributes that we requested:

- `impressions`: The number of times the ad was shown

- `reach`: The number of unique users the ad was shown to
- `clicks`: The number of clicks the ad has received
- `unique_clicks`: The number of unique users who clicked

Throughout the rest of the paper, we use the `reach` value when examining delivery; thus, when we report "Fraction of men in the audience" we calculate this as the `reach` of men divided by the sum of the `reach` of men and the `reach` of women (see Section 3.5 for discussion on using binary values for gender).

### 3.3   Measuring racial ad delivery

The Facebook Marketing API allows advertisers to request a break-down of ad delivery performance along a number of axes but it does not provide a breakdown based on race. However, for the purposes of this work, we are able to measure the ad delivery breakdown along racial lines by using location (Designated Market Area, or DMA[6]) as a proxy.

Similar to prior work [68], we obtain voter records from North Carolina; these are publicly available records that have the name, address, race, and often phone number of each registered voter in the state. We partition the most populated North Carolina DMAs into two sets; for the exact DMAs, please see Table 1. We ensure that each racial group (white and Black) from a set of DMAs has a matching number of records of the other group in the other set of DMAs. We sample three audiences (A, B, and C) that fit these constraints from the voter records and upload as separate Custom Audiences to Facebook.[7] Audiences A and B are disjoint from each other; audience C contains the voters from A with additional white voters from the first DMA set and Black voters from the second DMA set. We create audiences in this way to be able to test both "flipped" versions of the audiences (A and B), as well as large audiences with as many users as possible (C); we created audience B as large as possible (exhausting all voters who fit the necessary criteria), and sampled audience A to match its size. The details of the resulting audiences are shown in Table 1.

When we run ads where we want to examine the ad delivery along racial lines, we run the ads to one audience (A, B, or C). We then request that Facebook's Marketing API deliver us results broken down by DMA. Because we selected DMAs to be a proxy for race, we can use the results to infer which custom audience they were originally in, allowing us to determine the racial makeup of the audience who saw (and clicked on) the ad. Note that in experiments that involve measuring racial skew all ads target the same target audience. The limited number of registered voters does not allow us to create many large, disjoint custom audiences like we do in other experiments. However, as we show with ads targeting all U.S. users, internal competition does not appear to influence the results.

### 3.4   Ad campaigns

We use the Facebook Ad API described in Section 2.2 to create all ads for our experiments and to collect data on their delivery. We

---

[6]Designated Market Areas [57] are groups of U.S. counties that Neilson defines as "market areas"; they were originally used to signify a region where users receive similar broadcast television and radio stations. Facebook reports ad delivery by location using DMAs, so we use them here as well.

[7]Unfortunately, Facebook does not report the number of these users who match as we use multiple PII fields in the upload file [72].

| DMA(s) [57] | # Records (A) | | # Records (B) | | # Records (C) | |
|---|---|---|---|---|---|---|
| | White | Black | White | Black | White | Black |
| Wilmington, Raleigh–Durham | 400,000 | 0 | 0 | 400,000 | 900,002 | 0 |
| Greenville-Spartanburg, Greenville-New Bern, Charlotte, Greensboro | 0 | 400,000 | 400,000 | 0 | 0 | 892,097 |

**Table 1: Overview of the North Carolina custom audiences used to measure racial delivery. We divide the most populated DMAs in the state into two sets, and create three audiences each with one race per DMA set. Audiences $A$ and $B$ are disjoint from each other; audience $C$ contains the voters from $A$ with additional white voters from the first DMA set and Black voters from the second DMA set. We then use the statistics Facebook reports about delivery by DMAs to infer delivery by race.**

carefully control for any time-of-day effects that might be present due to different user demographics using Facebook at different times of the day: for any given experiment, we run all ads at the same time to ensure that any such effects are experienced equally by all ads. Unless otherwise noted, we used the following settings:

- *Objective:* Consideration→Traffic[8]
- *Optimization Goal:* Link Clicks
- *Traffic destination:* An external website (that depends on the ads run)
- *Creative:* All of our ads had a single image and text relevant to the ad.
- *Audience selection:* We use custom audiences for many of our ads, as described in Section 3.1, and further restrict them to adult (18+) users of all genders residing in the United States. For other ads, we target all U.S. users age 18 or older.
- *Budget:* We ran most ads with a budget of $20 per day, and stopped them typically after six hours.

### 3.5 Measuring and comparing audiences

We now describe the measurements we make during our experiments and how we compute their confidence intervals.

**Binary values of gender and race**    Facebook's marketing API reports "female", "male", and "uncategorized" as the possible values for gender. Facebook's users self-report their gender, and the available values are "female", "male", and "custom". The latter allows the user to manually type in their gender (with 60 predefined gender identities suggested through auto-complete functionality) and select the preferred pronoun from "female - her", "male - him", and "neutral - them". Across our experiments, we observe that up to 1% of the audiences are reported as "uncategorized" gender. According to Facebook's documentation this represents the users who did not not list their gender.[9] We do not know whether the

"uncategorized" gender also features users with self-reported "custom" gender. Thus, in this work we only consider the self-reported binary gender values of "female" and "male".

Further, when considering racial bias, we use the self-reported information from voter records. The data we obtained has 7,560,885 individuals, with 93% reporting their race as either Black or White. Among those, less than 1% report their ethnicity as "Hispanic/Latino". Thus, in this work, we only target the individuals with self-reported race of White or Black. However, when running our experiments measuring race (and targeting specific DMAs), we observe that a fraction (∼10%) of our ads are delivered to audiences outside of our predefined DMAs, thus making it impossible for us to infer their race. This fraction remains fairly consistent across our experiments regardless of what we advertise, thus introducing the same amount of noise across our measurements. This is not entirely unexpected, as we are targeting users directly, and those users may be traveling, may have moved, may have outdated information in the voter file, etc.

We do not claim that gender or race are binary, but choose to focus the analysis on users who self-reported their gender as "female" or "male" and race as "Black" or "White". In this work, we report the observable skew in delivery only along these axes. We recognize that delivery can be *further* skewed with respect to gender of non-binary users and/or users of other races in a way that remains unreported in this work.

**Measuring statistical significance**    Using the binary race and gender features, throughout this work, we describe the audiences by the fraction of male users and the fraction of white users. We calculate the lower and upper limits of the 99% confidence interval around this fraction using the method recommended by Agresti and Coull [9], defined in Equation 1:

$$L.L. = \frac{\hat{p} + \frac{z_{\alpha/2}^2}{2n} - z_{\alpha/2}\sqrt{\frac{\hat{p}(1-\hat{p})}{n} + \frac{z_{\alpha/2}^2}{4n^2}}}{1 + z_{\alpha/2}^2/n},$$

$$U.L. = \frac{\hat{p} + \frac{z_{\alpha/2}^2}{2n} + z_{\alpha/2}\sqrt{\frac{\hat{p}(1-\hat{p})}{n} + \frac{z_{\alpha/2}^2}{4n^2}}}{1 + z_{\alpha/2}^2/n},$$

(1)

---

[8]This target is defined as: Send more people to a destination on or off Facebook such as a website, app, or Messenger conversation.
[9]https://www.facebook.com/business/help/151999381652364

where $L.L.$ is the lower confidence limit, $U.L.$ is the upper confidence limit, $\hat{p}$ is the observed fraction of the audience with the attribute (here: male), $n$ is the size of the audience reached by the ad. To obtain the 99% interval we set $z_{\alpha/2} = 2.576$. The advantage of using this calculation instead of the more frequently used normal approximation

$$p \pm z_{\alpha/2}\sqrt{\frac{\hat{p}(1-\hat{p})}{n}} \tag{2}$$

is that the resulting intervals fall in the $(0,1)$ range. Whenever the confidence intervals around these fractions for two audiences are non-overlapping, we can make a claim that the gender or racial makeups of two audiences are significantly different [17]. However, the converse is not true: overlapping confidence intervals do not necessarily mean that the means are not different (see Figure 4 in [17] for explanation). In this work we report all the results of our experiments but for easier interpretation emphasize those where the confidence intervals are non-overlapping. We further confirm that the non-overlapping confidence intervals represent statistically significant differences, using the difference of proportion test as shown in Equation 3:

$$Z = \frac{(\hat{p_1} - \hat{p_2}) - 0}{\sqrt{\hat{p}(1-\hat{p})(\frac{1}{n_1} + \frac{1}{n_2})}} \tag{3}$$

where $\hat{p_1}$ and $\hat{p_2}$ are the fractions of men (white users) in the two audiences that we compare, $n_1$ and $n_2$ are sizes of these audiences, and $\hat{p}$ is the fraction of men (white users) in the combined delivery audiences. All the results we refer to as statistically significant are significant in this test with a $Z$-score of at least 2.576. Finally, as we present in the Appendix, the comparisons presented are statistically significant also after the application of Bonferroni correction [14] for multiple hypotheses testing.

Note that in experiments where we run multiple instances of an ad targeting disjoint custom audiences, the values of $\hat{p}$ and $n$ are calculated from the sums of reached audiences.

# 4   EXPERIMENTS

In this section, we explore how an advertiser's choice of ad creative (headline, text, and image) and ad campaign settings (bidding strategy, targeted audience) can affect the demographics (gender and race) of the users to whom the ad is ultimately delivered.

## 4.1   Budget effects on ad delivery

We begin by examining the impact that market effects can have on delivery, aiming to test the hypothesis put forth by Lambrecht et al. [51]. In particular, they observed that their ads were predominantly shown to men even though women had consistently higher click through rates (CTRs). They then hypothesized that the higher CTRs led to women being more expensive to advertise to, meaning they were more likely to lose auctions for women when compared to auctions for men.

We test this hypothesis by running the same ad campaign with different budgets; our goal is to measure the effect that the daily budget alone has on the makeup of users who see the ads. When running these experiments, we keep the ad creative and targeted audience constant, only changing the bidding strategy to give Facebook different daily limits (thus, any ad delivery differences can be



**Figure 2: Gender distributions of the audience depend on the daily budget of an ad, with higher budgets leading to a higher fraction of women. The left graph shows an experiment where we target all users located in the U.S.; the right graph shows an experiment where we target our random phone number custom audiences.**

attributed to the budget alone). We run an ad with daily budget limits of $1, $2, $5, $10, $20, and $50, and run multiple instances at each budget limit for statistical confidence. Finally, we run the experiment twice, once targeting our random phone number custom audiences, and once targeting all users located in U.S.; we do so to verify that any effect we see is not a function of our particular target audience, and that it persists also when non-custom audiences are targeted.

Figure 2 presents the results, plotting the daily budget we specify versus the resulting fraction of men in the audience. The left graph shows the results when we target all users located in the U.S., and the right graph shows the results when we target the random phone number custom audiences. In both cases, we observe that changes in ad delivery due to differences in budget are indeed happening: the higher the daily budget, the smaller the fraction of men in the audience, with the Pearson's correlation of $\rho = -0.88$, $p_{val} < 10^{-5}$ for all U.S. users and $\rho = -0.73$, $p_{val} < 10^{-3}$ for the custom audiences.

The stronger effect we see when targeting all U.S. users may be due to the additional freedom that the ad delivery system has when choosing who to deliver to, as this is a significantly larger audience.

To eliminate the impact that market effects can have on delivery in our following experiments, we ensure that all runs of a given experiment use the same bidding strategy and budget limit. Typically we use a daily budget of $20 per campaign.

## 4.2   Ad creative effects on ad delivery

Now we examine the effect that the ad creative (headline, text, and image) can have on ad delivery. To do so, we create two stereotypical ads that we believe would appeal primarily to men and women, respectively: one ad focusing on *bodybuilding* and another on *cosmetics*. The actual ads themselves are shown in Figure 1. We run each of the ads at the same time and with the same bidding strategy and budget. For each variable we target different custom audiences, i.e., the "base" level ads target one audience, "text" level ads target another, etc. *Note that we do not explicitly target either ad based on gender; the only targeting restrictions we stipulate are 18+ year old users in the U.S.*



**Figure 3:** "Base" ad contains a link to a page about either bodybuilding or cosmetics, a blank image, no text, or headline. There is a small difference in the fraction of male users for the base ads, and adding the "text" only decreases it. Setting the "headline" sets the two ads apart but the audience of each is still not significantly different than that of the base version. Finally, setting the ad "image" causes drastic changes: the bodybuilding ad is shown to a 91% male audience, the cosmetics ad is shown to a 5% male audience, despite the same target audience.

We observe dramatic differences in ad delivery, even though the bidding strategy is the same for all ads, and each pair of ads target the same gender-agnostic audience. In particular, the bodybuilding ad ended up being delivered to over 75% men on average, while the cosmetics ad ended up being delivered to over 90% women on average. Again, this skewed delivery is despite the fact that we—the advertiser—did not specify difference in budget or target audience.

**Individual components' impact on ad delivery**   With the knowledge that the ad creative can skew delivery, we dig deeper to determine *which* of the components of the ad creative (headline, text, and image) have the greatest effect on ad delivery. To do so, we stick with the bodybuilding and cosmetics ads, and "turn off" various features of the ad creative by replacing them with empty strings or blank images. For example, the bodybuilding experiment listed as "base" includes an empty headline, empty ad text, and a blank white image; it does however link to the domain bodybuilding.com. Similarly, the cosmetics experiment listed as "base" includes no headline, text, or image, but does link to the domain elle.com. We then add back various parts of the ad creative, as shown in Figure 1.

The results of this experiment are presented in Figure 3. Error bars in the figure correspond to 99% confidence intervals as defined in Equation 1. All results are shown relative to that experiment's "base" ad containing only the destination URL. We make a number of observations. *First*, we can observe an ad delivery difference due to the destination URL itself; the base bodybuilding ad delivers to 48% men, while the base cosmetics ad delivers to 40% men. *Second*, as we add back the title and the headline, the ad delivery does not appreciably change from the baseline. However, once we introduce the image into the ad, the delivery changes dramatically, returning to the level of skewed delivery discussed above (over 75% male for bodybuilding, and over 90% female for cosmetics). When we add the text and/or the headline back alongside the image, the skew of delivery does not change significantly compared to the presence of image only. Overall, our results demonstrate that the choice of ad



**Figure 4:** Ad delivery of original bodybuilding and cosmetics ads, as well as the same ads with incongruent images. Skew in delivery is observed from the beginning, and using incongruent images skews the delivery to a lesser degree.

image can have a dramatic effect on which users in the audience ultimately are shown the ad.

**Swapping images**   To further explore how the choice of image impacts ad delivery, we continue using the bodybuilding and cosmetics ads, and test how ads with incongruent images and text are delivered. Specifically, we swap the images between the two ads, running an ad with the bodybuilding headline, text, and destination link, but with the image from cosmetics (and vice versa). We also run the original ads (with congruent images and text) for comparison.

The results of this experiment are presented in Figure 4, showing the skew in delivery of the ads over time. The color of the lines indicates the image that is shown in the ad; solid lines represent the delivery of ads with images consistent with the description, while dotted lines show the delivery for ads where image was replaced. We make a number of observations. *First*, when using congruent ad text and image (solid lines), we observe the skew we observed before. However, we can now see clearly that this delivery skew appears to exist from the very beginning of the ad delivery, i.e., before users begin viewing and interacting with our ads. We will explore this further in the following section. *Second*, we see that when we switch the images—resulting in incongruent ads (dotted lines)—the skew still exists but to a lesser degree. Notably, we observe that the ad with an image of bodybuilding but cosmetics text delivers closest to 50:50 across genders, but the ad with the image of cosmetics but bodybuilding text does not. The exact mechanism by which Facebook decides to use the ad text and images in influencing ad delivery is unknown, and we leave a full exploration to future work.

**Swapping images mid-experiment**   Facebook allows advertisers to change their ad while it is running, for example, to update the image or text. As a final point of analysis, we examine how changing the ad creative mid-experiment—after it has started running—affects ad delivery. To do so, we begin the experiment with the original congruent bodybuilding and cosmetics ads; we let these run for over six hours. We then swap the images on the running ads, thereby making the ads incongruent, and examine how ad delivery changes.

Figure 5 presents the results of this experiment. In the top graph, we show the instantaneous ad delivery skew: as expected, the congruent ads start to deliver in a skewed manner as we have





**Figure 5: When we flip the image in the middle of the campaign, the ad is reclassified and shown to an updated audience. Here, we start bodybuilding and cosmetics ads with corresponding descriptions and after 6 hours and 32 minutes we flip the images. Within an hour of the change, the gender proportions are reversed, while there is no significant difference between the click through rates per gender pre and post flipping of the images.**

**Table 2: Diagram of the images used in the transparency experiments. Shown are the five stereotypical masculine and feminine images, along with the same images with a 98% alpha channel, denoted as invisible. The images with the alpha channel are almost invisible to humans, but are still delivered in a skewed manner.**

previously seen. After the image swap at six hours, we notice a very rapid change in delivery with the ads almost completely flipping in ad delivery skew in a short period of time. Interestingly, we do not observe a significant change in users' behavior to explain this swap: the bottom graph plots the click through rates (CTRs) for both ads by men and women over time. Thus, our results suggest that the change in ad delivery skew is unlikely to be due to the users' responses to the ads.

### 4.3 Source of ad delivery skew

We just observed that ads see a significant skew in ad delivery due to the contents of the ad, despite the bidding strategy and targeting parameters being held constant. However, we observed that the ad delivery skew was present from the very beginning of ad delivery, and that swapping the image in the middle of a run resulted in a very rapid change in ad delivery that could not be explained by how frequently users click on our ads. We now turn to explore the mechanism that may be leading to this ad delivery skew.

**Almost-transparent images**   We begin with the hypothesis that Facebook itself is automatically classifying the ad creative (including the image), and using the output of this classification to calculate a predicted relevance score to users. In other words, we hypothesize that Facebook is running automatic text and image

classification, rather than (say) relying on the ad's initial performance, which would explain (a) the delivery skew being present from the beginning of ad delivery, and (b) how the delivery changes rapidly despite no significant observable change in user behavior. However, validating this hypothesis is tricky, as we are not privy to all of Facebook's ad performance data.

To test this hypothesis, we take an alternate approach. We use the *alpha channel* that is present in many modern image formats; this is an additional channel that allows the image to encode the *transparency* of each pixel. Thus, if we take an image and add an alpha channel with (say) 99% opacity, all of the image data will still be present in the image, but any human who views the image would not be able to see it (as the image would show almost completely transparent). However, if an automatic classifier exists, and if that classifier is not properly programmed to handle the alpha channel, it may continue to classify the image.

**Test images**   To test our hypothesis, we select five images that would stereotypically be of interest to men and five images that would stereotypically be of interest to women; these are shown in the second and fourth columns of Table 2.[10, 11] We convert them

---

[10] All of these images were cropped from images posted to pexels.com, which allow free non-commercial use.

[11] We cropped these images to the Facebook-recommended resolution of 1,080×1,080 pixels to reduce the probability Facebook would resample the image.

to PNG format add an alpha channel with 98% opacity[12] to each of these images; these are shown in the third and fifth columns of Table 2. Because we cannot render a transparent image without a background, the versions in the paper are rendered on top of a white background. As the reader can see, these images are not discernible to the human eye.

We first ran a series of tests to observe how Facebook's ad creation phase handled us uploading such transparent images. If we used Reach as our ad objective, we found that Facebook "flattened" these images onto a white background in the ad preview.[13] By targeting ourselves with these Reach ads, we verified that when they were shown to users on the Facebook mobile app or in the desktop Facebook web feed, the images did indeed show up as white squares. Thus, we can use this methodology to test whether there is an automatic image classifier present by examining whether running different transparent white ads results in different delivery.

**Results**    We run ads with all twenty of the images in Table 2, alongside ads with five truly blank white images for comparison. For all 25 of these ads, we hold the ad headline, text, and destination link constant, run them all at the same time, and use the same bidding strategy and target custom audiences in a way that each user is potentially exposed to up to three ads (one masculine image, one feminine image, and one blank image). We then record the differences in ad delivery of these 25 images along gender lines. The results are presented in Figure 6A, with all five images in each of the five groups aggregated together. We can observe that ad delivery is, in fact, skewed, with the ads with stereotypically masculine images delivering to over 43% men and the ads with feminine images delivering to 39% men in the experiment targeting custom audiences as well as 58% and 44% respectively in the experiment targeting all U.S. users. Error bars in the plot correspond to the 99% confidence interval calculated using Equation 1.

Interestingly, we also observe that the masculine invisible ads appear to be indistinguishable in the gender breakdown of their delivery from the masculine visible ads, and the feminine invisible ads appear to be indistinguishable in their delivery from the feminine visible ads.

As shown in Figure 6A, we verify that the fraction of men in the delivery of the male ads is significantly higher than in female-centered and neutral ads, as well as higher in neutral ads than in female-centered ads. We also show that we cannot reject the null hypothesis that the fraction of men in the two versions of each ad (one visible, one invisible) are the same. Thus, we can conclude that the difference in ad delivery of our invisible male and female images is statistically significant, despite the fact that humans would not be able to perceive any differences in these ads. This strongly suggests that our hypothesis is correct: that Facebook has an automated image classification mechanism in place that is



**Figure 6: Fraction of reached men in the audiences for ads with the images from Table 2, targeting random phone number custom audience (A) and US audience (B). The solid markers are visible images, and the hollow markers are the same images with 98% opacity. Also shown is the delivery to truly white images ("blank"). We can observe that a difference in ad delivery exists, and that that difference is statistically significant between the masculine and feminine invisible images. This suggests that automated image classification is taking place.**

used to steer different ads towards different subsets of the user population.[14]

To confirm this finding, we re-run the same experiment except that we change the target audience from our random phone number custom audiences (hundreds of thousands of users) to all U.S. users (over 320 million users). Our theory is that if we give Facebook's algorithm a larger set of auctions to compete in, any effect of skewed delivery would be amplified as they may be able to find more users for whom the ad is highly "relevant". In Figure 6B we observe that the ad delivery differences are, indeed, even greater: the male visible and invisible images deliver to approximately 60% men, while the female visible and invisible images deliver to approximately 45% men. Moreover, the statistical significance of this experiment is even stronger, with a $Z$ value over 10 for the ad delivery difference between the male invisible and female invisible ads.

### 4.4   Impact on real ads

We have observed that differences in the ad headline, text, and image can lead to dramatic difference in ad delivery, despite the bidding strategy and target audience of the advertiser remaining the same. However, all of our experiments thus far were on test ads where we typically changed only a single variable. We now turn to examine the impact that ad delivery can have on realistic ads, where all properties of the ad creative can vary.

**Entertainment ads**    We begin by constructing a series of benign entertainment ads that, while holding targeting parameters fixed (targeting custom audience $C$ from Table 1, are stereotypically of interest to different races. Namely, we run three ads leading to lists of best albums in the previous year: general top 30 (neutral), top

---

[12]We were unable to use 100% transparency as we found that Facebook would run an image hash over the uploaded images and would detect different images with 100% opacity to be the same (and would refuse to upload it again). By using 98% transparency, we ensure that the images were still almost invisible to humans but that Facebook would not detect they were the same image.

[13]Interestingly, we found that if we instead used Traffic as our ad objective, Facebook would both "flatten" these images onto a white background *and then normalize the contrast.* This caused the ads to be visible to humans—simply with less detail than the original ads—thus defeating the experiment. We are unsure of why Facebook did not choose to normalize images with the objective for Reach.

[14]It is important to note we not know exactly how the classification works. For example, the classifier may also be programmed to take in the "flattened" images that appear almost white, but there may sufficient data present in the images for the classification to work. We leave a full exploration of how exactly the classifier is implemented to future work.



**Figure 7: We run three campaigns about the best selling albums. *Top 30* is neutral, targeting all. *Country* implicitly targets white users, and *Hip-hop* implicitly targets Black users. Facebook classification picks up on the implicit targeting and shows it to the audience we would expect.**

country music (stereotypically of interest mostly to white users), and top hip-hop albums (stereotypically of interest mostly to Black users). We find that Facebook ad delivery follows the stereotypical distribution, despite all ads being targeted in the same manner and using the same bidding strategy. Figure 7 shows the fraction of white users in the audience in the three different ads, treating race as a binary (Black users constitute the remaining fraction). Error bars represent 99% confidence intervals calculated using Equation 1.

Neutral ads are seen by a relatively balanced, 45% white audience, while the audiences receiving the country and hip-hop ads are 80% and 13% white, respectively. Assuming significant population level differences of preferences, it can be argued that this experiment highlights the "relevance" measures embedded in ad delivery working as intended. Next, we investigate cases where such differences may not be desired.

**Employment ads**     Next, we advertise eleven different generic job types: artificial intelligence developer, doctor, janitor, lawyer, lumberjack, nurse, preschool teacher, restaurant cashier, secretary, supermarket clerk, and taxi driver. For each ad, we customize the text, headline, and image as a real employment ad would. For example, we advertise for taxi drivers with the text "Begin your career as a taxi driver or a chauffeur and get people to places on time." For each ad, we link users to the appropriate category of job listings on a real-world job site.

When selecting the ad image for each job type, we select five different stock photo images: one that has a white male, one that has a white female, one that has a black male, one that has a black female, and one that is appropriate for the job type but has no people in it. We run each of these five independently to test a representative set of ads for each job type, looking to see how they are delivered along gender and racial lines (targeting custom audience *C* from Table 1). We run these ads for 24 hours, using the objective of Traffic, all targeting the same audience with the same bidding strategy.

The results of this experiment are presented in Figure 8, plotting the distribution of each of our ads along gender (left graph) and racial (right graph) lines. As before, the error bars represent the 99% confidence interval calculated using Eq. 1. We can immediately observe drastic differences in ad delivery across our ads along both racial and gender lines: our five ads for positions in the lumber industry deliver to over 90% men and to over 70% white users in aggregate, while our five ads for janitors deliver to over 65%



**Figure 8: Results for employment ads, showing a breakdown of ad delivery by gender (left figure) and race (right figure) in the ultimate delivery audience. The labels refer to the race/gender of the person in the ad image (if any). The jobs themselves are ordered by the average fraction of men or white users in the audience. Despite the same bidding strategy, the same target audience, and being run at the same time, we observe significant skew along on both racial and gender lines due to the content of the ad alone.**

women and over 75% black users in aggregate. Recall that the only difference between these ads are the ad creative and destination link; we (the advertiser) used the same bidding strategy and target audience, and ran all ads at the same time.

Furthermore, we note that the skew in delivery cannot merely be explained by possibly different levels of competition from other advertisers for white and Black users or for male and female users. Although it is the case that each user may be targeted by a different

number of advertisers with varying bid levels, by virtue of running all of our job ads at the same time, targeting the same users, with the same budget, we are ensuring that our ads are experiencing competition from other advertisers identically. In other words, our ad targeting asks that every user who is considered for our "lumberjack" job ad should also be considered for our taxi driver job ad, so these ads should be competing with each other and facing identical competition from other advertisers at auction time. If the content of the ad was not taken into account by the delivery optimization system, then the ads would be expected to have similar—though not necessarily even—breakdowns by race and gender at delivery. Our experiment demonstrates that this is not the case, and thus, aspects of ad delivery optimization, rather than merely advertiser competition, influence the skew in the delivery outcome.

**Housing ads**     Finally, we create a suite of ads that advertise a variety of housing opportunities, as discrimination in online housing ads has recently been a source of concern [28]. We vary the type of property advertised (rental vs. purchase) and the implied cost (fixer-upper vs. luxury). In each ad, the cost is implied through wording of the ad as well as the accompanying image. Each ad points to a listing of houses for sale or rental apartments in North Carolina on a real-world housing site. Simultaneously, we ran a baseline ad with generic (non-housing) text that simply links to `google.com`. All of the ads ran for 12 hours, using the objective of Traffic, all targeting the same North Carolina audiences and using the same bidding strategy. We construct the experiment such that each particular ad is run twice: once targeting audience $A$ and once targeting audience $B$ (see Table 1) This way we eliminate any potential geographical effects (for example, users in Wilmington could be interested in cheap houses to buy, and users in Charlotte could be interested in luxury rentals regardless of their ethnicity, but if we only used audience $C$ that effect could appear as racial skew).

We present the results in Figure 9 (we found little skew for the housing ads along gender lines, and we omit those results). We observe significant ad delivery skew along racial lines in the delivery of our ads, with certain ads delivering to an audience of over 72% Black users (comparable to the baseline results) while others delivering to an audience of as little as 51% Black users.

As with the employment ads, we cannot make claims about what particular properties of our ads lead to this skew, or about how housing ads in general are delivered. However, given the significant skew we observe with our suite of ads, it indicates the further study is needed to understand how real-world housing ads are delivered.

## 5   CONCLUDING DISCUSSION

To date, the public debate and ad platform's comments about discrimination in digital advertising have focused heavily on the targeting features offered by advertising platforms, and the ways that advertisers can misuse those features [23].

In this paper, we set out to investigate a different question: *to what degree and by what means may advertising platforms themselves play a role in creating discriminatory outcomes?*

Our study offers an improved understanding of the mechanisms behind and impact of ad delivery, a process distinct from ad creation and targeting. While ad targeting is facilitated by an advertising



**Figure 9: Results for housing ads, showing a breakdown in the ad delivery audience by race. Despite being targeted in the same manner, using the same bidding strategy, and being run at the same time, we observe significant skew in the makeup of the audience to whom the ad is delivered (ranging from estimated 27% white users for luxury rental ads to 49% for cheap house purchase ads).**

platform—but nominally controlled by advertisers—ad delivery is conducted and controlled by the advertising platform itself. We demonstrate that, during the ad delivery phase, advertising platforms can play an independent, central role in creating skewed, and potentially discriminatory, outcomes. More concretely, we have:

- Replicated and affirmed prior research suggesting that market and pricing dynamics can create conditions that lead to differential outcomes, by showing that the lower the daily budget for an ad, the fewer women it is delivered to.
- Shown that Facebook's ad delivery process can significantly alter the audience the ad is delivered to compared to the one intended by the advertiser based on the content of the ad itself. We used public voter record data to demonstrate that broadly and inclusively targeted ads can end up being differentially delivered to specific audience segments, even when we hold the budget and target audience constant.
- Demonstrated that skewed ad delivery can start at the beginning of an ad's run. We also showed that this process is likely automated on Facebook's side, and is not a reflection of the early feedback received from users in response to the ad, by using transparent images in ads that appear the same to humans but are distinguishable by automatic image classification tools, and showing they result in skewed delivery.
- Confirmed that skewed delivery can take place on real-world ads for housing and employment opportunities by running a series of employment ads and housing ads with the same targeting parameters and bidding strategy. Despite differing only in the ad creative and destination link, we observed skewed delivery along racial and gender lines.

We briefly discuss some limitations of our work and touch on the broader implications of our findings.

**Limitations**     It is important to note that while we have revealed certain aspects of how ad delivery is accomplished, and the effects it had on our experimental ad campaigns, we cannot make broad conclusions about how it impacts ads more generally. For example,

we observe that all of *our ads* for lumberjacks deliver to an audience of primarily white and male users, but that may not hold true of *all ads* for lumberjacks. However, the significant ad delivery skew that we observe for our employment and housing ads strongly suggests that such skew is present for such ads run by real-world advertisers.

**Skew vs. discrimination**    Throughout this paper we refer to differences in the demographics of reached audience as "skew" in delivery. We do not claim any observed skew *per se* is necessarily wrong or should be mitigated. Without making value judgements on skew in general, we do emphasize the distinct case of ads for housing and employment. In particular, the skew we observe in the delivery of ads for cosmetics or bodybuilding might be interpreted as reinforcing gender stereotypes but is unlikely to have legal implications. On the other hand, the skew in delivery of employment and housing ads is potentially discriminatory in a legal sense.

Further, for the experiments involving ethnicity, we attempted to create equally sized audiences (50% white and 50% Black). However, solely the fact that ads are not delivered to an evenly split audience does not indicate skew, as there might be differences in matching rates (what fraction of registered voters are active Facebook users) per ethnicity, or the groups could have different temporal usage patterns. Only when we run two or more ads at the same time, targeting the same audience, and these ads are delivered with different proportions to white and Black users, do we claim we observe skew in delivery.

Our focus lies in understanding the extent to which the ad platform's delivery optimization, rather than merely its targeting tools and their use as implied by Facebook [23], determine the outcomes of ad delivery, and on highlighting that demographic skews presently arise for certain legally protected categories in Facebook, even when the advertiser targets broadly and inclusively.

**Skew in traditional media**    Showing ads to individuals most likely to engage with them is one of the cornerstone promises of online ad platforms. While in traditional media—such as newspapers and television—advertisers can also place their ads strategically to reach particular kinds of readers or viewers, there are three significant differences with implications for fairness and discrimination when compared to advertising on Facebook.

*First*, when advertising in traditional media, *the advertiser* has the ability to purposefully advertise to a wide and diverse audience, and be assured that their ads will reach that audience. As we show in this work, this is not the case for advertising on Facebook. Even if the advertiser intends to reach a general and diverse audience, their ad can be steered to a narrow slice within that specified audience, that is skewed in unexpected or undesirable ways.

*Second, the individual's* agency to see ads targeted at groups they do not belong to is more severely limited in the hyper-targeted and delivery-optimized scenario of online ad platforms. In traditional media, an individual interested in seeing ads targeted to a different demographic than they belong to has to merely watch programming or read a newspaper that they are not usually a target demographic for. On Facebook, finding out what ads one may be missing out on due to gender, race, or other characteristic inferred or predicted by Facebook is more challenging. A particularly motivated user could change their self-reported gender but might

find themselves discouraged from doing so because the account's gender information is always public. Other characteristics, such as race and net worth, are inferred by Facebook (or accessed via third-party companies [75]) rather than obtained through user's self-reported data, which makes them challenging to alter for the purposes of seeing ads. Moreover, although users can remove some of their inferred interests using ad controls on Facebook, they have no ability to control *negative inferences* Facebook may be making about them. For example, Facebook may infer that a particular user is "not interested in working at a lumber yard", and therefore, not show this user ads for a lumberjack job even if the employer is trying to reach them. As a result, Facebook would be excluding them from an opportunity in ways unbeknownst to the user and to the advertiser.

*Third, public interest scrutiny* of the results of advertising is much more difficult in online delivery-optimized systems than in traditional media. Advertising in traditional media can be easily observed and analyzed by many members of society, from individuals to journalists, and targeting and delivery outside the expectation norms can be detected and called out by many. In the case of hyper-targeted online advertising whose delivery is controlled by the platform, such scrutiny is currently outside reach for most ads [32, 56].

**Policy implications**    Our findings underscore the need for policymakers and platforms to carefully consider the role of the optimizations run by the platforms themselves—and not just the targeting choices of advertisers—in seeking to prevent discrimination in digital advertising.

*First*, because discrimination can arise in ad delivery independently from ad targeting, limitations on ad targeting—such as those currently deployed by Facebook to limit the targeting features that can be used—will not address discrimination arising from ad delivery. On the contrary, to the extent limiting ad targeting features prompts advertisers to rely on larger target audiences, the mechanisms of ad delivery will have an even greater practical impact on the ads that users see.

*Second*, regulators, lawmakers, and platforms themselves will need to more deeply consider whether and how longstanding civil rights laws apply to modern advertising platforms in light of ad delivery dynamics. At a high level, U.S. federal law prohibits discrimination in the marketing of housing, employment and credit opportunities. A detailed consideration of these legal regimes is beyond the scope of this paper. However, our findings show that ad platforms themselves can shape access to information about important life opportunities in ways that might present a challenge to equal opportunity goals.

*Third*, in the U.S., Section 230 of the Communications Decency Act (CDA) provides broad legal immunity for internet platforms acting as publishers of third-party content. This immunity was a central issue in recently-settled litigation against Facebook, who argued its ad platform should be protected by CDA Section 230 in part because its advertisers are "wholly responsible for deciding where, how, and when to publish their ads." [31] Our research shows that this claim is misleading, particularly in light of Facebook's role in determining the ad delivery outcomes. Even absent unlawful behavior by advertisers, our research demonstrates that Facebook's

own, independent actions during the delivery phase are crucial to determining how, when, and to whom ads are shown, and might produce unlawful outcomes. These effects can be invisible to, and might even create liability for, Facebook's advertisers.

Thus, the effects we observed could introduce new liability for Facebook. In determining whether Section 230 protections apply, courts consider whether an internet platform "materially contributes" to the alleged illegal conduct. Courts have yet to squarely consider how the delivery mechanisms described in this paper might affect an ad platform's immunity under Section 230.

*Fourth*, our results emphasize the need for increased transparency into advertising platforms, particularly around ad delivery algorithms and statistics for real-world housing, credit, or employment ads. Facebook's existing ad transparency efforts are not yet sufficient to allow researchers to analyze the impact of ad delivery in the real world.

**Potential mitigations**     Given the potential impact that discriminatory ad delivery can have on exposure to opportunities available to different populations, a natural question is how ad platforms such as Facebook may mitigate these effects. This is not straightforward, and is likely to require increased commitment and transparency from ad platforms as well as development of new algorithmic and machine learning techniques. For instance, as we have demonstrated empirically in Section 4.1 (and as [25] have shown theoretically), skewed ad delivery can occur even if the ad platform refrains from refining the audience supplied by the advertisers according to the predicted relevance of the ad to individual users. This happens because different users are valued differently by advertisers, which, in a setting of limited user attention, leads to a tension between providing a useful service for users and advertisers, fair ad delivery, and the platform's own revenue goals.[15]

Thus, more advanced and nuanced approaches to addressing the potential issues of discrimination in digital advertising are necessary. Developing them is beyond the scope of this paper; however, we can imagine several different options, each with their own pros and cons. First, Facebook and similar platforms could disable optimization altogether for some ads, and deliver them to a random sample of users within an advertiser's target audience (with or without market considerations). Second, platforms could remove ads in protected categories from their normal ad flows altogether, and provide those listings in a separate kind of marketing product (e.g., , a user-directed listing service like `craigslist.org`). Third, the platforms could allow the advertisers to enforce their own demographic outcomes so long as those desired outcomes don't themselves violate anti-discrimination laws. Finally, the platforms could seek to constrain their delivery optimization algorithms to satisfy chosen fairness criteria (some candidates for such criteria from the theoretical computer science community are individual fairness [24] and preference-informed fairness [48], but a broader discussion of appropriate criteria involving policymakers is needed).

Digital advertising increasingly influences how people are exposed to the world and its opportunities, and helps keep online services free of monetary cost. At the same time, its potential for

negative impacts, through optimization due to ad delivery, is growing. Lawmakers, regulators, and the ad platforms themselves need to address these issues head-on.

## ACKNOWLEDGEMENTS

We thank the anonymous reviewers for their helpful comments. We also thank NaLette Brodnax and Christo Wilson for their invaluable feedback on the manuscript and Martin Goodson for pointing out erroneous confidence intervals. The authors also acknowledge Hannah Masuga, a graduate fellow at Upturn, whose initial experiments during her fellowship inspired this research. This work was funded in part by a grant from the Data Transparency Lab and NSF grant CNS-1616234. This work was done in part while Aleksandra Korolova was visiting the Simons Institute for the Theory of Computing.

## ERRATA

**v2:** In the version of the paper published on April 3rd, 2019 we wrongly stated in Section 3.5 that ~40-50% of ads were delivered outside of our predefined DMAs. In version **v2** we corrected this figure to ~10%. Further, in response to a request from Facebook, we changed the axis labels from "Fraction of white users in the audience" to "Estimated fraction of white users in the audience".
**v4:** We changed the method of calculating confidence intervals from normal approximation to the method described by Agresti and Coull [9]. All confidence intervals presented in the figures throughout the paper use this method. The change does not affect any of the conclusions. Notably, after the change the confidence intervals in Figure 4 no longer cross 0.
**v5:** Includes the feedback and requested changes from anonymous reviewers. The content is identical to this accepted at Computer-Supported Cooperative Work (CSCW) 2019.

## APPENDIX

**Multiple hypotheses testing.**     In the experiment described in the main paper we ran ads for 11 different job postings, each with five variations of the accompanying image. Here, we confirm that the apparent differences are not an effect of testing multiple hypotheses. We do so by aggregating the five variants for each ad and comparing the fraction of men and the estimated fraction of white users between each for pairs of jobs. This results in 55 tests, so rather than using the $Z$ value corresponding to $p_{val} = 0.01$, we use the Bonferroni correction [14], a statistical technique used to address the problem of making multiple comparisons. In Figure 10 we show that the majority of comparisons remain statistically significant, each at the $Z$ value corresponding to corrected $p_{val} = \frac{0.01}{55} \approx 0.0002$.

## REFERENCES

[1]  12 CFR § 202.4 (b) – Discouragement. https://www.law.cornell.edu/cfr/text/12/202.4.

[2]  24 CFR § 100.75 – Discriminatory advertisements, statements and notices. https://www.law.cornell.edu/cfr/text/24/100.75.

[3]  29 USC § 623 – Prohibition of age discrimination. https://www.law.cornell.edu/uscode/text/29/623.

[4]  About Ad Delivery. https://www.facebook.com/business/help/1006683343301256.

[5]  About Ad Principles. https://www.facebook.com/business/about/ad-principles.

---

[15]A formal statement of this claim for the theoretical notions of individual fairness [24] and its generalization, preference-informed fairness, can be found in [48].



**Figure 10: The demographic differences in ad delivery both in terms of gender and race are statistically significant after introducing Bonferroni correction with $N$ tests of 55. Green squares mark statistically significant differences, red squares indicate insignificant differences.**

[6] About Customer Match. https://support.google.com/adwords/answer/6379332?hl=en.

[7] About Twitter Ads approval. https://business.twitter.com/en/help/ads-policies/introduction-to-twitter-ads-approval.html.

[8] About advertising objectives. https://www.facebook.com/business/help/517257078367892.

[9] AGRESTI, A. AND COULL, B. A. Approximate is better than "exact" for interval estimation of binomial proportions. *The American Statistician 52*, 2 (1998), Taylor & Francis.

[10] ANDREOU, A., SILVA, M., BENEVENUTO, F., GOGA, O., LOISEAU, P., AND MISLOVE, A. Measuring the Facebook Advertising Ecosystem. In *Network and Distributed System Security Symposium* (San Diego, California, USA, Feb. 2019).

[11] ANDREOU, A., VENKATADRI, G., GOGA, O., GUMMADI, K. P., LOISEAU, P., AND MISLOVE, A. Investigating Ad Transparency Mechanisms in Social Media: A Case Study of Facebook's Explanations. In *Network and Distributed System Security Symposium* (San Diego, California, USA, Feb. 2018).

[12] BOLUKBASI, T., CHANG, K.-W., ZOU, J. Y., SALIGRAMA, V., AND KALAI, A. T. Man is to computer programmer as woman is to homemaker? debiasing word embeddings. In *Neural and Information Processing Systems* (Barcelona, Spain, Dec. 2016).

[13] BUOLAMWINI, J. AND GEBRU, T. Gender shades: Intersectional accuracy disparities in commercial gender classification. In *Conference on Fairness, Accountability, and Transparency* (New York, New York, USA, Feb. 2018).

[14] CABIN, R. J. AND MITCHELL, R. J. To Bonferroni or not to Bonferroni: when and how are the questions. *Bulletin of the Ecological Society of America 81*, 3 (2000).

[15] Certify Compliance to Facebook's Non-Discrimination Policy. https://www.facebook.com/business/help/136164207100893.

[16] CHEN, L., HANNAK, A., MA, R., AND WILSON, C. Investigating the Impact of Gender on Rank in Resume Search Engines. In *Annual Conference of the ACM Special Interest Group on Computer Human Interaction* (Montreal, Canada, April 2018).

[17] CUMMING, G. AND FINCH, S. Inference by eye: confidence intervals and how to read pictures of data. *American Psychologist 60*, 2 (2005), American Psychological Association.

[18] DATTA, A., DATTA, A., MAKAGON, J., MULLIGAN, D. K., AND TSCHANTZ, M. C. Discrimination in Online Personalization: A Multidisciplinary Inquiry. In *Conference on Fairness, Accountability, and Transparency* (New York, New York, USA, Feb. 2018).

[19] DATTA, A., TSCHANTZ, M. C., AND DATTA, A. Automated Experiments on Ad Privacy Settings: A Tale of Opacity, Choice, and Discrimination. In *Privacy Enhancing Technologies Symposium* (Philadelphia, Pennsylvania, USA, June 2015).

[20] DIAKOPOULOS, N., TRIELLI, D., JENNIFERSTARK, AND MUSSENDEN, S. I Vote For—How Search Informs Our Choice of Candidate. In *Digital Dominance: The Power of Google, Amazon, Facebook, and Apple* (2018), Oxford University Press, M. Moore and D. Tambini, eds.

[21] Digital Ad Spend Hits Record-Breaking $49.5 Billion in First Half of 2018, Marking a Significant 23% YOY Increase. https://www.iab.com/news/digital-ad-spend-hits-record-breaking-49-5-billion-in-first-half-of-2018/.

[22] Doing More to Protect Against Discrimination in Housing, Employment and Credit Advertising. https://newsroom.fb.com/news/2019/03/protecting-against-discrimination-in-ads/.

[23] Doing More to Protect Against Discrimination in Housing, Employment and Credit Advertising. https://newsroom.fb.com/news/2019/03/protecting-against-discrimination-in-ads/.

[24] DWORK, C., HARDT, M., PITASSI, T., REINGOLD, O., AND ZEMEL R. Fairness through awareness. In *Proceedings of the 3rd Innovations in Theoretical Computer Science Conference* (2012).

[25] DWORK, C. AND ILVENTO, C. Fairness Under Composition. In *10th Innovations in Theoretical Computer Science Conference (ITCS 2019)*, vol. 124 of *Leibniz International Proceedings in Informatics (LIPIcs)* (2018).

[26] Facebook Ads Manager. https://www.facebook.com/business/help/200008840044554.

[27] Facebook Advertising Policies, Discriminatory Practices. https://www.facebook.com/policies/ads/prohibited_content/discriminatory_practices.

[28] Facebook Engages in Housing Discrimination with Its Ad Practices, U.S. Says. https://www.nytimes.com/2019/03/28/us/politics/facebook-housing-discrimination.html.

[29] Facebook Lets Advertisers Exclude Users by Race. https://www.propublica.org/article/facebook-lets-advertisers-exclude-users-by-race/.

[30] Facebook Marketing API – Custom Audiences. https://developers.facebook.com/docs/marketing-api/custom-audiences-targeting/v3.1.

[31] Facebook Motion to Dismiss in Onuoha v. Facebook. https://www.courtlistener.com/recap/gov.uscourts.cand.304918/gov.uscourts.cand.304918.34.0.pdf.

[32] Facebook's Ad Archive API is Inadequate. https://blog.mozilla.org/blog/2019/04/29/facebooks-ad-archive-api-is-inadequate/.

[33] Facebook: About Facebook Pixel. https://www.facebook.com/business/help/742478679120153.

[34] Facebook: About Lookalike Audiences. https://www.facebook.com/business/help/164749007013531.

[35] Facebook: About the delivery system: Ad auctions. https://www.facebook.com/business/help/430291176997542.

[36] FAIZULLABHOY, I. AND KOROLOVA, A. Facebook's Advertising Platform: New Attack Vectors and the Need for Interventions. *Computing Research Repository* (Mar. 2018), https://arxiv.org/abs/1803.10099, Workshop on Technology and Consumer Protection (ConPro).

[37] GHOSH, A., VENKATADRI, G., AND MISLOVE, A. Analyzing Facebook Political Advertisers' Targeting. In *Workshop on Technology and Consumer Protection* (San Francisco, California, USA, May 2019).

[38] Google: About audience targeting. https://support.google.com/google-ads/answer/2497941?hl=en.

[39] Google: About similar audiences on the Display Network. https://support.google.com/google-ads/answer/2676774?hl=en.

[40] GREEN, B. AND CHEN, Y. Disparate Interactions: An Algorithm-in-the-Loop Analysis of Fairness in Risk Assessments. In *Conference on Fairness, Accountability, and Transparency* (Atlanta, Georgia, USA, Jan. 2019).

[41] HUD Sues Facebook Over Housing Discrimination and Says the Company's Algorithms Have Made the Problem Worse. https://www.propublica.org/article/hud-sues-facebook-housing-discrimination-advertising-algorithms.

[42] HANNAK, A., SOELLER, G., LAZER, D., MISLOVE, A., AND WILSON, C. Measuring Price Discrimination and Steering on E-commerce Web Sites. In *ACM Internet Measurement Conference* (Vancouver, Canada, Nov. 2014).

[43] HANNAK, A., WAGNER, C., GARCIA, D., MISLOVE, A., STROHMAIER, M., AND WILSON, C. Bias in Online Freelance Marketplaces: Evidence from TaskRabbit and Fiverr. In *ACM Conference on Computer Supported Cooperative Work* (Portland, Oregon, USA, Feb. 2017).

[44] Help: Choosing a Special Ad Category. https://www.facebook.com/business/help/298000447747885.

[45] Improving Enforcement and Promoting Diversity: Updates to Ads Policies and Tools. http://newsroom.fb.com/news/2017/02/improving-enforcement-and-promoting-diversity-updates-to-ads-policies-and-tools/.

[46] KAY, M., MATUSZEK, C., AND MUNSON, S. A. Unequal representation and gender stereotypes in image search results for occupations. In *Annual Conference of the ACM Special Interest Group on Computer Human Interaction* (2015).

[47] KIM, L. The Most Expensive Keywords in Google AdWords. (2011). http://www.wordstream.com/blog/ws/2011/07/18/most-expensive-google-adwords-keywords/.

[48] KIM, M. P., KOROLOVA, A., ROTHBLUM, G. N., AND YONA, G. Preference-Informed Fairness. (2019). https://arxiv.org/abs/1904.01793.

[49] KOROLOVA, A. Facebook's Illusion of Control over Location-Related Ad Targeting. Medium (Dec. 2018). https://medium.com/@korolova/facebooks-illusion-of-control-over-location-related-ad-targeting-de7f865aee78.

[50] KULSHRESTHA, J., ESLAMI, M., MESSIAS, J., ZAFAR, M. B., GHOSH, S., GUMMADI, K., AND KARAHALIOS, K. Quantifying Search Bias: Investigating Sources of Bias for Political Searches in Social Media. In *ACM Conference on Computer Supported Cooperative Work* (Portland, Oregon, USA, Feb. 2017).

[51] LAMBRECHT, A. AND TUCKER, C. E. Algorithmic bias? An empirical study into apparent gender-based discrimination in the display of STEM career ads. (2018). https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2852260.

[52] LECUYER, M., DUCOFFE, G., LAN, F., PAPANCEA, A., PETSIOS, T., SPAHN, R., CHAINTREAU, A., AND GEAMBASU, R. XRay: Enhancing the Web's Transparency with

Differential Correlation. In *USENIX Security Symposium* (San Diego, California, USA, Aug. 2014).

[53] Lecuyer, M., Spahn, R., Spiliopolous, Y., Chaintreau, A., Geambasu, R., and Hsu, D. Sunlight: Fine-grained Targeting Detection at Scale with Statistical Confidence. In *ACM Conference on Computer and Communications Security* (2015).

[54] Liu, Y., Kliman-Silver, C., Krishnamurthy, B., Bell, R., and Mislove, A. Measurement and Analysis of OSN Ad Auctions. In *ACM Conference on Online Social Networks* (Dublin, Ireland, Oct. 2014).

[55] Marketing API. https://developers.facebook.com/docs/marketing-apis/.

[56] More than 200 Researchers Sign Letter Supporting Knight Institute's Proposal to Allow Independent Research of Facebook's Platform. https://knightcolumbia.org/news/more-200-researchers-sign-letter-supporting-knight-institutes-proposal-allow-indepen.

[57] Neilson DMA® Regions. https://www.nielsen.com/intl-campaigns/us/dma-maps.html.

[58] Neumann, N., Tucker, C. E., and Whitfield, T. How Effective is Black-box Digital Consumer Profiling and Audience Delivery?: Evidence from Field Studies. *Social Science Research Network Working Paper Series* (2018).

[59] New Marketing API Requirements for all Advertising Campaigns. https://developers.facebook.com/blog/post/2019/08/15/new-marketing-api-requirements-for-all-advertising-campaigns/.

[60] New Targeting Tools Make Pinterest Ads Even More Effective. https://business.pinterest.com/en/blog/new-targeting-tools-make-pinterest-ads-even-more-effective.

[61] Parra-Arnau, J., Achara, J. P., and Castelluccia, C. MyAdChoices: Bringing Transparency and Control to Online Advertising. *ACM Transactions on the Web 11* (2017).

[62] Pinterest: Audience targeting. https://help.pinterest.com/en/business/article/audience-targeting.

[63] Robertson, R. E., Jiang, S., Joseph, K., Friedland, L., Lazer, D., and Wilson, C. Auditing Partisan Audience Bias within Google Search. In *Annual Conference of the ACM Special Interest Group on Computer Human Interaction* (2018).

[64] Saez-Trumper, D., Liu, Y., Baeza-Yates, R., Krishnamurthy, B., and Mislove, A. Beyond CPM and CPC: Determining the Value of Users on OSNs. In *ACM Conference on Online Social Networks* (Dublin, Ireland, Oct. 2014).

[65] Sandvig, C., Hamilton, K., Karahalios, K., and Langbort, C. Auditing algorithms: Research methods for detecting discrimination on internet platforms. In *International Communication Association Conference* (2014).

[66] Sapiezynski, P., Zeng, W., Robertson, R. E., Mislove, A., and Wilson, C. Quantifying the Impact of User Attention on Fair Group Representation in Ranked Lists. In *Workshop on Fairness, Accountability, Transparency, Ethics, and Society on the Web* (San Francisco, California, USA, May 2019).

[67] Showing Relevance Scores for Ads on Facebook. https://www.facebook.com/business/news/relevance-score.

[68] Speicher, T., Ali, M., Venkatadri, G., Ribeiro, F. N., Arvanitakis, G., Benevenuto, F., Gummadi, K. P., Loiseau, P., and Mislove, A. On the Potential for Discrimination in Online Targeted Advertising. In *Conference on Fairness, Accountability, and Transparency* (New York, New York, USA, Feb. 2018).

[69] Sweeney, L. Discrimination in online ad delivery. *Communications of the ACM 56*, 5 (2013).

[70] Twitter: Ad targeting. https://business.twitter.com/en/targeting.html.

[71] Upturn Amicus Brief in Onuoha v. Facebook. https://www.courtlistener.com/recap/gov.uscourts.cand.304918/gov.uscourts.cand.304918.76.1.pdf.

[72] Venkatadri, G., Liu, Y., Andreou, A., Goga, O., Loiseau, P., Mislove, A., and Gummadi, K. P. Privacy Risks with Facebook's PII-based Targeting: Auditing a Data Broker's Advertising Interface. In *IEEE Symposium on Security and Privacy* (San Francisco, California, USA, May 2018).

[73] Venkatadri, G., Lucherini, E., Sapiezyński, P., and Mislove, A. Investigating sources of PII used in Facebook's targeted advertising. In *Privacy Enhancing Technologies Symposium* (Stockholm, Sweden, July 2019).

[74] Venkatadri, G., Mislove, A., and Gummadi, K. P. Treads: Transparency-Enhancing Ads. In *Workshop on Hot Topics in Networks* (Redmond, Washington, USA, Nov. 2018).

[75] Venkatadri, G., Sapiezyński, P., Redmiles, E. M., Mislove, A., Goga, O., Mazurek, M., and Gummadi, K. P. Auditing Offline Data Brokers via Facebook's Advertising Platform. In *International World Wide Web Conference* (San Francisco, California, USA, May 2019).

[76] What it means when your ad is pending review. https://www.facebook.com/business/help/204798856225114.

[77] Wills, C. E. and Tatar, C. Understanding What They Do with What They Know. In *Workshop on Privacy in the Electronic Society* (2012).

[78] eyeWnder_Experiment. http://www.eyewnder.com/.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL FAIR HOUSING ALLIANCE; FAIR
HOUSING JUSTICE CENTER, INC.; HOUSING
OPPORTUNITIES PROJECT FOR
EXCELLENCE, INC.; FAIR HOUSING
COUNCIL OF GREATER SAN ANTONIO,

                              Plaintiffs,

          v.

  FACEBOOK, INC.,

                              Defendant.

No. 1:18-cv-02689

**FIRST AMENDED COMPLAINT**

## I.      PRELIMINARY STATEMENT

1.      This year marks the 50th anniversary of the Fair Housing Act ("FHA"), a statute
intended to end discrimination in housing markets throughout the United States.  For decades,
the FHA has prohibited both publishers and advertisers from "targeting" ads based on sex,
family status, disability, national origin, and other protected characteristics.

2.      Given this milestone, it is all the more egregious and shocking that Defendant
Facebook continues to create content for landlords and real estate brokers to bar families with
children, women, and others from receiving rental and sales ads for housing.  Facebook has
engaged in discrimination by design—stripping data from its users and using it to create
discriminatory advertising content: a pre-populated list of demographics, behaviors, and interests
from which housing advertisers select in order to exclude certain home seekers from ever seeing
their ads.

3.      Housing advertising has of course changed in the last fifty years, moving beyond
billboards, "for rent" signs, and classifieds in the newspaper, to online advertising.  Facebook's

ability to customize an online audience for advertisements based on its vast trove of user data has made it the biggest advertising agency in the world—the platform of choice for millions of businesses. But Facebook has abused its enormous power.

4.      Over the past months, Plaintiffs, four nonprofit organizations with the common mission of eliminating housing discrimination and promoting residential integration, investigated Facebook's conduct. Plaintiffs created dozens of housing advertisements and completed Facebook's full ad submission and review process. Plaintiffs' investigations in New York, Washington, D.C., Miami, and San Antonio confirm that Facebook first provides the option for advertisers to exclude families with children and women from receiving advertisements, as well as users with interests based on disability and national origin. Then Facebook approves the ads and permits advertisers to publish these ads in a discriminatory manner without consumers ever knowing they have been excluded.

5.      Discriminatory advertising is just as damaging as discrimination at the point of rental or sale. If women with school-age children are categorically excluded from the Facebook advertising audience for a rental apartment in a community with high-performing schools and other amenities, they are effectively denied access to that housing opportunity. Facebook and its advertisers have made the ad invisible to them. At the same time, Facebook's ad platform can further landlords' illegal efforts to maintain a segregated, adults-only rental complex. Whereas in the past, the excluded group might see the "for rent" sign or newspaper classified ad because the ads were located in a public forum, the stealth nature of Facebook's technology hides housing ads from entire groups of people. Facebook's algorithms can ensure exclusion and deny access to housing. Facebook's ability to target groups and promote discrimination so precisely will surely only improve as the company continues to refine its technology.

6.     Even before Plaintiffs conducted their most recent investigations, Facebook was on notice for more than a year—from Plaintiffs and media reports (including by ProPublica)—that its advertising platform violated fair housing laws.

7.     As Facebook significantly increases its presence in housing advertising and the housing marketplace,[1] it must first end its discriminatory advertising practices.

## II.     JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiffs assert federal claims under the FHA; under 28 U.S.C. § 1343(a)(4) as Plaintiffs seek to secure equitable and other relief under federal civil rights laws; and under 42 U.S.C. § 3613(a)(1)(A) as Plaintiffs seek appropriate relief regarding a discriminatory housing practice under the FHA.

9.     The Court has supplemental jurisdiction over Plaintiffs' local law claims under the New York City Human Rights Law pursuant to 28 U.S.C. § 1367(a), as these claims are so related to their federal claims in this action that they form part of the same case or controversy.

10.     This Court has personal jurisdiction over Facebook pursuant to Fed. R. Civ. P. 4(k)(1) and New York Civil Practice Law and Rules § 302(a)(1) because Facebook transacts business within the state, § 302(a)(2) because Facebook has committed tortious and discriminatory acts within the state, § 302(a)(3)(i) because Facebook has committed a tortious and discriminatory act without the state causing injury to persons within the state, and regularly does business in the state, § 302(a)(3)(ii) because Facebook has committed a tortious and discriminatory act without the state causing injury to persons within the state, and derives substantial revenue from interstate commerce, and § 302(a)(4).

---

[1] Ben Lane, *Facebook Launches Massive Push Into Real Estate Listings*, Housingwire.com (Nov. 13, 2017), https://www.housingwire.com/articles/41797-facebook-launches-massive-push-into-real-estate-listings.

11.     Declaratory and injunctive relief is sought and authorized by 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), as Defendant Facebook resides in this District in which it is subject to the Court's personal jurisdiction, and pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**A.      Facebook's Contacts with New York**

13.     Facebook maintains a corporate office in this District located at 335 Madison Avenue, New York, New York 10017.

14.     Facebook is registered with the New York State Division of Corporations and assigned DOS ID #3842367l, with an appointed agent for service located at 80 State Street, Albany, New York 12207.

15.     Upon information and belief, Facebook employs approximately 1,000 people.

16.     Facebook opened its New York office in 2012, stating that the New York office "won't just be a satellite office, it will be a core part of our engineering staff."[2]

17.     Facebook conducts advertising, engineering, and other activities in this District.

18.     According to Facebook, "Almost all of our big teams are centered around products that *specifically benefit from being in New York* . . . either teams working closely with local industries, products that address the experience of an urban environment, or center around talent that is abundant on the east coast (like AI Research or Mobile Engineering)."[3]

---

[2] Jason Kincaid, *Facebook To Open Engineering Office in NYC*, techcrunch.com (Dec. 2, 2011), https://techcrunch.com/2011/12/02/facebook-to-open-engineering-office-in-nyc.

[3] *Director of Engineering at Facebook AI Explains the Advantages of New York Tech*, Huffington Post.com (Jan. 22, 2016), https://www.huffingtonpost.com/quora/director-of-engineering-a_b_9052764.html_(emphasis supplied).

4

19.     As the largest city in the United States, New York City—with a total of more than 3 million households according to the 2010 United States Census—is also the largest housing market in the country.[4]  As of 2011, New York City had a total of 3.35 million housing units, of which 65% were rental units, 30% were owner units, and 5% were vacant but not available for sale or rent.  The vacancy rate in 2011 for rental units in New York City was only 3.12%.  Half of the City's housing units were in buildings of 20 or more units as of 2011.

20.     The New York City housing market is unique in that, unlike other cities in the United States where landlords handle advertising and renting apartments directly, many landlords use real estate agents to advertise apartments for rent and locate prospective renters. As of 2013, Manhattan alone had 27,000 licensed real estate brokers and sales persons working in both the sales and rental markets.[5]  These real estate brokers and agents use online real estate advertising, including on Facebook.

21.     For the New York City housing consumer, access to Facebook's online real estate advertising is crucial given the City's low vacancy rate, high competition for dwelling units, and heavy reliance on real estate brokers and agents.

22.     Upon information and belief, Facebook receives a substantial amount of revenue from advertisements that are sold to New York-area companies or target New York residents, including an estimated reach of millions of people within the District.

23.     Upon information and belief, a portion of this substantial revenue comes from housing advertisements that are sold to landlords and real estate brokers in the New York-area and target New York residents.

[4] New York City Consolidated Plan, 2015-2-19 Needs Assessment & Market Analysis, December 16, 2016, NA-1.

[5] Leigh Kamping-Carder, *Ranks of Manhattan brokers swell, as market strengthens*, The Real Deal (Dec. 10, 2012), https://therealdeal.com/2012/12/10/ranks-of-new-york-city-brokers-swell-as-market-strengthens/.

5

## III. THE PARTIES

24.    Plaintiff National Fair Housing Alliance ("NFHA") is a national, nonprofit, public service organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, D.C.  NFHA is a nationwide alliance of private, nonprofit, fair housing organizations, including organizations in 28 states.  NFHA's sole mission is to end discrimination in housing and to promote residential integration.  NFHA works to eliminate housing discrimination and to ensure equal opportunity for all people through leadership, education and outreach, membership services, public policy initiatives, advocacy, community development activities that promote inclusive communities, investigation of fair housing violations, and enforcement.  NFHA engages in fair housing education and enforcement throughout the United States where no local private fair housing organization exists, as well as in cooperation with its members.  NFHA creates and distributes national educational media campaigns to teach people about their rights and responsibilities under fair housing laws.  NFHA also provides grants to people to rent, purchase, or renovate housing; to stave off foreclosure; and to stabilize neighborhoods harmed by the foreclosure crisis.

25.    Plaintiff Fair Housing Justice Center ("FHJC") is a nonprofit organization with an office located in Queens, New York.  FHJC serves the five boroughs of New York City and seven suburban New York counties.  FHJC is dedicated to ensuring that all people have equal access to housing opportunities in the New York City region by eliminating housing discrimination and creating open and inclusive communities.

26.    Among other things, FHJC (a) provides information to the public and other nonprofit organizations in the New York City region about fair housing laws; (b) provides intake counseling to individuals and organizations with allegations of housing discrimination; (c)

6

conducts testing and other investigations of allegations of housing discrimination; (d) makes legal referrals to cooperating attorneys; (e) assists with the preparation and filing of administrative housing discrimination complaints; and (f) provides post-referral litigation support services.  FHJC provides these services free of charge and without regard to income.

27.     FHJC also conducts testing investigations for government law enforcement agencies, provides technical assistance to nonprofit organizations engaging in fair housing enforcement activities, and engages in policy initiatives that further FHJC's mission, including the publication and dissemination of reports and educational materials.

28.     Plaintiff Housing Opportunities for Project Excellence, Inc. ("HOPE") is the first nonprofit fair housing agency organized in the State of Florida and is located in Miami, Florida. HOPE's mission is to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunities throughout Florida.  One of HOPE's goals is the elimination of segregation in housing and the promotion of residential integration.

29.     Plaintiff HOPE employs a three-tiered system of education and outreach, intake and counseling, and private enforcement to affirmatively further fair housing.  HOPE's activities include, but are not limited to, counseling and obtaining facts regarding alleged acts of discrimination; conducting training seminars, presentations, and workshops on fair housing laws; assisting community leaders and members of the housing industry in developing fair housing strategies; developing resources to provide fair housing assistance; attempting resolution of complaints through litigation, conciliation, or appropriate referral; and providing assistance to the general public on housing-related issues such as predatory lending.

30.     Plaintiff Fair Housing Council of Greater San Antonio ("FHCGSA") is a nonprofit corporation organized under the laws of the State of Texas and located in San Antonio,

7

Texas.  FHCGSA's mission is to promote fair housing and non-discrimination in housing across the South Texas area.  FHCGSA serves thirty-seven counties in South Texas and is dedicated to eliminating discriminatory housing practices and promoting residential integration.

31.     FHCGSA provides various programs and services which include, but are not limited to, conducting complaint intake and counseling for consumers who allege housing discrimination; investigating housing discrimination complaints; submitting reasonable accommodation and modification requests to housing providers on behalf of consumers with disabilities, attempting to resolve complaints through mediation, referrals to administrative agencies, or private attorneys; and conducting education and outreach activities for consumers, housing providers, and others.  FHCGSA also works to promote accessible and affordable housing in South Texas through various activities including maintaining a Directory of Accessible Housing and providing fair housing training to developers of low-income housing tax credit rental units in Texas.

32.     Defendant Facebook, Inc. ("Facebook") is a publicly traded corporation, headquartered at 1601 Willow Road, Menlo Park, California, 94025, incorporated under the laws of the State of Delaware.  Facebook owns and operates an online social networking web site that allows its billion-plus daily users to communicate with each other through the sharing of text, photograph, and video.  Part of Facebook's website is an advertising platform that allows businesses and individuals to pay money to have Facebook provide marketing, recruitment, sourcing, advertising, branding, information, and/or hiring services, including displaying advertisements for housing for sale or rent.  In 2017, Facebook earned 98% of its $40.65 billion in revenues from third parties who advertised on Facebook.[6]

---

[6] Facebook Investor Relations, https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=12512043 (Facebook, Inc. Annual Report for the Fiscal Year Ended December 31, 2017).

33.     As of March 2017, Facebook had approximately 4 million advertisers using its platform.  Many of these advertisers are real estate brokers, residential property owners, and real estate management companies offering housing for rent or for sale.[7]

## IV.     LEGAL BACKGROUND: DISCRIMINATORY ADVERTISING

34.     The Fair Housing Act states that it shall be unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap,[8] familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c).

35.     Under its implementing regulations, the FHA provides that:

> (c) Discriminatory notices, statements and advertisements include, but are not limited to:  (1) Using words, phrases, photographs, illustrations, symbols or forms which convey that dwellings are available or not available to a particular group of persons because of race, color, religion, sex, handicap, familial status, or national origin . . . . (3) Selecting media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin. (4) Refusing to publish advertising for the sale or rental of dwellings  .  .  .  because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.75.

36.     The Fair Housing Act further makes it unlawful "[t]o represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."  42 U.S.C. § 3604(d).

---

[7] *See Facebook Marketplace to Post Apartment List Rental Homes*, naahq.org (Nov. 9, 2017), https://www.naahq.org/news-publications/facebook-marketplace-post-apartmentlist-rental-homes .

[8] Hereinafter, the term "disability" shall be used for the term "handicap" unless quoting from the statutory text.

37.     The Fair Housing Act's advertising prohibitions apply to "all written or oral notices or statements by a person engaged in the sale or rental of a dwelling" which include "any applications, flyers, brochures, deeds, signs, banners, posters, billboards, or any documents used with respect to the sale or rental of a dwelling."  24 C.F.R. § 100.75(b).

38.     In the advertising context, these prohibitions apply to both the person who drafted or placed the ad as well as the publisher of the ad because the negative effect of discriminatory advertising would be magnified if widely circulated by newspapers and other mass media.  *See United States v. Hunter*, 459 F.2d 205, 215 (4th Cir. 1972).  Under the FHA, illegal advertising practices not only discourage or prevent buyers and renters from accessing information about housing opportunities, but also create an impression that housing segregation is legal, thus facilitating future discrimination by others.  *See Spann v. Colonial Village, Inc*., 899 F.2d 24, 29 (D.C. Cir. 1990).

39.     It is black-letter law that publishing advertisements that indicate discriminatory preferences or limit the information available on the basis of discriminatory preferences is illegal.  *See Ragin v. New York Times*, 923 F.2d 995 (2d Cir. 1991); 24 C.F.R. § 100.80(b)(4) (explaining that § 3604(d) prohibits "[l]imiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race, color, religion, sex, handicap, familial status, or national origin").

40.     The continuing presence of discriminatory advertising practices serves to encourage both the housing provider and the home seeker to believe housing discrimination is "an accepted norm despite the FHA's pronouncements to the contrary."  Robert Schwemm, *Discriminatory Housing Statements and § 3604(c): A New Look at the Fair Housing Act's Most Intriguing Provision*, 29 Fordham Urb. L.J. 187, 250 (2001).

10

41.     Lastly, the FHA provides that "it shall be unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or *other service, organization, or facility relating to the business of selling or renting dwellings*, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, handicap, familial status, or national origin."  42 U.S.C. § 3606 (emphasis added).

42.     This prohibition applies to multiple-listing services, real estate organizations, rental listing services, and other entities in the business of providing services and/or information related to selling or renting housing.  *See United States v. Space Hunters, Inc.*, No. 00-CIV-1781, 2001 WL 968993, at *5 (S.D.N.Y. Aug. 24, 2001), *aff'd in relevant part*, *United States v. Space Hunters, Inc.*, 429 F.3d 416, 421 (2d Cir. 2005).

## V.     FACTUAL ALLEGATIONS

### A.     Facebook's Powerful and Far-Reaching Advertising Platform

43.     Facebook generated over $40 billion in revenue last year, almost all of which was made through selling advertisements on its website.

44.     Facebook's platform provides advertisers with "a number of different ways to engage with people on Facebook, the most important of which is the News Feed which displays an algorithmically-ranked series of stories and advertisements individualized for each person."[9]

45.     As Facebook promotes itself to its prospective advertisers, its greatest advertising asset is its user base of over 2 billion people.[10]  This user base includes not only Facebook users,

---

[9] Facebook Investor Relations, https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=12512043 (Facebook, Inc. Annual Report for the Fiscal Year Ended December 31, 2017).

[10] Facebook Business, *Facebook Ads*, https://www.facebook.com/business/products/ads (last visited March 21, 2018).

but also users of other applications owned by Facebook, including Instagram.  Facebook collects

a remarkable amount of information about each one of these users.

46.     Although Facebook users often voluntarily provide limited personal information,

such as their age, gender, employer, and limited other categories, most of the data Facebook

collects is not self-reported.[11]

47.     The vast majority of this information comes from Facebook's collection,

evaluation, and processing of their users' behavior both on and off Facebook to learn about

users' demographics (for example, their family status), their interests (for example, their political

leanings or hobbies), and their behaviors (for example that they are "recent mortgage borrowers"

or that their "spending method" is "primarily cash").[12]

48.     Users are given no choice but to provide this data when they register for a

Facebook account, as allowing Facebook to "process" this information about its users is a

mandatory condition of using the Facebook site.[13]

49.     The end result has been described as "arguably the most complete consumer

profile on earth,"[14] as it reflects each Facebook user's demographics, location, interests, and

online behaviors.

---

[11] Upturn, *Leveling the Platform: Real Transparency for the Paid Messages on Facebook*, at 8 (May 2018), available at https://www.teamupturn.org/static/reports/2018/facebook-ads/files/Upturn-Facebook-Ads-2018-05-08.pdf.

[12] *Id.*

[13] Facebook, *Data Policy*, https://www.facebook.com/full_data_use_policy (last visited June 25, 2018).

[14] Caitlin Dewey, *98 personal data points that Facebook uses to target ads to you*, Wash. Post (Aug. 19, 2016), https://www.washingtonpost.com/news/the-intersect/wp/2016/08/19/98-personal-data-points-that-facebook-uses-to-target-ads-to-you/?utm_term=.58ce94764ccf.

50.     Facebook then employs algorithms to analyze, sort, and repurpose this treasure trove of information so that advertisers can "target the people who are right for [their] business."[15]

51.     These algorithms automatically designate each Facebook user as falling into the various categories it has determined fit that user's demographics, interests, and behaviors.

52.     Facebook users' personal information regarding demographics, interests, and behaviors does not just passively flow untouched from the users to advertisers.  Rather, Facebook extracts data from its users' online behavior, both on Facebook and off, and uses algorithms designed to sort that data, process it, and repackage it to group potential customers into new and salient categories for advertisers to choose from when targeting their ads.

53.     These data-analyzing algorithms and the resulting Facebook-created content empower advertisers to seek out potential audiences with incredible specificity.  Advertisers can target users based on information as general as geographic location, or as specific as their birthday or preferred methods of payment.  Advertisers would not be able to engage in this targeted advertising without the categories and content that Facebook creates and develops.

### 1.  Facebook's Use of "Include" and "Exclude" Options

54.     Facebook has designed its advertising platform so that advertisers can "target" their audience using two general actions—"including" specific types of people and "excluding" specific types of people.

55.      Once Facebook has analyzed the immense amount of personal data it collects and has used it to classify potential customers by categories based on their perceived demographics, interests, and behaviors, Facebook then provides its advertisers with a pre-populated list of these

---

[15] Facebook Business, *Choose Your Audience*,  https://www.facebook.com/business/products/ads/ad-targeting (last visited March 21, 2018).

demographics, interests, and behaviors (the "Facebook Pre-Populated List").  As explained

above, only a handful of categories (age, gender, location, language, university, field of study,

employer, and any "liked" pages) are self-reported by users.  The majority of these hundreds of

categories are new categories that Facebook's algorithms create after Facebook sorts and

analyzes each Facebook user's online activity.

56.     Advertisers then scroll through this Facebook-created content and select which

characteristics they would like to "include" and which they would like "exclude" from the ad's

audience.

57.     For example, when an advertiser checks the pre-populated box to "include" the

Facebook-created demographic category of parents with toddlers (01-02), parents with toddlers

(01-02) become the target audience for the ad and, through Facebook's algorithms arranging the

ad delivery process, only parents with toddlers will receive the ad on their Facebook pages or in

their News Feeds.  Non-parents will not receive the ad.

58.     When an advertiser "excludes" a specific demographic, behavior, or interest, no

person who reflects that quality will receive the ad.  If an advertiser checks the pre-populated

box to exclude the Facebook-created interest category of people who have an interest in cooking,

Facebook's algorithms similarly ensure that no one with that interest will receive the

advertisement on their Facebook page or in their News Feed.

59.     These features can also be used simultaneously.  For example, if an advertiser

"includes" parents with toddlers but also "excludes" people with an interest in cooking, the ad

will only appear on the Facebook pages or in the News Feeds of parents with toddlers who do

not have an interest in cooking.  Facebook's algorithms prevent non-parents, or parents with non-

toddler children, (who are excluded because they were not "included" in the "target" audience)

and people with an interest in cooking (who were "excluded" even if they otherwise would be in the target audience) from receiving the ad.

60.     Facebook creates, in whole or in part, almost all of the information provided to advertisers to "include" or "exclude" certain persons.

61.     As advertisers add and subtract groups from their potential audience, Facebook provides them with real-time estimates of how many people can view their advertisements.  A screenshot of how this appears on Facebook's platform is attached hereto as Exhibit A.

62.     Facebook has placed these features on at least two different advertising platforms—by "boosting" posts and through Facebook Ad Manager.

63.     Facebook has also created algorithms to provide "lookalike" audiences to advertisers.  Under this feature, advertisers provide Facebook custom audiences they believe are good for their business, and Facebook employs its own algorithms to create new audiences that resemble that custom audience.  As Facebook itself explains, "[a] Lookalike Audience is a way to reach new people who are likely to be interested in your business because they're similar to your best existing customers."[16]  After the advertiser provides Facebook with its custom audience, Facebook will "hash [its] data, upload it and create the [new] audience."[17]  In creating these new "Lookalike Audiences" Facebook's algorithms consider protected characteristics such as sex, familial status, disability, race, and national origin.[18]

---

[16] Facebook Business, *Advertising Help Center*, https://www.facebook.com/business/help/164749007013531 (last visited June 25, 2018).

[17] Facebook Business, *Advertising Help Center*, https://www.facebook.com/business/help/170456843145568 (last visited June 25, 2018).

[18] Upturn, *Leveling the Platform: Real Transparency for the Paid Messages on Facebook*, at 9 (May 2018), available at https://www.teamupturn.org/static/reports/2018/facebook-ads/files/Upturn-Facebook-Ads-2018-05-08.pdf.

### 2. Facebook's Use of "Boosts"

64.    In order to "boost" a post, a business will first create a post to be published on its Facebook page.  This could be information about the business, a new promotion—anything that the business would like to share with its customers.

65.    The advertiser may then pay to "boost" that post by having it appear as an advertisement on the Facebook pages or in the News Feeds of various other Facebook users.

66.    To select which Facebook users receive that "boosted" advertisement, the business may use the same "inclusion" and "exclusion" features described above.

67.    While any Facebook user may view the ad on the business's Facebook page, only users in the audience selected by the advertiser will receive a "boosted" advertisement on their own Facebook pages or in their news feeds.

68.    For example, a restaurant may post about a new addition to its menu on its Facebook page.  It could then "boost" that post to an "included" or "targeted" audience—i.e., persons who live within 10 miles of the restaurant and have an interest in Italian food—both categories in the Facebook Pre-Populated List.  In this circumstance, any Facebook user could view the post by navigating to the restaurant's Facebook page, but only those in the targeted audience would receive the advertisement on their own pages or in their News Feeds.

### 3. Facebook "Ad Manager"

69.    Facebook also offers its advertisers the option to use Facebook Ad Manager. Using Ad Manager, an advertiser can customize exactly who will receive its advertisement, as well as various other features such as where and how frequently the ad appears on the Facebook accounts of its targeted audience.  In this circumstance, only the audience selected using the "inclusion" and "exclusion" features above will be able to view the ad.

70.     For example, a restaurant could create an advertisement using Ad Manager for a new menu item and then select its audience using the "inclusion" and "exclusion" features—i.e., "include" persons who live within ten miles of the restaurant and/or have an interest in Italian food but "exclude" persons with an interest in cooking.  In this circumstance only persons who live within ten miles of the restaurant or have an interest in Italian food, but do not have an interest in cooking, will be able to view the post.

**B.     ProPublica Reveals Facebook's Discriminatory Housing Advertising Platform**

71.     On October 28, 2016, the investigative news nonprofit ProPublica published an article reporting that Facebook's online platform enabled advertisers to exclude Facebook users assigned black, Hispanic and other "ethnic affinities" from seeing advertisements in the housing category through its advertising portal.[19]

72.     In response to ProPublica's article, NFHA investigated Facebook's practices.

73.     On November 3, 2016, an NFHA employee using a personal Facebook account created an advertisement using Facebook Ad Manager.  The ad was for a fictitious apartment for rent and the employee selected for it to be advertised across the United States.  Using the "exclusions" feature within Ad Manager, the employee selected the demographic preset options of "African-Americans" and "Hispanics" to exclude African-Americans and Hispanics from the ad's potential audience.  Facebook approved this ad.  The ad ran for three days.  A screenshot of these demographic preset options is attached hereto as Exhibit B.

74.     On November 3, 2016, NFHA sent Facebook a letter stating that Facebook's advertising features appeared to violate the FHA and state laws, and that it was "illegal for an

---

[19] Julia Angwin and Terry Parris Jr., *Facebook Lets Advertisers Exclude Users By Race*, Propublica.org (Oct. 28, 2016), https://www.propublica.org/article/facebook-lets-advertisers-exclude-users-by-race.

online advertiser to filter housing-related advertising in a discriminatory manner on the basis of race, religion, national origin and other protected characteristics."

75. On November 7, 2016, Facebook's representative responded to NFHA via email stating: "We think ethnic affinity marketing is really valuable in promoting diversity of the voices and images on our platform, but we also understand the concerns we're hearing about wrongful discrimination. At this point, we're listening to stakeholders like you and considering the way forward."

76. On November 10, 2016, NFHA met with Facebook representatives with regard to the discriminatory advertising platform. NFHA explained to the Facebook representatives present that the Fair Housing Act and civil rights laws prohibited any system which excluded certain categories of people from viewing advertisements for housing, employment or credit. NFHA requested that Facebook cease and remedy its discriminatory behavior.

77. On November 11, 2016, NFHA sent Facebook citations to legal cases regarding its liability for its advertising platform.

78. On November 11, 2016, Facebook posted a statement on its "Newsroom" titled "Improving Enforcement and Promoting Diversity: Updates to Ethnic Affinity Marketing," in which it stated that it would "disable the use of ethnic affinity marketing for ads that we identify as offering housing, employment or credit."[20]

79. On February 8, 2017, Facebook published a statement on its website titled, "Improving Enforcement and Promoting Diversity: Updates to Ads Policies and Tools."[21]

---

[20] Erin Egan, *Improving Enforcement and Promoting Diversity: Updates to Ethnic Affinity Marketing*, newsroom.fb.com, (Nov. 11, 2016), https://newsroom.fb.com/news/2016/11/updates-to-ethnic-affinity-marketing/.

[21] *Improving Enforcement and Promoting Diversity: Updates to Ads Policies and Tools*, newsroom.fb.com (Feb. 8, 2017), https://newsroom.fb.com/news/2017/02/improving-enforcement-and-promoting-diversity-updates-to-ads-policies-and-tools/.

Facebook committed to end the use of "ethnic affinity marketing" for ads that it identified as offering housing, employment, or credit. For ads that use Facebook's other exclusion and inclusion categories, Facebook said it would require housing, employment, and credit advertisers to "self-certify" that their ads complied with anti-discrimination laws.

80. In its self-certification feature, Facebook states that "when running an ad for an apartment for rent, it may be illegal to exclude people who have children from that opportunity."[22]

81. On November 21, 2017, more than a year after its original report, ProPublica published a second story revealing that Facebook had not followed through on its commitment to remedy its discriminatory conduct, and that Facebook continued to create content that enables housing advertisers to exclude users by prohibited categories such as race and national origin.[23]

82. ProPublica reported that it had bought dozens of rental housing ads on Facebook, but asked that they not be shown to certain categories of users, such as African-Americans, mothers of high school kids, people interested in wheelchair ramps, Jews, expats from Argentina, and Spanish speakers. Facebook had approved all of these ads.

83. Based on Facebook's prior announcement that it would end the use of "ethnic affinity marketing" for housing opportunities, Facebook should have rejected the ads purchased by ProPublica that excluded viewers on the basis of race. The other ads should have prompted a screen to pop up asking for self-certification. ProPublica reported that it never encountered a self-certification screen, and Facebook rejected none of its ads.

---

[22] *Id.*

[23] Julia Angwin, Ariana Tobin, Madeleine Varner, *Facebook (Still) Letting Housing Advertisers Exclude Users by Race*, propublica.org (Nov. 21, 2017), https://www.propublica.org/article/facebook-advertising-discrimination-housing-race-sex-national-origin.

C.   **Plaintiffs' Investigation Into Facebook's Housing Advertising Platform Confirms Discriminatory Practices Continue**

84.   In response to ProPublica's November 21, 2017 report, NFHA commenced an investigation into Facebook's advertising practices.

85.   On November 30, 2017, an NFHA employee using a personal Facebook account created a Facebook page for a non-existent real estate company entitled "Metro Boutique Rentals." Through this page, NFHA staff viewed Facebook's Ad Manager and Boost features.

86.   In summary, NFHA's initial investigation into Facebook's practices found as follows:

a.   The Facebook Pre-Populated List provided housing advertisers with the option of excluding potential audience members from housing ads on the basis of demographic categories that Facebook created based on its own analysis of users' online activity, including race and national origin.

b.   At some point, Facebook eliminated the option from the Facebook Pre-Populated List for housing advertisers to exclude potential audience members from housing opportunities on the basis of race and national origin.

c.   The Facebook Pre-Populated List created the capability for housing advertisers to exclude people from seeing their ads on the basis of their family status in a variety of ways. It provided checkboxes of family-status related categories created by Facebook from analyzing and repurposing users' data that housing advertisers could use to remove persons from their potential audience, such as parents with toddlers (01-02), parents with preschoolers (03-05), parents with early school-age children (06-08), moms of grade school kids, and moms of high school kids. A screenshot of how

20

these exclusions appear on Facebook's Boost and Ad Manager features is attached hereto as Exhibit C.

d.  The Facebook Pre-Populated List created the capability for housing advertisers to "include" potential audience members based on an interest in "no kids."

e.  The Facebook Pre-Populated List created content for housing advertisers to exclude people from seeing their ads on the basis of sex.  It provided checkboxes that housing advertisers could use to exclude either men or women from viewing their ads by checking the box to "include" the other.  A screenshot of how these exclusions appear on Facebook's Boost and Ad Manager features is attached hereto as Exhibit D.

f.  The Facebook Pre-Populated List created content for housing advertisers to exclude on the basis of interest categories created by Facebook and derived from Facebook's data analysis that are the equivalent of protected characteristics, such as: Interest in Disabled American Veteran, Interest in Disabled Parking Permit, Interest in Disability.gov, Interest in Telemundo, and Interest in English as a second language. Screenshots of how these exclusions on Facebook's Boost and Ad Manager features are attached hereto as Exhibit E.

g.  Facebook had created algorithms to provide "suggested" audiences to advertisers based on the audiences selected in their prior ads.  Facebook's "suggestions" included demographic and interest categories that discriminate on the basis of protected characteristics such as sex, familial status, disability, race, or national origin.

### 1.  Facebook's Discrimination in the Washington, D.C. Housing Market

#### a.  Boost Investigation

87.  On January 2, 2018, an NFHA employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to

promote the ad in Washington, D.C.  Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, the employee selected the preset options of those with interests in the "National Association for Bikers with a Disability," "Disabled American Veterans," "Disability.gov," and "Disabled Parking Permit" to exclude from the Boost's potential audience.   Facebook estimated that the Boost would reach 1.2 million people.

88.     On January 2, 2018, an NFHA employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to promote the ad in Washington, D.C.  Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, the employee selected the preset options of those with interests in "Telemundo," "English as a second language," and "Univision Deportes" to exclude from the Boost's potential audience.  Facebook estimated that the Boost would reach 1.2 million people.

89.    On January 3, 2018, an NFHA employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the Washington, D.C. market.  Using the Facebook Pre-Populated List and the "inclusion" feature within Boost, the employee selected the preset demographic option of "men," thereby excluding women from the Boost's potential audience.  Facebook estimated that the Boost would reach 500,000 people.

90.     On January 3, 2018, an NFHA employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the Washington, D.C market.  Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, the employee selected the preset demographic options of "parents with toddlers (01-02 years), parents with preschoolers (03-05 years), parents with early

school-age children (06-08 years), and parents with preteens (13-18 years)" to exclude families
with young children from the Boost's potential audience. Facebook estimated that the Boost
would reach 1.2 million people.

91.     In January 2018 and February 2018, an NFHA employee using a personal
Facebook account created multiple ads for fictitious apartments for rent and again used
Facebook's Boost feature to target each ad to the Washington, D.C. market. The employee then
used the Facebook Pre-Populated List and the "exclusion" features within Boost to select
multiple combinations of the  preset demographic options of "parents with toddlers (01-02),"
"parents with preschoolers (03-05)," "parents with early school-age children (06-08)," "parents
with teenagers (13-18)," "parents with preteens (08-12)," "corporate moms," "stay-at-home
moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms,"
"big-city moms," "trendy moms," "soccer moms," and "moms of preschool kids" to exclude
families with young children and mothers from the Boost's potential audience. In many of these
Boosts, and in additional Boosts targeted to the Washington, D.C. market, the employee used the
Facebook Pre-Populated List and the "inclusion" feature within Boost to select the preset
demographic option of "men," thereby excluding women from the Boosts' potential audience.
Facebook estimated that these Boosts would reach anywhere from 58,000 to 580,000 people.

### b.  Ad Manager Investigation

92.     On December 14, 2017, an NFHA employee using a personal Facebook account
created an ad using Facebook Ad Manager for a fictitious apartment for rent. The employee
selected Washington, D.C. as the market for the ad to run in. Using the Facebook Pre-Populated
List and the "exclusions" feature within Ad Manager, the employee selected the preset
demographic options of "new parents (0-12 months)" and "parents with preschoolers (03-05)" to

23

exclude families with young children from the ad's potential audience.  Facebook estimated that the ad would reach 77,000 people.

93.  Throughout February 2018, an NFHA employee using a personal Facebook account created additional ads for fictitious apartments for rent using Facebook Ad Manager and again selected Washington, D.C. as the market for the ads to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, the employee selected combinations of the preset options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms" and "moms of preschool kids" to exclude mothers from the ad's potential audience.  In many of these ads and in additional ads targeted to the Washington, D.C. market, the employee used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," thereby excluding women from the ad's potential audience.  Facebook estimated that these ads would reach anywhere from 48,000 to 820,000 people.

### c.  Investigation of Other Major Housing Markets

94.  In light of its investigation of Facebook's practices in the Washington, D.C. housing market, NFHA investigated other major housing markets across the United States.

95.  On February 1, 2018, an NFHA employee using a personal Facebook account created four ads for fictitious apartments for rent and then used Facebook's Boost feature to target one ad each to four major markets in different regions of the country.  Using the Facebook Pre-Populated List and Boost's "inclusion" feature, the employee selected the preset interest inclusion option of "no kids" and the present demographic inclusion option of "men" to target for the ad.  Using the "exclusions" feature within Boost for each ad,  the employee selected the demographic preset options of "corporate moms," "stay-at-home moms," "moms of grade school

kids," "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02)," "parents with preschoolers (03-05)," "parents with early school-age children (06-08)," "parents with teenagers (13-18)," and "parents with preteens (08-12)" to exclude families with young children and mothers from each Boost's potential audience. Facebook estimated that these four Boosts would reach a total of 463,000 people.

96.     Having determined that Facebook had likely developed the same discriminatory content in other major housing markets, NFHA contacted three of its member groups; FHJC, HOPE, and FHCGSA. NFHA provided these groups with training on how to use the Facebook advertising features and conduct a similar investigation. These groups investigated on their own and jointly with NFHA to assess Facebook's discriminatory practices in their home markets.

### 2. Facebook's Discrimination in the New York, New York Housing Market

#### a. Boost Investigation

97.     On January 30, 2018, an NFHA employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the New York, New York market. Using the Facebook Pre-Populated List and Boost's "inclusion" and "exclusion" features, the employee selected combinations of (1) the preset interest inclusion option of "no kids" and the present demographic inclusion option of "men" to target for the ad, and (2) the preset demographic exclusion options of "moms of grade school kids," "moms of high school kids," "moms of preschool kids" and "stay-at-home moms," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents

with preteens (08-12 years)" to exclude families with children and mothers from the Boost's potential audience. Facebook estimated that this Boost would reach 280,000 people.

98. On February 13, 2018, an FHJC employee created a personal Facebook account, created an ad for a fictitious apartment for rent, and then used Facebook's Boost feature to target the ad to the New York, New York market and its surrounding areas within ten miles. Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, the employee selected the preset demographic options of "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children from the Boost's potential audience. The employee also used the Facebook Pre-Populated List and the "inclusion" feature within Boost to select the preset demographic option of "men," and thereby exclude women from the Boost's potential audience. Facebook estimated that the Boost would reach 95,000 people.

99. On February 13, 2018, FHJC employees used a personal Facebook account to create an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the New York City, New York market and its surrounding areas within ten miles. Using the Facebook Pre-Populated List "inclusion" feature within Boost, the employee selected the preset demographic option of "men," thereby excluding women from the Boosts' potential audience. Facebook estimated that the Boost would reach 44,000 people.

**b. Ad Manager Investigation**

100. In February 2018, an NFHA employee using a personal Facebook account created two ads for fictitious apartments for rent, and selected New York, New York as the market for the ads to run in. Using the Facebook Pre-Populated List and Ad Manager's "exclusions" feature, the employee selected the preset demographic options of "corporate moms," "stay-at-

26

home moms," "moms of grade school kids,"  "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children and mothers from the ads' potential audience.  In one of these ads, the employee used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," and thereby exclude women from the ad's potential audience.  Facebook estimated that the ads would reach 80,000 to 10 million people.

101.    On February 21, 2018, an FHJC employee using a personal Facebook account created an ad using Facebook Ad Manager for a fictitious apartment for rent.  The employee selected New York, New York and its surrounding areas within twenty-five miles as the market for the ad to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, the employee selected the preset demographic options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms,"  "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children and mothers from the ad's potential audience.  The employee used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," and thereby exclude women from the ad's potential audience.   Facebook estimated that the ad would reach 5 million people.

102.    On February 23, 2018, FHJC and NFHA employees using a personal Facebook account collaborated to create an ad using Facebook Ad Manager for a fictitious apartment for rent.  The employees selected New York, New York and its surrounding areas within twenty-five miles as the market for the ad to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, the employees selected the preset demographic options of "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children from the ad's potential audience.  Facebook estimated that the ad would reach 5.2 million people.

### 3.    Facebook's Discrimination in the Miami, Florida Housing Market

#### a.  Boost Investigation

103.    On February 21, 2018, a HOPE employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the Miami, Florida market and its surrounding area within ten miles.  Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, the employee selected the preset demographic options of "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)"  to exclude families with young children from the Boost's potential audience.  The employee also used the Facebook Pre-Populated List and the "inclusion" feature within Boost to select the preset demographic option of "men," thereby excluding women from the Boost's potential audience.  Facebook estimated that the Boost would reach 450,000 people.

104.    On February 21, 2018, a HOPE employee using a personal Facebook account created an additional ad for a fictitious apartment for rent and used Facebook's Boost feature to

28

target the ad to the Miami, Florida market and its surrounding areas within ten miles.  Using the

Facebook Pre-Populated List and the "inclusion" feature within Boost, the employee selected the

preset demographic option of "men," thereby excluding women from the Boost's potential

audience.  Facebook estimated that the Boost would reach a total of 490,000 people.

### b.  Ad Manager Investigation

105.    On February 12, 2018, an NFHA employee using a personal Facebook account

created a fictitious apartment for rent and selected Miami, Florida as the market for the ad to run

in.  Using the Facebook Pre-Populated List and the "exclusion" feature within Ad Manager, the

employee selected the preset demographic options of "corporate moms," "stay-at-home moms,"

"moms of grade school kids," "moms of high school kids," "fit moms," "green moms," "big-city

moms," "trendy moms," "soccer moms," and "moms of preschool kids" to exclude families with

young children and mothers from the ad's potential audience.  The employee also used the

Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset

demographic option of "men," thereby excluding women from the ad's potential audience.

Facebook estimated that the ad would reach 200,000 people.

106.    On February 21, 2018, a HOPE employee using a personal Facebook account

created an ad using Facebook Ad Manager for a fictitious apartment for rent.  The employee

selected Miami, Florida and its surrounding areas within twenty-five miles as the market for the

ad to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad

Manager, the employee selected the preset demographic options of "corporate moms," "stay-at-

home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green

moms," "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents

with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early

school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with

preteens (08-12 years)" to exclude families with young children and mothers from the ad's
potential audience.  The employee also used the Facebook Pre-Populated List and the "inclusion"
feature within Ad Manager to select the preset demographic option of "men," thereby excluding
women from the ad's potential audience.  Facebook estimated that the ad would reach 750,000
people.

107.    On February 23, 2018, HOPE and NFHA employees using a personal Facebook
account collaborated to create an ad using Facebook Ad Manager for a fictitious apartment for
rent.  The employees selected Miami, Florida and its surrounding areas within ten miles as the
market for the ad to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature
within Ad Manager, the employees selected the preset demographic options of "parents with
toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-
age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens
(08-12 years)," to exclude families with young children from the ad's potential audience.  The
employees also used the Facebook Pre-Populated List and the "inclusion" feature within Ad
Manager to select the preset demographic option of "men," thereby excluding women from the
ad's potential audience.  Facebook estimated that the ad would reach 450,000 people.

108.    On February 23, 2018, HOPE and NFHA employees using a personal Facebook
account collaborated to create an additional ad using Facebook Ad Manager for fictitious
apartments for rent.  The employees selected Miami, Florida and its surrounding areas within
sixteen miles as the market the markets for the ad to run in.  Using the Facebook Pre-Populated
List and the "inclusion" feature within Ad Manager, the employees selected the preset
demographic option of "men," thereby excluding women from the ads' potential audience.
Facebook estimated that the ad would reach 2.8 million people.

30

### 4. Facebook's Discrimination in the San Antonio, Texas Housing Market

#### a. Boost Investigation

109.    On February 12, 2018, an NFHA employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the San Antonio, Texas market.  Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, the employee selected the preset demographic options of "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children from the Boost's potential audience.  The employee also used the Facebook Pre-Populated List and the "inclusion" feature within Boost to select the preset demographic option of "men," thereby excluding women from the Boost's potential audience.  Facebook estimated that the Boost would reach 280,000 people.

110.    On February 16, 2018, an FHCGSA employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the San Antonio, Texas market and its surrounding area within ten miles.  Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, the employee selected the preset demographic options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude mothers and families with young children from the Boost's potential audience.  The employee also used the Facebook Pre-Populated List and the "inclusion" feature within Boost to

31

select the preset demographic option of "men," thereby excluding women from the Boost's

potential audience.  Facebook estimated that the Boost would reach 270,000 people.

111.    On February 21, 2018, an FHCGSA employee using a personal Facebook account

created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to

promote the ad in the San Antonio, Texas market and its surrounding area within ten miles.

Using the Facebook Pre-Populated List and the "inclusion" feature within Boost, the employee

selected the preset option of "women," thereby excluding men from the Boost's potential

audience.  Facebook estimated that the Boost would reach 330,000 people.

### b.  Ad Manager Investigation

112.    On February 23, 2018, an FHCGSA employee using a personal Facebook account

created three ads using Facebook Ad Manager for fictitious apartments for rent.  The employee

selected San Antonio, Texas and its surrounding areas within ten miles as the market for the ad

to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad

Manager, the employee selected combinations of the preset options of "corporate moms," "stay-

at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green

moms,"  "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents

with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early

school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with

preteens (08-12 years)"  to exclude mothers and families with young children from the ad's

potential audience.  In two of these ads, the employee used the Facebook Pre-Populated List and

the "inclusion" feature within Ad Manager to select the preset demographic option of "men,"

thereby excluding women from the ads' potential audience.  Facebook estimated that the ads

would reach 340,000, and 440,000 people respectively.

32

**D.    Common Allegations Regarding the Results of Plaintiffs' Investigation into Facebook's Discriminatory Housing Advertising**

113.    Facebook approved all of the Boosts and ads described above in paragraphs 87-112 in anywhere from one minute to approximately one hour.

114.    After Facebook approved them, all of the Boosts and ads described above in paragraphs 87-112 were removed from Facebook by the respective persons who created them.

115.    Facebook's Advertising Policies do not comply with the Fair Housing Act or with state and local fair housing laws, including in New York.

116.    Under the caption "Discriminatory Practices," Facebook states: "Ads must not discriminate or encourage discrimination against people based on personal attributes such as race, ethnicity, color, national origin, religion, age, sex, sexual orientation, gender identity, family status, disability, medical or genetic condition."[24]

117.    This policy misleads Facebook users because, for example, it does not state that there are additional categories of prohibited discrimination in state and local fair housing laws such as marital status, military status, status as a survivor of domestic violence, lawful source of income, including rental subsidies, and others.

118.    The policy further misstates the obligations imposed by the FHA because, among other things, it does not explain that indicating a preference or limitation based on a protected characteristic constitutes illegal discrimination and that advertisements that deny information about housing opportunities to particular segments of the housing market violate the FHA.

119.    Although Facebook stopped approving housing advertisements that used its "ethnic affinity" option in late 2017, it continues to curate an entire system of discriminatory

---

[24] Facebook, *Discriminatory Practices*,
https://www.facebook.com/policies/ads/prohibited_content/discriminatory_practices# (last visited June 25, 2018).

advertising—analyzing and repurposing user data to create and develop content created so that advertisers can exclude protected classes from receiving housing ads.

120. Facebook created the Pre-Populated List so that landlords and real estate agents can target certain persons or groups for, and exclude other persons or groups from, receiving housing ads.

121. The vast majority of the categories provided on the Facebook Pre-Populated List are not from data voluntarily given by users. Instead, through its own analysis of user data, Facebook develops and provides these new and salient categories so that landlords and real estate agents can include and exclude people from receiving housing advertisements, including on the basis of family status.

122. Between December 14, 2017 and February 23, 2018, Facebook accepted for publication 40 advertisements from Plaintiffs that excluded potential home seekers on the basis of family status and/or sex.

123. Facebook also uses the data it gathers from its users' online activity to create "interests" categories for housing advertisements that permit a landlord or real estate firm to exclude users based on disability-related factors (for example, by checking the pre-populated category of "Interest in Disabled Parking Permit") and national origin (for example, "Interest in Telemundo").

124. These categories deny information about housing opportunities to persons with disabilities, persons living with or associating with persons with disabilities, and/or persons who are Hispanic or speak Spanish and are more likely to be Hispanic. These Facebook-created "interest" categories are the equivalent of demographic exclusion categories labeled "disability"

or "Hispanic."  There is no lawful reason for Facebook to create this content so that advertisers can exclude potential audience members for housing ads on these bases.

125.    As recently as March 23, 2018, an NFHA employee attempted to "edit" an ad that it created in November 2016 that excluded potential audience members only on the basis of race and national origin.  The employee received a message from Facebook stating that "some of the detailed targeting selections you originally used in your Saved Audience are no longer available.  They won't show up in this audience targeting, *but the associated ads will still deliver to the original audience*.  However, you'll be unable to use these detailed targeting selections if you edit this audience or try running future ads with it." (emphasis added).

126.    Based on this message, it appears that even though Facebook removed discriminatory demographic selections that allowed advertisers to exclude on the basis of race and national origin from the Facebook Pre-Populated List, it still allows previously existing ads that excluded or targeted on these bases to continue to do so.

127.    When Facebook users grant Facebook access to their data, they do not authorize Facebook to use that data to discriminate against them on the basis of their protected characteristics, such as their sex, family status, race, national origin, and disability status.  By exploiting users' data in this manner, Facebook transforms the character of the data in a manner to which the users did not consent and could not reasonably foresee.

128.    There is no lawful purpose for a housing advertiser to include or exclude a prospective renter from viewing a housing ad on the basis of that renter's sex, family status, disability status, race, or national origin.

129.    By creating the Facebook Pre-Populated List, a database that sorts users by these protected characteristics and allows advertisers to include and exclude its audience members on

35

those bases, Facebook materially contributes to ongoing violations of the Fair Housing Act made through its advertising platform.

130.    By exploiting user data, gathered from analyzing Facebook users' activities on Facebook, Instagram, and elsewhere throughout the internet, to create new categories based on these protected characteristics within the Facebook Pre-Populated List, Facebook materially contributes to ongoing violations of the Fair Housing Act made through its advertising platform.

131.    By creating and developing algorithms that use data regarding protected characteristics such as sex, familial status, disability, race, and national origin to create "suggested" or "lookalike" audiences for advertisers, Facebook materially contributes to ongoing violations of the Fair Housing Act made through its advertising platform.

132.    Plaintiffs' investigation demonstrates that despite notice from NFHA and other civil rights groups as early as 2016 of its clear violations of the federal Fair Housing Act, Facebook has continued to engage in discriminatory housing advertising practices.

133.    Facebook has acted intentionally, willfully, and with reckless disregard of existing federal and local fair housing rights.

## VI.    HARM TO PLAINTIFFS CAUSED BY FACEBOOK THROUGH DIVERSION OF RESOURCES AND FRUSTRATION OF MISSION

134.    Facebook's discriminatory and unlawful practices have frustrated and continue to frustrate each Plaintiff's mission of ensuring that all people have equal access to housing opportunities and promoting residential integration across the country, as well as in the New York City, Washington, D.C., Miami, and San Antonio metropolitan areas.

135.    In an effort to address and to counteract the effects of Defendant's discriminatory conduct, prior to the filing of this action, each of the Plaintiffs has diverted resources and staff from other activities to investigate and document Defendant's policies and practices.  Each

36

Plaintiff also engaged in public education efforts, prior to this filing, to raise awareness of discriminatory housing advertising practices in the communities each Plaintiff serves.

136.    Prior to the filing of this Complaint, NFHA diverted and expended financial resources and staff time to, among other things, design and implement the investigation, including time to train and work with other Plaintiffs on their investigations; review and analyze the investigative results; and conduct legal research and seek legal advice from attorneys.

137.    FHJC, HOPE, and FHCGSA each expended staff time and other resources to investigate Defendant's advertising practices, which diverted staff and resources away from other organizational activities, prior to the filing of this Complaint.  Among other things, FHJC, HOPE, and FHCGSA spent time being trained by NFHA to use Facebook's advertising platform, create a non-existent realty firm, and design and document their efforts to create and place housing advertisements on Facebook.

138.    If Facebook had complied with the requirements of the FHA after being informed of them by NFHA, then Plaintiffs would not have devoted considerable staff time and resources to identify the nature and scope of Facebook's advertising policies and practices.

139.    Each Plaintiff's mission is frustrated when Facebook excludes members of the public from access to housing advertising and information about housing opportunities based on their sex, familial status, disability, race, national origin, or other protected characteristics.

140.    Because Facebook's discriminatory advertising practices alleged in this Complaint violate federal, state, and local fair housing laws, they undermine rather than advance equal housing opportunity and perpetuate the harms of residential segregation.

141.    To address and attempt to counteract the effects of Facebook's discriminatory conduct, prior to the filing of this action, each Plaintiff has engaged in public education

campaigns to raise public awareness of the problem of discriminatory housing advertising and to

educate housing providers about their legal obligations under fair housing laws not to advertise

housing for rent or sale in a discriminatory manner.

142.    In early 2018, NFHA drafted guidelines for housing advertisers that it posted on

its website in English and Spanish with a link to specific information about each state's fair

housing laws, a copy of the HUD fair housing logo for advertisers to use, previously produced

public service announcements, and a recorded webinar on discriminatory advertising held by

NFHA in April 2017.

143.    In early 2018, each Plaintiff expended staff time to develop education campaigns

and design advertisements for social media aimed to reach housing providers who place ads and

consumers searching for housing in the Washington D.C., New York City, Miami, and San

Antonio metropolitan regions.  Plaintiffs posted these ads on Facebook and Twitter on an

ongoing basis, including translating ads into Spanish.

144.    During this same time period, each Plaintiff expended staff time to communicate

and coordinate with each other about their individual education campaigns to ensure Plaintiffs

were providing a consistent message reaching both housing providers and consumers in each

metropolitan area.  Each Plaintiff also has expended staff time prior to filing this Complaint to

begin to design workshops, a webinar, consumer flyers, and/or fact sheets.  Finally, NFHA has

begun to contact online education providers who offer courses on using social media for

advertising to request that they distribute information about housing advertising guidelines and

best practices that comply with fair housing laws.

145. As a direct and proximate result of Facebook's discriminatory practices described above, each Plaintiff has suffered and will continue to suffer a diversion of its resources and a frustration of its mission.

**FIRST CLAIM FOR RELIEF**
(Fair Housing Act, 42 U.S.C. § 3604(a), (c), (d), (f): Familial Status, Sex, Disability, Race, and National Origin Discrimination)

146. Plaintiffs restate and incorporate by reference the preceding paragraphs above as if fully set forth herein.

147. The housing advertised for rent or sale on Facebook using the platform described above are "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

148. Facebook's creation of unlawful preset categories on its advertising platform, exploitation of user data to create those categories, and use of those categories to create discriminatory "suggested" or "lookalike" audiences illegally discriminated against, and continues to discriminate against, Plaintiffs by:

    a. Making unavailable or denying a dwelling to any person because of sex, familial status, race or national origin. 42 U.S.C. § 3604(a).

    b. Making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on sex, disability familial status, race or national origin, or an intention to make any such preference, limitation, or discrimination. 42 U.S.C. § 3604(c).

    c. Representing to any person because of race, color, religion, sex, disability, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available. 42 U.S.C.A. § 3604(d).

d.  Making unavailable or denying, a dwelling to any buyer or renter because of a
disability of (A) that buyer or renter; (B) a person residing in or intending to reside in
that dwelling after it is so sold, rented, or made available; or (C) any person
associated with that buyer or renter.  42 U.S.C. § 3604(f)(1).

149.    Plaintiffs are aggrieved persons as defined by the Fair Housing Act, 42 U.S.C.

§ 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful

discriminatory conduct.

150.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages,

punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
(Fair Housing Act, 42 U.S.C. § 3606: Familial Status, Sex, Disability, Race, and National Origin
Discrimination)

151.    Plaintiffs restate and incorporate by reference the preceding paragraphs above as

if fully set forth herein.

152.    The housing advertised for rent or sale on Facebook using the platform described

above are "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

153.    Facebook provides a "service . . . relating to the business of selling or renting

dwellings" within the meaning of 42 U.S.C. § 3606.

154.    Facebook's creation of unlawful preset categories on its advertising platform,

exploitation of user data to create those categories, and use of those categories to create

discriminatory "suggested" or "lookalike" audiences illegally discriminated against, and

continues to discriminate against, Plaintiffs by "deny[ing] any person access to . . . [Facebook's]

service, organization, or facility relating to the business of selling or renting dwellings,[and]

discriminat[ing] against [such persons] in the terms or conditions of such access, membership, or

40

participation, on account of race, color, religion, sex, handicap, familial status, or national origin."

155.    Plaintiffs are aggrieved persons as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful discriminatory conduct.

156.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
(Plaintiffs NFHA and FHJC)
(New York City Human Rights Law: Aiding and Abetting
Familial Status and Gender Discrimination)

157.    New York City Administrative Code § 8-107(6) declares that it "shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter."

158.    The housing advertised for rent or sale on Facebook using the platform described above are "housing accommodations" as defined by the New York City Human Rights Law, N.Y.C. Admin. Code § 8-102(10).

159.    Facebook's creation of unlawful preset categories on its advertising platform, exploitation of user data to create those categories, and use of those categories to create discriminatory "suggested" or "lookalike" audiences constitutes aiding, abetting, inciting and compelling the doing of acts forbidden under Section 8-107(5)(3) of the New York City Administrative Code, including the "declar[ing], print[ing] or circulat[ing] or caus[ing] to be declared, printed or circulated any statement, advertisement or publication . . . which expresses, directly or indirectly, any limitation, specification or discrimination as to race, creed, color, national origin, *gender*, age, disability, sexual orientation, marital status, partnership status, or

alienage or citizenship status, or any lawful source of income, or *whether children are, may be, or would be residing with a person*, or any intent to make such limitation, specification or discrimination" (emphasis added).

160.     Facebook's creation of these unlawful preset categories on its platform for housing advertisements violated, and continues to violate, Section 8-107(5)(e) by denying persons access to Facebook's real estate advertisements on the basis of familial status and gender.

161.     NFHA and FHJC are "aggrieved persons" as defined in Section 8-502(a) of the New York City Administrative Code, and have suffered damages as a direct and proximate result of Defendant's discriminatory conduct.

162.     Accordingly, under Section 502(a) and (g) of the New York City Administrative Code, NFHA and FHJC are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendant as follows:

(a)     Declaring that Defendant's discriminatory policies and practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq*. and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq*.;

(b)     Enjoining Defendant, Defendant's subsidiaries, Defendant's agents, employees, and successors, and all other persons in active concert or participation from:

   (i)     Denying or withholding housing, or otherwise making housing unavailable on the basis on family status, sex, gender, disability, race, or national origin;

(ii) Making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling or a housing accommodation that indicates any preference, limitation, or discrimination based on family status, sex, gender, disability, race, or national origin;

(iii) Representing to any person because of race, color, religion, sex, disability, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available;

(iv) Denying any person access to Facebook's service, organization, or facility relating to the business of selling or renting dwellings, and discriminating against such persons in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, disability, familial status, or national origin;

(v) Aiding, abetting, inciting, and compelling the doing of acts forbidden under the New York City Human Rights Law, including declaring, printing or circulating or causing to be declared, printed or circulated any statement advertisement or publication which expresses directly or indirectly, any limitation, specification or discrimination as to family status, gender, disability, race, or national origin or any intent to make such limitation, specification or discrimination; and

(vi) Coercing, intimidating, threatening or interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his or her having aided or encouraged any other

43

person in the exercise or enjoyment of, any right granted by the Fair

Housing Act or New York City Human Rights Law.

(c)    Enjoining Defendant and its agents, employees, successors, and all other persons

in active concert or participation with Defendant to:

    (i)    Make all necessary modifications to Defendant's policies, practices, and

procedures to comply with fair housing laws, including eliminating check

boxes, selection categories, and other content created to restrict or limit

access to housing advertisements;

    (ii)    Develop a written fair housing advertising policy that is not dependent on

self-certification by advertisers and communicate it publicly, as well as to

Defendant's employees and agents;

    (iii)    Train all Defendant's current and future employees and agents with

responsibilities related to the design, implementation, and operation of

Defendants' housing advertising platform on fair housing laws;

    (iv)    Allow monitoring of Defendant's advertising platform and housing

advertisements for multiple years;

    (v)    Retain records to allow for appropriate monitoring by Plaintiffs.

(d)    Awarding such damages to Plaintiff NFHA as will fully compensate it for the

diversion of resources and frustration of mission caused by Defendant's unlawful

practices;

(e)    Awarding such damages to Plaintiff FHJC as will fully compensate it for the

diversion of resources and frustration of mission caused by Defendant's unlawful

practices;

44

    (f)       Awarding such damages to Plaintiff HOPE as will fully compensate it for the diversion of resources and frustration of mission caused by Defendant's unlawful practices;

    (g)       Awarding such damages to Plaintiff FHCGSA as will fully compensate it for the diversion of resources and frustration of mission caused by Defendant's unlawful practices;

    (h)       Awarding punitive damages to Plaintiffs;

    (i)       Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

    (j)       Granting Plaintiffs such other and further relief as may be just and proper.

Dated:  June 25, 2018
     New York, New York

                    EMERY CELLI BRINCKERHOFF & ABADY LLP

                    By:   /s/ Diane L. Houk
                         Diane L. Houk
                         Katherine Rosenfeld
                         David S. Berman
                         600 Fifth Avenue, 10th Floor
                         New York, NY  10020
                         212-763-5000

# Exhibit A





Case 4:19-cv-02689-JCK   Document 32   Filed 06/29/24   Page 229 of 285

# Exhibit B



# Exhibit C



# Exhibit D

# Exhibit E

# EXHIBIT 6

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is entered into by and among the National Fair Housing Alliance ("NFHA"), Fair Housing Justice Center, Inc., Housing Opportunities Project for Excellence, Inc., Fair Housing Council of Greater San Antonio (collectively, the "Plaintiffs"), and Facebook, Inc. ("Facebook"). Plaintiffs and Facebook are referred to collectively as the "Parties" and individually as a "Party." Plaintiffs are represented by Emery Celli Brinckerhoff & Abady LLP ("Plaintiffs' Counsel").

## I.     BACKGROUND

On March 27, 2018, Plaintiffs filed a complaint in the Southern District of New York against Facebook alleging that Facebook enables third-party advertisers to discriminate on the basis of race, national origin, sex, disability and familial status through use of audience selection tools in violation of the Fair Housing Act and the New York City Human Rights Law. Plaintiffs amended their complaint on June 25, 2018.

Facebook filed a motion to transfer venue to the Northern District of California, or alternatively to dismiss Plaintiffs' First Amended Complaint.

The Parties have agreed to resolve Plaintiffs' claims against Facebook as described in this Settlement Agreement and Release and the accompanying Exhibit A – Programmatic Relief.

## II.    DEFINITIONS

Terms used in this Agreement shall have the meanings specified below and in Exhibit A.

A.     **"Action"** means *National Fair Housing Alliance, et al., v. Facebook, Inc.*, Case No. 18-cv-02689-JGK, pending in the United States District Court for the Southern District of New York.

B.     **"Audience Selection Tools"** means tools that exist on or before the Effective Date and during the Term of the Agreement by which advertisers select the potential audience for advertisements in Ad Creation Flows.

C.     **"Effective Date"** means the date last executed by any Party as set forth next to the signature of the authorized representative of each Party below.

D.     **"HEC Advertisements"** means Housing Advertisements, Employment Advertisements, and Credit Advertisements as defined in Exhibit A.

E.     **"HEC Flow Implementation Date"** means the date on which advertisers may create HEC Advertisements through the HEC Flow.

F.     **"Term"** means the period that is three (3) years from the Housing Flow Implementation Date.

## III.   PROGRAMMATIC RELIEF

A.      The Parties agree to the programmatic relief set forth in Exhibit A to this Agreement as they apply to Housing Advertisements.  For avoidance of doubt, this agreement does not create any obligations between the Parties with respect to Employment Advertisements or Credit Advertisements, except to the extent that Credit Advertisements also falls within the definition of a Housing Advertisement.

## IV.   TRAINING

A.      Facebook will develop and administer training on civil rights laws as they relate to Housing Advertisements to the following Facebook employee groups: Ads Leadership Team, Regulated Ads Solutions, Mega-Taxonomy/Content Understanding Team, Machine Learning Team in BI, Ranking Feature Engineers, Ads Policy, and Advertising Product Counsel. Facebook and NFHA will work in an interactive process to develop the training materials and program.

B.      Facebook and NFHA will hold an initial planning meeting by phone or in person within sixty (60) days of the Effective Date of this Agreement.  Facebook will provide a draft of its proposed training curriculum, manual, and training materials to NFHA for review, comment and discussion and will provide NFHA with a copy of the final training materials prior to providing the training to its employees based upon a timeline agreed to during the initial planning meeting.

C.      Facebook will administer the training to current employees in the groups identified above within six (6) months of the Effective Date of this Agreement.  For new employees hired into those groups during the Term of the Agreement, Facebook will administer the training within sixty (60) days of hire.

D.      During the Term of the Agreement, either Facebook or NFHA may propose changes to the training that may be appropriate due to changed circumstances, such as changes in applicable laws or advertising services provided by Facebook.  Facebook and NFHA agree to provide the other party with the proposed revisions in writing and an opportunity to comment. Facebook and NFHA agree to discuss in good faith any proposed revisions.

## V.   DISMISSAL, CONTINUING JURISDICTION AND COORDINATED COMMUNICATIONS

A.      On the Effective Date, Plaintiffs will file a motion seeking to reopen the Action for the limited purpose of seeking a dismissal order that maintains continuing jurisdiction in the United States District Court for the Southern District of New York to enforce the Agreement. The Parties will file a stipulated motion and proposed order seeking that relief, substantially in the form attached hereto as Exhibit B.

B.      The Parties agree that dismissal of the Action by the court with continuing jurisdiction to enforce the Agreement are material terms of this Agreement.  If the Action is not dismissed by the court with continuing jurisdiction for any reason within thirty (30) days of the Effective Date, the Agreement will be deemed null and void *ab initio*.  In that event, the Action

2

will revert to the status that existed as of the Effective Date, and no term or draft of this Agreement, nor any part of the Parties' settlement discussions or communications, will be admissible or used as evidence or argument by any Party for any purpose in the Action or any other proceeding. The Parties may extend by mutual written agreement the 30-day period described in the second sentence of this Section.

## VI.   MONETARY RELIEF

A.   **Payment**. Facebook agrees to pay the total sum of one million, nine hundred fifty thousand and no cents ($1,950,000.00) to Plaintiffs for alleged damages and expenses for (a) diversion of Plaintiffs' resources; (b) frustration of Plaintiffs' mission by funding training for housing advertisers on how social media, including online advertising platforms, can be used by advertisers consistent with their obligations under fair housing/fair lending laws; programming for NFHA member organizations to promote fair housing using social media; and implementing compliance, training, and other activities described in Exhibit A; and (c) attorneys' fees and costs ("Payment").

B.   **Advertising**. Facebook will provide five hundred thousand dollars ($500,000) in credit to the Plaintiffs for advertising on Facebook to promote (1) educational programs such as information on consumer fair housing rights and housing industry fair housing responsibilities, fair housing/fair lending workshops, trainings and conferences; publication of reports on fair housing/fair lending issues;, and other educational activities; and (2) services, such as first-time homebuyer clinics, foreclosure prevention counseling, housing discrimination complaint intake, and landlord/tenant hotlines ("Advertising Credit").

C.   **Payment/Advertising Terms**. Within twenty one (21) days of dismissal of the Action by the court and Facebook's receipt of the necessary W-9 forms, Facebook shall (1) initiate a wire transfer of the Payment to the Emery Celli Brinckerhoff & Abady Attorney Trust Account; and (2) make available the Advertising Credit. Plaintiffs' Counsel will provide Facebook with the account information needed to transfer the Payment within five (5) days of the dismissal.

D.   **Distribution of Payment**. Plaintiffs' Counsel shall be solely responsible for apportionment and distribution of the Payment among Plaintiffs and Plaintiffs' Counsel.

E.   **No Further Payments**. Plaintiffs and Plaintiffs' Counsel waive any rights to seek any further payment for attorney's fees or costs from Facebook of any kind incurred in connection with the Action, including, but not limited to, those that have been, or may be, incurred in entering into this Agreement, verification of implementation as set forth in Section VIII below, and enforcing, if necessary, the terms of this Agreement.

## VII.   VERIFICATION OF IMPLEMENTATION

A.   **Testing**. During the Term of this Agreement, Plaintiffs will be permitted to place test ads for the purpose of evaluating implementation of the Agreement. Facebook agrees to waive any claims it may have against Plaintiffs under Facebook's policies for creating test ads, subject to Plaintiffs' agreement to take steps to ensure that such ads are not published to users,

*e.g.*, setting a publication date at least two (2) weeks from the date a test ad is created to allow time to cancel it.

      B.    **Meetings**. During the Term of this Agreement, Facebook and NFHA will meet every six (6) months to discuss implementation of the Agreement. At least fifteen (15) days in advance of those meetings, Facebook will provide NFHA with a report describing steps Facebook has taken to implement the Agreement and identifying any issues. As part of that report, Facebook will provide NFHA with a list of targeting options to be added to the HEC Flow. NFHA will have an opportunity to review the list prior to each meeting and to notify Facebook of any objections. In addition, NFHA may propose targeting options to be added to the HEC Flow by providing Facebook with a list of terms at least fifteen (15) days in advance of the meetings. Facebook will consider in good faith any such terms and discuss them with NFHA at the meetings. Facebook will provide NFHA with information that is reasonably necessary to confirm implementation of the Agreement. For clarity, this includes, for example, information confirming what audience selection tools are available in the HEC Flow, not how those audience selection tools are used. With respect to the modified Lookalike Audience tool, Facebook agrees to study how it impacts delivery of ads created in the HEC Flow with respect to gender and to discuss the study and any potential modifications of the tool at the meetings. Facebook also agrees to consider the potential for unintended bias with respect to the modified Lookalike Audience tool more generally. At the meetings, Facebook will share the status of those efforts, provide NFHA with an opportunity to respond and make recommendations, and consider those recommendations and whether to implement any feasible reforms as part of its ongoing commitment to nondiscrimination in advertising on its platform.

      C.    **Confidentiality**. Any written or oral information exchanged by the Parties during the Term of this Agreement regarding Verification of Implementation that one of the Parties identifies as confidential shall be treated as confidential by the Parties to encourage frank and open discussions between the Parties, except to the extent it is necessary for any of the Parties to disclose confidential information in any dispute resolution undertaken pursuant to Section X. Information designated confidential by any Party pursuant to this Section shall be treated as such in any dispute resolution process, including by seeking the Court's permission to file it under seal in any proceeding before the Southern District of New York.

## VIII.  **MUTUAL GENERAL RELEASES**

      A.    **Plaintiffs' General Release of Facebook**. In consideration of the promises herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Plaintiffs, on behalf of themselves, on behalf of all entities that are or were owned or controlled by Plaintiffs on or before the Effective Date, and on behalf of all of the respective heirs, executors, administrators, agents, directors, officers, predecessors, successors and assigns of all of the foregoing ("Plaintiffs Releasing Parties"), hereby fully, forever, and irrevocably release, waive, extinguish, and discharge Facebook and all entities that are or were owned and/or controlled by Facebook on or before the Effective Date, all of the respective past, present, and future officers, directors, employees, agents, principals, shareholders, and owners, and all of the respective heirs, executors, administrators, agents, predecessors, successors, and assigns of all of the foregoing ("Facebook Released Parties"), from any and all claims, causes of action, liability, charges, complaints, demands, or rights of recovery of any nature, type or

description whatsoever, whether legal, equitable, or statutory, asserted or unasserted, contingent or vested, express or implied, known or unknown, foreseen or unforeseen, suspected or unsuspected, accrued or unaccrued, liquidated or unliquidated, direct or indirect, that Plaintiffs had, now have, or may have, from the beginning of time through the Term of this Agreement, arising out of or relating to Audience Selection Tools, including but not limited to any and all claims, causes of action, charges, complaints, demands, or rights of recovery of any nature, type, or description whatsoever under the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq*.; the New York City Human Rights Law, N.Y. City Admin. Code § 8–107; and similar federal and state anti-discrimination laws ("Plaintiffs Released Claims"). Plaintiffs Released Claims do not include any claims Plaintiffs may have against third parties and do not impact the Parties' right to enforce this Agreement in accordance with the terms set forth in Section X below.

B. **Plaintiffs' Covenant Not To Sue**. Plaintiffs, on behalf of themselves and the other Plaintiff Releasing Parties, expressly covenant and agree to forever refrain from instituting, prosecuting, or continuing to maintain or prosecute any suit, action, complaint, or charge involving any court or administrative agency against the Facebook Released Parties in any way relating to the Plaintiffs Released Claims. Nothing in this Section shall be construed to limit the scope of the dispute resolution process set forth and described in Section X below.

C. **Facebook's General Release of Plaintiffs**. Facebook, on behalf of itself, on behalf of all entities that are or were owned or controlled by Facebook on or before the Effective Date, and on behalf of all of the respective heirs, executors, administrators, agents, directors, officers, predecessors, successors and assigns of all of the foregoing ("Facebook Releasing Parties"), hereby fully, forever, and irrevocably release, waive, extinguish, and discharge Plaintiffs and all entities that are or were owned and/or controlled by Plaintiffs on or before the Effective Date, all of the respective past, present, and future officers, directors, employees, agents, principals, shareholders, and owners, and all of the respective heirs, executors, administrators, agents, predecessors, successors, and assigns of all of the foregoing ("Plaintiffs Released Parties"), from any and all claims, causes of action, liability, charges, complaints, demands, and rights of recovery of any nature, type, or description whatsoever, whether legal, equitable, or statutory, asserted or unasserted, contingent or vested, express or implied, known or unknown, foreseen or unforeseen, suspected or unsuspected, accrued or unaccrued, liquidated or unliquidated, direct or indirect, that Facebook had, now have, or may have, from the beginning of time through the Term of this Agreement, arising out of or relating to Audience Selection Tools ("Facebook Released Claims"). Facebook Released Claims do not include any claims Facebook may have against third parties and do not impact the Parties' right to enforce this Agreement in accordance with the terms set forth in Section X below.

D. **Facebook's Covenant Not To Sue**. Facebook, on behalf of itself and the other Facebook Releasing Parties, expressly covenants and agrees to forever refrain from instituting, prosecuting, or continuing to maintain or prosecute any suit, action, complaint or charge involving any court or administrative agency against the Plaintiffs Released Parties in any way relating to the Facebook Released Claims. Nothing in this paragraph shall be construed to limit the scope of the dispute resolution process set forth and described in Section X below.

## IX.    ACKNOWLEDGMENT AND WAIVER OF UNKNOWN CLAIMS

A.    Plaintiffs and Facebook each acknowledge that subsequent to the execution of this Agreement they may discover facts or claims in addition to or different from those they now know or believe exist with respect to any of the matters being released through this Agreement, including, but not limited to, Audience Selection Tools, which were unknown or unsuspected at the time this Agreement was executed, and which if known or suspected by them at that time may have materially affected their decision to enter into this Agreement.  Each of Plaintiffs and Facebook each nevertheless agrees that the releases described above in Section VIII apply to any such additional or different claims and notwithstanding any such additional or different facts. Each of Plaintiffs and Facebook acknowledges that the significance and consequences of the releases in this Agreement have been explained to them by their counsel and that they understand the significance and consequences of the releases in this Agreement.  Nothing in this paragraph shall be construed to expand the scope of the Releases set forth and described in Section VIII above.

B.    Plaintiffs and Facebook each acknowledge that they have been advised of and expressly waives and releases any rights or benefits they may have under Section 1542 of the Civil Code of California that provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

C.    Plaintiffs and Facebook each further expressly waives and releases any rights or benefits they have or may have under any similar law or rule of any other jurisdiction pertaining to the matters released herein.

## X.    DISPUTE RESOLUTION

A.    Any disputes regarding the interpretation, implementation, or violation of the Agreement shall be resolved as described in this Section.

B.    Plaintiffs will notify Facebook in writing if they believe that Facebook is not in compliance with any term of the Agreement and allow Facebook at least sixty (60) days from Facebook's receipt of any such written notice to cure.  As part of the sixty (60) day notice and opportunity to cure time period, Plaintiffs and Facebook will meet and confer in good faith and attempt to resolve the matter.  It is the intent of the Parties to collaborate in good faith to resolve any disputes that may arise between them.

C.    If the Parties cannot resolve the dispute, it will be mediated by Hunter Hughes III or another mediator who is mutually agreeable to the Parties.  Any mediation will take place in New York or Washington D.C. with Facebook to pay the mediator's fee.

D.      If the dispute cannot be resolved through mediation, any Party may bring the dispute before the United States District Court for the Southern District of New York, which will retain jurisdiction over the Action for the purpose of enforcing the Agreement.

E.      The Parties will pay their own attorney's fees and costs.

## XI.     NO ADMISSION OF LIABILITY

A.      Plaintiffs acknowledge that Facebook denies any and all wrongdoing or liability.

B.      Plaintiffs further acknowledge that this Agreement is not an admission by Facebook of any wrongdoing or liability, and that the Parties will not argue in or before any court, administrative agency, or other tribunal, or make any public statement whatsoever, that this Agreement is or may be construed as an admission by Facebook of any wrongdoing or liability.

## XII.    MISCELLANEOUS

A.      **Authority**.  Plaintiffs and Facebook represent and warrant that they have the right and authority to enter into this Agreement and to give the releases and other promises contained in this Agreement.

B.      **No Other Actions**.  Plaintiffs represent and warrant that, other than the Action, they have not filed as a plaintiff or complainant any suit, action, complaint, or charge against the Facebook Released Parties as a defendant or respondent involving any court or governmental agency arising out of or relating to in any way to the Plaintiffs Released Claims.

C.      **Integration.**  Plaintiffs and Facebook acknowledge and agree that this Agreement constitutes the entire agreement between the Parties and supersedes any and all discussions, agreements, or understandings, whether oral, written or implied, regarding the subject matter of this Agreement.  Plaintiffs and Facebook further acknowledge and agree that they have had the benefit of the advice of their respective chosen counsel and financial and tax advisors in connection with the negotiation of this Agreement.

D.      **Disclaimer of Reliance**.  Plaintiffs and Facebook represent and warrant that no statement, communication, promise, representation, inducement, or condition that is not expressed in this Agreement has been made by Facebook to Plaintiffs, or by Plaintiffs to Facebook, in connection with this Agreement.  Plaintiffs and Facebook further represent and warrant that they are not relying on, and expressly disclaim reliance on, any statement, communication, promise, representation, inducement, or condition that does not appear in this Agreement.

E.      **Representation by Counsel**.  Plaintiffs and Facebook represent and warrant that they have each been represented by independent counsel of their own choice throughout all of the negotiations and drafting which preceded and resulted in the execution of this Agreement, and that they are relying solely upon their own judgment in entering into this Agreement.

7

F.      **Modification**.  This Agreement may not be modified or amended except by an instrument in a writing that specifically states that it is a supplement, modification, or amendment to this Agreement and is signed by an authorized representative of all of the Parties.

G.      **Headings**.  Plaintiffs and Facebook acknowledge and agree that the section headings in this Agreement are used for convenience only and will not be used in construing the Agreement.

H.      **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

I.      **Construction**. The drafting and preparation of this Agreement is the result of the efforts of all of the Parties and their respective counsel, and the language of all parts of this Agreement shall in all instances be constructed as a whole, according to its fair meaning, and not strictly for or against any Party.  Accordingly, no rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall be employed in the interpretation of this Agreement.

J.      **Severability**.  If any part or provision of this Agreement shall for any reason be determined to be invalid or unenforceable under applicable law, that part or provision shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the validity or enforceability of the remaining terms in that part or provision or of any other part of provision of the Agreement.

K.      **No Third-Party Beneficiaries**.  The Parties do not intend to create any third party beneficiaries to this Agreement.  Except for agents, officers, directors, trustees, assigns, subsidiaries, and predecessor or successor companies, no person or entity other than the Parties is intended to be bound by, or shall be bound by, the provisions of the Agreement.

L.      **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together will be deemed an original of the Agreement.  Facsimile and scanned (e.g., PDF) signatures will be deemed valid and effective for all purposes.

M.      **Taxes**.  Plaintiffs and Facebook each acknowledge and agree that they have not made any representations to each other with respect to the tax effects, if any, of this Agreement, and that each shall be solely responsible for the tax liability, if any, arising from this Agreement, including without limitation with respect to the Payment described in Section VI above.

N.      **Notices**.  Unless otherwise designated by a Party in writing, any notice relating to this Agreement shall be made in writing both by electronic mail and by next-day (excluding Saturday and Sunday) express delivery service, and shall be addressed as follows:

|  |  |
|---|---|
| For Plaintiffs: | Lisa Rice |
|  | President & CEO |
|  | National Fair Housing Alliance |
|  | 1331 Pennsylvania Ave., NW, Suite 650 |
|  | Washington, DC 20018 |

202-898-1661
LisaRice@NationalFairHousing.org

Morgan Williams
General Counsel
National Fair Housing Alliance
1331 Pennsylvania Ave., NW
Suite 650
Washington, DC 20018
202-898-1661
MorganWilliams@NationalFairHousing.org

Keenya Robertson
President & CEO
Housing Opportunities Project for Excellence (HOPE), Inc
11501 NW 2nd Avenue
Miami, FL 33168
305-651-4673
Keenya@hopefhc.com

Executive Director
Fair Housing Justice Center
30-30 Northern Boulevard, Suite 302
Long Island City, New York 11101
(212) 400-8231
fhjc@fairhousingjustice.org

Sandra Tamez
Executive Director
Fair Housing Council of Greater San Antonio
4414 Centerview Drive, Suite 229
San Antonio, Texas 78228
(210) 733-3247
sandra@myfairhousing.org

For Defendant:    Natalie Naugle
Associate General Counsel, Litigation
Facebook, Inc.
181 Fremont Street
San Francisco, CA 94105
nnaugle@fb.com

Rosemarie T. Ring
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
rose.ring@mto.com

9

**IN WITNESS OF THIS AGREEMENT,** the undersigned have executed this Agreement on the date shown below.

Dated:  March ___18___, 2019          National Fair Housing Alliance

                                      By: _____

                                      Name Lisa Rice
                                      Title   President and Chief Executive Officer

Dated:  March _____, 2019            Fair Housing Justice Center, Inc.

                                      By: _____

                                      Name
                                      Title

Dated:  March _____, 2019            Housing Opportunities Project for
                                      Excellence, Inc.

                                      By: _____

                                      Name
                                      Title

Dated:  March _____, 2019            Fair Housing Council of Greater San
                                      Antonio

                                      By: _____

                                      Name
                                      Title

Dated:  March _____, 2019            Facebook, Inc.

                                      By: _____

                                      Name
                                      Title

**IN WITNESS OF THIS AGREEMENT**, the undersigned have executed this Agreement on the date shown below.

Dated:  March _____, 2019                     National Fair Housing Alliance


By: _____
Name
Title

Dated:  March _18_, 2019                          Fair Housing Justice Center, Inc.


By: _Fred Freiberg_____
Name  *FRED FREIBERG*
Title  *EXECUTIVE DIRECTOR*

Dated:  March _____, 2019                     Housing Opportunities Project for
Excellence, Inc.


By: _____
Name
Title

Dated:  March _____, 2019                     Fair Housing Council of Greater San
Antonio


By: _____
Name
Title

Dated:  March _____, 2019                     Facebook, Inc.


By: _____
Name
Title

**IN WITNESS OF THIS AGREEMENT**, the undersigned have executed this Agreement on the date shown below.

Dated:  March _____, 2019          National Fair Housing Alliance

                                   By: _____
                                   Name
                                   Title

Dated:  March _____, 2019          Fair Housing Justice Center, Inc.

                                   By: _____
                                   Name
                                   Title

Dated:  March 18th, 2019           Housing Opportunities Project for
                                   Excellence, Inc.

                                   By: _____
                                   Name: Keenya Robertson
                                   Title: President & CEO

Dated:  March _____, 2019          Fair Housing Council of Greater San
                                   Antonio

                                   By: _____
                                   Name
                                   Title

Dated:  March _____, 2019          Facebook, Inc.

                                   By: _____
                                   Name
                                   Title

**IN WITNESS OF THIS AGREEMENT,** the undersigned have executed this Agreement on the date shown below.

Dated:  March _____, 2019

National Fair Housing Alliance

By: _____
Name
Title

Dated:  March _____, 2019

Fair Housing Justice Center, Inc.

By: _____
Name
Title

Dated:  March _____, 2019

Housing Opportunities Project for Excellence, Inc.

By: _____
Name
Title

Dated:  March _18_, 2019

Fair Housing Council of Greater San Antonio

By: _Sandra Tamez_
Name   Sandra Tamez
Title   Executive Director

Dated:  March _____, 2019

Facebook, Inc.

By: _____
Name
Title

10

By: _____
Name
Title

Dated:   March _____, 2019                    Housing Opportunities Project for
                                              Excellence, Inc.

By: _____
Name
Title

Dated:   March _____, 2019                    Fair Housing Council of Greater San
                                              Antonio

By: _____
Name
Title

Dated:   March 18, 2019                       Facebook, Inc.

By:  _Paul S. Grewal_____
Name   PAUL S. GREWAL
Title   VICE PRESIDENT +
        DEPUTY GENERAL COUNSEL

**APPROVED AS TO FORM BY COUNSEL:**

Dated:  March __18__, 2019                    EMERY CELLI BRINCKERHOFF &
                                              ABADY LLP
                                              Attorneys for Plaintiffs


                                              By: _Diane L. Houk_____

                                              Diane L. Houk
                                              Katherine Rosenfeld
                                              David Berman

Dated:  March _____, 2019                     MUNGER, TOLLES & OLSON LLP
                                              Attorneys for Facebook, Inc.


                                              By: _____

                                              Rosemarie T. Ring
                                              Jonathan H. Blavin
                                              Elizabeth A. Kim

**APPROVED AS TO FORM BY COUNSEL:**

Dated: March _____, 2019

EMERY CELLI BRINCKERHOFF &
ABADY LLP
Attorneys for Plaintiffs


By: _____
Diane L. Houk
Katherine Rosenfeld
David Berman


Dated: March _18_, 2019

MUNGER, TOLLES & OLSON LLP
Attorneys for Facebook, Inc.

By: _Rosemarie Ring_
Rosemarie T. Ring
Jonathan H. Blavin
Elizabeth A. Kim

11

# EXHIBIT 7

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF ADMINISTRATIVE LAW JUDGES

_____

| | |
|---|---|
| The Secretary, United States ) | |
| Department of Housing and Urban ) | |
| Development, on behalf of Complainant ) | |
| Assistant Secretary for Fair Housing and Equal ) | |
| Opportunity, ) | |
| ) | HUD ALJ No. |
|       Charging Party, ) | FHEO No.  01-18-0323-8 |
| ) | |
|       v. ) | |
| ) | |
| Facebook, Inc., ) | |
| ) | |
|       Respondent ) | |

_____)

**CHARGE OF DISCRIMINATION**

## I.     JURISDICTION

On August 13, 2018, the Assistant Secretary for Fair Housing and Equal Opportunity ("Assistant Secretary") filed a timely complaint with the Department of Housing and Urban Development ("HUD" or the "Department") alleging that Respondent violated subsections 804(a), 804(b), 804(c) and 804(f) of the Fair Housing Act, 42 U.S.C. §§ 3601-19 ("Act"), by discriminating because of race, color, religion, sex, familial status, national origin and disability.

The Act authorizes the Secretary of HUD to issue a Charge of Discrimination ("Charge") on behalf of aggrieved persons following an investigation and a determination that reasonable cause exists to believe that a discriminatory housing practice has occurred.  *See* 42 U.S.C. § 3610(g)(1), (2).  The Secretary has delegated that authority to the General Counsel, 24 C.F.R. §§ 103.400, 103.405, who has re-delegated that authority to the Associate General Counsel for Fair Housing and the Assistant General Counsel for Fair Housing Enforcement.  76 Fed. Reg. 42,463, 42,465 (July 18, 2011).

By a Determination of Reasonable Cause issued contemporaneously with this Charge of Discrimination, the Director of the Office of Systemic Investigations in the Office of Fair Housing and Equal Opportunity has determined that reasonable cause exists to believe that a discriminatory housing practice has occurred and has authorized and directed the issuance of this Charge.  42 U.S.C. § 3610(g)(2).

1

## II.     SUMMARY OF FINDINGS IN SUPPORT OF THIS CHARGE

Based on HUD's investigation of the allegations contained in the aforementioned complaint and the Determination of Reasonable Cause, Respondent is hereby charged with violating the Act as follows:

### A.     Legal Authority

1.      It is unlawful to make unavailable or deny a dwelling to any person because of race, color, religion, sex, familial status, national origin or disability.  42 U.S.C. § 3604(a), (f)(1); 24 C.F.R. § 100.50(b)(1), (3); 24 C.F.R. § 100.60(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(a).

2.      It is unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, national origin or disability. 42 U.S.C. § 3604(b), (f)(2); 24 C.F.R. § 100.50(b)(2); 24 C.F.R. § 100.65(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(b).

3.      It is unlawful to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, familial status, national origin or disability, or that indicates an intention to make such a distinction.  42 U.S.C. § 3604(c); 24 C.F.R. § 100.75(a), (b), (c)(1).  Such unlawful activity includes "[s]electing media or locations for advertising the sale or rental of dwellings which deny a particular segment of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin."  24 C.F.R. § 100.75(c)(3).  Such unlawful activity also includes "[r]efusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin."  24 C.F.R. § 100.75(c)(4).

### B.     Parties

4.      Complainant Assistant Secretary is authorized to file a complaint of discrimination under the Act on behalf of the Secretary of HUD.  42 U.S.C. § 3610(a); 24 C.F.R. § 103.204(a).

5.      Respondent Facebook, Inc., is incorporated in Delaware with headquarters in Menlo Park, California.  Respondent is the second largest online advertiser in the United States and is responsible for approximately twenty percent of all online advertising nationwide.

6.      Respondent operates Facebook and Instagram, two of the most widely used social media platforms in the United States.  Facebook has approximately 221 million active users in the United States and over two billion active users globally, while Instagram has approximately 114 million active users in the United States and over one billion active users globally, with active user defined as someone who uses the platform at least once per month.  Respondent also operates Messenger, a messaging tool and platform that can be accessed from within Facebook

or through a standalone website and mobile application.  In addition, Respondent has created an "Audience Network," which is comprised of thousands of websites and mobile applications that are operated by third parties but on which Respondent displays targeted ads.

### C.     Factual Allegations

7.      Respondent collects millions of data points about its users, draws inferences about each user based on this data, and then charges advertisers for the ability to microtarget ads to users based on Respondent's inferences about them.  These ads are then shown to users across the web and in mobile applications.  Respondent promotes and distinguishes its advertising platform by proclaiming that "most online advertising tools have limited targeting options . . . like location, age, gender, interests and potentially a few others. . . .  But Facebook is different.  People on Facebook share their true identities, interests, life events and more."[1]  As Respondent explains, its advertising platform enables advertisers to "[r]each people based on . . . zipcode . . .  age and gender . . . specific languages . . . the interests they've shared, their activities, the Pages they've like[d] . . . [their] purchase behaviors or intents, device usage and more."[2]  Thus, Respondent "use[s] location-related information-such as your current location, where you live, the places you like to go, and the businesses and people you're near to provide, personalize and improve our Products, including ads, for you and others."[3]

8.      Advertisers pay Respondent to show targeted ads to users on Facebook, Instagram, and Messenger, and on Respondent's Audience Network.  Targeted ads are generally placed through a single advertising platform called Ads Manager regardless of where the ads will be shown to users.

9.      Respondent holds out its advertising platform as a powerful resource for advertisers in many industries, including housing and housing-related services.  For example, Respondent promotes its advertising platform with "success stories," including stories from a housing developer, a real estate agency, a mortgage lender, a real-estate-focused marketing agency, and a search tool for rental housing.

10.     Respondent's advertising platform is actively being used for housing-related ads.  Such ads include ads for mortgages from large national lenders, ads for rental housing from large real estate listing services, and ads for specific houses for sale from real estate agents.

11.     Because of the way Respondent designed its advertising platform, ads for housing and housing-related services are shown to large audiences that are severely biased based on characteristics protected by the Act, such as audiences of tens of thousands of users that are nearly all men or nearly all women.

---

[1] Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320? helpref=uf_permalink (visited Mar. 27, 2019).

[2] Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320? helpref=uf_permalink (visited Mar. 27, 2019).

[3] Facebook, *Data Policy* (Apr. 19, 2018), www.facebook.com/privacy/explanation/.

12.     Respondent sells advertisers the ability to target advertisements to people who, according to Respondent's assessment of the data it collects, share certain personal attributes and/or are likely to respond to a particular ad.  Users may disclose some data about themselves when they set up their profiles, such as name and gender.  However, users disclose most of this data unwittingly through the actions they, and those associated with them, take on and off of Respondent's platforms.

13.     Respondent determines which users will see an ad through a two-phase process.  First, in the ad targeting phase, Respondent provides the advertiser with a variety of tools for selecting an ad's "eligible audience."  In other words, the advertiser can specify attributes that the users who will be shown the ad must have and attributes that users who will be shown the ad must not have. Second, in the ad delivery phase, Respondent selects the ad's "actual audience," meaning Respondent chooses which users will actually be shown the ad from among the pool of eligible users.

14.     During the ad targeting phase, Respondent provides an advertiser with tools to define which users, or which types of users, the advertiser would like to see an ad.  Respondent has provided a toggle button that enables advertisers to exclude men or women from seeing an ad, a search-box to exclude people who do not speak a specific language from seeing an ad, and a map tool to exclude people who live in a specified area from seeing an ad by drawing a red line around that area.  Respondent also provides drop-down menus and search boxes to exclude or include (i.e., limit the audience of an ad exclusively to) people who share specified attributes. Respondent has offered advertisers hundreds of thousands of attributes from which to choose, for example to exclude "women in the workforce," "moms of grade school kids," "foreigners," "Puerto Rico Islanders," or people interested in "parenting," "accessibility," "service animal," "Hijab Fashion," or "Hispanic Culture."  Respondent also has offered advertisers the ability to limit the audience of an ad by selecting to include only those classified as, for example, "Christian" or "Childfree."

15.     During this first phase, Respondent also provides a tool called Custom Audiences, which enables an advertiser to use a list of specific people whom the advertiser wants included in or excluded from the eligible audience for an ad.  The advertiser can do this by uploading the personal information of its customers, or by having Respondent generate a list of people who have engaged with the advertiser's content on Facebook or Instagram, on other websites, in a mobile application, or offline.

16.     Facebook offers a variant of its Custom Audiences tool called Lookalike Audiences.  If an advertiser selects this option, the platform directs the advertiser to pick a Custom Audience that represents the advertiser's "best existing customers."  Respondent then identifies users who share "common qualities" with those customers, and these users become the ad's eligible audience.  To generate a Lookalike Audience, Respondent considers sex and close proxies for the other protected classes.  Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline. Respondent alone, not the advertiser, determines which users will be included in a Lookalike Audience.

4

17.     During the second phase, the ad delivery phase, Respondent selects from among the users eligible to see an ad which users will actually see it.  Respondent bases this decision in large part on the inferences and predictions it draws about each user's likelihood to respond to an ad based on the data it has about that user, the data it has about other users whom it considers to resemble that user, and the data it has about "friends" and other associates of that user.  To decide which users will see an ad, Respondent considers sex and close proxies for the other protected classes. Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.  Respondent alone, not the advertiser, determines which users will constitute the "actual audience" for each ad.

18.     Respondent charges advertisers different prices to show the same ad to different users. The price to show an ad to a given user is based, in large part, on how likely Respondent believes that user is to interact with the particular ad.  To decide how an ad will be priced for each user, Respondent considers sex and close proxies for the other protected classes.  Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.  Respondent alone sets the price the advertiser will pay to have Respondent show each ad to each user.  Furthermore, Respondent uses the pricing differentials it sets to determine which users will see which ads rather than allowing advertisers to make that decision.  As Respondent explains, "If there are more and cheaper opportunities among men than women, then we'd automatically spend more of [an advertiser's] overall budget on the men."[4]

19.     Respondent's ad delivery system prevents advertisers who want to reach a broad audience of users from doing so.  Even if an advertiser tries to target an audience that broadly spans protected class groups, Respondent's ad delivery system will not show the ad to a diverse audience if the system considers users with particular characteristics most likely to engage with the ad.  If the advertiser tries to avoid this problem by specifically targeting an unrepresented group, the ad delivery system will still not deliver the ad to those users, and it may not deliver the ad at all.  This is so because Respondent structured its ad delivery system such that it generally will not deliver an ad to users whom the system determines are unlikely to engage with the ad, even if the advertiser explicitly wants to reach those users regardless.

20.     To group users by shared attributes, to create a Lookalike Audience, to determine an ad's "actual audience" during the ad delivery phase, and to price each ad for each user, Respondent combines the data it has about user attributes and behavior on its platforms with data it obtains about user behavior on other websites and in the non-digital world.  Respondent then uses machine learning and other prediction techniques to classify and group users so as to project each user's likely response to a given ad.  In doing so, Respondent inevitably recreates groupings defined by their protected class.  For example, the top Facebook pages users "like" vary sharply by their protected class, according to Respondent's "Audience Insights" tool.  Therefore, by grouping users who "like" similar pages (unrelated to housing) and presuming a shared interest

---

[4] Facebook, *Why did my cost per result go up when I increased my budget*, [https://web.archive.org/web/2016 0930124257/https://www.facebook.com/business/help/934288416682198?helpref=faq_content) (archived on Sep. 30, 2016 by The Internet Archive).

or disinterest in housing-related advertisements, Respondent's mechanisms function just like an advertiser who intentionally targets or excludes users based on their protected class.

### D.    Legal Allegations

21.    As described above, Respondent discriminated by making dwellings unavailable because of race, color, religion, sex, familial status, national origin or disability.  42 U.S.C. § 3604(a), (f)(1); 24 C.F.R. § 100.50(b)(1), (3); 24 C.F.R. § 100.60(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(a).

22.    As described above, Respondent discriminated in the terms, conditions, or privileges of the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin or disability.  42 U.S.C. § 3604(b), (f)(2); 24 C.F.R. § 100.50(b)(2); 24 C.F.R. § 100.65(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(b).

23.    As described above, Respondent made, printed, or published – or caused to be made, printed, or published – notices, statements, or advertisements with respect to the sale or rental of dwellings that indicated preferences, limitations, or discrimination because of race, color, religion, sex, familial status, national origin or disability, or that indicated an intention to make such a distinction.  42 U.S.C. § 3604(c); 24 C.F.R. § 100.75(a), (b), (c)(1).

24.    As described above, Respondent selected media or locations for advertising the sale or rental of dwellings that denied persons information about housing opportunities because of race, color, religion, sex, familial status, national origin or disability.  24 C.F.R. § 100.75(c)(3).

25.    As described above, Respondent refused to publish advertising for the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin or disability. 24 C.F.R. § 100.75(c)(4).

26.    As described above, Respondent required different charges or terms for advertising the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin and disability.  24 C.F.R. § 100.75(c)(4).

## III.    <u>CONCLUSION</u>

WHEREFORE, the Secretary of the United States Department of Housing and Urban Development, through the Office of the General Counsel, and pursuant to 42 U.S.C. § 3610(g)(2)(A), hereby charges Respondent with engaging in discriminatory housing practices in violation of 42 U.S.C. § 3604(a), (b), (c) and (f), and prays that an order be issued that:

1.    Declares that the discriminatory housing practices of Respondent, as set forth above, violate the Fair Housing Act, 42 U.S.C. §§ 3601-19;

2.    Enjoins Respondent and its agents, employees, successors, and all other persons in active concert or participation with it, from discriminating because of race, color, religion, sex, familial status, national origin or disability in any aspect of the sale, rental, use, marketing, or advertising of dwellings and related services pursuant to 42 U.S.C. § 3612(g)(3);

3.      Requires Respondent's agents and employees to attend, at Respondent's cost, training that addresses the Fair Housing Act's prohibitions against discrimination in advertising;

4.      Awards such damages pursuant to 42 U.S.C. § 3612(g)(3) as will fully compensate any aggrieved persons for any harm caused by Respondent's discriminatory conduct;

5.      Awards the maximum civil penalty against Respondent for each violation of the Act, pursuant to 42 U.S.C. § 3612(g)(3) and 24 C.F.R. § 180.671; and

6.      Awards such additional relief as may be appropriate under 42 U.S.C. § 3612(g)(3).

        Respectfully submitted on this 28th day of March, 2019.


        _____
        Jeanine Worden
        Associate General Counsel for Fair Housing


        _____
        Kathleen M. Pennington
        Assistant General Counsel for Fair Housing
          Enforcement


        _____
        Ayelet R. Weiss
        Trial Attorney
        U.S. Department of Housing
          and Urban Development
        Office of General Counsel
        451 7th St. SW, Room 10270
        Washington, DC 20410
        Office: (202) 402-2882
        Email: ayelet.r.weiss@hud.gov

# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

                  Plaintiff,

  - v. -

META PLATFORMS, INC. f/k/a
FACEBOOK, INC.,

                Defendant.

---

22 Civ. 5187 ( 36/C )

**SETTLEMENT AGREEMENT** & *Final Judgment*

WHEREAS, on August 13, 2018, the Assistant Secretary for Fair Housing and Equal

Opportunity filed an administrative complaint with the Department of Housing and Urban

Development ("HUD"), alleging that Meta Platforms, Inc. f/k/a Facebook, Inc. ("Meta") violated

the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), based on targeting options and delivery

processes for housing advertisements on Meta Platforms (as defined in paragraph 3.d.);

WHEREAS, HUD investigated the administrative complaint in accordance with 42

U.S.C. § 3610(a)-(b), and the Secretary determined there was reasonable cause to issue a Charge

of Discrimination under 42 U.S.C. § 3610(g)(2);

WHEREAS, on March 28, 2019, the Secretary issued a Charge of Discrimination under

42 U.S.C. § 3610(g)(2) ("HUD Charge");

WHEREAS, on April 16, 2019, Meta timely elected to have the HUD Charge decided in

federal district court in accordance with 42 U.S.C. § 3612(a);

WHEREAS, 42 U.S.C. § 3612(o)(1) provides that the United States of America (the

"United States"), within 30 days after the election, "shall commence and maintain[ ] a civil action";

WHEREAS, the United States and Meta (the "Parties") have agreed to toll the deadline established by 42 U.S.C. § 3612(o)(1) to permit discussion of resolution of this matter without contested litigation;

WHEREAS, the United States filed a Complaint against Meta on June 21, 2022, ("Complaint"), concurrently with the filing of this Settlement Agreement ("Settlement Agreement" or "Agreement"), alleging violations of the FHA based on Meta's provision of targeting options and delivery processes for housing advertisements on Meta Platforms;

WHEREAS, Meta denies liability and any and all wrongdoing relating to its provision of targeting options and delivery processes for housing advertisements on Meta Platforms;

WHEREAS, the Parties recognize, and the Court by entering this Settlement Agreement finds, that this Settlement Agreement has been negotiated by the Parties in good faith and will avoid litigation among the Parties about the targeting or delivery of advertisements on Meta Platforms and that this Settlement Agreement is fair, reasonable, and in the public interest;

WHEREAS, this Settlement Agreement is for settlement purposes only and does not constitute an admission by Meta of any of the allegations contained in the HUD Charge or the Complaint, nor does it constitute any finding of liability against Meta;

WHEREAS, the Parties have agreed that Meta will maintain certain changes to targeting options and make certain changes to delivery processes for housing advertisements on Meta Platforms to resolve the HUD Charge and the Complaint, subject to reaching agreement on VRS Compliance Metrics (as defined in paragraph 10.b.);

NOW, THEREFORE, before the taking of any testimony, without the adjudication, admission, finding, holding, or determination of any issue of fact or law except as provided in paragraphs 1-2 (Jurisdiction and Venue), and with the consent of the Parties,

Case 3:19-cv-05081-WHO  Document 142  Filed 01/29/24  Page 267 of 285
Case 1:22-cv-05187-JGK  Document 7  Filed 06/27/22  Page 3 of 19
Case 1:22-cv-05187-JGK  Document 5-1  Filed 06/21/22  Page 4 of 20

IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over the subject matter of this action, pursuant to 28

U.S.C. § 1345, 42 U.S.C. §§ 3612(o)(1), 3614.

2.     For the sole purpose of entering into this Settlement Agreement and enforcement

of this Settlement Agreement, the Parties agree that venue lies in this District pursuant to 28

U.S.C. § 1391.

## DEFINITIONS

3.     The following terms shall have the following meanings in this Settlement

Agreement:

    a.     Ads Library:  An interface that allows users to search and view active

Housing Advertisements by advertiser or by location targeting options selected by the

advertisers.

    b.     Effective Date:  The Effective Date of the Settlement Agreement will be

the date upon which the Settlement Agreement is entered by the Court or an application to enter

the Settlement Agreement is granted, whichever occurs first, as recorded on the Court's docket.

    c.     FHA-Protected Classes:  Race, color, religion, sex, disability, familial

status, and national origin within the meaning of the FHA.

    d.     Meta Platforms:  Facebook, Instagram, and Messenger.

    e.     Housing Advertisement:  An advertisement offering a specific opportunity

to rent, lease, sell, hold, convey, transfer, or buy a residential dwelling, and/or offering a specific

real-estate related transaction such as a residential mortgage, homeowner's insurance, or home

appraisal services within the meaning of the FHA.

     f.     Housing Ad Flows.  Interfaces that advertisers use to create Housing Advertisements for publication on Meta Platforms.

     g.     Special Ad Audience:  A tool in Housing Ad Flows that allows advertisers to create audiences with commonalities to a group of users, such as the advertisers' current customers, visitors to their websites, or people who like their Facebook pages.

## TERM OF AGREEMENT

4.     Initial Term.  If the Parties do not agree on VRS Compliance Metrics under paragraph 10.b., the term of the Settlement Agreement will be from the Effective Date of the Settlement Agreement until December 31, 2022, and, after December 31, 2022, the Settlement Agreement will be null and void and of no force or effect, and the Parties shall be returned to the legal positions they occupied prior to the Effective Date of this Settlement Agreement.

5.     Extended Term.  If the Parties agree on VRS Compliance Metrics under paragraph 10.b., the term of the Settlement Agreement will be extended to four (4) years from the Effective Date of the Settlement, and the Parties will file a joint notice with the Court by December 31, 2022, stating the following: "The Parties reached agreement on VRS Compliance Metrics and therefore the term of the Settlement Agreement will be the Extended Term."

## INJUNCTIVE RELIEF

6.     Meta, its agents, employees, successors, and assigns, and all other persons in active concert or participation with any of them, are hereby enjoined as described below during the Initial Term of the Settlement Agreement, and if the term of the Settlement Agreement is extended, during the Extended Term of the Settlement Agreement.

7.     Publication of Housing Advertisements.  Since December 2019, pursuant to the terms of the Settlement Agreement and Release, entered on March 29, 2019, in *National Fair*

*Housing Alliance, et al. v. Facebook, Inc.*, 18 Civ. 02689 (JGK) (S.D.N.Y.) ("NFHA

Settlement"), Meta has been publishing active Housing Advertisements in the Ads Library,

which allows any person to search and view these Housing Advertisements.

        a.    *Ad Library*. Meta will maintain the practice described in paragraph 7.

        b.    *Notice to Users*. Meta will take reasonable steps to provide notice to users

that active Housing Advertisements are available to search and view through the Ads Library.

    8.    <u>Identification of Housing Advertisements</u>. Pursuant to the NFHA Settlement,

Meta has implemented processes to identify Housing Advertisements, automatically and/or

through human review, prior to the point at which any ads are approved for publication and to

engage in commercially reasonable efforts to improve the accuracy of these processes, including

by analyzing false positives and false negatives. Meta will maintain these practices and, on the

VRS Implementation Date and every four months thereafter, will provide to the Reviewer and

the United States a report with the number of Housing Advertisements sampled, the number of

false positives, and the number of false negatives identified by Meta during the previous four-

month period.

    9.    <u>Ad Targeting Options</u>. Since December 2019, pursuant to the NFHA Settlement,

Meta has limited targeting options available to third-party advertisers in Housing Ad Flows.

        a.    *Limitations*. Under the NFHA Settlement, in Housing Ad Flows, (1) no

targeting options that Meta determines are direct descriptors of, or semantically or conceptually

related to, a person or group of people based on FHA-Protected Classes are available, and (2)

Meta modified the Lookalike Audience tool, which is now called the Special Ad Audience tool.

"Direct descriptors" means targeting options whose names directly describe persons in FHA-

Protected Classes. "Semantically or conceptually related to" means targeting options whose

names appear to be associated with FHA-Protected Classes or persons in FHA-Protected Classes.

      b.    *Targeting Options*.  Meta will maintain the limitations described in paragraph 9.a.  Targeting options that comply with the standards in paragraph 9.a. may be added to the Housing Ad Flows in accordance with the following procedure.  Meta will provide such targeting options to the United States, which will be given thirty (30) days to review and notify Meta of any objections based on the standards in paragraph 9.a. before the targeting options are added to the Housing Ad Flows.  In the event that the Parties cannot reach agreement on whether a targeting option meets the standards in paragraph 9.a., Meta may not add such option without Court approval.

      c.    *Special Ad Audiences*.  By December 31, 2022, Meta will no longer deliver Housing Advertisements that are targeted using the Special Ad Audience tool, and will not make the Special Ad Audience tool or the Lookalike Audience tool available for use in Housing Ad Flows.

    10.    Ad Delivery.  Meta will make changes to delivery processes for Housing Advertisements on Meta Platforms as described below.

      a.    *Variance Reduction System ("VRS")*.  Meta will develop a system to reduce variances in Ad Impressions between Eligible Audiences and Actual Audiences, which the United States alleges are introduced by Meta's ad delivery system, for sex and estimated race/ethnicity.

      i.    "Ad Impressions" are the display of ads on Meta Platforms.

      ii.    "Eligible Audience" is all users who (1) fit targeting options selected by an advertiser for an ad, and (2) received one or more impressions of any type of ad on Meta Platforms during the last thirty (30) days.

6

iii.      "Actual Audience" is all users in an Eligible Audience to whom at least one impression of a Housing Advertisement is displayed.

iv.      To determine the baseline distribution of Ad Impressions for measuring variances between Eligible Audiences and Actual Audiences, each user in an Eligible Audience will be weighted by the total number of impressions for any ads displayed to the user on Meta Platforms in the last thirty (30) days.

v.      Meta has proposed that use of sex and estimated race/ethnicity data for measuring variances will be limited to aggregate measurements and subject to privacy protections to prevent individual identification. For sex, measurements will be based on information reported by users in their profiles. For estimated race/ethnicity, measurements will be based on information estimating race/ethnicity using a privacy-enhanced version of the Bayesian Improved Surname Geocoding ("BISG") methodology. Alternative methods may be used as long as they reasonably enable VRS operation as described in paragraphs 10.a.-10.d.

b.      *VRS Compliance Metrics.* By December 16, 2022, the Parties will meet and confer in good faith in an effort to agree on metrics for how much the VRS will reduce any variances in Ad Impressions between Eligible Audiences and Actual Audiences for sex and estimated race/ethnicity ("VRS Compliance Metrics").

c.      *VRS Development Period.* Every month after the Effective Date until December 16, 2022, the Parties will meet and confer regarding the VRS development during which Meta will provide an update and discuss with the United States the development, testing, and analysis Meta has done over the last thirty (30) days regarding VRS performance under the Earth Mover's Distance ("EMD") or Wasserstein Metric; information regarding how the VRS is performing in terms of reducing variances in Ad Impressions between Eligible Audiences and

7

Actual Audiences for sex and estimated race/ethnicity; the development, testing, and analysis

Meta is planning to do during the next thirty (30) days as it works toward presenting the United

States with proposed compliance metrics for the VRS; and the potential for using confidence-

based or other alternative metrics to measure variances in Ad Impressions between Eligible

Audiences and Actual Audiences for sex and estimated race/ethnicity.

        d.     *VRS Implementation.* If the Parties agree on VRS Compliance Metrics

pursuant to paragraph 10.b., Meta will implement the VRS by December 31, 2022 ("VRS

Implementation Date").

        11.     <u>Advertiser Certification</u>. Since October 2018, Meta has required all persons

placing Housing Advertisements to certify compliance with its policies prohibiting

discrimination and with applicable federal, state, and local anti-discrimination laws. Meta will

continue this practice for the Term of this Settlement Agreement.

        12.     <u>Advertiser Education</u>. Since December 2019, Meta has provided persons placing

Housing Advertisements with enhanced educational content regarding its policies prohibiting

discrimination, applicable anti-discrimination laws, and advertisers' obligations to comply with

these policies and laws when placing Housing Advertisements. Meta will continue this practice

for the Term of this Settlement Agreement.

        13.     <u>Meta Education</u>. Within one year of the Effective Date of this Settlement

Agreement, Meta will provide training on the FHA to the following employee groups: Ads

Leadership Team, Regulated Ads Solutions, Mega-Taxonomy/Content Understanding Team,

Machine Learning Team in BI, Ranking Feature Engineers, Ads Policy, and Advertising Product

Counsel.

        14.     <u>Executive Statement and Notice to Users</u>. Within ten (10) days of the Effective

Case 3:19-cv-05081-WHO   Document 142   Filed 01/29/24   Page 273 of 285
Case 1:22-cv-05187-JGK   Document 7   Filed 06/27/22   Page 9 of 19
Case 1:22-cv-05187-JGK   Document 5-1   Filed 06/21/22   Page 10 of 20

Date of this Agreement, Meta will make a statement to be published on its website where such statements are regularly published, about this Settlement Agreement and the importance of taking steps to prevent unlawful discrimination on internet platforms. As part of the Executive Statement, Meta will include a summary of Meta's obligations under the Settlement Agreement and a link to the Settlement Agreement.

15.      Civil Penalties.  Meta shall pay a civil penalty in the amount of $115,054, pursuant to 42 U.S.C. § 3614(d)(1)(C)(i), according to payment instructions to be provided by undersigned counsel for the United States.

## COMPLIANCE REPORTING AND VERIFICATION

16.      Compliance Reporting.  Meta will prepare a report confirming that it has met the VRS Compliance Metrics for the previous four-month reporting period ("Compliance Report"), four (4) months after the VRS Implementation Date and every four (4) months thereafter during the Term of this Settlement Agreement ("Reporting Period").

17.      Verification By Third-Party Reviewer.  An independent third-party Reviewer will review each Compliance Report and verify compliance with the VRS Compliance Metrics.

18.      Reviewer Selection.  Within forty-five (45) days of the Effective Date, Meta shall propose a Reviewer.  The Reviewer shall be a qualified, objective, independent third-party professional or firm that has, at a minimum, expertise with respect to algorithmic fairness.  If the United States does not consent to the proposed Reviewer, the United States may propose its own candidate as Reviewer and, if the Parties are unable to agree, the Parties shall apply to the Court to select the Reviewer.  The Parties may not propose a Reviewer who has been retained, paid, engaged, or otherwise consulted by the United States or Meta in this matter, and must disclose any other matter for which a proposed Reviewer has been retained, paid, engaged, or otherwise

Case 3:19-cv-05081-WHO   Document 142   Filed 01/29/24   Page 274 of 285
Case 1:22-cv-05187-JGK   Document 5-1   Filed 06/27/22   Page 11 of 20
Case 1:22-cv-05187-JGK   Document 5-1   Filed 06/21/22   Page 11 of 20

consulted by the United States or Meta within the last five (5) years.

19.    Reviewer Fees and Costs.  The Reviewer may retain such employees or contractors as are necessary to complete its duties under this Settlement Agreement to verify compliance with the VRS Compliance Metrics.  Any such employees or contractors shall meet the same independence and disclosure standards as the Reviewer.  Reasonable fees and costs of the Reviewer shall be paid by Meta.

20.    Access to Information.  Meta will provide information to the Reviewer necessary to verify compliance with the VRS Compliance Metrics.  Within thirty (30) days of the VRS Implementation Date, the Reviewer and Meta will meet and confer to discuss what information the Reviewer believes is necessary to verify compliance with the VRS Compliance Metrics. Nothing herein shall limit the Reviewer's ability to request additional information that the Reviewer believes is necessary to verify compliance with the VRS Compliance Metrics after the meet and confer referenced above.  In the event of a dispute between the Reviewer and Meta over whether information requested by the Reviewer is necessary to verify compliance with the VRS Compliance Metrics, the following dispute resolution process will be followed: (a) the Reviewer will provide written notice to the Parties that such a dispute has arisen ("Notice of Dispute"); (b) Meta and the Reviewer will meet and confer and attempt to resolve any issue within ten (10) business days of the Notice of Dispute; (c) in the event Meta and the Reviewer are unable to resolve the dispute, the Parties will confer and attempt to resolve the dispute within twenty (20) business days, including, if necessary, by agreeing to hire an independent third party to resolve the issue, subject to the availability to the United States of appropriated funds; and (d) if the Parties have still not reached agreement, the Parties shall promptly seek relief from the Court.

21.  Protection of Information.  Meta will have the right to take reasonable steps to ensure the privacy and protection of its confidential, privileged, or otherwise proprietary information, including but not limited to user data and Meta's intellectual property and trade secrets.  These steps may include, but are not limited to, requiring the Reviewer to enter into a contractual agreement governing access to and treatment of information provided by Meta, under which Meta will have the right to designate appropriate information provided as confidential, which shall preclude disclosure of such information by the Reviewer to any party other than the United States.  If there is a dispute over the terms of any such contractual agreement, the Parties will follow the same dispute resolution process described in paragraph 20.

22.  Verification and Submission of Compliance Reports.

a.  No later than thirty (30) days before the end of each Reporting Period, Meta will provide a Compliance Report to the United States and the Reviewer and information necessary to verify compliance with the VRS Compliance Metrics to the Reviewer.  Upon request, the Reviewer shall share this information with the United States.

b.  No later than five (5) days before the end of each Reporting Period, the Reviewer will return the Compliance Report to the United States and Meta, either (1) verifying that Meta has met the VRS Compliance Metrics or (2) providing a detailed explanation of why the Reviewer cannot verify compliance with the VRS Compliance Metrics.

c.  If the Reviewer does not verify that Meta has met the VRS Compliance Metrics for any Reporting Period, the Reviewer will work with Meta in good faith to understand and address any failure to comply.  Meta will also submit to the Reviewer and the United States an explanation of the likely cause and remedial steps taken, or to be taken, to meet the VRS Compliance Metrics during the next Reporting Period.  If the cause cannot be fully explained at

11

the time a Compliance Report is due, Meta will submit an amended Compliance Report within

the following thirty (30) days with an explanation of the likely cause and remedial steps taken, or

to be taken, to meet the VRS Compliance Metrics during the next Reporting Period. If the

Reviewer determines that Meta has not met the VRS Compliance Metrics for two consecutive

Reporting Periods, the Parties may invoke the dispute resolution procedures set forth in

paragraphs 25-27 (Dispute Resolution).

## MODIFICATION

23.     In the event that the Parties jointly determine that an amendment to or

modification of this Settlement Agreement is appropriate, the Parties may jointly seek an

amendment to or modification of this Settlement Agreement.

## TERMINATION

24.     If either Party believes that a basis to seek termination of the Settlement

Agreement exists, that Party will notify the other Party and the Parties will meet and confer in

good faith. If the Parties agree that the Settlement Agreement should be terminated, the Parties

will submit, for the Court's approval, a joint stipulation terminating the Settlement Agreement.

If the Parties do not agree that the Settlement Agreement should be terminated, the Parties will

meet and confer in good faith for no less than an additional sixty (60) days before any

application may be submitted by either Party for the Court's approval, seeking to terminate the

Settlement Agreement.

## DISPUTE RESOLUTION

25.     In the event that any disputes arise about the interpretation of or compliance with

this Settlement Agreement, the Parties shall endeavor in good faith to resolve any such disputes

between themselves before bringing such disputes to this Court for resolution.

Case 3:19-cv-05081-WHO   Document 142   Filed 01/29/24   Page 277 of 285
Case 1:22-   187 JGK   Do  ument 7   Filed  6 27 22   Pa  e 13 o 19
Case 1:22-cv-05187-JGK   Document 5-1   Filed 06/21/22   Page 14 of 20

26. If the United States believes that Meta has violated any provision of this Settlement Agreement, it will provide Meta written notice explaining the basis for any alleged violation and allow at least sixty (60) days for the Parties to meet and confer in good faith to attempt to resolve the alleged violation before presenting the matter to this Court.

27. In the event the Parties are not able to resolve any alleged violation of this Settlement Agreement through the meet and confer process, either Party may move this Court to impose any remedy authorized by law or equity.

## EFFECT OF SETTLEMENT

28. As of the VRS Implementation Date, the United States shall be deemed to have fully, finally, and forever released Meta and its affiliates and direct and indirect subsidiaries, as well as their predecessors, successors, heirs, and assigns, and their current or former officers, directors, agents, employees, and representatives, from any and all claims, charges, obligations, rights, demands, liability, action, or cause of action under the FHA arising out of or related to the allegations in the HUD Charge and/or the Complaint, that the United States had or may have had as of the Effective Date, for equitable, declaratory, injunctive, monetary (including monetary damages, restitution, and disgorgement), or any other form of relief, or civil or other penalties.

29. The Parties further agree that, during the Initial Term of this Settlement Agreement, and if the term of the Settlement Agreement is extended, during the Extended Term of the Settlement Agreement, the United States will not initiate any judicial proceeding or other lawsuit against Meta under the FHA arising out of or related to the allegations in the HUD Charge and/or the Complaint. Nothing in this release shall preclude or affect the right of the United States to enforce the provisions of this Settlement Agreement. This Settlement Agreement does not release any claims that may be held or are currently under investigation by

any federal agency against Meta, except for claims released by the United States in paragraph 28.

30.    For the duration of this Settlement Agreement, Meta shall retain all information provided to the Reviewer under paragraph 20 (Access to Information).

31.    This Settlement Agreement shall be binding on Meta, including its officers, employees, agents, assignees, and successors in interest, and all those in active concert or participation with any of them. In the event Meta seeks to transfer or assign all or part of its operations, and the successor or assign intends on carrying on the same or similar use, as a condition of sale, Meta shall obtain the written accession of the successor or assign to any obligations remaining under the Settlement Agreement for its remaining term.

## COSTS

32.    The Parties shall bear their own costs, including attorneys' fees, in this action.

## NOTICES

33.    Unless otherwise specified in this Settlement Agreement, whenever notifications, reports, or communications are required by this Settlement Agreement, they shall be made in writing and addressed as follows:

As to the United States by email: ellen.blain@usdoj.gov; david.kennedy2@usdoj.gov; christine.poscablo@usdoj.gov; sameena.majeed@usdoj.gov; tamar.hagler@usdoj.gov

As to the United States by mail: Chief, Civil Rights Unit, United States Attorney's Office for the Southern District of New York, 86 Chambers Street, 3rd Floor, New York, NY 10007; and Chief, Housing and Civil Enforcement Section, Civil Rights Division, U.S. Department of Justice, 4 Constitution Square, 150 M Street NE, 8th Floor, Washington, DC 20002, Attn: DJ# 175-51-225.

14

As to Meta by email: rring@gibsondunn.com

As to Meta by mail: Rosemarie T. Ring, Gibson, Dunn & Crutcher LLP, 555 Mission Street, San Francisco, CA 94105.

Any Party may, by written notice to the other Party, change its designated notice recipient or notice email or mail address provided above.

## RETENTION OF JURISDICTION

34.   The Court shall retain jurisdiction over this action during the Initial Term of this Settlement Agreement, and if the term of the Settlement Agreement is extended, during the Extended Term of the Settlement Agreement, for the purpose of resolving disputes arising under this Settlement Agreement, entering orders modifying this Settlement Agreement pursuant to paragraph 23 (Modification), enforcing compliance with the terms of this Settlement Agreement, and resolving any collateral attacks or challenges to this Settlement Agreement, including, without limitation, collateral attacks or challenges to the Parties' rights and obligations under this Settlement Agreement and practices relating to the injunctive relief ordered herein.

## SIGNATORIES / SERVICE

35.   Each undersigned representative of Meta and the United States certifies that he or she is fully authorized to enter into this Settlement Agreement and to execute and legally bind the Party he or she represents to this Settlement Agreement.

36.   This Settlement Agreement may be signed in counterparts, and its validity shall not be challenged on that basis.

## INTEGRATION

37.   This Settlement Agreement constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the

15

Case 3:19-cv-05081-WHO   Document 142   Filed 01/29/24   Page 280 of 285
Case 1:22-cv-05187-JGK   Document 7   Filed 6/27/22   Page 16 of 19
Case 1:22-cv-05187-JGK   Document 5-1   Filed 06/21/22   Page 17 of 20

Settlement Agreement and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Settlement Agreement. The Parties understand and agree that this Settlement Agreement contains the entire agreement between them with respect to the settlement embodied in this Settlement Agreement, and that any statements, representations, promises, agreements, or negotiation, whether oral or written, concerning the settlement embodied herein that are not included in this Settlement Agreement shall be of no force or effect.

## FINAL JUDGMENT

38.    Upon approval and entry of this Settlement Agreement by the Court, this Settlement Agreement shall constitute a final judgment of the Court as to the United States and Meta. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

Case 1:22-cv-05187-JGK   Document 57-1   Filed 06/27/22   Page 17 of 19

Dated:      New York, New York
            June 21, 2022

FOR THE UNITED STATES:

KRISTEN CLARKE                          DAMIAN WILLIAMS
Assistant Attorney General              United States Attorney for the
Civil Rights Division                   Southern District of New York

SAMEENA SHINA MAJEED
Chief, Housing and Civil Enforcement
Section                                 By: _____
                                        ELLEN BLAIN
                                        DAVID J. KENNEDY
                                        CHRISTINE S. POSCABLO
                                        Assistant United States Attorneys
_____                 86 Chambers Street, 3rd Floor
R. TAMAR HAGLER                         New York, New York 10007
Deputy Chief                            Tel.: (212) 637-2733
JUNIS L. BALDON                         david.kennedy2@usdoj.gov
HARIN C. SONG
KINARA A. FLAGG
Trial Attorneys
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel.: (202) 353-1339
Fax: (202) 514-1116

FOR META PLATFORMS, INC., f/k/a
FACEBOOK, INC:                          As to Form:

_____                 _____
Natalie Naugle                          Rosemarie T. Ring
Director and Associate General Counsel, GIBSON, DUNN & CRUTCHER LLP
Litigation                              555 Mission Street
META PLATFORMS, INC.                    San Francisco, CA 94105
181 Fremont Street                      Tel.: (415) 393-8247
San Francisco, CA 94105                 rring@gibsondunn.com
nnaugle@fb.com

17

Case 3:19-cv-05081-WHO   Document 142   Filed 01/29/24   Page 282 of 285
Case 1:22-cv-05187-JGK   Document 71   Filed 06/27/22   Page 18 of 20
Case 1:22-cv-05187-JGK   Document 57-1   Filed 06/21/22   Page 19 of 20

Dated:     New York, New York
           June 21, 2022

FOR THE UNITED STATES:

KRISTEN CLARKE                          DAMIAN WILLIAMS
Assistant Attorney General              United States Attorney for the
Civil Rights Division                   Southern District of New York

SAMEENA SHINA MAJEED
Chief, Housing and Civil Enforcement
Section                                 By: _____
                                        ELLEN BLAIN
                                        DAVID J. KENNEDY
                                        CHRISTINE S. POSCABLO
                                        Assistant United States Attorneys
_____        86 Chambers Street, 3rd Floor
R. TAMAR HAGLER                         New York, New York 10007
Deputy Chief                            Tel.: (212) 637-2733
JUNIS L. BALDON                         david.kennedy2@usdoj.gov
HARIN C. SONG
KINARA A. FLAGG
Trial Attorneys
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel.: (202) 353-1339
Fax: (202) 514-1116

FOR META PLATFORMS, INC., f/k/a
FACEBOOK, INC:                          As to Form:

*Natalie Naugle (signature)*            *Rosemarie Ring (signature)*
_____        _____
Natalie Naugle                          Rosemarie T. Ring
Director and Associate General Counsel, GIBSON, DUNN & CRUTCHER LLP
Litigation                              555 Mission Street
META PLATFORMS, INC.                    San Francisco, CA 94105
181 Fremont Street                      Tel.: (415) 393-8247
San Francisco, CA 94105                 rring@gibsondunn.com
nnaugle@fb.com

17

Case 3:19-cv-05081-WHO   Document 142   Filed 01/29/24   Page 283 of 285
Case 1:22    187 JGK   Do ument 7   Filed  6 27 22   Pa e 19 o 19  g
Case 1:22-cv-05187-JGK   Document 5-1   Filed 06/21/22   Page 20 of 20

SO ORDERED:

Dated: New York, New York
          June   26, 2022

HON.
United States District Judge

The Clerk is directed to
close this case.

So ordered.

6/26/22

18

# EXHIBIT 9

# MANTESE HONIGMAN, PC

### ATTORNEYS AND COUNSELORS

**www.manteselaw.com**

| **Metro Detroit Office** | **West Michigan Office** | **New York Office** | **Missouri Office** |
|---|---|---|---|
| 1361 E. Big Beaver Rd. | 125 Ottawa Ave NW, Ste. 268 | 250 East 54th, #25A | 518 S. Hanley Rd. |
| Troy, MI 48083 | Grand Rapids, MI | New York, NY 10022 | Clayton, MO 63105 |
| Ph. 248-457-9200 | Ph. 616-358-4150 | 212-401-4008 | Ph. 314-656-6927 |

| | |
|---|---|
| Gerard V. Mantese**** | Brian P. Markham |
| David M. Honigman | Kristin K. Marschner |
| Ian Williamson | Kristen Y. James* |
| Theresamarie Mantese | Paul J. Tahan** |
| Douglas L. Toering | Nasrin Oveys |
| Terry Milne Osgood | Matthew E. Rose |
| Kathryn R. Eisenstein | Kenneth Chadwell, of Counsel in MI |
| Emily S. Fields | Robert J. Radice, of Counsel in MO |
| Michael S. Butterfield*** | Jack M. Horas, of Counsel in MO |

Gerard V. Mantese                                                    gmantese@manteselaw.com

January 23, 2024

Managing Attorney's Office
Office of the New York State Attorney General
28 Liberty Street, 16th Floor
New York, NY 10005

*VIA CERTIFIED*
*& FIRST CLASS MAIL*

*Re: Notice of Class Action Suit Against Facebook for Housing Discrimination*

Dear Attorney General's Office,

Our firm has filed a putative class action against Facebook for housing discrimination under the federal Fair Housing Act and analogous New York law (including the New York Civil Rights Law) and California law. Under New York law, it appears that we must give your office notice of our claims and we are doing this by sending to you the enclosed proposed Fourth Amended Complaint which includes revised NY statutory claims against Facebook.

Please let me know if you have any questions. If you had a moment to discuss, I would greatly appreciate the opportunity.

Very truly yours,

**MANTESE HONIGMAN, P.C.**

Gerard V. Mantese
248-515-6419

GVM/laj
Enclosures

All attorneys admitted to practice in MI unless otherwise noted
*Admitted to practice in IN only
**Admitted to practice in IL & MO only
***Admitted to practice in MI & MO
**** Admitted to practice in MI, MO, NY & FL

Business Litigation    Business Transactions    Shareholder Litigation    Health Care Law    Real Estate    Intellectual Property Litigation